UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIEL MIDLAND COMPANY,<br><br>       Plaintiff,<br><br>  and<br><br>JOINT STOCK COMPANY APATIT,<br><br>       Plaintiff-Intervenor, and<br>       Consolidated Plaintiff,<br><br>  and<br><br>THE MOSAIC COMPANY,<br><br>       Consolidated Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br>       Defendant,<br><br>  and<br><br>THE MOSAIC COMPANY,<br><br>       Defendant-Intervenor,<br>       and Consolidated<br>       Defendant-Intervenor,<br><br>  and<br><br>JOINT STOCK COMPANY APATIT,<br><br>       Consolidated Defendant-<br>       Intervenors. | Consol. Court No. 23-00239 |

RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF THE
MOSAIC COMPANY

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiff, Defendant-Intervenor, and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully moves for judgment on the administrative record on the issue raised in its Complaint challenging the U.S. Department of Commerce's ("Commerce") final results of the first administrative review of the countervailing duty order on phosphate fertilizers from the Russian Federation. *See Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("Final Results"), and accompanying Issues and Decision Memorandum.

For the reasons set forth in the accompanying memorandum, Commerce's determination is unreasonable, not supported by substantial evidence on the record, and otherwise not in accordance with law. Accordingly, Mosaic respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court; and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: June 5, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| **ARCHER DANIEL MIDLAND COMPANY,** | |
| **Plaintiff,** | |
| **and** | |
| **JOINT STOCK COMPANY APATIT,** | |
| **Plaintiff-Intervenor, and Consolidated Plaintiff,** | |
| **and** | |
| **THE MOSAIC COMPANY,** | |
| **Consolidated Plaintiff,** | |
| **v.** | **Consol. Court No. 23-00239** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **THE MOSAIC COMPANY,** | |
| **Defendant-Intervenor, and Consolidated Defendant-Intervenor,** | |
| **and** | |
| **JOINT STOCK COMPANY APATIT,** | |
| **Consolidated Defendant-Intervenors.** | |

**<u>ORDER</u>**

Upon consideration of Consolidated Plaintiff, Defendant-Intervenor, and Consolidated Defendant-Intervenor The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and the Memorandum in Support of The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Mosaic's motion is granted; it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce") in *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

**SO ORDERED.**

 

 

 

_____
Jane A. Restani, Judge

 

 

Dated: _____
      New York, New York

2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIEL MIDLAND COMPANY,<br><br>               Plaintiff,<br><br>   and<br><br>JOINT STOCK COMPANY APATIT,<br><br>               Plaintiff-Intervenor, and<br>               Consolidated Plaintiff,<br><br>   and<br><br>THE MOSAIC COMPANY,<br><br>               Consolidated Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br>               Defendant,<br><br>   and<br><br>THE MOSAIC COMPANY,<br><br>               Defendant-Intervenor,<br>               and Consolidated<br>               Defendant-Intervenor,<br><br>   and<br><br>JOINT STOCK COMPANY APATIT,<br><br>               Consolidated Defendant-<br>               Intervenors. | Consol. Court No. 23-00239 |

**MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF, DEFENDANT-INTERVENOR, AND CONSOLIDATED DEFENDANT-INTERVENOR THE MOSAIC COMPANY'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for The Mosaic Company*

Dated: June 5, 2024

2

Consol. Court No. 23-00239

<u>**TABLE OF CONTENTS**</u>

I.   INTRODUCTION ................................................................................................ 1

II.  RULE 56.2 STATEMENT ................................................................................... 1

    A. Administrative Decision Under Review ....................................................... 1

    B. Issues Presented and Summary of Arguments ............................................. 1

III. STATEMENT OF FACTS .................................................................................. 2

    A. The Preliminary Phase of Commerce's Administrative Review ................... 2

    B. Commerce's Preliminary Results ................................................................. 4

    C. Commerce's Final Results ............................................................................ 8

IV. STANDARD OF REVIEW ............................................................................... 10

V.  ARGUMENT ..................................................................................................... 11

    A. Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance With Law ........................... 11

        1. Commerce's Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services .............................................. 12

        2. The Kazakh Export Prices Sourced from BNS Are Not World Market Prices That Would Be Available to Purchasers in Russia Within the Meaning of 19 C.F.R. § 351.511(a)(2)(ii) ....................... 13

        3. The Kazakh Export Prices Sourced from BNS Are Not Suitable as a Tier Two Benchmark Because All Kazakh Gas Prices Are Distorted by Government Involvement in the Market ....................... 19

VI. CONCLUSION .................................................................................................. 21

Consol. Court No. 23-00239

**<u>TABLE OF AUTHORITIES</u>**

**Statues, Rules, and Regulations**

19 C.F.R. § 351.505(a)(1) .................................................................................16

19 C.F.R. §§ 351.511 ................................................................................. *passim*

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................10

19 U.S.C. § 1677 ....................................................................................12, 13, 16

Administrative Procedure Act.............................................................................11

Tariff Act of 1930 .........................................................................12, 13, 15, 16

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*, 26 C.I.T. 892 (CIT 2002).....................................10

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................11

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...............................................11

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) .......................................................................................11

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ....................................10, 15

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343 (CIT 2019).....................11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................................................................................11

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .............................12, 15

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002).........................................11

*Rust v. Sullivan*, 500 U.S. 173 (1991)...........................................................................................11

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996).............................................11

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................................................10

*Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011)...........................................11

