UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Plaintiff-Intervenor, and Consolidated Plaintiff, | ) |
| and | ) |
| THE MOSAIC COMPANY, | ) |
| Consolidated Plaintiff | ) |
| v. | )    Consol. Court No. 23-00239 |
| UNITED STATES, | )    **NON-CONFIDENTIAL VERSION** |
| Defendant, | ) |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor, and Consolidated Defendant-Intervenor, | ) |
| And | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Consolidated Defendant-Intervenor. | ) |

**MOTION OF PLAINTIFF-INTERVENOR AND CONSOLIDATED PLAINTIFF
JOINT STOCK COMPANY APATIT
FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff-Intervenor and Consolidated Plaintiff Joint Stock Company Apatit ("JSC Apatit") respectfully moves this Court for Judgment on the Agency Record with respect to the Final Results of the U.S. Department of Commerce in the first administrative review of Phosphate Fertilizers from Russia, Case No. C-821-825, published as *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum.

JSC Apatit respectfully requests, for the reasons explained in the accompanying Memorandum, this Court to hold that the contested portions of the Final Results are not supported by substantial evidence and are not otherwise in accordance with law.

JSC Apatit further requests that this Court remand this appeal to the U.S. Department of Commerce to correct its errors consistent with the order and opinion of this Court.

A proposed order is enclosed.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda
Cayla D. Ebert

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

Dated: June 5, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                                )
ARCHER DANIELS MIDLAND COMPANY,                 )
                                                )
                 Plaintiff,                     )
                                                )
          and                                   )
                                                )
JOINT STOCK COMPANY APATIT,                     )
                                                )
                 Plaintiff-Intervenor, and      )
                 Consolidated Plaintiff,        )
                                                )
          and                                   )
                                                )
THE MOSAIC COMPANY,                             )
                                                )
                 Consolidated Plaintiff         )
                                                )
                 v.                             )          Consol. Court No. 23-00239
                                                )
UNITED STATES,                                  )          **NON-CONFIDENTIAL VERSION**
                                                )
                 Defendant,                     )          Business Proprietary Information
                                                )          removed at pages 16, 18, 24,
                                                )          32–37, 39, and 41–42.
THE MOSAIC COMPANY,                             )
                                                )
                 Defendant-Intervenor, and      )
                 Consolidated Defendant-Intervenor )
                                                )
          and                                   )
                                                )
JOINT STOCK COMPANY APATIT,                     )
                                                )
                 Consolidated Defendant-Intervenor. )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF
PLAINTIFF-INTERVENOR AND CONSOLIDATED PLAINTIFF
JOINT STOCK COMPANY APATIT**

H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to JSC Apatit*

June 5, 2024

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ................................................................................2

II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT .................................3

III.    PROCEDURAL HISTORY.................................................................................4

IV.     STANDARD OF REVIEW ................................................................................8

V.      ARGUMENT .................................................................................................10

VI.     COMMERCE FAILED TO SELECT A LAWFUL AND REASONABLE PHOSPHATE
        ROCK BENCHMARK REFLECTIVE OF PREVAILING MARKET CONDITIONS IN
        RUSSIA AND CONSISTENT WITH MARKET PRINCIPLES ....................................10

        A.      Governing Statutory and Regulatory Framework for Commerce's Benchmark
                Selection.......................................................................................13

        B.      The Global and Russian Phosphate Markets are Driven by Quality of Rock and
                Price Leader Morocco.........................................................................15

        C.      Commerce's Final Benchmark Selection..................................................19

        D.      Commerce's Benchmark Fails to Reflect "Prevailing Market Conditions" as
                Required by Statue .............................................................................20

        E.      Commerce's Phosphate Rock Benchmark is Not Consistent with "Market
                Principles" as Required by Its Governing Regulation .............................23

                1.      Commerce's Miniscule Benchmark is *Per Se* Not Consistent with "Market
                        Principles".............................................................................24

                2.      Commerce Failed to Explain How Substantial Evidence Demonstrates that
                        Commerce's Benchmark Is Consistent with Market Principles ...............26

        F.      Commerce Unreasonably Rejects Adjustments to Correct its Benchmark ..........27

VII.    COMMERCE FAILED TO CALCULATE JSC APATIT'S PHOSPHATE ROCK COST
        OF SALES PLUS PROFIT AS ACCURATELY AS POSSIBLE ....................................29

        A.      Commerce Erroneously Employed Profit Before Tax in JSC Apatit's Profit Ratio
                ...................................................................................................29

        B.      Commerce Failed to Accurately Calculate JSC Apatit's Cost of Sales as Accurately
                as Possible By Excluding a One-time fee Paid by JSC Apatit to Maintain Its Mining
                License ..........................................................................................33

VIII.   COMMERCE UNLAWFULLY COUNTERVAILED JSC APATIT'S NATURAL GAS
        PURCHASES FROM INDEPENDENT GAS PRODUCERS.........................................35

        A.      Record Evidence Demonstrates that JSC Apatit's Independent Gas Producers Are
                Not Government Authorities.................................................................36

        B.      Commerce's Application of AFA to the GOR Was Overly Broad and Unlawfully
                Harmed JSC Apatit ............................................................................37

i

IX. COMMERCE ERRONEOUSLY RELIED ONLY ON 2021 CALENDAR YEAR BENCHMARK DATA, IGNORING THE THIRTEENTH MONTH INCLUDED IN THE POR ................................................................................................................43

    A. Commerce Calculated JSC Apatit's Benefit Based Solely On Calendar Year 2021 Data, Notwithstanding the Record also Contains December 2020 Data ...............43

    B. Commerce Unlawfully Disregarded 2020 Data and Failed to Calculate JSC Apatit's Margin as Accurately as Possible .........................................................................45

X. CONCLUSION................................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*,
    61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015)----------------------------------------------------------------- 9

*Changzhou Trina Solar Energy Co. v. United States*,
    No. 17-00246, 2019 (Ct. Int'l Trade 2019) ----------------------------------------------------------------43

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
    359 F.Supp.3d 1329, (Ct. Int'l Trade 2019) -------------------------------------------------------------39

*Changzhou Trina Solar Energy Co., Ltd. v. United States, F*
    352 F. Supp. 3d 1316, (Ct. Int'l Trade 2018) ----------------------------------------------------------40

*Daewoo Elecs. Co. v. Int'l Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*,
    6 F.3d 1511, (Fed. Cir. 1993)----------------------------------------------------------------------------10

*Gerald Metals, Inc. v. United States*,
    132 F.3d 716 (Fed. Cir. 1997) -------------------------------------------------------------------------9, 28

*GPX Int'l Tire Corp. v. United States*,
    942 F.Supp.2d 1343, (Ct. Int'l Trade 2013) -----------------------------------------------------------40

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
    37 C.I.T. 319 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014)-------------------------------------36

*Guizhou Tyre Co. v. United States*,
    399 F. Supp. 3d 1346, (Ct. Int'l Trade 2019)------------------------------------------------- 39,40

*Guizhou Tyre Co., Ltd. v. United States*,
    523 F. Supp. 3d 1312, (Ct. Int'l Trade 2021) ---------------------------------------------------------40

*Itochu Bldg. Prod., Co. v. United States*,
    163 F. Supp. 3d 1330, (Ct. Int'l Trade 2016) --------------------------------------------------------- 9

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
    405 F. Supp. 3d 1317, (Ct. Int'l Trade 2019)---------------------------------------------------------43

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349, (Ct. Int'l Trade 2015) --------------------------------------------------------15

*Maverick Tube Corp. v. United States*,

    857 F.3d 1353 (Fed. Cir. 2017) -------------------------------------------------------------9

*Oman Fasteners, LLC v. United States*,

    No. 22-00348, 2023 (Ct. Int'l Trade 2023) ---------------------------------------------10

*PT. Zinus Glob. Indonesia v. United States*,

    628 F. Supp. 3d 1252, (Ct. Int'l Trade 2023) ------------------------------------ 10, 15

*Risen Energy Co. v. United States*,

    658 F. Supp. 3d 1364, (Ct. Int'l Trade 2023) ---------------------------------------44

*Risen Energy v. United States*,

    570 F.Supp.3d 1369 (Ct. Int'l Trade)------------------------------------------------22

*The Mosaic Co. v. United States*,

    *Slip Op. 23-134*, Ct. No. 21-116 (Ct. Int'l Trade 2023) -------------------------------25

*Tri Union Frozen Prods., Inc. v. United States,*

    163 F. Supp. 3d 1255, (Fed. Cir. 2018)) ----------------------------------- 10,15

*Yama Ribbons & Bows Co. v. United States*,

    419 F. Supp. 3d 1341, (Ct. Int'l Trade 2019) --------------------------------------41

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ------------------------------------------------------- 9

19 U.S.C. § 1675(a) -------------------------------------------------------------- 8

19 U.S.C. § 1677(5)-------------------------------------------------------------1, 12

19 U.S.C. § 1677(5)(B)----------------------------------------------------------2, 35

19 U.S.C. § 1677(5)(E) --------------------------------------------------------13, 14, 20

19 U.S.C. § 1677(5)(E)(iv)---------------------------------------------------------20

19 U.S.C. § 1677e(a)-------------------------------------------------------------37

19 U.S.C. § 1677e(b) ------------------------------------------------------------37

5 U.S.C. § 706(2)(A)------------------------------------------------------------- 9

**OTHER AUTHORITIES**

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*

83 Fed. Reg. 11,694 (Dep't Commerce Mar. 16, 2018)----------------------------------------- 44, 45

*Drawn Stainless Steel Sinks from the People's Republic of China,*

80 Fed. Reg. 26,226 (Dep't Commerce May 7, 2015)------------------------------------------45

*Drawn Stainless Steel Sinks from the People's Republic of China,*

80 Fed. Reg. 69,638 (Dep't Commerce Nov. 10, 2015 ------------------------------------------45

*Glycine from India,*

87 Fed. Reg. 2,761 (Dep't Commerce Jan. 19, 2022)------------------------------------------46

*Honey from Argentina,*

69 Fed. Reg. 29,518 (Dep't Commerce May 24, 2004) ---------------------------------- 44, 46

*Large Diameter Welded Pipe from the Republic of Korea,*

87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022 ------------------------------------------45

*Phosphate Fertilizers From the Kingdom of Morocco,*

86 Fed. Reg. 9,482 (Dep't Commerce Feb 16. 2021) ------------------------------------------24

*Phosphate Fertilizers From The Kingdom of Morocco,*

88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023)------------------------------------------23

## REGULATIONS

19 C.F.R. § 351.213(e) ------------------------------------------------------------------------------45

19 C.F.R. § 351.511(a)(2)(iii) ---------------------------------------------------------------------- 1

19 C.F.R. § 351.511(a)(iii)------------------------------------------------------- 13, 23, 24, 27

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF
PLAINTIFF-INTERVENOR AND CONSOLIDATED PLAINTIFF
JOINT STOCK COMPANY APATIT**

Plaintiff-Intervenor and Consolidated Plaintiff Joint Stock Company Apatit ("JSC Apatit") respectfully submits the following memorandum in support of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade ("CIT" or "the Court"). For the reasons set forth below, JSC Apatit requests that this Court remand the Final Results of the first administrative review of the Countervailing Duty ("CVD") Order on Phosphate Fertilizers from the Russian Federation to the U.S. Department of Commerce ("Commerce" or the "Department"), with instructions to recalculate JSC Apatit's CVD margin. Commerce failed to meet its statutory and regulatory requirements in its Final Results. Moreover, its determination is unsupported by substantial evidence and otherwise not in accordance with law.

