# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Plaintiff-Intervenor, and ) | |
| Consolidated Plaintiff, and ) | |
| ) | |
| THE MOSAIC COMPANY ) | |
| ) | |
| Consolidated Plaintiff, ) | |
| v. ) | **Consol. Ct. No. 23-00239** |
| ) | |
| UNITED STATES, ) | **PUBLIC DOCUMENT** |
| ) | |
| Defendant, ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Defendant-Intervenor, and ) | |
| Consolidated Defendant- ) | |
| Intervenor, and ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Consolidated Defendant- ) | |
| Intervenor ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF THE PLAINTIFF ARCHER DANIELS MIDLAND COMPANY

Warren E. Connelly
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel for Plaintiff the Archer Daniels Midland Company

Dated:  June 5, 2024

# TABLE OF CONTENTS

I.     THE ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED .................. 1

II.    ISSUE PRESENTED ......................................................................................... 1

III.   SUMMARY OF THE ARGUMENT ................................................................... 2

IV.   STATEMENT OF FACTS .................................................................................. 3

     A.    The Requests for the First Administrative Review .......................................... 3

     B.    Initiation of the First Administrative Review ................................................. 4

     C.    The Subject of ADM's Complaint ................................................................. 4

     D.    The Commerce Department's Preliminary Calculation of the Benchmark for Measuring the Benefit Provided by Phosphate Mining Rights .................................... 5

     E.    ADM's Challenge to Commerce's Preliminary Benchmark Calculation .................... 8

     F.    Commerce's Final Determination ................................................................. 10

V.    STANDARD OF REVIEW ................................................................................ 12

VI.   ARGUMENT ................................................................................................... 12

     A.    Undisputed Record Facts ............................................................................ 12

     B.    Commerce Erroneously Refused to Include the Volumes and Values of Phosphate Rock Exported from Togo and Iran in Its Tier 3 Benchmark Calculation ............................................................................................. 15

     C.    Commerce's Benchmark Calculation Contradicts the Analysis of This Court in The Mosaic Company v. United States ............................................................... 19

          1.    The Holding in The Mosaic Company v. United States ................................. 19

          2.    Commerce's Decision in This Case Is Inconsistent with the Holding in the Mosaic Decision ................................................................................ 21

          3.    Commerce Erroneously Refused to Consider ADM's Notice of Subsequent Authority ................................................................................ 23

     D.    Commerce's Reliance on Minuscule Export Volumes from Brazil, Finland, and South Africa Contradicts the Tier 3 Benchmark Regulations ............................. 24

     VII.   CONCLUSION ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**<u>Court Decisions</u>**

<u>Altx, Inc. v. United States</u>, 167 F.Supp.2d 1353 (Ct. Int'l Trade 2001)…………………………18

<u>Amanda Foods (Vietnam) Ltd. v. United States</u>, 33 C.I.T. 1407 (Ct. Int'l Trade 2009) ……….24

<u>C.S. Wind Vietnam Co., Ltd. v. United States</u>, 832 F.3d 1367 (Fed. Cir. 2016)………………..18

<u>Giorgio Foods, Inc. v. United States</u>, 804 F.Supp.2d (Ct. Int'l Trade 2011)……………………24

<u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrial A.S v. United States</u>, 635 F.Supp.2d 1339 (Ct. Int'l Trade 2009) ……………………………………………………………………………………24

<u>Norsk Hydro Canada, Inc. v. United States</u>, 341 F.Supp.2d 1263 (Ct. Int'l Trade 2004) ………24

<u>Nucor Corp. v. United States</u>, 621 F.Supp.2d (Ct. Int'l Trade 2009)……………………………24

<u>The Mosaic Company v. United States</u>, 659 F.Supp.2d 1285 (Ct. Int'l Trade 2023)……….passim

<u>Wind Tower Trade Coalition v. United States</u>, 569 F.Supp.3d 1353 (Ct. Int'l Trade 2022)…….18

**<u>Statutes</u>**

19 U.S.C. § 1516a(b)((1)(B)(i)…………………………………………………………………..12

19 U.S.C. § 1675(a) ……………………………………………………………………………..12

**<u>Regulations</u>**

19 C.F.R. § 351.511(a)(2)……………………………………………………...……………...24

19 C.F.R. § 351.301(c)(6) …………………………………………………………………24

**<u>Commerce Determinations (in chronological order)</u>**

<u>Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the People's Republic of China</u>, 82 Fed. Reg. 58,175 (Dec. 11, 2017) and accompanying Issues and Decision Memorandum………………………………………………………………………………5, 25

<u>Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation; Final Affirmative Countervailing Duty Determination</u>, 86 Fed. Reg. 9,482 (Feb. 16, 2021) and accompanying Issues and Decision Memorandum. …………………………………………3

Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation; Countervailing Duty Orders: 86 Fed. Reg. 18,037 (Apr. 7, 2021). ……………………………….…………3

Antidumping or Countervailing Duty Order, Findings or Suspended Investigation; Opportunity to Request Administrative Review, 87 Fed. Reg. 19,075 (Apr. 1, 2022)………………………....3

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 35,165 (June 9, 2022)...………………………………………………………………………4

Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 28,505 (May 4, 2023) and accompanying Issues and Decision Memorandum. …………………………………………5

Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 76,182 (Nov. 6, 2023) and accompanying Issues and Decision Memorandum. …………………………………………………1, 10

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF THE
PLAINTIFF ARCHER DANIELS MIDLAND COMPANY**</u>

## I.      THE ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Plaintiff Archer Daniels Midland Company contests the Commerce Department's

calculation of the Tier 3 benchmark that the agency used in the first administrative review of the

countervailing duty order on <u>Phosphate Fertilizers from the Russian Federation</u> to measure the

benefit, if any, that the Russian government provided to a Russian phosphate fertilizer producer,

called Joint Stock Company Apatit, as a result of its grant to that company of phosphate rock

mining rights.  The final results of that review are contained in <u>Phosphate Fertilizers From the

Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021</u>,

88 Fed. Reg. 76,182 (Nov. 6, 2023).  P.R. 246.  Commerce provided the rationale for its Tier 3

benchmark calculation in its accompanying "Issues and Decision Memorandum for the Final

Results," dated October 31, 2023, at Comments 2f through 2j ("Final Decision Memo").  P.R.

