## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) |
| Plaintiff, | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Plaintiff-Intervenor, and Consolidated Plaintiff, and | ) |
| THE MOSAIC COMPANY, | ) |
| Consolidated Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor, and Consolidated Defendant-Intervenor, and | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Consolidated Defendant-Intervenor. | ) |

Consol. Court No. 23-00239

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
K. GARRETT KAYS
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 482-0018
Email: Kenneth.Kays@trade.gov

SOSUN BAE
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7568
Fax: (202) 514-8624
Email: Sosun.Bae@usdoj.gov

November 21, 2024

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

<u>PAGES</u>

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT
UPON THE AGENCY RECORD ..................................................................................1

STATEMENT PURSUANT TO RULE 56.2 ...........................................................................2

    I.     Administrative Decision Under Review......................................................2

    II.    Issues Presented ......................................................................................2

STATEMENT OF FACTS ....................................................................................................3

    I.     Commerce Issues A Countervailing Duty Order.........................................3

    II.    Commerce Initiates A Review Of The Order ...............................................3

    III.   Preliminary Results ...................................................................................4

    IV.   Final Results.............................................................................................5

ARGUMENT .......................................................................................................................5

    I.     Standard Of Review....................................................................................5

    II.    Commerce's Reliance On Data Only From Calendar Year 2021 In
             Calculating JSC Apatit's Subsidy Rate Is Lawful And Consistent
             With Its Practice.......................................................................................6

          A.    Relevant Legal Framework.................................................................6

          B.    Relevant Factual Background ............................................................8

          C.    Commerce Acted Consistently With Its Past Practice, And JSC
                Apatit Cannot Establish That Commerce Acted Unlawfully In
                Doing So.........................................................................................9

    III.   Commerce's Application Of AFA To The GOR Is Supported By
             Substantial Evidence And In Accordance With Law...............................11

          A.    Relevant Legal Framework For Application Of AFA.................11

          B.    Relevant Factual Background As To The GOR's
                Non-Cooperation .........................................................................12

C.   Commerce Reasonably Applied AFA To The GOR In Countervailing JSC Apatit's Natural Gas Purchases ...................14

IV.   Commerce's Selection Of Kazakh Export Prices For Its Tier-Two Benchmark Calculation For The Provision Of Natural Gas For LTAR Is Supported By Substantial Evidence And In Accordance With Law........19

A.   Legal Framework For The Selection Of Benchmarks..................19

B.   Commerce's Selection Of Kazakh Exports As A Two-Tier Benchmark....................................................................................21

C.   Commerce Did Not Err In Selecting Kazakh Export Prices For Its Tier-Two Benchmark Calculation For The Provision Of Natural Gas For LTAR ............................................................................23

V.   Commerce's Tier-Three Benchmark For The Provision Of Mining Rights For LTAR Is Supported By Substantial Evidence And In Accordance With Law ...............................................................................28

A.   Relevant Factual Background And Framework For Tier-Three Analysis For Mining Rights..........................................................28

B.   Commerce's Phosphate Rock Benchmark Is Reflective Of Prevailing Market Conditions In Russia And Consistent With Market Principle ...................................................................................................30

VI.   Commerce Correctly Included Cost Of Sale Plus Profit In JSC Apatit's Mining Rights Benefit Calculation ...........................................................37

CONCLUSION...........................................................................................................42

**TABLE OF AUTHORITIES**

**CASES**                                                                    **PAGES**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) .......................................................12, 14

*AG der Dillinger Hüttenwerke v. United States,*
    672 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) ...............................................................6

*Allied-Signal Aerospace Co. v. United States,*
    28 F.3d 1188 (Fed. Cir. 1994) .................................................................................16

*Archer Daniels Midland Co. v. United States,*
    917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ............................................................14

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) .................................................................................6

*Changzhou Trina Solar Energy Co., Ltd. v. United States,*
    359 F. Supp. 3d 1329 (Ct. Int'l Trade 2019) ............................................................17

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) .................................................................................................6

*Cooper Kunshan Tire Co., Ltd. v. United States,*
    610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ............................................................19

*Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers,*
    *AFL–CIO,*
    6 F.3d 1511 (Fed. Cir. 1993) ...................................................................................34

*Domestic Oil, Inc. v. United States,*
    357 F.3d 1278 (Fed. Cir. 2004) ..................................................................................7

*DuPont Teijin Films USA, LP v. United States,*
    407 F.3d 1211 (Fed. Cir. 2005) ..................................................................................5

*Essar Steel Ltd. v. United States,*
    721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ............................................................12

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ................................................................................12

*Fine Furniture (Shanghai) Ltd. v. United States,*
    748 F.3d 1365 (Fed. Cir. 2014) ...........................................................................12, 14

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ............................................................5, 39

*Guizhou Tyre Co. v. United States,*
    399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .................................................17

*Habas Sinai v. United States,*
    536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) .................................................31

*Magnola Metallurgy, Inc. v. United States,*
    508 F. 3d 1349 (Fed. Cir. 2007) ...................................................................21

*Mosaic Company v. United States,*
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) .................................................34

*Mosaic Company v. United States,*
    589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) .................................................40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................7, 36

*NMB Sing. Ltd v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009) ....................................................................36

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ......................................................................6

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ...............................................................11, 12

*Nucor Corp. v. United States,*
    633 F. Supp. 3d 1225 (Ct. Int'l Trade 2023) .................................................31

*Nucor Corp. v. United States,*
    927 F.3d 1243 (Fed. Cir. 2019) ....................................................................31

*Papierfabrik August Koehler SE v. United States,*
    843 F.3d 1373 (Fed. Cir. 2016) ....................................................................12

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014) .........................................................16, 34, 35

*Qingdao Taifa Grp. Co. v. United States,*
    780 F. Supp. 2d 1342 (Ct. Int'l Trade 2011) .................................................16

*QVD Food Co., v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ....................................................................34

*Reiner Brach GmbH & Co. KG v. United States,*
    206 F. Supp. 2d 1323 (Ct. Int'l Trade 2002) ............................................................36

*Risen Energy Co., Ltd. v United States,*
    658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) .......................................................18, 35

*RZBC Group Shareholder Co. v. United States,*
    100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ............................................................34

*Save Domestic Oil, Inc. v. United States,*
    357 F.3d 1278 (Fed. Cir. 2004)..................................................................................7

*Seah Steel Vina Corp. v. United States,*
    332 F. Supp. 3d 1314 (Ct. Int'l Trade 2018) ..............................................................5

*Timken Co. v. United States,*
    16 Ct. Int'l Trade 142 (1992)...................................................................................40

*United States v. Zenith Radio Corp.,*
    562 F.2d 1209 (C.C.P.A. 1977) ...............................................................................39

*United States v. Zenith Radio Corp.,*
    437 U.S. 443 (1978) ................................................................................................40


## **STATUTES**

19 U.S.C. § 1516a(b)(1)(B) ...............................................................................................5

19 U.S.C. § 1675(a)(1)......................................................................................................6

19 U.S.C. § 1677(5)(B).................................................................................11, 13, 14, 15

19 U.S.C. § 1677(5)(D)(iii)........................................................................................13, 21

19 U.S.C. § 1677 e(a) ......................................................................................................11

19 U.S.C. § 1677 e(b) ......................................................................................................11

19 U.S.C. § 1677 m(c)(1).................................................................................................13

19 U.S.C. § 1677 m(d)......................................................................................................19

## **REGULATIONS**

19 C.F.R. § 351.213(e)...................................................................................................6, 9

19 C.F.R. § 351.213(e)(2)(ii) ...............................................................................................7

19 C.F.R. § 351.511(a)(iii).................................................................................................30

19 C.F.R. § 351.511(a)(2)...................................................................................................19

19 C.F.R. § 351.511(a)(2)(i)...............................................................................................20

19 C.F.R. § 351.511(a)(2)(ii) ..................................................................................... *passim*

19 C.F.R. § 351.511(a)(2)(iii) ......................................................................................28, 31

## **ADMINISTRATIVE DETERMINATIONS**

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ..........................................37

*Carbon and Alloy Steel Wire Rod from the Republic of Turkey,*
    83 Fed. Reg. 13,239 (Dep't of Commerce Mar. 28, 2018)..........................................27

*Certain Oil Country Tubular Goods from India,*
    82 Fed. Reg. 18,282 (Dep't Commerce Apr. 18, 2017) ................................................8

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*
    83 Fed. Reg. 11,694 (Dep't of Commerce Mar. 16, 2018) ...........................................7

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*
    82 Fed. Reg. 42,287 (Dep't of Commerce Sept. 7, 2017) .............................................8

*Certain Cold-Rolled Steel from the Russian Federation,*
    81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016)....................................21, 29

*CVD Preamble,*
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)................................. *passim*

*Fine Denier Polyester Staple Fiber from the People's Republic of China,*
    83 Fed. Reg. 3,120 (Jan. 23, 2018) ............................................................................27

*Glycine from India,*
    87 Fed. Reg. 2,761 (Dep't Commerce Jan. 19, 2022) ........................................7, 9, 10

*Granular Polytetrafluoroethylene Resin from the Russian Federation,*
    87 Fed. Reg. 3,764 (Dep't of Commerce Jan. 25, 2022) ...............................23, 24, 25

*Honey from Argentina,*
    69 Fed. Reg. 29,518 (Dep't of Commerce May 24, 2004) ....................................7, 10

*Oil Country Tubular Goods from the Russian Federation,*
    87 Fed. Reg. 14,249 (Dep't of Commerce Mar. 14, 2022)...................................23, 24

*Phosphate Fertilizers From Morocco,*
    86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) ....................................20, 27

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation,*
    86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) ............................................3

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:*
    *Initiation of Countervailing Duty Investigations,*
    85 Fed. Reg. 44,505 (Dep't of Commerce July 23, 2020)............................................3

*Phosphate Fertilizers From the Russian Federation,*
    88 Fed. Reg. 76,182 (Dep't of Commerce Nov. 6, 2023)............................................2

*Phosphate Fertilizers From the Russian Federation,*
    88 Fed. Reg. 28,505 (Dep't of Commerce May 4, 2023) ............................................4

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the*
    *Administration of the Antidumping and Countervailing Duty Laws,*
    89 Fed. Reg. 29, 850 (Dep't of Commerce May 9, 2023) ...........................................36

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the*
    *Administration of the Antidumping and Countervailing Duty Laws,*
    89 Fed. Reg. 20,766 (Dep't of Commerce Mar. 25, 2024)...........................................37

