UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

———————————————————————

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Plaintiff-Intervenor, and ) | |
| Consolidated Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Consolidated Plaintiff ) | |
| ) | |
| v. ) | Consol. Court No. 23-00239 |
| ) | |
| UNITED STATES, ) | **PUBLIC DOCUMENT** |
| ) | |
| Defendant, ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Defendant-Intervenor, and ) | |
| Consolidated Defendant-Intervenor ) | |
| ) | |
| and ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Consolidated Defendant-Intervenor. ) | |

———————————————————————

**DEFENDANT-INTERVENOR JOINT STOCK COMPANY APATIT'S
RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to JSC Apatit*

December 12, 2024

**TABLE OF CONTENTS**

I.      RULE 56.2 STATEMENT ...................................................................................... 1

II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT ................................. 2

III.    PROCEDURAL HISTORY ................................................................................... 4

IV.     STANDARD OF REVIEW ................................................................................... 7

V.      COMMERCE CORRECTLY EMPLOYED KAZAKH EXPORT DATA AS A TIER TWO BENCHMARK FOR THE ALLEGED NATURAL GAS FOR LTAR PROGRAM ................................................................................................................ 9

        A.      Record Evidence Demonstrates that Kazakh Gas Was Available to Russian Purchasers As Required by 19 C.F.R. § 351.511(a)(2)(ii)................................... 10

        B.      Commerce Correctly Found that Alleged Government Involvement in the Kazakh Domestic Market for Natural Gas Does Not Preclude its Selection of Tier Two Benchmark Comprising Export Prices of Kazakh Natural Gas ............................ 18

VI.     CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Tech. & Materials Co. v. United States*,
    35 C.I.T. 1380 (Ct. Int'l Trade 2011) ...................................................................... 8, 21

*Dofasco Inc. v. United States*,
    326 F.Supp.2d 1340 (Ct. Int'l Trade 2004) .............................................................. 16

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) .................................................................................... 8

*Mittal Steel Roman v. United States*,
    32 C.I.T. 42 (Ct. Int'l Trade 2008) ............................................................................ 8

*Jianxing Brother Fastener Co. v. United States*,
    380 F.Supp.3d 1343 (Ct. Int'l Trade 2019) ............................................................... 8

*Lyng v. Payne*,
    476 U.S. 926 (1986) .................................................................................................. 15

*Martin v. Occ. Safety and Health Review Comm'n*,
    499 U.S. 144 (1991) ............................................................................................ 15, 16

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) .................................................................................. 8

*Olympia Indus., Inc. v. United States*,
    22 C.I.T. 387 (Ct. Int'l Trade 1998) .......................................................................... 8

*RHP Bearings Ltd. v. United States*,
    288 F.3d 1334 (Fed. Cir. 2002) .................................................................................. 8

*Target Corp. v. United States*,
    578 F.Supp.2d 1369 ( Ct. Int'l Trade 2008) ........................................................ 16, 17

*The Mosaic Company v. United States*,
    589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) ............................................................. 21

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ............................................................................................ 16, 17

*Zhejiang DunAn Hetian Metal Co. v. United States*,

   652 F.3d 1333 (Fed. Cir. 2011)..................................................................................... 8

STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i).......................................................................................... 8

19 U.S.C. § 1677(5)......................................................................................................... 10

19 U.S.C. § 1677(5)(E)................................................................................................. 2, 9

OTHER AUTHORITIES

*Carbon and Alloy Steel Wire Rod from the Republic of Turkey*,

   83 Fed. Reg. 13,239 (Dep't Commerce Mar. 28, 2018) (final affirmative countervailing duty

   determination), and accompanying Issues and Decision Memorandum .............................. 19, 20

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*,

   81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative CVD determination and

   final negative critical circumstances determination), and accompanying Issues and Decision

   Memorandum ............................................................................................................... 20

*Countervailing Duties*,

   63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)................................................... 15

*Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's*

*Republic of China*,

   83 Fed. Reg. 3,120 (Dep't Commerce Jan. 23, 2018) (final affirmative determination), and

   accompanying Issues and Decision Memorandum................................................................ 18, 19

*Granular Polytetrafluoroethylene Resin from the Russian Federation*,

   87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022) (final affirmative countervailing duty

   determination), and accompanying Issues & Decision Memorandum .............................. 6, 11, 12

*Oil Country Tubular Goods From the Russian Federation*,

   87 Fed. Reg. 14,249 (Dep't Commerce Mar. 14, 2022) (preliminary affirmative countervailing

   duty determination, preliminary negative critical circumstances determination, and alignment of

   final determination with final antidumping duty determination), and accompanying Preliminary

   Determination Memo ...................................................................................................... 12

*Oil Country Tubular Goods From the Russian Federation*,

   87 Fed. Reg. 59,047 (Dep't Commerce Sept. 29, 2022) (final affirmative countervailing duty

   determination and negative critical circumstances determination)............................................. 12

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*,

  86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ................................................................... 4

*Phosphate Fertilizers from the Russian Federation*,

  86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum ..................................... 21

*Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*,

  89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024), and accompanying Issues & Decision Memo ........................................................................................................................................ 12

