UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY,<br><br>               Plaintiff,<br><br>   and<br><br>JOINT STOCK COMPANY APATIT,<br><br>               Plaintiff-Intervenor, and<br>               Consolidated Plaintiff,<br><br>   and<br><br>THE MOSAIC COMPANY,<br><br>               Consolidated Plaintiff,<br><br>               v.<br><br>UNITED STATES,<br>               Defendant,<br><br>   and<br><br>THE MOSAIC COMPANY,<br><br>               Defendant-Intervenor,<br>               and Consolidated<br>               Defendant-Intervenor,<br><br>   and<br><br>JOINT STOCK COMPANY APATIT,<br><br>               Consolidated Defendant-<br>               Intervenor. | Consol. Court No. 23-00239<br><br>PUBLIC VERSION<br><br>Business Proprietary<br>Information Deleted From<br>Pages 22, 23, 35-37, 39 |

THE MOSAIC COMPANY'S MEMORANDUM IN OPPOSITION TO CONSOLIDATED
PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY
RECORD

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
  LLP
2100 Pennsylvania Avenue NW.
Washington, DC 20037

Dated: December 12, 2024

*Counsel for The Mosaic Company*

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................... 1

II.   RULE 56.2 STATEMENT ........................................................................ 1

    A.    Administrative Decision Under Review ......................................1

    B.    Issues Presented and Summary of Arguments.............................2

          1.    Whether Commerce's construction of a tier three benchmark for phosphate mining rights is reasonable, supported by substantial evidence, and otherwise in accordance with law. ....................................... 2

          2.    Whether Commerce's calculation of the profit ratio for JSC Apatit is reasonable, supported by substantial evidence, and otherwise in accordance with law.................................................................... 2

          3.    Whether Commerce's decision to countervail JSC Apatit's purchases of natural gas from so-called "independent gas producers" is reasonable, supported by substantial evidence, and otherwise in accordance with law. .............................................. 2

          4.    Whether Commerce's decision to calculate benefits based on benchmark data for calendar year 2021 is reasonable, supported by substantial evidence, and otherwise in accordance with law...................... 3

III.  STATEMENT OF FACTS .......................................................................... 3

    A.    Commerce's Investigation of the Phosphate Mining Rights for LTAR Program..........................................................................3

    B.    Commerce's Preliminary Results ................................................4

    C.    ADM's Submission of Supplemental Authority...........................6

    D.    Commerce's Final Results ..........................................................6

IV.   STANDARD OF REVIEW ....................................................................... 9

V.    ARGUMENT ........................................................................................... 9

    A.    Commerce's Construction of a Tier Three Benchmark for Phosphate Rock Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law ...........................................................................9

          1.    Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services ................................ 10

          2.    Commerce's Benchmark Selection is Consistent With the Law ............. 11

          3.    Commerce's Benchmark Selection is Consistent With Its LTAR Regulation ................................................................................... 14

          4.    Commerce's Selection of Benchmark Prices Based on Phosphate Rock Quality Is Supported by Substantial Evidence ................................. 20

               a.    Commerce provided a reasoned explanation, supported by substantial evidence, for limiting its benchmark selection to

countries with igneous phosphate deposits, and therefore excluding Togo and Iran. ..................................................20

b.    Commerce reasonably rejected the Eurostat data as an alternative to the GTA data...........................................24

c.    Commerce reasonably rejected JSC Apatit's proposal to expand the South Africa export prices to include a third HS code. ....................................................................................26

5.    Commerce Rightfully Rejected ADM's Untimely Notice of Supplemental Authority ............................................. 28

B.    Commerce's Calculation of the Profit Ratio for JSC Apatit Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law .............................................................................................33

C.    Commerce's Decision to Countervail JSC Apatit's Purchases from Gazprom of Natural Gas Produced by So-Called "Independent Gas Suppliers" Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law ......................................36

1.    Commerce Reasonably Found That the GOR's Refusal to Cooperate Created a Gap in the Record.................................... 39

2.    Application of AFA was Warranted Because the GOR Refused to Cooperate to the Best of its Ability......................... 41

D.    Commerce's Calculation of Subsidy Rates Based on Benchmark Data for Calendar Year 2021 Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law ...............................................43

VI.    CONCLUSION.......................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**STATUTES, RULES, AND REGULATIONS**

19 C.F.R. § 351.213(e) ................................................................................................43

19 C.F.R. § 351.301(c)(6)(ii) .......................................................................................30

19 C.F.R. § 351.511(a)(2)(i) .........................................................................................10

19 C.F.R. § 351.511(a)(2)(ii) ........................................................................................11

19 C.F.R. § 351.511(a)(2)(iii) ................................................................................. *passim*

19 C.F.R. § 351.511(a)(2). ...........................................................................................10

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................9

19 U.S.C. § 1677(5)(B)-(B)(i) ......................................................................................10

19 U.S.C. § 1677(5)(D) ................................................................................................10

19 U.S.C. § 1677(5)(E) .................................................................................10, 11, 12

19 U.S.C. § 1677(5)(E)(iv) ....................................................................................10, 12

19 U.S.C. § 1677e(a) ....................................................................................................38

19 U.S.C. § 1677e(b)(1) .........................................................................................38, 41

19 U.S.C. § 1677m(d) ..................................................................................................38

28 U.S.C. § 2637(d) .....................................................................................................34

**CASES**

*Acciai Speciali Terni, S.p.A. v. United States*, 26 CIT 892 (CIT 2002) ...........................9

*Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1376 (CIT 2009) ...........................................................................................................................29

*Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331 (2013) ...............42

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .........................9, 34

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) ...................................................................................................................41

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 359 F. Supp. 3d 1329, (CIT 2019) ........................................................................................41

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ................................................34

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................9

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) .................27, 28

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) .......................41

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)...........................................27

*Giorgio Foods, Inc. v. United States*, 804 F. Supp. 2d 1315 (CIT 2011) ......................................29

*GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343, 1349 (CIT 2013) .........................42

*Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346 (CIT 2019);...............................41

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312 (CIT 2021)................................42

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrial A.S v. United States*, 625 F. Supp. 2d 1339 (CIT 2009) ........................................................................................29

*Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354 (CIT 2020) ........38, 39, 41

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333 (CIT 2019) ........................................................................................41

*Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293 (CIT 2017) ............................11, 12

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ...........................35

*Mosaic Co. v. United States*, No. 21-00117, 2024 WL 208136 (CIT Jan. 19, 2024), *appeal dismissed*, No. 2024-1593, 2024 WL 3875143 (Fed. Cir. Aug. 20, 2024) ........................................................................................33

*Mosaic Co. v. United States*, 589 F. Supp. 3d 1298 (CIT 2022) .......................................39, 41, 42

*Mosaic Co. v. United States*, 647 F. Supp. 3d 1358 (CIT 2023) .......................................15, 16, 33

*Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (CIT 2023) .........................................6, 31, 32

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................9

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)...........................................41

*Norsk Hydro Can., Inc. v. United States*, 341 F. Supp. 2d 1263 (CIT 2004) ...............................29

*Nucor Corp. v. United States*, 286 F. Supp. 3d 1364 (CIT 2018), aff'd, 927 F.3d 1243 (Fed. Cir. 2019).....................................................15

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1337 n.78 (CIT 2009)..............................29

*Nucor Corp. v. United States*, 633 F. Supp. 3d 1302 (CIT 2023)........................16

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019)..............................11, 15

*Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (CIT 2022).........................13

*Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364 (CIT 2023).........................40

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................9

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1356 (CIT 2019) .....................................................41

## ADMINISTRATIVE DETERMINATIONS

*Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008), and accompanying Issues and Decision Memorandum.....................................................17

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377-79 (Dep't Commerce Nov. 25, 1998) .....................................................16

*Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2014–2015*, 83 Fed. Reg. 11,694 (Dep't Commerce Mar. 16, 2018), and accompanying Issues and Decision Memorandum.....................................................43, 44

*Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Aluminum Extrusions from the People's Republic of China*, 89 Fed. Reg. 80,526 (Dep't Commerce Oct. 3, 2024), and accompanying Issues and Decision Memorandum.....................................................29

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) and accompanying Issues and Decision Memorandum .....................................................16

*Countervailing Duty Investigation of Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 58,175 (Dep't Commerce Dec. 11, 2017), and accompanying Issues and Decision Memorandum..........................................19

*Fine Denier Polyester Staple Fiber from India: Final Results of Countervailing Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 86,537 (Dep't Commerce Dec. 30, 2020), and accompanying Issues and Decision Memorandum.........................................................................................................44

*Multilayered Wood Flooring From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,939 (Dep't Commerce May 14, 2024), and accompanying Issues and Decision Memorandum.........................................................................................................17

*Phosphate Fertilizers From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2020-2021*, 88 Fed. Reg. 29,089 (Dep't Commerce, May 5, 2023), and accompanying Preliminary Decision Memorandum.................................................................................44

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum...........................................................................15, 16

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum...............14, 15, 16

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum........................................................................... *passim*

*Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505, 28,506 (Dep't Commerce May 4, 2023), and accompanying Preliminary Decision Memorandum............................................ *passim*

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766 (Dep't Commerce Mar. 25, 2024).........................................30

*Silicon Metal From Australia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 37,843 (Dep't Commerce Aug. 14, 2017), and accompanying Preliminary Decision Memorandum .......................16

## I.    INTRODUCTION

On behalf of Consolidated Plaintiff, Defendant-Intervenor, and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic"), we submit this brief in opposition to the Rule 56.2 motions for judgment upon the agency record filed on June 5, 2024, by Plaintiff Archer Daniels Midland Company ("ADM") and Plaintiff-Intervenor and Consolidated Plaintiff Joint Stock Company Apatit ("JSC Apatit"). *See* ADM's Rule 56.2 Mot. for J. Upon the Agency R. (June. 5, 2024), ECF No. 41 ("ADM Br."); JSC Apatit's Rule 56.2 Mot. for J. Upon the Agency R. (June. 5, 2024), ECF No. 39 ("JSC Apatit Br."). ADM and JSC Apatit challenge several aspects of the final determination of the U.S. Department of Commerce ("Commerce") in the first administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from the Russian Federation ("Russia"). As demonstrated below, Commerce's determinations with respect to Consolidated Plaintiffs' claims are reasonable, supported by substantial evidence, and otherwise in accordance with law. Accordingly, Mosaic respectfully requests that the Court deny ADM's and JSC Apatit's motions in their entirety.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination under review is the final results of the first administrative review of the CVD order on phosphate fertilizers from Russia, covering the period November 30, 2020 to December 31, 2021. The final results were published in the Federal Register on November 6, 2023. *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), P.R. 241, ECF No. 23-4 ("*Final Results*"), and accompanying Issues and Decision Memorandum, P.R. 242, ECF No. 23-5 ("IDM").

