## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) |
| Plaintiff, | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Plaintiff-Intervenor, and Consolidated Plaintiff, and | ) |
| THE MOSAIC COMPANY, | ) |
| Consolidated Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) **Consol. Ct. No. 23-00239** |
| Defendant, | ) **PUBLIC DOCUMENT** |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor, and Consolidated Defendant-Intervenor, and | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Consolidated Defendant-Intervenor | ) |

## REPLY OF THE ARCHER DANIELS MIDLAND COMPANY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
202-223-3760

Counsel for Plaintiff Archer Daniels
Midland Company

Dated:  January 22, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..................................................................................................ii

I.      INTRODUCTION..............................................................................................1

II.     ARGUMENT ......................................................................................................2

      A.      The Statute and Regulations Require Commerce to Calculate Each Tier 3
             Benchmark in Accordance with "Prevailing Market Conditions" and
             "Market Principles".........................................................................................2

      B.      Commerce Failed to Identify Any Record Evidence that Supported Its
             Conclusion that Production Costs Differed Between Phosphate Rock
             Produced from Igneous Ore Versus Sedimentary Ore ....................................3

      C.      Commerce Failed to Address ADM's Undisputed Evidence that Phosphate
             Rock Purchasers in Brazil, India, Japan, and New Zealand Did Not
             Distinguish Between Phosphate Rock Produced from Igneous and
             Sedimentary Ore Possessing the Same Quality................................................9

      D.      This Court Possesses Ample Discretion to Consider the Relevance of the
             <u>Mosaic Decision</u> Despite Commerce's Unlawful and Arbitrary Refusal to
             Consider It .....................................................................................................14

III.    CONCLUSION .................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

### <u>Court Decisions</u>

*Allen v. United States*, 2024 WL 4002305 (Fed. Cir. August 30, 2024) ........................................12

*Altx, Inc.v. United States*, 167 F. Supp. 3d 1353 (CIT 2024) ......................................................... 6

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 929 F. Supp. 2d 1252 (CIT 2013) ...............................................................................................................................................10

CS *Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ...........................................10

*Gerald Metals, Inc. v United States*, 132 F.3d 716 (Fed. Cir. 1997) ...........................................10

*Guizhou Tyre Co., Ltd. v. United States*, 389 F. Supp. 3d 1315 (CIT 2019) ................................14

*Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318 (CIT 2024) ...............................................................................................................................................5

*Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024) ....................................................12

*New Am Keg v. United States*, Ct. No. 20-00008, Slip Op 21-30, 2021 WL 1206153 (CIT Mar. 23, 2021) .........................................................................................................................................10

*Risen Energy Co., Ltd. v. United* States, 570 F. Supp. 3d 1369(CIT 2022) ....................................3

*The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (CIT 2023) .......................... *passim*

*Universal Camera Corp. v. NLRB*, 71 S. Ct. 456 (1951).............................................................10

### <u>Statutes</u>

19 U.S.C. § 1677(5)(E)(iv) ....................................................................................................2, 4, 12

19 U.S.C. § 1677f(i)(3)(A) .............................................................................................................5

19 U.S.C. § 1677f(i)(1) ..................................................................................................................5

### <u>Regulations</u>

19 C.F.R. § 351.511(a)(2)(iii) ........................................................................................................2

**Commerce Determinations**

Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty
Administrative Review; 2020-2021.  88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) and
accompanying Issues and Decision Memorandum .........................................................................1

Phosphate Fertilizers from the Russian Federation, April 27, 2023 Decision Memorandum
for the Preliminary Results and Partial Rescission of the Countervailing Duty Administrative
Review; 2020-2021 .......................................................................................................................4

## I.    INTRODUCTION

Plaintiff Archer Daniels Midland Company ("ADM") respectfully submits this Reply Brief in support of its Rule 56.2 motion for judgment upon the agency record.  ADM challenges the Commerce Department's calculation of the Tier 3 benchmark that it used in the first administrative review of the countervailing duty order on Phosphate Fertilizers From the Russian Federation.  See ADM's Mot. For J. on the Agency Record, ECF No. 41-1 (June 5, 2024) ("ADM Br.").  Commerce used this benchmark to determine the countervailable benefit that the Russian phosphate fertilizer producer, JSC Apatit, received in return for the Russian government's alleged provision of phosphate rock mining rights for less than adequate remuneration ("LTAR").

