ARCHER DANIEL MIDLAND COMPANY,

        Plaintiff,

  and

JOINT STOCK COMPANY APATIT,

        Plaintiff-Intervenor, and
        Consolidated Plaintiff,

  and

THE MOSAIC COMPANY,

        Consolidated Plaintiff,

        v.

UNITED STATES,

        Defendant,

  and

THE MOSAIC COMPANY,

        Defendant-Intervenor,
        and Consolidated
        Defendant-Intervenor,

  and

JOINT STOCK COMPANY APATIT,

        Consolidated Defendant-
        Intervenors.

Consol. Court No. 23-00239

## THE MOSAIC COMPANY'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
  LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated: January 22, 2025

*Counsel for The Mosaic Company*

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION .......................................................................................................... 1

II. ARGUMENT .............................................................................................................. 2

    A.  **Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law** ................................................................2

        1.  **The Legal Framework for 19 C.F.R. § 351.511(a)(2)(ii)** ........................................ 2

        2.  **Defendants Misinterpret the Requirements of 19 C.F.R. § 351.511(a)(2)(ii)** ........ 3

        3.  **Record Evidence Demonstrates that the Kazakh Export Prices Were Not Available to Russian Purchasers as Required by 19 C.F.R. § 351.511(a)(2)(ii)** .... 7

        4.  **Kazakh Gas Prices are Not Suitable As a Benchmark Because They Are Distorted** ................................................................................................................ 11

III. CONCLUSION ........................................................................................................ 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Regulations**

19 C.F.R. § 351.511 ......................................................................................... *passim*

**Administrative Determinations**

*Countervailing Duties*, *Preamble*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov.
    25, 1998) ..........................................................................................2, 3, 4, 5

*Granular Polytetrafluoroethylene Resin From the Russian Federation: Final
    Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't
    Commerce Jan. 25, 2022) .........................................................................8, 9

*Phosphate Fertilizers From the Russian Federation: Final Results of
    Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182
    (Dep't Commerce Nov. 6, 2023) ...............................................................1, 2

*Phosphate Fertilizers From the Russian Federation: Preliminary Results and
    Partial Rescission of the Countervailing Duty Administrative Review; 2020–
    2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ...............................7, 8

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results
    of Countervailing Duty Administrative Review and Intent To Rescind the
    Review in Part; 2016*, 83 Fed. Reg. 63,472 (Dec. 10, 2018)............................ 11-12

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of
    Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056
    (Dep't Commerce Mar. 20, 2020)...........................................................11

**Cases**

*CS Wind Viet. Co. v. United States*,
    832 F.3d 1367 (Fed. Cir. 2016)...............................................................11

*DynaEnergetics U.S. Inc. v. United States*,
    203 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) ..................................................8, 10

*Kisor v. Wilkie*,
    588 U.S. 558 (2019)..........................................................................4, 5

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009).................................................................11

*RHP Bearings Ltd. v. United States*,
    288 F.3d 1334 (Fed. Cir. 2002).................................................................13

## I.  <u>INTRODUCTION</u>

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits this reply brief in support of its Rule 56.2 motion for judgment upon the agency record challenging certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the first administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from the Russian Federation ("Russia").  *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), P.R. No. 246, ECF No. 23-4 ("Final Results"), and accompanying Issues and Decision Memorandum, P.R. No. 242, ECF No. 23-5 ("IDM").

This reply brief addresses arguments that Defendant, the United States ("Defendant") and Plaintiff-Intervenor, Consolidated Plaintiff, and Defendant-Intervenor Joint Stock Company Apatit ("JSC Apatit") (collectively, "Defendants") made in their response briefs.  *See* Defendant's Response to Plaintiffs' Motions for Judgement Upon the Agency Record (Nov. 21, 2024), ECF No. 49 ("Def.'s Response Br."); JSC Apatit's Response Brief in Opposition to Plaintiff's Motion for Judgment on the Agency Record (Dec. 12, 2024), ECF No. 53 ("JSC Apatit Response Br.").  As Mosaic demonstrates below, Defendants fail to rebut Mosaic's arguments that Commerce's selection of Kazakh natural gas export prices as a tier two benchmark for natural gas is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.  Given these failed rebuttals, Mosaic respectfully requests that the Court grant its motion for judgment on the agency record and remand to Commerce for redetermination consistent with the Court's opinion.

