UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                                )
ARCHER DANIELS MIDLAND COMPANY,                 )
                                                )
              Plaintiff,                         )
                                                )
         and                                    )
                                                )
JOINT STOCK COMPANY APATIT,                     )
                                                )
              Plaintiff-Intervenor, and         )
              Consolidated Plaintiff,           )
                                                )
         and                                    )
                                                )
THE MOSAIC COMPANY,                             )
                                                )
              Consolidated Plaintiff            )
                                                )
         v.                                     )      Consol. Court No. 23-00239
                                                )
UNITED STATES,                                  )      **NON-CONFIDENTIAL VERSION**
                                                )
              Defendant,                         )      Business Proprietary Information
                                                )      removed at page 19
                                                )
THE MOSAIC COMPANY,                             )
                                                )
              Defendant-Intervenor, and         )
              Consolidated Defendant-Intervenor )
                                                )
         and                                    )
                                                )
JOINT STOCK COMPANY APATIT,                     )
                                                )
              Consolidated Defendant-Intervenor. )
_____)

**PLAINTIFF INTERVERNOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S REPLY BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda


HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to JSC Apatit*

January 22, 2025

# **TABLE OF CONTENTS**

I.  SUMMARY OF THE ARGUMENT ............................................................................. 1

II.  DEFENDANTS' POST HOC RATIONALIZATIONS FAIL TO CURE THE FATAL FLAWS IN COMMERCE'S PHOSPHATE ROCK BENCHMARK SELECTION ........................................................................................................ 4

    A.  Commerce's Benchmark Selection is Inconsistent with the "Best Reading" of the Governing Statute and Conflates the Agency's Statutory and Regulatory Obligations ........................................................................... 4

    B.  Defendants Fail to Demonstrate that the Type of Phosphate Ore is a Predicate for Inclusion in Commerce's Export Sale Price Benchmark ................. 9

    C.  Defendants Fail to Sustain Commerce's Decisions to Disregard Additional Export Pricing Data for Phosphate Rock ............................................ 12

III.  COMMERCE'S FAILURE TO EMPLOY GROSS PROFIT TO CALCULATE JSC APATIT'S PROFIT RATIO OR OTHERWISE ACCOUNT FOR ADDITIONAL EXPENSES INCURRED IS CONTRARY TO LAW ........................... 16

IV.  COMMERCE FAILED TO ADDRESS REASONABLY THE INFORMATION JSC APATIT PROVIDED REGARDING ITS INDEPENDENT GAS SUPPLIERS ............................................................................................................. 18

V.  COMMERCE FAILED TO CALCULATE A CVD MARGIN FOR JSC APATIT BASED ON FULL POR DATA—THIS ERROR MUST BE CORRECTED ON REMAND ................................................................................................. 20

VI.  CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Chevron, U.S.A., Inc. v. N.R.D.C, Inc*,
467 U.S. 837 (1984)................................................................................................ 2

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)................................................................................ 22

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)............................................................................................. 2, 8

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ......................................................... 5

*PT. Zinus Glob. Indonesia v. United States*,
628 F.Supp.3d 1252 (Ct. Int'l Trade 2023) ........................................................... 5

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)................................................................ 16, 17, 22

*Risen Energy Co. v. United States*,
658 F.Supp.3d 1364 (Ct. Int'l Trade 2023) .................................................... 11, 20

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001).............................................................................. 19

*The Mosaic Co. v. United States*,
Slip Op. 23-134, Ct. No. 21-116 (Ct. Int'l Trade Sept. 14, 2023) ........................ 10

*Tri Union Frozen Prods., Inc. v. United States*,
163 F.Supp.3d 1255 (Ct. Int'l Trade 2016), *aff'd*, 741 F.App'x 801 (Fed. Cir. 2018) ............ 5

### STATUTES

19 U.S.C. § 1677(5)(E) .................................................................................... 2, 4, 8, 9

### OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner, Reading Law (2012)............................................ 8

*Certain Collated Steel Staples from the People's Republic of China*,
87 Fed. Reg. 47,980 (Dep't Commerce Aug. 5, 2022) and accompanying Calculations ....... 21

*Certain Oil Country Tubular Goods from India*,
82 Fed. Reg. 18,282 (Dep't Commerce Apr. 18, 2017), and accompanying IDM ................ 22

*Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China*,
83 Fed. Reg. 11,694 (Dep't Commerce Mar. 16, 2018), and accompanying IDM ............... 22

*Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)..................................... 7, 8

*Large Diameter Welded Pipe from the Republic of Korea*,
   87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022) (final results of the countervailing
   duty administrative review; 2018-19), and accompanying IDM ............................................. 21

Letter from WilmerHale to the U.S. Department of Commerce,
   *Phosphate Fertilizers from Morocco: Petitioner's Submission of Factual Information
   to Measure the Adequacy of Remuneration*, Case No. C-714-001 (2020-21 Review)
   (Mar. 22, 2023) ............................................................................................................................... 12

*Multilayered Wood Flooring from the People's Republic of China; Final Results of
   Countervailing Duty Administrative Review; 2021*,
   89 Fed. Reg. 41,939 (Dep't Commerce May 14, 2024), and accompanying IDM ................. 15

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing
   Duty Determination*,
   86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying IDM ............. 10, 17

*Phosphate Fertilizers From The Kingdom of Morocco: Final Results of Countervailing
   Duty Administrative Review; 2020-2021*,
   88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying IDM ...... 10, 11, 17

<u>R<small>EGULATIONS</small></u>

19 C.F.R. § 351.511(a)(2)(iii) ...................................................................................................... 2, 5

19 C.F.R. § 351.213(e) ...................................................................................................................... 21

