UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | |
| Plaintiff, | |
| and | |
| JOINT STOCK COMPANY APATIT, | |
| Plaintiff-Intervenor, and Consolidated Plaintiff, | |
| and | |
| THE MOSAIC COMPANY, | |
| Consolidated Plaintiff | |
| v. | Consol. Court No. 23-00239 |
| UNITED STATES, | **PUBLIC DOCUMENT** |
| Defendant, | |
| THE MOSAIC COMPANY, | |
| Defendant-Intervenor, and Consolidated Defendant-Intervenor | |
| and | |
| JOINT STOCK COMPANY APATIT, | |
| Consolidated Defendant-Intervenor. | |

# PLAINTIFF INTERVERNOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S SUPPLEMENTAL BRIEFING

Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910

*Counsel to JSC Apatit*

April 17, 2025

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Beijing Tianhai Indus. Co. v. United States*,
52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ................................................................... 3

*Essar Steel Ltd. v. United States*,
34 C.I.T. 1057 (Ct. Int'l Trade 2010) ........................................................................... 2

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) .................................................................................... 2

**STATUTES**

19 U.S.C. § 1677(5)(E) ...................................................................................................... 1

**OTHER AUTHORITIES**

*Decision Memo. for the Final Affirmative Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*,
Case No. C-812-834 (2020 Review) (Sept. 23, 2022) .................................................. 3

*Decision Memo. for the Preliminary Determination and Preliminary Negative Critical Circumstances Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*,
Case No. C-821-834 (2020 Review) (Mar. 7, 2022) ................................................ 3, 4

*Decision Memo. for the Final Affirmative Determination of the CVD Investigation of Granular PTFE from Russia*,
Case No. C-821-825 (Inv.) (Jan 18, 2022) ................................................................ 3, 5

**REGULATIONS**

19 C.F.R. § 351.511(a)(2) .............................................................................................. 1, 2

# PLAINTIFF INTERVERNOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S SUPPLEMENTAL BRIEFING

Plaintiff Intervenor and Consolidated Plaintiff, Joint Stock Company Apatit ("JSC Apatit"), respectfully submits this supplemental brief to address The Mosaic Company's ("Mosaic's") claims that gas exported from Kazakhstan to Russia was (A) "raw (high sulfur)" gas not comparable to the natural gas consumed by JSC Apatit, and (B) re-exported to Kazakhstan. Mosaic thus asserts that the natural gas exported from Kazakhstan does not qualify as "available" in Russia and cannot be used as a tier two global benchmark under 19 C.F.R. § 351.511(a)(2)(ii). Judge Restani emphasized at the April 8, 2025 oral argument that "we have to have some product comparability" for a tier two benchmark and requested clarity on the type of gas exported from Kazakhstan to Russia during the Period of Review ("POR"). The answer to this Court's question is that a tier two benchmark may lawfully employ a comparable—but not necessarily identical—product to compare with the good allegedly provided for less than adequate remuneration.

JSC Apatit demonstrated that the tier two benchmark used by Commerce in the Final Results is lawful and supported by substantial evidence. JSC Apatit Reply Br. (ECF 60 and 61) at 9-12. The governing statute, 19 U.S.C. § 1677(5)(E), provides that a subsidy's benefit must be determined in relation to the "prevailing market conditions" for the good being provided in the country of provision of the good (here, Russia). The statutory prevailing market conditions expressly include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* Commerce's regulation further clarifies that "{w}here there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, *making due allowance for factors affecting comparability*." 19 C.F.R. § 351.511(a)(2)(ii) (emphasis added).

Thus, the relevant regulation requires product *comparability*, but this does not mandate that the tier two benchmark product be *identical* to the allegedly subsidized product. *See id.*; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–74 (Fed. Cir. 2012) ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue"). Indeed, the CIT in *Essar Steel Ltd.* explained that it was reasonable for Commerce to find that two types of iron ore were sufficiently comparable to be used as a benchmark, even though they were different grades with different iron content and the sole respondent only used one of the grades. *Essar Steel Ltd. v. United States*, 34 C.I.T. 1057, 1066 (Ct. Int'l Trade 2010). The Court further explained that the respondent incorrectly "confound{ed} what may be incompatible with what is so dissimilar that it cannot serve as a fair price comparison. The regulation requires product comparability, but does not mandate that the products be identical." *Id*. Evidently, the standard for comparability is beyond differences that may make a product "incompatible" and instead make it "***so dissimilar***" so as to not be a fair comparison. Just like the different iron content and grade in *Essar Steel*, raw natural gas is not materially different than refined gas—it simply has higher sulfur content. Thus, the raw and more purified gas at issue here meets this comparability threshold.