Consol. Court No. 23-00239

**Administrative Determinations**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 87 Fed. Reg. 19,075 (Dep't Commerce Apr. 1, 2022)....................................2

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug. 9, 2022), and accompanying Issues and Decision Memorandum...........................................19

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Dep't Commerce Aug. 9, 2018), and accompanying Issues and Decision Memorandum ...........................................................................................19

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ................. *passim*

*Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) ................................................17

*Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 37,828 (Dep't Commerce June 24, 2022) ................................................17

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165, 35,174 (Dep't Commerce June 9, 2022) ................................................2

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ...............................................1, 2

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ................................................1, 9, 12

*Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023), and accompanying Preliminary Decision Memorandum ................................................. *passim*

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020)........................................................21

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2016*, 83 Fed. Reg. 63,472 (Dec. 10, 2018)............................................21

Consol. Court No. 23-00239

I.    **<u>INTRODUCTION</u>**

On behalf of Consolidated Plaintiff, Defendant-Intervenor, and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic"), we submit this brief in support of Mosaic's Rule 56.2 motion for judgment on the agency record.

II.    **<u>RULE 56.2 STATEMENT</u>**

A.    **Administrative Decision Under Review**

Mosaic challenges certain aspects of the final determination by the U.S. Department of Commerce ("Commerce") in the administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from the Russian Federation ("Russia") for the period November 30, 2020 to December 31, 2021.  The final results were published in the Federal Register on November 6, 2023.  *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("Final Results"), and accompanying Issues and Decision Memorandum, P.R. No. 242, ECF No. 5 ("IDM").

B.    **Issues Presented and Summary of Arguments**

1.    **Whether Commerce's selection of Kazakh export prices to measure the adequacy of remuneration for natural gas is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.**

Yes.  Commerce's selection of Kazakh export prices as a tier two benchmark for the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") program was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law. Commerce's finding that Kazakh export prices are "available to" purchasers in Russia, and therefore that such prices may serve as a viable tier two benchmark, is inconsistent with its regulations and not supported by the record evidence.  Further, Commerce failed to meaningfully

1

Consol. Court No. 23-00239

address Mosaic's arguments that the Government of Kazakhstan's ("GOK") involvement in the

market distorts Kazakh export prices, rendering them unusable as a tier two benchmark.

## III.    STATEMENT OF FACTS

### A.    The Preliminary Phase of Commerce's Administrative Review

On April 7, 2021, Commerce published a CVD order on phosphate fertilizers from

Russia. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation:*

*Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) (the "Order").

On April 1, 2022, Commerce published a notice of opportunity to request an administrative

review of the Order. *See Antidumping or Countervailing Duty Order, Finding, or Suspended*

*Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service*

*List*, 87 Fed. Reg. 19,075 (Dep't Commerce Apr. 1, 2022).  On April 29, 2022, PhosAgro Public

Joint Stock Company, its wholly owned subsidiary Joint Stock Company Apatit (collectively,

"JSC Apatit"), and Industrial Group Phosphorite LLC ("EuroChem"), submitted requests for

administrative review.  Letter from Hogan Lovells LLP, re: "Request for Review – 2020-2021

Countervailing Duty Review Period" (Apr. 29, 2022), P.R. No. 2; Letter from Squire Patton

Boggs, re: "Request for Administrative Review" (Apr. 29, 2022), P.R. No. 1.  On May 2, 2022,

Mosaic submitted a timely request that Commerce conduct an administrative review with respect

to JSC Apatit and EuroChem and their affiliates.  Letter from Wilmer Cutler Pickering Hale and

Dorr LLP, re: "Phosphate Fertilizers From Russia: Request for Countervailing Duty

Administrative Review" (May 2, 2022), P.R. No. 3.

On June 9, 2022, Commerce initiated a countervailing duty administrative review of the

Order for JSC Apatit and EuroChem for the period of review ("POR") November 30, 2020,

through December 31, 2021. *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 87 Fed. Reg. 35,165, 35,174 (Dep't Commerce June 9, 2022).  Commerce selected JSC

2

Consol. Court No. 23-00239

Apatit for individual examination and eventually rescinded the review with respect to

EuroChem. *See Phosphate Fertilizers From the Russian Federation: Preliminary Results and*

*Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg.

28,505 (Dep't Commerce May 4, 2023), P.R. No. 191 ("Preliminary Results"), and

accompanying Preliminary Decision Memorandum at 1, P.R. No. 188 ("PDM").

The GOR and JSC Apatit submitted responses to the initial countervailing duty

questionnaire on September 13, 2022 and September 23, 2022, respectively.  Response from

Ministry of Economic Development of the Russian Federation, IQR – Cover Ltr. & Narrative

(Sept. 13, 2022), P.R. No. 38, C.R. No. 5; Response from Hogan Lovells LLP, JSC Apatit Sec III

QR - Narrative (Sept. 23, 2022), P.R. No. 60, C.R. No. 31 ("JSC Apatit IQR").  In its initial

questionnaire response ("IQR"), JSC Apatit confirmed it purchased natural gas from Gazprom, a

Russian governmental entity that controls the Russian gas pipeline system.  JSC Apatit IQR at

37-39, P.R. No. 60, C.R. No. 31; *id.*, Exhibits 36, 37, P.R. No. 83, C.R. No. 77.