This appeal primarily addresses Commerce's failure to act reasonably in the administrative review at issue. We first address the Department's unlawful findings with respect to the alleged provision of mining rights for phosphate rock for less than adequate remuneration ("LTAR") during the period of review ("POR"). Specifically, this Court should hold that Commerce's Tier Three benchmark is not reflective of prevailing market conditions in Russia or consistent with market principles as required under 19 U.S.C. § 1677(5) and 19 C.F.R. § 351.511(a)(2)(iii), respectively, and is thus unlawful. Commerce failed to adopt a methodology that reasonably effectuated its governing statutory and regulatory purposes and is supported by substantial evidence.

Moreover, JSC Apatit submits that Commerce failed to calculate its CVD margin as accurately as possible with respect to the mining rights for LTAR program. That is, Commerce excluded certain additional expenses incurred by JSC Apatit from its benefit calculations.

In addition to erring fundamentally in its mining rights findings, the Department unlawfully countervailed JSC Apatit's natural gas purchases from non-government authorities. In so doing, Commerce unlawfully ignored record evidence submitted by JSC Apatit and instead applied adverse facts available ("AFA") to the Government of Russia ("GOR") for its failure to provide information related to private independent gas producers. Commerce then relied on its AFA finding to countervail unlawfully JSC Apatit's purchases of natural gas from independent gas producers, which are not government authorities in accordance with 19 U.S.C. § 1677(5)(B).

Lastly, Commerce unlawfully calculated the benefit ascribed to JSC Apatit solely on the basis of data for the 2021 calendar year. That is, inconsistent with its prior findings, Commerce's calculations failed to take into account the entire thirteen-month POR. Commerce's calculations willfully ignored JSC Apatit sales and costs data, as well as benchmark data on the record for December 2020 in addition to only relying on benchmark data for calendar year 2021.

## I.    RULE 56.2 STATEMENT

JSC Apatit contests certain aspects of the Final Results issued by Commerce in its first CVD administrative review of Phosphate Fertilizers from Russia, Case No. C-821-825. *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246). 1/  This appeal also contests certain aspects of Commerce's accompanying Issues and

---

1/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021, dated October 31, 2023 ("Final IDM") (P.R. 242) and the Final Calculations for JSC Apatit, dated October 31, 2023 ("Final Calculations") (P.R. 243, 244; C.R. 226, 227). Commerce's POR was November 30, 2020, through December 31, 2021.

JSC Apatit's summons and complaint were timely filed on December 4, 2023 and January 3, 2023, respectively. *JSC Apatit v. United States*, Ct. No. 23-254, ECF Nos. 1, 9. This Court consolidated JSC Apatit's appeal with appeals of the *Final Results* filed by The Mosaic Company ("Mosaic" or "Petitioner") and Archer Daniels Midland Company ("ADM"). Consol. Order, Feb. 2, 2024, CM/ECF No. 27. JSC Apatit's motion for judgment on the agency record and this memorandum are timely filed in accordance with this Court's Amended Scheduling Order dated May 23, 2024, CM/ECF No. 37.

## II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

JSC Apatit respectfully asks this Court to render judgment on the agency record with respect to the following issues raised in JSC Apatit's Complaint, consistent with the legal arguments set forth below. 2/

---

2/    JSC Apatit calls to this Court's attention that its Complaint also set forth counts alleging Commerce unlawfully (1) employed a cut-off date to determine JSC Apatit's mining rights benefit and (2) rejected a Notice of Subsequent Authority pertinent to this case. JSC Apatit has elected not to prosecute these claims in this litigation. JSC Apatit notes that Plaintiff ADM also challenges Commerce's selection of its Tier Three benchmark at Section VI and Commerce's rejection of its Notice of Subsequent Authority in Section VI.C of its Memorandum of Points and Authorities in Support of The Rule 56.2 Motion for Judgment on the Agency Record of the Plaintiff Archer Daniels Midland Company ("ADM's Brief").

1.   Whether Commerce failed to meet its statutory and regulatory obligations to select a "Tier Three" benchmark for Phosphate Rock reflective of prevailing market conditions and consistent with market principles. Commerce failed to act reasonably when it employed Global Trade Atlas Data for Brazil, Finland, and South Africa while ignoring more complete, accurate, and representative benchmark data available on the record.

2.   Whether Commerce unlawfully calculated JSC Apatit's Cost of Sales Plus Profit in its Mining Rights benefit calculations by employing Profit Before Tax in its Profit Ratio and Excluding Certain Payments Required to Maintain its Licenses from the Cost of Production.

3.   Whether Commerce unlawfully extrapolated GOR's AFA to JSC Apatit by countervailing JSC Apatit's natural gas purchases from independent gas producers/suppliers (i.e. non-governmental authorities).

4.   Whether Commerce unlawfully relied on record evidence and benchmark data solely from calendar year 2021 rather than the entire POR, including data from December 2020.

## III.   PROCEDURAL HISTORY

Commerce published its CVD order on phosphate fertilizers from Russia in the Federal Register on April 7, 2021. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order"). On April 1, 2022, Commerce published its notice of opportunity to request an administrative review of the CVD Order. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 87 Fed. Reg. 19,075 (Dep't Commerce April 1, 2022). On April 29, 2022, JSC Apatit and Industrial Group Phosphorite LLC ("Phosphorite") timely submitted requests for administrative review. Commerce initiated the CVD review on June 9, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't Commerce June 9, 2022) (P.R. 6).

On July 20, 2022, Commerce selected JSC Apatit as a mandatory respondent. Letter from Rebecca Trainor to Anastasia Zimonina, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation: Countervailing Duty Questionnaire*, Case No. C-821-825 (2020-21 Administrative Review) (Jul. 20, 2022) (P.R. 16–18).

JSC Apatit timely and thoroughly submitted responses to Commerce's initial CVD questionnaire and supplemental questionnaires from August 8, 2022 to April 10, 2023. Memorandum from James Maeder to Lisa Wang, *Issues and Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021: Phosphate Fertilizers from the Russian Federation*, Case No. C-821-825 (2020-21 Administrative Review) (Apr. 27, 2023) at 1–2 ("Preliminary IDM") (P.R. 188); Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Affiliate Questionnaire Response*, Case No. C-821-825 (2020-21 Administrative Review) (Aug. 8, 2022) ("JSC Apatit's AQR") (P.R. 28; C.R. 3); Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Section III of Initial Questionnaire Response*, Case No. C-821-825 (2020-21 Administrative Review) (Sept. 23, 2022) ("JSC Apatit's Sec. III IQR") (P.R. 60–84; C.R. 31–156); Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Response to Affiliation and Section III Supplemental Questionnaire, Questions 1-6*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 1, 2023) (P.R. 124; C.R. 168); Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Response to Affiliation and Section III Supplemental Questionnaire,*

*Questions 7-24*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 9, 2023) ("JSC Apatit 1SQR") (P.R. 128; C.R. 170–174); Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Response to Second Supplemental Questionnaire*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 23, 2023) ("JSC Apatit's 2SQR") (P.R. 159; C.R. 195–200); Response from Hogan Lovells to U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Response to Third Supplemental Questionnaire* (April 7, 2023) ("JSC Apatit's 3SQR") (P.R. 180; C.R. 208–214). Both Mosaic and JSC Apatit timely provided benchmark data to Commerce related to the alleged natural gas and phosphate rock mining rights programs on March 15, 2023. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Benchmark Data Submission*, Case No. C-821-825 (2020-2021 Administrative Review) (Mar. 15, 2023) ("JSC Apatit's Benchmark Submission") (P.R. 142–155; C.R. 178–192); Letter from WilmerHale to U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Submission of Factual Information to measure the Adequacy of Remuneration*, Case No. C-821-825 (2020-2021 Administrative Review) (Mar. 15, 2023) ("Mosaic's Benchmark Submission") (P.R. 131–141). JSC Apatit also filed detailed rebuttal benchmark comments and additional benchmark data in response to Mosaic's inaccurate and unrepresentative benchmark data. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 27, 2023) ("JSC Apatit's Benchmark Rebuttal") (P.R. 169–172; C.R. 202–205). Lastly, JSC Apatit submitted detailed Pre-Preliminary Determination Comments. Letter from Hogan Lovells US LLP

to U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Comments In Advance of the Preliminary Determination*, Case No. C-821-825 (2020-2021 Administrative Review) (Apr. 14, 2023) ("JSC Apatit's Pre-Prelim Comments") (P.R. 182; C.R. 215–216).

On May 4, 2023, Commerce published the Preliminary Results and assigned a preliminary CVD rate of 53.29% to JSC Apatit. *Phosphate Fertilizers from the Russian Federation: Preliminary Results and Partial Recission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ("*Preliminary Results*") (P.R. 191). In response, JSC Apatit filed a letter with Commerce that identified the material legal and factual errors in Commerce's preliminary calculations. Letter from Hogan Lovells US LLP to U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Response to Preliminary Results and Request for Meeting*, Case No. C-821-825 (2020-21 Administrative Review) (May 16, 2023) ("JSC Apatit's Meeting Request") (P.R. 193). JSC Apatit's counsel also met with Commerce officials to discuss the material errors in Commerce's calculation of its mining rights benchmark in the *Preliminary Results*. Memorandum from Shane Subler to The File, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation: Meeting with Respondent's Counsel*, Case No. C-821-825 (2020-21 Administrative Review) (June 5, 2023) ("JSC Apatit Meeting Memorandum") (P.R. 199).

On June 12, 2023, JSC Apatit, Mosaic, and Archer Daniels Midland Company ("ADM") timely filed case briefs with Commerce. Final IDM at 3 (P.R. 242); Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: Resubmission of JSC Apatit Case Brief*, Case No. C-821-825 (2020-2021 Administrative Review) (Aug. 4, 2023) ("JSC Apatit Case Br.") (P.R. 228, 229; C.R.

225); Letter from Trade Pacific PLLC to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: Redacted ADM Case Brief*, Case No. C-821-825 (2020-2021 Administrative Review) (Aug. 4, 2023) ("ADM Case Br.") (P.R. 225, 226).