242.[1]

## II.     ISSUE PRESENTED

Did Commerce correctly calculate the Tier 3 benchmark that it used to measure the

benefit, if any, afforded by the Russian Government's provision of mining rights for phosphate

rock to JSC Apatit and was this calculation supported by substantial evidence on the record and

was it otherwise in accordance with law.

---

[1] The public version of the administrative record is found in ECF No. 23-2.  References
to documents contained in that record are cited as "P.R. ___."  ADM relies herein solely on
documents in the public version of the record.  Citations herein to P.R. documents identify the
issuance date rather than the "Upload Date" listed for each record document in ECF No. 23-2.

## III.    SUMMARY OF THE ARGUMENT

Commerce erroneously calculated the Tier 3 benchmark that it used to measure the amount of the countervailable subsidy that JSC Apatit received that was attributable to the Russian government's alleged provision of mining rights for less than adequate remuneration. Specifically, Commerce erred in determining that the benchmark should be calculated solely by reference to the volumes and values of phosphate rock exported from three countries that produced it from igneous ore deposits, i.e., from Brazil, Finland, and South Africa. Nothing in the record establishes a distinction between phosphate rock produced from igneous ore formations versus from sedimentary ore formations in terms of its grade, quality, marketability, or suitability for use in the production of phosphate fertilizer where their BPL content is similar.[2] Nor does the record contain any evidence that phosphate rock production costs differ between producers of phosphate rock from igneous ore formations versus producers from sedimentary ore formations. Therefore, Commerce should have included the volumes and values of exports from those countries that produced phosphate rock from sedimentary ore formations, i.e., from Togo and Iran, as well as from igneous ore formations, in its benchmark calculation.

Commerce did not dispute ADM's evidence that the countries of Togo and Iran produced phosphate rock from sedimentary ore formations with a BPL content like the BPL content of

---

[2] The fertilizer industry generally, as well as documents submitted for the record in this review, use interchangeably the terms "BPL content" (bone content of lime content) and $P_2O_5$ content (phosphorus pentoxide content). The BPL content and the $P_2O_5$ content are the industry's standard measures of the quality of phosphate rock and, therefore, its suitability for processing into phosphate fertilizer under the manufacturing criteria applied by each phosphate fertilizer producer. It is undisputed that the BPL content can be converted to $P_2O_5$ content using a factor of 0.4576. See, e.g., Exhibit 21 to Mosaic's March 15, 2023 Benchmark Submission at p. 436. P.R. 133. Conversely, the BPL percentage of phosphate rock is equal to 2.1852 times the $P_2O_5$ percentage. For convenience, ADM refers primarily herein to the BPL content of phosphate rock.

phosphate rock that JSC Apatit produced in Russia.  Therefore, this Court should order Commerce to recalculate the benchmark by including the volumes and values of exports from Togo and Iran along with the exports from Brazil, Finland, and South Africa.

ADM's motion is supported by Judge Stanceu's recent decision in The Mosaic Company v. United States, 659 F.Supp.2d 1285, 1305-1309 (Ct. Int'l Trade 2023) (the "Mosaic Decision"), which rejected The Mosaic Company's challenge to Commerce's calculation of the Tier 3 benchmark in the original investigation of Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 9,482 (Feb. 16, 2021).

## IV.    STATEMENT OF FACTS

On April 7, 2021, Commerce published its countervailing duty order covering phosphate fertilizers from the Russian Federation.  See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders: 86 Fed. Reg. 18,037 (Apr. 7, 2021).

### A.    The Requests for the First Administrative Review

Pursuant to Commerce's notice of opportunity to request an administrative review,[3] EuroChem (LLC Industrial Group Phosphorite), PhosAgro PJSC (on behalf of JSC Apatit), and The Mosaic Company filed timely requests for review.  See Letter from Squire Patton Boggs (US) LLP re: "Phosphate Fertilizers from the Russian Federation;" Letter from Hogan Lovells US LLP re: "Phosphate Fertilizers from the Russian Federation - Request for Review – 2020-2021 Countervailing Duty Period;" and Letter from WilmerHale re: "Phosphate Fertilizers from Russia:  Request for Countervailing Duty Administrative Review."  P.R. 1, 2, and 3.

---

[3] See Antidumping or Countervailing Duty Order, Findings or Suspended Investigation; Opportunity to Request Administrative Review, 87 Fed. Reg. 19,075 (Apr. 1, 2022).

**B.     Initiation of the First Administrative Review**

On June 9, 2022, Commerce published its notice initiating the first countervailing duty administrative review covering subject imports during the period from November 30, 2020 through December 31, 2021.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 35,165.  P.R. 6.  Specifically, Commerce initiated this review to determine if two Russian producers, Industrial Group Phosphorite LLC and JSC Apatit, had received countervailable subsidies during the November 30, 2020 through December 31, 2021 period of review ("POR").  87 Fed. Reg. at 35,174.  ADM imported phosphate fertilizer produced and/or exported by JSC Apatit and/or its affiliates during the POR.

**C.     The Subject of ADM's Complaint**

The subject of ADM's Complaint is Commerce's calculation of the Tier 3 benchmark that the agency used to measure the amount of the countervailable subsidy, if any, that JSC Apatit received from the Russian government that was attributable to that government's alleged provision of mining rights for phosphate rock for "less than adequate remuneration."  The Tier 3 benchmark in 19 C.F.R. § 351.511(a)(2)(iii) is defined as follows:

> World market price unavailable.  If there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.

Commerce correctly found that the benchmark for determining whether the Russian government provided phosphate rock mining rights for less than adequate remuneration should be determined using Tier 3 "market principles," rather than under the Tier 1 and Tier 2 benchmark calculation methodologies contained in 19 C.F.R. §§ 351.511(a)(2)(i) and (a)(2)(ii).  See Final Decision Memo at 16.  P.R. 242.  Commerce has determined that the Tier 3 benchmark calculation in every case should embody "the most robust world market price possible that reflects the broadest

spectrum of prices under market principles."  See, e.g., December 4, 2017 Final Issues and
Decision Memorandum in <u>Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the
People's Republic of China</u>, 82 Fed. Reg. 58,175 (Dec. 11, 2017) at Comment 4.