*Stainless Steel Sheet and Strip in Coils from the Republic of Korea,*
    67 Fed. Reg. 1,964 (Dep't of Commerce Jan. 15, 2002) ..............................................8

*Steel Concrete Reinforcing Bar From the Republic of Turkey,*
    85 Fed. Reg. 16,056 (Dep't of Commerce Mar. 20, 2020)..........................................28

*Urea Ammonium Nitrate Solutions From the Russian Federation,*
    87 Fed. Reg. 37,836 (Dep't of Commerce June 24, 2022) ..........................................20

*Urea Ammonium Nitrate Solutions From the Russian Federation,*
    86 Fed. Reg. 68,635 (Dep't of Commerce Dec. 3, 2021) ...........................................24

*Utility Scale Wind Towers from the People's Republic of China,*
    77 Fed. Reg. 75,978 (Dep't of Commerce Dec. 26, 2012) .........................................23

*Wood Mouldings and Millwork Products from the People's Republic of China,*
88 Fed. Reg. 62,319 (Dep't of Commerce Sept. 11, 2023)..........................................7

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, )<br><br>Plaintiff, )<br><br>JOINT STOCK COMPANY APATIT, )<br><br>Plaintiff-Intervenor,<br>and Consolidated<br>Plaintiff, and )<br><br>THE MOSAIC COMPANY, )<br><br>Consolidated<br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>THE MOSAIC COMPANY, )<br><br>Defendant-Intervenor, and<br>Consolidated Defendant-<br>Intervenor, and )<br><br>JOINT STOCK COMPANY APATIT, )<br><br>Consolidated Defendant-<br>Intervenor. )<br> | Consol. Court No. 23-00239 |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment upon the agency record,

defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative

record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                    _____
      New York, New York                                        JUDGE

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) |
| Plaintiff, | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Plaintiff-Intervenor, and Consolidated Plaintiff, and | ) |
| THE MOSAIC COMPANY, | ) |
| Consolidated Plaintiff, | ) |
| v. | )  Consol. Court No. 23-00239 |
| UNITED STATES, | ) |
| Defendant, | ) |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor, and Consolidated Defendant-Intervenor, and | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Consolidated Defendant-Intervenor. | ) |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the rules of this Court, defendant, the United States, respectfully submits this response to the motions for judgment on the agency record filed by plaintiffs Archer Daniels Midland Company (ADM), plaintiff-intervenor and consolidated plaintiff Joint Stock Company Apatit (JSC Apatit), and consolidated plaintiff The Mosaic Company (Mosaic)

concerning the Department of Commerce's (Commerce) final results in the administrative review

of the countervailing duty order covering phosphate fertilizers from Russia.  Because

Commerce's determination is supported by substantial evidence and is otherwise in accordance

with law, the Court should deny plaintiffs' motions.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Decision Under Review

The administrative determination under review is *Phosphate Fertilizers From the Russian

Federation*, 88 Fed. Reg. 76,182 (Dep't of Commerce Nov. 6, 2023) (final results) (P.R. 246),[1]

and accompanying Issues and Decision Memorandum (IDM) (P.R. 242).  The period of review is

November 30, 2020, through December 31, 2021.  *Id.*

### II.    Issues Presented

1.    Whether Commerce's decision to rely on record evidence from calendar year

2021 is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's application of adverse facts available (AFA) to the

Government of Russia (GOR) regarding JSC Apatit's natural gas purchases is supported by

substantial evidence and in accordance with law.

3.    Whether Commerce's selection of Kazakh export prices for its tier-two

benchmark calculation for the provision of natural gas for less than adequate remuneration

(LTAR) is supported by substantial evidence and in accordance with law.

4.    Whether Commerce's selection of a tier-three benchmark for phosphate mining

rights for LTAR is supported by substantial evidence and in accordance with law.

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of
the underlying administrative review.

5.     Whether Commerce's calculation of cost of sale plus profit in JSC Apatit's mining rights benefit calculations is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

### I.    Commerce Issues A Countervailing Duty Order

On July 16, 2020, Commerce initiated a countervailing duty investigation covering phosphate fertilizers from Russia.  *See Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:  Initiation of Countervailing Duty Investigations,* 85 Fed. Reg. 44,505 (Dep't of Commerce July 23, 2020).  Following final affirmative determinations by Commerce and the International Trade Commission (ITC), Commerce published its countervailing duty order.  *See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation*, 86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) (order).

### II.    Commerce Initiates A Review Of The Order

On June 9, 2022, Commerce initiated its first administrative review of the order. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't of Commerce June 9, 2020) (P.R. 6).  On July 20, 2022, Commerce issued its initial questionnaire to the GOR, with instructions to forward the questionnaire to mandatory respondent JSC Apatit.[2]  *See* Initial Questionnaire, dated July 20, 2022 (P.R. 16).  On August 8, 2022, JSC Apatit submitted its affiliate questionnaire response.  *See* JSC Apatit Affiliate Questionnaire Response, dated Aug. 8, 2022 (C.R. 3) (P.R. 28).  On September 13, 2022, the Russian Ministry of Economic Development submitted its response to the initial questionnaire.

---

[2]  Commerce had also selected Industrial Group Phosphorite LLC, but rescinded its review with regard to the company based on an absence of suspended entries during the period of review.  *See* Notice of Intent to Rescind Review, In Part, dated July 22, 2022 (P.R. 20).

*See* GOR CVD Initial Questionnaire Response, dated Sept. 13, 2022 (C.R. 5) (P.R. 38).  JSC

Apatit then submitted its Section III questionnaire response on September 23, 2022.  *See* JSC

Apatit Section III Questionnaire Response, dated September 23, 2022 (C.R. 31) (P.R. 60).

Commerce issued supplemental questionnaires to JSC Apatit and the GOR, to which both parties

responded.

## III.    <u>Preliminary Results</u>

On May 4, 2023, Commerce published its preliminary results.  *See Phosphate Fertilizers*

*From the Russian Federation*, 88 Fed. Reg. 28,505 (Dep't of Commerce May 4, 2023)

(preliminary results) (P.R. 191) and accompanying Preliminary Decision Memorandum (PDM)

(P.R. 188).  Commerce preliminarily determined that JSC Apatit had received countervailable

subsidies during the period of review, both with respect to the provision of natural gas for LTAR

and the provision of mining rights for LTAR.  *Id.* at 13-20.  Regarding natural gas for LTAR,

Commerce selected, as a tier-two benchmark, 2021 export prices from Kazakhstan.  *Id.* at 17.

Regarding mining rights for LTAR, Commerce selected, as a tier-three benchmark, export data

from the Global Trade Atalas (GTA) and UN Comtrade for Finland, Brazil, and South Africa.  *Id.*

at 10.

JSC Apatit submitted comments contesting certain aspects of the preliminary results.  *See*

JSC Apatit Response to Preliminary Results and Request for Meeting, dated May 16, 2023 (JSC

Apatit PDM Comments) (P.R. 193).  Between June 12, 2023, and August 4, 2023, ADM,

Mosaic, and JSC Apatit submitted case briefs and rebuttal briefs.  *See* ADM Case Brief, dated

June 12, 2023 (P.R. 204); Mosaic Case Brief, dated June 12, 2023 (C.R. 221); JSC Apatit Case

Brief, dated June 12, 2023 (C.R. 225); JSC Apatit Rebuttal Brief, dated July 5, 2023 (C.R. 223);

ADM Rebuttal Brief, dated July 5, 2023 (P.R. 216); Mosaic Rebuttal Brief, dated July 5, 2023

(C.R. 224); Resubmission of JSC Apatit Case Brief, dated Aug. 4, 2023 (C.R. 225).

IV.    **Final Results**

On November 6, 2023, Commerce published its final results, assigning JSC Apatit a

29.50 percent *ad valorem* countervailing duty margin.  *See* Final Results, 88 Fed. Reg. 76,182.

Commerce continued to rely on exports of Kazakh-origin natural gas under a tier-two benchmark

for the provision of natural gas for LTAR.  IDM at 46-49.  For the provision of mining rights for

LTAR, Commerce determined not to rely on the UN Comtrade data, as it had in the preliminary

results, but used only the GTA data as a tier-three benchmark.  *Id.* at 26.

This action followed.

## ARGUMENT

I.    **Standard Of Review**

In reviewing Commerce's countervailing duty determinations, "the Court of International

Trade must sustain 'any determination, finding or conclusion' by Commerce unless it is

'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)).  Substantial evidence requires "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Seah Steel Vina Corp. v. United States*, 332

F. Supp. 3d 1314, 1328 (Ct. Int'l Trade 2018) (quoting *DuPont Teijin Films USA, LP v. United

States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005)).  Substantial evidence is "less than the weight of

the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does

not prevent an administrative agency's finding from being supported by substantial evidence."

*AG der Dillinger Hüttenwerke v. United States*, 672 F. Supp. 3d 1351, 1354 (Ct. Int'l Trade

2023) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

A party challenging Commerce's determination under the substantial evidence standard

"has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1352 (Fed. Cir. 2006) (cleaned up), and the Court sustains Commerce's factual

determinations as long as they are reasonable and supported by the record as a whole, even if

some evidence detracts from the agency's conclusions. *Alt. Sugar Ltd. v. United States*, 744 F.2d

1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

## II. Commerce's Reliance On Data Only From Calendar Year 2021 In Calculating JSC Apatit's Subsidy Rate Is Lawful And Consistent With Its Practice

JSC Apatit contends that Commerce erred in relying only on data from calendar year

2021 to calculate its subsidy rate, and that Commerce should be required to also use data from

December 2020, as that month fell within the period of review. *See* JSC Apatit Br. at 43-47.

But, as Commerce explained, its practice is to rely only on one year's worth of data when the

period of review extends into a second year by no more than two months. Because Commerce

acted consistently with its past practice, and JSC Apatit cannot demonstrate legal error, this

Court should reject this argument.

### A. Relevant Legal Framework

Commerce is required to conduct periodic reviews at least once during each year

"beginning on the anniversary of the date of publication of a countervailing duty order{,}" if

such a review is requested. 19 U.S.C. § 1675(a)(1). These administrative reviews include, with

respect to countervailing duties, determinations as to "the amount of any net countervailable

subsidy." *Id.* at § 1675(a)(1)(A). Commerce conducts administrative reviews in accordance

with 19 C.F.R. § 351.213(e). Pursuant to this regulation, administrative reviews based on

6

"requests received during the first anniversary month after publication of an order or suspension of investigation" are to "cover entries or exports, as appropriate, during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the most recently completed calendar or fiscal year." 19 C.F.R § 351.213(e)(2)(ii).