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,

  85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of countervailing duty administrative review), and accompanying Issues & Decision Memorandum...................... 19, 20

*Steel Rebar from Turkey*,

  84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019) (preliminary results of countervailing duty administrative review), and accompanying Issues & Decision Memorandum ................... 19

*Urea Ammonium Nitrate Solutions from the Russian Federation*,

  87 Fed. Reg. 37,836 (Dep't Commerce June 24, 2022) (final determination in the countervailing duty investigation), and accompanying Issues and Decision Memorandum ............................................................................................................ 7, 12, 18, 20

*Utility Scale Wind Towers from the People's Republic of China*,

  77 Fed. Reg. 75,978 (Dep't Commerce Dec. 26, 2012) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum ..................................... 16

**REGULATIONS**

19 C.F.R. § 351.511(a)(2) ..................................................................................................................... 14

19 C.F.R. § 351.511(a)(2)(i) .................................................................................................................... 9

19 C.F.R. § 351.511(a)(2)(ii) ........................................................................................................... passim

19 C.F.R. § 351.511(a)(2)(iii) ................................................................................................................. 9

<u>**DEFENDANT-INTERVENOR JOINT STOCK COMPANY APATIT'S**</u>
<u>**RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT**</u>
<u>**ON THE AGENCY RECORD**</u>

Pursuant to Rule 56.2 of the Rules of this Court, Defendant-Intervenor Joint Stock Company Apatit ("JSC Apatit") respectfully submits this response in opposition to the motion for judgment on the agency record filed by Consolidated Plaintiff, The Mosaic Company ("Mosaic" or "Petitioner"). ECF No. 38 ("C. Pl.'s Br."). Mosaic challenges the U.S. Department of Commerce's ("Commerce" or the "Department") final determination in its first administrative review of its countervailing duty ("CVD") Order on Phosphate Fertilizers from Russia, Case No. C-821-825. Specifically, Mosaic challenges Commerce's employ of Kazakh natural gas export data as a Tier Two benchmark in its calculations for the alleged Provision of Natural Gas for Less than Adequate Remuneration ("LTAR"). For the reasons set forth below and consistent with the arguments presented by the Government in its November 21, 2024 response brief, Mosaic's contentions are without merit and should be rejected. ECF Nos. 49, 50 ("Def. Br."). Commerce's natural gas benchmark selection is supported by substantial evidence and lawful. Accordingly, Mosaic's motion for judgment on the agency record should be denied.

## I.    RULE 56.2 STATEMENT

Mosaic contests certain aspects of the Final Results issued by Commerce in its first CVD administrative review of Phosphate Fertilizers from Russia, Case No. C-821-825. *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246). <u>1</u>/  Plaintiff's appeal also contests certain aspects of Commerce's accompanying

<u>1</u>/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021, dated October 31, 2023 ("Final IDM") (P.R. 242) and the Final Calculations for JSC Apatit, dated October 31, 2023 ("Final Calculations") (P.R. 243, 244; C.R. 226, 227). Commerce's period of review ("POR") was November 30, 2020, through December 31, 2021.

## II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

**1.     Whether Commerce's use of Kazakh natural gas exports as a Tier Two benchmark, including its finding that Kazakh-origin gas was available to purchasers in Russia, was supported by substantial evidence and otherwise in accordance with law.**

Commerce correctly and lawfully employed Kazakh export pricing as a Tier Two benchmark in its natural gas LTAR analysis. Under the governing statute, Commerce must employ a benchmark that reflects "prevailing market conditions" in the country at issue (here, Russia). 19 U.S.C. § 1677(5)(E)(iv). Moreover, Commerce's regulatory benchmark hierarchy requires the Department to assess the availability of a Tier Two benchmark—that is, a world-market price that is available to "purchasers" in the country at issue—when, as is the case here, a Tier One benchmark is not available. 19 C.F.R. § 351.511(a)(2)(ii). Commerce complied with both the governing statute and its regulation here—that is, Commerce found that exports of Kazakh-origin natural gas reflect prevailing market conditions in Russia and, based on substantial evidence, were available to consumers in Russia. Accordingly, Commerce employed certain exports of Kazakh natural gas (i.e., to markets other than China and Russia) as a Tier Two benchmark. Final IDM at 46. (P.R. 242).

Petitioner claims that Commerce erred and that record evidence demonstrates that Kazakh natural gas prices were not "'available' to purchasers" in Russia within the meaning of

Commerce's regulation.  C. Pl.'s Br. at 12.  Specifically, Mosaic contends that the Kazakh natural gas sold into Russia was not sold to "purchasers," which Mosaic claims must equate to Russian private consumers.  *Id.* at 13–14.

Contrary to Petitioner's claim, the Department did not err in finding that Kazakh natural gas was available to purchasers in Russia during the POR.  Record evidence clearly demonstrates that Kazakh-origin gas was sold to the Gazprom Orenburg Plant located in Russia.  Second, Mosaic's proposed interpretation of Commerce's regulation – i.e., that the gas must have been purchased by a "private consumer" to be a valid Tier Two benchmark – is flawed and should not be accepted by this Court.