1

B.    **Issues Presented and Summary of Arguments**

1.    **Whether Commerce's construction of a tier three benchmark for phosphate mining rights is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Consolidated plaintiffs fail to demonstrate that Commerce's tier three benchmark for phosphate mining rights is contrary to law because Commerce did not account for "prevailing market conditions" or that it is not "consistent with market principles."  Commerce's selection of phosphate rock export prices based on phosphate quality and type of geological deposits, *i.e.*, igneous vs. sedimentary, is supported by substantial evidence and consistent with its prior practice.  Further, Commerce reasonably rejected ADM's notice of subsequent authority, as the Court's opinion in *The Mosaic Company v. United States* involved facts not on the record or relevant to this case.

2.    **Whether Commerce's calculation of the profit ratio for JSC Apatit is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  This Court has previously rejected JSC Apatit's argument that gross profit is a better profit figure than profit before tax.  JSC Apatit failed to exhaust its arguments regarding a proposed adjustment to profit before tax to account for administrative, selling, and other expenses.  Nonetheless, the record supports Commerce's decision not to adjust the profit ratio for these expenses.

3.    **Whether Commerce's decision to countervail JSC Apatit's purchases of natural gas from so-called "independent gas producers" is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce had a reasoned basis and substantial evidence to countervail JSC Apatit's natural gas purchases from so-called "independent gas suppliers."  Commerce's decision to apply adverse facts available ("AFA") was lawful because the Government of Russia

2

("GOR") failed to cooperate, and the information that JSC Apatit submitted did not fill the gap in the record that the GOR created by refusing to provide a response to the Input Producer Appendix for the so-called "independent gas suppliers."

>    **4.    Whether Commerce's decision to calculate benefits based on benchmark data for calendar year 2021 is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes. Commerce followed its practice for cases with a period of review ("POR") that is 14 months or less and calculated a single subsidy rate based on calendar year 2021 data. JSC Apatit fails to show that Commerce departed from its practice, or that its practice should not apply to this case. The fact that Commerce also requested certain information from calendar year 2020 does not give rise to a legal requirement that Commerce use all such information in calculating subsidy rates – particularly if doing so would contravene its policies or practices.

## III.    STATEMENT OF FACTS

Consistent with Rule 81(k) of the Rules of this Court, the facts in this section are limited to those necessary to correct inaccuracies and omissions in ADM's and JSC Apatit's briefs. Other facts relevant to specific issues are discussed below in the context of each argument.

### A.    Commerce's Investigation of the Phosphate Mining Rights for LTAR Program

Commerce investigated and countervailed the Phosphate Mining Rights for LTAR program in the original investigation. Commerce previously identified and measured the benefit for this program by constructing a tier three benchmark for the downstream product, phosphate rock, because there are no viable tier one or tier two benchmarks for Russian mining rights. *See Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,505, 28,506

(Dep't Commerce May 4, 2023), P.R. 191 ("*Preliminary Results*"), and accompanying

Preliminary Decision Memorandum ("PDM") at 19, P.R. 188.

In the investigation, Commerce constructed the tier three benchmark for Russian

phosphate rock using export prices for phosphate rock from Brazil, Finland, and South Africa

sourced from IHS Markit's Global Trade Atlas ("GTA") and UN Comtrade.  For this review,

Mosaic submitted benchmark prices from the same sources for calendar year 2021.  Letter from

WilmerHale, Petitioner Benchmark – Part 1 (Mar. 15, 2023) ("Mosaic Benchmark Submission"),

Exhibits 4 & 6, P.R. 132.  Mosaic also provided information showing that phosphate rock from

Brazil, Finland, and South Africa is comparable to Russian phosphate rock in terms of geological

characteristics (*i.e.*, originating from igneous deposits, as opposed to sedimentary deposits) and

quality (measured by bone phosphate of lime ("BPL" or "BLP") or phosphorus pentoxide

("$P_2O_5$") content).  *Id.*, Exhibits 9-21, P.R. 132-133.  This evidence included excerpts from a

book on phosphates by Prof. Peter Ptacek, which explains the distinction between igneous and

sedimentary phosphate ores in terms of mineralogical, textural, and chemical characteristics,

including levels of unwanted impurities.  *Id.*, Exhibits 19 & 20, P.R. 133.  Prof. Ptacek also

describes the different production processes used to beneficiate igneous versus sedimentary

phosphate ores, because of their different physical and chemical characteristics.  *See id.*  Finally,

Mosaic submitted evidence showing that Russia, Brazil, Finland, and South Africa are four of

the five countries where "significant igneous occurrences are found."  *Id.*, Exhibit 18, P.R. 133.

### B.    Commerce's Preliminary Results

Commerce issued the *Preliminary Results* on April 27, 2023.  *See Preliminary Results* at

28,506.  Commerce preliminarily determined that six Russian subsidy programs were

countervailable during the POR, including the Provision of Mining Rights for LTAR program

4

and the Provision of Natural Gas for LTAR program, and Commerce calculated a preliminary *ad valorem* subsidy rate of 53.29 percent for JSC Apatit. *See id.*; PDM at 9.

Regarding the Provision of Mining Rights for LTAR program, Commerce found that there was no new information in this review to warrant reconsideration of its determinations in the investigation that the program conferred a financial contribution and that it is *de facto* specific. PDM at 19. Commerce also followed its prior approach to determine the benefit, stating:

> {T}o determine the benefit pursuant to 19 CFR 351.511(a)(2)(iii), we are preliminarily comparing the actual per-unit cost buildup of JSC Apatit's beneficiated phosphate rock to a market price for phosphate rock. This methodology is consistent with the investigation of this proceeding and Final Remand. Additionally consistent with the investigation and Final Remand, we are preliminarily relying on POR export data from GTA and UN Comtrade for Finland, Brazil, and South Africa under HTS codes 2510.10 and 2510.20 to calculate a market price for phosphate rock for the comparison under 19 CFR 351.511(a)(2)(iii).

*Id.* at 20. Commerce added an amount for profit to the phosphate rock cost buildup using the same approach as in the remand proceeding. Commerce preliminarily used the financial statements of JSC Apatit's parent company, PhosAgro Public Joint Stock Company (PhosAgro), and calculated the profit ratio as profit before tax divided by cost of sales. Memo from USDOC to File, Prelim Calcs Memo. – JSCA (Apr. 27, 2023), at 7-8, P.R. 189, C.R. 218.

Regarding the Provision of Natural Gas for LTAR program, Commerce had previously found the program to be countervailable in the investigation, and Commerce found that the GOR did not submit any new information in this review to warrant reconsideration. PDM at 13. Accordingly, Commerce preliminary determined that Gazprom's sales of natural gas to JSC Apatit conferred a financial contribution and that the program is *de facto* specific. *See id.* at 7, 13-18. Commerce included in the subsidy calculations Gazprom's sales of natural gas that was

produced by so-called "independent gas producers" based on adverse facts available, because the

GOR failed to provide the information Commerce requested about these producers.  PDM at 12-

13.

> **C.** **ADM's Submission of Supplemental Authority**

On September 21, 2023, ADM submitted a Notice of Subsequent Authority ("NSA")

arguing that this Court's decision in *The Mosaic Company v. United States*, 659 F. Supp. 3d

1285 (CIT 2023) ("*Mosaic v. United States*"),[1] was relevant to Commerce's decision in the

present case.  ADM's Notice of Subsequent Authority (Sept. 21, 2023), P.R. 234.  On September

29, 2023, Mosaic requested that Commerce reject ADM's NSA because the Court's decision in

*Mosaic v. United States* addressed whether Commerce's benchmark selection in Phosphate

Fertilizers from Morocco was supported by the record of that investigation and is irrelevant to

this case and that ADM was using the Court's decision as a pretext to rehash arguments it had

already made in its administrative case brief.  Letter from WilmerHale, re: "Mosaic Request to

Reject ADM Notice" (Sept. 29, 2023), P.R. 235 ("Mosaic Response to ADM NSA").  On

October 18, 2023, Commerce rejected and removed ADM's NSA from the record because it

contained "untimely new arguments."  Letter from Commerce, re: "Rejection of Untimely

Comments" (Oct. 18, 2023), P.R. 237.

> **D.** **Commerce's Final Results**

Commerce issued the Final Results on October 31, 2023.  *Final Results*, 88 Fed. Reg.

76,182.  Commerce continued to construct a tier three benchmark for phosphate mining rights

based on phosphate rock prices from Brazil, Finland, and South Africa.  Commerce explained

that it followed the same tier three benchmarking methodology as in the investigation and

---

[1] Note that ADM incorrectly cited this case throughout its brief as 659 F.Supp.2d 1285.

"identified the BPL-based grade of phosphate rock *and type of ore deposit* (*i.e.*, igneous) as qualities relevant for selecting 'comparable phosphate rock'." *Id*. at 30 (emphasis added). Commerce also explained that "{b}ecause this analysis under 19 C.F.R. § 351.511(a)(2)(iii) focuses on JSC Apatit's costs to mine and process phosphate ore into phosphate rock, any differences in the production process for phosphate rock from sedimentary deposits versus igneous deposits are relevant to our analysis." *Id*.

Commerce then identified the record evidence demonstrating that the "production processes for phosphate rock from sedimentary reserves and igneous reserves differ," and found that the "production of phosphate rock from igneous deposits involves different production steps, and hence different production costs, compared to the production of phosphate rock from sedimentary deposits." *Id*. at 30-31.  Commerce concluded – as it had in the investigation – that phosphate rock produced "from sedimentary reserves is not comparable to {the} phosphate rock that JSC Apatit produced in Russia from igneous reserves." *Id*. at 31.  Commerce therefore continued to limit its benchmark selection to phosphate rock from countries that both (1) have BPL content comparable to Russian phosphate rock; and (2) originate from igneous phosphate ore deposits.  *Id*. at 15.  Commerce found that the GTA data for Finland, Brazil, and South Africa under HS subheadings 2510.10 and 2510.20 was the best available information on the record for its tier three benchmark analysis.  *Id*. at 27.[2]

Commerce rejected JSC Apatit's arguments that it should deviate from its prior approach for calculating the profit amount to be added to the phosphate rock cost buildup.  Commerce explained why using PhosAgro's gross profit instead of profit before tax – and therefore

---

[2] In the Preliminary Results, Commerce used the benchmark prices for Brazil, Finland, and South Africa sourced from both GTA and UN Comtrade.  PDM at 20.  In the Final Results, Commerce only used the GTA data.  IDM at 26-27.

including expenses such as selling and administrative expenses and "other expenses" – "would be inconsistent with the aim of the calculation methodology: to isolate costs for phosphate ore mining and beneficiation activities" and would introduce the risk of double-counting. *Id*. at 20-22. Commerce also rejected JSC Apatit's argument that adjustments should be made to the profit ratio for administrative, selling, and other expenses. *Id*. at 22. However, Commerce did make a minor change to the profit ratio calculation. In order to more narrowly isolate JSC Apatit's costs for phosphate mining and beneficiation, Commerce used the profit before tax and cost of sales reported in PhosAgro's 2021 financial statements for the phosphate segment, instead of the figures for the company as a whole. *Id*. at 23.