The final results of the first administrative review are contained in Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021.  88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023).  P.R. 246.  Commerce provided the rationale for its Tier 3 benchmark calculation, along with the basis for its rejection of ADM's proposed benchmark calculation, in its accompanying "Issues and Decision Memorandum for the Final Results" at Comments 2g and 2h (Dep't Commerce Nov. 6, 2023 ("IDM").  P.R. 242 at 28-32.[1]

This Reply Brief addresses arguments made by Defendant, the United States, and by the Defendant-Intervenor, The Mosaic Company, concerning how Commerce should have calculated the Tier 3 benchmark.  See Defendant's Response to Plaintiffs' Motions for Judgment Upon the

---

[1] The public version of the administrative record appears in ECF No. 23-2.  References to documents contained in the public record are cited as "P.R. ___."  ADM relies herein solely on documents in the public version of the record.  Citations to P.R. documents identify the issuance date, rather than the "Upload Date," listed for each record document in ECF No. 23-2.

Agency Record (Nov. 21, 2024), ECF No. 49 ("Gov. Br."); and The Mosaic Company's

Memorandum in Opposition to Consolidated Plaintiffs' Rule 56.2 Motions for Judgment Upon

the Agency Record (Dec. 13, 2024), ECF No. 55 ("Mosaic Br.").

ADM proposed just one method for calculating the Tier 3 benchmark, and this method is

the sole focus of its Rule 56.2 motion.  Neither Commerce nor Mosaic has refuted ADM's

showing that Commerce failed to calculate the benchmark in a manner that was supported by

substantial evidence and that was not contrary to law.  Moreover, Commerce failed to address in

either its final determination or its IDM a directly relevant argument that ADM raised in both its

(refiled) Case Brief and its Rebuttal Brief.  P.R. 225 and P.R. 216, respectively.  These briefs

explained the statutory and regulatory relevance of purchases by importers located in Brazil,

India, Japan, and New Zealand of phosphate rock produced from both sedimentary ore and

igneous ore.

In summary, this Court should remand the case with an instruction that Commerce

recalculate the Tier 3 benchmark for phosphate rock mining rights in accordance with the

methodology that ADM submitted to Commerce.

## II.    ARGUMENT

### A.  The Statute and Regulations Require Commerce to Calculate Each Tier 3 Benchmark in Accordance with "Prevailing Market Conditions" and "Market Principles"

Section 1677(5)(E)(iv) of the Tariff Act states that where goods are provided for less than

adequate remuneration:

> the adequacy of remuneration shall be determined in relation to prevailing market
> conditions for the good or service being provided . . .  Prevailing market conditions
> include price, quality, availability, marketability, transportation, and other
> conditions or purchase or sale.

19 U.S.C. § 1677(5)(E)(iv).  Similarly, Commerce's Tier 3 benchmark regulation in 19 C.F.R. §

351.511(a)(2)(iii) provides that where no world market price is available to purchasers in the

country in question (here, Russia), the adequacy of remuneration will normally be measured "by

assessing whether the government price is consistent with market principles."

ADM does not dispute that Commerce has discretion to consider various factors when

applying these statutory and regulatory requirements, but it does not have the discretion to ignore

directly relevant "market conditions" or equally relevant "market principles" that ADM brought

to the agency's attention in the form of undisputed evidence that importers in Brazil, India,

Japan, and New Zealand imported phosphate rock produced from both igneous and sedimentary

ore.  ADM Br. at 8-10, 15-18.  As the court stated in *Risen Energy Co., Ltd. v. United* States, 570

F. Supp. 3d, 1369, 1376 (CIT 2022), a remand is warranted where "the record does not

adequately explain why Commerce granted controlling weight to geographic proximity in

evaluating the land benchmark data, while disregarding other factors."  We discuss the relevance

of the evidence that Commerce disregarded in this review in Section II(C) below.