## II.    ARGUMENT

### A.    Commerce's Selection of Kazakh Export Prices as a Tier Two Benchmark for Natural Gas is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law

In the *Final Results*, Commerce used Kazakh natural gas export prices sourced from Kazakhstan's Bureau of Natural Statistics ("BNS") as a tier two benchmark to measure the benefit of the subsidy that the GOR conferred on JSC Apatit through the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") program.  As Mosaic demonstrated in its opening brief, Commerce's determination was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.  Mosaic 56.2 Br. at 11-21.  Defendants' defenses of Commerce's determination are without merit, and the Court should remand to Commerce for redetermination consistent with the Court's opinion.

### 1.    The Legal Framework for 19 C.F.R. § 351.511(a)(2)(ii)

Section 351.511(a)(2) of Commerce's regulations sets out the three-tier hierarchy that Commerce uses to select benchmarks to measure the adequacy of remuneration paid for goods or services.  19 C.F.R. § 351.511(a)(2).  Under tier two (the tier at issue in this dispute), Commerce seeks to perform this calculation by "comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).

Commerce stated in the IDM that "there is no language in the regulation or discussion in the *CVD Preamble* indicating that 'available' must be interpreted as available to private entities, nor is there text equating 'available' to prices that are available to 'consumers.'"  IDM at 47.  Mosaic explained in its opening brief why Commerce's interpretation of the regulation is wrong.  The *Preamble* to the CVD regulations does in fact refer to benchmark prices that are available to consumers.  Mosaic 56.2 Br. at 15.  Specifically, in discussing what it means for a world market

2

price to be "available to purchasers" within the meaning of § 351.511(a)(2)(ii), the *Preamble* states that Commerce:

> will consider whether the market conditions are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) ("*Preamble*"). As this excerpt makes clear, in the context of tier two of Commerce's benchmark methodology, the *Preamble* does equate prices that are available to purchasers to prices that are available to consumers. Indeed, the *Preamble* uses the terms interchangeably.

Further, section 351.511(a)(2)(iii) of Commerce's regulation (addressing tier three of Commerce's methodology) states that "if there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). The *Preamble* explains that this paragraph applies:

> in situations where the government is clearly the only source available to consumers in the country . . . . Where the government is the sole provider of a good or service, and there are not world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles . . . .

*Preamble*, 63 Fed. Reg. at 65,378. Thus, in the context of tier three as well, the *Preamble* treats "purchasers" as synonymous with "consumers."

## 2. Defendants Misinterpret the Requirements of 19 C.F.R. § 351.511(a)(2)(ii)

Defendant argues that "neither of these passages {in the *Preamble*} stand for the proposition that, in the context of tier-two benchmarks, 'available' is narrowly defined and must equate to available to private entities or consumers." Def.'s Response Br. at 26. Defendant misconstrues Mosaic's argument. Commerce erroneously stated in the IDM that "there is no . . .

discussion in the *CVD Preamble* indicating that 'available' must be interpreted as available to private entities, nor is there text equating 'available' to prices that are available to 'consumers.'" IDM at 47. The two *Preamble* passages that Mosaic cited directly refute this erroneous finding.