19 C.F.R. § 351.511(a)(2) ................................................................................................................... 5

**PLAINTIFF INTERVERNOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S REPLY BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Intervenor and Consolidated Plaintiff, Joint Stock Company Apatit ("JSC Apatit"), respectfully submits this reply brief in support of its Rule 56.2 Motion for Judgment on the Agency Record and Memorandum in Support (ECF Nos. 39 and 40) ("JSC Apatit's Rule 56.2 Br."). JSC Apatit addresses below the inapposite arguments presented by Defendants (the Government and the Mosaic Company) in their response briefs (ECF No. 49) ("Def. Br.") and (ECF No. 55) ("Mosaic's Br."). This Court should remand the Final Results of the first administrative review of the countervailing duty ("CVD") order on Phosphate Fertilizers from the Russian Federation, *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246), to the U.S. Department of Commerce ("Commerce" or the "Department"), to recalculate JSC Apatit's CVD margin consistent with the instructions of this Court.

## I.    SUMMARY OF THE ARGUMENT

The *Final Results* are contrary to law and unsupported by substantial evidence for the reasons set forth below and in JSC Apatit's Rule 56.2 Br. Specifically, Commerce has unlawfully

(1) Failed to select an accurate benchmark for the phosphate rock for less than adequate remuneration ("LTAR") program;

(2) Refused to make certain necessary adjustments to its phosphate rock benefit calculations, resulting in an inaccurate benefit being ascribed to JSC Apatit;

(3) Extrapolated its adverse facts available ("AFA") finding for the Government of Russia ("GOR") to JSC Apatit by countervailing its purchases of natural gas from independent producers; and

1

(4) Refused to calculate the CVD rate for JSC Apatit based on record evidence and benchmark data spanning the entirety of the period of review ("POR").

This Court should remand these unlawful decisions by Commerce for further consideration, consistent with the record evidence and the appropriate standard of review.

Defendants unpersuasively contend that the *Final Results* can somehow be remedied by certain post hoc rationalizations and incorrect explanations of the applicable law. First, Defendants assert that Commerce has broad discretion to interpret "prevailing market conditions," thereby permitting the agency to assess only one of the factors, "quality," explicitly enumerated in the governing statute. This is false—the Supreme Court has recently instructed this Court to ensure that Commerce employs the "best reading of the statute." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 373 (2024) (overruling *Chevron, U.S.A., Inc. v. N.R.D.C, Inc*, 467 U.S. 837 (1984)). Furthermore, Defendants err by conflating the factors relevant to Commerce's statutory obligation to assess "prevailing market conditions," in 19 U.S.C. § 1677(5)(E), with its regulatory obligation to establish a benchmark "consistent with market principles," in 19 C.F.R. § 351.511(a)(2)(iii).

Second, Defendants erroneously contend that alleged production differences between igneous and sedimentary phosphate rock require Commerce to consider only igneous rock in its "third tier" benchmark calculation. But, Defendants' claim fails to account for the fact that any alleged differences between the production costs of igneous and sedimentary phosphate rock are inherently reflected in sales prices. Moreover, Commerce's unlawful decision to rely solely on igneous rock contributed to its impermissible disregard of additional benchmark data from Eurostat, GTA/UN Comtrade (Togo and Iran), and GTT (the third harmonized tariff schedule ("HTS") code for South Africa).

Third, Defendants argue that Commerce correctly rejected JSC Apatit's request to use gross profit in the profit ratio calculation (or, at minimum, to account for additional expenses).

But, in so doing, Defendants acknowledge that the approach undertaken in the *Final Results* did not account for all the additional costs related to JSC Apatit's mining and production of phosphate rock. This was wrong. In order to calculate an accurate profit ratio that properly compares the cost of production to the export sales price, Commerce must add the profit inherently included in a benchmark export price to the cost of production (i.e., gross profit).

Fourth, Defendants ignore they key question relevant to Commerce's application of AFA with respect to JSC Apatit's suppliers of natural gas. That is, JSC Apatit does not contest Commerce's application of AFA to the GOR—rather, the question before this Court is whether Commerce could also ignore the record evidence submitted *by JSC Apatit* to "fill the gap" and still determine that these suppliers are government authorities. The clear answer is no—especially where Commerce previously found in the original investigation that one of JSC Apatit's suppliers was not a government authority.

Finally, Defendants claim that Commerce has a "practice" of calculating a CVD margin based on data from only one calendar year when the POR extends into a second year by no more than two months. Defendants' legal support is inapposite. Moreover, as JSC Apatit supplied data covering the full POR at Commerce's explicit request, Commerce should have used the full POR data to calculate the CVD margin.

For all of these reasons and those set forth in JSC Apatit's Rule 56.2 Brief, the *Final Results* are not supported by substantial evidence and are contrary to law. The *Final Results* should be remanded to Commerce to correct its calculation of JSC Apatit's CVD margin, consistent with this Court's instructions.

## II.     DEFENDANTS' POST HOC RATIONALIZATIONS FAIL TO CURE THE FATAL FLAWS IN COMMERCE'S PHOSPHATE ROCK BENCHMARK SELECTION

The principal (unlawful) driver of JSC Apatit's CVD margin in the *Final Results* is the Department's erroneous calculation of the benefit ascribed to JSC Apatit with respect to the alleged mining rights for LTAR program. Commerce created a benchmark for the mining rights program that is neither reflective of prevailing market conditions for phosphate rock in Russia nor consistent with market principles. Thus, Commerce's benchmark is *per se* unlawful. Moreover, Commerce's benchmark is not supported by substantial evidence. Specifically, JSC Apatit submitted evidence to Commerce demonstrating the unreliability of its benchmark and, in the alternative, requested that the benchmark be modified consistent with the governing statute and regulations. Commerce ignored JSC Apatit's legal arguments, its benchmark evidence, and even its requests for adjustments. Defendants' attempts to justify Commerce's impermissible decisions amount to impermissible post hoc rationalizations and cannot sustain the unlawful *Final Results*.