The CIT has also upheld Commerce's employ of broader product categories as tier two benchmarks than the high sulfur gas at issue here. For example, in *Beijing Tianhai Indus. Co. v. United States,* the CIT found that Commerce acted reasonably in considering steel tubes of **all diameter levels**, and not limiting the benchmark to steel tubes in specific diameter ranges. The CIT explained that this was because the broader product category selected by Commerce was more representative. *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1369–70 (Ct. Int'l

2

Trade 2015). Similarly, in the case below it was reasonable for Commerce to determine that the relevant group of comparable products should be broader than just the narrow product at issue – *i.e.*, it should include all natural gas, regardless of whether it is raw or refined.

The question before this Court is whether Commerce reasonably concluded that Kazakh and Russian natural gas were comparable. Commerce has repeatedly found that Kazakh-origin gas is sufficiently comparable to Russian natural gas to be used as a tier two benchmark—and it was reasonable for the agency to continue to do so in the review below. In the Final Results, citing to its prior determination in *Granular PTFE from Russia*, Commerce addressed Mosaic's remarks that there *may* be differences between the purportedly raw gas transported to Orenburg and the gas under consideration. In that case, Commerce explained that "{d}ata on the record from the Russian Federal Customs Service demonstrate that there were Russian imports of natural gas from Kazakhstan during the POI identified under customs code **2711210000**." *IDM for the Final Affirmative Determination of the CVD Investigation of Granular PTFE from Russia*, Case No. C-821-825 (Inv.) (Jan 18, 2022) at 19 (emphasis added). Commerce further noted that "imports from customs code 2711210000 are released into free circulation." *Id.* at 20. 1/

The record evidence further supports Commerce's benchmark determination. Data from

---

1/ Commerce has made this same finding in other recent cases involving Russia. *See Decision Memo. for the Preliminary Determination and Preliminary Negative Critical Circumstances Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, Case No. C-821-834 (2020 Review) (Mar. 7, 2022) at 20. Unchanged in the *Decision Memo. for the Final Affirmative Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, Case No. C-812-834 (2020 Review) (Sept. 23, 2022) (citations omitted) ("As in *UAN from Russia* and *Granular PTFE from Russia*, in this investigation, information on the record leads us to preliminarily determine that natural gas exported from Kazakhstan is available to purchasers in Russia, fulfilling the criteria for a tier-two benchmark. Specifically, data on the record from the Russian Federal Customs Service demonstrate that there were **Russian imports of natural gas from Kazakhstan during the POI identified under customs code 2711210000** and data from the Eurasian Economic Union indicates there were exports from Kazakhstan to Russia. **In prior cases, including *UAN from Russia*, the GOR has confirmed that imports under this customs code are placed under a customs procedure of a release into free circulation.**").

3

the Bureau of National Statistics of Kazakhstan, JSC NC "KazMunayGas," and KPO's 2019 Sustainability Report confirm that Kazakh natural gas was exported to the Orenburg Gas Processing Plant in Russia via the Karachaganak-Orenburg pipeline. 2/ This pipeline terminates in Russia and, contrary to Mosaic's assertion, the gas is integrated into Russia's domestic supply. Mosaic's Benchmark Rebuttal Submission, Exh. 8 (P.R. 163–64) at 130, 132 (explaining that only "*some of the processed gas {is sent} back to the Kazakh domestic market*" from Russia) (emphasis added). Moreover, Kazakhstan exported both raw and processed gas. JSC Apatit's Benchmark Rebuttal, App. 18 – *Russian and Kazakhstan Gas Pipelines into Europe Structure*, (P.R. 172; C.R. 205) at 4 (showing that Kazakhstan's pipelines transport both raw and processed gas to domestic and international markets).

Furthermore, the customs data shows that gas exported from Kazakhstan under the same HTS code (2711.21.0000) is treated the same as Russian gas under the same code. JSC Apatit's Benchmark Submission App. 1 (P.R. 145; C.R. 179). The HTS system, designed to differentiate products based on their characteristics, treats both raw and refined natural gas the same. There is no basis for Commerce to treat them differently.