Commerce issued supplemental questionnaires to the respondents between February 13,

2023 and March 28, 2023, and the respondents submitted responses to these supplemental

questionnaires between March 1, 2023 and April 7, 2023.  *See* Response from Hogan Lovells

LLP, JSC Apatit Affiliation & Sec III Suppl QR – Questions 1-6 (Mar. 1, 2023), P.R. No. 124,

C.R. No. 168; Response from Hogan Lovells LLP, JSC Apatit Affiliation & Sec III Suppl QR,

Questions 7-24 (Mar. 9, 2023), P.R. No. 128, C.R. No. 170; Response from Ministry of

Economic Development of the Russian Federation, GOR Suppl QR - Narrative (Mar. 10, 2023),

P.R. No. 129, C.R. No. 175; Response from Hogan Lovells LLP, re: "Countervailing Duty

Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Response to Second

Consol. Court No. 23-00239

Supplemental Questionnaire" (Mar. 23, 2023); Response from Hogan Lovells LLP, JSC Apatit 3rd Suppl QR (Apr. 7, 2023), P.R. No. 180, C.R. No. 208.

      Mosaic submitted all necessary information for Commerce to calculate benchmarks for the natural gas for LTAR program.  This included 2021 export volume and value data for harmonized tariff schedule ("HTS") headings 2510.10 and 2510.20 sourced from the International Energy Agency ("IEA"), European OECD natural gas price data for industrial purposes retrieved from the IEA's database of energy prices and taxes for OECD countries, and information from the IEA on energy conversion ratios for natural gas.  *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP, Petitioner Benchmark – Part 5 (Mar. 15, 2023) ("Mosaic Benchmark Submission"), Exhibits 31-34, P.R. No. 136.  JSC Apatit submitted Kazakh natural gas export prices under customs classification code 2711.21.000 sourced from the Bureau of Natural Statistics ("BNS") of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan.  Letter from Hogan Lovells, JSC Apatit Benchmark – Appendix 1 (Mar. 15, 2023) ("JSC Apatit Benchmark Submission") at Appendix 1, P.R. No. 143, C.R. No. 179.

      **B.**    **Commerce's Preliminary Results**

      Commerce issued the *Preliminary Results* on April 27, 2023.  *Preliminary Results*, 88 Fed. Reg. at 28,506.  Commerce preliminarily determined that six Russian subsidy programs were countervailable during the POR, including the Provision of Natural Gas for LTAR program, and calculated a preliminary *ad valorem* subsidy rate of 53.29 percent for JSC Apatit. *See id.*; PDM at 9.  Regarding the Provision of Natural Gas for LTAR program in particular, Commerce had previously found the program to be countervailable in the investigation, and Commerce found that the GOR did not submit any new information in this review to warrant reconsideration of its prior determination.  PDM at 13.  Accordingly, Commerce preliminary

Consol. Court No. 23-00239

determined that Gazprom's sales of natural gas to JSC Apatit conferred a financial contribution and that the program is *de facto* specific. *See id.* at 7, 13-18.

To assess the adequacy of remuneration that JSC Apatit paid for natural gas provided by the GOR, and thereby calculate the amount of benefit conferred under this program, Commerce applied the hierarchy for selecting a benchmark under 19 C.F.R. § 351.511(a)(2). PDM at 14. Consistent with its findings in the investigation, Commerce preliminarily determined that there were no suitable tier one benchmarks (*i.e.*, in-country prices) because the GOR's predominant role in the Russian market for natural gas during the POR distorted the market. PDM at 15. Commerce then evaluated whether there were viable tier two benchmarks on the record, pursuant to 19 C.F.R. § 351.511(a)(2)(ii), namely a "world market price where it is reasonable to conclude that such price is available to purchasers in the country in question." PDM at 16.

Commerce stated that the record contained the following world market natural gas pricing data: OECD natural gas prices for Europe, and corresponding taxes, sourced from the IEA, which Mosaic had submitted; and Kazakh natural gas export prices under customs classification code 2711.21.0000 sourced from BNS, which JSC Apatit had submitted. *Id.* Commerce focused its analysis of potential benchmarks on the existence of natural gas pipelines through which gas could be exported to Russia. Commerce stated that it had found in other proceedings that the natural gas pipelines connecting Europe and Russia are not bi-directional and are not fitted with the necessary compressors to allow the inflow of gas from Europe into Russia. *Id.* at 16-17. On this basis, Commerce further stated that it continued to find that natural gas from Europe would not be available to purchasers in Russia, and thus that the European export prices reflected in the IEA data were not viable tier two world market prices. *Id.* at 17.

Consol. Court No. 23-00239

Commerce also preliminarily found, however, that natural gas exported from Kazakhstan was available to purchasers in Russia during the POR. In support of this finding, Commerce cited export statistics from BNS that showed that Kazakhstan exported natural gas to Russia during the POR, and customs data from the Russian Federal Customs Service that showed that Russia imported natural gas from Kazakhstan during the POR under HTS code 2711.21.0000. Commerce also stated that evidence from Kazakh natural gas producer Karachaganak Petroleum Operating BV ("KPO") indicated that KPO sold natural gas to Gazprom's Orenburg Gas Processing Plant in Russia in 2021 using the Karachaganak Orenburg Transportation System pipeline, which connects to and terminates in Russia. *Id.* On the basis of this information, Commerce preliminarily concluded that natural gas exported from Kazakhstan was available to purchasers in Russia, and therefore that Kazakh export prices for natural gas were usable as a tier two benchmark. *Id.*