On September 21, 2023, more than five weeks before the *Final Results*, ADM submitted a Notice of Subsequent Authority to Commerce, comprising *The Mosaic Company v. United States*, Ct. No. 21-00116, Slip Op. 23-123 (Ct. Int'l Trade Sept. 14, 2023). *See* Letter from WilmerHale to U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Request to Reject ADM's Notice of Subsequent Authority*, Case No. C-821-825 (2020-21 Administrative Review) (Sept. 29, 2023) (referencing ADM's submission of a Notice of Subsequent Authority) (P.R. 235). ADM explained that this recently decided CIT case (at that time) highlighted Commerce's inconsistent approaches and methodologies in the *Phosphate Fertilizer from Morocco* and the *Phosphate Fertilizer from Russia* administrative reviews. On October 18, 2023, during its public hearing with counsel and the public in attendance, Commerce rejected ADM's Notice of Subsequent Authority. *See* Memorandum from William J. Horn to The File, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation: Reject and Remove Barcode 4433639-01 from the Record*, Case No. C-821-825 (2020-21 Administrative Review) (Oct. 18, 2023) (P.R. 238).

On November 6, 2023, Commerce assigned a final CVD rate of 28.50% to JSC Apatit in the *Final Results*. *Final Results* (P.R. 246). Commerce failed to correct certain material errors in the *Preliminary Results*, as detailed below.

## IV.      STANDARD OF REVIEW

This Court reviews CVD final determinations issued by Commerce pursuant to 19 U.S.C. § 1675(a) to determine whether they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2015) *aff'd sub nom.*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) (internal citation omitted). "In order for Commerce's determination to be sustained, the determination must be reasonable, supported by the record as a whole, and the grounds that the administrative agency acted upon clearly disclosed." *Itochu Bldg. Prod., Co. v. United States*, 163 F. Supp. 3d 1330, 1333–34 (Ct. Int'l Trade 2016).

The substantial evidence standard is also grounded in the reasonableness test. Substantial evidence requires a reasonable quantum of evidence to support Commerce's decisions. At minimum, this requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1319. To determine whether sufficient evidence supports Commerce's decisions, the Court must review the record as a whole, including whatever evidence fairly detracts from the agency's determination. *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

In addition, Commerce's exercise of discretion is subject to the Administrative Procedure Act ("APA"). The APA instructs a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Oman Fasteners, LLC v. United States*, No. 22-00348, 2023 WL 2233642, at \*4 (Ct. Int'l Trade 2023) (citing 5 U.S.C. § 706(2)(A)). Moreover, although Commerce has discretion in selecting its methodology, it "must be a reasonable means of effectuating the statutory purpose." *PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252, 1263 (Ct. Int'l Trade 2023). This Court must review Commerce's action to determine "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l*

*Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted).

## V.      ARGUMENT

Commerce's *Final Results* are both contrary to law and unsupported by substantial evidence. We explain below why Commerce (1) failed to select a lawful benchmark for the alleged phosphate rock for LTAR program, (2) unlawfully refused to make certain adjustments to its phosphate rock benefit calculations, resulting in an unlawful and inaccurate benefit being ascribed to JSC Apatit, (3) unlawfully extrapolated the AFA applied to the GOR to JSC Apatit by countervailing its purchases of natural gas from independent producers, and (4) unlawfully refused to calculate the CVD rate for JSC Apatit based on record evidence and benchmark data spanning the entirety of the POR. This Court should remand these unlawful decisions by Commerce for further consideration, consistent with the standard of review and the legal principles and evidence set forth below.

## VI.     COMMERCE FAILED TO SELECT A LAWFUL AND REASONABLE PHOSPHATE ROCK BENCHMARK REFLECTIVE OF PREVAILING MARKET CONDITIONS IN RUSSIA AND CONSISTENT WITH MARKET PRINCIPLES

The principal driver of JSC Apatit's CVD margin in the *Final Results* is the Department's erroneous calculation of the benefit ascribed to JSC Apatit with respect to the alleged mining rights for LTAR program. Commerce created a benchmark for the mining rights program that is neither reflective of the prevailing market conditions in Russia nor consistent with market principles. Such a benchmark is *per se* unlawful.

Moreover, Commerce's mining rights benchmark is not supported by substantial evidence on the underlying administrative review record. Specifically, JSC Apatit provided evidence demonstrating the unreliability of Commerce's benchmark and, in the alternative, requested that

the benchmark be modified consistent with the governing statute and regulations. Commerce ignored both JSC Apatit's evidence and its requests for adjustments.

The fundamentally flawed nature of Commerce's benchmark is apparent in the cherry-picked data used to calculate a benchmark to produce a high CVD margin for JSC Apatit. Commerce's benchmark, comprising certain Global Trade Atlas IHS Markit ("GTA") export data for only Brazil, Finland, and South Africa in 2021, accounts for less than 0.02% of the total global production and less than 0.12% of the total global exports of phosphate rock in 2021. JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191). The figure below illustrates succinctly and starkly why Petitioner's benchmark data are wholly unrepresentative of the phosphate rock market during 2021. *Compare* Final Calculations to JSC Apatit Benchmark Submission at App. 9. (P.R. 155; C.R. 191). 3/

---

3/       A similar version of this graph was provided to Commerce in JSC Apatit's case brief. JSC Apatit Case Br. at 5 (P.R. 228; C.R. 225). The data have been adjusted to reflect the minor adjustments made in Commerce's benchmark selection in the *Final Results*.



We first set forth the legal framework guiding Commerce's selection of a benchmark for the alleged mining rights program. Although the framework provides some discretion to Commerce in its benchmark selections, that discretion is bounded by an inherent requirement that the agency must act reasonably and such actions be supported by substantial evidence.

Next, we describe below the global market for phosphate rock, as well as the key factors driving the sale and purchase of phosphate rock from Russia. We then summarize the Department's benchmark selection and explain how the cherry-picked benchmark data proffered by Petitioner—and selected by Commerce—were extremely limited in scope, non-reflective of the Russian market, and inconsistent with broader market principles.

Third, we explain why the Department's selected benchmark is inconsistent both legally and factually with the governing statute's requirement, at 19 U.S.C. § 1677(5), that the benchmark must reflect "prevailing market conditions" in Russia. Specifically, the Department only examined

one of the statutorily enumerated factors – "quality" – and expressly refused JSC Apatit's request that the agency address all of the statutory factors.

Fourth, we detail why the Department's benchmark, as both a matter of law and the substantial evidence, does not permit the measure of adequate remuneration "consistent with market principles," as required by 19 C.F.R. § 351.511(a)(iii). To repeat—Commerce's selected benchmark constitutes but a sliver of the global phosphate rock market – 0.02% to be exact – and erroneously relies on one physical characteristic of Russian phosphate rock that is not determinative of the price paid for it.

Finally, in addition to demonstrating the legal (statutory and regulatory) and evidentiary infirmities of Commerce's benchmark, we demonstrate that the agency failed to make certain necessary corrections to its selected benchmark that were timely called for and detailed by JSC Apatit and ADM. Most importantly, Commerce failed to include export data from Togo and Iran, both of which produce phosphate rock with similar qualities to Russian phosphate rock, and failed to account for additional phosphate rock exports from South Africa. These failures greatly skewed Commerce's export benchmark price. Commerce's failure to correct its benchmark is, separate from its benchmark selection, both contrary to law and unsupported by substantial evidence.

As explained below, Commerce's narrow and results-oriented phosphate rock benchmark exceeds the bounds of reasonableness, especially in light of other record evidence. This Court must remand this case to Commerce and instruct the agency to select a benchmark reasonably reflective of prevailing market conditions in Russia and consistent with relevant market principles.

### A. Governing Statutory and Regulatory Framework for Commerce's Benchmark Selection

The governing statute, section 1677(5)(E) of the Tariff Act, 19 U.S.C. § 1677(5)(E), provides that the provision of a good by a government authority does not confer a benefit to the

recipient unless the good is provided for LTAR. The statute further dictates that adequacy of remuneration must be determined in relation to the "prevailing market conditions" for the good being provided in the country of provision of the good (here, Russia). 19 U.S.C. § 1677(5)(E)(iv). The relevant prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of sale – notably not only quality as Commerce seems to believe in its *Final Results. Id.* Accordingly, adequacy of remuneration for a good must be assessed against a benchmark reflecting all of the prevailing conditions within the entire market for the good within the relevant country—at minimum, Commerce must employ as many factors as possible, relying on the record evidence, to create the most accurate benchmark based on the record. Only an approach that properly considers all factors and data on the record would "be a reasonable means of effectuating the statutory purpose." *PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252, 1263 (Ct. Int'l Trade 2023) (citing *Tri Union Frozen Prods., Inc. v. United States,* 163 F. Supp. 3d 1255, 1301 (2016), *aff'd*, 741 F. App'x 801 (Fed. Cir. 2018)).

Beyond the bounds set forth in the statute, Commerce must also follow the regulatory hierarchy for selecting a benchmark price set forth in 19 C.F.R. § 351.511(a)(2). All parties agree that neither of the first two benchmarks are available with respect to phosphate rock. Final IDM at 29 (P.R. 242). Commerce thus was required to select a third-tier benchmark, which considers whether the government price in the country of provision of the good or service is "consistent with market principles." 19 C.F.R § 351.511(a)(2)(iii). Thus, lawful benchmarks in this case must (1) reasonably reflect the "prevailing market conditions" for the provision of mining rights – or what Commerce has equated to cost of sales of phosphate rock – in Russia and (2) be consistent with market principles. Commerce itself states that the regulation "does not prescribe a specific benchmark calculation methodology" but admits its selection discretion is not unbounded. It must

be consistent with Commerce's obligation to calculate subsidy rates as accurately as possible. Final IDM at 29 (citing to *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2015)) (P.R. 242).

### B. The Global and Russian Phosphate Markets are Driven by Quality of Rock and Price Leader Morocco

As explained below, Commerce elected to employ Petitioner's narrow phosphate rock export data from Brazil, Finland, and South Africa over much more robust and representative data on the record. This data is fundamentally flawed and unreliable. As demonstrated above, the cherry-picked data constitute ***well less than one-quarter of one percent*** of the world's phosphate rock market.