    **D.**    **The Commerce Department's Preliminary Calculation of the Benchmark
for Measuring the Benefit Provided by Phosphate Rock Mining Rights**

In its April 27, 2023 Decision Memorandum for the Preliminary Results (at 18-21)
("Prelim Dec. Memo"), Commerce calculated the Tier 3 benchmark by using the average of the
prices that exporters in just three countries, Brazil, Finland, and South Africa, charged in their
export sales of phosphate rock during the POR.[4]  P.R. 188.  According to Commerce, those
countries mined phosphate rock solely from igneous ore formations.  To identify the prices that
exporters in those three countries charged, Commerce relied upon two databases that contained
the volume and values of exports in 2022 of phosphate rock produced in third countries: (1) IHS
Markit's Global Trade Atlas ("GTA"); and (2) the United Nations Comtrade database.

The GTA and UN Comtrade databases contained export volumes and values for
merchandise exported under the following Harmonized Tariff System subheadings: (1) 2510.10,
which covers "Natural calcium phosphates, natural aluminum calcium phosphates and
phosphatic chalk; unground"; and (2) 2510.20, which covers "Natural calcium phosphates,
natural aluminum calcium phosphates and phosphatic chalk; ground."  Prelim. Dec. Memo at 20.
P.R. 188.

Commerce determined that its Tier 3 benchmark calculation should contain an average of
the values and volumes of phosphate rock exports from only those countries that produced

---

[4] See <u>Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial
Rescission of the Countervailing Duty Administrative Review; 2020-2021</u>, 88 Fed. Reg. 28,505
(May 4, 2023).  P.R. 191.

phosphate rock <u>from igneous ore formations</u>, i.e., from Brazil, Finland, and South Africa. See April 27, 2023 "Preliminary Results Calculations for Joint Stock Company Apatit (at 8) ("Prelim Calc. Memo"). P.R. 189. However, producers in most countries produce phosphate rock from <u>sedimentary ore formations</u>.[5] Nevertheless, Commerce excluded from its Tier 3 benchmark calculation the volumes and values of phosphate rock exports from those countries that produced phosphate rock from sedimentary ore formations even though such rock is indistinguishable in quality or any other characteristics that matter to fertilizer producers compared to rock produced from igneous ore formations.

As just noted, Commerce identified three countries, i.e., Finland, Brazil, and South Africa, in the GTA database that contained export volumes, values, and resulting average unit values of phosphate rock produced from igneous ore formations. The UN Comtrade dataset contained the same volume, value, and AUV data for Brazil and South Africa as the GTA dataset, but it did not include volumes and values for Finland. See Prelim Calc. Memo at 8 and Attachment 1. P.R. 189.

To calculate the benefit that JSC Apatit received for the phosphate rock mining rights that the Russian government provided, Commerce calculated JSC Apatit's per-unit cost to mine phosphate rock and then subtracted it from the Tier 3 benchmark price of phosphate rock that it had calculated. It then multiplied the resulting difference by the total amount of phosphate rock

---

[5] See, e.g., Exhibit 18 to The Mosaic Company's March 15, 2023 Benchmark Submission, which is the Mineral Commodity Summary for Phosphate Rock. This document discusses events in 2021, and it was published by the U.S. Geological Survey in January 2022. P.R. 133. It states (at 2) that "Phosphate rock resources occur principally as sedimentary marine phosphorites. The largest sedimentary deposits are found in northern Africa, the Middle East, China, and the United States."

that JSC Apatit beneficiated (i.e., produced) from its mining deposits during the POR.[6]  Prelim. Calc. Memo at 7-8.  P.R. 189.  This resulted in a benefit calculation of 51.57% *ad valorem*.  Id.

Commerce calculated the Tier 3 benchmark per-unit price of phosphate rock by, first, calculating an overall weighted AUV of $237.63/MT for phosphate rock exports from Finland, Brazil, and South Africa, which were contained in the GTA database.  Prelim. Calc. Memo at 7–8, Attachment 1.  P.R. 189.  Second, Commerce separately calculated an overall weighted AUV of $482.40/MT for the phosphate rock exports from two countries – Brazil and South Africa – contained in the Comtrade database.  Id.  The Comtrade database does not report phosphate rock export quantities and values for Finland, whereas the GTA database does include those quantities and values.  Finally, Commerce calculated the mathematical average of the GTA AUV and the Comtrade AUV to derive the Tier 3 benchmark of $360.01/MT (i.e., $237.63 + $482.40 = $720.03 ÷ 2 = $360.01).  Id.

Using this methodology to calculate the Tier 3 benchmark, Commerce calculated a preliminary *ad valorem* subsidy rate of 51.57% for JSC Apatit that was attributable to the provision of mining rights for less than adequate remuneration.  Prelim. Calc. Memo at 8.

After reviewing Commerce's Tier 3 benchmark calculations and methodology, ADM determined that it was not supported by substantial evidence and was otherwise not in accordance with law.  Accordingly, it timely entered its appearance in the administrative review proceeding on June 7, 2023.  P.R. 200.

---

[6] In the mining industry, the term "beneficiation" refers to the process of removing extraneous materials and impurities from mined ore to increase its value.  As noted in Exhibit 19 to Mosaic's March 15, 2023 Benchmark Submission (at p. 336), "The beneficiation products of apatite ores as a commodity are traded as phosphate rock.  It is the only significant global resource used dominantly in the manufacturing of nitrogen-phosphorus-potassium (NPK) fertilizers for food-crop nutrition and in the production of animal feed supplements."  P.R. 133.

**E.       ADM's Challenge to Commerce's Preliminary Benchmark Calculation**

On June 12, 2023, ADM submitted its Original Case Brief in advance of Commerce's issuance of its <u>Final Results</u>.[7]  P.R. 204 and 205.   ADM contested Commerce's calculation of the Tier 3 benchmark for phosphate rock that Commerce in turn used to calculate the benefit that JSC Apatit received through the Russian government's alleged provision of phosphate rock mining rights for LTAR.  ADM first argued that Commerce's benchmark calculation erroneously "double counted" the values and volumes of phosphate rock exported from Brazil and South Africa -- which, unlike the data from Finland, appeared in both the GTA and UN Comtrade database -- thereby yielding a highly distorted benchmark.

In addition, ADM argued that Commerce should have included phosphate rock export values, volumes, and resulting average unit values from two other countries, Togo and Iran. ADM demonstrated that these two countries, like Brazil, Finland, and South Africa, exported phosphate rock of the same grade, quality, marketability, and suitability for use in the production of phosphate fertilizer as the phosphate rock that JSC Apatit produced.  ADM Refiled Case Br. at 11–16.  P.R. 225.  Using the Togo and Iran data, along with the data for Brazil, Finland, and South Africa, ADM provided an alternative Tier 3 benchmark calculation to Commerce.  <u>Id.</u> at 16–19.