When Commerce maintains a "routine practice for addressing like situations," it is required to "apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)). Commerce's practice with respect to administrative reviews with periods of review longer than one year and two months is to calculate separate subsidy rates for each year covered by the period of review. *See, e.g., Honey from Argentina*, 69 Fed. Reg. 29,518 (Dep't of Commerce May 24, 2004), and accompanying IDM at 32–33; *Wood Mouldings and Millwork Products from the People's Republic of China*, 88 Fed. Reg. 62,319 (Dep't of Commerce Sept. 11, 2023) (*Mouldings from China*), and accompanying IDM at 40. If the first year is less than a full year, Commerce calculates a subsidy rate based on data for the entire calendar year, rather than only the portion covered by the period of review, to avoid distortions in calculation. *Id.* "This practice recognizes the importance of the one-year period for financial reporting purposes and" accounts for "the fact that subsidies provided by a government can be provided only once a year, . . . be provided at only certain times during the year, or be provided unevenly during a year." *Glycine from India*, 87 Fed. Reg. 2,761 (Dep't of Commerce Jan. 19, 2022), and accompanying IDM at 10.

However, when the period of review extends into a second year by no more than two months, Commerce's policy is to rely only on one year's worth of data. *See Certain Passenger*

*Vehicle and Light Truck Tires from the People's Republic of China*, 83 Fed. Reg. 11,694 (Dep't of Commerce Mar. 16, 2018) (*PVLT from China*), and accompanying IDM at 12–13; *see also Certain Oil Country Tubular Goods from India*, 82 Fed. Reg. 18,282 (Dep't Commerce Apr. 18, 2017) (*OCTG from India*) and accompanying IDM at 3 n.7.

  **B.** **Relevant Factual Background**

  The period of review for this administrative review was November 30, 2020, through December 31, 2021.  IDM at 3.  Accordingly, JSC Apatit submitted data covering the entire period.  *See e.g.*, JSC Apatit Section III Questionnaire Response at 1, dated Sept. 23, 2022 (P.R. 60) (C.R. 31) ("This response covers Commerce's period of review ('POR'), which is November 30, 2020, through December 31, 2021.").

  In its preliminary results, Commerce explained that, consistent with its prior practice, it would rely exclusively on data from calendar year 2021 to determine JSC Apatit's subsidy rate, as the period of review spanned less than two months of 2020.  PDM at 2-3 (citing *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 82 Fed. Reg. 42,287 (Dep't of Commerce Sept. 7, 2017), and accompanying PDM at 9; *OCTG from India* IDM at 3 n.7; and *Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 67 Fed. Reg. 1,964 (Dep't of Commerce Jan. 15, 2002).

  While JSC Apatit argued in its case brief that Commerce should incorporate data from 2020 to calculate its subsidy rate, Commerce, in the final results, continued to rely on data only from 2021.  IDM at 11-13.  In doing so, Commerce reiterated that its practice was to rely on data from one year when a period of review extends into a second year by two months or less, and explained that calculating a rate for 2020 based only on data from December 2020 would disregard the significance of year-long periods in financial reporting.  *Id.* at 12–13.

**C.    Commerce Acted Consistently With Its Past Practice, And JSC Apatit Cannot Establish That Commerce Acted Unlawfully In Doing So**

JSC Apatit cannot demonstrate that Commerce erred by not incorporating data from December 2020 in calculating JSC Apatit's subsidy, as Commerce's reliance on only calendar year 2021 accords with its regulations and practice.

First, 19 C.F.R. § 351.213(e) does not provide a methodology for calculating subsidies, and Commerce's approach in the underlying proceeding was reasonable. *See Glycine from India* IDM at 10 (stating that Commerce's "practice recognizes the importance of the one-year period for financial reporting purposes and" accounts for "the fact that subsidies provided by a government can be provided only once a year, . . . be provided at only certain times during the year, or be provided unevenly during a year."). Commerce's reliance on only 2021 data is also consistent with its practice. For instance, in both *PVLT from China* and *Oil Country Tubular Goods from India*, Commerce relied solely on a single calendar year's worth of data when the period of review spanned into a second year by less than two months. *See PVLT from China* IDM at 12-13 ("Commerce's general policy is to rely on one year's worth of data when the POR of the first administrative review extends into a second year by no more than two months."), *OCTG from India* IDM at 3 n.7 (explaining Commerce's intention to base the assessment rate only on subsidy information provided for calendar year 2014 when the period of review was December 23, 2013 through December 31, 2014).

Moreover, even if Commerce *were* to rely on data from both 2020 and 2021, it could not, as JSC Apatit suggests, incorporate only the one month of data from December of 2020, as doing so would run counter to Commerce's practice. As Commerce explained, when it includes data from two years of a period (*i.e.*, in situations where the period of review includes more than two months of the second year), it uses data from the ***entirety*** of each year, not simply the months

included in the period of review.  *See* IDM at 12-13; *see also Honey from Argentina* IDM at 32–33.  Commerce does this to avoid distortions in the calculation of a subsidy rate, recognizing that subsidies can be provided once a year, only at certain times during the year, or unevenly throughout the year.  IDM at 12-13.  Here, JSC Apatit failed to place on the record an entire year's worth of data for 2020; rather, it only included information for December 2020.  *See* JSC Apatit Section III Response at 1 ("This response covers Commerce's period of review ('POR'), which is November 30, 2020, through December 31, 2021.").  Accordingly, Commerce could not include data from December 2020 without departing entirely from its practice; JSC Apatit has shown no reason for Commerce to do so.

JSC Apatit claims that the proceedings Commerce cited in its final results do not support its decision to only use data from 2021, contending that, at least with regard to *Honey from Argentina* and *Glycine from India*, Commerce calculated rates based on each year included in the period of review.  *See* JSC Apatit Br. at 46–47.  But this ignores a crucial distinction—that both reviews involved periods of review longer than one year and two months; here, of course, the period of review was only one year and **one** month.  *See Glycine from India* IDM at 9; *Honey from Argentina* IDM at 1.  Tellingly, JSC Apatit ignores that Commerce's practice, as articulated in *PVLT from China* and *OCTG from India*, "is to rely on one year's worth of data" if a "first administrative review extends into a second year by no more than two months."  *PVLT from China* IDM at 12–13.  Because Commerce's decision to only rely on data from calendar year 2021 in calculating JSC Appetit's subsidy is consistent with Commerce's practice and its regulations, this Court should reject JSC Apatit's argument.

**III.    Commerce's Application Of AFA To The GOR Is Supported By Substantial Evidence And In Accordance With Law**

Commerce's determination to apply AFA to the GOR with regard to JSC Apatit's purchases of natural gas from purportedly independent gas producers/suppliers is supported by substantial evidence and in accordance with law.  The GOR failed to cooperate to the best of its ability, and Commerce found that information necessary to determine whether JSC Apatit's gas producers/suppliers were actually independent was not available on the record; accordingly, Commerce reasonably determined, as AFA, that the gas producers/suppliers were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B), and that they had provided a financial contribution to JSC Apatit.

**A.    Relevant Legal Framework For Application Of AFA**

Pursuant to 19 U.S.C. § 1677e(a), Commerce follows a two-step process to determine whether to use an adverse inference when selecting among the facts otherwise available.  19 U.S.C. § 1677e(a).  Commerce will use facts otherwise available to fill gaps in the record if: (1) necessary information is not available; or (2) an interested party (a) withholds information requested by Commerce, (b) fails to provide the information in the form or in the manner requested, (c) significantly impedes the proceedings, or (d) provides information that cannot be verified.  *Id.*

Further, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b).  A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The standard requires that respondents "conduct prompt,

11

careful and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016). Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability*, regardless of motivation or intent*." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). Commerce, of course, "enjoys broad, although not unlimited, discretion" in both "the proprietary use of facts available" and "the application of adverse facts available." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 675 F. Supp. 2d 1287, 1304 (Ct. Int'l Trade 2009) (cleaned up).

In countervailing duty proceedings, Commerce requires information from both the foreign government in question and the foreign producers or exporters. "Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012). Accordingly, "{c}ooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," and "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

**B.    Relevant Factual Background As To The GOR's Non-Cooperation**

In the underlying review, JSC Apatit reported natural gas purchases both from affiliates of Gazprom—a Russian gas producer determined during the investigation to be an "authority" within the meaning of 19 U.S.C. § 1677(5)(B)—and certain purportedly independent gas producers/suppliers. PDM at 12 (citing JSC Apatit Section III Response at 39). In its initial

questionnaire, Commerce requested that the GOR respond to the input producer appendix for all natural gas producers/suppliers reported by JSC Apatit.  *Id*. at 12 (citing Initial Questionnaire at 17, 36–38), IDM at 50.  Because the GOR did not provide a response regarding JSC Apatit's purportedly independent gas producers/suppliers, Commerce reiterated its request in a supplemental questionnaire.  *See* Section II Supplemental Questionnaire at 5, dated Feb. 15, 2023 (P.R. 112) (C.R. 166).  In response, the GOR stated only "that it was 'trying to obtain the information requested by {Commerce},'" but did not provide any further information.  PDM at 12 (citing GOR Supplemental Questionnaire Response at 5, dated Mar. 13, 2023 (P.R. 129) (C.R. 175)).  The GOR presented no "alternative forms in which it could have submitted the requested information, in accordance with" 19 U.S.C. § 1677m(c)(1), and did not request an extension for providing the requested information.  PDM at 12-13.

In the preliminary results, Commerce applied AFA to the GOR, and as a result found that JSC Apatit's gas producers/suppliers were authorities within the meaning of the statute and that those producers/suppliers had provided JSC Apatit with a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii).  *Id*. at 13.  In doing so, Commerce explained that, due to the GOR's lack of cooperation, information necessary for it to determine whether the producers/suppliers were authorities was not available on the record.  *Id*.  Accordingly, Commerce found both that the GOR had withheld requested information and had failed to cooperate to the best of its ability.  *Id.*

In the final results, Commerce continued to find, as AFA, that the gas producers/suppliers listed by JSC Apatit were authorities under section 1677(5)(B), and that they had provided a financial contribution under section 1677(5)(D)(iii).  *See* IDM at 50-51.  Commerce explained that "the specific information . . . requested from the GOR in the Input Producer Appendix was

necessary to determine whether the producers/suppliers {we}re 'authorities'" under 19 U.S.C.