**2.** **Whether Commerce's finding that alleged government involvement in the Kazakh domestic market is not relevant to the agency's use of Kazakh exports as a Tier Two benchmark was lawful.**

Mosaic also claims that domestic prices for natural gas in Kazakhstan are distorted due to government involvement, and thus that export prices for natural gas from Kazakhstan may not be used as a benchmark.  C. Pl.'s Br. at 19.  Petitioner's last-ditch effort to undermine the Department's selected benchmark is fatally flawed.  Most critically, Petitioner's plea is irrelevant to Commerce's benchmark selection, which relates to ***export prices*** for Kazakh natural gas. Commerce has long found that the possible distortion of domestic prices in the country of production or export (here, Kazakhstan) is not pertinent to determining whether export pricing may comprise a non-Tier One benchmark.  In fact, Commerce has repeatedly emphasized that export prices reflect commercial realities of the world market, not the in-country market of the exporter.

Commerce correctly adhered to the governing statute and its regulatory hierarchy in the *Final Results* (P.R. 246). As a Tier Two benchmark was available, Commerce correctly rejected Petitioner's International Energy Agency ("IEA") data, which were a Tier Three benchmark.

## III.    PROCEDURAL HISTORY

Commerce published its CVD order on phosphate fertilizers from Russia in the Federal Register on April 7, 2021. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order"). Commerce initiated this first administrative review of the CVD Order on June 9, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't Commerce June 9, 2022) (P.R. 6).

JSC Apatit timely provided benchmark data to Commerce on March 15, 2023 demonstrating that Kazakh natural gas was sold into Russia during the POR and therefore was available to Russian purchasers during the POR. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Benchmark Data Submission*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 15, 2023) ("JSC Apatit's Benchmark Submission") (P.R. 142–155; C.R. 178–192). In particular, JSC Apatit provided information from the Bureau of National Statistics of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan ("BNS") on exports of natural gas (customs code 2711.12.0000) from Kazakhstan during the POR, including exports to Russia. JSC Apatit's Benchmark Submission at App. 1 (P.R. 143; C.R. 179). In support of these export data, JSC Apatit also submitted to Commerce (1) information from the U.S. Energy Information Administration ("EIA") on Kazakh gas production and exports, (2) ownership information on the natural gas fields in Kazakhstan, and (3) annual reports released by Karachaganak Petroleum

Operating BV ("KPO") and JSC National Company KazMonayGas ("KMG"), which operate Kazakh natural gas production. JSC Apatit's Benchmark Submission at App. 2–3 (P.R. 143–145; C.R. 179–181). Additionally, JSC Apatit provided detailed information on the delivery of Kazakh natural gas to Russia, including KPO's gas pipeline route through the Karachaganak Orenburg Transportation System ("KOTS") that is used to transport natural gas to Orenburg, Russia. KMG's annual reports on Commerce's administrative review record corroborate this pipeline information. JSC Apatit's Benchmark Submission at App. 4–5 (P.R. 146–154; C.R. 182–190). Moreover, Petitioner also provided Russian import data further demonstrating that natural gas was imported into Russia from Kazakhstan during the POR. Letter from Wilmer Hale to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Benchmark Rebuttal Submission*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 27, 2023) ("Mosaic's Benchmark Rebuttal") at Ex. 11 (P.R 165).

Petitioner provided benchmark data for exports of natural gas for Organization for Economic Co-operation and Development ("OECD") countries sourced by the IEA for 2021, along with energy conversion ratios for natural gas as these export data were not reported in the same units as Russian natural gas. Letter from WilmerHale to U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Submission of Factual Information to measure the Adequacy of Remuneration*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 15, 2023) ("Mosaic's Benchmark Submission") (P.R. 132–141). Mosaic also provided documentation from Russia's 2021 World Trade Organization ("WTO") Accession Protocol explaining that the Government of Russia customs code 2711.21.0000 covers "natural gas (excluding as sold to the population)." Mosaic's Benchmark Rebuttal at Ex. 12. (P.R. 165).

In response, JSC Apatit timely provided additional information demonstrating that natural gas pipelines during the POR did not permit gas to be delivered to Russian consumers from Europe.  Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission*, Case No. C-821-825 (2020-21 Administrative Review) (Mar. 27, 2023) ("JSC Apatit Benchmark Rebuttal") (P.R. 169–172; C.R. 202–05).

JSC Apatit submitted detailed Pre-Preliminary Determination Comments to Commerce. Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Comments In Advance of the Preliminary Determination*, Case No. C-821-825 (2020-21 Administrative Review) (Apr. 17, 2023) ("JSC Apatit's Pre-Prelim Comments") (P.R. 182; C.R. 215–16).   These comments demonstrated that Kazakh natural gas exports meet the legal requirements of a Tier 2 benchmark and identified the factual similarities between the instant case and recent cases in which Commerce had employed the use of Kazakh natural gas exports as a Tier 2 benchmark. JSC Apatit's Pre-Prelim Comments at 8–11 (P.R. 182; C.R. 215–216).   As discussed in JSC Apatit's comments, Commerce first determined in *Granular Polytetrafluoroethylene Resin from the Russian Federation*, based on newly submitted factual information, that Kazakh natural gas was being delivered via pipeline to Russia, and therefore that Kazakh exports prices were suitable as a Tier Two benchmark.  87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022) (final affirmative countervailing duty determination), and accompanying Issues & Decision Memorandum ("*PTFE from Russia* I&D Memo").  Commerce subsequently made this same finding in *Urea Ammonium Nitrate Solutions from the Russian Federation,* 87 Fed. Reg. 37,836 (Dep't

Commerce June 24, 2022) (final determination in the countervailing duty investigation), and accompanying Issues and Decision Memorandum ("*UAN from Russia* I&D Memo").