Commerce also addressed JSC Apatit's arguments that it erred by countervailing purchases of natural gas produced by so-called "independent gas suppliers." Commerce explained that the burden of providing information related to financial contribution lies with the GOR, and the annual reports and other evidence that JSC Apatit submitted does not provide the information necessary for Commerce's analysis. *Id*. at 50-51. Commerce also cited other record evidence in support of its finding that purchases of natural gas from so-called "independent gas suppliers" are countervailable. *Id*. at 51.

Finally, Commerce addressed and rejected JSC Apatit's arguments that it should use information from December 2020 in the subsidy rate calculations. Commerce explained that when a POR covers a full calendar year and extends into a second calendar year by less than two months, its practice is to use data only from the full calendar year. *Id*. at 11-12. Commerce rejected JSC Apatit's alternative approach because the POR of this case only covers calendar year 2021 and one month of 2020. *Id*. at 12-13.

## IV.    STANDARD OF REVIEW

In reviewing Commerce's CVD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 CIT 892, 893 (2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373, n.4 (Fed. Cir. 2016). The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## V.    ARGUMENT

### A.    Commerce's Construction of a Tier Three Benchmark for Phosphate Rock Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

Consolidated Plaintiffs challenge Commerce's methodology for constructing a tier three benchmark for phosphate rock as unlawful and unreasonable on several grounds, none of which has merit. Defendant thoroughly rebutted Consolidated Plaintiffs' arguments in its response brief, and Mosaic supports Defendant's arguments. Below we rebut four arguments that the Consolidated Plaintiffs make: (1) that the benchmark "fails to reflect 'prevailing market conditions' as required by statute"; (2) that the benchmark "is not consistent with 'market principles' as required by {Commerce's} regulation"; (3) that Commerce's selection based on

9

phosphate rock quality is unsupported by substantial evidence; and (4) that the benchmark

"contradicts the analysis of this Court in *The Mosaic Company v. United States*."

### 1. Legal Framework for Measuring the Adequacy of Remuneration Paid for Government-Provided Goods and Services

Section 771(5)(B) of the Tariff Act states that a subsidy exists within the meaning of the

Act if, *inter alia*, an authority "provides a financial contribution . . . to a person and a benefit is

thereby conferred." 19 U.S.C. § 1677(5)(B)-(B)(i). Section 771(5)(D) of the Act includes the

provision of goods and services among the government actions that fall within the definition of

the term "financial contribution." 19 U.S.C. § 1677(5)(D). Section 771(5)(E) of the Act, in turn,

addresses the issue of "benefit." It states that "{a} benefit shall normally be treated as conferred

where there is a benefit to the recipient, including . . . (iv) in the case where goods or services are

provided, if such goods or services are provided for less than adequate remuneration . . . ." 19

U.S.C. § 1677(5)(E)-(E)(iv). Section 771(5)(E) further states that: For purposes of clause (iv),

the adequacy of remuneration shall be determined in relation to prevailing market conditions for

the good or service being provided . . . in the country which is subject to the investigation or

review. 19 U.S.C. § 1677(5)(E).

Section 351.511(a)(2) of Commerce's regulations sets out the three-tier hierarchy that

Commerce uses to select benchmarks to measure the adequacy of remuneration paid for goods or

services. 19 C.F.R. § 351.511(a)(2). Under tier one, Commerce seeks to measure the adequacy

of remuneration by comparing the government price to a market-determined price for the good or

service resulting from actual transactions in the country in question. 19 C.F.R.

§ 351.511(a)(2)(i). If there is no useable market-determined price, then under tier two

Commerce seeks to measure the adequacy of remuneration by comparing the government price

to a "world market price where it is reasonable to conclude that such price would be available to

purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). If there is no world market price available to purchasers in the country in question, then under tier three Commerce normally measures the adequacy of remuneration "by assessing whether the government price is consistent with market principles." *Id.* § 351.511(a)(2)(iii).

### 2.    Commerce's Benchmark Selection is Consistent With the Law

JSC Apatit argues that Commerce's benchmark selection is unlawful because it "fails to reflect 'prevailing market conditions' as required by statute." JSC Apatit Br. at 20. As this court has previously found, Congress' intent in adopting the "prevailing market conditions" language in section 771(5)(E) is unclear, and therefore that Commerce has broad discretion in interpreting whether and how best to account for relevant "prevailing market conditions." *See Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1306 (CIT 2017); 19 U.S.C. § 1677(5)(E). Moreover, as the Government noted in its brief, the CAFC has held that for purposes of its tier three calculation methodologies, "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations." *Nucor Corp. v. United States*, 927 F.3d 1243, 1255 (Fed. Cir. 2019). Commerce's choice of methodology in this case was both reasonable and consistent with its established practice for subsidy programs of this type.

JSC Apatit devotes an entire section of its brief to the "landscape of the global phosphate rock market," including Morocco's alleged dominance in the market, its alleged role as a global price leader, and that "pricing and commercial negotiations for phosphate rock in Europe" are supposedly "based on Moroccan phosphate rock prices." JSC Apatit Br. at 15-18. JSC Apatit argues that "any benchmark that reflects 'prevailing market conditions'" must take this landscape into account. *Id.* at 17. There is no support for JSC Apatit's argument in the text of the statute,

11

which refers to prevailing market conditions "in the country which is subject to investigation or review," not in the "global" market.  19 U.S.C. § 1677(5)(E)(iv).  None of the evidence JSC Apatit cites is relevant to prevailing market conditions in Russia.

JSC Apatit also argues that it sells almost all of its phosphate rock in Europe, JSC Apatit Br. at 16-17, but this too is beside the point.  The statute does not require Commerce to measure the adequacy of remuneration that JSC Apatit paid for its phosphate mining rights in light of prevailing market conditions in the export markets where JSC Apatit sells its products.[3]  If Commerce were to adopt JSC Apatit's approach, it would result in a circular comparison of JSC Apatit's cost of production for phosphate rock, plus profit, to its own export prices for phosphate rock, which is not a reasonable means of identifying and measuring the adequacy of remuneration that JSC Apatit paid for mining rights.

JSC Apatit also argues that Commerce's benchmark selection was unlawful because Commerce "essentially determined" that quality was the only prevailing market condition that was material to its benchmark selection, and that Commerce neglected the other factors set forth in section 771(5)(E)(iv) of the Act.  JSC Apatit Br. at 20.  However, while the statute identifies these other factors as "prevailing market conditions," it does not mandate that Commerce address each of them in evaluating the adequacy of remuneration.  As previously noted, this Court has previously found that Congress' intent in adopting the "prevailing market conditions" language in section 771(5)(E) is unclear, and therefore that Commerce has broad discretion in interpreting whether and how best to account for relevant "prevailing market conditions."  *See Maverick Tube Corp.*, 273 F. Supp. 3d at 1306.  Here, Commerce found that quality is the factor most

---

[3] JSC Apatit's repeated references to the total volume of global phosphate rock production and exports are similarly irrelevant.  *See* JSC Apatit Br. at 12.

relevant to its analysis and reasonably based its benchmark selection on factors affecting the quality of phosphate rock, namely geological source and BPL content.[4]  IDM at 30.

JSC Apatit argues that Commerce was required to explain why it did not need to consider the other factors, citing *Risen Energy*.  JSC Apatit Br. at 21.  But that case is inapposite.  *Risen Energy* involved a benchmark analysis for the government provision of land-use rights in China ("Land Use Memo").  *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369, 1374 (CIT 2022).  In the underlying proceeding, Commerce selected land benchmark prices from Thailand over prices from Mexico and Brazil based on Thailand's geographic proximity to China.  *Id*. at 1375.  The Court noted that Commerce had "determined that geographic proximity to China was a heavily weighted factor in its tier-three land benchmark analysis" in the Land Use Memo, but held it was "not convinced, however, that Commerce may continue to rely on aging data from Thailand {from 2010} without further explanation."  *Id*.  The Court specifically cited the staleness of the Thailand land prices compared to more contemporaneous benchmark data; Commerce's use of Mexico and Brazil as surrogate countries for China in other cases; and divergence in economic development between China and Thailand as factors requiring further explanation.  *Id*. at 1375-76.  Thus, the Court's analysis in *Risen Energy* pertained to factors relevant to Commerce's selection of surrogate countries for China and the contemporaneity of benchmark data.  The Court did not address section 771(5)(E) of the Act, nor did it hold that the statute requires Commerce to address every factor identified as a "prevailing market condition."

The Court should therefore reject JSC Apatit's argument that Commerce's phosphate rock benchmark selection is unlawful based on the "prevailing market conditions" language in section 771(5)(E) of the Act.

---

[4] We discuss this issue in detail in Section V.A.4 below.

### 3.    Commerce's Benchmark Selection is Consistent With Its LTAR Regulation

JSC Apatit argues that Commerce's benchmark selection is unlawful because "a 'Tier Three' benchmark must be consistent with the market principles of the relevant market," and "as a matter of law, the tiny benchmark volume relied on by Commerce in the *Final Results* per se does not represent the market principles of the global (or even Russian) phosphate rock market." JSC Apatit Br. at 23.  JSC Apatit also argues that Commerce "failed to explain why its selected benchmark is consistent with market principles . . . ."  *Id*.

Contrary to JSC Apatit's arguments, Commerce's benchmark selection is consistent with its regulation.  Commerce properly found there are no viable tier one or tier two benchmarks for Russian mining rights.  PDM at 19-20.  Commerce therefore resorted to constructing a tier three benchmark.  Commerce explained in the PDM that it was following the same approach that it took in the investigation and remand determination, which is based on a comparison of the respondents' phosphate rock cost buildup to "a world market price for comparable phosphate rock."  *Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum ("Inv. IDM") at 19.  Specifically:

> {T}o determine the benefit pursuant to 19 CFR 351.511(a)(2)(iii), we are preliminarily comparing the actual per-unit cost buildup of JSC Apatit's beneficiated phosphate rock to a market price for phosphate rock.  This methodology is consistent with the investigation of this proceeding and Final Remand.