**B. Commerce Failed to Identify Any Record Evidence that Supported Its Conclusion that Production Costs Differed Between Phosphate Rock Produced from Igneous Ore Versus Sedimentary Ore**

The sole basis upon which Commerce rejected ADM's contention that the prices and

volumes of exports of phosphate rock produced from sedimentary ore formations should be

included in its Tier 3 benchmark calculation was that only the phosphate rock produced from

igneous ore formations in Brazil, Finland, and South Africa was comparable to the "government

provided good" that the Russian government provided to JSC Apatit for LTAR, i.e., igneous ore.

IDM at 29-30.  P.R. 242.  Commerce's rationale for this conclusion was that, because the

agency's focus was on "JSC Apatit's costs to mine and process phosphate ore into phosphate

rock, any differences in the production process for phosphate rock from sedimentary deposits versus igneous deposits are relevant to our analysis." IDM at 30.

This finding was the only record evidence of a "prevailing market condition" or a "market principle" that the agency relied upon to support its Tier 3 benchmark calculation. Specifically, Commerce found that:

> Accordingly, because we are comparing JSC Apatit's phosphate rock cost buildup to world market phosphate rock export prices in this Tier 3 analysis, we find that the production method and corresponding production costs for the underlying good are "conditions of purchase or sale," and thus necessary characteristics to consider in our selection of a comparable benchmark.[192]

IDM at 31. (Emphasis added.) Footnote 192 to this sentence cited "section 771(5)(E)(iv) of the Act." This section contains the "prevailing market conditions" requirement.

ADM does not dispute that the production processes used to produce phosphate rock from igneous ore deposits are different from the processes that are employed to produce rock of comparable quality, as measured in BPL content, from sedimentary ore deposits. However, that was not the critical distinction that Commerce relied upon in rejecting ADM's submission of the phosphate rock prices that Togo and Iran exported.

Instead, Commerce based that rejection on its assertion that the "different production steps" for each type of ore have "different production costs."[2] IDM at 31. Moreover, Commerce stated that "ADM did not cite any evidence that the underlying costs for producing phosphate rock from each type of deposit are the same despite these {production process} differences." Id. Thus, Commerce indicated that, if the production costs were the same for the extraction and

---

[2] In its Preliminary Decision Memorandum, Commerce did not rely on production cost differences between phosphate rock sourced from igneous ore deposits versus sedimentary ore deposits. See April 27, 2023 Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021: Phosphate Fertilizers from the Russian Federation at 10, 18-20. P.R. 188.

beneficiation of the phosphate rock that was mined from the two different types of ore deposits, then it would have included the Togo and Iran prices and volumes in its Tier 3 benchmark calculation.  Nothing in the record demonstrates that the costs were not the same or similar.

Moreover, Commerce erred in stating that ADM bore the burden of demonstrating that the underlying costs of producing phosphate rock from igneous ore versus sedimentary ore were the same.  The substantial evidence test requires Commerce in every case to support each factual finding that is material to its ultimate decision, as well as address all relevant arguments made by interested parties:

> The administering authority shall include in a final determination described in paragraph (1) an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review (as the case may be), concerning the establishment of dumping or a countervailable subsidy, or the suspension of the investigation, with respect to which the determination is made.[3]

19 U.S.C. § 1677f(i)(3)(A).  See also *Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1332 (CIT 2024), where the court held that:

> Commerce thus declined to respond to Kaptan's objection to the use of the Colliers report as a benchmark. This was error. "When confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." Mittal Steel Galati S.A. v. United States, 31 C.I.T. 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007). Commerce was aware that Kaptan had raised a concern with the possibly distortive nature of the Colliers report's geographic focus. See IDM at 7. And this concern was a colorable one: in theory, at least, the estimated value of foregone rent for Nur's use of the Trabzon land could be inaccurately high if based on a non-representative sample of higher-priced land rentals in a different area of Turkey.
>
> But rather than "provide an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the

---

[3] The determinations listed in "paragraph (1)" include Commerce's final countervailing duty determinations.  See 19 U.S.C. § 1677f(i)(1).

investigation or review," 19 U.S.C. § 1677f(i)(3)(A), Commerce resorted to a process of elimination in which it struck the C&W report and then selected the Colliers report by default. Under the Government's framing, which is that Commerce "found the [C&W] report unusable only after considering various factors detracting from its credibility," Gov't Br. at 15, Commerce was also required to address the "usability" of the Colliers report by considering the "detracting" factors that Kaptan raised in its case brief.