JSC Apatit takes a different approach, arguing that Mosaic is "implicitly" arguing that the regulation "requires 'purchasers' to mean '***private*** consumers' and that Mosaic "fails to demonstrate how 'purchasers' in 19 C.F.R. § 351.511(a)(2)(ii) must mean private consumers." JSC Apatit Response Br. at 14 (emphasis original). JSC Apatit is trying to create a strawman. To be clear, Mosaic is arguing that a world market price must be one that would be available to consumers of the good or service, which (contrary to JSC Apatit's characterization of Mosaic's argument) could include privately-owned and state-owned entities. For example, if the record evidence in this case had shown that JSC Apatit had the ability to purchase Kazakh natural gas on the world market, then the prices of that natural gas would have been available to JSC Apatit, and thus would have satisfied the requirements of section 351.511(a)(2)(ii). However, the evidence actually showed that JSC Apatit did not have that ability, and thus that Kazakh export prices were not available to JSC Apatit or any other Russian consumers of natural gas, as discussed further below. The Kazakh export prices were only available to Gazprom's Orenburg Processing Plant, through a tolling arrangement between Gazprom and its Kazakh joint venture partner, KazRosGas ("KRG"). Gazprom is a producer and processor of natural gas, not a consumer.

Defendant argues that "Mosaic can point to no authority requiring Commerce to interpret the term 'available' in 19 C.F.R. § 351.511(a)(2)(ii) as referring only to consumers or private entities" and that "Mosaic provides no instances in which Commerce has interpreted 'available' in that manner." Def.'s Response Br. at 26. Mosaic agrees this case presents a novel question of

regulatory interpretation that the courts have not yet addressed. However, Commerce's own

interpretation of its regulation in past cases only merits deference under *Auer* and *Kisor* if the

Court finds, after exhausting all the traditional tools of construction, that the regulation is

genuinely ambiguous. *Kisor v. Wilkie*, 588 U.S. 558, 559 (2019). In this case, it is not: the

regulation and the *Preamble* are clear that a tier two benchmark must be based on the price that

would be available to purchasers – *i.e.*, consumers – in the country in question.

JSC Apatit similarly argues in its response brief that Commerce's interpretation of its

regulation is entitled to "substantial deference," citing *Martin v. Occ. Safety and Health Review

Comm'n.*[1] JSC Apatit Response Br. at 15-16. However, JSC Apatit ignores the Supreme

Court's holding in *Kisor* that "the possibility of deference can arise only if a regulation is

genuinely ambiguous." 588 U.S. at 573. "{I}f the law gives an answer – if there is only one

reasonable construction of a regulation – then a court has no business deferring to any other

reading, no matter how much the agency insists it would make more sense." *Id.* at 575. The

Supreme Court in *Kisor* also held that "before concluding that a rule is genuinely ambiguous, a

court must exhaust all the 'traditional tools' of construction," and "only when that legal toolkit is

empty and the interpretive question still has no single right answer can a judge conclude" that the

regulation is ambiguous and consider whether the agency's interpretation merits deference.[2] *Id.*

The traditional tools of interpretation that the Court must carefully consider include the

text, structure, history, and purpose of the regulation. *Id.* Mosaic explained in its opening brief

---

[1] JSC Apatit also argues that Commerce's interpretation should be affirmed because it is not "plainly erroneous," citing *Seminole Rock*. JSC Apatit Br. at 16. However, the Supreme Court in *Kisor* held that even in the case of genuinely ambiguous regulations, the agency's interpretation must be "reasonable," as opposed to not "plainly erroneous," the formulation articulated in *Seminole Rock*. 588 U.S. at 576.

[2] *Auer* deference is only appropriate where the regulatory interpretation reflects the agency's "authoritative" or "official" position, rather than an *ad hoc* statement, and also reflects the "fair and considered judgment" of the agency, rather than a "convenient litigating position" or "*post hoc* rationalization." *Kisor*, 588 U.S. at 576-79. Commerce has been inconsistent in its application of the tier two regulation, *see* Mosaic 56.2 Br. at 16, which is further reason why Commerce's interpretation is not entitled even to *Auer* deference.