### A.     Commerce's Benchmark Selection is Inconsistent with the "Best Reading" of the Governing Statute and Conflates the Agency's Statutory and Regulatory Obligations

The governing statute provides that the provision of a good by a government authority does not confer a benefit to the recipient unless the good is provided for less than adequate remuneration, which must be determined in relation to the "prevailing market conditions" for the good being provided in the country of provision of the good (here, Russia). 19 U.S.C. § 1677(5)(E). The statutory prevailing market conditions expressly include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id*. Accordingly, Commerce must assess the adequacy of remuneration for a good against a benchmark reflecting all of the prevailing conditions for the good under investigation within the country of export that are demonstrated by the record evidence. Only an approach that properly considers all

statutory factors and data on the record would "be a reasonable means of effectuating the statutory purpose." *PT. Zinus Glob. Indonesia v. United States*, 628 F.Supp.3d 1252, 1263 (Ct. Int'l Trade 2023) (citing *Tri Union Frozen Prods., Inc. v. United States*, 163 F.Supp.3d 1255, 1301 (Ct. Int'l Trade 2016), *aff'd*, 741 F.App'x 801 (Fed. Cir. 2018)).

Beyond the bounds set forth in the statute, Commerce must also follow the regulatory hierarchy set forth in 19 C.F.R. § 351.511(a)(2) for selecting a benchmark price. All parties agree that neither of the first two benchmarks are available with respect to phosphate rock. Memorandum from James Maeder to Lisa W. Wang, *Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russia Federation; 2020-2021*, Case No. C-821-825 (2020-21 Review) (Oct. 31, 2023) ("Final IDM") (P.R. 242) at 29. Commerce thus selected a "tier three" benchmark, which considers whether the price for the good in the country of export is "consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

Accordingly, Commerce needed to select a benchmark that (1) reasonably reflects the "prevailing market conditions" in Russia for the provision of mining rights (which Commerce has equated to cost of sales of phosphate rock), and (2) is consistent with market principles. Moreover, Commerce acknowledges that its benchmark selection is not unbounded and must comport with its obligation to calculate subsidy rates as accurately as possible. Final IDM at 29 (citing *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2015)) (P.R. 242).

Notwithstanding, Commerce selected a benchmark based on consideration of just **one** of the statutory factors, thereby failing to comply with both the statutory or regulatory requirements set forth above. Commerce claimed that, due exclusively to "quality" concerns, it was required to

use igneous phosphate rock export prices as a benchmark, and could not consider sedimentary rock export prices.  Final IDM at 29–31 (P.R. 242).  Therefore, Commerce elected to employ export data for phosphate rock from Brazil, Finland, and South Africa over much more robust and representative data on the record.  *E.g.*, JSC Apatit Rule 56.2 Br. at 11–12, 17 (demonstrating that Commerce's benchmark data account for a mere sliver of global phosphate rock exports).

As explained in JSC Apatit's Rule 56.2 Br. at Section VI.B, Commerce unlawfully ignored pricing information for European imports of phosphate rock during the POR (the "Eurostat data") that include Moroccan sales prices, based on commercial negotiations and market principles.  Final IDM at 37–38 (P.R. 242) (rejecting Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Benchmark Data Submission*, Case No. C-821-825 (2020-21 Review) (Mar. 15, 2023) ("JSC Apatit's Benchmark Submission") (P.R. 142–55; C.R. 178–92) at App. 8 (P.R. 155; C.R. 191)).  Commerce also disregarded record evidence demonstrating that the Eurostat data could be easily adjusted for the $P_2O_5$ level of the exported phosphate rock if Commerce believed such an adjustment was necessary.  Final IDM at 38 (P.R. 242) (rejecting arguments set forth in Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: Resubmission of JSC Apatit Case Brief*, Case No. C-821-825 (2020-21 Review) (Aug. 4, 2023) ("JSC Apatit Case Br.") (P.R. 228, 229; C.R. 225) at 39).  Commerce's rationale for ignoring and disregarding this robust and representative data was based on its unlawful consideration of just one statutory factor: quality.  Final IDM at 37 (P.R. 242).

Moreover, Commerce refused to acknowledge that the larger source data for phosphate rock *supplied by Mosaic* contain export data for Togo and Iran from GTA and UN Comtrade. Letter from Wilmer Cutler Pickering Hale and Dorr to the U.S. Department of Commerce,

*Petitioner's Submission of Factual Information of Measure the Adequacy of Remuneration*, Case No. C-821-825 (2020–21 Review) (Mar. 15, 2023) ("Mosaic Benchmark") (P.R. 132–41) at Exhs. 4 and 6 (P.R. 138, 139).  Plaintiff ADM repeatedly called these data to Commerce's attention, including in its case brief. Final IDM at 30–31 (P.R. 242) (rejecting ADM's Case Br. at 16-17, Exhs. 1-1 to 1-4, 2-1 to 2-4 (P.R. 225, 226)).  Commerce also refused to acknowledge that the GTA and UN Comtrade data were incomplete, as they failed to include South African phosphate rock exports during the POR made under a third HTS code, 2835.26.90.  Final IDM at 38 (P.R. 242) (rejecting Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission*, Case No. C-821-825 (2020-21 Review) (Mar. 27, 2023) ("JSC Apatit Benchmark Rebuttal") (P.R. 169–72; C.R. 202–05) at App. 14 (P.R. 171; C.R. 202, 204)).  Again, Commerce's only rationale for ignoring this additional data was its consideration of the phosphate rock's quality, *see* Final IDM at 37 (P.R. 242), while refusing to address that the Togo and Iran data, for instance, result in a more comparable benchmark among the remaining five statutory factors.