Finally, just like in the other cases where Commerce used Kazakh-origin gas as a tier two

---

2/ Commerce has relied upon similar information in previous cases to determine that Kazakh-gas is available to purchasers in Russia. *See id* at 21 ("Data on the record from the Bureau of National Statistics of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan, the JSC NC "KAZMUNAYGAS"' management report, and KPO's 2019 Sustainability Report further indicate that it is reasonable for Commerce to conclude that natural gas was exported from Kazakhstan to Russia during the POI. More specifically, Kazakh natural gas producer KPO stated that it sold natural gas to the Orenburg Gas Plant in Russia using the Karachaganak Orenburg pipeline, which is not a part of the UGSS. While other pipelines from Kazakhstan to Russia connect to third countries (such as the Caspian Pipeline Consortium pipeline and Atyrau – Samara pipeline), and could, therefore, be directly transported to third countries, the Karachaganak Orenburg pipeline connects to and terminates in Russia. **This information, coupled with customs statistics and the GOR's prior statements that imports from customs code 2711210000 are released into free circulation, leads us to preliminarily determine that natural gas exported from Kazakhstan is available to purchasers in Russia**; fulfilling the main criteria for a tier-two benchmark.") (emphasis added).

4

benchmark, 3/ Commerce explained that the purported differences Mosaic alleges between raw versus further processed gas are irrelevant. This is because Commerce did not use the export prices for that raw gas in the benchmark for the allegedly subsidized Russian good. Instead, Commerce selected prices for Kazakh-origin natural gas exported to markets other than China and Russia to serve as the tier two benchmark. Final IDM at 48 (P.R. 242).

In conclusion, Commerce's tier two benchmark is lawful, supported by substantial evidence, and consistent with its established practice. Mosaic's claim seeks to impose non-existent requirements on Commerce's tier two benchmark selection that do not exist in the statute, regulation, or Commerce's practice. Mosaic's position that products must be identical in order to serve as a benchmark would illegitimately restrict Commerce's ability to select tier two benchmark unusable. 4/ The record demonstrates that Kazakh-origin gas is comparable to Russian natural gas and was available to purchasers in Russia during the POR. For the foregoing reasons, and those previously set forth in this appeal, JSC Apatit respectfully requests that this Court reject Mosaic's claims and uphold Commerce's tier two benchmark for natural gas.

---

3/ *Granular PTFE from Russia*, Final Det. IDM at 20 ("With respect to the petitioner's argument that the gas imported through the Karachaganak Orenburg pipeline to the Orenburg Gas Plant in Russia is, in fact, '**sour gas**' sold for further processing and, thus, does not allow for an 'apples-to-apples' comparison, **we note that this fact is also not directly relevant to our benchmark comparison given that we are not including Kazakh exports to Russia in the calculation**. Further, **whether the gas is 'sour gas' does not speak to the consideration of whether natural gas is available to Russian purchasers**, and the petitioner has not pointed to any record evidence demonstrating that the Karachaganak Orenburg pipeline cannot transport natural gas").

4/ Furthermore, Mosaic argued at oral argument that the Orenburg Gas Plant processed the Kazakh-origin gas and then re-exported it to Kazakhstan. However, Mosaic's own brief concedes that "after Gazprom processes this gas, the finished gas is *primarily* re-exported back to Kazakhstan." Rule 56.2 Motion for Judgment on the Agency Record of the Mosaic's Company at 17-18 (ECF 66) (emphasis added). However, record evidence demonstrates that processed gas from Orenburg is integrated into Russia's domestic gas supply and sold in the Russian market, and that the infrastructure in Kazakhstan transports both raw and further processed gas. Mosaic's Benchmark Rebuttal Submission, Exh. 8 (P.R. 163–64) at 130, 132 (explaining that only "*some of the processed gas {is sent} back to the Kazakh domestic market*" from Russia) (emphasis added); JSC Apatit's Benchmark Rebuttal, App. 18 – *Russian and Kazakhstan Gas Pipelines into Europe Structure*, (P.R. 172; C.R. 205) at 4 (showing that Kazakhstan's pipelines transport both raw and processed gas to domestic and international markets).

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6634
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

Dated: April 17, 2025