In its pre-preliminary calculations memorandum, Commerce stated that it removed Kazakhstan's exports to Russia from the data in accordance with 19 C.F.R. § 351.511(a)(2)(ii), and it excluded Kazakhstan's exports to the People's Republic of China (China) from the benchmark calculations, as Commerce has previously determined as adverse facts available that China's domestic natural gas market is distorted. *See* Memo from USDOC to File, Prelim Calcs Memo - JSCA at 6-7 (Apr. 27, 2023), P.R. No. 189, C.R. No. 218 ("JSC Apatit Prelim. Calc. Mem."). Commerce then calculated an annual average of the remaining Kazakh export prices, which it compared to the prices that JSC Apatit paid for its natural gas purchases during the POR, including taxes and delivery charges. PDM at 18. Where the benchmark unit price was greater than the price paid to the GOR authorities, Commerce multiplied the difference by the quantity of natural gas purchased to arrive at the benefit. *Id.* Commerce then added the benefits

Consol. Court No. 23-00239

from JSC Apatit's purchases of natural gas from Gazprom and divided the amount by JSC

Apatit's total POR sales to calculate a subsidy rate of 0.99 percent *ad valorem* for this program.

JSC Apatit Prelim. Calc. Mem. at 7, P.R. No. 189, C.R. No. 218; PDM at 18.

Mosaic, JSC Apatit, and ADM timely filed case briefs and rebuttal briefs on June 12,

2023, and July 5, 2023, respectively.  *See* IDM at 3.  Mosaic argued in its case brief that

Commerce erred in preliminarily selecting a tier two benchmark composed of Kazakh export

prices.  *See* Brief from Wilmer Cutler Pickering Hale and Dorr LLP, Petitioner Case Brief at 2-

11 (June 12, 2023), P.R. No. 207, C.R. No. 221 ("Mosaic Case Br.").  In particular, Mosaic

argued that the record evidence showed that Kazakh natural gas data are not suitable as a tier two

benchmark because Russian purchasers do not have access to a world market price for processed

Kazakh natural gas comparable to the gas that the GOR provided for LTAR.  *Id.* at 2, 5-8.  For

example, Mosaic noted that the record evidence showed that the customs classification

subheading that Commerce cited in support of the preliminary results, 2711.21.0000, covers

"Natural gas (*excluding as sold to the population*)."  *Id.* at 6.  In other words, if natural gas

imported into Russia is classified under HTS subheading 2711.21.0000, then the natural gas in

question – by definition – is not available to purchasers in Russia and cannot serve as the basis

for a tier two benchmark.  *Id.*

Mosaic also argued that Gazprom is the only importer of natural gas from Kazakhstan.

Mosaic stated that, contrary to the Department's preliminary finding, the record evidence showed

that the majority of the gas that KPO sold to Gazprom consisted of "raw (high-sulfur)" gas,

which is a different product than the natural gas the GOR provided to JSC Apatit.  *Id.* at 6.  The

record evidence also showed that this gas – a biproduct of oil production from Kazakhstan's

Karachaganak field – is sent from Kazakhstan to Gazprom's Orenburg Gas Processing Plant in

Consol. Court No. 23-00239

Russia for processing, pursuant to an arrangement between Gazprom and KazRosGas ("KRG"), and that after Gazprom processes this gas, Gazprom re-exports finished gas derived from the Kazakh raw gas back to Kazakhstan. *Id.* at 6-7.

Mosaic also argued that the record evidence did not support findings that raw Kazakh gas, or any other Kazakh gas imported into Russia, is available to Russian purchasers at a world market price, rather than at a GOR-determined price. To the contrary, the record evidence showed that, to the extent that any finished Kazakh gas remained in Russia after processing, it consisted of a product processed and sold by Gazprom – *i.e.*, by the GOR – rather than a non-Russian product traded on the world market. *Id.* at 7. Thus, there was no evidence that export prices for processed Kazakh gas were "available to" purchasers in Russia during the POR.

Finally, Mosaic argued that, in addition to the fact that Kazakh natural gas is not "available" to Russian purchasers, the BNS data were not usable as a tier two benchmark because the GOK's significant involvement in the Kazakh natural gas market distorts all Kazakh gas prices, including both domestic and export prices. The record evidence showed that Kazakh exports of gas to Russia represented the transfer from one government-distorted market to another, rather than the availability of a market-determined price to Russian purchasers. *Id.* at 8-10. Thus, Mosaic argued that Commerce should instead rely on the European OECD natural gas prices sourced from the IEA to construct a tier three benchmark of natural gas prices in Russia, consistent with its approach in the investigation. *Id.* at 10-11.