To best understand Commerce's error, it is important for this Court to consider the landscape of the global phosphate rock market and within it, the market for Russian phosphate rock. In calendar year 2021, which is within the POR, global production of phosphate rock was 207,440,200 metric tons, with 31,854,200 of those metric tons exported to world markets in the same year. JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191); JSC Apatit Pre-Prelim Comments at 23 (P.R. 182; C.R. 215–216). Morocco is the largest exporter of phosphate rock, accounting for more than one-third of total world exports. JSC Apatit's Benchmark Submission at App. 9 (P.R. 155; C.R. 191). The importance of Moroccan phosphate rock exports is demonstrated by the fact that Petitioner has brought a separate CVD case against Moroccan producers, *Phosphate Fertilizers from Morocco*, Case No. C-714-001. The record evidence shows that Morocco establishes global pricing for phosphate rock. *See* JSC Apatit Benchmark *Rebuttal* at App. 11 (demonstrating sales price is set based on Morocco price) (P.R. 169–171; C.R. 202–203).

The market is also driven by the quality of the phosphate rock. Phosphate rock is graded by its $P_2O_5$ content level or its Bone Phosphate Lime ("BPL") level—the higher the $P_2O_5$/BPL level, the more pure and effective the phosphate rock. The production of phosphate fertilizer manufactured with phosphate rock with higher $P_2O_5$ levels inherently require less phosphate rock as input, than using lower $P_2O_5$ level rock. It is undisputed that Russia produces phosphate rock high in $P_2O_5$ content, over 35% (or 78+% BPL) and that it is of igneous nature, rather than sedimentary. JSC Apatit Benchmark Submission App. 9 (P.R. 155; C.R. 191). In addition, the record evidence demonstrates that Brazil, Finland, South Africa, Togo, and Iran have similarly high $P_2O_5$/BPL levels. *Id.*

The type of phosphate rock – igneous or sedimentary – plays a role in its $P_2O_5$/BPL level. Notwithstanding, the record evidence demonstrates that market pricing for phosphate rock is dependent on the $P_2O_5$ level, not on the type of deposit from which the rock was mined. For example, the record contains JSC Apatit's **[**

**]**. Because the $P_2O_5$ content level of phosphate rock determines how much rock must be consumed in the production process of fertilizer and other downstream products, the $P_2O_5$ Content level is inherently factored into the pricing and commercial negotiations. JSC Apatit Benchmark Rebuttal at App. 11 (demonstrating how phosphate rock pricing is formulaically adjusted in commercial negotiations to account for the $P_2O_5$ content level) (P.R. 169–171; C.R. 202–203).

Notably, the European market accounts for one-third of the world's imports of 35+% $P_2O_5$ content level phosphate rock, and the European market is also where JSC Apatit sells almost all of its phosphate rock. JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191); JSC Apatit Pre-Prelim Comments at 21 (P.R. 182; C.R. 215–216). Additionally, because of Morocco's

dominance in the world market for phosphate rock, pricing and commercial negotiations for phosphate rock in Europe – again, where JSC Apatit sells nearly all of its phosphate rock – are based on Moroccan phosphate rock prices. JSC Apatit Benchmark Rebuttal at App. 11 (P.R. 169–171; C.R. 202–203). Inherently then, any benchmark that reflects "prevailing market conditions" must take into account this landscape, particularly the roles of price leaders and commercial negotiations in the market.

In order to provide the most accurate comparison with JSC Apatit's production and sales of phosphate rock, JSC Apatit submitted to Commerce pricing information for European imports of phosphate rock during the POR (the "Eurostat data"). JSC Apatit Benchmark Submission at App. 8 (P.R. 142, 155; C.R. 178, 191). The Eurostat data include pricing information for all imports of phosphate rock into Europe, including Moroccan sales prices, based on commercial negotiations and market principles. 4/ The Eurostat data are reliable and voluminous, comprising 3,860,000+ metric tons of phosphate rock imported into Europe during the POR, or 12% of the global export market—they are *more than 100 times larger than the volume of phosphate rock comprised by the data on which Commerce relied*. *Id.*

In stark contrast, Mosaic submitted phosphate rock benchmark pricing data from GTA for exports from only Brazil, Finland, and South Africa and from UN Comtrade for exports from only South Africa and Brazil. Mosaic contended that Commerce must only use benchmark pricing data of countries with igneous phosphate rock deposits—the same type of rock found in Russia. Mosaic Benchmark Submission at Exh. 4, 6 (P.R. 132). But, these data represent only a *sliver* of the

---

4/      JSC Apatit demonstrated that the Eurostat data can be easily (yet artificially) adjusted for $P_2O_5$ level if Commerce believed this was necessary. *See* JSC Apatit Case Br. at 39 (P.R. 228, C.R. 225); Final IDM at 38 (P.R. 242).

world's phosphate rock market: GTA and UN Comtrade data, even when illogically and incorrectly combined, only account for 37,000 metric tons – or approximately 0.02% of the total global production and 0.12% of the total global exports of phosphate rock in 2021. JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191); JSC Apatit Pre-Prelim Comments at 23 (P.R. 182; C.R. 215). Moreover, the total volume of this benchmark data amounts to a mere [      ] of JSC Apatit's total phosphate rock sold in 2021. Final Calculations at Att. 2 BPI Mining Costs (P.R. 244; C.R. 227).

Export data for Togo and Iran – countries with rock which "no party has argued { } is not comparable" to Russian rock (Final IDM at 30 (P.R. 242)) – were also included in the larger source data provided by Mosaic in its benchmark submission. This was brought to Commerce's attention by ADM in its case brief, in which ADM clearly laid out pricing information from GTA and UN Comtrade for Iran and Togo, respectively. *See* ADM Case Br. at 16–17, Exhs. 1-1–1-4, 2-1–2-4 (P.R. 204, 205).

Further calling into question the validity of Petitioner's minuscule data, on which Commerce relied, JSC Apatit demonstrated that the GTA and UN Comtrade data provided by Petitioners was incomplete by submitting additional information regarding South African phosphate rock exports during the POR. While the GTA data provides exports under HS codes 251010 and 25102, record evidence demonstrates that South Africa exported the overwhelming majority of its phosphate rock under a third harmonized tariff schedule ("HTS") code, 2835.26.90, which was not included in Mosaic's data. These omitted, substantial South African exports are clear on the record when one compares reporting by the International Fertilizer Association ("IFA") of South Africa's exports with Mosaic's GTA data for South Africa—the GTA data account for less than 1% of the reported IFA volume. JSC Apatit accounted for these additional

exports through the submission of Global Trade Tracker ("GTT") data, which include South African exports under HTS 2835.26.90. JSC Apatit Benchmark Rebuttal at App. 14 (P.R. 169–171; C.R. 202, 204).

### C. Commerce's Final Benchmark Selection

Notwithstanding that Petitioner's benchmark was fundamentally flawed, Commerce relied solely on the GTA data from Brazil, Finland, and South Africa for HS codes 251010 and 251020 to create its Tier Three Benchmark in its *Final Results*. Final IDM at 26 (P.R. 242); Final Calculations (P.R. 244; C.R. 227). Commerce employs its benchmark in its calculations in the following way: (1) Commerce calculates the cost of sales for phosphate rock per metric ton; then (2) multiplies it by a "profit ratio," to account for the difference between a cost and sale price, therefore bringing it to a sales price; then it (3) compares that cost of sales plus profit figure to the export benchmark price it constructed, which are undisputedly comprised of ***sales prices***.

Commerce attempted to justify this narrow benchmark by finding that it must compare phosphate rock "from countries known to export phosphate rock of a grade, measured by the percentage of bone phosphate of lime (BPL), which most closely corresponds to the BPL-based grade of Russian phosphate rock and for countries with igneous rock containing apatite ore deposits with $P_2O_5$ content similar to that reported by {respondents}." Final IDM at 29–30 (internal quotations removed) (P.R. 242). This claim is false. Commerce's assertion ignores that differences in BPL are inherently accounted for in the sales price in the market. As described herein, while the type of rock may influence the $P_2O_5$ content, there is no evidence that phosphate

rock from igneous sources and phosphate rock from sedimentary sources *that have the same P₂O₅ content* level would have different prices. 5/

Notwithstanding, Commerce still relies on alleged differences in production processes based on the type of rock deposit to justify why it can only use igneous rock pricing. Final IDM at 30–31 (P.R. 242) ("Accordingly, because we are comparing JSC Apatit's phosphate rock cost buildup to world market phosphate rock export prices in this Tier 3 analysis, we find that the production method and corresponding production costs for the underlying good are "conditions of purchase or sale," and thus necessary characteristics to consider in our selection of a comparable benchmark.").

### D.    Commerce's Benchmark Fails to Reflect "Prevailing Market Conditions" as Required by Statue

In its narrow benchmark selection, Commerce essentially determined that **only** one prevailing market condition is "material" to its Tier Three benchmark selection per 19 U.S.C. § 1677(5)(E)—quality. Specifically, Commerce determines that any rock used as a benchmark must be (1) of the same ore type – i.e. igneous, **and** (2) of the same P₂O₅ content/BPL level. Final IDM at 30 (P.R. 242). Commerce fails to support its results-oriented and unlawful focus exclusively on the quality factor of the phosphate rock and willfully neglects the other factors set forth in 19 U.S.C. § 1677(5)(E)(iv)—that is, price, availability, marketability, transportation, and other conditions of sale. Even if Commerce had correctly considered all factors available to it as

_____

5/    JSC Apatit also brings to the Court's attention and incorporates ADM's arguments demonstrating the information provided by the Petitioner on these alleged differences in production based on ore type, do not provide substantial evidence that any production differences actually result in different production costs or end sales prices. *See* ADM Rule 56.2 Br. at 16-18.

required by the statute, Commerce's reliance on the quality factor is not supported by substantial evidence.

First, to meet its statutory requirements, Commerce must review all of the relevant statutory factors– "price, quality, availability, marketability, transportation, and other conditions of purchase or sale" – and failed to do so here. Commerce's underlying reasoning for relying solely on phosphate rock exports from these three countries is therefore unlawful. In its rejection of alternative benchmark data, Commerce asserts that Section 771(5)(E)(iv) of the Act identifies "quality" as a relevant factor, notably ignoring the other factors listed in the statute. Commerce also determined that "quality" was a "condition of purchase or sale" under the factors laid out in the statute, effectively giving it double weight. Final IDM at 31.

Commerce fails to explain why none of the other factors are relevant, or need not be considered. In *Risen Energy v. United States*, 570 F. Supp. 3d 1369, 1376 (Ct. Int'l Trade 2022), the CIT rejected Commerce's weight of one factor over others in its tier-three analysis without proper explanation. "the record does not adequately explain why Commerce granted controlling weight to {one factor} in evaluating the { } benchmark data, while disregarding the other factors." The same is true here, and must be rejected by this Court.

Second, the distinction on which Commerce bases its "quality" findings is not supported by substantial evidence. In Commerce's analysis of the "quality" factor, it looks at two characteristics: the type of ore and the $P_2O_5$ content level. In its Final IDM, Commerce rejected all other benchmark pricing on this insignificant and arbitrary basis:

> 19 CFR 351.511(a)(2)(iii) does not prescribe a specific benchmark calculation methodology for Commerce to follow. In practice, this methodology has taken multiple forms, though Commerce has endeavored to apply benchmark analyses under 19 CFR 351.511(a)(2)(iii) accurately and, to the extent possible, use benchmarks that are comparable to the government-provided good.