ADM's revised benchmark calculation used the identical export volumes, values, and resulting AUVs that Commerce obtained from the GTA database for Brazil, Finland, and South

---

[7] Commerce requested that ADM redact certain statements in its Original Case Brief and directed it to refile that brief after making the required redactions.  P.R. 221 and 222.  ADM refiled its brief on August 4, 2023 with the statements redacted.  P.R. 225 and 226.  We discuss below why Commerce erred in excluding from the record the statements that it required ADM to redact.  However, we cite below to ADM's "Refiled Case Brief" except where we explain why Commerce wrongly required ADM to redact certain statements from its "Original Case Brief."

Africa.  ADM then added the relevant export volumes, values, and resulting AUVs for: (1) Togo, which were included in the Comtrade database; and (2) Iran, which were included in the GTA database.  Id. at 16–19, Exhibits 3 and 4.

In addition, ADM contended that Commerce should have excluded the South African volumes, values, and AUVs for January, February, May, and July through December 2021 because those values were aberrational in that they exceed $1,300 per metric ton, while the AUVs for Brazil and Finland averaged $225 per MT and $235 per MT, respectively.  Id. at 19–20.

On July 5, 2023, ADM timely submitted its Rebuttal Brief in response to certain arguments made by the petitioner, The Mosaic Company.  P.R. 216.  Among other things, ADM demonstrated that Mosaic's proposed benchmark relied on a minuscule volume of exports in 2021 from Brazil, Finland, and South Africa that could not and should not be regarded as representative of world market export prices, as required by the Tier 3 benchmark regulation.  Id. at 6–7.

In addition, ADM once again contended that exports from Togo and Iran should be included in Commerce's Tier 3 benchmark calculation because phosphate rock processors in three countries, namely India, Japan, and New Zealand, imported phosphate rock, with 78% and above BPL content from countries that produced phosphate rock from both sedimentary ore and igneous ore formations.   In addition, Brazil imported phosphate rock from countries that produced it from sedimentary ore formations even though Brazil produced phosphate rock from igneous ore formations.  Id. at 7–11.  This evidence further demonstrated that the type of ore formation from which the phosphate rock was produced made no difference to phosphate fertilizer producers in these countries.

ADM emphasized that Commerce lacked a rational basis for its finding that only phosphate rock produced from igneous ore deposits was comparable in grade or quality to Russian phosphate rock when the record demonstrated that the same quality of phosphate rock produced from sedimentary ore formations was regarded by phosphate fertilizer producers in four importing countries, Brazil, India, Japan, and New Zealand, as interchangeable. Id. at 11–12.

### F. Commerce's Final Determination

On November 6, 2023, Commerce published the Final Results of Countervailing Duty Administrative Review; 2020-1021. 88 Fed Reg. 76,182. P.R. 246. See also accompanying "Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021," dated October 31, 2023. P.R. 242.

In its Final Decision Memo (at Comment 2f, pp. 25-28), Commerce explained that it had revised its calculation of the Tier 3 benchmark to eliminate its previous "double counting." Specifically, Commerce relied solely on data from the GTA database to calculate the Tier 3 benchmark. It excluded data from the UN Comtrade database for Brazil and South Africa because it found a "significant discrepancy in coverage" between the UN Comtrade and GTA sources, and it found the GTA data to be significantly more robust relative to the UN Comtrade data. Id. at 26–27.

Nevertheless, despite acknowledging that phosphate rock export volume, value, and AUV data from Togo and Iran reflected exports of phosphate rock of a similar $P_2O_5$ (or, alternatively, BPL) content to that of Russia, Commerce excluded that data from its Tier 3 benchmark calculation. It found that phosphate rock produced in Togo and Iran was not

comparable to phosphate rock produced in Russia because it was mined from sedimentary ore deposits, rather than from igneous ore deposits. Id. at 30–32. For this reason, Commerce declined to include in its Tier 3 benchmark calculation the phosphate rock data exported from countries with similar BPL content to that of Russia, i.e., from Togo and Iran.

In justifying its Tier 3 benchmark calculation methodology, Commerce stated that "the production processes for phosphate rock from sedimentary reserves and igneous reserves differ." Id. at 30. For this reason, Commerce concluded that the production of phosphate rock from igneous ore deposits had different production costs compared to production of phosphate rock from sedimentary deposits. Id. at 31. Commerce cited no evidence to support the latter conclusion, and the record contains no evidence concerning the relative production costs of phosphate rock produced from igneous ores versus sedimentary ores. Nor does the record contain any evidence concerning the preferences, if any, that phosphate fertilizer producers have for phosphate rock produced from igneous versus sedimentary ore formations.

Moreover, Commerce did not address ADM's undisputed evidence that processors of phosphate rock in four countries did not recognize any difference in the quality or suitability for use of phosphate rock produced from sedimentary ore deposits versus igneous ore deposits. These processors purchased phosphate rock from exporters in third countries that produced phosphate rock from both types of deposits.

As a result of its changes to the benchmark calculation, Commerce calculated a Tier 3 benchmark of $237.63/MT (compared to the preliminary results benchmark of $360.01/MT) and a final *ad valorem* rate for JSC Apatit of 26.78 percent attributable to the provision of mining rights for less than adequate remuneration. See Final Decision Memo at 9. P.R. 242.

## V.    STANDARD OF REVIEW

This Court reviews a Commerce final determination pursuant to 19 U.S.C. § 1675(a) to determine whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.    ARGUMENT

### A.    Undisputed Record Facts

1. The export volume of phosphate rock from all countries with a BPL content of 78% or higher in 2021 totaled 5,788,400 metric tons.  The volume of phosphate rock exported in that year from Brazil, Finland, and South Africa with a BPL content of 78% and higher totaled 36,684 MT.  Thus, Commerce included in its benchmark calculation export volumes that constituted just 0.63% of total exports of the same or similar BPL content as Russian-origin phosphate rock.  In contrast, the combined export volume in 2021 from Togo and Iran, plus the combined export volume from Brazil, Finland, and South Africa in that year, constituted 24.59% of total exports.  ADM Refiled Case Br. at 17-18.   P.R. 225.