§ 1677(5)(B). *Id.* at 50. And, while JSC Apatit had provided certain information in an attempt

to demonstrate that its gas producers/suppliers were independent, Commerce determined that

"JSC Apatit {could not} simply provide other information in lieu of the GOR's failure to

respond," and that the documentation provided by JSC did not contain the level of detailed

information requested by Commerce of the GOR. *Id.* at 50-51.

**C.    Commerce Reasonably Applied AFA To The GOR In Countervailing JSC Apatit's Natural Gas Purchases**

Commerce reasonably found, as AFA, that JSC Apatit's gas producers/suppliers were

"authorities" within the meaning of 19 U.S.C. § 1677(5)(B), as the GOR clearly failed to

cooperate by not responding to Commerce's inquiries regarding the input producer appendix for

the gas producers/suppliers reported by JSC Apatit. As Commerce found, information necessary

to determine whether the gas producers/suppliers were authorities was not on the record.

As stated above, Commerce is entitled to broad discretion in the use of facts available and

the application of AFA. *See Ad Hoc Shrimp Trade Action Comm*, 675 F. Supp. 2d at 1304 (Ct.

Int'l Trade 2009). And, because Commerce requires information from both foreign governments

in countervailing duty proceedings, Commerce may apply AFA to those governments when they

fail to cooperate in providing requested necessary information, even if otherwise cooperating

respondents would be subject to collateral effects. *See Fine Furniture (Shanghai) Ltd.*, 748 F.3d

at 1373; *see also Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct.

Int'l Trade 2013) ("{a}n interested party, such as a foreign government, fails to meet the 'best of

its ability' statutory standard if it has not demonstrated 'maximum effort'" and "Commerce may

apply AFA to find that a government authority provided a financial contribution to a specific

industry" when the standard is not met).

Here, there can be no reasonable question as to the GOR's failure to cooperate.  As to the information withheld by the GOR, Commerce explained that the information it had requested regarding the input producer appendix was necessary to determine whether JSC Apatit's natural gas producers/suppliers were authorities under 19 U.S.C. § 1677(5)(B).  IDM at 50.  Commerce also explained that the information provided by JSC Apatit regarding its gas producers/suppliers was not an adequate substitute for that requested from the GOR.  *See id.* ("JSC Apatit cannot simply provide other information in lieu of the GOR's failure to respond, as the specific information that we requested from the GOR in the Input Producer Appendix was necessary to determine whether the producers/suppliers are "authorities" within the meaning of {19 U.S.C. § 1677(5)(B)}").  While JSC Apatit provided annual reports and Orbis reports, Commerce explained that these sources "fail{ed} to provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the Input Producer Appendix."  *Id.* at 50–51; *see also* JSC Apatit Section III Response at Exhibit 24 (C.R. 69-70).  Commerce also noted that JSC Apatit did "not negotiate price or quantity of its purchases of natural gas from independent suppliers directly with those suppliers" but, rather, negotiated exclusively with Gazprom—a Russian government authority.  IDM at 51 (citing JSC Apatit Section III Response at 41 (P.R. 60) (C.R. 31)).  Because Gazprom effectively acted as the supplier, Commerce found that any influence exerted by Gazprom over the negotiations could not be separated out such that it could deem the other gas producers/suppliers independent without the requested information from the GOR.  *Id.*  Commerce complied with the statutory requirements in applying AFA, and its determination is supported by substantial record evidence.

JSC Apatit contends Commerce erred in countervailing JSC Apatit's gas purchases through the application of AFA to the GOR, arguing that: (1) it provided sufficient evidence on

its own to demonstrate that the producers/ suppliers were not authorities but instead independent, and (2) Commerce's application of AFA was overly broad and unlawfully harmed JSC Apatit. *See* JSC Apatit Br. at 35-42.  These arguments fail.

JSC Apatit first alleges that Commerce ignored that the documentation JSC Apatit submitted to the record identified the ultimate owners of the producers/suppliers, and thus "demonstrated that no single government entity own{ed} a controlling stake . . . in either supplier." *Id.* at 36 (citing JSC Apatit Section III Response at Exhibit 24 (C.R. 69-70)).  But, as Commerce observed, the information provided by JSC Apatit was not an adequate substitute for that requested of the FOR, as JSC Apatit's information did not speak to "each level of ownership between the supplier and its ultimate ownership."  IDM at 50.  Commerce did not ignore the evidence, but explained why it did not suffice to allow Commerce to find that the gas producers/suppliers were not authorities.

JSC Apatit then notes that Commerce had found during the original CVD investigation that one of the gas suppliers/ producers at issue—███████████████████—was not an authority, and claims there is no evidence of an ownership change that would suggest that ████ ███████████████ is now an authority.  *See* JSC Apatit Br. at 36–37.  But, as this Court has recognized, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  Moreover, "Commerce can use a case-by-case analysis" in reaching discretionary determinations and "is not required to justify its determination in terms of past alternatives" when doing so.  *Qingdao Taifa Grp. Co. v. United States*, 780 F. Supp. 2d 1342, 1350 (Ct. Int'l Trade 2011) (citing *Allied-Signal Aerospace Co. v. United States*, 28 F.3d 1188, 1191 (Fed. Cir. 1994)).

16

While Commerce may have made a certain determination regarding ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ during the investigation, the record in ***this*** review, coupled with the GOR's lack of cooperation, supports Commerce's decision to apply AFA.  Commerce twice requested that the GOR respond to the input producer appendices and provide information "for each level of ownership" "necessary to trace all ownership back to the ultimate individual or state owners*.*"  PDM at 12; *see also* Questionnaire at 17, 36–38 (P.R. 16); Section II Supplemental Questionnaire at 5 (P.R. 112).  The GOR, of course, did not provide this information.  *See* PDM at 12; *see also* GOR Initial Response at "Provision of Natural Gas for LTAR" (P.R. 38) (C.R. 5).  Finally, as explained above, the information submitted by JSC Apatit was insufficient to allow Commerce to make the finding that the gas producers/suppliers were not authorities.  JSC Apatit does not establish that the record of this review is so indistinguishable from the record of the investigation that the same finding was required.

JSC Apatit next claims that Commerce's application of AFA to the GOR was overly broad and unlawfully harmful, alleging that Commerce failed to establish both the necessity of the information requested and the insufficiency of the record evidence provided by JSC Apatit.  *See* JSC Apatit Br. at 37-42.  JSC Apatit asserts that Commerce is permitted to apply AFA based on the non-cooperation of a foreign government only when it must "fill gaps necessary to complete the factual record and . . . to 'find that the elements of the statute have been satisfied.'"  *Id.* at 37–38 (citing *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 359 F. Supp. 3d 1329, 1338 (Ct. Int'l Trade 2019)).  According to JSC Apatit, Commerce may not use "AFA against a cooperative respondent based on actions taken, or lack thereof, by its government when no real gap in the record exists."  *Id.* at 38 (citing *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2019).  In JSC Apatit's view, Commerce did not sufficiently

establish the existence of a gap in the record caused by the GOR's non-cooperation. As already demonstrated, this is simply not true.

JSC Apatit's argument is belied by Commerce's explanations in the preliminary and final results; Commerce explained why the information requested in the input producer appendix was necessary. *See* Initial Questionnaire at 36–37 (stating that the information was needed "to ***trace all ownership back to the ultimate individual or state owners***.") (P.R. 16) (emphasis added); *see also* IDM at 50 (explaining the necessity of the information to determine if the natural gas producers/suppliers were authorities). Commerce also expounded on why the evidence provided by JSC Apatit was not a sufficient substitute, pointing out that the documentation submitted by JSC Apatit failed to provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the input supplier index, and observing that, because Gazprom—a governmental authority—effectively acted as the supplier and could influence the negotiations, Commerce could not separate out such influence to be able to establish the suppliers as independent. IDM at 51. Indeed, JSC Apatit effectively concedes that it only provided information regarding ownership structure, shareholders, and ultimate ownership—not detailed information regarding each level of ownership. *See* JSC Apatit Br. at 41 (citing JSC Apatit Section III Response at Exhibit 24).

Finally, JSC Apatit contends that Commerce was required to afford "JSC Apatit . . . the opportunity to provide supplemental information if Commerce believed the substantial ownership information supplied by JSC Apatit was insufficient." JSC Apatit Br. at 42. But Commerce is not required "to ask respondents for supplemental information" when a government's response is deficient; by statute, only "the deficient party" is provided "the opportunity to remedy, not affected third parties." *Risen Energy Co., Ltd. v United States*, 658 F.

Supp. 3d 1364, 1371 (Ct. Int'l Trade 2023) (citing *Cooper Kunshan Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287, 1317 (Ct. Int'l Trade 2022)). In *Risen Energy*, Commerce had found information offered by a party to be an insufficient substitute for information requested from the government because such information was incomplete. *Id.* The Court held that Commerce had "essentially declared the responses deficient," and, therefore, "was required under 19 U.S.C. § 1677m(d) to provide . . . an opportunity to supplement the record." *Id.* Here, unlike in *Risen Energy*, Commerce did not find the record evidence provided by JSC Apatit to be incomplete or otherwise deficient; rather, it found that such information could not suffice as a substitute for the information regarding input producer appendix withheld by the GOR. In any event, JSC Apatit would have been well aware of the GOR's lack of cooperation, and the deficiencies in the GOR's response.

Because Commerce's decision to apply AFA regarding JSC Apatit's gas producers/suppliers is supported by substantial evidence and in accordance with law, this Court should sustain Commerce's decision.

**IV.  Commerce's Selection Of Kazakh Export Prices For Its Tier-Two Benchmark Calculation For The Provision Of Natural Gas For LTAR Is Supported By Substantial Evidence And In Accordance With Law.**

Mosaic contests Commerce's selection of exports of Kazakh-origin natural gas to non-distorted, non-Russian countries as a tier-two world market benchmark for the provision of natural gas for LTAR. This decision was lawful and supported by the evidence on the record, and Mosaic cannot demonstrate otherwise.