On May 4, 2023, Commerce published the Preliminary Results and calculated a CVD preliminary rate of 0.99% for JSC Apatit pursuant to the natural gas LTAR program. *Phosphate Fertilizers from the Russian Federation: Preliminary Results and Partial Recission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ("*Preliminary Results*") (P.R. 191). Commerce preliminarily determined to employ a Tier Two benchmark comprising Kazakh natural gas exports in its LTAR calculations.

On June 12, 2023, Mosaic filed its case brief with Commerce, erroneously contending that the Department erred in using a Kazakh natural gas as a Tier Two benchmark. Letter from WilmerHale to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Case Brief*, Case C-821-825 (2020-21 Administrative Review) (June 13, 2013) (P.R. 207, C.R. 221). Mosaic presented the same arguments at issue here before this Court: (1) that Kazakh-origin gas was not available to private consumers in Russia, and therefore does not meet Commerce's "available to purchasers" requirement, and (2) Kazakhstan's government involvement in the Kazakh domestic market disqualifies its exports as suitable Tier Two benchmark prices. Commerce correctly rejected these arguments in its *Final Results* and employed Kazakh natural gas exports as a Tier Two benchmark in its LTAR calculations.

On November 6, 2023, in the *Final Results* Commerce again calculated a CVD rate of 0.99% for JSC Apatit with respect to the natural gas LTAR program. *Final Results* (P.R. 246).

## IV.    STANDARD OF REVIEW

This Court must sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record" and is otherwise "in accordance with

law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1037 (Fed. Cir. 1996).   The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept to support a conclusion." *Fujitsu Gen. Ltd.*, 88 F.3d at 1044; *see also* 19 U.S.C. § 1516a(b)(1)(B)(i); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).   In reviewing Commerce's decision, "the Court must consider {} whether the Department has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Advanced Tech. & Materials Co. v. United States*, 35 C.I.T. 1380, 1387 (Ct. Int'l Trade 2011) (internal citations and quotation marks omitted).   If such rational connection is demonstrated, the Court must uphold Commerce's determination. *Id.*   The Court should affirm Commerce's decision as long as it is "reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Mittal Steel Roman v. United States*, 32 C.I.T. 42, 44 (Ct. Int'l Trade 2008) (citing *Olympia Indus., Inc. v. United States*, 22 C.I.T. 387, 389 (Ct. Int'l Trade 1998).

Additionally, this Court shall only hold unlawful an agency action found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.   An agency action is not is arbitrary and capricious when the agency provides sufficient reasons for "treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (internal quotations removed).   As such, Commerce may not depart from its prior practice unless "it provides a reasoned explanation for its change." *Jianxing Brother Fastener Co. v. United States*, 380 F.Supp.3d 1343, 1365 (Ct. Int'l Trade 2019) (internal citations omitted).

## V.    COMMERCE CORRECTLY EMPLOYED KAZAKH EXPORT DATA AS A TIER TWO BENCHMARK FOR THE ALLEGED NATURAL GAS FOR LTAR PROGRAM

Commerce correctly relied on exports of Kazakh natural gas as a Tier Two world market benchmark.  This finding is in accord with U.S. law, consistent with Commerce's recent practice, and supported by record evidence.

Commerce's governing statute, Section 1677(5)(E) of the Tariff Act, 19 U.S.C. § 1677(5)(E), dictates that the adequacy of remuneration is to be determined in relation to the "prevailing market conditions" for the good being provided in the country of provision of the good (here, Russia).  The relevant prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.  19 U.S.C. § 1677(5)(E)(iv).  Accordingly, the adequacy of remuneration of a provided good must be assessed against a benchmark reflecting the prevailing market conditions for the good in the country of provision (here, Russia).

Commerce's regulatory hierarchy sets forth Commerce's preference when selecting an LTAR benchmark.  A Tier One benchmark compares the government price to "a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i).  If no such market-determined price exists, Commerce proceeds to its Tier Two benchmark, which compares the government price (in Russia) to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question" (Russia).  19 C.F.R. § 351.511(a)(2)(ii).  *Only if neither of the first two benchmarks is available* does Commerce consider a Tier Three benchmark, in which the Department examines whether the government price in the country of provision of the good or service is "consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).

There is no dispute in this appeal that a Tier One, market-determined benchmark was not available to Commerce with respect to natural gas provided in Russia.  As such, Commerce correctly looked to a Tier Two, global market price benchmark.  Commerce's decision to employ Kazakh export prices as a Tier Two benchmark is consistent with the statutory and regulatory requirements, the record evidence, and Commerce's recent practice.