PDM at 20.

In the investigation, Commerce explained that:

> Although there are no suitable "Tier Two" benchmarks for valuing any benefit for mining rights, *per se*, Commerce can consider world market prices for the underlying good that is conveyed with the mining rights, *i.e.*, phosphate rock, under a "Tier Three" analysis.

14

> Therefore, in order to calculate the benefit for the final determination, we compared the actual per-unit cost build-up . . . to the benchmark, *i.e.*, a world market price of comparable phosphate rock.

Inv. IDM at 19. Under Commerce's approach, third country export prices are, by definition, world market prices that are set "consistent with market principles," and therefore may be used to measure the adequacy of remuneration under tier three. *See, e.g.*, *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum ("Phosphate Fertilizers Morocco AR1 IDM") at 28 ("export prices would reflect 'the commercial realities on the world market for such goods and services'").

JSC Apatit claims that "as a matter of law," an export price that is based on purportedly "tiny" or "miniscule" volumes is *per se* not "consistent with market principles" per 19 C.F.R. § 351.511(a)(2)(iii). JSC Apatit Br. at 21. However, JSC Apatit fails to cite any legal authority in support of its argument, or even proffer an interpretation of "consistent with market principles" that would *per se* exclude low-volume transactions. There is no basis in the text of section 351.511(a)(2)(iii), the *Preamble* to the CVD regulations, or Commerce's practice for such an interpretation.

The text of section 351.511(a)(2)(iii) states that Commerce will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). However, the regulation does not define "market principles." *See Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1371 (CIT 2018), aff'd, 927 F.3d 1243 (Fed. Cir. 2019). Further, this Court has held that the "regulations do not compel any specific methodology for Commerce to follow for a tier-three benchmark" and that "Commerce has some matter of discretion" in its methodology and calculations. *See Mosaic Co. v. United States*, 647

F. Supp. 3d 1358, 1365 (CIT 2023); *Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (CIT 2023). Nothing in the text of the regulation precludes Commerce's use of benchmark prices that may represent low volumes of exports under tier three.

The *Preamble* to the CVD regulations similarly does not define what it means for prices to be "consistent with market principles." The *Preamble* states that, under section 351.511(a)(2)(iii), in "situations where the government is clearly the only source available to consumers in the country," Commerce "will assess whether the government price was established in accordance with market principles." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377-79 (Dep't Commerce Nov. 25, 1998) ("*Preamble*"). It identifies several factors that Commerce may consider, on a case-by-case basis, including the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. *Id*. at 65,378. But the *Preamble* does not require Commerce to consider these factors, or preclude the use of other benchmark information, such as export (world market) prices.

As a matter of practice, Commerce routinely uses export prices for downstream products to assess the adequacy of government prices for mining licenses. *See, e.g.*, Inv. IDM, Comment 2c; Phosphate Fertilizers Morocco AR1 IDM, Comment 5; *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying Issues and Decision Memorandum at 29-30; *Silicon Metal From Australia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 37,843 (Dep't Commerce Aug. 14, 2017), and accompanying

Preliminary Decision Memorandum at 11-13; *Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008), and accompanying Issues and Decision Memorandum at 73.

Where Commerce has declined to use export prices as a tier three benchmark, it is because Commerce found the prices were not for comparable merchandise, were not contemporaneous, or were otherwise distorted or aberrational. *See, e.g.*, *Multilayered Wood Flooring From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,939 (Dep't Commerce May 14, 2024), and accompanying Issues and Decision Memorandum, Comment 6.C. Commerce has stated that "the standard for finding potential benchmark data aberrational is high because it does require . . . 'evidence beyond the simple fact that a number is smaller or larger than others to find that a value is aberrational,'" *see id*. at 63, and the fact that a particular export price may reflect a low volume is not sufficient cause to set it aside. For example, in *Multilayered Wood Flooring*, Commerce disregarded as aberrational export prices that were over 300 times lower than other potential benchmark prices, but Commerce did not exclude export prices representing transactions only 1 kilogram in size. *Id*. at 64 n.262.

Here, JSC Apatit fails to show that the export prices for Brazil, Finland, and South Africa are aberrational, or represent such a low volume of phosphate rock that Commerce's use of the data was unreasonable. JSC Apatit argues that Commerce's benchmark is "tiny" or "miniscule" by comparing export volumes from Brazil, Finland, and South Africa to the "global phosphate rock market," meaning alternatively global production or global exports. JSC Apatit Br. at 18, 23. But JSC Apatit fails to explain why either of these is a relevant metric for evaluating the reasonableness of Commerce's benchmark selection. The comparison that JSC Apatit presents

17

simply reflects that just four countries – Russia, Morocco, Peru, and Jordan (two of which heavily subsidize their domestic phosphate producers) – account for over 90 percent of global exports of phosphate rock, *see* Mosaic Benchmark Submission, Exhibit 4 ("Pivot" tab), P.R. 138, and that Russia is the only one of these countries with igneous deposits.  However, this does not mean that export prices from other countries with igneous deposits are not market-based, or that it is unreasonable for Commerce to use export prices from those countries as a benchmark.

The total combined volume of exports from Brazil, Finland, and South Africa represented by the GTA data that Commerce used in its phosphate rock benchmark is over 36,684 metric tons.  *See* JSC Apatit Br. at 12.  The raw GTA data show that only 10 countries in the world had export volumes higher than this during the POR.  *See* Mosaic Benchmark Submission, Exhibit 4 ("Pivot" tab), P.R. 138.  At the same time, eleven countries had exports lower than *1* metric ton in 2021, ranging as low as 0.0003 metric tons (Namibia), and the average export prices for these countries range up to USD 137,640 per MT.  *See id*.  The volumes and prices of exports from Brazil, Finland, and South Africa – 36,684 metric tons and an average per-unit value of $237.63 – are not aberrational when viewed in this context.

JSC Apatit argues that there are "significant price discrepancies" between the prices used by Commerce because the South Africa prices "have an average per-unit value that is roughly two-and-a-half times higher than the average per-unit values for rock from Brazil and Finland," and that these alleged discrepancies "confirm" that Commerce's benchmark is not consistent with market principles.  JSC Apatit Br. at 27.  However, as Commerce explained, the mere fact that South African prices are higher than prices from Brazil and Finland is not a reason to exclude them absent evidence of specific distortions.  IDM at 33.  Moreover, as Consolidated Plaintiffs acknowledge, there are wide variations in average per-unit export prices for phosphate

rock, *see* ADM Br. at 16 n.10.  The GTA data show per-unit values ranging from USD 12 per

MT to *137,640* per MT.  *See* Mosaic Benchmark Submission, Exhibit 4 ("Pivot" tab), P.R. 132.

In this context, the difference between the South Africa average per-unit value and the average

per-unit values for Brazil and Finland of roughly USD 300 per MT does not compel the

conclusion that the South Africa prices are inconsistent with market principles.

JSC Apatit and ADM also argue that Commerce erred in relying on the GTA data for

Brazil, Finland, and South Africa because there were other, more "robust" benchmark datasets

on the record, namely the Eurostat import data.  *See* JSC Apatit Br. at 22; ADM Br. at 25.  ADM

claims that Commerce "has stated that it is obligated to determine Tier 3 benchmarks using 'the

most robust world market price possible that reflects the broadest spectrum of prices available

under market principles,'" citing *Cold-Drawn Mechanical Tubing of Carbon and Aloy Steel from

China*.  ADM Br. at 25.  But ADM mischaracterizes that case.  In *Cold-Drawn Mechanical

Tubing*, Commerce was selecting among tier two benchmarks for various steel inputs.

*Countervailing Duty Investigation of Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel

From the People's Republic of China: Final Affirmative Determination, and Final Affirmative

Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 58,175 (Dep't Commerce Dec.

11, 2017), and accompanying Issues and Decision Memorandum, Comment 4.  Commerce was

not applying its tier three regulation, and it certainly did not state that it is "obligated" under the

tier three regulation to use the most "robust" data source available, regardless of comparability to

the government-provided good.

In sum, Commerce has discretion under section 351.511(a)(iii) in choosing how to

measure whether the government price is "consistent with market principles."  Nothing in the

text of the regulation, the *Preamble*, or Commerce's practice precludes the use of export prices

that may reflect relatively low-volume transactions.  Further, Consolidated Plaintiffs fail to show

that Commerce's use of the Brazil, Finland, and South Africa export prices was unreasonable,

because the volumes represented are not "tiny" or "miniscule" as compared to phosphate rock

exports from other countries, and because the prices are not aberrational.  The Court should

therefore reject Consolidated Plaintiffs' arguments that Commerce's benchmark selection was

unlawful.

> ### 4.    Commerce's Selection of Benchmark Prices Based on Phosphate Rock Quality Is Supported by Substantial Evidence

Consolidated Plaintiffs argue that Commerce's finding that the GTA data for Finland,

Brazil, and South Africa under HS subheadings 2510.10 and 2510.20 was the best available

information on the record for its tier three benchmark analysis is unsupported by substantial

evidence, and therefore unlawful.  Consolidated Plaintiffs both argue that Commerce erred in

excluding prices for Togo and Iran.  JSC Apatit Br. at 18; ADM Br. at 15-18.  JSC Apatit argues

that Commerce should have relied on the Eurostat data that it submitted, instead of the GTA

data.  JSC Apatit Br. at 22.  Finally, JSC Apatit argues that Commerce erred in omitting South

Africa exports under a third HS code, 2835.26.90.  JSC Apatit Br. at 18.  None of these

arguments has merit.

> #### a.    Commerce provided a reasoned explanation, supported by substantial evidence, for limiting its benchmark selection to countries with igneous phosphate deposits, and therefore excluding Togo and Iran.

Commerce explained in the Final Results that the "production of phosphate rock from

igneous deposits involves different production steps, and hence different production costs,

compared to the production of phosphate rock from sedimentary deposits."  IDM at 31.