See also *Altx, Inc.v. United States*, 167 F. Supp. 3d 1353, 1374 (CIT 2024) ( "While the ITC need not address every argument and piece of evidence, *see supra* note 6, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions.")

However, in violation of the statute, Commerce did not identify any record evidence bearing upon the similarities or differences between the production costs attributable to mining and processing igneous ore versus sedimentary ore.  Instead, it simply assumed without basis that different processes generated different total costs.

This assumption, in addition to lacking factual support, is contradicted by evidence that Mosaic submitted.  Specifically, in Exhibit 19 to Mosaic's March 15, 2023 Benchmark Submission, Prof. Ptacek stated that "The composition of phosphate rocks differs from one deposit to another.  Therefore, phosphate rocks from different sources may be expected to behave differently in beneficiation and acidulation processes."  P.R. 133 at 336.  If different sources of phosphate rock "behave differently" during processing, then it necessarily means that production costs will differ, as well, among producers that produce phosphate rock from igneous ore in the same country.  It also logically follows that producers of phosphate rock from igneous ores in different countries will incur different production costs.

Given the diversity of the production environments in three countries (Brazil, Finland, and South Africa), significant differences in production costs for rock produced solely from igneous ore deposits are highly likely.  The prices charged by exporters in each of those countries

6

differ significantly, from which it is logical to infer that their production costs also differed.  For example, Commerce determined that the price at which South African countries exported phosphate rock in the 2021 period of review averaged $576 per metric ton, while exporters in Brazil and Finland charged an average of $225 and $235 per ton, respectively, in that year.  See Memorandum to The File re Final Results Calculations for Joint Stock Company Apatit and Excel Worksheet provided in Attachment 1, captioned Summary of Phosphate Rock Export Prices by Reporter.  P.R. 243 and P.R. 244, respectively.

Monthly prices varied even more significantly within each of the countries during 2021.  In Brazil, prices varied from a low of $21 per MT to a high of $204 per MT (after disregarding an aberrational price of $1.6 million for a quantity of 0.002 MT).  In Finland, prices varied from a low of $139 per MT to a high of $298 per MT after disregarding an aberrational price of $114,126 for a quantity of 0.0011 MT).  In South Africa, prices varied from a low of $184 per MT to a high of 8,113 per MT (after disregarding aberrational prices for monthly quantities that did not exceed 2 MT).

In short, the wide variations in average prices during the period of review (ranging from a low of $21 per MT to a high of $8,133 per MT) strongly suggest different production costs for the very same phosphate rock produced solely from igneous ore formations by different producers in different countries.  See also Exhibit 16(b) to Mosaic's March 12, 2023 benchmark submission, captioned "History and Future of Phosphate Mining and Beneficiation in South Africa."  P.R. 132.  This exhibit, which appears to be a PowerPoint presentation lacking page numbers, shows dozens of onshore and offshore "phosphate deposits" located throughout the country, including sedimentary ore deposits, with, presumably, widely differing costs of

7

extraction and beneficiation given the differences in the nature of the deposits and their locations.[4]

Given the production cost differentials among producers in these three exporting countries, there is no factual basis for Commerce's implicit assumption that production costs for rock produced from igneous formations are identical regardless of the mine from which the rock is sourced or the country in which the mine is located. Nor is there any basis for Commerce's assumption that production costs for sedimentary ore never overlap with production costs for igneous ore. That is precisely why Commerce's reliance on what it merely assumed to be a single difference between production costs of rock from igneous ore versus sedimentary ore is fatally flawed.

In other words, the record contains no evidence that the cost of producing phosphate rock from igneous formations is identical from country to country and from producer to producer in each country. Similarly, the record contains no evidence that the cost of producing phosphate rock is always different from the cost of producing phosphate rock from sedimentary ore. Without any evidence, much less substantial evidence, to support its conclusion that production cost differed depending on the type of ore that was mined, the entire premise of Commerce's exclusion of the Togo and Iran prices from its benchmark calculation fails.[5]

---

[4] Additional slides in this exhibit appear to show that most igneous ore is beneficiated by the Phalaborwa Company. One of those slides appears to identify fifteen different types of mineral deposits.