that the plain language of the regulation, the *Preamble*, and the purpose of the regulation support an interpretation of "available to purchasers" in section 351.511(a)(2)(ii) to mean "available to consumers" of the good or service that the government is providing for LTAR. Mosaic 56.2 Br. at 15-17. Specifically, the plain language of section 351.511(a)(2)(ii) states that a tier two benchmark is a world market price that would be "available to purchasers" in the country in question. *See* 19 C.F.R. § 351.511(a)(2)(ii). The *Preamble* provides an example of what this means, and it equates prices that are available to purchasers with prices that are available to consumers.[3] *Preamble,* 63 Fed. Reg. at 65,377. The language of section 351.511(a)(2)(ii) mirrors the wording of section 351.511(a)(2)(i), which states that Commerce will normally seek to measure the adequacy of remuneration by reference to a "market-determined" price. *See* 19 C.F.R. § 351.511(a)(2)(i). Thus, the best reading of the regulation is that "available to purchasers" in section 351.511(a)(2)(ii) means "available to consumers."

Moreover, the purpose of the regulation – to determine whether the government's provision of goods or services is for less than adequate remuneration, and thus provides a "benefit to the recipient" – also supports this interpretation. If a world market price is not available to consumers of the good or service in question (such as the respondent), it is not probative for measuring the "benefit to the recipient," and thus is not suitable for use as a tier two benchmark. Defendant fails to rebut these arguments, or even assert that the regulation is genuinely ambiguous. The Court should therefore reach its own conclusion and hold that Commerce's interpretation is not the best reading of the regulation.

---

[3] Indeed, the example uses the terms interchangeably, as noted above.

**3.    Record Evidence Demonstrates that the Kazakh Export Prices Were Not Available to Russian Purchasers as Required by 19 C.F.R. § 351.511(a)(2)(ii)**

Defendant argues that "{t}he relevant question is whether Kazakh natural gas is available to Russian purchasers, not the prices at which such gas is made available."  Def. Response Br. at 26-27; JSC Apatit Response Br. at 17.  This argument misrepresents the plain language of the regulation.  Section 351.511(a)(2)(ii) states that Commerce: "will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  The phrase "available to purchasers" is the predicate of "such price"; in other words, the tier two regulation states that the world market price itself must be "available to purchasers" in the subject country in order to be selected as a benchmark.  The *Preamble* states that, in assessing whether there are "world market prices that *would be available* to the purchaser," Commerce "will consider whether the market conditions in the country are such that it is reasonable to conclude the purchaser could obtain the good or service on the world market."  *Preamble* at 65,377 (emphasis original).  Thus, the relevant question is not just whether Kazakh natural gas is available to Russian purchasers, but rather whether it is available for purchase on the world market, at the world market price.  The record is clear that the answer is no.

Specifically, the record of this review shows that Gazprom – a Russian government authority – is the sole importer of Kazakh gas.  There is only one natural gas pipeline connecting Kazakhstan and Russia that terminates in Russia, the Karachaganak Orenburg Transportation System pipeline.  *Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) P.R. No. 187, and accompanying Preliminary Decision

Memorandum, P.R. No. 188 ("PDM") at 16-17; IDM at 46.  This is a trunk pipeline that

terminates at Gazprom's Orenburg Gas Processing Plant in Orenburg, Russia.  PDM at 17; IDM

at 46; JSC Apatit Benchmark Submission, Appendix 4 at 4, 14, P.R. No. 146, C.R. No. 182.  The

record shows that, during the POR, Kazakh natural gas producer Karachaganak Petroleum

Operating BV ("KPO") sold a small volume of "raw (high sulfur)" or "sour" gas to Gazprom's

Orenburg Gas Processing Plant pursuant to a tolling arrangement between Gazprom and its

Kazakh joint venture partner, KRG.  Mosaic Benchmark Rebuttal Submission, Exhibit 8 at 118,

122, 132, P.R. Nos. 163-164; JSC Apatit Benchmark Submission, Appendix 4 at 4, 14, P.R.

No.146, C.R. No. 182.  This is the only natural gas exported from Kazakhstan to Russia during

the POR, as reflected in the BNS export statistics.  *See* PDM at 17; IDM at 46-47.  Such prices

are not "world market prices" for natural gas that would have been "available to" consumers in

Russia, or in fact to any purchasers other than Gazprom, a Russian government authority that is a

producer and processor of natural gas, not a consumer.