Seeking refuge in post-hoc rationalization to refute the claims presented by JSC Apatit and ADM and to justify its igneous rock-only benchmark, Defendants assert that Commerce has broad discretion in interpreting whether and how to best account for "prevailing market conditions." *E.g.*, Mosaic's Br. at 12.  Specifically, Defendants' attempt to rely on the Preamble to the CVD regulations, *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ("CVD Preamble"), to support Commerce's reliance on just phosphate rock "quality."  But Commerce *never* cited to the Preamble for this purpose in the *Final Results*.

7

Moreover, Defendants now contend for the first time that Commerce "found that quality is the factor ***most relevant*** to its analysis," and therefore Commerce need not have addressed the remaining factors set forth in Section 771(5)(E)(iv). Mosaic's Br. at 12-13 (emphasis added); *see also* Def. Br. at 31 ("Simply because Commerce focused more closely on the quality of phosphate rock (i.e., sedimentary vs. igneous) than the other market conditions does not render its decision erroneous"). In the first instance, Defendants' claim is not the "best reading of the statute." *Loper Bright Enterprises v. Raimondo* at 373. The statute states:

> {T}he adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions ***include*** price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E) (emphasis added). As such, if there is record evidence pertaining to the relevance of any of these market conditions, Commerce was not free to ignore them and focus exclusively on only "quality." The canon against surplusage requires that, where possible, every word and every provision of a statute should be given effect, and none should be ignored. Antonin Scalia & Bryan A. Garner, Reading Law (2012) at 174. Commerce does not have discretion to disregard Congress's explicit choice to list these six factors in the statute, particularly where Commerce was presented with evidence regarding ***all*** of the enumerated factors. Commerce's approach in the *Final Results* is contrary to law for this reason alone.

Second, Defendants' claim is inapposite. The portion of the CVD Preamble cited by the Government relates to the ***regulatory*** factors for Commerce to consider in a "tier three" benchmark analysis, not the ***statutory*** factors set forth in Section 771(5)(E)(iv). The factors enumerated in the CVD Preamble consist of "the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." CVD Preamble at

8

65,378.  The Government correctly emphasizes that these factors are not "in any hierarchy," and that Commerce may rely *on one or more* of these factors in any particular case.  Def. Br. at 31.  But, this is beside the point—these regulatory factors have no bearing on whether Commerce properly assessed the *statutory* factors of "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).  As such, this Court should not give any credence to the Government's erroneous conflation of these *statutory factors* with the agency's *regulatory* factors identified in the CVD Preamble.

Finally, Commerce's selection of a benchmark is not unbounded as Commerce itself acknowledges in the *Final Results*.  Commerce did not consider quality to be the "factor most relevant to its analysis," *see* Mosaic's Br. at 12–13; rather, Commerce *solely* considered the quality factor.  In so doing, Commerce failed to act reasonably.  Simply put, there is no justification for Commerce's failure to consider the other prevailing market condition factors enumerated in the statute.

## B.    Defendants Fail to Demonstrate that the Type of Phosphate Ore is a Predicate for Inclusion in Commerce's Export Sale Price Benchmark

In addition to its purported legal justification, the Government contends factually that "because the production of phosphate rock from igneous deposits involves different production steps and costs compared to the production of phosphate rock from sedimentary deposits, it should only consider data concerning phosphate rock from igneous reserves…" Def. Br. at 33.  But, the alleged differences in production steps and costs to which the Government refers do not necessarily result in different export sale prices.  In fact, record evidence shows that phosphate rock prices are already adjusted based on quality (i.e., its bone phosphate lime ("BPL")), making any alleged differences irrelevant to Commerce's analysis.  JSC Apatit Benchmark Rebuttal at App. 11 (demonstrating formulaic adjustments in phosphate rock pricing in commercial negotiations to

9

account for BPL ($P_2O_5$) levels) (P.R. 169–171; C.R. 202–203); *cf.* Def. Br. at 33 (failing to identify record evidence demonstrating that use of sedimentary rock pricing would lead to a "less accurate benefit calculation").

Furthermore, the *Final Results* provide no reasonable connection between these alleged differences in production costs and their possible effect on a market sale or export price. To the contrary, the export price for phosphate rock is precisely what Commerce is using for its benchmark, not the production costs of other companies. Commerce even adjusted JSC Apatit's cost of production to account for profit in its benefit calculations. Final IDM at 21 (P.R. 242). Furthermore, Commerce explained that the "proper comparison" for the mining rights benchmark price is "between the cost of phosphate rock produced . . . and the cost of comparable phosphate rock available for purchase on the world market on an FOB basis." Final IDM at 42 (P.R. 242). Thus, any alleged differences in production **costs** between different types of rock are irrelevant to the benchmark comparison at hand—what Commerce should be considering is the **price** of available rock in the world market.

Moreover, in Commerce's companion *Phosphate Fertilizers from Morocco* case, the agency repeatedly relied solely on BPL ($P_2O_5$) content levels in determining its tier three benchmark, making it clear that this is the driving factor of price in the market. *Phosphate Fertilizers From The Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying IDM ("*Morocco AR1 Results*") at 26–28; *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying IDM ("*Morocco Investigation Results*") at 18–19; *see The Mosaic Co. v. United States*, Slip Op. 23-134, Ct. No. 21-116 (Ct. Int'l Trade Sept. 14, 2023) at 42–43.