### C.    Commerce's Final Results

Commerce issued the Final Results on October 31, 2023. *Final Results*, 88 Fed. Reg. 76,182. In the Final Results, Commerce continued to find that export prices for Kazakh-origin natural gas are "available to" purchasers in Russia and, therefore, that Kazakh export prices to "non-distorted, non-Russian" countries could serve as a tier two benchmark under 19 C.F.R. §

Consol. Court No. 23-00239

351.511(a)(2)(ii). IDM at 46. To support its determination, Commerce asserted that record information indicated that there were Russian imports of natural gas from Kazakhstan under customs code 2711210000; that Kazakh export statistics showed exports of Kazakh natural gas to Russia during the POR; and that Kazakh natural gas producer KPO stated that it sold natural gas to the Orenburg Gas Processing Plant using the Karachaganak Orenburg pipeline. *Id.* Commerce also stated that, "{i}n prior cases, . . . the GOR has confirmed that imports under this customs code (2711210000) are placed under a customs procedure of a release into free circulation." *Id.*

Although Commerce noted Mosaic's argument that customs code 2711.21.0000 only covers imports of natural gas "excluding as sold to the population," it asserted that there was "no language in the regulation or discussion in the *CVD Preamble*" indicating that "available" must be interpreted as available to private entities or consumers (including, by implication, the purchaser under investigation). IDM at 47. In particular, Commerce found that Kazakh-origin natural gas was available to (and purchased by) the Orenburg Gas Processing Plant, which is owned by Gazprom, a GOR authority. *Id.* at 48.

In addition, Commerce dismissed Mosaic's argument that the "raw (high-sulfur)" gas that KPO sold to Gazprom's Orenburg facility was not comparable to the natural gas that Gazprom sold to JSC Apatit because:

> {w}hile the provided information purportedly demonstrates differences affecting comparability and a comparison between the 'raw' gas delivered to Orenburg and the natural gas under consideration, we are not using exports to Russia as the benchmark for the provision of natural gas. Rather, as discussed above, we are using exports to other markets and the petitioner's argument does not speak to the primary issue of availability. Rather, the record information continues to indicate that natural gas would be available to Russian purchasers, pursuant to 19 CFR 351.511(a)(2).

Consol. Court No. 23-00239

*Id*. at 48.  Apart from this conclusory statement, however, Commerce did not explain why the

fact that the raw gas that KPO sent to Gazprom for processing is a different product than the

natural gas that Gazprom sold to JSC Apatit "does not speak to the primary issue of availability."

Finally, Commerce found that market distortions in the Kazakh domestic market for

natural gas should have "no bearing" on Commerce's ability to use Kazakh export prices as a tier

two benchmark.  *Id.* at 48.  Because Commerce found the Kazakh data were a viable tier two

benchmark, Commerce stated that it was not necessary to consider the IEA industry natural gas

prices that Mosaic had submitted as a tier three benchmark.  *Id.* at 49.

## IV.  <u>STANDARD OF REVIEW</u>

In reviewing Commerce's CVD determinations, the Court will hold unlawful any

determination, finding, or conclusion found "to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial

evidence means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 C.I.T. 892, 893 (2002)

(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account

"whatever in the record fairly detracts" from the weight of supportive evidence.  *CS Wind Viet.*

*Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The substantial evidence standard

also requires the agency to "examine the relevant data and articulate a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made.'"

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Court of Appeals for the Federal Circuit has explained that this standard of review

encompasses the "arbitrary and capricious" standard established under the Administrative

Procedure Act.  *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367,

Consol. Court No. 23-00239

1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42). Failure to consider "an important aspect of the problem" similarly renders a determination by an agency arbitrary. *State Farm*, 463 U.S. at 43. Agency determinations that ignore relevant statutory or regulatory language, or interpret that language contrary to its plain meaning, are also not in accordance with law. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408, 437 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011).

Finally, Commerce is required by law to provide in the final determination "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). Failure to do so renders a CVD determination unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

## V.    ARGUMENT

### A.    Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance With Law

In the Final Results, Commerce correctly determined that the GOR provided a countervailable subsidy to JSC Apatit during the POR in the form of natural gas for LTAR. Commerce erred, however, by using Kazakh export prices sourced from BNS as a "tier two" benchmark to measure the benefit that the subsidy conferred on JSC Apatit, given record

11

Consol. Court No. 23-00239

evidence demonstrating that Kazakh natural gas prices were not "available" to purchasers in Russia within the meaning of Commerce's regulations. Instead of the BNS prices, Commerce should have used OECD prices sourced from the IEA as a tier three benchmark, as it did in the original investigation. Commerce's selection of a benchmark for natural gas was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.

### 1.    Commerce's Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services

Section 771(5)(B) of the Tariff Act states that a subsidy exists within the meaning of the Act if, *inter alia*, an authority "provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Section 771(5)(D) of the Act includes the provision of goods and services among the government actions that fall within the definition of the term "financial contribution." Section 771(5)(E) of the Act, in turn, addresses the issue of "benefit." It states that "{a} benefit shall normally be treated as conferred where there is a *benefit to the recipient*, including . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration . . . ." 19 U.S.C. § 1677(5)(E) (emphasis added).[1]

Section 351.511(a)(2) of Commerce's regulations sets out the three-tier hierarchy that Commerce uses to select benchmarks to measure the adequacy of remuneration paid for goods or services. 19 C.F.R. § 351.511(a)(2). First, under tier one, Commerce seeks to measure the adequacy of remuneration by comparing the government price to a market-determined price for

---

[1]  Section 771(5)(E) further states that:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E).

Consol. Court No. 23-00239

the good or service resulting from actual transactions in the country in question.  19 C.F.R. §

351.511(a)(2)(i).  Next, if there is no useable market-determined price, then under tier two

Commerce seeks to measure the adequacy of remuneration by comparing the government price

to a "world market price where it is reasonable to conclude that such price would be available to

purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  Finally, if there is no

world market price available to purchasers in the country in question, then under tier three

Commerce normally measures the adequacy of remuneration "by assessing whether the

government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

     The *Preamble* to Commerce's regulations provides guidance on Commerce's application

of its three-tier methodology.  For example, with respect to tier two, the *Preamble* states:

> Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices
> stemming from *actual* transactions, we will turn to world market prices that *would be*
> *available* to the purchaser.  We will consider whether market conditions are such that the
> purchaser could obtain the good or service on the world market.  For example, a
> European price for electricity normally would not be an acceptable comparison price for
> electricity provided by a Latin American government, because electricity from Europe in
> all likelihood would not be available to consumers in Latin America. . . .