> In the investigation segment of this proceeding, we determined that the appropriate comparison benchmark pursuant to 19 CFR 351.511(a)(2)(iii) was 'a world market price of comparable phosphate rock.' ***Specifically, we identified the BPL-based grade of phosphate rock and type of ore deposit (i.e., igneous) as qualities relevant for selecting "comparable phosphate rock.' Therefore, selecting phosphate rock exports from countries with comparable BPL grades to Russia and with igneous deposits is necessary to determine the adequacy of remuneration in relation to 'prevailing market conditions' for the good in question.***

Final IDM at 37 (emphasis added) (P.R. 242).

At the same time, Commerce rejected the robust Eurostat data, finding that because it the agency could not identify from which countries the rock was being imported, it could not determine if it was of igneous nature and the same $P_2O_5$ content level. *Id.* at 38. Moreover, Commerce also rejected JSC Apatit's reasonable explanation that, if necessary, the Eurostat data could be easily adjusted to account for $P_2O_5$ content.

Commerce claims to rely on certain record evidence provided by Petitioner that allegedly demonstrates the production processes for sedimentary and igneous rock are different and therefore concludes that the type of ore is really the only characteristic that matters. Final IDM at 30 (P.R. 242). Commerce also rejected the Togo and Iran export data because these countries' deposits are sedimentary rather than igneous, despite all parties agreeing that they have the same $P_2O_5$ content as Russian rock. *Id*. at 29–30. Notably then, after determining only to consider two characteristics of quality of phosphate rock when selecting a comparable benchmark, Commerce disregards one of them. Such an artificially thin window for comparison, with total disregard for the other statutory factors, is unlawful.

As explained by ADM in its Rule 56.2 Brief, the record evidence does not demonstrate that any differences in production processes based on ore type result in measurable differences in cost and sales price. Rather, record evidence demonstrates that any differences between type of rock

or quality/level of rock are baked into prices – the very basis for Commerce's benchmark price. JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191).

Accordingly, Commerce's reasoning fails to meet its statutory requirements and is not supported by substantial evidence.

### E. Commerce's Phosphate Rock Benchmark is Not Consistent with "Market Principles" as Required by Its Governing Regulation

Not only did Commerce fail to select a benchmark that meets its statutory requirements, the agency's selection also does not meet its regulatory requirements under 19 C.F.R. § 351.511(a)(iii). In accordance with Commerce's regulations, a "Tier Three" benchmark "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* Therefore, a "Tier Three" benchmark must be consistent with the market principles of the relevant market.

As discussed below, as a matter of law, the tiny benchmark volume relied on by Commerce in the *Final Results* per se does not represent the market principles of the global (or even Russian) phosphate rock market. Moreover, Commerce has failed to explain why its selected benchmark is consistent with market principles or how the substantial evidence supports its selection. These failures require this Court to remand this case to Commerce to correct its benchmark selection to meet the regulatory requirements set forth in 19 C.F.R. § 351.511(a)(iii).

As a preliminary matter, Commerce's reasoning is not consistent with its own recent precedent dealing with phosphate fertilizer, the sister case to this one, *Phosphate Fertilizers from Morocco*. There, Commerce has repeatedly relied solely on BPL/$P_2O_5$ content levels in determining its Tier Three benchmark, making it clear that this is the driving factor of price in the market. *Phosphate Fertilizers From The Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023),

and accompanying IDM ("*Morocco AR1 Results*") at 26–28; *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying IDM ("*Morocco Investigation Results*") at 18–19; *The Mosaic Co. v. United States*, *Slip Op. 23-134*, Ct. No. 21-116 (Ct. Int'l Trade Sept. 14, 2023) at 42–43. In fact, Commerce does not discuss the sedimentary versus igneous distinction at all in that case, further proving Commerce's claimed distinction is arbitrary. Rather, for the same POR at issue in this appeal, Commerce explained:

> {W}e created a {Tier-Three} benchmark price for phosphate rock for calendar year 2021 by calculating a simple average of certain worldwide prices of phosphate rock from industry publications submitted by both the petitioner and OCP. ***Certain worldwide prices were selected based on their similarity in BPL level, and therefore, comparability, to OCP's own phosphate rock***. We then compared this simple average of these worldwide phosphate rock prices to a calculated price of OCP's phosphate rock.

*Morocco AR1 Results* at 27 (emphasis added).

1.    **Commerce's Miniscule Benchmark is *Per Se* Not Consistent with "Market Principles"**

Commerce may not employ the miniscule GTA data proffered by Petitioner as a lawful benchmark under 19 C.F.R. § 351.511(a)(iii). On their face, these data do not "permit the measure of adequate remuneration consistent with market principles."

Commerce relied solely on the GTA data from Brazil, Finland, and South Africa for HS codes 251010 and 251020 to create its Tier Three Benchmark. Final IDM at 26 (P.R. 242); Final Calculations (P.R. 244; C.R. 227). To reiterate, the volume of this data accounts for less than 0.02% of the total global production and approximately 0.12% of global exports. Further demonstrating its non-representative nature, the volume of the data amounts to a mere [       ] of JSC Apatit's total phosphate rock sold in 2021 and only 0.63% of total global exports of similarly high $P_2O_5$/BPL level phosphate rock in 2021. Final Calculations at Att. 2 BPI Mining

Costs (P.R. 244; C.R. 227); JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191). Such a small volume is inherently unreliable and unreasonable to use as a comparison.

JSC Apatit previously demonstrated this fundamental flaw in the benchmark in its post-preliminary letter, video-conference with Commerce, and case brief before Commerce. JSC Apatit's Meeting Request (P.R. 193); JSC Apatit Meeting Memorandum (P.R. 199); JSC Apatit Case Br. at 30–31 (P.R. 228; C.R. 225). Yet Commerce chose to review record evidence regarding the phosphate rock market and benchmark data available on the record with blinders on, ignoring the *per se* unrepresentative nature of the GTA data and the realities of the phosphate rock marketplace.

Commerce itself admits that a larger benchmark would be more representative and appropriate. Final IDM at 38 (P.R. 242) (observing that its "general practice is to use as robust benchmarks as possible, including in Tier 3 analyses."). 6/ Notwithstanding, Commerce still failed to employ the more robust benchmarks on the record. Specifically, in its Final IDM, Commerce justifies its use of GTA over UN Comtrade because of "the relative robustness of the GTA data relative to UN Comtrade." Final IDM at 26–27 (P.R. 242) (citing to the fact that the GTA data covered only $8.7 million in exports, and the UN Comtrade data only covered $181,000 in exports). Yet, such a distinction is absurd when viewed in the context of the whole market –

────────────────────

6/      JSC Apatit notes, that paradoxically, Commerce rejects the  more robust 1) Eurostat pricing data, that accounts for 12% of the market, and 2) the Togo and Iran export data, on the grounds that despite the robustness or the added volume, the dataset does not only include igneous rock pricing. Final IDM at 38 (P.R. 242).

datasets that amount to fractions of 1% of the export market simply do not meet the regulatory requirement to be consistent with market principles. 7/

2.      **Commerce Failed to Explain How Substantial Evidence Demonstrates that Commerce's Benchmark Is Consistent with Market Principles**

In addition, Commerce failed to explain how its benchmark selection is consistent with market principles and supported by substantial evidence on the record.  Commerce states in its Final IDM: "In deriving a benchmark from available data to determine a 'market-determined price,' *Commerce considers the source, nature, and completeness of available data on a case-by-case basis*."  Final IDM at 29 (P.R. 242) (emphasis added).  And yet Commerce failed to properly consider these factors in its decision.

The bottom line is that Commerce's blinders block the flaws in the source, nature, and completeness of the data to achieve its desired result.  Commerce states over and over that it must use igneous rock data to reflect prevailing market conditions, but the agency entirely fails to address how this selection is also consistent with market principles. *See* Final IDM, Cmts. 2g, 2h, 2i, and 2j.  Rather, Commerce merely refers back to its findings that the additional data sets are inappropriate based on the only prevailing market condition relevant to Commerce – the type of ore.  Commerce provides no *affirmative* discussion regarding why the igneous rock datasets selected for its benchmark are consistent with market principles and why it has met its regulatory burden.  Commerce attempts to explain why it may ignore the proposed adjustments to the

---

7/      JSC Apatit notes that the absurdity of Commerce's benchmark selection is further demonstrated by the fact that it's original selection in its *Preliminary Results*, double counted export data from Brazil and South Africa, artificially increasing the benchmark price by 41%.  See Final Calculations at Att. 1 (P.R. 244; C.R. 227).

benchmarks, but again, fails to provide any explanation of why despite the identified flaws, the selected benchmark still meets the regulatory requirements and the reasonableness standard.

One example of why Commerce's benchmark is not consistent with market principles is the agency's decision to ignore the additional South African exports of phosphate rock contained in a third HS code not included in Mosaic's benchmark data. In fact, as observed above, the GTA data relied on by Commerce comprise less than 0.06% of the total amount of South African exports of phosphate rock. *Compare* Mosaic Benchmark Submission Exh. 3(b) (P.R. 132) *to* JSC Apatit Benchmark Submission App. 9 (P.R. 155; C.R. 191). As a consequence, Commerce relied on a very small, skewed subset of the phosphate rock exported from South Africa. Moreover, the South African data used by Commerce have an average per-unit value that is roughly two-and-a-half times higher than the average per-unit values for rock from Brazil and Finland. Commerce never addresses this significant price disparity, simply reasserting that these three countries should all have similar pricing to Russia. *See* Final IDM at 27 (P.R. 242). These significant data discrepancies confirm that Commerce's benchmark is not consistent with market principles and also not supported by the substantial evidence.

In sum, Commerce failed to explain how its benchmark met the requirements of 19 C.F.R. § 351.511(a)(iii) to construct a market principles benchmark and is supported by substantial evidence. This Court should remand the *Final Results* back to Commerce to remedy this error.

### F.    Commerce Unreasonably Rejects Adjustments to Correct its Benchmark

Commerce also unlawfully failed to make certain adjustments required to ensure the accuracy of its phosphate rock benchmark. These reasonable and necessary adjustments were timely brought to Commerce's attention during the administrative review, yet Commerce failed to

implement them, again pointing to an irrelevant physical characteristic of phosphate rock for justification.