2. Togo and Iran produced phosphate rock from sedimentary ore formations with a BPL content similar to the BPL content of rock produced from igneous ore formations in Russia, Brazil, Finland, and South Africa.  ADM Refiled Case Br. at 15.  P.R. 225.  Commerce found that "No party has argued that the $P_2O_5$ content of Russian phosphate reserves is not comparable to reserves in Togo and Iran."  Final Decision Memo at 30.  P.R. 242.

3. In its original June 2020 countervailing duty petition, Mosaic stated that the Tier 3 benchmark should be calculated by averaging the export values of phosphate rock from

Jordan and India.  Both countries produced phosphate rock from sedimentary ore formations.[8]

ADM Original Case Br. at 14.  P.R. 204.

       4.  In that petition, Mosaic stated that "Phosphate rock prices from Jordan and

India are for phosphate rock with a BPL quality most comparable to phosphate rock from

Russia."  ADM Original Case Br. at 14.  P.R. 204.

       5.  The United States Geological Survey defines "marketable" phosphate rock as

"beneficiated phosphate rock with phosphorus pentoxide ($P_2O_5$) content suitable for phosphoric

acid or elemental phosphorus production."  In other words, it is the $P_2O_5$ content or, alternatively,

---

[8]By letter dated August 1, 2023, Commerce rejected ADM's Original Case Brief on the ground that the "entire first paragraph" on page 14 contained untimely new factual information. This paragraph read as follows:

> Undoubtedly for this reason, in its original petition, Mosaic submitted benchmark-related data from Jordan and India.  Both countries produce phosphate rock from sedimentary deposits. . . .  Moreover, Mosaic stated in the narrative portion of Volume III of its petition (at p. III-14) that "Phosphate rock prices from Jordan and India are for phosphate rock with a BPL quality most comparable to phosphate rock from Russia.  Accordingly, Petitioner used phosphate rock prices from Jordan and India to calculate a benchmark."

P.R. 221 and 223.  It was arbitrary and capricious for Commerce to find that this reference to the petitioner's submission in the original investigation was "untimely" when Commerce itself relied on numerous portions of the record in the original investigation in its Prelim. Dec. Memo and Final Decision Memo.  P.R.188 and 242.  Mosaic, too, repeatedly relied in its Rebuttal Brief on Commerce's findings in the investigation without objection from Commerce.  See P.R. 217 at 14, 15, 18, 20, 21, 23, and 24.  ADM, in its August 4, 2023 request for reconsideration of Commerce's rejection of its Original Case Brief, stated that there was nothing "new" in its reference to the petition filed in the original investigation and that Commerce itself had relied in its Prelim. Dec. Memo in at least 20 instances to methodologies used or findings made in the investigation.  P.R. 227.  Nevertheless. Commerce rejected ADM's request because its reliance on statements in Mosaic's original countervailing duty petition constituted "untimely new factual information."  P.R. 232.  Commerce has retained ADM's Original Case Brief in the record so the Court may examine it.  See P.R. 204 (Original Case Brief) and P.R. 223 (Commerce retention of Case Brief in the record).

the BPL content, that determines marketability and not whether the rock is recovered from an igneous or sedimentary rock formation.  ADM Refiled Case Br. at 14.  P.R. 225.

6.  South Africa produces phosphate rock from sedimentary ore formations, as well as from igneous ore formations.  ADM Refiled Case Br. at 15, fn. 7.  P.R. 225.  See also ADM Rebuttal Br. at 10.  P.R. 216.

7.  Three countries imported phosphate rock in 2021 and/or 2022 with a BPL content of 78% or above that was beneficiated from both sedimentary and igneous ore formations, i.e., India; Japan; and New Zealand.  A fourth country, Brazil, produced phosphate rock from igneous formations but also imported phosphate rock from Jordan and Morocco, which produced it from sedimentary ore formations.  ADM Rebuttal Br. at 8-10.  P.R. 216.

8.  The record does not contain any information concerning the cost that any producer in any country, other than JSC Apatit, incurred in 2022 to produce phosphate rock, regardless of whether the producer beneficiated that rock from an igneous ore formation or a sedimentary ore formation.  There is also no record evidence that all producers of phosphate rock in Brazil, Finland, and South Africa incur the same production costs.  Nor is there any record evidence that producers in those three countries incur production costs that differ from the costs incurred by phosphate rock producers in Togo or Iran.

As noted in Exhibit 19 to Mosaic's March 15, 2023 Benchmark Submission (at 336), "The composition of phosphate rocks differs from one deposit to another.  Therefore, phosphate rocks from different sources may be expected to behave differently in beneficiation and acidulation processes."  P.R. 133.  If the composition of phosphate rocks "differs from one deposit to another," then it necessarily follows that the production costs differ from one deposit to another, even when all of those deposits are igneous ore deposits.

.     9.  The Tier 3 benchmark is $77.26 per metric ton when calculated by averaging

the export values of phosphate rock exported from Togo, Iran, Brazil, Finland, and South Africa.

ADM Refiled Case Br. at 19.  P.R. 225.  By excluding exports from Togo and Iran from its Tier

3 benchmark calculation, Commerce calculated a benchmark of $237.63/MT.  See Final Calc.

Memo at Attachment 1.  P.R. 243.

**B.     Commerce Erroneously Refused to Include the Volumes and Values
of Phosphate Rock Exported from Togo and Iran in Its Tier 3 Benchmark
Calculation**

Commerce provided its rationale for rejecting the inclusion of export volumes and values

for Togo and Iran in its Final Decision Memo.  See Comment 2g at 28-32.  P.R. 242.  The

rationale was as follows: (1) the production processes for producing phosphate rock from

sedimentary ore formations and igneous ore formations differ for several reasons, including (a)

the use or non-use of grinding steps, (b) the waste disposal steps; and (c) the steps necessary to

remove impurities from the ore; (2) the differences in production steps result in different

production costs; and (3) for these reasons, the phosphate rock produced from sedimentary

reserves is "not comparable" to phosphate rock that JSC Apatit produced in Russia from igneous

reserves.  Moreover,

> because we are comparing JSC Apatit's phosphate rock cost buildup to world
> market phosphate rock export prices in this Tier 3 analysis, we find that the
> production method and corresponding production costs for the underlying good
> are "conditions of purchase or sale," and thus necessary characteristics to consider
> in our selection of a comparable benchmark.  The GOR is providing JSC Apatit
> with the right to mine phosphate ore from igneous reserves.  Accordingly, to
> calculate JSC Apatit's subsidy rate as accurately as possible under this Tier 3
> analysis, we are comparing JSC's cost buildup to a benchmark for phosphate rock
> produced on the most comparable basis possible.  For these reasons, and
> consistent with the *Final Determination*, we have continued to limit the
> benchmark to countries with igneous phosphate ore deposits as opposed to
> sedimentary deposits.