**A.  Legal Framework For The Selection Of Benchmarks**

Commerce conducts benefit analyses for the provision of goods or services for LTAR pursuant to 19 C.F.R § 351.511(a)(2). Commerce first conducts a tier-one analysis, seeking to compare "the government price to a market-determined price for the good or service resulting

from actual transactions in the country in question." 19 C.F.R § 351.511(a)(2)(i). When that price is unavailable, Commerce applies a tier-two analysis, seeking "to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R § 351.511(a)(2)(ii). If no world market price satisfies this standard, Commerce will apply a tier-three analysis to determine adequacy of remuneration by "assessing whether the government price is consistent with market principles." 19 C.F.R § 351.511(a)(2)(ii). Commerce is not required to contemplate the use of a proposed tier-three benchmark if an appropriate tier-two benchmark is available. *See Urea Ammonium Nitrate Solutions from the Russian Federation*, 87 Fed. Reg. 37,836 (Dep't of Commerce June 24, 2022) (*UAN from Russia*), and accompanying IDM at 28.

    To serve as a tier-two benchmark, Commerce must find that it is "reasonable to conclude that" a global market price "would be available to purchasers in the country in question." 19 C.F.R § 351.511(a)(2)(ii). Availability is the lodestar of this analysis. Accordingly, the disqualification of an import price as a tier-one benchmark due to domestic market distortion does not preclude its usage as a tier-two benchmark. *UAN from Russia* IDM at 21. Importantly, government distortion in a domestic market does not disqualify export prices from that market from usage as a tier-two benchmark. *See Phosphate Fertilizers from Morocco*, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021), and accompanying IDM at 19 ("The mere fact that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted.").

B.      <u>Commerce's Selection Of Kazakh Exports As A Tier-Two Benchmark</u>

In the preliminary results, Commerce determined that JSC Apatit had received a

countervailable subsidy of 0.99 percent *ad valore*m with respect to the provision of natural gas

for LTAR.  *See* PDM at 18.  Specifically, Commerce found that Gazprom's provision of natural

gas to JSC Apatit constituted a financial contribution under 19 U.S.C. § 1677(5)(D)(iii), and that

the program was specific under 19 U.S.C. § 1677(5A)(D)(iii)(II).  *Id.* at 13–14 (citing *Magnola*

*Metallurgy, Inc. v. United States*, 508 F. 3d 1349, 1353-56 (Fed. Cir. 2007).  In looking at

benchmarks, Commerce determined that the Russian natural gas market was distorted by the

GOR, and therefore unusable as a tier-one benchmark.  *Id.* at 16.  Commerce then looked at

whether a world market price could serve as a tier-two benchmark under 19 C.F.R.

§ 351.511(a)(2)(ii).  *Id.*

The record contained two possible tier-two benchmarks:  Organization for Economic

Cooperation and Development natural gas prices and corresponding taxes sourced from the

International Energy Agency (IEA data), and prices for natural gas exports under HTS code

2711.21.0000 from Kazakhstan during the period of review from the Bureau of National

Statistics (BNS) of the Agency for Strategic Planning and Reforms of the Republic of

Kazakhstan (Kazakh export data).  *Id.* (citing Mosaic Benchmark Submission at 6-7 and Exhibits

31-34, dated Mar. 15, 2023 (P.R. 132); and JSC Apatit Benchmark Submission, dated Mar. 15,

2023 (P.R. 142) (C.R. 178)).  Commerce declined to use the IEA data, finding that natural gas

from Europe was not available to Russian purchasers.  PDM at 16-17.  As Commerce explained,

an "examination of pipeline schematics and the direction of gas streams" revealed "that the

pipelines connecting Europe and Russia were not bi-directional and were not fitted with the

necessary compressors to allow an inflow of gas."  *Id.* (citing *Certain Cold-Rolled Steel from the*

*Russian Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016), and

accompanying IDM at 60).

Regarding the Kazakh export data, Commerce concluded that Kazakh natural gas exports

were available to Russian purchasers during the period of review.  PDM at 17.  Specifically,

Commerce noted that the BNS export statistics established "that Kazakhstan exported natural gas

to Russia during the POR" and Russian customs data showed "that Russia imported natural gas

from Kazakhstan during the POR under HTS code 2711.21.0000."  *Id.*; *see also* JSC Apatit

Benchmark Submission at Appendix 1.  Commerce also cited the statement of a Kazakh natural

gas producer—Karachaganak Petroleum Operating BV—that it had sold natural gas to the

Orenburg Gas Plant in Russia using the Karachaganak Orenburg Transportation System pipeline

in 2021.  *Id.*  Based on this, Commerce determined that the pipeline connected to and terminated

in Russia.  *Id.*  Commerce concluded that Kazakh natural gas exports were available to Russian

purchasers, and, therefore, constituted a viable tier-two benchmark.  *Id.*  In calculating the tier-

two benchmark, Commerce removed Kazakh exports to Russia due to the GOR's distortion of

the Russian natural gas market.  *Id.*  Commerce also excluded Kazakh exports to China.

In the final results, Commerce continued to rely on exports of Kazakh-origin natural gas

as a tier-two benchmark.  IDM at 46.  Addressing arguments from Mosaic that the gas was not

available to purchasers in Russia, Commerce explained that its regulatory language did not

indicate that "available" must be interpreted as being available to private entities, or that

"available" should be equated to prices available to "consumers."  *Id.*  Commerce further

observed that Mosaic had offered "no citations to prior CVD proceedings where Commerce has

interpreted 'available'" in such a manner, and that such an interpretation would run contrary to

Commerce's practice.  *Id.* at 47–48 (citing *CVD Preamble*, 63 Fed. Reg. 65,348 65,377–79

(Dep't of Commerce Nov. 25, 1998); and *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,978 (Dep't of Commerce Dec. 26, 2012), and accompanying IDM at 68–69).  Commerce also rejected Mosaic's argument that distortions in Kazakhstan's domestic natural gas market were relevant to the adequacy of Kazakh prices as a tier-two benchmark.  *Id.* at 48.

**C.    Commerce Did Not Err In Selecting Kazakh Export Prices For Its Tier-Two Benchmark Calculation For The Provision Of Natural Gas For LTAR**

Commerce acted lawfully in selecting Kazakh natural gas exports as a tier-two benchmark, and its decision is supported by substantial evidence.  Commerce found, based on the record, that Russia imported Kazakh natural gas during the period and, specifically, that a Kazakh natural gas producer—Karachaganak Petroleum Operating BV—sold natural gas to the Orenburg Gas Plant in Russia through the Karachaganak Orenburg pipeline.  *See* JSC Apatit Benchmark Submission at 2 and Appendix 1.  Importantly, in contrast to other pipelines between Kazakhstan and Russia which connect to third countries, the Karachaganak Orenburg pipeline connects to and terminates in Russia.  *See id.* at Appendix 4.  Accordingly, Commerce concluded that Kazakh-origin natural gas was available to Russian purchasers during the period of review, and that exports of Kazakh natural gas were non-distorted, such that non-Russian markets would be an appropriate tier-two benchmark.  This finding was reasonable, as well as consistent with Commerce's other recent determinations involving Russia.  *See Granular Polytetrafluoroethylene Resin from the Russian Federation*, 87 Fed. Reg. 3,764 (Dep't of Commerce Jan. 25, 2022) (*PTFE from Russia*), and accompanying IDM at 20; *UAN from Russia* IDM at 20; *Oil Country Tubular Goods from the Russian Federation*, 87 Fed. Reg. 14,249 (Dep't of Commerce Mar. 14, 2022) (*OCTG from Russia*), and accompanying PDM at 21.

Mosaic primarily argues that Kazakh natural gas is not actually available to Russian purchasers within the meaning of 19 C.F.R § 351.511(a)(2)(ii).  *See* Mosaic Br. at 13-21.  In making this argument, Mosaic claims that GOR customs code 2711210000 excludes natural gas sold to the population, that the Orenburg Gas Processing Plant is a producer and processor of natural gas rather than a consumer, and that gas sold to the public by the Orenburg Gas Processing Plant reflects Russia's market distortion.  *See id*. at 13-18.  These contentions all lack merit.

First, Mosaic's claim that Commerce improperly ignored evidence that GOR customs code 2711210000 excludes natural gas sold to the population is simply incorrect.  To start, the documentation offered by Mosaic to support this contention is from May 2001, which significantly predates the period of review.  *See* Mosaic Benchmark Rebuttal at Exhibit 12 (P.R. 162); *see also* JSC Apatit Rebuttal Brief at 13 (C.R. 223).  Moreover, Mosaic has acknowledged that Gazprom actually distributes Kazakh natural gas.  *See* Mosaic Case Brief at 7 (C.R. 221) ("To the extent any finished Kazakh gas remains in Russia after processing, it consists of a product processed and sold by Gazprom . . . .").  Commerce's determination also comports with prior administrative proceedings in which the GOR has stated that imports under 2711210000 are released into free circulation.  *See, e.g. Urea Ammonium Nitrate Solutions From the Russian Federation*, 86 Fed. Reg. 68,635 (Dep't of Commerce Dec. 3, 2021), and accompanying PDM at 28 (quoting GOR Second Supplemental Response at 27, dated November 9, 2021 ("According to the official customs statistics of Russia such imports were placed under a customs procedure of a release into free circulation.")); *OCTG from Russia* PDM at 21; *PTFE from Russia* at "Provision of Natural Gas for LTAR" and 19–20 (quoting GOR Second Supplemental Response at 4, dated July 30, 2021 ("According to the official customs statistics of Russia such imports were placed

under a customs procedure of a release into free circulation."). The shred of evidence provided by Mosaic—which does not remotely concern the period of review—does not outweigh the more substantial evidence indicating that Kazakh gas was available to Russian purchasers.

Mosaic also claims that, because the Orenburg Gas Processing Plant is a producer and processor of natural gas, rather than a consumer, its purchases of Kazakh natural gas were not "available" to Russian purchasers. *See* Mosaic Br. at 17-18. As an initial matter, Mosaic has acknowledged that Gazprom (the owner of the plant) sells Kazakh natural gas domestically. *See* Mosaic Case Br. at 7 ("To the extent any finished Kazakh gas remains in Russia after processing, it consists of a product processed and sold by Gazprom . . . ."). But Mosaic has not demonstrated that "available" must be construed as encompassing only availability to private entities or consumers. IDM at 47 (citing *CVD Preamble* at 65,377-79). Indeed, Commerce has already considered and rejected a similar argument as not relevant to the availability of Kazakh natural gas under a tier-two analysis. S*ee PTFE from Russia* IDM at 20 (explaining that whether imported gas was "sour gas" was "not directly relevant to {the} benchmark comparison given that" exports to Russia were not included in the benchmark calculation, and that the issue did "not speak to the consideration of whether natural gas is available to Russian purchasers"). Put simply, any differences between the exported "raw" gas and the natural gas under consideration are beside the point, as Commerce is not using exports **to Russia** as the benchmark, but, rather, is relying on exports to other, non-distorted, markets. IDM at 48.