### A.    Record Evidence Demonstrates that Kazakh Gas Was Available to Russian Purchasers As Required by 19 C.F.R. § 351.511(a)(2)(ii)

Mosaic contends that Commerce's Tier Two benchmark requirements set forth in 19 C.F.R. § 351.511(a)(2)(ii) are not met, and therefore that Kazakh natural gas export pricing cannot be used as a benchmark.  Specifically, Mosaic argues on both factual and legal grounds that Kazakh gas is not "available to purchasers" in Russia.  Mosaic claims that the exports were not actually available to "purchasers" within the broader meaning of the statute, 19 U.S.C. § 1677(5)—rather, Mosaic asserts that "purchasers" must equate to "consumers."  Following this argument, Mosaic claims that the natural gas was purchased by the Gazprom Orenburg Gas Processing Plant for further processing, and therefore Gazprom, or any government entity, is not a "consumer" of natural gas under the meaning of the regulation.  Lastly, Mosaic claims that the gas exported from Kazakhstan was "raw (high sulfur)" gas, and this is insufficient evidence that natural gas was actually available to purchasers in Russia.

Mosaic's claims are specious and unsupported by record evidence.  On the contrary, record evidence demonstrates that Kazakh-origin natural gas was imported to the Gazprom plant located in Orenburg, Russia during the POR.  Moreover, Commerce reasonably interpreted its own regulation and correctly rejected Mosaic's narrow interpretation of the meaning of "purchaser" in 19 C.F.R. § 351.511(a)(2)(ii).  Accordingly, Commerce reasonably concluded that Kazakh gas was available for purchase in Russia during the POR.

10

In its *Final Results*, Commerce found that "exports of Kazakh-origin natural gas to Russia are available to purchasers in Russia and, therefore, that exports of Kazakh-origin natural gas to non-distorted, non-Russian countries may serve as a world market benchmark under 19 CFR 351.511(a)(2)(ii)." Final IDM at 46 (P.R. 242). Commerce explains that record evidence demonstrated that, unlike during its period of investigation, there were Russian imports of natural gas from Kazakhstan during the POR, and that these exports were corroborated by both Kazakh export data and Russian import data. *Id.* Commerce also cites to record evidence that KPO sold natural gas to the Orenburg Gas Plant in Russia through the Karachaganak Orenburg pipeline. *Id.*

Commerce explains that, in its original investigation and in historical cases involving Russia, record evidence demonstrated that "natural gas from other countries was either not available due to uni-directional pipeline flows . . . or was merely transshipped though Russia to third countries." *Id.* Commerce observes, however, that this situation changed during the periods covered by the underlying administrative review and in more recent proceedings involving Russia, such that the record evidence supported a finding that the "Karachaganak Orenburg {natural has} pipeline connects to and terminates in Russia." *Id.* In fact, Commerce made this same finding in three cases in 2022 prior to these *Final Results*: (1) *Granular Polytetrafluoroethylene Resin From the Russian Federation*; (2) *Oil Country Tubular Goods from the Russian Federation*; and (3) *Urea Ammonium Nitrate Solutions From the Russian Federation. Id.* (citing *PTFE from Russia* I&D Memo at 19–20; *Oil Country Tubular Goods From the Russian Federation*, 87 Fed. Reg. 14,249 (Dep't Commerce Mar. 14, 2022) (preliminary affirmative countervailing duty determination, preliminary negative critical circumstances determination, and alignment of final determination with final antidumping duty

determination), and accompanying Preliminary Determination Memo at 21 ("*OCTG from Russia*

Prelim"), unchanged in *Oil Country Tubular Goods From the Russian Federation*, 87 Fed. Reg.

59,047 (Dep't Commerce Sept. 29, 2022) (final affirmative countervailing duty determination

and negative critical circumstances determination) ("*OCTG from Russia* Final"); *UAN from*

*Russia* I&D Memo at 20.  Moreover, Commerce relied on identical record evidence in the *Final*

*Results* as the agency relied on in those cases.  In particular, in *UAN from Russia* and *PTFE from*

*Russia*, as well as in the underlying administrative review, Commerce found that Russian Federal

Customs Service import data, Kazakh export data from BNS, and statements by Kazakh

producers KMG and KPO (including the annual reports) constituted sufficient evidence

demonstrating that Kazakh gas was sold to Russian consumers during the relevant period.  *UAN*

*from Russia I&D Memo* at Cmt. 2; *PTFE from Russia* I&D Memo at Cmt. 2; *OCTG from Russia*

Prelim.  Lastly, Commerce states that it confirmed in these prior cases that imports under customs

code 2711210000 are placed under a customs procedure of a release into free circulation," to

support its finding that the Kazakh imports were available to purchasers in Russia.  Final IDM

at 46 (P.R. 242). 2/

     Mosaic challenges Commerce's findings and argues that Commerce misinterprets the

meaning of its own regulation, 19 C.F.R. § 351.511(a)(2)(ii).  Specifically, Mosaic contends that

"available to purchasers" in Russia must mean available to private consumers, and that record

evidence fails to demonstrate that Kazakh gas was sold to private consumers during the POR.