Commerce cited several exhibits in Mosaic's benchmark submission in support of these factual

findings.  *Id*. at 30-31.  Commerce therefore concluded – as it did in the investigation and

remand segment – "that phosphate rock produced from sedimentary reserves in Togo and Iran is not a comparable benchmark to phosphate rock produced from igneous reserves in Russia under our Tier 3 benefit analysis." *Id*. at 30.  Based on these findings, Commerce limited its benchmark selection to phosphate rock from countries that both:  (1) have BPL content comparable to Russian phosphate rock; *and* (2) originate from igneous phosphate ore deposits. *Id*. at 30.  The only countries that meet both of these criteria are Brazil, Finland, and South Africa.  Commerce therefore rejected ADM's and JSC Apatit's proposal to include prices for Togo and Iran.[5]

ADM argues that "Commerce cited no evidence to support" its conclusion that the production of phosphate rock from igneous versus sedimentary deposits have different production costs, and that there is no record evidence concerning the relative costs.  ADM Br. at 11, 16-17.  To the contrary, Commerce cited substantial evidence demonstrating significant differences in the production processes used to beneficiate phosphate ore from igneous deposits versus sedimentary deposits, and hence different production costs.  IDM at 30-31.  These differences include: (1) a grinding step used in beneficiation of igneous phosphate ore; (2) additional processing steps used to remove impurities found in sedimentary ore, such as heating to very high temperatures; and (3) different waste disposal steps for sedimentary ore.  *Id.*

Commerce also explained that differences in the production processes for rock from sedimentary versus igneous deposits are relevant because its benefit analysis focuses on JSC Apatit's costs to mine and process phosphate ore into phosphate rock.  IDM at 30.  The record contains highly detailed information on JSC Apatit's production process and costs to mine and

---

[5] Prices for Iran were included in the raw data sourced from UN Comtrade in Mosaic's benchmark submission, and prices for Togo were included in the raw data sourced from GTA.  Mosaic Benchmark Submission, Exhibits 4 & 6, P.R. 132.

beneficiate its igneous phosphate ore.  Response from Hogan Lovells LLP, JSC Apatit

Affiliation & Sec III Suppl QR, Questions 7-24 (Mar. 9, 2023) ("JSC Apatit 1SQR"),  Exhibits

SUPP-11 & SUPP-12, P.R. 128, C.R. 171-72; Response from Hogan Lovells LLP, JSC Apatit

Second Suppl QR (Mar. 23, 2023) ("JSC Apatit 2SQR"), Exhibit SUPP-20 & SUPP-21 P.R.

159, C.R. 196-99.  It was therefore reasonable for Commerce to conclude that the significant

differences in production processes used to produce phosphate rock from igneous versus

sedimentary deposits would result in different production costs.

Consolidated Plaintiffs argue that the record evidence "does not demonstrate that any

differences in production processes based on ore type result in measurable differences in cost and

sales price," and that "any differences between type of rock or quality/level of rock are baked

into prices."  JSC Apatit Br. at 22-23.  JSC Apatit concedes that "{t}he type of phosphate rock –

igneous or sedimentary – plays a role in its $P_2O_5$/BPL level," but argues that "the record

evidence demonstrates that market pricing for phosphate rock is dependent on the $P_2O_5$ level, not

on the type of deposit from which the rock was mined."  JSC Apatit Br. at 16; *see also* ADM Br.

at 17-18.  However, JSC Apatit's own evidence contradicts its arguments.

Specifically, JSC Apatit cites a sales contract between [

].  Letter from

Hogan Lovells, JSC Apatit Benchmark Rebuttal Comments – Appendix 11 (Mar. 27, 2022)

("JSC Apatit Benchmark Rebuttal"), P.R. 171, C.R. 203-204.  [

**].**  In other words, this evidence shows that JSC Apatit's phosphate rock –

produced from igneous deposits – **[**

**].**  This evidence directly contradicts

Consolidated Plaintiffs' arguments that market pricing is dependent solely on the $P_2O_5$ or BPL

levels of phosphate rock and not on the type of deposit from which the rock was mined.

      ADM also claims that "processors of phosphate rock in four countries did not recognize

any difference in the quality or suitability for use of phosphate rock produced from sedimentary

ore deposits versus igneous deposits," but ADM does not cite to any such record evidence in its

brief to the Court.  ADM Br. at 9, 11.  Before Commerce, ADM cited evidence of phosphate

rock trade flows to argue that "importers do not distinguish between phosphate rock exported

from (or produced in) countries that beneficiate that rock from igneous formations as opposed to

countries that beneficiate from sedimentary formations."  ADM Rebuttal Brief at 9-11 (July 5,

2023), P.R. 216 (citing JSC Apatit Benchmark Submission–Appendix 9, P.R. 155, C.R. 191).

But the mere fact that some countries import both types of phosphate rock does not "fairly

detract" from Commerce's conclusion that there are differences in production processes and

production costs that render phosphate rock produced from sedimentary sources not

"comparable" to phosphate rock produced from igneous sources for purposes of Commerce's

benchmarking analysis.  ADM's argument is contrary to the purpose of the analysis, which is to

calculate the benefit of this program by comparing JSC Apatit's cost buildup to benchmark

prices that reflect the same types of production costs. If Commerce were to include benchmark prices that reflected different production costs, it would distort the calculation.

Thus, substantial evidence supports Commerce's factual findings and its conclusion that phosphate rock produced from sedimentary deposits is not comparable to the phosphate rock that JSC Apatit produces in Russia. Consolidated Plaintiffs fail to point to any record evidence that fairly detracts from the evidence Commerce relied upon, and therefore fail to demonstrate that Commerce's decision was unsupported by substantial evidence.

Consolidated Plaintiffs' claims that Commerce erred in excluding prices for Togo and Iran are predicated on their arguments that Commerce's distinction between igneous and sedimentary phosphate deposits is unlawful. JSC Apatit Br. at 22; ADM Br. at 15. However, the record is clear that phosphate deposits in Togo and Iran are sedimentary, not igneous. Mosaic Benchmark Submission, Exhibit 18, P.R. 133. If the Court affirms Commerce's finding that phosphate rock produced from sedimentary deposits is not comparable to phosphate rock produced from igneous deposits, then the Court should also affirm Commerce's decision to exclude the benchmark prices for Togo and Iran.

### b. Commerce reasonably rejected the Eurostat data as an alternative to the GTA data.

In the Final Results, Commerce rejected JSC Apatit's proposal to use Eurostat data as a tier three benchmark. IDM at 37-38. Commerce correctly found that the Eurostat data are for imports of phosphate rock into Europe during the POR, and that these data do not identify the exporting countries. *Id*. It was therefore not possible for Commerce to determine if the Eurostat data reflect prices for "comparable" phosphate rock. *See id*.

JSC Apatit argues that Commerce's rejection of the Eurostat data is unsupported because the Eurostat data "include pricing information for all imports of phosphate rock into Europe,

including Moroccan sales prices, based on commercial negotiations and market principles," and these data "are reliable and voluminous{.}" JSC Apatit Br. at 17. However, JSC Apatit does not cite any legal authority that would require Commerce to use the most "robust" or "voluminous" benchmark data on the record, particularly when doing so would result in a less accurate benchmark. As Commerce stated in the IDM, while Commerce's general practice is to use robust data sources when possible, this does not mean that Commerce will select benchmarks that are not comparable simply in order to obtain a more robust dataset. IDM at 38.

Commerce has been consistent in its approach in this review and in prior segments that there are two factors relevant to assessing the comparability of phosphate rock from different sources: (1) BPL content levels; and (2) geological origin, meaning whether the phosphate rock is sourced from igneous deposits or sedimentary deposits. IDM at 38. As previously explained, the latter distinction is particularly relevant because Commerce's benefit analysis is based on a comparison of JSC Apatit's cost of production for phosphate rock to the world benchmark price, where the record shows there are significant differences in the production processes and thus production costs associated with phosphate rock from igneous sources as compared to sedimentary sources. A benchmark that does not account for these differences would degrade the accuracy of the benefit calculation.

Here, the Eurostat import data are not broken out by source of imports, and it is therefore impossible to determine which, if any, import volumes and values are for phosphate rock that is comparable to Russian phosphate rock in terms of BPL content and geological source. *See* JSC Apatit Benchmark Submission, Appendix 8, P.R. 155, C.R. 191.[6] JSC Apatit argues in a

---

[6] Eurostat import data are also reported on a "CIF" basis, and therefore freight costs must be deducted in order to arrive at a "FOB" price that would be on an "apples-to-apples" basis with JSC Apatit's phosphate rock cost buildup. JSC Apatit Benchmark Submission at Appendix 8, P.R. 155, C.R. 191; *see also* JSC Apatit Case Brief at 34-38.

footnote that Commerce could have "easily" adjusted the Eurostat data for differences in $P_2O_5$

levels, "if Commerce believed this was necessary." JSC Apatit Br. at 17, n.4. However,

Commerce rejected this argument and explained in detail why, in fact, it is not possible to adjust

the Eurostat data to account for difference in BPL or $P_2O_5$ content. IDM at 38. Specifically,

Commerce explained that "JSC Apatit's request to adjust the {Eurostat} benchmark prices based

on 'the average $P_2O_5$ content of European imports (approx. 32.94)' makes clear that the proposed

adjustment is based on assumptions about the underlying data," which are unsupported. *Id*.

Commerce therefore reasonably rejected the Eurostat data as a potential benchmark source.

### c. Commerce reasonably rejected JSC Apatit's proposal to expand the South Africa export prices to include a third HS code.

JSC Apatit argues that Commerce erred by failing to include additional South African

exports of phosphate rock under a third HS code in the benchmark. JSC Apatit Br. at 28. The

GTA data that Mosaic submitted reported exports from South Africa under the two HS codes

that cover phosphate rock. Mosaic Benchmark Submission, Exhibit 4, P.R. 132. JSC Apatit

submitted data from a different source, Global Trade Tracker (GTT), which show exports from

South Africa under a third HS code that JSC Apatit claims is used for phosphate rock. IDM at

35-36. JSC Apatit argued before Commerce that the IFA annual 2021 export statistics show a

gap between the total exports for South Africa and the export volumes reflected in the GTA data.

IDM at 36-37.

JSC Apatit states in its brief that Commerce "acknowledged" the difference between the

GTA data and IFA annual 2021 export statistics, but "the agency maintained there was

insufficient information regarding the third code." JSC Apatit Br. at 28. JSC Apatit argues that

"this was not reasonable decision-making" because "Commerce has an obligation to consider

factual information contradictory to its findings." JSC Apatit Br. at 28. However, JSC Apatit

concedes that Commerce did consider the factual information contained in the GTT data and the IFA annual 2021 export statistics. *See id*. Specifically, Commerce stated that it "acknowledge{s} that the export quantities for the two sources {referring to GTT and IFA} are similar." IDM at 40. Thus, Commerce did not fail to review the record as a whole, including evidence that purportedly "fairly detracts" from its decision. *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). JSC Apatit is asking this Court to reweigh the evidence before Commerce, which is not the role of a reviewing court. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (explaining that the court's task is not to reweigh the evidence).