[5] Mosaic asserts that "several exhibits in Mosaic's benchmark submission" support Commerce's finding that production costs differ depending on the type of ore that is processed. Mosaic Br. at 20. That assertion is incorrect because nothing in Mosaic's benchmark submission addresses the issue of production costs, much less the issue of similarities or differences in production costs depending on the type of ore from which phosphate rock is produced. Nor has Mosaic ever identified precisely where in any of its submissions it provided a discussion of production costs.

Finally, Commerce relied for its assumption of production cost differences on a 2016 book authored by Professor Peter Ptacek entitled "Apatites and Their Synthetic Analogues." IDM at 30-31.[6]  However, this book contains no information concerning the cost of producing phosphate rock from either igneous or sedimentary ore, much less any differences in those costs.[7]  Thus, it provides no support for Commerce's conclusion that production costs differ depending on the type of ore.  In short, the agency's sole reliance on an alleged difference between sedimentary and igneous ore production processes, but a never proven difference in production costs, fails the substantial evidence test.

### C. Commerce Failed to Address ADM's Undisputed Evidence that Phosphate Rock Purchasers in Brazil, India, Japan, and New Zealand Did Not Distinguish Between Phosphate Rock Produced from Igneous and Sedimentary Ore Possessing the Same Quality

ADM's Rule 56.2 motion explains the relevance of the evidence that it presented in its Case Brief and Rebuttal Brief that importers in four countries, i.e., Brazil, India, Japan, and New Zealand, imported phosphate rock of a quality comparable to the rock that JSC Apatit produced (in terms of BPL content), that was produced from both igneous and sedimentary ore.  ADM Br. at 14.  See also ADM Case Brief at 11-16, P.R. 225, and ADM Rebuttal Brief at 2-10, P.R. 216.  Neither Commerce nor Mosaic has disputed this evidence nor the benchmark calculation that

---

Instead, Mosaic merely adopts Commerce's unsupported assumption that different production processes always and inevitably entail different production costs.  Mosaic Br. at 21.  Thus, it was literally impossible for Commerce to conclude that production costs differ depending on the type of ore where the record contained no information concerning production costs for either type of ore.

[6] Chapters 7, 8, and 9 of the Ptacek book are found in Exhibits 19, 20, and 21 of Mosaic's March 15, 2023 Benchmark Submission.  P.R. 133.

[7] In any event, a book published in 2016 provided little, if any, factual basis for Commerce to make assumptions about the cost of production of phosphate rock in the 2021 period of review.

results when the Togo and Iran export volumes and prices are included in the Tier 3 benchmark calculation.

Commerce did not address ADM's evidence in either its IDM or its Response Brief filed in this Court, which alone requires a remand due to its legal significance. Through this omission, Commerce failed to consider record evidence that "fairly detracts" from the evidence that the agency relied upon. See, e.g., *Universal Camera Corp. v. NLRB*, 71 S. Ct. 456, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); see also CS *Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Gerald Metals, Inc. v United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

In addition, this Court has held that "Not addressing conflicting evidence on the record fails the substantial evidence test because it does not consider record evidence contrary to Commerce's determination." *New Am Keg v. United States*, Ct. No. 20-00008, Slip Op 21-30, at 35, 2021 WL 1206153 at 13 (CIT Mar. 23, 2021) (quoting *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 929 F. Supp. 2d 1252, 1356 (CIT 2013).

If producers of phosphate fertilizers in those four countries regard both ore sources of phosphate rock as equally suitable for processing into phosphate fertilizers because they concededly have the same quality (measured in BPL content), then their decisions to import both sources of rock constitutes a "prevailing market condition" under the statute. Commerce, concededly, has the discretion to consider "price, quality, availability, marketability, transportation, and other conditions or purchase or sale" as it evaluates what constitutes prevailing market conditions. But, it cannot ignore undisputed evidence that purchasers in four countries considered the "quality, availability, marketability . . . and other conditions of purchase and sale" of the phosphate rock that they purchased from different sources.