Further, after processing the gas, Gazprom re-exports the finished gas back to

Kazakhstan.  Mosaic Benchmark Rebuttal Submission, Exhibit 8 at 132, P.R. No. 164; JSC

Apatit Benchmark Submission, Appendix 4 at 14, P.R. No. 146, C.R. No. 182.  To the extent that

any finished Kazakh gas remains in Russia after Gazprom processes it, it is a new and different

product that would be sold by Gazprom – *i.e.*, by the GOR – to consumers in the distorted

Russian market at the GOR-regulated price.[4]  Such prices are also not "world market prices" that

would be "available to purchasers" in Russia.

---

[4] Defendants assert that Mosaic has "acknowledged that Gazprom (the owner of the plant) sells Kazakh natural gas domestically."  Def.'s Response Br. at 25.  To the contrary, Mosaic stated that "{t}*o the extent* any finished Kazakh gas remains in Russia after processing, it consists of a product processed and sold by Gazprom."  Mosaic Case Br. At 7 (emphasis added).  In other words, it was a hypothetical.  Neither Commerce nor the Defendants have pointed to any record evidence showing that Gazprom actually did sell Kazakh gas to Russian consumers, much less that KPO did.

The result in this case is even more unreasonable because Commerce ultimately excluded the BNS values for Kazakh exports to Russia from the benchmark calculation. Instead, Commerce used the values for Kazakh gas exports to third countries (other than China), *see* PDM at 17, which are certainly not world market prices that would have been "available to purchasers" in Russia within the meaning of the regulation. *See* 19 C.F.R. § 351.511(a)(2)(ii). Defendants point to this absurd result as a reason to sustain Commerce's decision. *See* Def.'s Response Br. at 23 ("Commerce concluded that Kazakh-origin natural gas was available to Russian purchasers during the period of review, and that exports of Kazakh natural gas were non-distorted, such that non-Russian markets would be an appropriate tier-two benchmark."). But this logic flies in the face of the regulation's plain language: a tier-two benchmark must reflect world market prices that would be "available to purchasers" *in Russia*. The Kazakh export prices for natural gas do not qualify.

Defendant argues that Commerce "has already considered and rejected a similar argument as not relevant to the availability of Kazakh natural gas under a tier-two analysis," citing *PTFE From Russia*. Def.'s Response Br. at 25. To the contrary, Commerce's decision in that case did not address the question of what constitutes a price that is "available to purchasers" in the subject country within the meaning of section 351.511(a)(2)(ii), which is the key question at issue here. *See Granular Polytetrafluoroethylene Resin From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022), and accompanying Issues and Decision Memorandum ("*PTFE From Russia* IDM") at 20. Commerce's decision in *PTFE From Russia* is therefore irrelevant to the Court's analysis.

Finally, Defendant disputes Mosaic's contention that Commerce unlawfully disregarded evidence contrary to its determination, namely, evidence from Russia's World Trade

Organization Accession Protocol showing that GOR customs code 2711210000 covers "Natural

gas (*excluding as sold to the population*)." Defendant characterizes this as a "shred" of evidence

that "does not remotely concern the period of review," and "does not outweigh the more

substantial evidence indicating that Kazakh gas was available to Russian purchasers." Def.'s

Response Br. at 24-25; *see also* JSC Apatit Response Br. at 13-14.

As an initial matter, Commerce did not raise any concerns about the contemporaneity of

this evidence in its decision, so Defendant's argument is a *post hoc* rationalization. *See* IDM at

46-49. It is well established that Commerce's determinations may be upheld, if at all, only on

the basis of the reasoning articulated by the agency itself. *DynaEnergetics U.S. Inc. v. United

States*, 203 F. Supp. 3d 1351, 1355 (Ct. Int'l Trade 2017) (citing *Burlington Truck Lines, Inc. v.