10

Indeed, Commerce does not mention the rock type (i.e., sedimentary versus igneous) distinction at all.

In response to JSC Apatit's complaint that Commerce's determination is impermissibly inconsistent with its determination in *Phosphate Fertilizers from Morocco*, the Government cites to *Risen Energy Co. v. United States*, 658 F.Supp.3d 1364 (Ct. Int'l Trade 2023), and contends that "Commerce is allowed to change its mind—in fact, it is regularly required to do so, since, for example, it is required to use 'the best available information' when making benchmark determinations for nonmarket economies." Def. Br. at 35. The Government's argument is unconvincing. Russia was deemed a nonmarket economy as of November 2022, well after the underlying POR addressed in this appeal. Furthermore, as shown herein and in JSC Apatit's Rule 56.2 Brief, the data from South Africa, Finland, and Brazil on which Commerce relied to concoct its benchmark determination were not the "best available information" on a record replete with additional data from Eurostat, Iran, and Togo that are more accurate and comprehensive.

In yet another post hoc rationalization, the Government contends that Commerce identified the type of ore as an important quality in the *Final Results* – but not in the *Phosphate Fertilizers from Morocco* proceeding – because Mosaic submitted additional record evidence regarding alleged production differences between sedimentary and igneous sources below that is not on the *Morocco AR1 Results* record. Def. Br. at 35. This is factually incorrect—Mosaic placed on the *Morocco AR1 Results* record (for the very same POR) ***the exact same information*** about igneous deposits on which Commerce relied entirely in the *Final Results* to reject sedimentary rock prices in the agency's benchmark selection. *Compare* Final IDM at 30-31, n. 184-88 (P.R. 242) (citing Mosaic's Benchmark Submission at Exh. 20 (P.R. 133)), *with* Letter from WilmerHale to the U.S. Department of Commerce, *Phosphate Fertilizers from Morocco: Petitioner's Submission of*

*Factual Information to Measure the Adequacy of Remuneration*, Case No. C-714-001 (2020-21 Review) (Mar. 22, 2023) at Exh. 10.  Commerce has not explained its adoption of inconsistent approaches in two proceedings addressing the same benchmark selection issue.  This unexplained difference in approach was unlawful and must be remanded to Commerce for reassessment.

Finally, Commerce offers yet another new rationale in an attempt to justify its overly narrow benchmark.  That is, Commerce asserts that the benchmark must comprise phosphate rock from "countries with igneous rock containing apatite ore deposits with $P_2O_5$ content similar to that reported by {respondents}."  Final IDM at 30 (P.R. 242).  This claim is false.  Commerce's assertion, repeated by the Government and Mosaic in their briefs, ignores that differences in BPL or phosphate ore type are inherently accounted for in the sales price in the market.  As demonstrated in JSC Apatit's Rule 56.2 Brief, it is accurate that the type of rock may influence the BPL content, but there is no evidence supporting Commerce's naked assertion that phosphate rock from igneous sources and phosphate rock from sedimentary sources, with the same BPL content level, would have different prices.  See JSC Apatit Rule 56.2 Br. at 19–20.

In sum, Defendants fail to demonstrate that ore type is determinative in calculating the benchmark price.  Rather, like many other factors affecting the price of phosphate rock, ore type is inherently accounted for in any export sales price.

### C.    Defendants Fail to Sustain Commerce's Decisions to Disregard Additional Export Pricing Data for Phosphate Rock

Commerce was required to measure the adequacy of remuneration for Russian phosphate rock in relation to the prevailing market conditions in Russia.  As demonstrated above, Commerce's selection of certain igneous rock exports from Brazil, Finland, and South Africa fails to meet this test.  But, the underlying record is replete with available data that Commerce could have employed to create a broader, more representative benchmark for phosphate rock.  The

12

remaining five statutory factors that Commerce failed to consider (pricing, availability, marketability, transportation, and other conditions of purchase or sale) support the inclusion of the Eurostat, GTA/UN Comtrade (Togo and Iran), and additional South Africa GTT data on the record.

The Eurostat and Togo and Iran data on the record are more representative of prevailing market conditions in Russia, as is evident pursuant to an assessment of the remaining five statutory factors. Non-exhaustive examples include:

- Eurostat data demonstrate comparable "availability" and "pricing" to JSC Apatit's phosphate rock: they comprise more than 3,860,000 metric tons of phosphate rock imported into the same market as JSC Apatit's rock (Europe) in 2021, and reflect actual sale prices into Europe based on commercial negotiations and market principles. JSC Apatit's Benchmark Submission at App. 8 (P.R. 155; C.R. 191); JSC Apatit Benchmark Rebuttal at App. 11 (P.R. 171; C.R. 203).

- Togo and Iran data demonstrate comparability with JSC Apatit's phosphate rock pursuant to "other conditions of purchase or sale": no party has argued that the BPL/P2O5 content of Russian phosphate reserves is not comparable to reserves in Togo and Iran. Final IDM at 30 (P.R. 242). Further, there is no evidence that either the "pricing" or "marketability" of the phosphate rock from Togo and Iran is not comparable to that of Brazil, Finland, and South Africa.

Defendants fail to identify any factual concerns with the Eurostat, Togo, or Iran data besides the type of ore quality, which (as discussed above) is irrelevant to determining the benchmark price. Commerce erred when it failed to consider the additional data on the record that clearly addresses more than just the "quality" factor. The additional data on the record are more representative of prevailing market conditions in Russia than Commerce's erroneous concoction of GTA data from Brazil, Finland, and South Africa.