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998)

("*Preamble*") (emphasis in original).  Similarly, with respect to tier three, the *Preamble* states

that "in situations where the government is clearly the only source available to consumers in the

country, we normally will assess whether the government price was established in accordance

with market principles. . . ." *Id.*

     **2.**     **The Kazakh Export Prices Sourced from BNS Are Not World Market**
              **Prices That Would Be Available to Purchasers in Russia Within the**
              **Meaning of 19 C.F.R. § 351.511(a)(2)(ii)**

     Commerce's determination that Kazakh export prices are available to purchasers in

Russia within the meaning of section 351.511(a)(2)(ii) of its regulations – and thus that such

prices are suitable as a tier two benchmark for measuring the adequacy of the remuneration that

Consol. Court No. 23-00239

JSC Apatit paid for the natural gas it purchased from Gazprom – is unreasonable, not supported

by substantial evidence, and otherwise not in accordance with law.  Commerce's arguments in

defense of its determination rely on misinterpretations of section 351.511(a)(2)(ii) and the record

evidence, and the Court should reject them.

       As an initial matter, Commerce based its determination in part on the fact that BNS data

showed exports of natural gas from Kazakhstan to Russia under GOR customs code

2711210000, and it stated that, "{i}n prior cases, . . . the GOR has confirmed that imports under

this customs code (2711210000) are placed under a customs procedure of a release into free

circulation."  IDM at 46.  However, there is no evidence on the record that includes this alleged

GOR "confirmation."  Therefore, it cannot constitute evidence in support of Commerce's

determination.

       Further, in relying on this non-record evidence to defend its determination, Commerce

improperly disregarded contrary evidence that is on the record – namely, evidence from Russia's

World Trade Organization Accession Protocol showing that GOR customs code 2711210000

covers "Natural gas (*excluding as sold to the population*)."  Letter from Wilmer Cutler Pickering

Hale and Dorr LLP, Mosaic Benchmark Rebuttal – Ex 9-17, Exhibit 12 at 13 (Mar. 27, 2023),

P.R. No. 165 ("Mosaic Benchmark Rebuttal Submission") (emphasis added).  In other words, the

record evidence indicates that imports under GOR customs code 2711210000 are for natural gas

that – by definition – is *not sold to the population* in Russia.  Thus, it is not reasonable to

conclude that such imports would be "available to purchasers" in Russia within the meaning of

section 351.511(a)(2)(ii).  Commerce unlawfully disregarded this contrary evidence and failed to

meaningfully address Mosaic's arguments, rendering its determination unsupported by

Consol. Court No. 23-00239

substantial evidence and otherwise not in accordance with law. *See CS Wind*, 832 F.3d at 1373; *NMB Sing. Ltd.*, 557 F.3d at 1320.

Commerce does not contest the accuracy of Mosaic's description of GOR customs code 2711210000. *See* IDM at 47-48. Instead, it argues that "there is no language in the regulation or discussion in the *CVD Preamble* indicating that 'available' must be interpreted as available to private entities, nor is there text equating 'available' to prices that are available to 'consumers.'" IDM at 47. But Commerce's interpretation is wrong – both as a factual matter, and in light of the purpose of Commerce's calculations under section 771(5)(E) of the Act and section 351.511(a)(2) of Commerce's regulations.

*First*, Commerce's interpretation is wrong as a factual matter because Commerce's *Preamble* does in fact equate prices that are "available" to purchasers in the subject country with prices that are available to consumers. As noted above, for example, the *Preamble* specifically states that Commerce would not normally use a European price for electricity as a comparison price for electricity provided by a Latin American government "because electricity from Europe in all likelihood would not be available to *consumers* in Latin America." 63 Fed. Reg. at 65,377 (emphasis added). Similarly, the *Preamble* states that Commerce will resort to tier three of its methodology "in situations where the government is clearly the only source available to *consumers* in the country . . . ." *Id*. (emphasis added).

*Second*, Commerce's interpretation is contrary to the purpose of its calculations under section 771(5)(E) of the Act and section § 351.511(a)(2) of its regulations because the entire point of Commerce's subsidy calculations is to determine whether a given financial contribution provides a "benefit to the recipient" of the contribution. 19 U.S.C. § 1677(5)(E). In the context of the provision of goods and services for LTAR, Commerce performs its calculation by

15

Consol. Court No. 23-00239

comparing the price that the respondent paid to the government supplier of the relevant good or service to a market-determined price for the same good or service. *See* 19 C.F.R. §§ 351.511(a)(1), (a)(2). Consistent with Commerce's statement in the *Preamble*, if it is not reasonable to conclude that a given price would have been available to *consumers* of the good or service (such as the respondent), then the price is not probative for measuring the "benefit to the recipient," and thus is not suitable for use as a tier two benchmark.[2]