First, Commerce erred by failing to include additional South African exports of phosphate rock. As explained above, Commerce's benchmark failed to represent accurately all of South Africa's phosphate rock exports, distorting the unlawful and unrepresentative benchmark even further. Commerce acknowledged the gap between the GTA South African export numbers under the two HS codes and IFA's reported South African export numbers, but the agency maintained that there was insufficient information regarding the third code and refused to include the additional data. This was not reasonable decision-making—Commerce has an obligation to consider factual information contradictory to its findings. *Gerald Metals*, 132 F.3d at 720. Commerce failed to do so here.

Second, as explained in further detail in ADM's Rule 56.2 motion, Commerce failed to include export data from Togo and Iran, providing export pricing for similarly high $P_2O_5$ content/BPL, in its benchmark. Adding these additional data would have increased the representative nature of Commerce's benchmark significantly. That is, the volume of phosphate rock comprised by the benchmark would have been almost 25% of total exports from countries with a BPL content of 78% or higher in 2021. *See* ADM Rule 56.2 Br. at 12.

Commerce's refusal to make any significant changes to its benchmark is unlawful and constitutes a separate basis for remand. If this Court allows Commerce to maintain its benchmark selection, Commerce should be instructed to include the additional South African exports and the Togo and Iran export data.

## VII. COMMERCE FAILED TO CALCULATE JSC APATIT'S PHOSPHATE ROCK COST OF SALES PLUS PROFIT AS ACCURATELY AS POSSIBLE

In addition to failing to select a correct, accurate phosphate rock benchmark, Commerce also made two fundamental errors in its calculation of JSC Apatit's ascribed benefit from the mining rights program. For the reasons set forth below, Commerce erroneously (a) employed Profit Before Tax in JSC Apatit's profit ratio and (b) excluded certain costs incurred to maintain one of its licenses from its cost of sales calculations. Commerce therefore failed to include significant costs in its so-called "cost-build up" methodology when calculating JSC Apatit's cost of cost of sales plus profit, thereby unlawfully failing to calculate JSC Apatit's benefit as accurately as possible.

### A. Commerce Erroneously Employed Profit Before Tax in JSC Apatit's Profit Ratio

Commerce failed to calculate JSC Apatit's benefit as accurately as possible. Specifically, Commerce changed the financial figures employed to calculate JSC Apatit's profit ratio between the *Preliminary Results* and the *Final Results*, claiming to have further isolated the expenses related to the extraction and beneficiation of phosphate rock. Notwithstanding, Commerce still fails to accurately account for additional expenses incurred in connection with JSC Apatit's mining and beneficiation of phosphate rock, and therefore failed to calculate JSC Apatit's benefit as accurately as possible. 8/

Commerce calculated JSC Apatit's phosphate rock cost of sales plus profit (i.e. Commerce's cost build-up) by following these general steps: (a) taking JSC Apatit's reported cost of sales of phosphate rock as provided in its questionnaire responses; (b) adding certain additional

---

8/     Because Commerce changed its methodology between the *Preliminary* and *Final Results*, this is JSC Apatit's first opportunity to review and respond to Commerce's calculations.

expenses not already included in the cost of sales; (c) dividing that combined cost by the total volume of phosphate rock sold, as reported by JSC Apatit, to obtain a per unit cost amount; and, finally, (d) multiplying that per unit cost by a "profit ratio." Final Calculations (P.R. 244; C.R. 227). In the *Preliminary Results* Commerce divided PhosAgro PJSC's Consolidated Financials' (JSC Apatit's parent company) Profit Before Tax by PJSC PhosAgro's Cost of Goods Sold figure to calculate JSC Apatit's profit ratio. In its case brief, JSC Apatit requested Commerce use either PJSC PhosAgro's Gross Profit figure or, if it continued to rely on Profit Before Tax, to account for additional expenses inherently considered in JSC Apatit's–or any business'–price setting method to accurately derive an amount for comparison to the market-based export price benchmark. JSC Apatit Case Br. at 43–48 (P.R. 228; C.R. 225).

In the *Final Results*, Commerce did not follow JSC Apatit's request, instead changing its calculations to use the Profit Before Tax provided in the phosphate-based products segmented portion of PJSC PhosAgro's Consolidated Financial Statements. Final Calculations (P.R. 243–244; C.R. 226–227); Final IDM at 23 (P.R. 242). Commerce justified its rejection by stating that the record did not show that all of the financial items included in Gross Profit relate to the mining and production of phosphate rock. *Id.* at 20. Commerce also expressed concern that using Gross Profit could result in double-counting of certain expenses. *Id.* at 21. In response to JSC Apatit's alternative suggestion to add additional expenses to the Profit Before Tax figure rather than using Gross Profit, Commerce stated that "JSC Apatit has {not} provided an adequate basis for consideration of any adjustment to the profit ration calculation" because JSC Apatit "fails to provide any basis on which we can 'quanti{f}y and add amounts for the additional expenses.' " *Id.* at 22. Commerce's explanations for why it could not adopt the approaches requested by JSC Apatit are unpersuasive and should be rejected.

There is clear evidence that JSC Apatit incurred additional expenses in connection with the mining and beneficiation of phosphate rock. The record demonstrates the following:

- JSC Apatit provided detailed information regarding the administrative and selling expenses of the Kirovsk Branch of JSC Apatit, whose primary business function is the mining and beneficiation of phosphate rock. JSC Apatit 1SQR at Exhs. SUPP-12-B (4), SUPP-12-B (5), and SUPP-12-B (6).

- JSC Apatit provided a demonstration of how the administrative and selling expenses incurred by the Kirovsk Branch could be allocated to the sales of phosphate rock by the Kirovsk Branch. *Id.* at Exh. SUPP-12-B (4).

- JSC Apatit provided a detailed list of the types of administrative expenses and selling expenses incurred by the Kirovsk Branch. *Id.* at Exh SUPP-12-B (5).

- JSC Apatit demonstrated how the administrative expenses and selling expenses of the Kirovsk Branch could be reconciled to the audited consolidated financial statements of the PhosAgro Group. *Id.* at Exh. SUPP-12-B (6).

Therefore, Commerce's claim that there was no evidence that JSC Apatit incurred additional expenses is not supported by substantial evidence. JSC Apatit's Kirovsk Branch, the branch that is responsible for the mining and beneficiation of phosphate rock, reported both selling expenses and administrative expenses in the POR. Ignoring these expenses by using Profit Before Tax results in an understated cost of sales plus profit figure and an overstated benefit.

To account for these expenses, Commerce must either utilize gross profit or include additional expenses that are not part of reported cost of production. This is readily apparent when one considers the income statement formula. Commerce listed the detailed income statement formula for PhosAgro at pages 19–20 of its Issues and Decisions Memo. Simplified and equivalent expressions of the income statement formula within the context of the profit ratio include the two following options:

Revenue =

Option 1
(Cost of Sales + Gross Profit)

Option 2
(Cost of Sales + Administrative Expenses + Selling Expenses + Net Interest Expenses + Other Expenses + Profit Before Tax)

Reliance on Profit Before Tax without considering Administrative Expenses, Selling Expenses, Net Interest Expenses, and Other Expenses excludes critical portions of JSC Apatit's revenue, and subsequently artificially and inaccurately increases the benefit ascribed to JSC Apatit. Of note, Gross Profit as a percent of Cost of Group Products Sold is at [            ], whereas Commerce used a profit ratio of [            ] based on Profit Before Tax. Significantly, this decision results in a overstatement of [                    ] in JSC Apatit's total benefit under Commerce's methodology.

In order to derive a fair comparison, Commerce could simply work with Gross Profit, as JSC Apatit has suggested. Alternatively, if Commerce uses Profit Before Tax, then it must consider Administrative Expenses, Selling Expenses, Net Interest Expenses, and Other Expenses. Failure to include other expenses in the buildup of the cost of sales for comparison to the benchmark creates a distortion that overstates the benefit. Companies set their sales prices by factoring in administrative expenses, net interest expenses, selling expenses, and other expenses that are not part of the cost of sales on the income statement, and these expenses are inherently included in the market-based benchmark price.

Despite its change to the phosphate-based products segmented financial figures, Commerce still refuses to include these additional expenses. Commerce continues to claim it was necessary to avoid double-counting or inclusion of expenses unrelated to phosphate rock production to achieve its objective of isolating phosphate mining and beneficiation costs as

accurately as possible. Final IDM at 20–21, 23 (P.R. 242).  Yet, this is exactly the point of using segmented financials – all of these expenses are inherently related to production of phosphate-based products, all of which are made from the mined and beneficiated phosphate rock.

Notably, Commerce overlooked JSC Apatit's reconciliation of its cost of sales, administrative expenses, selling expenses, and other expenses of the Kirovsk Branch to the consolidated PhosAgro financial statements.  JSC Apatit 1SQR at Exhs. SUPP-12-A (1), SUPP-12-A (2), SUPP-12-A (3), and SUPP-12-A (4) for cost of sales; Exh. SUPP-12-B (6) for administrative expenses and selling expenses; and Exh. SUPP-12-B (3), SUPP-12-B (7) for other expenses (P.R. 128; C.R. 170, 172).  In no instances were expenses from one income statement line (*i.e,*, the cost of sales, administrative expenses, selling expenses, and other expenses) for JSC Apatit reclassified to a different income statement line in the PhosAgro financial statements.  Notwithstanding, to alleviate its concerns regarding double counting, Commerce could simply make adjustments to the additional expenses it adds to Profit Before Tax, or simply multiply the cost of production figure reported by JSC Apatit by the profit ratio (using gross profit) before it adds in the separately reported expenses such as mineral extraction tax and environmental payments.

Commerce's calculation methodology is not supported by substantial evidence and fails to calculate JSC Apatit's benefit as accurately as possible.  Accordingly, this Court should remand to Commerce to adjust JSC Apatit's profit ratio accordingly.

> **B.**     **Commerce Failed to Accurately Calculate JSC Apatit's Cost of Sales as Accurately as Possible By Excluding a One-time fee Paid by JSC Apatit to Maintain Its Mining License**

In a change from the *Preliminary Results*, in the *Final Results*, Commerce: "revised JSC Apatit's cost of sales for phosphate rock by [

].” Final Calculations at 2 (P.R. 243, 244; C.R. 226, 227).  JSC Apatit's Second SQR identified this amount as [

].”  *Id.*  This payment was made in 2021, during the POR, and was required by JSC Apatit to maintain its use of its license. JSC Apatit's 3SQR at 6.  Notwithstanding, Commerce simply excluded this payment from JSC Apatit's cost of sales build-up, claiming that the payment related to JSC Apatit's mining activities [          ].  Final Calculations at 2 (P.R. 243; C.R. 226).