Final Decision Memo at 31.  P.R. 242.

The fatal flaws in this rationale are as follows. First, the record does not contain any evidence concerning the relative cost to produce phosphate rock from igneous ore versus from sedimentary ore.[9] Moreover, there is no evidence that all producers of phosphate rock from igneous ore formations incur the same production costs. Finally, there is no evidence that each producer of phosphate rock in Togo or Iran incurs different production costs from each producer in Brazil, Finland, or South Africa. Therefore, Commerce had no evidentiary basis to conclude that production costs were different depending on the type of ore formation and the precise ore deposit from which the phosphate rock was mined.[10]

Second, Commerce's conclusion that different production processes resulted in different production costs relied solely upon excerpts from a book authored by Prof. Petr Ptacek that Mosaic submitted.[11] However, the author did not draw any distinction between phosphate rock produced from igneous formations as opposed to sedimentary formations for any purpose, including the marketability of exports, or the grade, the quality, or the suitability for phosphate fertilizer production. Nor did he state that different production processes necessarily generated

---

[9] Commerce stated that "ADM did not cite any evidence that the underlying costs for producing phosphate rock from each type of deposit are the same despite these {physical} differences." Final Decision Memo at 31. P.R. 242. However, if Commerce was going to rely on alleged production cost differences to distinguish sedimentary from igneous rock, then it, not ADM, had the burden of supporting that reliance with record evidence.

[10] The export prices that Commerce relied upon in its final benchmark calculation differed significantly from month to month and from country to country. See P.R. 243 at Attachment 1. For example, the average per unit export price in April 2021 was $116/MT in Brazil, $190/MT in Finland, and $143/MT in South Africa. Similarly, in June 2021, the average per unit export price was $204/MT in Brazil, $233/MT in Finland, and $184/MT in South Africa. These wide variations in export prices support the inference that production costs also vary widely among producers of phosphate rock from igneous formations. To put it another way, they do not support the inference that production costs are the same from country to country or from producer to producer in any particular country.

[11] See Exhibits 19-21 to Mosaic's Benchmark Submission, which consist of Chapters 7, 8, and 9 from a book authored by Prof. Ptacek. P.R. 133.

different production costs. Rather, in Chapter 9 of his book, the author stated (at p. 437) that "Commercial phosphate rocks vary in grade from about 80 to 60 BLP. Most international trade involves higher-grade phosphate rocks and lower-grade rocks are often used at local processing facilities."[12] In other words, Prof. Ptacek did not distinguish grade or the nature of international trade based on the ore from which the rock is produced. P.R. 133.

Thus, it is the BPL content of the ore, not the formation from which it is produced, that determines the quality of the phosphate rock. Prof. Ptacek implicitly confirmed this contention where he stated that "Since the grade of phosphate rock determines the grade of the SSP product, high-grade rocks are desirable . . . . It is extremely difficult to produce single superphosphate from some igneous rocks." See Chapter 9 at 438. P.R. 133.

Third, Commerce implicitly assumed, without any record basis, that all producers of phosphate rock from igneous formations, regardless of the country in which they were located, used the same production processes and, as a result, incurred the same production costs.

Fourth, it is equally likely that producers of phosphate rock from sedimentary formations incurred the same or similar production costs as producers of rock from igneous formations, regardless of any differences in the production processes that they used.

Fifth, no record evidence suggests that the production cost, as opposed to the quality and/or price of phosphate rock, matters to phosphate fertilizer producers that purchase that rock.

Sixth, Commerce ignored evidence that ADM submitted showing that phosphate fertilizer producers in Brazil, India, Japan, and New Zealand imported phosphate rock from

---

[12] As noted in a previous footnote, BLP content, also abbreviated as BPL, or bone phosphate of lime, converts to $P_2O_5$ content at a ratio of 0.4576. Thus, for example, a BPL content of 60% converts to a $P_2O_5$ content of 27.46%. See conversion factors in Chapter 9 of the Mr. Ptacek's book at p. 436, provided as Exhibit 21 to Mosaic's Benchmark Submission. P.R. 133.

countries that produced that rock from both igneous and sedimentary formations. Commerce's failure to address this evidence renders the <u>Final Results</u> unsupported by substantial evidence and, therefore, unlawful. See, e.g., <u>CS Wind Vietnam Co., Ltd. v United States</u>, 832 F.3d 1367, at 1373-74 (Fed. Cir. 2016); <u>Wind Tower Trade Coalition v. United States</u>, 569 F.Supp.3d 1221, at 1241, 1247-49 (Ct. Int'l Trade 2022) (citing <u>Altx, Inc. v. United States</u>, 167 F.Supp.2d 1353, at 1374 (Ct. Int'l Trade 2001) ("While the ITC need not address every argument and piece of evidence . . . , it must address significant arguments and evidence which seriously undermines its reasoning and conclusions.")

Seventh, Commerce erred in finding that differences in "production method and corresponding production costs for the underlying good are 'conditions of purchase or sale.'" Final Decision Memo at 31. P.R 242. The record contains no evidence that either purchasers or sellers of phosphate rock distinguish between the type of ore formation from which phosphate rock is produced.

Eighth, Commerce ignored that fact that exports from Togo and Iran, like exports from Brazil, Finland, and South Africa, possessed the same or similar BPL levels as phosphate rock produced in Russia.

Finally, Commerce ignored its own finding in its November 1, 2023 "Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco; 2020-2021" (at 27) that "there is no requirement in the statute or {Commerce's} regulations that a benchmark price match precisely all of the characteristics of the subsidized product."

**C.    Commerce's Benchmark Calculation Contradicts the Analysis of This Court in <u>The Mosaic Company v. United States</u>**

**1.    The Holding in <u>The Mosaic Company v. United States</u>**

On September 14, 2023, Judge Stanceu issued his Opinion and Order in <u>The Mosaic Company v. United States</u>, 659 F.Supp.2d 1285 (Ct. Int'l Trade 2023) ("the <u>Mosaic Decision</u>"). ADM, upon recognizing the relevance of this decision, quickly submitted Judge Stanceu's slip opinion as an attachment to its Notice of Subsequent Authority on September 21, 2023 along with an explanation of its relevance.  See P.R. 234 and Slip Opin. No. 23-134.