As it did during the underlying proceeding, Mosaic disputes Commerce's interpretation of the term "available," arguing that the *CVD Preamble* equates purchasers with consumers and claiming that Kazakh-origin gas was not available to consumers. Mosaic Br. at 15. In attempting to bolster its position, Mosaic points to two statements in the *CVD Preamble* referring

to consumers: a passage stating "that Commerce would not normally use a European price for electricity as a comparison price for electricity provided by a Latin American government" because European electricity is unlikely to be available to Latin American consumers, and a passage stating that Commerce "will resort to tier-three of its methodology when a government is "clearly the only source available to consumers in the country." *Id.* (citing *CVD Preamble*, 63 Fed. Reg. at 65,378). But neither of these passages stand for the proposition that, in the context of tier-two benchmarks, "available" is narrowly defined and must equate to available to private entities or consumers, and Mosaic provides no instances in which Commerce has interpreted "available" in that manner.

Moreover, Mosaic can point to no authority requiring Commerce to interpret the term "available" in 19 C.F.R § 351.511(a)(2)(ii) as referring only to consumers or private entities. Commerce reasonably found that a Kazakh natural gas producer sold natural gas to a Russian gas processing plant through a pipeline connecting to and terminating in Russia, and that these types of imports are placed into free circulation, thereby making the gas available to purchasers in Russia. IDM at 46-47. The Court should not disturb this determination.

Mosaic next contends that, because the Orenburg Gas Processing plant is owned by Gazprom and the GOR distorts the Russian natural gas market, Kazakh prices are not available to Russian purchasers. *See* Mosaic Br. at 17. But, as Commerce explained, "the disqualification of natural gas import prices . . . into Russia as a {tier-one} benchmark is distinct from the issue of whether exports of Kazakh-origin natural gas is 'available' to purchasers in Russia under 19 C.F.R. § 351.511(a)(2)(ii)." IDM at 47. Whatever price distortions might exist in the Russian gas market have no bearing on the tier-two benchmark that is based on Kazakh export prices to ***other countries with non-distorted markets***. The relevant question is whether Kazakh natural

gas is available to Russian purchasers, not the prices at which such gas is made available. *See* IDM at 46; *see also* JSC Apatit's Benchmark Submission at 2, Appendix 1, and Appendix 4.

Finally, Mosaic claims that Kazakh prices are not a viable tier-two benchmark because involvement by the Government of Kazakhstan in the domestic natural gas market distorts prices. *See* Mosaic Br. at 19-21. Again, Commerce is not relying on domestic prices in Kazakhstan as the benchmark, but rather export prices to other countries with non-distorted markets. Accordingly, distortion in the Kazakh domestic market is irrelevant to Commerce's analysis.[3] Indeed, Commerce has previously determined that the disqualification of domestic or import prices as a tier-one benchmark does not disqualify export prices from that market from use as a tier-two benchmark. *See, e.g., Phosphate Fertilizers from Morocco* IDM at 19 ("The mere fact that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted."); *Carbon and Alloy Steel Wire Rod from the Republic of Turkey*, 83 Fed. Reg. 13,239 (Dep't of Commerce Mar. 28, 2018), and accompanying IDM at 13; *Fine Denier Polyester Staple Fiber from the People's Republic of China*, 83 Fed. Reg. 3,120 (Jan. 23, 2018) (*PSF from China*), and accompanying IDM at 35 (explaining "that domestic market distortion does not necessarily indicate export market distortion and that, because "such export prices would reflect . . . the commercial realities on the world market for such goods or services," it would be inappropriate "to disregard world market

---

[3] Moreover, Mosaic failed to provide sufficient evidence to support a determination that Kazakh government interference even distorts the natural gas export market, and JSC Apatit's submissions show that Kazakh natural gas exports are not distorted. *See* JSC Apatit Rebuttal Brief at 20-22 (C.R. 223); JSC Apatit Benchmark Submission at Appendix 4 (C.R. 182-183).

prices for a good or service stemming from a country whose **domestic market** has been found to be distorted under the analysis for the benefit determination in this instance.").

While Mosaic claims that Commerce has previously rejected Russian natural gas export prices as a benchmark due to government interference, *see* Mosaic Br. at 20–21(citing *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't of Commerce Mar. 20, 2020) (*Steel Rebar from Turkey*), and accompanying IDM at 23), that proceeding is distinguishable, as Commerce determined in *Steel Rebar from Turkey* that the GOR had distorted natural gas export prices for geopolitical purposes. Mosaic fails to provide similar evidence of export price distortion with respect to Kazakh export prices.

Because Commerce reasonably determined that Kazakh natural gas exports are available to Russian purchasers, it deemed Kazakh export prices to non-domestic, non-distorted countries to be a viable tier-two benchmark, and correctly declined to consider whether the IEA data could be used as a tier-three benchmark. This Court should sustain Commerce's decision.

**V.    Commerce's Tier-Three Benchmark For The Provision Of Mining Rights For LTAR Is Supported By Substantial Evidence And In Accordance With Law**

    **A.    Relevant Factual Background And Framework For Tier-Three Analysis For Mining Rights**

In its preliminary results, Commerce determined that JSC Apatit had received a countervailable subsidy under the Provision of Mining Rights for LTAR program. *See* PDM at 18-20. Commerce first found that neither a tier-one nor a tier-two benchmark was available. *Id.* As such, Commerce conducted a tier-three benchmark analysis.

Under 19 C.F.R. § 351.511(a)(2)(iii), a tier-three analysis requires Commerce to measure adequate remuneration by assessing whether the government-provided input price "is consistent with market principles." Commerce assesses whether the price was set in accordance with market principles by analyzing factors such as the government's price-setting philosophy, costs

(including rates of return sufficient to ensure future operations), or possible price discrimination.  *Id.*  These tier-three factors are not hierarchical in application, and Commerce may rely on one or more of these factors in any particular case.  *See CVD Preamble*, 63 Fed. Reg. at 65,378.

In both *Cold-Rolled Steel from Russia* and the underlying investigation for this proceeding, Commerce conducted a benefit analysis based not on mining rights *per se*, but instead on whether the value of the acquired underlying good via the mining rights was market-based.  PDM at 20; *see also Cold-Rolled Steel from Russia* IDM at 30; *Phosphate Fertilizers from Russia Final Determination* IDM at Comment 2c.  Commerce acted consistently here, considering prices for the underlying good that is conveyed via the mining rights, *i.e.*, phosphate rock.  PDM at 20.  Commerce compared the actual per-unit cost buildup of JSC Apatit's beneficiated phosphate rock to a market price for phosphate rock, determining to rely on export data from GTA and UN Comtrade for Finland, Brazil, and South Africa under HTS codes 2510.10 and 2510.20 to calculate a market price for phosphate rock for the comparison.  *Id.*; *see also Phosphate Fertilizers from Russia Final Determination* IDM at Comment 2e; Petitioner Benchmark Submission at Exhibits 4 and 6, dated March 15, 2023 (P.R.132).

In the final results, Commerce continued to find the provision of mining rights for LTAR countervailable, and maintained its reliance on a tier-three benchmark.  However, Commerce determined not to rely on UN Comtrade data, instead choosing to rely solely on the GTA data from Brazil, Finland, and South Africa.  IDM at 26-27.  Addressing parties' arguments, Commerce declined to include export prices for Togo and Iran in its benchmark calculation, finding the phosphate rock from those countries not to be comparable because it was produced from sedimentary reserves rather than igneous reserves.  *Id.* at 30.  Commerce explained that,

because its analysis focused on JSC Apatit's costs to mine and process phosphate ore into phosphate rock, the differences in the production process between sedimentary and igneous deposits were important. *Id.* Commerce rejected arguments from JSC Apatit and ADM to exclude export prices from South Africa as too high, finding that the parties had not identified that these prices were distorted. *Id.* at 33-34. Finally, Commerce determined that the benchmarks proposed by JSC Apatit were not appropriate. *Id.* at 37-40.

### B. Commerce's Phosphate Rock Benchmark Is Reflective Of Prevailing Market Conditions In Russia And Consistent With Market Principle

ADM and JSC Apatit argue that Commerce erred in selecting its tier-three benchmark. Specifically, they claim that: (1) Commerce was required to, but did not, consider other prevailing market conditions besides quality; (2) Commerce's selection of data as the basis of its tier-three benchmark failed to adequately consider data based on phosphate ore from sedimentary rock, export data from Togo and Iran, and whether South African export prices were too high to be included; (3) Commerce's decision is inconsistent with its determinations in the proceeding covering phosphate fertilizers from Morocco; and (4) Commerce erred in not considering a notice of subsequent authority submitted by ADM.[4]  *See* JSC Apatit Br. at 10-28, ADM Br. at 15-25.  For the reasons explained below, plaintiffs' arguments fail, and this Court should sustain Commerce's tier-three benchmark selection.

First, plaintiffs claim that Commerce inappropriately focused on the quality of the phosphate rock, largely ignoring the other factors relevant to an analysis of prevailing market conditions and allegedly failing to comply with the regulatory requirements set forth in 19 C.F.R. § 351.511(a)(iii).  *See* JSC Apatit Br. 13-14, 20-27.  But Commerce properly calculated a tier-three benchmark for JSC Apatit, and did not run afoul of the statutory and regulatory

---

[4]  JSC Apatit has abandoned this argument, but ADM still pursues it.

requirements in doing so.  As set forth in the *CVD Preamble*, while a tier-three analysis

considers "such factors as the government's price-setting philosophy, costs (including rates of

return sufficient to ensure future operations), or possible price discrimination{;}" *CVD*

*Preamble*, 63 Fed. Reg. at 65,378; "{t}hese factors are not hierarchical in application, and

Commerce may rely ***on one or more*** factors to calculate a tier-three benchmark in any particular

case." *Habas Sinai v. United States*, 536 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2021)

(emphasis added).  Importantly, "{w}hen conducting a Tier 3 analysis, the CAFC has held that

Commerce has 'considerable prima facie leeway to make a reasonable choice within the

permissible range' of calculation methodologies, so long as that choice is properly justified

'based on the language and policies of the countervailing-duty statutes . . . and other practical

considerations.'" *Nucor Corp. v. United States*, 633 F. Supp. 3d 1225, 1230 (Ct. Int'l Trade

2023) (citing *Nucor Corp. v. United States*, 927 F.3d 1243, 1255 (Fed. Cir. 2019)).  Simply

because Commerce focused more closely on the quality of the phosphate rock (*i.e.*, sedimentary

versus igneous) than the other market conditions does not render its decision erroneous.