---

2/     JSC Apatit also notes that since Commerce's *Final Results* in this review, Commerce has
made identical findings in the second administrative review of this Order, employing Kazakh
export prices as a Tier Two benchmark.  *Phosphate Fertilizers from the Russian Federation:*
*Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't
Commerce Nov. 12, 2024), and accompanying Issues & Decision Memo at Cmt. 2a.

First, Mosaic claims that a WTO document placed on the record by Mosaic itself demonstrates that imports entered into Russia under the customs code 2711.12.0000 cover "natural gas (excluding as sold to the population)," and therefore cannot meet Commerce's requirement that the imports are available to Russian purchasers.  In tandem, Mosaic claims that Commerce cannot rely on record evidence from prior cases showing that the natural gas imports "are placed under a customs procedure of release into free circulation."  Second, Mosaic challenges Commerce's interpretation of its own regulation that "available" does not necessarily equate to "available to private entities" or private individual consumers.  Accordingly, Mosaic argues that Gazprom is not a sufficient purchaser under 19 C.F.R. § 351.511(a)(2)(ii).  Third, Mosaic argues that Kazakh gas is "raw (high-sulfur gas)" sold to Gazprom, and that the price of any Kazakh-origin, or further processed Gazprom gas distributed to Russian consumers would be distorted. The Court should reject these arguments on both factual and legal grounds.

In regard to Mosaic's first claim, the document on which Mosaic's argument stands is from 2001 – ***20 years before the POR at issue in this case***.  Mosaic Benchmark Rebuttal at Ex. 12 (P.R. 165).  Second, the tariff code descriptions in both the export data provided from Kazakh BNS and the Russian import data for the POR are not indicative whatsoever that the product is not sold to the population.  JSC Apatit Benchmark Submission at App. 1 ("PETROLEUM GASES AND OTHER GAS HYDROCARBONS: – IN GASEOUS STATE: – – NATURAL GAS") (P.R. 143; C.R. 179); Mosaic Benchmark Rebuttal at Ex. 11 (P.R. 165) ("2711210000 - NATURAL GAS IN GASEOUS STATE").  The record is bereft of any evidence – from Mosaic or any other party – that this singular tariff code description from more than 20 years ago was still applicable during the POR.  Mosaic conveniently omits this detail in its arguments.  As such, Commerce correctly disregarded this evidence as it is not relevant to the time period at issue.

In its second claim, Mosaic attempts to bend the text of the *CVD Preamble* to its goal-oriented interpretation that "purchasers" in 19 C.F.R. § 351.511(a)(2) must mean "consumers". Mosaic argues that "Commerce's Preamble does in fact equate prices that are 'available' to purchasers in the subject country with prices that are available to consumers," based on the language of one of two examples in the *Preamble*. C. Pl.'s Br. at 15. Implicitly in its arguments, Mosaic goes even further—as Mosaic claims Gazprom fails to meet this requirement—its true contention is that the regulation requires "purchasers" to mean "***private*** consumers." That is, Mosaic contends that if a world market price is not available to *private consumers* in the country in question (Russia), then the price is not "probative" for measuring the alleged benefit. Notably, however, Mosaic fails to cite any Commerce or CIT precedent to support its interpretation. Rather, Mosaic argues that any interpretation of the regulation other than its own is contrary to the purpose of LTAR calculations—to determine whether a financial contribution provides a "benefit to the recipient" as outlined in 19 U.S.C. § 1677(5)(E). C. Pl.'s Br. at 16 (contending that Commerce cannot measure the benefit to the recipient if the benchmark price is not available to {private} consumers).

Notwithstanding, Mosaic fails to demonstrate how "purchasers" in 19 C.F.R. § 351.511(a)(2)(ii) must mean private consumers. To the contrary, Commerce's interpretation is reasonable given there is no explicit language equating "available to purchasers" to different text, "available to private consumers," in the regulation or the *CVD Preamble*. Rather, the *Preamble* states:

14

> Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices stemming from actual transactions, we will turn to world market prices that ***would be available to the purchaser***. We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be ***available to consumers*** in Latin America. However, as another example, the world market price for commodity products, such as certain metals and ores, or for certain industrial and electronic goods commonly traded across borders, could be an acceptable comparison price for a government provided good, provided that it is ***reasonable to conclude from record evidence that the purchaser would have access*** to such internationally traded goods.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) (emphases added) ("*CVD Preamble*"). Notably, while Commerce uses the word "consumer" in the first example on which Mosaic attempts to rely, Commerce again uses "purchaser" in the second example, thereby making its intentions clear.

Moreover, even if Mosaic is correct – and it is not – that "purchasers" and "consumers" are meant to have the same meaning in the *Preamble*, Gazprom still meets this requirement. Gazprom purchased the gas for its Orenburg plant, and so Gazprom is a consumer. There is simply no basis for Mosaic's contention that "consumers" must equate to "***private*** consumers". In fact, the *Preamble* itself contemplates that under ordinary circumstances there will be some level of government involvement in the domestic market. *CVD Preamble*, 63 Fed. Reg. at 65,377. Commerce's discussion does not indicate that the electricity consumers in its example cannot be government or public consumers.