Further, Commerce provided a reasoned explanation for its decision to reject the GTT data because there was insufficient information on the record regarding the coverage of the third HS code, 2835.2690. IDM at 40. Specifically, Commerce explained that the descriptions for the two main HS codes that cover phosphate rock, HS subheadings 2510.10 and 2510.20 in the GTA and UN Comtrade data, are similar: "Natural calcium phosphates, natural aluminum calcium phosphates and phosphatic chalk; unground," and "Natural calcium phosphates, natural aluminum calcium phosphates and phosphatic chalk; ground," respectively. IDM at 39. The third HS code included in the GTT data, HS subheading 2835.2960, is described as "Phosphates of calcium (excl. calcium hydrogenorthophosphate 'dicalcium phosphate') with a fluorine content >= 0,005% by weight on the dry anhydrous product." *Id*. As Commerce found, there is no specific information on the record regarding what products this subheading covers, and whether the covered products are comparable to Russian phosphate rock. *See id*.

Parties bear the burden of building the evidentiary record necessary to support their arguments. *See Hyundai Heavy Indus. Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (CIT

27

2018). Commerce considered JSC Apatit's explanation regarding the similar export quantities

shown in the GTT data and IFA 2021 annual report, but found this evidence does not overcome

the absence of record evidence regarding the coverage of HS subheading 2835.2960. IDM at 39.

The Court should reject JSC Apatit's invitation to reweigh the record evidence. *Downhole Pipe*,

776 F.3d at 1376-77.

### 5. Commerce Rightfully Rejected ADM's Untimely Notice of Supplemental Authority

ADM argues that Commerce was wrong to reject and remove ADM's NSA regarding

*Mosaic v. United States* because it "contain{ed} untimely new argument for the final results."

ADM Br. at 23 (quoting P.R. 238); *see also* IDM at 3. ADM asserts that it would have been

impossible to submit arguments related to the decision because it post-dated ADM's case and

rebuttal briefs. ADM Br. at 23. As Mosaic explained in its Request to Reject ADM's Notice of

Subsequent Authority, however, *Mosaic v. United States* is irrelevant to this case, and ADM's

NSA was merely a "pretext to obtain an additional opportunity to brief its arguments about the

appropriate benchmark in this case." Mosaic Response to ADM NSA, P.R. 235. Commerce's

decision to reject ADM's NSA and remove it from the record was correct, and this Court should

uphold that decision.

ADM argues that Commerce and this Court have "routinely" accepted Notices of

Subsequent Authority, ADM Br. at 24, citing a string of cases. ADM's reliance on these cases is

misleading. In *Habas Sinai ve Tibbi Gazlar Istihsal Endustrial A.S v. United States*, this Court

discussed the notices of subsequent authority but explicitly declined to opine on their relevance,

stating that, "there is no need to here decide the implications *(if any)* for this case . . . .

Commerce *may* consider the matter in the first instance on remand, as it reevaluates the proper

methodology and standard to be applied in this case {}*just as Commerce may, if appropriate,*

*consider any other relevant developments. . . .*" 625 F. Supp. 2d 1339, 1361 n.21 (CIT 2009) (emphasis added).  Importantly, this Court remanded the case to Commerce on various grounds unrelated to the issue of subsequent authority.  *See id.*

*Nucor Corp. v. United States*, a companion case to *Habas*, says much the same, with this Court noting that Commerce would have the opportunity to determine whether subsequent authority had any implications upon remand.  612 F. Supp. 2d 1264, 1337 n.78 (CIT 2009). While these cases indicate Commerce has discretion to consider notices of subsequent authority, Commerce equally has discretion not to consider such notices.  *See, e.g.*, *Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Aluminum Extrusions from the People's Republic of China*, 89 Fed. Reg. 80,526 (Dep't Commerce Oct. 3, 2024), and accompanying Issues and Decision Memorandum at Background and n.10 (rejecting notice of subsequent authority as containing untimely new argument).

The remaining cases ADM cites all pertain to notices of subsequent authority filed with this Court, not with Commerce.  *See Norsk Hydro Can., Inc. v. United States*, 341 F. Supp. 2d 1263, 1264 (CIT 2004); *Giorgio Foods, Inc. v. United States*, 804 F. Supp. 2d 1315, 1325 n.18 (CIT 2011); *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1376 (CIT 2009).  This Court is not bound by the same timelines and regulations as Commerce, and whether this Court accepts notices of subsequent authority in any given case is irrelevant to the appropriateness of Commerce's decision to reject such a notice during an administrative review.

Indeed, Commerce in March 2024 issued a final rule that, *inter alia*, promulgated regulations related to notices of subsequent authority and expressly retained Commerce's discretion to consider such notices within the confines of statutory deadlines.  *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of*

*the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766 (Dep't Commerce Mar. 25, 2024) ("*Final Rule*").  In its brief, ADM asserts that the corresponding proposed rule "expressly recognized the right of interested parties to submit notices of subsequent authority" and "authorizes" the filing of such notices.  ADM Br. at 24.  To the contrary, as the final rule indicates, Commerce was not "recognizing a right" but rather clarifying an area of ambiguity. Commerce noted that it previously:

> {H}a{d} no regulation guiding the filing of, or receipt and use of, a Notice of Subsequent Authority, nor {was} there {a} regulation which addresses the filing of a Notice of Subsequent Authority in light of the administrative procedures and deadlines which Commerce faces in the last few weeks of a segment (*e.g.*, meeting internally to get official clearances for the agency's decisions and positions, drafting and finalizing positions, completing calculations when necessary, and preparing documents for publication in the Federal Register and for release to the parties under the APO).

*Final Rule* at 20,780.  Commerce ultimately adopted an approach that retains Commerce's discretion to decide whether to consider notices of subsequent authority, recognizing the realities of statutory deadlines, the administrative process, and the need to consider subsequent authority that is "directly relevant" to an ongoing issue in a segment.  *Id*. at 20,780-81; *see also* 19 C.F.R. § 351.301(c)(6)(ii) (explicitly retaining the prerogative not to consider "alleged" subsequent authorities in light of statutory deadlines).

Moreover, and notwithstanding the different circumstances under which Commerce and this Court operate, none of the authorities ADM cites *requires* Commerce to accept ADM's NSA; rather, these authorities establish that Commerce has discretion to decide whether to consider or reject such notices.

Further, *Mosaic v. United States* does not speak to the reasonableness of Commerce's benchmark selection in this case.  This is another reason that the Court should rule against ADM.

ADM argues that *Mosaic v. United States* is relevant because Commerce's benchmark-related decision in this case allegedly accepted arguments "identical in nature" to those rejected in *Mosaic v. United States*, rendering Commerce's action "inconsistent" with the Court's decision. ADM Br. at 21. Specifically, ADM points to the following observations on which the Court in *Mosaic v. United States* relied: (1) Commerce previously concluded that Egyptian phosphate rock "has a similar BPL or $P_2O_5$ content as OCP's phosphate rock;" *id*. at 19-20 (quoting 659 F. Supp. 3d at 1308); (2) Mosaic did not deny that Commerce used all phosphate rock prices on the record that fell within a BPL or $P_2O_5$ content range of the producer's rock to calculate the benchmark; *id.* at 20 (citing 659 F. Supp. 3d at 1308); (3) Mosaic did not deny that "phosphate content/BPL content is the industry's own standard…metric of comparability for phosphate rock;" *id.* (quoting 659 F. Supp. 3d at 1308) (internal quotation marks omitted); and (4) Mosaic relied on "record evidence {a report regarding the quality of Egyptian phosphate rock} that Commerce could have regarded as having little if any probativity on the issue presented," *id*. (quoting 659 F. Supp. 3d at 1308). None of these observations has any bearing on the benchmark selection issue in this case, rendering *Mosaic v. United States* irrelevant.

ADM's first three points fail for the simple reason that the igneous versus sedimentary distinction was not at issue in *Mosaic v. United States*. Specifically, the issue in *Mosaic v. United States* was whether Egyptian phosphate rock (which is sedimentary in origin) was "comparable" to Moroccan rock (which also is sedimentary in origin) because of its inferior quality, not because it was igneous. Indeed, no party advocated for using phosphate rock prices from countries with igneous deposits as benchmarks for Moroccan (sedimentary) phosphate rock. Thus, the case is inapposite.

ADM's other argument about the relevance of *Mosaic v. United States* fails because this Court merely acknowledged that Commerce considered and rejected record evidence that is not on the record in this segment, and that pertained to a country that Commerce did not include in the benchmark calculation at issue in this case. ADM attempts to draw a parallel between *Mosaic v. United States* and this case by mischaracterizing Commerce's reliance on excerpts from a book on phosphates by Prof. Peter Ptacek as a "single report" used in a manner that "closely resembles Mosaic's failed effort in {*Mosaic v. United States*} to distinguish allegedly 'low quality' Egyptian phosphate rock," ADM Br. at 22. But ADM's attempt is unavailing. These are two different pieces of evidence on two different records, which Commerce considered for different purposes in the context of their respective segments. In one instance, Commerce rejected the evidence, and the Court opined that "Commerce could have regarded {the evidence} as having little if any probativity on the issue presented." *Mosaic v. United States*, 659 F. Supp. 3d at 1308. In the other instance, Commerce found the Ptacek excerpts reliable and relevant, and incorporated them into its analysis accordingly. *See* IDM at 29. Other than this transparent attempt to discredit the Ptacek excerpts by drawing a nonexistent parallel, ADM has not shown how *Mosaic v. United States* speaks to Commerce's decision to rely on record evidence properly before it.

In sum, *Mosaic v. United States* does not speak to any issues currently before this Court, and thus the case has no probative value to the issues under consideration here. This Court should sustain Commerce's decision to reject ADM's NSA as reasonable and in accordance with law.

**B.    Commerce's Calculation of the Profit Ratio for JSC Apatit Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law**

JSC Apatit argues that Commerce failed to account for certain expenses that it allegedly incurred in connection with its mining and beneficiation of phosphate rock, and that to account for these expenses, Commerce must either utilize gross profit instead of profit before tax to calculate the profit ratio, "or include additional expenses that are not part of reported cost of production." JSC Apatit Br. at 29-31. Neither argument has merit.