Nevertheless, Commerce ignored the relevance of ADM's evidence insofar as it applied to each of these factors. For example, it is undeniable that a "condition of purchase or sale" in each of the four countries was that the source of phosphate rock could be either igneous or sedimentary ore because there was no difference in quality. Similarly, phosphate rock produced from both igneous and sedimentary ore was equally "available" to purchasers in all four of these countries, and its "marketability" to these purchasers was regarded as identical. Commerce's failure to consider these essential aspects of the definition of "prevailing market conditions" is reversible error. It is one thing to focus on just a single aspect of the statutory and regulatory requirements, but it is quite another to blindly ignore equally relevant aspects.[8]

Mosaic (inadvertently) appears to agree with ADM's reliance upon purchases made by the four countries of phosphate rock produced from both igneous ore and sedimentary ore when it quotes from Commerce's final determination in its countervailing duty review of phosphate fertilizers from the Kingdom of Morocco. Mosaic states that Commerce found there that "third country export prices are, by definition, world market prices that are set 'consistent with market principles.'" Mosaic Br. at 15. It is no less true that the third country purchases, i.e., prices paid by Brazil, India, Japan, and New Zealand are "consistent with market principles."[9]

---

[8] Mosaic attempts, in reliance upon Prof. Ptacek's book, to distinguish the igneous ore sources of phosphate rock from sedimentary ore sources based on the differences in "mineralogical, textural, and chemical characteristics, including levels of unwanted impurities." Mosaic Br. at 4. However, the fact that purchasers in four countries found these alleged differences to have no effect on their purchase decisions demonstrates the irrelevance of Mosaic's contention.

[9] In addition, if purchasers distinguished between phosphate rock produced from igneous versus sedimentary ore, then the prices for one or the other would always be cheaper because the production costs were lower. The fact that purchasers in four countries purchased phosphate rock produced from both types of ore suggests that the prices were the same, regardless of the type of ore, or else that price differences did not matter because the important characteristic, if not the only characteristic that mattered, was the BPL content, i.e., the quality of the rock.

Nevertheless, Mosaic asserts that the only relevant market considerations and market principles that apply are those that prevail "in the country which is subject to investigation or review {i.e., Russia}, not in the global market." Mosaic Br. at 11-12. The statute contains no such limitation. Rather, 19 U.S.C. § 1677(5(E)(iv) states that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to investigation or review." Thus, the limitation to the country subject to investigation pertains solely to "goods being purchased" in Russia, while at the same time there is no limitation to Russia "in relation to prevailing market conditions for the good or service being provided." Nothing in the Statement of Administrative Action or the preamble to the countervailing duty regulations says anything to the contrary.[10]

Mosaic also asserts that "ADM does not cite to any record evidence in its brief to the Court" showing that "processors in four countries did not recognize any difference in the quality or suitability for use of phosphate rock produced from sedimentary ore deposits versus igneous deposits." Mosaic Br. at 23. This assertion is incorrect because ADM's Rule 56.2 motion stated the following:

> Togo and Iran produced phosphate rock from sedimentary ore formations with a BPL content similar to the BPL content of rock produced from igneous ore formations in Russia, Brazil, Finland, and South Africa. ADM Refiled Case Br. at 15. P.R. 215. Commerce found that "No party has argued that the $P_2O_5$ content of Russian phosphate reserves is not comparable to reserves in Togo and Iran." Final Decision Memo at 30. P.R. 242.

---

[10] The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) authorizes this Court to resolve any statutory ambiguity: "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." The Federal Circuit has acknowledged that *Loper Bright* "does not demand that courts 'mechanically afford binding deference to agency interpretations.'" *Allen v. United States*, 2024 WL 4002305 (Fed. Cir. August 30, 2024).

ADM Br. at 12.  Then, ADM stated the following:

> Three countries imported phosphate rock in 2021 and/or 2022 with a BPL content of 78% or above that was beneficiated from both sedimentary and igneous ore formations, i.e., India, Japan, and New Zealand.  A fourth country, Brazil produced phosphate rock from igneous formations but also imported phosphate rock from Jordan and Morocco, which produced it from sedimentary ore formations.  ADM Rebuttal Br. at 8-10.  P.R. 216.