United States*, 371 U.S. 156, 168–69 (1962)).

Further, Defendants do not dispute that this evidence contradicts Commerce's

conclusion.[5] Def. Response Br. at 24-25; *see also* JSC Apatit Response Br. at 13-14. To the

extent that Commerce had concerns regarding the contemporaneity of this evidence or the proper

weight that should be accorded to it, Commerce should have explained its reasoning in the IDM.

Commerce's failure to address this evidence and Mosaic's arguments related to this evidence

render its determination unsupported by substantial evidence and otherwise not in accordance

---

[5] JSC Apatit argues that "Commerce correctly disregarded this evidence as it is not relevant to the time period at
issue" because "{t}he record is bereft of any evidence . . . that this singular tariff code description from more than
20 years ago was still applicable during the POR." JSC Apatit Br. at 13. The document in question is part of
Russia's Accession Protocol to the WTO, which included a list of "goods and services for internal consumption for
which prices are regulated by the Government of the Russian Federation." Mosaic Benchmark Rebuttal Submission,
Ex. 12, P.R. No. 165. This list identifies HS code 271121 with the description "Natural gas (excluding as sold to the
population)." *Id.* This document is not a tariff schedule and nothing in the document indicates a temporal
limitation. Further, as noted above, Commerce provided no explanation of any purported concerns regarding the
contemporaneity of this evidence in its decision. IDM at 46-49. Finally, JSC Apatit has failed to point to any
evidence indicating that the tariff code was *not* still applicable during the POR. Presumably, if there were such
evidence, JSC Apatit or the GOR would have submitted it.

with law.[6]  *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *NMB*

*Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

Defendant's contention that this "shred" of evidence is somehow "outweigh{ed}" by

other evidence also fails.  As explained above, there is in fact no evidence on the record that

Kazakh export prices were available to Russian purchasers.

In sum, the Court should find that Commerce misinterpreted section 351.511(a)(2)(ii) and

the record evidence and hold the selection of Kazakh export prices as a tier two benchmark for

natural gas unreasonable, unsupported by substantial evidence, and otherwise not in accordance

with law.

### 4.      Kazakh Gas Prices are Not Suitable As a Benchmark Because They Are Distorted

Mosaic explained in its opening brief that Commerce's selection of Kazakh export prices

as a tier two benchmark is unsupported by substantial evidence and otherwise contrary to law

because all Kazakh gas prices – including both domestic and export prices – are distorted by the

Government of Kazakhstan's ("GOK") significant involvement in the market.  Mosaic 56.2 Br.

at 19-21.  Mosaic also explained that Commerce has previously relied on very similar evidence

about the GOR's involvement in the Russian gas market to find that Russian export prices for

natural gas are distorted.  *Id.* at 20-21 (citing *Steel Concrete Reinforcing Bar From the Republic*

*of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg.

16,056 (Dep't Commerce Mar. 20, 2020), accompanying Issues and Decision Memorandum at

23 (citing, *e.g.*, *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary*

---

[6] Defendant also argues that Commerce's decision comports with prior proceedings in which the GOR reported that imports under customs code 2711210000 are released into free circulation.  Def.'s Response Br. at 24.  As Mosaic explained in its opening brief, the GOR's questionnaire responses in this proceeding do not contain any such facts. *See* Mosaic 56.2 Br. at 14.  Therefore, this does not constitute evidence in support of Commerce's determination.

*Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part;*

*2016*, 83 Fed. Reg. 63,472 (Dep't Commerce Dec. 10, 2018) and accompanying Preliminary

Decision Memorandum at 22)). It was arbitrary and capricious for Commerce to reject Mosaic's

evidence of the GOK's significant involvement in the market as irrelevant to its finding that

Kazakh export prices are suitable as a tier two benchmark.