The Government also erroneously claims that JSC Apatit "failed to identify any distortion" in the South Africa data and has "demonstrated only that the South African prices were higher than the prices from Brazil and Finland." Def. Br. at 33. The Government thus (intentionally) avoids the thrust of JSC Apatit's claim—the South Africa data provided by Petitioners are uncontestably incomplete without the addition of the third HTS code under which the majority of phosphate rock

is exported from South Africa.  As such, the South Africa HTS data on which Commerce relied are inherently distorted.  This is apparent by comparing the average GTA export price for phosphate rock from South Africa with and without the addition of the third HTS code—the price changes from 576.83 $/MT (for two HTS codes) to 128.89 $/MT (for three HTS codes).  JSC Apatit Benchmark Rebuttal at App. 14 (P.R. 171; C.R. 204).  In other words, Commerce's failure to include the third South Africa HTS code results in an almost ***350% increase*** in the benchmark price for South Africa.

Furthermore, the South African GTA data relied on by Commerce amount to only 274 MT of exports in 2021.  Mosaic Benchmark at Exh. 4 (P.R. 132).  This volume of phosphate rock exports from South Africa is miniscule compared to the International Fertilizer Association ("IFA") data submitted to Commerce reporting 2021 phosphate rock exports from South Africa of 461,100 MT.  JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191).  As such, the South Africa data relied on by Commerce accounted for only 0.0002% of the total volume of 2021 phosphate rock exports from South Africa.  This difference plainly calls into question the completeness and legitimacy of Commerce's data.  On the other hand, the South Africa data supplied by JSC Apatit (the third HTS code) amount to 462,108 MT of phosphate rock exports, a figure within 0.22% of the 2021 IFA statistics.  *Id.* (P.R. 155; C.R. 191).  These data bely the Government's claim that the South African prices employed in the *Final Results w*as representative.  On the contrary, failing to add the third HTS code for South Africa was distortive and artificially increased JSC Apatit's CVD margin.

Mosaic cites *Multilayered Wood Flooring from the People's Republic of China* to claim that "the simple fact that a number is smaller or larger than others" is not sufficient to find benchmark data aberrational.  Mosaic's Br. at 17 (citing *Final Results of Countervailing Duty*

*Administrative Review; 2021*, 89 Fed. Reg. 41,939 (Dep't Commerce May 14, 2024), and accompanying IDM at Comment 6.C).    Mosaic misstates JSC Apatit's point.    For one, *Multilayered Wood Flooring* addresses whether Commerce **disregarded** certain aberrational data—that is not the situation here, where JSC Apatit asked Commerce to **add** supplemental, representative data to construct a more accurate benchmark price.    Commerce explained in *Multilayered Wood Flooring* that it prefers not to **disregard** data to avoid the "the manipulation of data by removing one or more line items {the parties} find objectionable, with the result that we would not be using the average prices for that category, but some subset thereof."    *Id*. at 63.    There is no such risk here as JSC Apatit is not asking Commerce to remove any data—rather, Commerce should have added certain robust data to make its benchmark more complete.    Commerce's rejection of these additional data, with no bona fide explanation, was contrary to law and not supported by substantial evidence.

Finally, Mosaic contends that the description of the third South African HTS code, 2835.29.60, "Phosphates of calcium (excl. calcium hydrogenorthophosphate 'dicalcium phosphate') with a fluorine content . . ." does not provide sufficient information about what material is included in that subheading.    Mosaic's claim fails.    The description of the HTS subheadings on which Commerce relies are – (1) "Natural *calcium phosphates*, natural aluminum *calcium phosphates* and phosphatic chalk; unground," and (2) "Natural *calcium phosphates*, natural aluminum *calcium phosphates* and phosphatic chalk; ground."    Mosaic's Br. at 27 (emphases added).    Each of these HTS codes thus describes "calcium phosphates," the technical name for the phosphate rock product at issue in Commerce's benchmark calculation.

For all these reasons, Commerce's benchmark selection for the phosphate rock for LTAR program is contrary to law and unsupported by substantial evidence.    Accordingly, this Court

should remand and instruct Commerce to calculate the phosphate rock benchmark price using the additional data identified in JSC Apatit's Rule 56.2 Brief.

### III.    COMMERCE'S FAILURE TO EMPLOY GROSS PROFIT TO CALCULATE JSC APATIT'S PROFIT RATIO OR OTHERWISE ACCOUNT FOR ADDITIONAL EXPENSES INCURRED IS CONTRARY TO LAW

Commerce failed to calculate JSC Apatit's benefit as accurately as possible as required by U.S. law and Federal Circuit precedent. *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Specifically, Commerce erred in its calculation of JSC Apatit's profit ratio. Commerce divided JSC Apatit's Profit Before Tax figure by JSC Apatit's Total Cost of Sales, ignoring additional expenses that are considered when setting sales prices.

The Government and Mosaic parrot Commerce's claims that the record did not show that all of the financial items included in gross profit relate to the mining and production of phosphate rock and that using gross profit would result in the double counting of certain expenses. Def. Br. at 39; Mosaic's Br. at 34 (citing Final IDM at 20–22 (P.R. 242)). These claims are erroneous— using gross profit would yield a more accurate profit ratio based on an apples-to-apples comparison. In order to properly compare cost of production with an export sales price benchmark, Commerce should have added the profit inherently included in the benchmark export price to the cost of production (i.e., the gross profit).[1]

The Government and Mosaic both misleadingly claim that Commerce has a "practice" of using profit before tax as the profit figure. But, they cite only to this case and its sister case,

---

[1] Furthermore, the Government barely responds to JSC Apatit's demonstration that Commerce improperly deducted a one-time fee incurred by JSC Apatit during the POR to maintain its mining license, merely reiterating the same erroneous arguments Commerce proffered in the *Final Results*. Def. Br. at 42. Mosaic fails entirely to address JSC Apatit's point.