Furthermore, Commerce's assertion that its "practice belies the petitioner's proposed interpretation" of section 351.511(a)(2)(ii) is without merit. See IDM at 47-48. Specifically, Commerce cites its determination in *Utility Scale Wind Towers* as an example of a proceeding where it incorporated pricing information from countries into a tier two benchmark "even where the record lacks evidence that the countries exported the LTAR input to the country in question." *Id.* This alleged practice appears contrary to the text of Commerce's regulation, which states that a tier two benchmark is usable only if it is "reasonable to conclude that such price *would be available* to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii) (emphasis added). Further, Commerce has not applied this alleged practice consistently. In cases involving the provision of natural gas for LTAR and other goods such as electricity, Commerce has only found export prices to be "available to" purchasers in the subject country, and thus usable as a tier two benchmark, where the exporting and subject country are physically connected via pipeline or transmission line. *See Urea Ammonium Nitrate Solutions From the Republic of Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 37,828 (Dep't Commerce June 24, 2022), and accompanying Issues and Decisions Memorandum

---

[2] Other aspects of Commerce's regulations also support this interpretation. For example, Commerce's regulations state that in the case of a loan, a benefit exists "to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) *that the firm could actually obtain on the market*." 19 C.F.R. § 351.505(a)(1) (emphasis added).

Consol. Court No. 23-00239

at 4-8; *Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015), and accompanying Issues and Decisions Memorandum at 41-48.[3]  Moreover, even if this alleged "practice" existed and were reasonable – which Mosaic does not concede – it is not relevant to the interpretation of the term "purchasers" in section 351.511(a)(2), which is the key question here.

In the review at issue in this case, Commerce found that the Kazakh natural gas was "available to" and "purchased by" the Orenburg Gas Processing Plant.  IDM at 48.  As Mosaic argued to Commerce, however, the Orenburg Gas Processing Plant is not a consumer of natural gas within the meaning of section 351.511(a)(2).  Mosaic Case Br. at 6-7.  Rather, as its name indicates, the Orenburg facility – which is owned by Gazprom – is a producer and processor of natural gas.  Thus, even if Kazakh natural gas was "available to" and "purchased by" Gazprom's Orenburg Gas Processing Plant, this does not constitute substantial evidence that Kazakh natural gas was "available" to consumers in Russia, such that the prices for the Kazakh gas would be suitable for use as a tier two benchmark under Commerce's regulation.

*Third*, Commerce cited the fact that there is a trunk gas pipeline between Kazakhstan and Russia that terminates at Gazprom's Orenburg Gas Processing plant in Russia, and that Kazakh natural gas producer KPO stated that it sold natural gas to Gazprom's Orenburg facility in 2021.  IDM at 48.  However, the record shows that the Kazakh natural gas that KPO sent to the Orenburg Gas Processing Plant consisted of "raw (high-sulfur)" gas that it exported pursuant to a tolling arrangement between Gazprom and KazRosGas ("KRG").  Mosaic Benchmark Rebuttal Submission, Exhibit 8 at 118, 122, 132, P.R. Nos. 163-164.  After Gazprom processes this gas,

---

[3] Commerce's assertion is also inconsistent with the statement in the *Preamble* that European electricity prices normally would not be an acceptable comparison for electricity provided by a Latin American government "because electricity from Europe in all likelihood would not be available to consumers in Latin America."  Preamble, 63 Fed. Reg. at 65,377.

Consol. Court No. 23-00239

the finished gas is primarily re-exported back to Kazakhstan. *See id.* It is not reasonable for Commerce to assume, without any supporting evidence, that raw gas that a Gazprom-owned entity imports pursuant to a tolling arrangement with KRG would be available to any purchasers in Russia other than Gazprom. For this reason as well, it is unreasonable for Commerce to use the prices for such gas as a tier two benchmark for the natural gas that JSC Apatit purchased from Gazprom.[4]

Finally, Commerce stated that "there is no language in the regulation or discussion in the *CVD Preamble* indicating that 'available' must be interpreted as available to private entities . . ." IDM at 47. However, Commerce ignores the plain language in section 351.511(a)(2)(ii) that a tier two benchmark is a world "market price" that would be "available to" purchasers in the country in question. *See* 19 C.F.R. § 351.511(a)(2)(ii). This language mirrors the wording of section 351.511(a)(2)(i), which states that Commerce will normally seek to measure the adequacy of remuneration by reference to a "market-determined" price. *See* 19 C.F.R. § 351.511(a)(2)(i). Any price that is set by a governmental entity is, by definition, not a market-determined price.[5] Commerce correctly rejected respondents' arguments that Russian domestic prices are usable as a tier one benchmark because of the GOR's interference in the Russian gas market and Gazprom's control of the Russian gas distribution network. *See* PDM at 15-17; IDM at 46-49. It was arbitrary and capricious for Commerce to then find that Kazakh export prices –

---

[4] Commerce seeks to dismiss the relevance of the differences between the raw gas exported to the Orenburg Gas Processing plant and the processed natural gas that JSC Apatit purchased from Gazprom on the grounds that it was "not using exports to Russia as the benchmark for the provision of natural gas. Rather, . . . we are using exports to other markets and the petitioner's argument does not speak to the primary issue of availability." IDM at 48. However, Commerce's statement is a non-sequitur: If the record evidence demonstrates that the raw gas sent to the Orenburg Gas Processing plant is a different product than the processed natural gas that JSC Apatit purchased from Gazprom, then it cannot serve as evidence that Kazakh-origin natural gas was "available" to purchasers in Russia, and thus suitable for use as a tier two benchmark, within the meaning of section 351.511(a)(2)(ii).