Specifically, JSC Apatit explained in its Third SQR that it "made this payment in 2021 pursuant to [

].  JSC Apatit 3SQR at 6 (P.R. 180; C.R 208–214).  Although this payment does *relate* to [                    ], the expense was actually incurred [        ], and therefore should be included in the cost of production for this POR.  Commerce provides no justification for why the simple fact that the payment related to activity that occurred [                    ] means that the payment should be excluded if the payment was incurred as a cost during the POR.  Commerce thus failed to calculate the CVD margin as accurately as possible by unlawfully excluding this cost in its cost of sales in JSC Apatit's cost of production build-up, which was then compared with Commerce's benchmark to calculate JSC Apatit's alleged phosphate rock benefit.  Commerce's exclusion of this payment must be remanded to correct its unlawful action, which is not supported by substantial evidence.

## VIII.  COMMERCE UNLAWFULLY COUNTERVAILED JSC APATIT'S NATURAL GAS PURCHASES FROM INDEPENDENT GAS PRODUCERS

Commerce's *Final Results* also erred by countervailing certain JSC purchases of natural gas from independent producers/suppliers, which are not "government authorities."  This decision was both contrary to law and unsupported by substantial evidence and should be remanded to Commerce for further consideration.

In order for a subsidy to be countervailable by Commerce, the subsidy must be provided by a "government authority."  The governing statute defines an authority as "a government of a country or any public entity within the territory of the country."  19 U.S.C. § 1677(5)(B).  The actions of non-governmental entities are not countervailable, absent evidence that the entity has been directed or controlled by a government.  Commerce treats firms that are owned by a government as "authorities."  Countervailing Duties, Final Rule, 63 Fed. Reg. 65,348, 65,402 (Nov. 25, 1998).  Only "*where it is unclear whether a firm is an authority based on ownership information alone*," can Commerce consider other factors.  *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1376 (Ct. Int'l Trade 2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) (emphasis added).

JSC Apatit provided detailed information regarding its natural gas purchases made during the POR.  Specifically, JSC Apatit identified and listed all of its purchases from independent gas producers  [

].  JSC Apatit's 1SQR at Exh. SUPP-10 (P.R. 128; C.R. 170–171).  Moreover, JSC Apatit demonstrated to Commerce that these [     ] companies were not "government authorities" in accordance with 19 U.S.C. § 1677(5)(B).

Commerce found to the contrary, claiming instead that the ownership information for these [     ] companies was insufficient due to the failure of the GOR to provide certain information in

response to Commerce's input appendix. Final IDM at 51. As a consequence, Commerce applied AFA to the GOR and countervailed the natural gas provided by those [      ] companies. *Id.* at 50–51. Commerce's refusal to assess the record evidence demonstrating that these companies are not government authorities was unlawful and not supported by substantial evidence.

### A.    Record Evidence Demonstrates that JSC Apatit's Independent Gas Producers Are Not Government Authorities

This Court should look skeptically on Commerce's claim that the ownership information pertaining to [                                            ] was insufficient. On the contrary, JSC Apatit submitted detailed evidence demonstrating exactly what Commerce said was missing: the ownership structure of its independent gas producers/suppliers. JSC Apatit's Sec. III IQR at Exh. 24 (P.R. 60, 79; C.R. 31, 69, 70). Specifically, JSC Apatit provided Commerce with these firms' direct and total ownership percentages, their current and historical shareholders, and their respective ownership percentages. JSC Apatit also identified the ultimate owners of [

] and demonstrated that no single government entity owns a controlling stake (*i.e.*, more than 50.01%) in either supplier, including by providing the suppliers' Orbis reports. *Id.*

The very purpose of this evidence supplied by JSC Apatit was to close any gap in the record left by the GOR and to demonstrate that JSC Apatit's purchases of natural gas from these [      ] companies were not made from a "government authority." *Id.* at Exhs. 24, 38, 39 (P.R. 60, 79, 83; C.R. 31, 69, 70, 77–84). And yet Commerce failed to address this evidence, other than to reiterate that the GOR had failed to answer Commerce's input appendix.

Moreover, in Commerce's original CVD investigation, the agency found that one of the same companies, [                              ], was not a "government authority." Memorandum from James Maeder to Joseph A. Laroski Jr., *Decision Memorandum for the*

*Affirmative Preliminary Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation*, Case No. C-821-825 (Investigation) (Nov. 23, 2020) at 9 (unchanged in Final IDM). That is, Commerce correctly excluded purchases of natural gas produced by [                                        ] from its LTAR benefit calculations for JSC Apatit's purchases of natural gas. Memorandum from William Horn to The File, *Final Remand Redetermination Calculations for PhosAgro PJSC,* Case No. C-821-825 (Remand) (Dec. 16, 2022), and accompanying calculations worksheet. JSC Apatit again purchased from [                                        ] during the POR, and Commerce pointed to no change in ownership suggesting that its purchases of natural gas from this firm should be countervailed. Commerce also proffered no evidence that JSC Apatit's other independent natural gas supplier, [                        ], is a government authority. In sum, Commerce failed to address the substantial evidence demonstrating that these firms are not government authorities.

### B. Commerce's Application of AFA to the GOR Was Overly Broad and Unlawfully Harmed JSC Apatit

Commerce applied AFA to the GOR for failing to respond to Commerce's input appendix. Relying on its AFA finding, Commerce then found that [

                    ] are government authorities and countervailed JSC Apatit's purchases of natural gas from these private firms. Commerce's actions were both unsupported by record evidence and contrary to law.

Commerce may only apply AFA if (1) necessary information is not available on the record, or (2) a party withholds information, fails to provide requested information by the deadline, significantly impedes a proceeding, or provides unverifiable information. 19 U.S.C. § 1677e(a). If one of these criterion is met, Commerce may apply an adverse inference if a party has failed to cooperate to the best of its ability. 19 U.S.C. § 1677e(b). The CIT has clarified the circumstances

under which Commerce may exercise this authority—AFA may only be used to fill gaps necessary to complete the factual record and ultimately to "find that the elements of the statute have been satisfied." *Changzhou Trina Solar Energy Co., Ltd. v. United States,* 359 F. Supp. 3d 1329, 1338 (Ct. Int'l Trade 2019). Further, the CIT has rejected Commerce's use of AFA against a cooperative respondent based on actions taken, or lack thereof, by its government when no real gap in the record exists. *See, e.g.*, *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2019) ("So when a government respondent does not cooperate with the Department's questionnaires—as here—a gap in the record *may* exist; but the Department cannot rely solely on the government's failure to comply in order to invoke AFA without first identifying such a gap.").

In particular, specific requirements must be met in order for Commerce to apply AFA to a cooperating party when its government has failed to cooperate: (1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the government refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify. *Changzhou Trina Solar Energy Co., Ltd. v. United States,* 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018) (instructing Commerce to explain specifically why the information the Government of China withheld created a gap that resulted in the use of AFA); *Guizhou Tyre Co., Ltd. v. United States,* 399 F. Supp. 3d 1346, 1352-53 (Ct. Int'l Trade 2019) (remanding for Commerce to explain why verification was not possible); *Guizhou Tyre Co., Ltd. v. United States,* 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) (applying the same three step rule).

Moreover, the application of AFA to a non-cooperative government may lawfully be extrapolated to a fully cooperative respondent only as a last resort. *See e.g.*, *GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343, 1348 & n.2, 1362 (Ct. Int'l Trade 2013) (ordering remand for Commerce to use neutral facts available, instead of extrapolating AFA from the non-cooperating government to the cooperating respondent). In *Changzhou Trina Solar Energy Co., Ltd. v. United States,* 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018), the Court rejected the application of AFA to a respondent company regarding its alleged use of Export Buyers' Credit Program ("EBCP"). Commerce identified a gap on the record caused by the Government of China's refusal to explain the involvement of third-party banks in the EBCP, making respondent's claims of non-use unverifiable. *Id.* at 1326. But, the CIT rejected Commerce's application of AFA to the company respondents, finding that Commerce had not explained "why the {government's} failure to explain this program was necessary to assess claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the {government's} refusal to provide internal bank records." *Id.* The CIT further instructed that "use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but {Commerce} is not permitted to skip either of these steps on the way to use of AFA." *Id.* at 1326-27; *see Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1356 (Ct. Int'l Trade 2019) (requiring Commerce to consider any information actually submitted by cooperating respondents).

What Commerce did in the present case is precisely the same as what Commerce has previously attempted to do, and that this Court has repeatedly found inadequate. Similar to the cases cited above, here the GOR did not answer a request for ownership information as it "does not have [                                                                ]."

Letter from The Ministry of Economic Development of the Russian Federation to the U.S. Department of Commerce, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation: Supplemental Questionnaire Response of the Ministry of Economic Development of the Russian Federation*, Case No. C-821-825 (2020-2021 Administrative Review) (Mar. 10 2023) at 5 (P.R. 129; C.R. 175). Notwithstanding, JSC Apatit (a fully cooperating respondent) answered Commerce's request, including by providing detailed ownership information demonstrating that the independent gas suppliers are not government authorities. JSC Apatit's Sec. III IQR at Exhs. 24, 38, and 39 (P.R. 60, 79, 83; C.R. 31, 69, 70, 77–84).

As such, Commerce failed to meet prongs (2) requiring the agency to establish why the information in the input supplier appendices was necessary to verify that the independent gas suppliers are not government authorities, and (3) requiring the agency to show that the record evidence provided by JSC Apatit is insufficient. Final IDM at 50–51. Instead, Commerce sought to sidestep these requirements, averring as follows:

> Commerce requires information from foreign government respondents to determine whether a program provides a financial contribution and is specific, but the GOR did not provide the requested information. JSC Apatit cannot simply provide other information in lieu of the GOR's failure to respond, as the specific information that we requested from the GOR in the Input Producer Appendix was necessary to determine whether the producers/suppliers are "authorities" within the meaning of section 771(5)(B) of the Act. For example, the documentation provided by JSC Apatit (*i.e.,* annual reports and Orbis reports) fails to provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the Input Producer Appendix.

*Id.*

With regards to the second prong, Commerce failed to explain why the information requested in the input appendix was necessary to determine whether JSC Apatit's gas producers were government authorities. *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 405

F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019) ("Commerce again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program."). In fact, Commerce's claim that the evidence is insufficient is wrong. The record evidence provided by JSC Apatit includes these firms' ownership structures, their current and historical shareholders, and their respective ownership percentages. *See* JSC Apatit's Sec. III IQR at Exh. 24 (P.R. 60, 79; C.R. 31, 69, 70). JSC Apatit also identified the ultimate owners of [

], demonstrating that no single government entity owns a controlling stake (*i.e.*, more than 50.01%) in either supplier. *Id.*

Likewise, regarding the third prong, Commerce failed to demonstrate why the evidence provided by JSC Apatit did not fill the gap created by the GOR's failure to submit the input supplier appendices. The ownership information provided by JSC Apatit, at a very early stage in the administrative review, evidences that the independent gas suppliers are not state owned. *Id.* No information on the record contradicts this fact. Moreover, Commerce did not issue any supplemental questionnaire to JSC Apatit or otherwise seek further information with respect to these producers. Commerce thus was not permitted simply to disregard the evidence JSC Apatit provided. On the contrary, Commerce must always assess the record evidence, particularly any evidence contradictory to its findings, and consider that evidence reasonably in its decision-making. *Id.*; *see also, Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2019 WL 6124908, at *3 (Ct. Int'l Trade 2019).