In that opinion, the Court, under the caption, "The World Price Benchmark for Phosphate Rock," considered whether Commerce had correctly calculated the Tier 3 benchmark for measuring the benefit that the Moroccan government provided in return for phosphate rock mining rights during the investigation phase of the proceeding.[13]  659 F.Supp.2d at 1305-1309. The Court first stated that "Commerce identified thirteen world market prices for phosphate rock that were sold on a free-on-board basis and were comparable to the phosphate rock produced by OCP {the Moroccan producer}, based on similarities in BPL level or $P_2O_5$ (phosphorus pentoxide) content."[14]  Id. at 1305.

Mosaic challenged Commerce's use of all 13 prices to calculate the benchmark on the ground that "Commerce unlawfully included two prices reflecting lower-quality Egyptian rock in the calculation of the world price benchmark."  Id.  at 1307.  However, the Court observed that

---

[13] The Commerce remand decision in <u>Mosaic</u> is currently pending before this Court, but in the remand proceeding The Mosaic Company did not challenge the Court's affirmance of Commerce's calculation of the Tier 3 benchmark for phosphate rock.  See docket entries in Court No. 21-00116.

[14] OCP was the Moroccan phosphate fertilizer producer being investigated for its alleged receipt of countervailable subsidies attributable to the Moroccan government's provision of phosphate rock mining rights.

Commerce had previously concluded that Egyptian phosphate rock "has a similar BPL or $P_2O_5$ content as OCP's phosphate rock." Id. at 1308.

The Court then stated that Mosaic "does not deny that Commerce, in calculating the benchmark, 'include[d] *all* phosphate rock prices on the record -- including Egyptian prices -- that fall within or overlap with the BPL and $P_2O_5$ content range of OCP's rock.'" Id. "Nor does Mosaic deny that 'phosphate content/BPL content' is 'the industry's own standard . . . metric of comparability' for phosphate rock." Id. Instead, Mosaic argued that "'phosphate rock characteristics other than BPL content affect rock quality' and that Egyptian phosphate rock is compromised by 'qualitative differences' such as 'elevated levels of carbonate and iron' that render the Egyptian rock 'low quality.'" Id. (Emphasis added.)

The Court rejected Mosaic's argument on the ground that Mosaic had relied "on record evidence that Commerce could have regarded as having little if any probativity on the issue presented." Id. Specifically, Mosaic relied on a single report for the proposition that "Egyptian rock is low-quality and mostly used in low-value applications." Id. The "report" was in fact based on a speculative article published by a commodities research firm. Id.

OCP pointed out that this article "does not substantiate the extent to which the carbonate or iron content in Egyptian rock renders it low quality for purposes other than manufacturing phosphoric acid, nor does the article, or other record evidence provide 'any actual analysis of the carbonate and iron levels or the end use of the Egyptian rock as compared to OCP's rock produced during the POI.'" Id. at 1308-09. For these reasons, the Court denied Mosaic's claim that it should direct Commerce to eliminate the Egyptian phosphate rock prices from its Tier 3 benchmark calculation. Id.

### 2.   Commerce's Decision in This Case Is Inconsistent with the Holding in the Mosaic Decision

The benchmark-related arguments raised by Mosaic that the Court rejected in the Mosaic Decision are identical in nature to the arguments that Commerce accepted in this case. As similarly noted in the Mosaic Decision, Commerce in this review did not dispute that the BPL content of the phosphate rock exported from Togo and Iran was similar to the BPL content of the rock produced in Russia, Brazil, Finland, and South Africa. Nor did Commerce deny that BPL content is the "standard metric of comparability" of phosphate rock in the phosphate fertilizer production industry.

Instead, in its Final Decision Memo (at 30), Commerce rejected the inclusion of the Togo and Iran volume and value data in the benchmark calculation on the ground that "the igneous versus sedimentary distinction is material to our benefit analysis." P.R. 242. Specifically, "any differences in the production process for phosphate rock from sedimentary deposits versus igneous deposits are relevant to our analysis" because JSC Apatit beneficiated phosphate rock from igneous ore deposits. Id. To support this conclusion, Commerce relied on "the report from Prof. Ptacek" that "identified different steps to mine and beneficiate each type of ore":

> The beneficiation of igneous phosphate ores, for example, involves grinding the ore in a rod mill or "closed circuit ball mill." By contrast, the chart {provided by Prof. Ptacek} identifies no grinding step to beneficiate sedimentary phosphate ores. The chart also identifies different waste disposal steps for sedimentary ores (e.g., "clay waste") that are not present for igneous ores. Additionally, the Ptacek report identifies other impurities and beneficiation methods specific to each type of ore, such as the process of heading sedimentary ores to extremely high temperatures to remove certain compounds. This information demonstrates that the production of phosphate rock from igneous deposits involves different production steps, and hence different production costs, compared to the production of phosphate rock from sedimentary deposits. Given our focus on JSC Apatit's costs to mine and beneficiate phosphate ore into phosphate rock in this Tier 3 analysis, we find that phosphate rock produced in Togo and Iran from sedimentary reserves is not comparable to phosphate rock that JSC Apatit produced in Russia from igneous reserves.

Final Decision Memo at 30-31 (footnotes omitted, emphasis added). P.R. 242. We now

demonstrate that the Department's reliance on the Ptacek report was misplaced and is directly

contradicted by the Mosaic Decision.

First, Commerce failed to identify any authority or study that treated the source or the

production process or production cost of phosphate rock as relevant to a purchaser's decision so

long as the BPL content of that rock met its requirements. Commerce rejected this argument

because:

> ADM's reference to the "marketability" of beneficiated phosphate rock in the
> context of the Tier 3 benefit analysis is misplaced. The marketability of
> phosphate rock from each type of deposit only relates to the product
> characteristics of the final beneficiated product available on the market. The steps
> to mine and beneficiate phosphate ore from each type of deposit are different, and
> ADM did not cite any evidence that the underlying costs for producing phosphate
> rock from each type of deposit are the same despite these differences.