Here, Commerce analyzed whether the value of the underlying good JSC Apatit acquired

via the mining rights (*i.e.*, beneficiated phosphate rock) was market-based pursuant to 19 C.F.R.

§ 351.511(a)(2)(iii).  *See* IDM at 29-40; *see also* PDM at 14-18.  Commerce did not blindly rely

on the GTA data, but also analyzed the two proposed benchmarks submitted by JSC Apatit—the

EuroStat data and Global Trade Tracker (GTT) data.  IDM at 37-40.  Commerce found those

benchmarks unusable, explaining that the EuroStat data did not identify the exporting countries

or contain enough detail to discern whether the phosphate rock was comparable to that produced

by JSC Apatit, and that the GTT data failed to establish that the HTS subheading covering the

South African exports in the GTT data were of "comparable phosphate rock" to that produced in

Russia by JSC Apatit. *Id*. Because Commerce identified severe flaws with the EuroStat and GTT data, it determined that only the GTA data remained as a suitable tier-three benchmark, and that this data permitted Commerce to calculate the most accurate market price for phosphate rock for the comparison. *See* IDM at 26-40. Accordingly, Commerce appropriately relied on the GTA data.

Second, ADM and JSC Apatit allege that Commerce erred in not finding ore from sedimentary rock comparable, consequently excluding export data from Togo and Iran. *See* JSC Apatit Br. at 15-20, 27-28; ADM Br. at 24-25. The thrust of plaintiffs' argument is that "there is no evidence that phosphate rock from igneous sources and phosphate rock from sedimentary sources *that have the same $P_2O_5$ content* level would have different prices.{,}" and that, therefore, Commerce should also have also considered data from exports of phosphate rock mined from sedimentary deposits rather than limiting itself to data concerning igneous deposits. JSC Apatit Br. at 19-20 (emphasis in original). Plaintiffs' argument, however, is belied by the record, which demonstrates the differences between phosphate rock mined from sedimentary reserves and that mined from igneous reserves.

Commerce first identified the BPL-based grade[5] of phosphate rock and type of ore deposit (*i.e.*, igneous) as qualities relevant for selecting "comparable phosphate rock.{,}" and noted that the GOR had provided JSC Apatit the right to mine phosphate ore from igneous reserves. IDM at 30-31. Accordingly, Commerce examined the record, determining that the production processes for phosphate rock from sedimentary reserves (the source of phosphate rock in Togo and Iran) and igneous reserves (the source of phosphate rock for JSC Apatit's

---

[5] As plaintiffs have explained the meaning of BPL levels, we do not repeat such explanations here. *See* JSC Apatit Br. at 16; ADM Br. at 2 n.2 (explaining BPL and phosphorus pentoxide content).

phosphate rock and the source represented by Brazil, Finland, and South Africa in the GTA data)

differ. *Id.* (citing Petitioner Benchmark Submission at Exhibit 20) (P.R. 132-133).  Commerce

explained these differences:

> {A report provided by petitioner} provides a chart with a "generic
> scheme for mining and beneficiation of sedimentary and igneous
> phosphate ores."  This chart identifies different steps to mine and
> beneficiate each type of ore.  The beneficiation of igneous phosphate
> ores, for example, involves grinding the ore in a rod mill or "closed
> circuit ball mill." By contrast, the chart identifies no grinding step
> to beneficiate sedimentary phosphate ores.  The chart also identifies
> different waste disposal steps for sedimentary ores (e.g., "clay
> waste") that are not present for igneous ores.  Additionally, the
> Ptacek report identifies other impurities and beneficiation methods
> specific to each type of ore, such as the process of heating
> sedimentary ores to extremely high temperatures to remove certain
> compounds.

IDM at 30-31 (citing Petitioner Benchmark Submission at Exhibit 20) (P.R. 132-133).

Commerce thus determined that, because the production of phosphate rock from igneous

deposits involves different production steps and costs compared to the production of phosphate

rock from sedimentary deposits, it should only consider data concerning phosphate rock from

igneous reserves, as it would be the most comparable to the phosphate rock mined by JSC Apatit.

*Id.*  Because the phosphate rock from Togo and Iran was produced from sedimentary reserves,

Commerce reasonably declined to include data from those countries in its benchmark

calculation, as including it would lead to a less accurate benefit calculation.  *Id.*

   Commerce also rejected JSC Apatit's and ADM's requests to omit the South African

GTA data, observing that ADM and JSC Apatit had failed to identify any distortion in the data,

but had demonstrated only that the South African prices were higher than the prices from Brazil

and Finland.  IDM at 33-34.  As Commerce explained, the lowest values (here, the Brazilian and

Finnish prices) are always lower than the prevailing—or average—prices, but Commerce is not

required to only use the lowest values to make its benchmarks.  *Id.* at 34 (citing *RZBC Group Shareholder Co. v. United States*, 100 F. Supp. 3d 1288, 1306-07 (Ct. Int'l Trade 2015)). Accordingly, as Commerce stated, "{t}he fact that the South African prices are the highest on the record alone does not make them unusable." *Id.* at 34.  Without evidence that the prices were distorted, or otherwise incorrect or unrepresentative, Commerce correctly declined to exclude them.

Third, ADM and JSC Apatit claim that Commerce's determination here is inconsistent with its determination in a proceeding covering phosphate fertilizers from Morocco, which was sustained by this Court in *Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023).  *See* JSC Apatit Br. 23-24; ADM Br. at 19-23.  In particular, plaintiffs focus on Commerce's inclusion of Egyptian phosphate rock prices in its benchmark, based on an understanding that the rock had similar BPL levels as the rock mined by the respondent.  *See* ADM Br. at 19-20 (citing *Mosaic Company*, 659 F. Supp. 3d at 1307-08).  But neither *Phosphate Fertilizers from Morocco* nor *Mosaic Company* dictate a conclusion that Commerce's determination in the underlying proceeding was incorrect or unreasonable.

Of course, "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line*, 766 F.3d at 1387 (internal citation omitted); *QVD Food Co., v. United States*, 658 F.3d 1318, 1326 (Fed. Cir. 2011) (sustaining Commerce's decision to reject financial data used in a previous administrative review for surrogate valuation because new record information suggested that the data previously used was unreliable).  Thus, "{t}he question is whether the record adequately supports the decision of {Commerce.}"  *Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993).

Moreover, "Commerce may change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily, and it articulates a reasonable basis for the change.  Indeed, the Trade Court has recognized that each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Qingdao Sea-Line*, 766 F.3d at 1387.  "Commerce is allowed to change its mind—in fact, it is regularly required to do so, since, for example, it is required to use "the best available information" when making benchmark determinations for nonmarket economies."  *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1377 (Ct. Int'l Trade 2023).

Commerce never disclaimed the significance of similar BPL levels in the underlying proceeding.  Indeed, Commerce explicitly identified BPL grade as a quality relevant for selecting comparable phosphate rock.[6]  IDM at 30.  But, significantly, Commerce ***also*** identified the type of ore deposit (sedimentary or igneous) as an important quality in determining the comparability of phosphate rock—a matter apparently not raised to Commerce in *Phosphate Fertilizers from Morocco*.  Here, Mosaic submitted record evidence regarding the differences in production between sedimentary and igneous sources; Commerce duly considered such evidence and explained why it would consider the distinctions between sedimentary and igneous formations in its selection of a tier-three benchmark.  *See* IDM 29-39.  Thus, to the extent that *Phosphate Fertilizers from Morocco* and *The Mosaic Company* should even be read as inconsistent with Commerce's determination in the underlying proceeding (which we do not concede), Commerce

---

[6] Plaintiffs do not appear to contest that phosphate rock from Finland, Brazil, and South Africa has BPL levels not comparable to phosphate rock from Russia.  Indeed, ADM acknowledges the similarity of BPL levels between rock produced in those four countries.  ADM Br. at 21.

articulated, in this proceeding, why it considered the type of phosphate rock deposit to be significant, and relied on the best available information on the record. *See NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

Finally, ADM claims that Commerce erred in not considering a notice of subsequent authority—*i.e.*, notice of this Court's *Mosaic Company* decision—because Commerce has accepted notices of subsequent authority in the past, and Commerce's proposed regulation (now finalized) permits the filing of notices of subsequent of authority. *See* ADM Br. at 23-24.

Commerce did not err in rejecting ADM's notice of subsequent authority because that notice contained untimely new arguments. *See* IDM at 3; s*ee also* Rejection Letter, dated October 18, 2023 (P.R.237). As Commerce explained, ADM's notice of subsequent authority contained untimely new arguments for the final results, and was submitted well past the deadlines for case and rebuttal briefs. *See* Rejection Letter. As this Court has held, "Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits and it has found that Commerce's policy of setting time limits to be reasonable{.}" *Reiner Brach GmbH & Co. KG v. United States*, 206 F. Supp. 2d 1323, 1334 (Ct. Int'l Trade 2002).

ADM's argument that, in light of a proposed modification to 10 C.F.R. § 351.301, Commerce should have accepted its new arguments, is unavailing. *See* ADM Br. at 23-24; *see also Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 29, 850 (Dep't

of Commerce May 9, 2023).  The underlying review started on April 29, 2022, and was therefore

subject to the agency's regulations at the time the proceeding began.  *See Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997).  ADM also

relies on a ***proposed*** regulation, which by definition, is not a final rule and is not effective until

finalized.  The final rule was not published until March 25, 2024, and not effective until April

24, 2024 – well after the conclusion of the underlying proceeding.  *See Regulations Improving*

*and Strengthening the Enforcement of Trade Remedies Through the Administration of the*

*Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20.766, 20,780 (Dep't of Commerce

Mar. 25, 2024).

In any event, even if Commerce erred in refusing to accept the notice (it did not),

Commerce's decision constitutes harmless error.  As explained above, Commerce's

determination in the underlying proceeding is not inconsistent with *Mosaic Company* and, to the

extent the Court determines an inconsistency exists, Commerce explained its reasoning and

supported its determination with substantial evidence from the record of ***this*** proceeding.