Furthermore, "{i}t is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. Occ. Safety and Health Review Comm'n*, 499 U.S. 144, 151 (1991) (quoting *Lyng v. Payne*, 476 U.S. 926, 939 (1986)). As this

15

Court has explained, the Supreme Court has made clear that Commerce's interpretation of its own regulations will be upheld unless it is "plainly erroneous or inconsistent with the regulation"; or, put another way, if the interpretation "sensibly conforms to the purpose and wording of the regulations." *Target Corp. v. United States*, 578 F.Supp.2d 1369, 1380 ( Ct. Int'l Trade 2008) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)) (internal quotations removed); *Dofasco Inc. v. United States*, 326 F.Supp.2d 1340, 1350 (Ct. Int'l Trade 2004) (quoting *Martin* 499 U.S. 144 at 151 (1991)) (internal quotations removed).   Here, Commerce's interpretation is not plainly erroneous and sensibly conforms to the rest of the regulation.   Specifically, Commerce's interpretation is consistent with the discretionary first half of the regulatory phrase at issue—"***where it is reasonable to conclude*** that such price would be available to purchasers in the country in question."   19 C.F.R. § 351.511(a)(2)(ii) (emphasis added).   Commerce thus wrote into the regulation a certain level of flexibility into the Tier Two benchmark requirement.   Commerce addresses this flexibility itself in its *Final Results* when the agency explains that it has used export pricing information from countries as a Tier Two benchmark even when the record lacks clear evidence that the countries exported to the country in question.   Final IDM at 47–48 (citing *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,978 (Dep't Commerce Dec. 26, 2012) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum at Cmt. 15)) (P.R. 242).

Finally, in essence Mosaic asks this Court to infer the existence of a specific requirement in the regulation that simply does not exist.   The statutory canon *expressio unius est exclusio alterius* provides that unless such an explicit requirement is present, the absence of the requirement necessarily means Commerce did not intend to include it.   Relatedly, "{w}hen

reviewing Commerce's interpretations of its own regulations, the court does not 'decide which among several competing interpretations best serves the regulatory purpose.'" *Target Corp.*, 578 F.Supp.2d at 1379 (Ct. Int'l Trade 2008) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512). Here, it is not this Court's duty to assess whether Mosaic's interpretation of the regulation is better than Commerce's interpretation, rather this Court is tasked solely with determining whether Commerce's interpretation is reasonable. It is plain that the answer to this question is affirmative.

In regards to Mosaic's third and fourth arguments, the Court should not be distracted by these red herrings—Commerce has already removed prices of Kazakh exports into Russia (and China) from its benchmark. Thus, any alleged price distortion by Gazprom would not come into play in Commerce's calculations. Final IDM at 48 ("{W}e are not using exports to Russia as the benchmark for the provision of natural gas. Rather, as discussed above, we are using exports to other markets and the petitioner's argument does not speak to the primary issue of availability.") (P.R. 242). Rather, as explained in the Government's brief, "the relevant question is whether Kazakh natural gas is available to Russian purchasers, not the prices at which gas is made available." Def. Br. at 26–27.

Moreover, substantial evidence clearly demonstrates that Kazakh gas was sold to the Orenburg Gazprom plant located in Russia, and thus was sold to a Russian purchaser. Commerce's benchmark is thus consistent with the requirements for a Tier Two benchmark under 19 C.F.R. § 351.511(a)(2)(ii). The Court should reject Mosaic's argument and affirm Commerce's determination on this issue.

**B.**    **Commerce Correctly Found that Alleged Government Involvement in the Kazakh Domestic Market for Natural Gas Does Not Preclude its Selection of Tier Two Benchmark Comprising Export Prices of Kazakh Natural Gas**

Commerce also correctly determined in its *Final Results* that alleged government involvement in the Kazakhstan domestic natural gas market does not have "any bearing on Commerce's ability to use Kazakh *exports* as a Tier 2 benchmark." Final IDM at 48. (P.R. 242). As Commerce explained in its *Final Results* and the Government expounds on in its Response, "the mere fact that that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted." Final IDM at 48 (P.R. 242); Def.'s Br. at 27–28. Rather, export prices reflect "the commercial realities on the world market for such goods or services." Final IDM at 48 (citing *Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China*, 83 Fed. Reg. 3,120 (Dep't Commerce Jan. 23, 2018) (final affirmative determination), and accompanying Issues and Decision Memorandum at Cmt. 4 ("*FDPSF from China*") (P.R. 242).

Commerce's discussion of this issue is consistent with its repeated findings in several previous CVD investigations and administrative reviews, including with respect to Kazakhstan. Therein, Commerce explained that market distortion in a third country of export (i.e., a country not under investigation or review) of a good allegedly provided for LTAR in the country under investigation or review does not per se mean that export prices from that third country are unusable in a Tier Two benchmark. In fact, Commerce previously examined this exact argument in regards to Government of Kazakhstan involvement in the domestic natural gas market and rejected it. *UAN from Russia* I&D Memo at Cmt. 3. And in cases involving exports from Turkey and China, Commerce likewise found that distortion in the domestic market of the country of export did not render the relevant exports unusable as a Tier Two benchmark. *See, e.g.*, *Carbon*

*and Alloy Steel Wire Rod from the Republic of Turkey*, 83 Fed. Reg. 13,239 (Dep't Commerce Mar. 28, 2018) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum at Cmt. 1 ("*Carbon and Alloy Steel Wire Rod from the Republic of Turkey* IDM") (finding that previous findings that the Russian domestic market was distorted did not prevent the employ of Russian export prices as a Tier Two benchmark); *FDPSF from China* (employing export pricing of monoethylene glycol ("MEG") and purified terephthalic acid ("PTA") from China, notwithstanding Commerce's finding that China's domestic market for MEG and PTA was distorted for purposes of Commerce's Tier One benchmark analysis).