This Court has previously rejected JSC Apatit's argument that gross profit is a better profit figure than profit before tax. *Mosaic Co. v. United States*, 647 F. Supp. 3d 1358, 1371-72 (CIT 2023) ("Second Remand Decision"). The Court affirmed Commerce's reasoning that the goal of constructing a tier three cost buildup is to isolate the respondent's costs for phosphate mining and beneficiation that would be reflected in the price of beneficiated phosphate rock. *Id*. Profit before tax is the correct profit item to use in the numerator of the profit ratio calculation because it is more narrowly focused than gross profit and excludes expenses unrelated to phosphate mining and beneficiation. *Id*. The Court previously affirmed Commerce's explanation as reasonable, supported by substantial evidence, and otherwise in accordance with law. *See Mosaic Co. v. United States*, No. 21-00117, 2024 WL 208136, at *3 (CIT Jan. 19, 2024), *appeal dismissed*, No. 2024-1593, 2024 WL 3875143 (Fed. Cir. Aug. 20, 2024).

The record of this review is similar to that of the investigation and remand proceeding. PhosAgro's financial statements for 2021 show that its gross profit includes several categories of expenses unrelated to phosphate mining and beneficiation, namely: (1) selling and administrative expenses; (2) taxes other than income taxes; (3) "other expenses"; (4) net foreign exchange losses; (5) net financing costs; and (6) COVID-19-related expenses. IDM at 20. Commerce cited record evidence from PhosAgro's financial statements showing that its gross profit includes

33

"vague non-production-related" expenses in these categories. *Id*. at 21. Commerce explained

that it would be inconsistent with its aim of isolating JSC Apatit's costs for phosphate ore mining

and beneficiation activities to include these categories of expenses in the profit ratio calculation.

*Id*. at 20. Commerce also explained that if it were to use PhosAgro's gross profit, it would result

in double-counting of expenses that JSC Apatit's phosphate rock cost buildup already reflects.

*Id*. at 21-22. This Court previously affirmed Commerce's explanation as reasonable and in

accordance with law, and it should do the same here, because Commerce's straightforward

explanation is reasonable and supported by the record evidence and clearly articulates a "rational

connection between the facts found and the choice made." *Burlington Truck Lines, Inc.*, 371

U.S. at 168.

JSC Apatit argues that if Commerce does not use PhosAgro's gross profit, "then it must

consider Administrative Expenses, Selling Expenses, Net Interest Expenses, and Other

Expenses." JSC Apatit Br. at 32. JSC Apatit claims that "{t}here is clear evidence that JSC

Apatit incurred additional expenses" in these categories "in connection with the mining and

beneficiation of phosphate rock," citing Exhibit SUPP-12-B to its first supplemental

questionnaire response. *Id*. at 31; JSC Apatit 1SQR, Exhibit SUPP-12-B, P.R. 128, C.R. 172.

However, JSC Apatit failed to exhaust its administrative remedies before Commerce by not

identifying this evidence in its administrative case brief.[7] Indeed, JSC Apatit's argument on this

issue before Commerce is limited to a single sentence, with no citation to record evidence: "If

Commerce continues to rely on Profit Before Tax, then it should separately quantify and add

---

[7] Pursuant to 28 U.S.C. § 2637(d), "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The CIT "takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("{A}bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.").

PUBLIC VERSION

amounts for the additional expenses that are the difference between Gross Profit and Profit

Before Tax." JSC Apatit Case Br. at 45. Commerce reasonably found that JSC Apatit failed to

present an argument regarding a specific adjustment or allocation methodology for selling,

administrative, and other expenses for Commerce to consider. IDM at 22. Commerce was not

given an opportunity to address the record evidence that JSC Apatit cites in its brief to the Court.

JSC Apatit Br. at 31 (citing JSC Apatit 1SQR, Exhibit SUPP-12-B, P.R. 128, C.R. 172). Simple

fairness requires that the Court should not overturn Commerce's decision based on a failure to

address evidence and arguments that were not presented to it. *Mittal Steel Point Lisas Ltd. v.

United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008).

Furthermore, the record supports Commerce's decision not to make an adjustment to

profit before tax for these categories of expenses. JSC Apatit claims that its Kirovsk branch is

"the branch that is responsible for the mining and beneficiation of phosphate rock," JSC Apatit

Br. at 31, but the record shows that the Kirovsk branch [

]. *See* JSC Apatit 1SQR, Exhibit SUPP-12-D, P.R. 128, C.R. 172. JSC Apatit

identifies no evidence showing that the Kirovsk branch actually incurred the selling,

administrative, and other expenses in question in connection with its mining and beneficiation of

phosphate rock. Instead, the only exhibit that JSC Apatit cites identifies the types of expenses

included in just two categories of non-production-related costs – the "administrative" and

"selling" categories – and shows how the total amounts reconcile to PhosAgro's financial

statements. JSC Apatit 1SQR, Exhibit SUPP-12-B, P.R. 128, C.R. 172. This evidence does not

prove that these costs relate to phosphate mining or beneficiation or that Commerce must

account for these costs in the profit calculation. If anything, this evidence supports Commerce's

finding that inclusion of these types of non-production costs risks double-counting and

BUSINESS PROPRIETARY
INFORMATION DELETED                              PUBLIC VERSION

introducing inaccuracies into the benefit calculation, *see* IDM at 22, because the cost buildup

[

]. *Compare* JSC Apatit 1SQR, Exhibit

SUPP-12-B, P.R. 128, C.R. 172, *with* JSC Apatit 1SQR, Exhibit SUPP-12-A, P.R. 128, C.R.

172.

       Further, JSC Apatit only submitted proposed allocations for administrative and selling

expenses (and not for "net interest expenses" or "other" expenses), and it unreasonably allocated

[

].

*See* JSC Apatit 1SQR, Exhibits SUPP-12-B & SUPP-12-D, P.R. 128 C.R. 172.  The Court

should therefore affirm Commerce's decision not to make an adjustment to profit before tax for

administrative, selling, or other expenses as reasonable, supported by substantial evidence, and

otherwise in accordance with law.

      **C.**    **Commerce's Decision to Countervail JSC Apatit's Purchases from Gazprom of Natural Gas Produced by So-Called "Independent Gas Suppliers" Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law**

       Commerce properly countervailed JSC Apatit's purchases of natural gas produced by so-

called "independent gas producers" or "independent gas suppliers."  IDM at 49-50.  JSC Apatit's

arguments to the contrary omit key facts regarding the nature of these purchases that support

Commerce's decision, and the Court should reject them.

       The purchases that JSC Apatit describes as "purchases of natural gas from independent

producers/suppliers," JSC Apatit Br. at 35, are, in actuality, purchases of natural gas from

Gazprom, a Russian government authority.  According to JSC Apatit's initial questionnaire

BUSINESS PROPRIETARY
INFORMATION DELETED                    PUBLIC VERSION

response, these purchases [


]. *See* Response from Hogan Lovells LLP, JSC Apatit Sec III QR - Narrative (Sept. 23, 2022) at 39, 41, P.R. 60, C.R. 31 ("JSC Apatit IQR"); *see also id.*, Exhibit 42, P.R. 83, C.R. 85-90. JSC Apatit also conceded that it "does not negotiate separate pricing directly with the so-called "independent gas producers/suppliers." IDM at 51. Rather, JSC Apatit reported that it negotiates with Gazprom to purchase certain quantities of gas sourced from independent producers and also negotiates over the prices to be paid for that independent producer-sourced gas. JSC Apatit IQR at 41, P.R. 60, C.R. 31. JSC Apatit also reported that "the [


]," *i.e.*, [

]. *Id.* at 41 n.5, P.R. 60, C.R. 31. This evidence supports Commerce's findings that "all of JSC Apatit's negotiations are with Gazprom that has been found to be an authority," and "{b}ecause JSC Apatit does not have direct negotiations with its suppliers, Gazprom is effectively the supplier." IDM at 51.

JSC Apatit argues that Commerce found in the original investigation that one of the so-called "independent gas suppliers," [                                    ], was not a "government authority," and that Commerce "proffered no evidence that JSC Apatit's other independent gas supplier, [                ], is a government authority. JSC Apatit Br. at 36-37. However, JSC Apatit's arguments ignore Commerce's finding that *Gazprom*, a Russian government authority, is the effective supplier for JSC Apatit's natural gas purchases. IDM at 51. Thus, even without resorting to AFA, Commerce had a reasoned basis and substantial evidence to countervail JSC Apatit's natural gas purchases from so-called "independent gas suppliers."

Furthermore, Commerce's decision to apply AFA to countervail JSC Apatit's purchases from the so-called "independent gas suppliers" based on the GOR's refusal to cooperate to the best of its ability was also supported by substantial evidence and in accordance with law. Section 776 of the Act empowers Commerce to use the "facts otherwise available" to make determinations where "necessary information is not available on the record" or where an interested party:  (1) "withholds information that has been requested" by Commerce; (2) fails to provide information within the established deadlines or in the form or manner requested, subject to section 782 of the Act; or (3) significantly impedes an investigation.  19 U.S.C. § 1677e(a). Section 782 of the Act states that where a party fails to provide requested information, Commerce must inform the party and, to the extent practicable, provide an opportunity to remedy or explain the deficiency.  *Id*. § 1677m(d).  If Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," the statute allows Commerce to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  *Id*. § 1677e(b)(1); *see also Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354, 1363 (CIT 2020).

JSC Apatit argues that Commerce's application of AFA is unwarranted because there allegedly is no gap in the record created by the GOR's failure to cooperate and because it views Commerce's application of AFA as overly broad and harmful.  As explained below, these arguments are meritless.  *First*, the information regarding the so-called "independent gas suppliers" that JSC Apatit submitted is not sufficient to close the gap in the record that the GOR created through its refusal to cooperate.  *Second*, Commerce's application of AFA is lawful because the GOR did not cooperate to the best of its ability, and because it is the government's

burden – not the company respondents' – to provide necessary information regarding financial

contributions.

       1.      **Commerce Reasonably Found That the GOR's Refusal to Cooperate
Created a Gap in the Record.**

       Commerce explained in the Final Results that there is a gap in the record due to the

GOR's failure to provide an Input Producer Appendix for all natural gas producers and suppliers

reported by JSC Apatit.[8]  IDM at 50.  The GOR furnished an Input Producer Appendix for

Gazprom, but not for any other gas producers/suppliers.  Response from Ministry of Economic

Development of the Russian Federation, IQR – Cover Ltr. & Narrative (Sept. 13, 2022) ("GOR's

IQR"), at (B)(9) "Provision of Natural Gas for LTAR," P.R. 38, C.R. 5.  Commerce provided

multiple opportunities for the GOR to respond to the Input Producer Appendix for the other

natural gas producers/suppliers, but the GOR failed to provide the requested information, failed

to provide an adequate explanation for *why* it could not provide the requested information, and

failed to present any alternative forms of the requested information.  IDM at 50.  Application of

AFA was therefore warranted.  *See, e.g.*, *Jindal Poly Films*, 439 F. Supp. 3d at 1363; *Mosaic Co.
v. United States*, 589 F. Supp. 3d 1298, 1306 (CIT 2022).