ADM Br. at 14.

> See also ADM Rebuttal Brief, which stated the following:

> It is indisputable that both countries {i.e., Togo and Iran} export phosphate rock with a $P_2O_5$ content similar to the $P_2O_5$ content of both Russian phosphate rock and the rock exported from Brazil, Finland, and South Africa during the period of review.  Specifically, 100% of the reported export transactions for Togo and Iran in 2021 that are included in the GTA and/or UN Comtrade databases consists of phosphate rock with an average $P_2O_5$ (grade) content of 35.7% or higher.  See Appendix 9 to JSC Apatit's Benchmark Submission in the slide captioned "World Phosphate Rock Production (2021)."  This slide shows that Togo's "Average Grade (% $P_2O_5$ content) was 35.85% and Iran's was 38.00%.

P.R. 216 at 6.

Accordingly, no basis exists to accept Mosaic's assertion that ADM did not provide to the Court or to Commerce record evidence to the effect that "processors of phosphate rock did not recognize any difference in the quality or suitability for use of phosphate rock produced from sedimentary ore deposits versus igneous deposits."

Finally, Mosaic's claim that "phosphate rock produced from sedimentary deposits {is} not "comparable" to phosphate rock produced from igneous deposits for purposes of Commerce's benchmarking analysis" is belied by the evidence that phosphate fertilizer producers in four countries imported rock produced from both sources of ore.  Mosaic Br. at 23. If these sources were not "comparable," then those producers would have imported rock produced from only one of the two types of ore deposits.  Commerce ignored this evidence of comparability, as noted above.

13

**D. This Court Possesses Ample Discretion to Consider the Relevance of the <u>Mosaic Decision</u> Despite Commerce's Unlawful and Arbitrary Refusal to Consider It**

Commerce's refusal to consider the decision in *The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (CIT 2023) (the "<u>Mosaic Decision</u>") due to ADM's alleged "untimely" submission of its notice of subsequent authority constitutes reversible error for the reasons that ADM has previously described. ADM Br. at 23-24.

Nevertheless, the government continues to defend Commerce's refusal to consider ADM's notice of subsequent authority on the ground that it contained "untimely new arguments." Gov. Br. at 36. But, by definition, a notice of subsequent authority is typically "untimely" only in the sense that it is filed after applicable filing deadlines have passed. Otherwise, a "subsequent" notice would not be required. That is why courts, including this Court, have uniformly accepted notices of subsequent authority despite the fact that, in this review, ADM had already filed its Case Brief and Rebuttal Brief.

Commerce also claims that the <u>Mosaic Decision</u> is distinguishable on its facts because that case did not consider the alleged distinction between phosphate rock produced from sedimentary ore versus igneous ore.[11] Gov. Br. at 35-36. <u>See also</u> Mosaic Br. at 31-32. This claim is an impermissible *post hoc* rationale of Commerce's counsel because Commerce never considered the relevance of the <u>Mosaic Decision</u> after finding that it was untimely submitted. *Guizhou Tyre Co., Ltd. v. United States*, 389 F. Supp. 3d 1315, 1325 (CIT 2019). The resolution of the benchmark calculation dispute might have been different had Commerce considered ADM's contentions concerning the opinion's relevance rather than declaring it untimely.

---

[11] While accurate, this claim is a distinction without a difference. The critical similarity between the facts in that case and the facts here is that The Mosaic Company in the Moroccan phosphate fertilizer case sought to have Commerce reject two allegedly lower-quality Egyptian phosphate rock prices from its Tier 3 benchmark calculation.

Third, Commerce grudgingly concedes that "even if Commerce erred in refusing to accept" ADM's notice, it was "harmless error" since Commerce explained its evidence and supported its determination with substantial evidence.  Gov. Br. at 37.  Be that as it may, the suggestion of harmless error is refuted by Commerce's amendment to its regulation that expressly authorizes the filing of notices of subsequent authority.  Effective on April 24, 2024, Commerce published its regulation governing the provision of notices of subsequent authority.  See 89 Fed. Reg. 20,766 (Dep't Commerce Mar. 25, 2024).  In the preamble to that regulation, Commerce stated that:

> {W}hile an administrative segment is ongoing, a Federal court may issue a holding, or Commerce may issue an administrative decision, in another case which an interested party believes is directly applicable to an issue currently before the agency.  When that occurs, the interested party may file on the record a Notice of Subsequent Authority.  The uniqueness of a Notice of Subsequent Authority is that the subsequent authority may occur at any time, including after the time for new factual information under § 351.301(c) has passed, after briefs and rebuttal briefs have been filed consistent with § 351.309(c) and (d), and possibly right up until Commerce issues a final determination or final results in a segment of an AD or CVD proceeding.