Defendant argues that "Mosaic failed to provide sufficient evidence to support a

determination that Kazakh government interference even distorts the natural gas export market,

and JSC Apatit's submissions show that Kazakh natural gas exports are not distorted." Def.'s

Response Br. at 27 n.3. Defendant's cursory argument in a footnote is another *post hoc*

rationalization. As noted above, Commerce's determination may be upheld, if at all, only on the

basis of the reasoning articulated by the agency itself. *DynaEnergetics U.S. Inc.*, 203 F. Supp.

3d at 1355 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962)).

Commerce failed to explain why the evidence Mosaic presented of the GOK's significant

involvement in the market is insufficient to show Kazakh export prices are distorted, or why the

evidence that JSC Apatit submitted outweighs the evidence Mosaic submitted.[7] *See* IDM at 48-

49. The Court should reject Defendant's impermissible attempt at *post hoc* rationalization and

remand to Commerce for further explanation.

Defendant also claims that Commerce's decision in *Steel Concrete Reinforcing Bar From*

*the Republic of Turkey* is distinguishable because in that case, Commerce determined that the

---

[7] Defendant cites only one exhibit from JSC Apatit's benchmark submission: the KPO Sustainability Report. Def. Response Br. at 27 n.3 (citing JSC Apatit Benchmark Submission, Appendix 4). KPO is a Kazakh oil producer that is partially owned by the Kazakh national oil and gas company, KazMunayGas. JSC Apatit Benchmark Submission, Appendix 4 at 4, P.R. No. 146, C.R. No. 182. According to its Sustainability Report, KPO only sells "raw" (or "sour") gas to KazRosGaz under a long-term Gas Sales Agreement for processing at Gazprom's Orenburg Gas Processing Plant (*i.e.*, the Gazprom tolling agreement discussed previously). *Id.* at 14. The remainder of KPO's gas is either re-injected into its oil reservoirs to maintain reservoir pressure or used to generate electricity at KPO facilities. *Id.* Contrary to Defendant's argument, this evidence does not show "that Kazakh natural gas exports are not distorted." *Cf.* Def.'s Response Br. at 27 n.3.

GOR had distorted natural gas export prices for "geopolitical reasons" and Mosaic did not provide similar evidence of Kazakh export price distortion. Def. Response Br. at 28; JSC Apatit Br. at 20 n.3. This is yet another example of Defendant seeking to provide a *post hoc* rationalization for Commerce's failings: Commerce itself made no such finding. Instead, Commerce completely failed to address Mosaic's argument regarding *Steel Concrete Reinforcing Bar From the Republic of Turkey*, and the similarities of the evidence in that case and the evidence that Mosaic presented of the GOK's interventions in the market. *See* IDM at 48-49.

JSC Apatit argues that *Steel Concrete Reinforcing Bar From the Republic of Turkey* is distinguishable because Commerce relied on prior findings from another case that the Russian gas market was distorted. JSC Apatit Br. at 19 (citing *Cold-Rolled Steel Flat Products From the Russian Federation*). Contrary to JSC Apatit's arguments, the fact that there has been "no separately conducted investigation of Kazakhstan's domestic natural gas market" does not excuse Commerce's obligation to address Mosaic's arguments and provide a reasoned explanation for reaching a different conclusion when presented with very similar evidence regarding the GOK's involvement in the Kazakh market and state-owned KTG's control over the distribution and export of Kazakh gas. *See RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (holding that "'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently'") (citation omitted).

Thus, Defendants fail to rebut Mosaic's arguments that Commerce's decision was unsupported by substantial evidence and arbitrary and capricious. The Court should therefore remand to Commerce for reconsideration of its benchmark selection.

### III.    <u>CONCLUSION</u>

For the reasons discussed above, Mosaic respectfully requests that the Court reject all arguments made by Defendants and grant Mosaic's motion for judgment on the agency record in its entirety.

Respectfully submitted,

<u>/s/ David J. Ross</u>
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
   LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: January 22, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this reply brief complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Hale LLP's word processing system, is 4,428 words.

<u>/s/ David J. Ross</u>
(Signature of Attorney)

<u>David J. Ross</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>January 22, 2025</u>
(Date)