*Phosphate Fertilizers from Morocco*.  This is hardly a longstanding "practice."  The Government also falls back on Commerce's broad discretion in determining calculation methodologies due to their complexity and technical nature—but, that discretion is tempered by Commerce's obligation to CVD margins as accurately as possible.  *Rhone Poulenc, Inc.*, 899 F.2d at 1191.

Commerce's failure to use gross profit had significant consequences on its calculations. That is, Commerce ignored more than RUB 40,000,000,000 in line item costs for 2021 and excluded of the following nine line items from JSC Apatit's 2021 financial statement:

- Administrative and selling overhead expenses
- Taxes, other than income tax, net
- Other expenses, net
- Foreign exchange (loss)/gain from operating activities, net
- Gain from revaluation of financial assets measured at fair value
- Finance income
- Finance costs
- Foreign exchange loss from financing activities, net
- COVID-19 related expenses.

Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *Countervailing Duty Administrative Review on Phosphate Fertilizers from Russia: JSC Apatit Section III of Initial Questionnaire Response*, Case No. C-821-825 (2020–21 Review) (Sept. 23, 2022) ("JSC Apatit's Sec. III IQR") (P.R. 60–84; C.R. 31–156) at Exh. 7 (P.R. 63–64; C.R. 35). Companies do not set their sale prices in a vacuum, without considering these significant additional expenses that are not part of the cost of sales.  Accordingly, Commerce should use JSC Apatit's gross profit in its profit ratio calculations to ensure that it includes all costs, expenses, and profit in its cost buildup.

The briefs of the Government and Mosaic offer various critiques of JSC Apatit's alternative data, which were wholly ignored by Commerce.  Def. Br. at 22 (discussing quantification

concerns); Mosaic's Br. at 35–36 (addressing whether JSC Apatit's Kirovsk branch produces only phosphate rock and alleging reconciliation concerns). But, these purported data issues can all be addressed on remand—for instance, contrary to the claim in Mosaic's Br. at 35, JSC Apatit populated the record with detailed information regarding the Kirovsk branch's operations and reconciling its cost of sales, administrative expenses, selling expenses, and other expenses to the consolidated PhosAgro financial statements. *See, e.g.*, JSC Apatit 1SQR at Exh. SUPP-12D (discussing the Kirovsk branch's operations); JSC Apatit 1SQR at Exhs. SUPP-12-A (1), SUPP-12-A (2), SUPP-12-A (3), and SUPP-12-A (4) (its cost of sales); Exh. SUPP-12-B (6) (its administrative expenses and selling expenses); and Exh. SUPP-12-B (3), SUPP-12-B (7) (its other expenses) (P.R. 128; C.R. 170, 172).

In sum, Commerce failed to calculate JSC Apatit's benefit as accurately as possible (i.e., by using Profit Before Tax). Accordingly, this Court should remand to Commerce with instruction to use gross profit in calculating the profit ratio, or otherwise account for the additional expenses related to phosphate rock production.

## IV.    COMMERCE FAILED TO ADDRESS REASONABLY THE INFORMATION JSC APATIT PROVIDED REGARDING ITS INDEPENDENT GAS SUPPLIERS

Commerce unlawfully countervailed JSC Apatit's gas purchases from independent suppliers ("IGS") after applying adverse facts available to the GOR. In so doing, Commerce brushed aside detailed record evidence supplied by JSC Apatit, claiming that the documentation "fails to provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the Input Producer Appendix." Final IDM at 50–51 (P.R. 242). Commerce's claim is wrong and unsupported by substantial evidence. The Government and Mosaic seek to distract this Court from the key question and fail to address in

their briefs whether the IGS companies were government authorities, i.e., independent companies from Gazprom. *See, e.g.*, Def. Br. at 14–16, Mosaic's Br. at 36–38.

JSC Apatit placed Orbis reports on the administrative record that provide all levels of ownership between the supplier and its ultimate ownership, if they exist. For example: page 143 of the Orbis report for [                                    ] provides paths to the controlling shareholders. *See* JSC Apatit's Sec. III IQR at Exhibit 24 (P.R. 79; C.R. 69–70). That Orbis report also provides additional direct and indirect ownership details. *Id*. at 146. JSC Apatit likewise submitted to Commerce the same breakdown of controlling shareholders and ownership paths for [                    ]. *Id*. Accordingly, Commerce's claim that JSC Apatit failed to provide detailed information about each level of ownership is simply erroneous.

Additionally, as demonstrated in JSC Apatit's Rule 56.2 Br. at 36–37, Commerce's finding is also inconsistent with its prior treatment of similar evidence in the CVD original investigation. Commerce has pointed to no change in ownership (or other factual information) supporting why the *Final Results* reached a different result from the original investigation. Commerce's failure to explain its changed decision based on essentially the same facts and with no explanation, is contrary to law. *See e.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{I}t is well-established that 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'").

Finally, Commerce erred procedurally by failing to provide JSC Apatit with an opportunity to cure any alleged gap in the administrative record by providing supplemental information. The Government contends that Commerce was not required to afford JSC Apatit such an opportunity. Def. Br. at 19. But, as the Government itself explains:

> In *Risen Energy*, Commerce had found information offered by a party to be an ***insufficient substitute*** for information requested from

> the government because such information was incomplete. The
> Court held that Commerce "had essentially declared the responses
> deficient," and therefore, was required under 19 U.S.C. § 1677m(d)
> to provide . . . an opportunity to supplement the record."