[5] The narrow exception in section 351.511(a)(2)(i) for actual sales from competitively run government auctions is not relevant here. *See* 19 C.F.R. § 351.511(a)(2)(i).

Consol. Court No. 23-00239

where both the prices and the gas are practically available only to Gazprom pursuant to a tolling

arrangement – qualify as market-determined prices that would be available to purchasers in

Russia, and thus are usable as a tier two benchmark.

> **3.    The Kazakh Export Prices Sourced from BNS Are Not Suitable as a
> Tier Two Benchmark Because All Kazakh Gas Prices Are Distorted
> by Government Involvement in the Market**

The *Preamble* states that Commerce will not use prices that are significantly distorted as

a result of the government's involvement in the market as a benchmark for measuring the

adequacy of remuneration. *Preamble*, 63 Fed. Reg. at 65,377.  Consistent with the *Preamble*,

Commerce has a well-established practice of rejecting potential benchmark prices that it has

found to be distorted by government involvement in the market. *See Certain Softwood Lumber*

*Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty*

*Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug. 9, 2022), and

accompanying Issues and Decision Memorandum, Comment 14; *Certain Uncoated Groundwood*

*Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg.

39,414 (Dep't Commerce Aug. 9, 2018), and accompanying Issues and Decision Memorandum,

Comment 21.

Here, Mosaic submitted extensive evidence showing that the GOK's significant

involvement in the Kazakh natural gas market distorts all Kazakh gas prices, including both

domestic and export prices.  The GOK owns and controls a substantial share of natural gas

production and transportation in Kazakhstan through the Samruk-Kazyna JSC sovereign wealth

fund; KazMunayGas ("KMG"), the GOK-owned oil and gas company; and other GOK-

controlled entities.  Mosaic Benchmark Rebuttal Submission, Exhibit 18 at 23, P.R. No. 166.

KMG "represents Kazakhstan's interests in the national oil and gas industry," and is responsible

for the exploration, production, transportation, and sale of oil, gas, and other hydrocarbons in

Consol. Court No. 23-00239

Kazakhstan.  *Id.*, Exhibit 2, P.R. No. 162; *id.*, Exhibit 18 at 34, 48, 50, P.R. No. 166.  In addition

to owning and controlling KMG, the GOK also owns a stake in the country's other major gas

producer, Karachaganak Petroleum Operating ("KPO"), which is the source of the gas sold to

Gazprom pursuant to the tolling arrangement discussed above.  *Id.*, Exhibit 8 at 86, P.R. No. 163;

*id.*, Exhibit 18 at 34, P.R. No. 166.

Mosaic also submitted evidence showing that the GOK sets prices for natural gas and

controls gas transportation in Kazakhstan.  Specifically, the GOK controls the transport and price

of natural gas in Kazakhstan through the state-owned KazTransGas ("KTG").  *See id.*, Exhibit 8

at 134-135.  KTG is "the designated 'national operator' of all gas transmission and distribution

infrastructure in" Kazakhstan, and it "also has exclusive rights to purchase (associated) gas from

producers, sell gas on the local market, and export gas."  *Id.*, Exhibit 8 at 121-122, P.R. No. 163;

*id.*, Exhibit 18 at 36, P.R. No. 166.  KTG is also the GOK's representative in major gas pipeline

operations involving foreign partners.  *Id.*, Exhibit 3, P.R. No. 162.  In 2021, the GOK

restructured KTG to strengthen its control over the country's natural gas industry.  *Id.*, Exhibits

2, 3, 17, P.R. Nos. 162 & 165.

Commerce discounted this evidence, finding that whether the Kazakh domestic market is

distorted should have "no bearing" on its ability to use Kazakh export prices as a tier two

benchmark.  IDM at 48.  However, Commerce relied on very similar evidence regarding the

GOR's involvement in the Russian natural gas market to find that Russian gas prices are

distorted and unsuitable as a benchmark.  PDM at 15-17.  In prior cases, Commerce has

specifically found that Russian *export* prices are unsuitable for use in constructing a natural gas

benchmark due to the GOR's involvement in the Russian market and Gazprom's control of the

Russian gas distribution network and exclusive right to export natural gas.  *Steel Concrete*

Consol. Court No. 23-00239

*Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020), accompanying Issues and Decision Memorandum at 23 (*citing, e.g.*, *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2016*, 83 Fed. Reg. 63,472 (Dec. 10, 2018) and accompanying Preliminary Decision Memorandum at 22).  Mosaic presented very similar evidence regarding the GOK's involvement in the Kazakh market and state-owned KTG's control over the distribution and export of Kazakh gas.  It was arbitrary and capricious for Commerce to reject this evidence as irrelevant to its finding that Kazakh export prices are suitable as a tier two benchmark.

## VI.    CONCLUSION

Mosaic respectfully requests that the Court find that Commerce's determinations addressed above are unsupported by substantial evidence and otherwise not in accordance with law and remand for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: June 5, 2024

21

**Consol. Court No. 23-00239**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Support of Mosaic's Rule 65.2 Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Hale LLP's word processing system, is 6,292 words.

<u>/s/ David J. Ross</u>
(Signature of Attorney)

<u>David J. Ross</u>
(Name of Attorney

<u>The Mosaic Company</u>
(Representative Of)

<u>June 5, 2024</u>
(Date)