The *Final Results* meekly assert that JSC Apatit is unable to provide the information in lieu of the GOR. *Final Results* (P.R. 246). This is not sufficient to justify Commerce's application of AFA in an unlawful manner that adversely impacts JSC Apatit. Commerce cannot so easily sidestep the legal test established by the Federal Circuit and the CIT in circumstances where

cooperative respondents, like JSC Apatit, have filled the alleged gap in Commerce's record. In fact, the CIT has explained that where respondents provided certified information to fill a factual gap left by a government and Commerce still finds the evidence not to have sufficiently filled that gap, Commerce was required to provide the respondents with an "opportunity to supplement the record." *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2023). thus, at minimum, Commerce should have provided JSC Apatit with the opportunity to provide supplemental information if Commerce believed the substantial ownership information supplied by JSC Apatit was insufficient. Moreover, when there is record information that could be used to fill any gaps resulting from another party's non-cooperation, Commerce must first attempt to verify that information before it can apply AFA so as to harm the cooperating party (here JSC Apatit). *See Guizhou Tyre Co. v. United States,* 415 F. Supp. 3d 1335, 1342 (Ct. Int'l Trade 2019) (ordering Commerce "to pursue verification of the nonuse affidavits on record from the Plaintiffs; otherwise, as it stands, the Department's use of adverse facts available to impute use of the EBCP is unlawful on the record of this case"). Commerce never sought to verify the ownership of [

]—on the contrary, as just explained, Commerce never even asked JSC Apatit for additional ownership information.

In sum, JSC Apatit fully responded to Commerce's information and data requests, filling the hole in the record created by GOR's failure to submit certain information. Commerce's decision to dismiss JSC Apatit's uncontradicted evidence was contrary to law and not supported by substantial evidence. Therefore, this Court must remand this issue back to Commerce to consider again the ownership evidence supplied by JSC Apatit and to ask for further information if so required.

## IX. COMMERCE ERRONEOUSLY RELIED ONLY ON 2021 CALENDAR YEAR BENCHMARK DATA, IGNORING THE THIRTEENTH MONTH INCLUDED IN THE POR

Commerce failed to calculate its benchmarks and alleged benefits received based on the detailed data available for the entire POR. Rather, Commerce based the *Final Results* solely in reliance on data for calendar year 2021, despite JSC Apatit providing its own cost data and benchmark data for the entire POR. That is, Commerce unlawfully ignored the record evidence pertaining to December 2020. Final IDM at 11 (P.R. 242); *see, e.g.*, JSC Apatit Sec. III IQR at (P.R. 60–84; C.R. 31–156); JSC Apatit's 1SQR at (P.R. 128; C.R. 170–174); JSC Apatit's 2SQR at (P.R. 159; C.R. 195–200) (containing JSC Apatit's responses to multiple Commerce questionnaires, in which the agency specifically requested voluminous data and reconciliations for the entire POR). The *Final Results* are thus inconsistent with Commerce's practice of employing data for the entirety of the POR in its CVD calculations.

### A. Commerce Calculated JSC Apatit's Benefit Based Solely On Calendar Year 2021 Data, Notwithstanding the Record also Contains December 2020 Data

Commerce established the POR as November 30, 2020, through December 31, 2021, consistent with the governing statute and regulations. *Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ("*AR Initiation*"); Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List, 87 Fed. Reg. 19,075 (Dep't Commerce Apr. 1, 2022). The POR thus covers thirteen months and one day.

In accordance with Commerce's numerous and extensive requests, JSC Apatit provided corporate and benchmark data covering the full POR, November 30, 2020, through December 31, 2021. *See* JSC Apatit's Sec. III IQR (P.R. 60–84; C.R. 31–156); JSC Apatit's 1SQR

(P.R. 128; C.R. 170–174); JSC Apatit's 2SQR (P.R. 159; C.R. 195–200).  Specifically, JSC Apatit

made extensive efforts to provide the requested corporate data for the last month of 2020, which is

explicitly covered by Commerce's POR.  JSC Apatit's 2SQR at 6, Exh. SUPP-20 (P.R. 159; C.R.

195–198) (Commerce requested: "Please revise the chart to include sales data for the entire POR,

not only calendar year 2021").

Commerce ignored JSC Apatit's data comprising the entire POR in the *Preliminary Results*.

For example, Commerce only used JSC Apatit's 2021 sales and JSC Apatit's 2021 mining costs in

its benefit calculations, ignoring the data and reconciliations provided for 2020.  *See* Final

Calculations (P.R. 243, 244; C.R. 226, 227) .

Notwithstanding JSC Apatit's request to address this issue, Commerce determined in the

*Final Results*:

> Consistent with the *Preliminary Results*, because the POR covers a
> small portion of 2020 (i.e., less than two months), *we relied*
> *exclusively on data provided for 2021 to determine JSC Apatit's final*
> *subsidy rate*.  Consistent with our practice, we will apply JSC
> Apatit's final subsidy rate in this review to all appropriate entries
> from November 30, 2020, through December 31, 2021.

Final IDM at 3–4 (emphasis added).

Commerce asserted that its "general practice is to rely on one year's worth of data when the

POR of an administrative review extends into a second year by no more than two months."  Final

IDM at 11–12 & n.46 (P.R. 242).  Commerce stated that employing data for the whole POR would

be inconsistent with its practice.  *Id.* (citing *Countervailing Duty Order on Certain Passenger*

*Vehicle and Light Truck Tires From the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2014-2015*, 83 Fed. Reg. 11,694 (Dep't Commerce

Mar. 16, 2018), and accompanying IDM at cmt 2; *Honey from Argentina:  Final Results of*

*Countervailing Duty Administrative Review*, 69 Fed. Reg. 29,518 (Dep't Commerce May 24, 2004) (*Honey from Argentina*), and accompanying IDM at cmt 4).

**B. Commerce Unlawfully Disregarded 2020 Data and Failed to Calculate JSC Apatit's Margin as Accurately as Possible**

Commerce's regulation, 19 C.F.R. § 351.213(e), requires that the POR for the first administrative review include the period from the suspension of liquidation of entries of the merchandise (usually the date of the preliminary determination) through the month immediately preceding the first anniversary month of the order. Here, it is not contested by any party that the period was November 30, 2020 to December 31, 2021. Final IDM at 4 (P.R. 242).

Commerce has explained that "*{f}or a POR that covers more than one calendar year and two months*, Commerce's practice calls for determining separate subsidy rates for each year encompassing the POR by using each calendar year's sales to attribute subsidies received by the mandatory respondents during each respective calendar year." *See Large Diameter Welded Pipe from the Republic of Korea*, 87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022) (final results of the countervailing duty administrative review; 2018-19), and accompanying IDM at 4; *see also Honey from Argentina*, 69 Fed. Reg. 29,518 (Dep't Commerce May 24, 2004) (final results of countervailing duty administrative review), and accompanying IDM at Issue 4; *Drawn Stainless Steel Sinks from the People's Republic of China*, 80 Fed. Reg. 26,226 (Dep't Commerce May 7, 2015) (preliminary results of countervailing duty administrative review, rescission in part, and intent to rescind the review in part; 2012-13), and accompanying Preliminary Decision Memorandum at 18, unchanged in *Drawn Stainless Steel Sinks from the People's Republic of China*, 80 Fed. Reg. 69,638 (Dep't Commerce Nov. 10, 2015) (final results of countervailing duty administrative review and rescission in part; 2012-13), and accompanying IDM at 17; *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 83 Fed. Reg. 11,694

(Dep't Commerce Mar. 16, 2018) (final results of countervailing duty administrative review; 2014-2015), and accompanying IDM at cmt. 2 (emphasis added).

This practice does not apply here. Commerce's POR in the underlying administrative review is less than one year and two months. Accordingly, Commerce should employ corporate and benchmark data for the entire POR to calculate any subsidies received during the entire POR. The cases Commerce claims support its decision are inapposite and do not support excluding the 2020 data provided by JSC Apatit at Commerce's request. Final IDM at 12. For instance, in *Glycine from India*, the POR covered three full months of calendar year 2018 (September 4, 2018, through December 31, 2018). *See Glycine from India,* 87 Fed. Reg. 2,761 (Dep't Commerce Jan. 19, 2022) (final results of countervailing duty administrative review, 2018-19), and accompanying IDM at cmt 1. As the POR covered more than one calendar year and two months, Commerce followed its practice and collected information for the entirety of calendar year 2018 to calculate a separate rate for that calendar year. That situation is clearly distinguishable from the facts presented here.

In addition, Commerce claims its finding in *Honey from Argentina* supports the *Final Results*. There, Commerce stated: "As such, when the first administrative review of a CVD order is conducted, we examine the entire year during which suspension of liquidation began." *See Honey from Argentina IDM* at Comment 4. The period of review in that case was January 1, 2001 through December 31, 2002. *Id.* at 1. On this basis, Commerce concludes in its *Final Results*, "{t}herefore, in cases where a POR spans more than one calendar year and two months, Commerce calculates two subsidy rates: one for each year covered by the POR. Final IDM at 12. Commerce then added that it required full calendar year data to calculate a subsidy rate for said calendar year. *Id*. However, that is not at issue here. In *Honey from Argentina,* Commerce calculated two different

46

rates for each calendar year 2001 and 2002. Here, Commerce requested complete data sets and reconciliations for the complete POR (30 November 2020 through 31 December 2021) and therefore it should calculate a rate based on the POR data on the record.

Consequently, Commerce's refusal to calculate JSC Apatit's CVD margin based on data covering the entire POR is contrary to law and unsupported by substantial record. As such, we respectfully ask that this Court order Commerce to calculate one CVD rate for JSC Apatit covering the entire POR, encompassing November 30, 2020, through December 31, 2021. The administrative review record is complete with the relevant and necessary data for Commerce to complete its *Final Results* calculations based on the entire POR.

## X. CONCLUSION

For the foregoing reasons, JSC Apatit respectfully requests that this Court grant JSC Apatit's Motion for Judgment on the Agency Record and remand the CVD AR1 *Final Results* to Commerce, with instructions to recalculate JSC Apatit's CVD margin consistent with the arguments set forth above.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6634
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

Dated: June 5, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 13,933 words according to the word-count function of the word-processing software used to prepare the brief. This is less than the 14,000 words permitted for Plaintiff briefs.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

June 5, 2024