Final Decision Memo at 31. However, in the Mosaic Decision, the Court found that "phosphate

content/BPL content" is "the industry's own standard . . . metric of comparability." 659

F.Supp.2d at 1308. As such, and in the absence of any record evidence to the contrary,

production processes and production costs are irrelevant to the comparability of phosphate rock

produced from igneous ore versus sedimentary ore formations.

Second, the Department relied on a single "report" compiled by Prof. Ptacek for the

proposition that production processes are different for phosphate rock produced from igneous

versus sedimentary ores. This distinction closely resembles Mosaic's failed effort in the Mosaic

Decision to distinguish allegedly "low quality" Egyptian phosphate rock on the ground that its

carbonate and iron content affected quality. Specifically, Mosaic contended that "phosphate rock

characteristics other than BPL content affect rock quality" and that Egyptian phosphate rock is

compromised by "qualitative differences" such as "elevated levels of carbonate and iron" that render the Egyptian rock "low quality." 659 F.Supp.2d at 1308.

In short, Mosaic argued that there were qualitative differences in Egyptian rock just as Commerce here found that there were "qualitative differences" between phosphate rock sourced from igneous versus sedimentary ores. The Court rejected this argument because it had "little if any probativity." Id.

Specifically, Mosaic there had relied on a single article published by a commodity research firm to the effect that "Egyptian rock is low-quality and mostly used in low-value applications." Id. Similarly here, Commerce relied on a single report by Prof. Ptacek that contained no information concerning production cost differences between phosphate rock produced from igneous ore versus sedimentary ore. In other words, there is no basis in the record for the distinction that Commerce drew between the two sources of phosphate rock based on alleged production cost differences.

Third, Commerce did not address, much less dispute, the relevance of the information that ADM submitted that demonstrated that importers in Brazil, India, Japan, and New Zealand relied upon phosphate rock produced from both igneous and sedimentary ores. ADM Rebuttal Brief at 8-10. P.R. 216.

### 3. Commerce Erroneously Refused to Consider ADM's Notice of Subsequent Authority

On October 18, 2023, Commerce rejected ADM's Notice of Subsequent Authority because "it contains untimely new argument for the final results." P.R. 238. Commerce further stated that ADM was required to submit all arguments in its Original Case Brief, which it filed on June 12, 2023, and in its Rebuttal Brief, which it filed on July 5, 2023. Of course, it was

impossible for ADM to submit this Court's September 14, 2023 <u>Mosaic Decision</u> by no later than July 5, 2023.

Equally important, both Commerce and this Court have routinely accepted Notices of Subsequent Authority.  See, e.g., <u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrial A.S v. United States</u>, 635 F.Supp.2d 1339 (Ct. Int'l Trade 2009); <u>Norsk Hydro Canada, Inc. v. United States</u>, 341 F.Supp.2d 1263 (Ct. Int'l Trade 2004); <u>Nucor Corp. v. United States</u>, 621 F.Supp.2d (Ct. Int'l Trade 2009); <u>Giorgio Foods, Inc. v. United States</u>, 804 F.Supp.2d (Ct. Int'l Trade 2011); and <u>Amanda Foods (Vietnam) Ltd. v. United States</u>, 33 C.I.T. 1407 (Ct. Int'l Trade 2009).  Thus, nothing prevents this Court from considering the opinion in the <u>Mosaic Case</u> even if Commerce (erroneously) failed to consider it.

Finally, on May 9, 2023, Commerce issued a proposed regulation that, among other things, expressly recognized the right of interested parties to submit notices of subsequent authority and it also proposed to allow responsive comments to those notices.  See 88 Fed. Reg. 29,850 at 29,857.  Specifically, the Department proposed to add a new subsection 351.301(c)(6) to 19 C.F.R.  This proposed regulation authorizes the filing of "Notices of Subsequent Authority" no later than 30 days before the issuance of the final determination in a proceeding.  Moreover, interested parties would be entitled to have five days to respond to a properly and timely filed Notice.  ADM's submission was timely under this proposed rule, which Commerce finalized on March 25, 2024.  See 89 Fed. Reg. 20,766, at 20,767.  This Court may take judicial notice of the proposed and final rules.

### D.     Commerce's Reliance on Miniscule Export Volumes from Brazil, Finland, and South Africa Contradicts the Tier 3 Benchmark Regulation

It is undisputed that 2021 export volumes of phosphate rock from Brazil, Finland, and South Africa totaled 36,684 MT and, therefore, they accounted for just 0.63 percent of total

export volumes in that year of phosphate rock with a BPL content of 78% and higher. Even if the Department were to find that the record supports Commerce's finding that the type of ore from which phosphate rock is produced makes export data from other countries with igneous phosphate rock deposits more comparable to the Russian phosphate rock for which it is seeking to measure the adequacy of remuneration, limiting the benchmark to only three countries (i.e., Brazil, Finland, and South Africa) that collectively exported a miniscule percentage of the total volume and value of exports of phosphate rock from all countries with similar BPL content would undermine the robustness of the phosphate rock benchmark.

The Department has stated that it is obligated to determine Tier 3 benchmarks using "the most robust world market price possible that reflects the broadest spectrum of prices available under market principles." See <u>Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the PRC</u>, Issues and Decision Memorandum, dated December 4, 2017 (at Comment 4, p.42). In that case, the Department selected both weightable and un-weightable data sources to construct its Tier 3 benchmark to "maintain the most robust world market price possible that reflects the broadest spectrum of prices available under market principles."

In contrast here, the record does not support excluding a significant volume and value of exports of phosphate rock from a broader range of countries with similar BPL content merely because the source of that rock is sedimentary ore rather than igneous ore.

## VII. CONCLUSION

For the forgoing reasons, ADM respectfully requests that the Court: (1) grant its Rule 56.2 Motion for Judgment on the Agency Record: (2) find that Commerce's calculation of the Tier 3 benchmark for valuing phosphate rock mining rights was not supported by substantial evidence and was not otherwise in accordance with law; and (3) remand the Final Determination

with an instruction to recalculate the Tier 3 benchmark used to measure the benefit of mining rights provided for LTAR and JSC Apatit's resulting CVD margin consistent with the arguments set forth above.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760
wconnelly@tradepacificlaw.com

Counsel for the Archer Daniels Midland Company

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that the foregoing Memorandum of Points and Authorities complies with the word-count limitation in the Standard Chambers Procedures. This Memorandum contains 7,984 words according to the word-count function used in the word processing software used to prepare this Memorandum.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760
wconnelly@tradepacificlaw.com

Dated: June 5, 2024