## VI.    Commerce Correctly Included Cost Of Sale Plus Profit In JSC Apatit's Mining Rights Benefit Calculation

Commerce appropriately determined to use Profit Before Tax in undertaking its benefit

calculation for JSC Apatit, and JSC Apatit cannot demonstrate otherwise, especially considering

Commerce's broad discretion in determining calculation methodologies.

Commerce calculates the benefit conferred through the provision of goods or services in

accordance with 19 C.F.R § 351.511.  *See* 19 C.F.R § 351.511.  When LTAR benefit calculations

involve a profit adjustment to the recipient's cost, it has been Commerce's practice to use Profit

Before Tax as the profit figure.  *See Phosphate Fertilizers from Morocco* IDM at 27 ("we

determine it appropriate to calculate a profit ratio for OCP {S.A.} by taking OCP {S.A.}'s

'income before taxes' (profit before tax) and dividing it by its "operating expense" (COGS) from its 2019 unconsolidated profit and loss statement"); *see also* Final Results of Redetermination Pursuant to Court Remand at 24-25, *Mosaic Company v. United States*, Consol. Court No. 21-00117 (Ct. Int'l Trade), dated December 16, 2022, ECF No. 97 ("we have used profit before taxes instead of gross profit to calculate PhosAgro's profit ratio for the Provision of Mining Rights for LTAR benefit calculation for PhosAgro, which is consistent with Commerce's calculation for EuroChem and the Court's *Remand Order*.").

In the preliminary results, to calculate the benefit received by JSC Apatit for the provision of mining rights, Commerce calculated the program benefit by comparing the per-unit cost buildup of JSC Apatit's beneficiated phosphate rock with a benchmark market price. PDM at 20. Specifically, Commerce compared the per-unit cost buildup of JSC Apatit's beneficiated phosphate rock with a benchmark market price. *Id.* Commerce calculated JSC Apatit's per-unit cost buildup, and calculated the 2021 per-unit cost of sales by dividing the 2021 total cost of sales by JSC Apatit's total reported quantity of phosphate rock sold. *See* Preliminary Calculations at 7 (C.R. 218-219). Commerce then divided JSC Apatit's parent company, PhosAgro Public Joint Stock Company's (PhosAgro) Profit Before Tax by its overall 2021 cost of sales to calculate a 2021 profit ratio. *Id.*; IDM at 19. Finally, Commerce multiplied the 2021 profit ratio by the 2021 per-unit cost of sales. Preliminary Calculations at 7.

JSC Apatit argued in its case brief that Commerce should employ JSC Apatit's Gross Profit instead of Profit Before Tax in calculating JSC Apatit's profit ratio. *See* JSC Apatit Case Br. at 43 (P.R. 228). Commerce, addressing JSC Apatit's arguments, explained in the final results that, in the absence of a prescribed methodology, it was appropriate to "consider{} the objective of {the} benefit calculation and certain inaccuracies that may result from using Gross

Profit instead of Profit Before Tax." IDM at 19. Commerce further explained that "compared to Gross Profit, Profit Before Tax excludes: (1) selling and administrative expenses; (2) taxes other than income taxes; (3) "Other Expenses;" (4) net foreign exchange losses; (5) net financing costs; and (6) Covid-19-related expenses, while it includes a net gain from a revaluation of financing assets." *Id.* at 20 (citing JSC Apatit Section III Response at Exhibit 7 pt. 2 (C.R. 35), PhosAgro Consolidated Statement (P.R. 64)). Commerce concluded that the use of Profit Before Tax excludes expenses unrelated to phosphate mining and beneficiation, eliminates double-counting, and removes the risk of double-counting. IDM at 22.

Finally, Commerce revised the calculation for JSC Apatit's cost of sales in the final results. *See* Final Calculations at 2 (C.R. 226-227). Specifically, Commerce ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* Commerce conducted its benefit calculation based on JSC Apatit's cost of phosphate mining and beneficiation during the period. *Id.* (citing IDM at 20). Because, ██████████████ ████████████████████████████████████████████████ ████████████████, Commerce found the alteration appropriate. *Id.* (citing JSC Apatit Second Supplemental Response at Exhibit SUPP-21, p. 19. (C.R. 199)).

Determinations as to the proper valuation of mining licenses, the costs to consider, and the profit figures that best reflect those costs are "complex" and "technical" decisions squarely within Commerce's discretion. *See Fujitsu*, 88 F.3d at 1039 (citing *U.S. v. Zenith Radio Corp.*, 562 F.2d 1209, 1216 (C.C.P.A. 1977), *aff'd*, 437 U.S. 443 (1978)) ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts."). Commerce, well

within its discretion, determined that the value of phosphate rock should be used in assessing

whether mining rights were provided for LTAR.  IDM at 16.  It also determined that the cost

buildup for phosphate rock is most accurately reflected by mining and beneficiation expenses.

*Id.* at 22.  Commerce thus concluded that the use of Profit Before Tax was most consistent with

its aims and that additional administrative and selling expenses should not be added to that

figure.  *Id.*  In addition, to arrive at the most accurate cost buildup, Commerce sought to isolate

costs for JSC Apatit's phosphate mining and beneficiation.  *See* IDM at 20 (stating that the aim

of Commerce's calculation methodology was "to isolate costs for phosphate ore mining and

beneficiation activities.").  The use of Profit Before Tax, as opposed to Gross Profit, was a

reasonable means to isolate JSC Apatit's mining and beneficiation costs because it excludes

expenses unrelated to phosphate mining and beneficiation, eliminates double-counting, and

removes the risk of further double-counting.  *Id.* at 22. Commerce's determinations consisted of

reasonable measures taken to ensure an accurate cost calculation, and should be sustained.  *See*

*Mosaic Company v. United States,* 589 F. Supp. 3d 1298, 1314 (Ct. Int'l Trade 2022) (quoting

*Timken Co. v. United States*, 16 Ct. Int'l Trade 142, 147 (1992)) ("When Commerce is faced with

the decision to choose between two alternatives and one alternative is favored over the other in

{its} eyes, then {it has} the discretion to choose accordingly if {its} selection is reasonable.").

JSC Apatit nonetheless maintains that Commerce erroneously employed Profit Before

Tax in JSC Apatit's profit ratio.  *See* JSC Apatit Br. at 29-33.  First, it claims that Commerce

failed to accurately account for additional expenses incurred in connection with JSC Apatit's

mining and beneficiation of phosphate rock.  *See* JSC Apatit Br. 29-33.  In particular, JSC Apatit

argues that the use of Profit Before Tax, as opposed to Gross Profit, improperly excludes

"Administrative Expenses," "Selling Expenses," "Net Interest Expenses," and "Other Expenses"

from the profit ratio because Gross Profit does not include expenses that are excluded by Profit

Before Tax. *Id.* But, as previously discussed, these expenses include costs unrelated to

phosphate mining and beneficiation. As articulated in the PhosAgro Consolidated Statement,

"Other Expenses" includes "Social expenditures" and "Increase in provision for bad debt and

expected credit losses allowance." PhosAgro Consolidated Statement at 23. Moreover,

Administrative and Selling Overhead Expenses" includes "Salaries and Social Contributions."

*Id.* These expenses do not relate to the production or beneficiation of phosphate; therefore, their

inclusion would be contrary to Commerce's aim of isolating those costs. IDM at 21. Commerce

selected a "more narrowly focused profit figure," determining that such a figure was more

consistent with its aims, and reasonably determined that including these costs in the benchmark

calculation would be improper.

The use of Profit Before Tax also mitigates the risk of double-counting. *Id.* at 22.

PhosAgro "deducted 'Administrative and Selling Overhead Expenses'" and "'Other expenses,

net' from Gross Profit to calculate Profit Before Tax" in its Consolidated Statement of Proft or

Loss. *See* Final Calculations at 2-3*;* PhosAgro Consolidated Statement at 1. Further, the

"Administrative and Selling Overhead Expenses" covers costs including "Professional services,"

"Security and fire safety services," "Materials and services," and "Other." Final Calculations at

2–3; *see* JSC Apatit Section III Response at Exhibit 7. "Other expenses, net" also includes

"Social expenditures." Final Calculations at 2-3; *see also* PhosAgro Consolidated Statement at

23. Finally, JSC Apatit's reported phosphate production costs include ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Final Calculations at 3; *see also* JSC

41

Apatit Supplemental Section III Response at Exhibit SUPP-12-A, p. 2. (C.R. 172). Given the potential overlap between these categories, Commerce reasonably used Profit Before Tax to ensure that certain values were not double counted in calculating a profit ratio for JSC Apatit.

JSC Apatit also contends that Commerce improperly ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ JSC Apatit Br. at 33-34. According to JSC Apatit, while the expense relates to ████████████, it was incurred ████████, "and therefore should be included in the cost of production for {the} POR." *Id.* This argument has no merit.

Commerce calculated the benefit for JSC Apatit based on phosphate mining and beneficiation costs during the period of review. Final Calculations at 2; IDM at 19, 20–21. Commerce explained that it ██████████████████████████████████ ██████████████████████████████ and, because this related to JSC Apatit's mining and beneficiation activities ████████, Commerce reasonably ████████████ ██████████ JSC Apatit's ████████████████████████████████████ ████████ field in the benefit calculation. Final Calculations at 2. Commerce properly isolated the cost of mining and beneficiating phosphate rock during the period of review in order to determine the benefit that JSC Apatit received during that period. IDM at 23. Excluding costs for activities ██████████████████ was, therefore, a reasonable measure taken to ensure the accuracy of that calculation.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment upon the administrative record and enter judgment for the United States.

42

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

/s L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                             s/Sosun Bae
K. GARRETT KAYS                         SOSUN BAE
Attorney                                Senior Trial Counsel
U.S. Department of Commerce             United States Department of Justice
Office of the Chief Counsel for Trade   Civil Division
  Enforcement and Compliance  Commercial Litigation Branch
1401 Constitution Avenue, NW            P.O. Box 480
Washington, D.C. 20230                  Ben Franklin Station
Tel: (202) 482-0018                     Washington, D.C. 20044
Email: Kenneth.Kays@trade.gov           Telephone: (202) 305-7568
                                        Fax: (202) 514-8624
                                        Email: Sosun.Bae@usdoj.gov

November 21, 2024                       Attorneys for Defendant

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chamber Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 12,753 words, excluding those exempted portions of this brief.

<u>/s/ Sosun Bae</u>

November 21, 2024