Ignoring Commerce's clear, rational position espoused in several prior determinations, Mosaic maintains its same contention from the underlying review and even attempts to take its argument one step further before this Court.  Petitioner contends that, in *Steel Concrete Reinforcing Bar from the Republic of Turkey* ("*Steel Rebar from Turkey*"), Commerce disqualified the use of Russian export data due to findings of government distortion in the Russian domestic market, and that, consequentially, Commerce should do the same here with Kazakh exports.  C. Pl.'s Br. at 21 (citing *Steel Rebar from Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of countervailing duty administrative review), and accompanying Issues & Decision Memorandum at Cmt. 5).  Mosaic is wrong and ignores a key, distinguishing factual point.  In *Steel Rebar from Turkey*, Commerce relied on the agency's findings of distortion in its investigation of *Cold-Rolled Steel Flat Products from the Russian Federation*, a separate Commerce investigation regarding the domestic Russian market.  *Steel Rebar from Turkey*, 84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019) (preliminary results of countervailing duty administrative review), and accompanying Issues & Decision Memorandum at Cmt. 1 (citing *Certain Cold-Rolled Steel Flat Products from the Russian*

*Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative CVD determination and final negative critical circumstances determination), and accompanying Issues and Decision Memorandum at Cmt. 5.  Moreover, Commerce's determination in *Steel Rebar from Turkey* predates Commerce's reiteration in *UAN from Russia* in 2022 that distortion in a domestic market – either alleged or actually found by Commerce – does not preclude the use of that market's export pricing.  *UAN from Russia* I&D Memo at Cmt. 3.  Additionally, as mentioned above, these exact findings did not stop Commerce from employing Russian export prices as a Tier Two benchmark in *Carbon and Alloy Steel Wire Rod from Turkey*.  There has been no separately conducted investigation of Kazakhstan's domestic natural gas market, and thus Mosaic's claimed comparison is irrelevant to the situation at hand. 3/  Commerce correctly disregarded this meritless argument, and this Court should as well.

Further demonstrating Commerce's comprehensive analysis on the comparability and accuracy of its Tier Two benchmark, Commerce has addressed any issues of distortion by removing pricing for Kazakh exports to Russia and China from its benchmark.  There is no evidence in the BNS export data on Commerce's record that the natural gas markets of Uzbekistan, Ukraine, Germany, Kyrgyzstan, and Switzerland (the destination countries for Kazakh's exports employed in Commerce's benchmark) are distorted—and Petitioner has pointed to none.  This logical and close analysis of distortion in its benchmarks appears to have been part of Commerce's studied rationale in this case—that is, Commerce declined to exclude Russian export pricing from its Tier Three benchmark for natural gas in the original

---

3/    JSC Apatit notes that Commerce's finding in *Steel Rebar from Turkey* specifically related to distortion for geopolitical purposes. Such a fact-based analysis is the height of Commerce's discretion and must be given deference.  With this same discretion, Commerce did not find that similar facts were present on this record in regards to Kazakhstan.

investigation, notwithstanding Commerce's finding that the Russian natural gas market was distorted due to government involvement. *Phosphate Fertilizers from the Russian Federation*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum at Cmt. 3j. Commerce's decision in the original investigation was correctly upheld by this Court. *The Mosaic Company v. United States*, 589 F.Supp.3d 1298, 1314-15 (Ct. Int'l Trade 2022).

As noted above, the facts in regards to whether a Tier Two benchmark is available in Russia have changed. Commerce did not depart from its past practice lightly—it has reviewed whether Kazakh natural gas exports are valid Tier Two benchmark prices now three separate times and come to the same conclusion. In reviewing Commerce's decision, "the Court must consider { } whether the Department has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Advanced Tech. & Materials Co.*, 35 C.I.T. at 1387 (internal citations and quotation marks omitted). Commerce's findings are supported by substantial evidence and demonstrate this rational connection between such record evidence and its selection of its benchmark.

In sum, Commerce's finding that market distortion in the Kazakh market purportedly caused by the Government of Kazakhstan does not render Kazakh exports unusable as a Tier Two benchmark is both lawful and supported by substantial evidence. This Court should uphold Commerce's finding on this issue.

## VI.    CONCLUSION

For the foregoing reasons, JSC Apatit respectfully requests that this Court deny Plaintiff's Motion for Judgment on the Agency Record.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.6634
Fax:  +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

Dated: December 12, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 6,409 words according to the word-count function of the word-processing software used to prepare the brief.  This is less than the 7,000 words permitted for reply briefs.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

December 12, 2024