       JSC Apatit argues that Commerce's application of AFA was unwarranted because it

submitted Orbis Reports for **[**                            **]** and an

annual report for **[**                **]**, which it claims provide "these firms' direct

and total ownership percentages, their current and historical shareholders, and their respective

ownership percentages."  JSC Apatit Br. at 36 (citing JSC Apatit IQR, Exhibit 24, P.R. 79, C.R.

---

[8] Commerce instructed the GOR to provide an Input Producer Appendix for all natural gas producers and suppliers
reported by JSC Apatit.  *See* Letter from Commerce, Initial Questionnaire (July 20, 2022) at 17, Input Producer
Appendix, P.R. 16.

69-70).[9]  However, this information is not sufficient to cure the gap that the GOR's failure to submit Input Producer Appendices for the so-called "independent gas suppliers" created.  The Input Producer Appendix instructed the GOR to: (1) trace all ownership of the supplier back to the ultimate individual or state owner(s); (2) provide information regarding the different types of shares by owner, role of minority shareholders, and corporate governance structure *at each level of ownership* between the supplier and the ultimate owner(s); and (3) explain how and by whom specific types of key decisions are made, including decisions related to production and marketing, and whether the entity is required to carry out any obligations on behalf of the GOR. Letter from Commerce, Initial Questionnaire (July 20, 2022), Input Producer Appendix, P.R. 16. The last category of information is particularly relevant here, given the record evidence that all of JSC Apatit's negotiations are with Gazprom, not with the so-called "independent gas suppliers."  IDM at 51.  The information that JSC Apatit submitted falls far short of filling the gap in the record that the GOR created through its refusal to cooperate.[10]

    This Court has previously held that Commerce is warranted in resorting to facts available when the GOR fails to provide a complete Input Producer Appendix for a Russian supplier of natural gas, and that an interested party's submission of publicly available information from annual reports cannot cure the gap created by the GOR's refusal to cooperate.  *See Mosaic Co. v.*

---

[9] JSC Apatit also misrepresents *Guangdong Wireking Housewares* as holding that "only" where it is "unclear" whether a firm is a government authority based on ownership information does Commerce consider other factors. JSC Apatit Br. at 36.  In reality, Commerce analyzes key factors in addition to government ownership, including government presence on the board of directors and control over an entity's activities, as well as evidence of the entity pursuing governmental policies or interests.  *Id.*

[10] JSC Apatit argues that Commerce should have provided it with another opportunity to fill the gap in the record that the GOR's failure to cooperate created, citing *Risen Energy*.  JSC Apatit Br. at 42.  The Court in *Risen Energy* reversed Commerce's decision to reject a company respondent's attempt to cure its own deficient submission. *Risen Energy Co. v. United States,* 658 F. Supp. 3d 1364, 1371 (CIT 2023).  The Court did not hold that Commerce must provide a company respondent even one opportunity to cure a government's failure to cooperate, let alone two.

*United States*, 589 F. Supp. 3d 1298, 1306 (CIT 2022); *Jindal Poly Films*, 439 F. Supp. 3d at

1361.  The Court should reach the same conclusion here.

> ### 2.    Application of AFA was Warranted Because the GOR Refused to Cooperate to the Best of its Ability.

The statute authorizes Commerce to draw adverse inferences in selecting among the facts

available when "an interested party has failed to cooperate by not acting to the best of its ability

to comply with a request for information."  *See* 19 U.S.C. § 1677e(b)(1).  A party cooperates to

the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full

and complete answers to all inquiries in an investigation."  *See Nippon Steel Corp. v. United

States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  In a countervailing duty proceeding, Commerce

requires certain information from the foreign government allegedly providing subsidies,

including information regarding whether that government provides a financial contribution.  *See

Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014).

JSC Apatit argues that this Court "has rejected Commerce's use of AFA against a

cooperative respondent based on actions taken, or lack thereof, by its government when no real

gap in the record exists."  JSC Apatit Br. at 38.  However, the cases that JSC Apatit cites

involved a gap in the record of information necessary to verify usage (or non-use) of a subsidy

program, specifically the Export Buyer's Credit program in China.  *See id*. (citing *Changzhou

Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326-27 (CIT 2018);

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 359 F. Supp. 3d 1329, 1338 (CIT

2019); *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333

(CIT 2019); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1356 (CIT

2019); *Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1352-53 (CIT 2019);

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1361 (CIT 2021)).  Subsidy usage

is a category of information that company respondents are required to report.

By contrast, it is Commerce's practice to require foreign governments to provide

information regarding financial contribution and specificity.  Other interested parties cannot

remedy a government's failure to respond to the best of its ability to Commerce's requests for

information on these topics.  When a foreign government fails to respond to the best of its ability

to Commerce's requests for information, Commerce may apply AFA to find that a government

authority provided a financial contribution to a specific industry.  *See Mosaic Co.*, 589 F. Supp.

3d at 1307 (citing *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342

(2013)).[11]  Here, the necessary information that was missing from the record due to the GOR's

refusal to cooperate related to financial contribution, and specifically the GOR's ownership and

control over the so-called "independent gas suppliers."  This is not information JSC Apatit could

provide.

JSC Apatit also mischaracterizes the information that the GOR failed to provide.  JSC

Apatit claims the GOR "did not answer a request for ownership information," JSC Apatit Br. at

39, but, as explained above, the Input Producer Appendix requests much more than just

ownership information.  Commerce explained in the IDM that it provided the GOR multiple

opportunities to complete the Input Producer Appendix.  IDM at 50.  The GOR failed to do so,

failed to request an extension, failed to provide an adequate explanation for why it was unable to

provide the requested information, and failed to identify alternative information that it could

---

[11] JSC Apatit cites *GPX Int'l Tire Corp. v. United States* as holding that Commerce may not apply AFA to a fully cooperative respondent as a result of the government's lack of cooperation, but it mischaracterizes the applicability of that case.  The Court in *GPX* stated that "Typically, Commerce cannot rely on an unaffiliated party's failure to cooperate to justify application of an AFA rate unless the exporter under investigation also is found responsible for the behavior in some way."  942 F. Supp. 2d 1343, 1349 (CIT 2013).  *GPX* did not involve the application of AFA due to the *government*'s failure to cooperate in a CVD proceeding.

provide.  *Id*.  Substantial evidence thus supports Commerce's finding that the GOR did not

cooperate to the best of its ability and decision to use adverse inferences.

In sum, Commerce's decision to countervail all of JSC Apatit's purchases of natural gas,

including purchases of gas produced by so-called "independent gas suppliers" based on facts

available and adverse inferences, is reasonable, supported by substantial evidence, and otherwise

in accordance with law.

### D.   Commerce's Calculation of Subsidy Rates Based on Benchmark Data for Calendar Year 2021 Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

The POR of this review is November 30, 2020 through December 31, 2021.  Commerce

calculated JSC Apatit's subsidy rates using data from calendar year 2021 "because the POR

covers a small portion of 2020 (*i.e.*, less than two months)."  PDM at 2-3; IDM at 11-12.  JSC

Apatit argues that the Final Results are "inconsistent with Commerce's practice of employing

data for the entirety of the POR in its CVD calculations" and that Commerce unlawfully ignored

evidence pertaining to December 2020.  JSC Apatit Br. at 43.  JSC Apatit's arguments are

incorrect and mischaracterize Commerce's practice.

Commerce's regulations provide that the POR for the first administrative review of an

antidumping or countervailing duty order includes the period "from the date of suspension of

liquidation . . . to the end of the month immediately preceding the first anniversary month" of the

order.  19 C.F.R. § 351.213(e).  However, Commerce's regulations do not specify the time

period that it must use for calculating subsidy rates.  As a matter of practice, "Commerce's

general policy is to rely on one year's worth of data when the POR of the first administrative

review extends into a second year by no more than two months."  *See, e.g.*, *Countervailing Duty*

*Order on Certain Passenger Vehicle and Light Truck Tires From the People's Republic of*

*China: Final Results of Countervailing Duty Administrative Review; 2014-2015*, 83 Fed. Reg.

11,694 (Dep't Commerce Mar. 16, 2018), and accompanying Issues and Decision Memorandum at 13.  When the POR is longer than a calendar year and two months, Commerce treats the two calendar years as separate periods and calculates two subsidy rates.  *See id*. at 12-13.

JSC Apatit argues that Commerce's "practice does not apply here," JSC Apatit Br. at 46, but fails to cite any legal authority in support of this assertion.  This case does not fall into the latter category, where Commerce's practice is to calculate two subsidy rates for a POR that is longer than 14 months.  Commerce therefore followed its practice for cases with a POR that is 14 months or less and calculated a single subsidy rate based on calendar year 2021 data.  IDM at 11. This is the same approach that Commerce took in the first administrative review of the countervailing duty order on phosphate fertilizers from Morocco, and in other cases.  *See Phosphate Fertilizers From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2020-2021*, 88 Fed. Reg. 29,089 (Dep't Commerce, May 5, 2023), and accompanying Preliminary Decision Memorandum at 3; *Fine Denier Polyester Staple Fiber from India: Final Results of Countervailing Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 86,537 (Dep't Commerce Dec. 30, 2020), and accompanying Issues and Decision Memorandum at 2.

JSC Apatit complains that it provided data covering the entire POR, including December 2020, at Commerce's request and argues that Commerce unlawfully disregarded the 2020 data. JSC Apatit Br. at 44-45.  However, the mere fact that Commerce requested certain information from a respondent does not create a legal requirement that Commerce use all such information in calculating subsidy rates – particularly if doing so would contravene its policies or practices. JSC Apatit fails to identify any legal authority that would obligate Commerce to alter its practice for this case. The Court should reject its arguments.

VI.    **CONCLUSION**

Mosaic respectfully requests that the Court find that Commerce's determinations addressed above are reasonable, supported by substantial evidence, and otherwise in accordance with law and deny the Consolidated Plaintiffs' motion for judgment on the agency record.

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
      LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: December 12, 2024

45

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Support of Mosaic's Rule 65.2 Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by WilmerHale's word processing system, is 13,878 words.


<u>/s/ David J. Ross</u>
(Signature of Attorney)

<u>David J. Ross</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>December 12, 2024</u>
(Date)