89 Fed. Reg. at 20,780.  Notably, Commerce did not say that this statement was prospective in effect.  The policy had always been in effect.  What was new was that it was enacting a regulation that made explicit what was always implicit.[12]

Mosaic adds the argument that ADM's notice was "a pretext to rehash arguments it had already made in its administrative case brief."  Mosaic Br. at 6.  However, this was not the basis for Commerce's rejection of ADM's submission.  Rather, it is merely the impermissible *post hoc* rationale of the Defendant-Intervenor's counsel.

---

[12] Mosaic acknowledges that Commerce's final rule, discussed above, in which it expressly recognized the circumstances in which an interested party could file a notice of subsequent authority, clarified "an area of ambiguity."  Mosaic Br. at 30.  This is an implicit admission that, as ADM has contended, Commerce was merely making explicit what had always been implicit.

Finally, regardless of Commerce's erroneous decision, this Court possesses ample discretion to consider that opinion's relevance to the issues that ADM has raised, and which it explained in its Rule 56.2 motion. Id. at 19-23. See also ADM's September 21, 2023 Notice of Subsequent Authority. P.R. 234. Neither the government nor Mosaic contends that this Court cannot at this time consider the relevance of the Mosaic Decision.

On the merits, the two prices that the Mosaic Decision held should be included in the benchmark calculation applied to phosphate rock that fell within the same quality range, i.e., the BPL content range, of the phosphate rock that OCP, the mandatory respondent in that case, produced. The situation here is the same – the phosphate rock that Togo and Iran produced from sedimentary ore fell within the same BPL content (quality) range as the phosphate rock that JSC Apatit produced. Therefore, under the Mosaic Decision, Commerce had no basis to exclude the export prices of that rock from its benchmark calculation.[13]

## III.    CONCLUSION

For the foregoing reasons, as well as the reasons provided in ADM's Rule 56.2 motion, ADM respectfully requests that the Court: (1) grant its Rule 56.2 Motion for Judgment on the Agency Record: (2) find that Commerce's calculation of the Tier 3 benchmark for valuing phosphate rock mining rights was not supported by substantial evidence and was not otherwise in accordance with law; and (3) remand the final determination with an instruction to recalculate

---

[13] Mosaic also asserts that "These are two different pieces of evidence on two different records, which Commerce considered for different purposes in the context of their respective segments." Mosaic Br. at 32. However, despite any factual differences, this Court can consider the relevance of the Mosaic Decision by analogy. Neither Mosaic nor Commerce contends to the contrary. Rather, they rely on factual differences, not the principled basis upon which Judge Stanceu made his decision. The same principles apply here for the reasons that ADM has previously explained.

the Tier 3 benchmark used to measure the benefit of mining rights provided for LTAR, as well as

JSC Apatit's resulting CVD margin, consistent with the arguments set forth above.

                                    Respectfully submitted,

                                    /s/ Warren E. Connelly
                                    Warren E. Connelly
                                    Robert G. Gosselink
                                    Jonathan M. Freed
                                    Kenneth N. Hammer

                                    TRADE PACIFIC PLLC
                                    700 Pennsylvania Avenue, SE
                                    Suite 500
                                    Washington, D.C. 20003
                                    (202) 223-3760
                                    wconnelly@tradepacificlaw.com

                                    Counsel for the Archer Daniels Midland Company

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that the foregoing Reply Brief complies with the word count limitation in the Standard Chambers Procedures.  This Brief contains 5,370 words according to the word count function used in the word processing software used to prepare this Reply Brief.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E Connelly

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760
wconnelly@tradepacificlaw.com