*Id.* (emphasis added) (discussing *Risen Energy Co.*, 658 F.Supp.3d at 1371 (remanding to Commerce when it failed to provide respondents with "an opportunity to supplement the record" after first determining that respondents' evidence did not fill a factual gap left by a government)). This is precisely the case here. Final IDM at 50-51 (P.R. 242) (finding that the documentation provided by JSC Apatit "fails to provide the detailed information . . . requested in the Input Producer Appendix"). Just as in *Risen Energy* where the Court required Commerce on remand to issue a supplemental questionnaire to complete the agency record, *Risen Energy Co.* 658 F.Supp.3d at 1371, this Court should order that Commerce do the same here.

Indeed, the Government's brief highlights this need. That, is the Government asserts that Commerce "did not find the record evidence provided by JSC Apatit to be incomplete or otherwise deficient," but rather "that {JSC Apatit's} information *could not suffice as a substitute* for the information . . . withheld by the GOR." Def. Br. at 19 (emphasis added). In other words, on remand JSC Apatit should be given a further opportunity to fill the gap ostensibly left by the GOR. Commerce's failure to do so was unsupported by substantial evidence and contrary to law.

## V. COMMERCE FAILED TO CALCULATE A CVD MARGIN FOR JSC APATIT BASED ON FULL POR DATA—THIS ERROR MUST BE CORRECTED ON REMAND

It is uncontested that Commerce's record contains data submitted by JSC Apatit spanning the full POR but that Commerce failed to employ them in the *Final Results*. Commerce's failure is contrary to law and unsupported by substantial evidence. Where there is record evidence for a full POR, Commerce must use them.

Commerce's regulation, 19 C.F.R. § 351.213(e), provides that the POR for the first administrative review of a CVD order includes the period from the suspension of liquidation of entries of the merchandise through the month immediately preceding the first anniversary month of the order. Here, it is uncontested that the POR was November 30, 2020 to December 31, 2021. Final IDM at 4 (P.R. 242). Commerce's CVD practice recognizes that it must employ all data on the record to calculate subsidy margins. Def. Br. at 7–8; Mosaic's Br. at 43-44. That is, Commerce's repeatedly invoked practice is that, "*[f]or a POR that covers more than one calendar year and two months*, the agency determines separate subsidy rates for each year encompassing the POR by using each calendar year's sales to attribute subsidies received by the mandatory respondents during each respective calendar year." *E.g.*, *Large Diameter Welded Pipe from the Republic of Korea*, 87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022) (final results of the countervailing duty administrative review; 2018-19), and accompanying IDM at 4; *cf. Certain Collated Steel Staples from the People's Republic of China*, 87 Fed. Reg. 47,980 (Dep't Commerce Aug. 5, 2022) and accompanying Calculations at 4-5 (unchanged in Final Results) (calculating the alleged benefit for respondent using the entire POR, which was less than one calendar year and two months (November 12, 2019 to December 31, 2020)).

Consistent with its regulations and practice, Commerce repeatedly requested data and other information from JSC Apatit spanning the full POR. In turn, JSC Apatit (expending significant time and resources) fully complied with these requests. JSC Apatit's 2SQR at 6, Exh. SUPP-20 (P.R. 159; C.R. 195-198) (Commerce requested: "Please revise the chart to include sales data for the entire POR, not only calendar year 2021."); *see also* JSC Apatit's Sec. III IQR (P.R. 60-84; C.R. 31-156); JSC Apatit's 1SQR (P.R. 128; C.R. 170-174); JSC Apatit's 2SQR (P.R. 159; C.R.

195-200).  Notwithstanding, Commerce refused to employ these data and information to calculate a CVD margin spanning the full POR, instead limiting its *Final Results* to calendar year 2021.

Defendants now claim two cases support its decision – Def. Br. at 7–8; Mosaic's Br. at 43–44 – but these cases only serve to highlight the failures in Commerce's action.  That is, in *Certain Passenger Vehicles and Light Truck Tires from the People's Republic of China*, Commerce adjusted respondent's denominator by *averaging* the thirteen months of sales data provided by the respondent and subtracting the average sales for one month from the denominator.  83 Fed. Reg. 11,694 (Dep't Commerce Mar. 16, 2018), and accompanying IDM at 12–13.  Thus, Commerce considered the entire POR data (i.e., thirteen months) provided by the respondent and did not ignore the additional month of data provided.  Further, in *Certain Oil Country Tubular Goods from India*, the Department issued a memorandum informing parties of its plan to use a truncated set of data and invited comments (to which no party responded).  82 Fed. Reg. 18,282 (Dep't Commerce Apr. 18, 2017), and accompanying IDM at 3 n.7.

Commerce thus recognized in these two cases that where data for the full POR are on the agency record, Commerce must use them consistent with its obligations to calculate JSC Apatit's CVD margin "as accurately as possible," *Rhone Poulenc, Inc.*, 899 F.2d at 1191, and to consider the full administrative record.  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).  As such, Commerce's failure to calculate a subsidy margin for JSC Apatit for the full POR was contrary to law and unsupported by substantial evidence.

## VI.     CONCLUSION

For the foregoing reasons and those set forth in its Rule 56.2 Brief, JSC Apatit respectfully requests that this Court grant JSC Apatit's Motion for Judgment on the Agency Record and remand the *Final Results* to Commerce, consistent with its decision.

Respectfully submitted,

/s/ Jonathan T. Stoel
H. Deen Kaplan
Jonathan T. Stoel
Maria A. Arboleda

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.6634
Fax:  +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

Dated: January 22, 2025

23

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 6,879 words according to the word-count function of the word-processing software used to prepare the brief.  This is less than the 7,000 words permitted for reply briefs.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

January 22, 2025