Slip Op. 25-55

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | |
| Plaintiff, | |
| JOINT STOCK COMPANY APATIT, | Before: Jane A. Restani, Judge |
| Plaintiff-Intervenor, | Consol. Court No. 23-00239 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| THE MOSAIC COMPANY, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Commerce's final determination in the countervailing duty order review of phosphate fertilizers from the Russian Federation is partially sustained and partially remanded for reconsideration consistent with this opinion.]

Dated: May 6, 2025

Warren E. Connelly, Trade Pacific PLLC, of Washington, DC, argued for the plaintiff, Archer Daniels Midland Co. With him on the brief were Jonathan M. Freed, Kenneth Neal Hammer, and Robert George Gosselink.

Jonathan Thomas Stoel and Maria Alejandra Arboleda Gonzalez, Hogan Lovells US LLP, of Washington, DC, argued for the plaintiff-intervenor, Joint Stock Company Apatit. With them on the brief were Harold Deen Kaplan and Jared Rankin Wessel.

Sosun Bae, Lead Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. With her on the brief was Meen Geu Oh, Trial Attorney. Of counsel on the brief was Kenneth Garrett Kays, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stephanie Ellen Hartmann, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, argued for defendant-intervenor, The Mosaic Company. With her on the brief were Alexandra S. Maurer, David J. Ross, and Lindsey A. Ricchi.

Restani, Judge: This action is a challenge to the final determination made by the United States Department of Commerce ("Commerce") in the countervailing duty ("CVD") order review of phosphate fertilizers from the Russian Federation ("Russia") covering the period from November 30, 2020, through December 31, 2021.

Plaintiff, Consolidated Plaintiffs, and Plaintiff-Intervenors request that the court hold aspects of Commerce's final determination unsupported by substantial evidence or otherwise not in accordance with law. The United States ("Government") asks that the court sustain Commerce's final determination.

## BACKGROUND

On July 23, 2020, Commerce initiated a countervailing duty investigation covering phosphate fertilizers from the Kingdom of Morocco and the Russian Federation. See Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations, 85 Fed. Reg. 44,505 (Dep't Commerce July 23, 2020) ("Initiation of Investigation"). After affirmative determinations by Commerce and the International Trade Commission, Commerce published its order on April 7, 2021, imposing countervailing duties on imported phosphate fertilizer from Morocco and Russia. See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("Initial CVD Determination"). On June 9, 2022, Commerce initiated its review of the order for Period of Review ("POR") from November 30, 2020, to December 31, 2021. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 35,165 (Dep't Commerce June 9, 202) ("Initiation of Investigation"). Commerce selected Joint Stock Company

Apatit ("JSC") as a mandatory respondent in this review.[1]  Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty of Administrative Review; 2020–2021: Phosphate Fertilizers from the Russian Federation at 1, P.R. 188 (Apr. 27, 2023) ("PDM").  JSC is a producer of phosphate fertilizer in Russia.  Compl. at 1, Case No. 23-00254, ECF No. 9 (Jan. 3, 2024).  Commerce published its preliminary results on May 4, 2023, see Phosphate Fertilizers From the Russian Federation, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ("Prelim. Results"), along with the accompanying PDM.

On September 21, 2023, Archer Daniels Midland Company ("ADM") submitted a notice of subsequent authority citing to Mosaic Co. v. United States, 659 F. Supp. 3d 1285 (CIT 2023).  See ADM Notice of Subsequent Authority (Rejected), P.R. 234 (Sept. 21, 2023).  ADM is a domestic corporation that imported phosphate fertilizer from Russia.  Compl. at 1, Case No. 23-00239, ECF No. 9 (Dec. 1, 2023).  On October 18, 2023, Commerce rejected and removed ADM's submission from the record because it contained untimely new arguments.  See Commerce's Rejection of Subsequent Authority Submission, P.R. 238 (Oct. 18, 2023); Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021 at 3, P.R. 242 (Dep't Commerce Oct. 31, 2023) ("IDM").  Commerce published its final determination on October 31, 2023.  See

[1] The review initially involved only two parties: JSC and Industrial Group Phosphorite LLC ("Phosphorite").  Initial CVD Determination at 18,038; Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty of Administrative Review; 2020–2021: Phosphate Fertilizers from the Russian Federation at 1, P.R. 188 (Apr. 27, 2023) ("PDM").  On July 22, 2022, Commerce notified interested parties that it "intended to rescind this administrative review with respect to Industrial Group Phosphorite LLC because it did not have reviewable entries of subject merchandise during the POR for which liquidation is suspended."  Phosphate Fertilizers from the Russian Federation, 88 Fed. Reg. 28,505, 28,505 (Dep't Commerce May 4, 2023) ("Prelim. Results"); PDM at 1.  No parties commented on the notification of intent to rescind the review.  Prelim. Results at 28,505.  Accordingly, Commerce rescinded the review with respect to Phosphorite.  Id.; PDM at 1.

Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("Final Results"); see also IDM. Commerce determined the countervailable subsidy rate to be 28.50 percent. Final Results, 88 Fed. Reg. at 76,183. Relevant here, Commerce found subsidies based on the government of Russia's ("GOR") provision of phosphate mining rights for less than adequate remuneration ("LTAR") and provision of natural gas for LTAR.[2] IDM at 2, 9. ADM, JSC, and Mosaic[3] raise challenges to the final determination.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2020) and 28 U.S.C. § 1581(c) (2020). The court will uphold Commerce's determinations in a CVD proceeding unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Commerce Reasonably Relied on Record Evidence from Calendar Year 2021

JSC argues that Commerce unreasonably disregarded 2020 data and failed to calculate JSC's subsidy rate as accurately as possible. JSC Apatit Mot. for J. on the Agency R. at 43, ECF No. 39 (June 5, 2024) ("JSC Mot."). JSC contends that Commerce should have employed corporate and benchmark data for the entire POR, which included parts of two months of 2020 in addition to all of 2021. JSC Reply Br. in Support of Mot. for J. on the Agency R. at 20–21, ECF

---

[2] Commerce also found subsidies based on several other programs. See IDM at 9–10. The parties have not challenged those findings.

[3] Mosaic is a U.S. producer of phosphate fertilizer. Compl. at 2, Case No. 23-00247, ECF No. 18 (Dec. 28, 2023).

No. 60 (Jan. 22, 2025) ("JSC Reply").  JSC notes that Commerce requested data from JSC for the

entire POR rather than just 2021.  Id. at 21.

The government responds that 19 C.F.R. § 351.213(e) does not provide a methodology for

calculating subsidies, and that Commerce's practice is to rely on only one year's worth of data

when the POR extends into a second year by no more than two months.[4]  Gov. Resp. in Opp. to

Mot. for J. on the Agency R. at 9, ECF No. 49 (Nov. 21, 2024) ("Gov. Resp.").  The government

notes that even if Commerce were to rely on data from both 2020 and 2021, it could not incorporate

only the one month of data from December of 2020 because it would need to use data for all of

2020 to conform with its practice and to avoid distortions in the calculation of a subsidy rate.  Id.

at 9–10.  It argues that because JSC only included information from December of 2020, it could

not consider the data for all of 2020.  Id. at 9.  Mosaic echoes these arguments.  See Mosaic Resp.

in Opp. to Mot. for J. on Agency R. at 43–44, ECF No. 55 (Dec. 13, 2024) ("Mosaic Resp.").

Mosaic notes that the fact that Commerce requested information from JSC for the whole POR does

not create a legal requirement for Commerce to use all the information.  Id. at 44.

Commerce is required to conduct period reviews "at least once during each 12-month

period beginning on the anniversary of the date of publication of a countervailing duty order" if

Commerce receives a request for such a review.  19 U.S.C. § 1675(a)(1).  These reviews include

a "review and determin[ation] [of] the amount of any net countervailable subsidy."  Id. at

§ 1675(a)(1)(A).  Commerce conducts administrative reviews in accordance with 19 C.F.R.

---

[4] JSC also argues that two of the determinations that Commerce cites do not support its decision
to exclude 2020 data provided by JSC.  JSC Reply at 22.  Each administrative review, however, is
a "separate exercise of Commerce's authority that allows for different conclusions based on
different facts in the record."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378,
1387 (Fed. Cir. 2014).  The fact that Commerce may have departed from its practice in the past,
therefore, does not on its own necessitate a conclusion that Commerce should have departed from
its practice here.

§ 351.213.  The regulation requires the POR for the first administrative review to include the period "from the date of suspension of liquidation under this part or suspension of investigation to the end of the most recently completed calendar year or fiscal year."  Id. § 351.213(e)(2)(ii).  The regulation is silent regarding the time period that Commerce must use to calculate subsidy rates.  See generally id.

Commerce established the POR as November 30, 2020, through December 31, 2021, consistent with the governing statute and regulations.  Prelim. Results at 28,505.  JSC provided corporate and benchmark data covering the full POR.  See JSC Apatit's Sec. III Questionnaire Resp., P.R. 60–83, C.R. 31–90 (Sept. 23, 2022) ("JSC Sec. III QR"); JSC Apatit's Affiliation & Sec. III Suppl. Questionnaire Resp., P.R. 128, C.R. 170–72 (Mar. 9, 2023); JSC Apatit's Resp. to Second Suppl. Questionnaire, P.R. 159, C.R. 195–99 (Mar. 23, 2023).  Commerce used JSC's 2021 sales and mining costs in its benefit calculations only.  See USDOC Final Calculation Memo – JSC Apatit, P.R. 243–44, C.R. 226–27 (Nov. 3, 2023) ("Final Calculation Memo").  Commerce noted that "because the POR covers a small portion of 2020 (i.e., less than two months), we relied exclusively on data provided from 2021 to determine JSC's final subsidy rate.  Consistent with our practice, we will apply JSC's final subsidy rate in this review to all appropriate entries from November 30, 2020, through December 31, 2021."  IDM at 3–4.  Commerce stated that its "general practice is to rely on one year's worth of data when the POR of an administrative review extends into a second year by no more than two months" and that employing data for the whole POR would be inconsistent with its practice.  Id. at 11–12.

JSC has pointed to no persuasive reason why Commerce improperly relied on record evidence from only the 2021 calendar year.  JSC merely argues that Commerce can deviate from its practice, that Commerce requested information from the entire POR, and that therefore,

Commerce should have departed from its practice here.  The relevant regulation does not provide a methodology for calculating subsidies.  While JSC argues that Commerce's practice recognizes that Commerce must employ all data on the record to calculate subsidy margins, JSC does not cite to any evidence besides the government's and Mosaic's briefs for support.  JSC Reply at 21.  The court does not see how the relevant portions of the briefs can be interpreted to support that proposition.  Rather, the government and Mosaic both state that Commerce's general practice is to rely on one year's worth of data when the POR extends into a second year by less than two months.  See Gov. Resp. at 7–8; Mosaic Resp. at 43–44.  The court sees no reason, and JSC has presented none, why Commerce should have deviated from its practice and why it is distortive.  Accordingly, Commerce's decision to rely on record evidence from calendar year 2021 was supported by substantial evidence.

## II.    Commerce's Phosphate Rock Benchmark was not Supported by Substantial Evidence

JSC argues that Commerce's phosphate rock benchmark was not supported by substantial evidence because it does not reflect "prevailing market conditions" in Russia as required by 19 U.S.C. § 1677(5)(E)(iv).  JSC Mot. at 20–23.  JSC and ADM contend that the benchmark used was the result of cherry-picked data that produced a high CVD margin for JSC.[5]  Id. at 23–26;

---

[5] ADM also argues that Commerce erred in refusing to consider ADM's Notice of Subsequent Authority, P.R. 234 (Sept. 21, 2023), regarding the court's decision in Mosaic Co. v. United States, 659 F. Supp. 3d 1285 (CIT 2023).  See ADM Mot. for J. on the Agency R. at 21–24, ECF No. 41 (June 5, 2024) ("ADM Mot.").  JSC has chosen not to pursue the issue.  See JSC Mot. at 3 n.2.  The government and Mosaic argue that Commerce's denial of ADM's Notice of Subsequent Authority was reasonable because the Notice contained untimely new arguments and because the case did not support ADM's proposition that Commerce should have used the bone phosphate of lime ("BPL") content of the phosphate rock as the driving factor for its tier three benchmark.  Gov. Resp. at 36; Mosaic Resp. at 28–32.  On September 21, 2023, ADM submitted a Notice of Subsequent Authority regarding Mosaic Co.  On October 18, 2023, Commerce rejected and removed ADM's submission from the record because it contained untimely new arguments.  See

ADM Mot. for J. on the Agency R. at 15–25, ECF No. 41 (June 5, 2024) ("ADM Mot."). The government and Mosaic respond that Commerce reasonably constructed its benchmark in the light of prevailing market conditions in Russia and consistent with market principles. Gov. Resp. at 28–37; Mosaic Resp. at 9–32.

To find a countervailable subsidy, Commerce must establish that an authority provided a financial contribution, and a benefit was thereby conferred. 19 U.S.C. § 1677(5)(B). A foreign government's provision of goods to a respondent for less than adequate remuneration constitutes a benefit. Id. § 1677(5)(E)(iv). "[T]he adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Id. Commerce determines the amount of the subsidy by comparing remuneration actually paid with a market-determined price for the goods or services under "a three-tiered hierarchy" employed by Commerce "to determine the appropriate remuneration benchmark." Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316, 1332 (2018); see 19 C.F.R. § 351.511(a)(2)(i)–(iii) (2021).

Commerce derives a tier one benchmark "by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in

---

Commerce's Rejection of Subsequent Authority Submission, P.R. 238 (Oct. 18, 2023). Official decisions of the court are law that either informs or binds Commerce, and Commerce may not choose to ignore them because they are issued at an inconvenient time. The court finds, however, that Commerce's failure to consider the holding in Mosaic Co. was harmless error as the court did not explicitly hold that BPL content should be the driving factor in a tier three benchmark analysis of phosphate rock across the board. Rather, the court merely acknowledged that "Mosaic [does not] deny that 'phosphate content/BPL content' is 'the industry's own standard … metric of comparability' for phosphate rock." Mosaic Co., 659 F. Supp. 3d at 1308. This does not amount to a prescriptive holding regarding Commerce's use of BPL content in its investigations.

question." 19 C.F.R. § 351.511(a)(2)(i).  In the absence of such a benchmark, Commerce turns to

a tier two benchmark "by comparing the government price to a world market price where it is

reasonable to conclude that such price would be available to purchasers in the country in question."

Id. § 351.511(a)(2)(ii).  "If there is no world market price available to purchasers in the country in

question," however, Commerce moves on to a tier three analysis and "measure[s] the adequacy of

remuneration by assessing whether the government price is consistent with market principles."  Id.

§ 351.511(a)(2)(iii).  If Commerce determines that the government price is not consistent with

market principles, it will construct an external benchmark.  Canadian Solar Inc. v. United States,

537 F. Supp. 3d 1380, 1389 n.6 (2021).

Because the GOR owns subsoil resources, Commerce determined that the GOR's sale of

mining rights to JSC constitutes a financial contribution in the form of a provision of a good within

the meaning of section 771(5)(D)(iii) of the Trade Act of 1930 ("The Act") [19 U.S.C.

§ 1677(5)(D)(iii)].  PDM at 20–21.  Commerce determined that there was no viable tier one

benchmark available because the GOR is the sole issuer of phosphate mining rights in Russia,

meaning there were no private, market-determined prices available.  Id. at 19.  Commerce also

determined that there was no viable tier two benchmark available because it found that mining

right licenses were "goods that do not lend themselves to comparison to a world market price

because such prices would not be available to purchasers in Russia."  Id. at 19–20.  Commerce

therefore used a tier three analysis under 19 C.F.R. § 351.511(a)(2)(iii).  Id.  Commerce found that

the appropriate comparison benchmark was "a world market price of comparable phosphate rock."

IDM at 29 (quotation omitted).  To conduct this analysis, Commerce compared the actual per-unit

cost buildup for JSC's beneficiated phosphate rock to a world market price for comparable

phosphate rock.  PDM at 20; IDM at 30.

Commerce identified bone phosphate of lime ("BPL") content[6] and the type of ore deposit (i.e. igneous or sedimentary) as qualities relevant for selecting "comparable phosphate rock." IDM at 30 (quotation omitted). Commerce found that record information demonstrates that the production processes for phosphate rock from sedimentary reserves and igneous reserves differ. To support this conclusion, Commerce relied on a report from Professor Petr Ptacek which identified different steps to mine and beneficiate each type of ore. Id. This report only spoke to the difference in the mining processes, not the difference in costs associated with mining the two kinds of phosphate rock. See id. at 30–31. Because Commerce's analysis focused on "JSC Apatit's costs to mine and process phosphate ore into phosphate rock," Commerce reasoned that "any differences in the production process for phosphate rock from sedimentary deposits versus igneous deposits" were "conditions of purchase or sale" and therefore relevant to its analysis. Id. Accordingly, Commerce concluded that phosphate rock produced from sedimentary reserves is not comparable to the phosphate rock from igneous reserves that JSC produced. Id. at 31.

Commerce limited the content of the benchmark in several other ways. For the final results, Commerce relied solely on export data from the Global Trade Analysis ("GTA") database. IDM at 26. The GTA database included export prices from Brazil, South Africa, and Finland. Id. Commerce declined to use data from the Eurostat database as requested by JSC and ADM. Id. at 37. Commerce reasoned that the dataset did not identify the exporting countries, meaning Commerce could not determine whether the values were for igneous or sedimentary phosphate rock. Id. at 38–39. Commerce also declined to include export prices for Togo and Iran because

---

[6] The fertilizer industry uses the terms "BPL content" and "$P_2O_5$" (phosphorous pentoxide) content interchangeably. Letter from WilmerHale, Mosaic Benchmark, Ex. 21 at 436–37, P.R. 132–33, 136, 138 (Mar. 15, 2023) ("Mosaic Benchmark"). These metrics are the industry's standard measures of the grade of phosphate rock and its suitability for processing into phosphate fertilizer. Id.

the two countries produced sedimentary rather than igneous phosphate rock.  Id. at 30.  In addition, Commerce declined to adjust the South Africa export data to eliminate allegedly distorted export prices, as JSC and ADM requested.  Id. at 33.

Based on its tier three benchmark, Commerce found that JSC had received a countervailable subsidy from the GOR.  See IDM at 9.  Commerce calculated the final subsidy rate for this program as 26.78 percent ad valorem.  Id.  JSC and ADM raise several challenges to Commerce's construction of the tier three benchmark.  These arguments focus on Commerce's decision to focus on quality as the prevailing "market condition" in its analysis and its decision to exclude sedimentary phosphate rock from the benchmark.  The court addresses each argument in turn.

### a. Commerce's tier three benchmark reasonably focused on the quality of the rock

JSC argues that Commerce's benchmark did not reflect prevailing market conditions because it focused exclusively on "quality" while ignoring the other prevailing market conditions listed in 19 § C.F.R. 351.511(a)(iii).  JSC Mot. at 13–15, 20–23.  JSC contends that Commerce was required to consider all the relevant prevailing market conditions outlined by the statute— "price, quality, availability, marketability, and other conditions of purchase or sale"—for its analysis to be lawful under 19 § C.F.R. 351.511(a)(iii).[7]  Id. at 21.  The government counters that

---

[7] JSC also argues that Commerce failed to explain why none of the factors besides quality were relevant to its tier three benchmark.  JSC Mot. at 21.  JSC cites Risen Energy Co. v. United States, 570 F. Supp. 3d 1369, 1376 (CIT 2022) to support this contention.  The court in Risen, however, did not hold that Commerce must address every factor identified as a "prevailing market condition."  Rather, the court in Risen found that Commerce had not adequately explained why it used certain data in its benchmark rather than other viable alternatives.  See id.  While this is relevant to the issue of whether Commerce reasonably excluded sedimentary rock sales from the benchmark, it does not speak to whether Commerce must explain why it relied on only one prevailing market condition.

the tier three analysis factors are not hierarchical, and that Commerce may rely on one or more factors to calculate a tier three benchmark. Gov. Resp. at 31. Mosaic also notes that the statute does not mandate that Commerce address each factor it lists in evaluating the adequacy of remuneration. Mosaic Resp. at 12.

The governing statute dictates that the "adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv). Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale. Id.

JSC incorrectly contends that, to meet its statutory requirements, Commerce must rely on all the relevant necessary factors. The statute only requires Commerce to consider all the factors, not rely on them. Accordingly, Commerce's decision to rely on quality alone does not on its own render the phosphate rock benchmark unsupported by substantial evidence. Whether Commerce reasonably relied on quality, and particularly the distinction between igneous and sedimentary phosphate rock, to construct its benchmark is a separate issue to which the court now turns.

### b. Exclusion of sedimentary phosphate rock in the construction of the tier three benchmark was not supported by substantial evidence

ADM and JSC argue that Commerce unreasonably limited its benchmark to igneous rather than phosphate rock due to the different production processes, despite there being no record evidence that the relative cost to produce the two kinds of phosphate rock differs significantly. ADM Mot. at 16–18; JSC Mot. at 15–16. JSC contends that the phosphate rock market is not driven by the distinction between igneous and sedimentary phosphate rock; rather, the market is driven by BPL content of the rock and by the price of Moroccan phosphate rock, as Morocco is

the largest exporter of phosphate rock.[8]  JSC Mot. at 15–17 (citing Letter from Hogan Lovells,

JSC Apatit Benchmark at Appx. 9, P.R. 155, C.R. 191 (Mar. 15, 2023) ("JSC Benchmark"); JSC

Apatit Benchmark Rebuttal at Appx. 11, P.R. 169–171, C.R. 202–04 (Mar. 27, 2023) ("JSC

Benchmark Rebuttal")).  Nothing in this record contradicts this contention.  See supra n.8.

     ADM and JSC contend that the distinction between sedimentary and igneous rock led

Commerce to construct a benchmark that included an unreasonably "miniscule" volume of data

that constituted less than one-quarter of one percent of the world's phosphate rock market.[9]  ADM

Mot. at 24–25; JSC Mot. at 15, 23.  Rather, they argue that Commerce should have included data

from countries, specifically Togo and Iran, whose phosphate rock contained similar BPL levels as

those of Russian phosphate rock.  ADM Mot. at 15–18; JSC Mot. at 16, 28.  JSC also argues that

Commerce should have included data from European imports of phosphate rock during the POR

("Eurostat data") because the European market accounts for one-third of the world's imports of

---

[8] JSC also argues that Commerce was inconsistent with its recent determinations in which it relied solely on BPL content levels in determining its tier three benchmark.  JSC Mot. at 23.  Each administrative review is a "separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  Qingdao, 766 F.3d at 1387.  Commerce's prior determinations are not binding on its current ones and, even if they were, JSC has not shown that the distinction between igneous and sedimentary phosphate rock was a central issue in Commerce's prior determinations.  Nonetheless, the fact remains that the record here established the importance of BPL content to pricing.  See JSC Benchmark, Appx. 9 at 10–11 (P.R. 155, C.R. 191) (organizing phosphate rock exports based on BPL content); JSC Benchmark Rebuttal, Appx. 11 (P.R. 169–171, C.R. 202–03) (demonstrating that BPL content directly impacts the price of phosphate rock); Mosaic Benchmark, Ex. 19 at 352, (organizing phosphate rock sources by BPL content); Mosaic Benchmark, Ex. 20 at 384–85 (noting that it is highly desirable for economic and technical reasons to increase the grade of phosphate feedstock and that phosphate rock concentrate must meet a minimum BPL content to be salable); Mosaic Benchmark, Ex. 21 at 437 (stating that commercial phosphate rocks vary in grade based on the BPL content and that most international trade involves higher-grade phosphate rocks).

[9] JSC notes that the GTA database is unrepresentative of the phosphate rock market during 2021 because the data accounts for less than 0.02% of the total global production and less than 0.12% of the total global exports of phosphate rock in 2021.  JSC Mot. at 24.

phosphate rock with similar BPL levels, JSC sells almost all of its phosphate rock to the European market, and the prices of phosphate rock in Europe reflect Moroccan prices.[10]  JSC Mot. at 16–17.

The government and Mosaic argue that Commerce reasonably excluded sedimentary phosphate rock from the benchmark because it determined that the processes to mine and beneficiate each type of ore differed.  Gov. Resp. at 32–33; Mosaic Resp. at 20–24.  Accordingly, they conclude that Commerce reasonably excluded the data from Togo and Iran because both countries produce sedimentary phosphate rock.  Gov. Resp. at 33; Mosaic Resp. at 24.  They also contend that Commerce reasonably found the Eurostat data unusable because it did not identify the exporting countries, meaning Commerce could not determine which import volumes and

---

[10] JSC also argues that the data from South Africa that Commerce included in the benchmark was distorted because it was incomplete without data from a third HTS code of South African Exports from the Global Tariff Tracker ("GTT") dataset, which accounted for a large percentage of South African phosphate rock exports.  JSC Mot. at 27–28; JSC Reply at 13–14.  Mosaic responds that Commerce reasonably found that no specific information on the record described the products covered by the third subheading and accordingly, the benchmark should not include the third subheading.  Mosaic Resp. at 27–28; see Gov. Resp. at 33.  Commerce described the subheadings in the IDM:

> JSC Apatit claims that South Africa exported the majority of its phosphate rock under HS subheading 2835.2690. The description from GTT that JSC Apatit provided describes the product under this HS subheading as "Phosphates of calcium (excl. calcium hydrogenorthophosphate 'dicalcium phosphate') with a fluorine content >= 0,005% by weight on the dry anhydrous product." This differs from the descriptions for phosphate rock under HS subheadings 2510.10 and 2510.20 in the GTA and UN Comtrade data, which are "Natural calcium phosphates, natural aluminum calcium phosphates and phosphatic chalk; unground," and "Natural calcium phosphates, natural aluminum calcium phosphates and phosphatic chalk; ground," respectively.

IDM at 39.  JSC has failed to show that the products described by these three subheadings are comparable.  Given that subheadings 2510.10 and 2510.20 limit their scope to "natural calcium phosphates" and subheading 2835.2690 does not mention the word "natural," Commerce reasonably concluded that 2835.2690 likely covers different products.

values are comparable to Russian phosphate rock in terms of BPL content and geological source.[11]

Gov. Resp. at 31; Mosaic Resp. at 25. Last, Mosaic argues that the small volume of the benchmark

does not render it per se inconsistent with market principles because Commerce's regulations do

not speak to the volume of the benchmark. Mosaic Resp. at 15–16.

While the regulations do not compel any specific methodology for Commerce to follow

for a tier three benchmark, Commerce's construction of the benchmark must be supported by

substantial evidence. See 19 U.S.C. § 1516a(b)(1)(B)(i). Commerce constructed a benchmark

that reflected only a tiny percentage of global phosphate rock exports because it chose to exclude

any data for sedimentary phosphate rock. While the size of the benchmark data alone does not

render the benchmark unreasonable, Commerce must have relied on important market conditions

to warrant such a small volume-based benchmark. The government, however, has failed to point

to any record evidence to suggest that the phosphate rock market is driven by the difference

between sedimentary and igneous rock. It has failed to show even that there are different costs

associated with the production of each type of rock.[12] Rather, Commerce constructed a chain of

inferences without cited support to reach its conclusion that the benchmark should include only

igneous rock. While Commerce reasonably found that the record indicated that sedimentary and

igneous rock have different production processes, it extrapolated that the cost to produce each kind

of rock differs and that therefore, the price of sedimentary and igneous rock is not comparable,

even if BPL content does not differ. Without record evidence that the costs to produce the two

---

[11] The court does not reach this issue as it is intertwined with the geological distinction issue that is not yet resolved.

[12] In post argument submissions, Mosaic notes evidence that there may be a ten percent difference in production costs. Mosaic Post Argument Submission at 4, ECF No. 77 (Apr. 17, 2025). This evidence was not specifically credited and relied on by Commerce, and it does not resolve the issue of what drives market price.

kinds of rock differ significantly and that the distinction between the two was a significant driver of prices in the phosphate rock market, a benchmark reflecting such minimal volume data is unreasonable.

Accordingly, the court remands for Commerce to either present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark.

### III.    Commerce Reasonably Calculated JSC's Phosphate Rock Cost of Sales Plus Profit

JSC argues that Commerce erroneously employed Profit Before Tax in JSC's profit ratio and therefore failed to calculate JSC's benefit as accurately as possible.  JSC Mot. at 29.  JSC argues that, although Commerce claimed to have isolated JSC's expenses related to the extraction and beneficiation of phosphate rock, it failed to accurately account for additional associated expenses.  Id.  JSC contends that to account for these expenses, Commerce must either utilize gross profit or include additional expenses that are not part of the reported cost of production, including administrative expenses, selling expenses, net interest expenses, and other expenses.  Id. at 31–32.  In particular, JSC argues that Commerce unreasonably excluded additional expenses that JSC incurred to mine and beneficiate phosphate rock at its Kirovsk Branch.[13]  Id. at 31.  JSC notes that

---

[13] JSC also argues that Commerce erroneously excluded a one-time fee paid by JSC to maintain a mining license that was incurred during the POR.  JSC Mot. at 33–34.  The government states that Commerce excluded the payment from its calculation because JSC did not mine phosphate rock under this license during the POR.  Gov. Resp. at 39.  In the IDM, Commerce referred to the license as a "benefit offset," explaining that "[i]n a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit cannot be masked or otherwise offset by any such 'negative benefit.'"  IDM at 24.  Section 771(6)(A) of the Act states that, in determining the net countervailable subsidy, Commerce may subtract from the gross countervailable subsidy the amount of "any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy."  19 U.S.C. § 1677(6)(A).  Because, and the parties do not dispute, JSC did not mine under this license during the POR, this license did not

it reconciled its cost of sales, administrative expenses, selling expenses, and other expenses to the consolidated PhosAgro, JSC's parent company, financial statements, meaning there would be little risk of double counting any expenses by using gross profit.  Id. at 33.

The government argues that Commerce appropriately used Profit Before Tax in undertaking its benefit calculation for JSC.  It notes that when LTAR benefit calculations involve a profit adjustment to the recipient's cost, it is Commerce's practice to use Profit Before Tax as the profit figure.  Gov. Resp. at 37–38.  The government argues that the Profit Before Tax methodology isolates JSC's mining and beneficiation costs because it excludes expenses unrelated to phosphate mining and beneficiation and removes the risk of double counting.  Id. at 40.  Mosaic adds that PhosAgro's financial statements for 2021 show that its gross profit includes several categories of expenses unrelated to phosphate mining and beneficiation.[14]  Mosaic Resp. at 33. The government and Mosaic argue that Commerce reasonably excluded expenses of the Kirovsk Branch because JSC has not shown that the branch's expenses related to phosphate mining or beneficiation or how Commerce should account for those costs in its profit calculation.  Id. at 35; Oral Argument at 46:15.

To calculate Gross Profit, Commerce calculates the respondent's revenue and subtracts the cost of group products sold and the cost of products for resale.  IDM at 19.  Compared to Gross Profit, a Profit Before Tax calculation excludes: (1) selling and administrative expenses; (2) taxes

---

provide a benefit to JSC during the POR.  Commerce therefore reasonably found that an offset was not appropriate and excluded the fee from its calculation.

[14] Mosaic also argues that JSC failed to exhaust its administrative remedies before Commerce by not identifying evidence in its administrative case brief.  Mosaic Resp. at 34.  Mosaic argues that Commerce reasonably found that JSC failed to present an argument regarding a specific adjustment or allocation methodology for selling, administrative, and other expenses for Commerce to consider.  Mosaic Resp. at 35.  Whether or not a sufficient argument was made, JSC did not provide Commerce a roadmap for a proper allocation.  See infra pp. 18–19.

other than income taxes; (3) "Other Expenses;" (4) net foreign exchange losses; (5) net financing costs; and (6) Covid-19-related expenses.  Id. at 20.  It includes a net gain from a revaluation of financing assets.  Id.

Commerce calculated JSC's per-unit cost buildup and the 2021 per-unit cost of sales by adding JSC's reported 2021 cost of sales for phosphate rock to the total 2021 extraction taxes and environmental payments that JSC paid to the GOR.  USDOC Preliminary Calculation Memo – JSC Apatit at 7, P.R. 189–90, C.R. 218–19 (Apr. 27, 2023) ("Preliminary Calculation Memo"); Final Calculation Memo at 2.  Commerce then divided the 2021 total cost of sales by JSC's total reported quantity of phosphate rock sold.  Preliminary Calculation Memo at 7.  To calculate a 2021 profit ratio, Commerce divided PhosAgro's Profit Before Tax by its overall 2021 cost of sales for phosphate-based products.  Id.; Final Calculation Memo at 2; IDM at 19.  Finally, Commerce multiplied the 2021 profit ratio by the 2021 per-unit cost of sales.  Preliminary Calculation Memo at 7; Final Calculation Memo at 2.

Commerce justified its use of Profit Before Tax by stating that "using Gross Profit, and, therefore, including items such as selling and administrative expenses in the numerator of the profit ratio calculation, would be inconsistent with the aim of the calculation methodology: to isolate costs for phosphate ore mining and beneficiation activities."  IDM at 20; see Final Calculation Memo at 2.  Commerce noted that expenses within PhosAgro's POR financial statements show that Gross Profit includes expenses for activities much broader than JSC's mining and beneficiation of phosphate ore, such as "[s]ocial expenditures" and "[i]ncrease in provision for bad debt and expected credit losses allowance."  IDM at 21.

The government has presented sufficient evidence to show that Commerce reasonably used Profit Before Tax rather than Gross Profit.  As Commerce explained in the IDM, Profit Before Tax

is narrower and helps to isolate costs for phosphate ore mining and beneficiation activities. Id. at 21, 23. Conversely, using a Gross Profit calculation risks including costs unrelated to the mining of phosphate ore such as selling and administrative expenses. JSC has failed to demonstrate that including additional expenses in the calculation would render a more accurate profit ratio calculation. Regarding the expenses incurred by the Kirovsk Branch, JSC has similarly failed to show that it provided Commerce with a breakdown of the expenses related to phosphate mining and beneficiation and how those expenses should be allocated in the benefit calculation. While the expense sheets that JSC provided lists different expenses incurred by the branch, they do not show which administrative expenses related to phosphate mining and beneficiation and which related to the branch's other activities. Without more, Commerce could not reasonably include the expenses of the Kirovsk Branch in its calculations. The court therefore concludes that Commerce reasonably used Profit Before Tax and excluded expenses incurred by the Kirovsk Branch when it calculated JSC's benefit.

## IV.  JSC's Natural Gas Purchases

### a.  Commerce's application of an Adverse Finding of Fact to the Government of Russia regarding JSC's natural gas purchases was supported by substantial evidence

JSC argues that Commerce improperly countervailed certain JSC purchases of natural gas from independent producers and suppliers by selecting from facts available using an adverse inference ("AFA") that those producers were government authorities. JSC Mot. at 35–36. JSC argues that it provided sufficiently detailed information about the independent gas producers to demonstrate that they were not government authorities in accordance with 19 U.S.C. § 1677(5)(B). Id. at 36. JSC contends that Commerce improperly imposed the results of the non-cooperative

GOR to JSC, a cooperative respondent, which should only be done as a last resort.[15] Id. at 36, 39. Last, JSC argues that Commerce failed to demonstrate why the evidence provided by JSC did not fill the gap created by the GOR's failure to submit the input supplier appendices.[16] Id. at 41.

The government argues that Commerce's decision to apply AFA to the GOR is supported by substantial evidence because the GOR failed to cooperate to the best of its ability and the information necessary was not available on the record. Gov. Resp. at 11. The government notes that the information provided by JSC was not an adequate substitute for the information requested from the GOR because it did not provide detailed information regarding each level of ownership between the supplier and its ultimate ownership. Id. at 15. The government also argues that its application of AFA to the GOR was not overly broad nor unlawfully harmful because the government established the necessity of the information requested and the insufficiency of the record evidence provided by JSC. Id. at 17.

As discussed previously, a subsidy is countervailable if the following elements are satisfied: (1) an authority has provided a financial contribution directly or entrusts a private entity to make a financial contribution; (2) a benefit is thereby conferred on a recipient of the financial

---

[15] JSC further notes that, in Commerce's original CVD investigation, it found that one of the companies was "not a government authority," but that Commerce countervailed JSC's later purchases from the company. JSC Mot. at 36–37. The government responds that each administrative determination is a separate exercise and that it may use a case-by-case analysis. Gov. Resp. at 16. Commerce's prior finding that a company was not a government authority has no bearing on the present administrative review, particularly in the context of a non-cooperative government. See Qingdao, 766 F.3d at 1387.

[16] JSC also argues that Commerce was required to afford JSC an opportunity to provide supplemental information if Commerce believed the information provided by JSC was insufficient. JSC Mot. at 42. The government argues that, by statute, only the deficient party is provided the opportunity to remedy, not third parties. Gov. Resp. at 18–19 (citing Risen, 658 F. Supp. 3d at 1371). The court does not reach the issue because the type of information requested is uniquely within the control of the government and JSC has not proffered the complete set of information that Commerce requested.

contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  See 19 U.S.C. § 1677(5)(A)–(B), (D)–(E), (5A).  Information from a foreign government is often necessary for Commerce to make a reasonable determination about whether an entity is a government authority.  See Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369–70 (Fed. Cir. 2014).  If the record is missing necessary information to an investigation, Commerce may use facts otherwise available to fill in any gaps that are necessary to find that the elements of the CVD statute are satisfied.  See 19 U.S.C. § 1677e(a).

There are two avenues to fill in the gap for the missing information: "facts otherwise available" and "facts otherwise available" with "adverse inferences."  See 19 U.S.C. § 1677e(a)–(b).  Facts otherwise available shall be used when necessary information is not available on the record, or if an interested party or any other person fails to satisfactorily respond to Commerce's requests for "necessary information" by: (1) withholding requested information, (2) failing to provide information by the submission deadlines or in the form or manner requested, (3) significantly impeding a proceeding, or (4) providing information that cannot be verified.  19 U.S.C. § 1677e(a)(1)–(2).  Separately, Commerce may use an adverse inference when selecting from available facts if an interested party has "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b).

In its initial questionnaire, Commerce requested that the GOR respond to the Input Producer Appendix for all natural gas producers/suppliers reported by JSC.  Letter from USDOC, Initial Questionnaire at 17, 36–38, P.R. 16 (July 20, 2022).  When the GOR did not provide a response regarding JSC's gas producers and suppliers, Commerce reiterated its request in a supplemental questionnaire.  See Letter from USDOC to Government of the Russian Federation, GOR Sec II Supplemental Questionnaire, P.R. 112, C.R. 166 (Feb. 15, 2023).  In response, the

GOR stated that it was "trying to obtain the information requested by [Commerce]," but did not provide any further information.  Response from Ministry of Economic Development of the Russian Federation, GOR Suppl. Questionnaire Response at 5, P.R. 129, C.R. 175 (Mar. 13, 2023) ("GOR Suppl. Questionnaire Response").  In both the preliminary and final results, Commerce applied AFA to the GOR and found that JSC's gas producers/suppliers were authorities within the meaning of the statute and had provided JSC with a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii).  PDM at 13–14; IDM at 50–51.

In an attempt to demonstrate that its gas producers and suppliers were independent, JSC provided Commerce with the firms' direct and total ownership percentages, their current and historical shareholders, and their respective ownership percentages.  JSC Sec. III QR at Ex. 24. Commerce determined, however, that JSC's documentation was insufficient to "determine whether the producers/suppliers are 'authorities' within the meaning of section 771(5)(B) of the Act."  IDM at 50.  Specifically, Commerce noted that the documentation provided by JSC "fails to provide the detailed information regarding each level of ownership between the supplier and its ultimate ownership as requested in the Input Producer Appendix."  Id. at 50–51.  Accordingly, Commerce found as AFA that JSC's gas producers/suppliers are "authorities" within the meaning section 771(5)(B) of the Act [19 U.S.C. § 1677(5)(B)] and provided a financial contribution to JSC within the meaning of section 771(5)(D)(iii) of the Act [19 U.S.C. § 1677(5)(D)(iii)].  Id. at 51.  Commerce calculated the final subsidy rate for this program as 0.99 percent ad valorem.  Id. at 9.

Here, Commerce found a relevant gap in the record created by the GOR's failure to provide the requested Input Producer Appendix.  Commerce reasonably requested a wide range of information from the GOR regarding the ownership and corporate structure of the relevant Input

Producers and received no meaningful response. While JSC attempted to fill this evidentiary gap, the information that it provided did not speak to each level of ownership between the supplier and its ultimate ownership. See JSC Sec. III QR at Ex. 24. JSC contends that it provided Commerce with the firms' direct and total ownership percentages, their current and historical shareholders, and their respective ownership percentages. JSC Mot. at 36. JSC only directs the court, however, to an exhibit that does not appear to include information about each level of ownership, as Commerce requested. See id. (citing JSC Sec. III QR at Ex. 24). Because of this gap in the record, Commerce reasonably selected from the facts available pursuant to 19 U.S.C. § 1677.

As discussed, the AFA statute authorizes Commerce to use adverse inferences when selecting from facts otherwise available when an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information. The only response that Commerce received from the GOR in response to its questionnaires was that "it was 'trying to obtain the information requested by [Commerce],'" but did not provide any further information. PDM at 12 (citing GOR Suppl. Questionnaire Response). Such a response hardly amounts to cooperation to the best of the GOR's ability. Accordingly, Commerce reasonably selected among facts otherwise available by utilizing an adverse inference.

Commerce's application of AFA was not unduly harmful to JSC. While the application of adverse facts that collaterally impact a cooperating party is disfavored, Commerce provided JSC with a meaningful opportunity to submit factual evidence that weighs in its favor. See Fine Furniture (Shanghai) Ltd. v. United States, 36 CIT 1206, 1212 n.10, 865 F. Supp. 2d 1254, 1262 n.10 (2012), aff'd, 748 F.3d 1365 (Fed. Cir. 2014). JSC availed itself of such an opportunity. JSC Sec. III QR at Ex. 24. Commerce considered the factual evidence that JSC submitted and reasonably determined it to be insufficient to fill the gap created by the GOR's non-cooperation.

IDM at 50–51.  Accordingly, Commerce did not err in concluding that JSC's natural gas producers/suppliers were government authorities, based on facts available with an adverse inference.

### b. Commerce's selection of Kazakh export prices for its tier two LTAR benchmark calculation was not supported by substantial evidence

Mosaic argues that, while Commerce correctly determined that the GOR provided a countervailable subsidy to JSC during the POR in the form of natural gas for LTAR, it erred by using Kazakh export prices as a tier two benchmark because of record evidence demonstrating that Kazakh natural gas was not "available" to purchasers in Russia within the meaning of Commerce's regulations.  Mosaic Mot. at 11–12.  Instead, Mosaic argues that Commerce should have used a tier three benchmark, as it did in the original investigation.  Id.  Mosaic cites to several pieces of evidence to support this contention.  First, Mosaic notes that the relevant GOR customs code covers "Natural gas (excluding as sold to the population)," which indicates that the imports would not be "available to purchasers" in Russia.[17]  Id. at 14.  Second, Mosaic argues that the Preamble to the regulation does not contemplate a government entity to be a "purchaser," as required by the regulation; rather, the regulation contemplates private entities and consumers as purchasers.  Id. at 15.  Third, Mosaic contends the high-sulfur gas that KPO sold to Gazprom (a GOR-owned entity)

---

[17] Commerce based its determination in part on the fact that data showed exports of natural gas from Kazakhstan to Russia under GOR customs code 2711210000 and it stated that "[i]n prior cases, … the GOR has confirmed that imports under this customs code (2711210000) are placed under a customs procedure of a release into free circulation."  IDM at 46.  Mosaic argues that there is no evidence on the record that includes this alleged GOR "confirmation" and that therefore, the customs code cannot constitute evidence in support of Commerce's determination.  Mosaic Mot. at 14.  The government and JSC respond that in prior administrative proceedings, the GOR had stated that imports under the relevant customs code were released into free circulation.  Gov. Resp. at 24; JSC Resp. at 13.  If, as the parties seem to agree, the sales from Kazakhstan were only to the refiner, this code is irrelevant.  Downstream sales of the refined gas do not appear to be relevant.

was not comparable to the natural gas that Gazprom sold to JSC, and that it was only sold for

Gazprom to process and then re-export back to Kazakhstan.[18] Id. at 17–18.

The government and JSC argue that no language in the regulation or discussion in the CVD

Preamble indicates that "available" must be interpreted as available to private entities, nor is there

text equating "available" to prices that are available to "customers."  Gov. Resp. at 25–26; JSC

Resp. at 13.  The government and JSC also contend that any difference between the exported "raw"

gas and the natural gas under consideration is irrelevant because Commerce is not using exports

to Russia as a benchmark but rather relying on exports to other non-distorted markets.  Gov. Resp.

at 27; JSC Resp. at 17.  In a post argument submission, JSC clarifies that the two kinds of gas are

comparable, even though they are not identical, and that a tier two benchmark may lawfully

employ a comparable product.  JSC Post Argument Submission at 1, 3–5, ECF No. 80 (Apr. 17,

2025).

As discussed previously, Commerce's regulation sets out the three-tier hierarchy that

Commerce uses to select benchmarks to measure the adequacy of remuneration paid for goods or

services.  19 C.F.R. § 351.511(a)(2).  If there is no useable market-determined price to conduct a

tier one analysis, Commerce conducts a tier two analysis in which it seeks to measure the adequacy

of remuneration by comparing the government price to a "world market price where it is reasonable

---

[18] Mosaic also argues that the Kazakh domestic market itself is distorted because the Government of Kazakhstan ("GOK") owns and controls a substantial share of natural gas and transportation in Kazakhstan through GOK-controlled entities.  Mosaic Mot. at 20.  Commerce responds that disqualification of an import price as a tier one benchmark due to domestic market distortion does not preclude its usage as a tier two benchmark.  Gov. Resp. at 20.  JSC also notes that Commerce previously examined whether the Kazakh domestic market was distorted and found that it was not. JSC Resp. at 18–19.  Even if the domestic market is distorted, however, JSC argues that this does not preclude its selection as a tier two benchmark based on Commerce's prior rulings.  Id.  This issue is relevant only if the refiner is a purchaser per the meaning of the regulation and its purchases are comparable to the benchmark sales.

to conclude that such price would be available to purchasers in the country in question." Id. § 351.511(a)(2)(ii). If there is no world market price available to purchasers in the country in question, then Commerce moves on to a tier three analysis and "measure[s] the adequacy of remuneration by assessing whether the government price is consistent with market principles." Id. § 351.511(a)(2)(iii).

In its initial questionnaire response JSC confirmed it purchased natural gas from Gazprom, a Russian government entity that controls the Russian gas pipeline system. JSC Sec. III QR at 37–39. Commerce preliminarily determined that Gazprom's sale of natural gas to JSC conferred a financial contribution, that the program is de facto specific, and that it was a countervailable program. PDM at 13–18. To determine the adequacy of remuneration that JSC paid for natural gas provided by the GOR, Commerce determined that there was no suitable tier one benchmark because of the GOR's predominant role in the Russian market for natural gas during the POR, which distorted the market. Id. at 15. Commerce then evaluated whether there were viable tier two benchmarks on the record. Id. at 16. Commerce found that evidence from Kazakh natural gas producer Karachaganak Petroleum Operating BV ("KPO") indicated that KPO sold natural gas to Gazprom's Orenburg Gas Processing Plant in Russia. Id. at 17. Commerce concluded that natural gas exported from Kazakhstan was available to purchasers in Russia and therefore that Kazakh export prices for natural gas were usable as a tier two benchmark. Id. at 17. In its Final Results, Commerce continued to use Kazakh-origin natural gas export prices to "non-distorted, non-Russian" countries as a tier two benchmark. IDM at 46.

The government has not shown that its tier two benchmark was supported by substantial evidence. It does not seem reasonable to infer from the sale of Kazakh natural gas to a single government-owned entity—the very entity that Commerce found distorts Russia's domestic

natural gas market in the first place—that Kazakh natural gas would be available to "purchasers" in the country in question within the meaning of the regulation.  Further, Gazprom only purchases raw gas, which it then refines and primarily exports back to Kazakhstan.  JSC's gas purchases, however, were of refined natural gas, and presumably the benchmark would reflect the subsidized product, not some other product.  Although the record and briefing suggest that Commerce's tier two benchmark was unreasonable, Commerce will be afforded the opportunity to consider important issues that are not fully addressed.  First, the question of the comparability of the benchmark third-party sales and the sales into Russia remains.  Second, if the sales are comparable, Commerce must address why sales to a government entity that distorts the market was within the intended meaning of "purchaser" in the regulation and how that fits into the logic of the three-level benchmark scheme.  The court remands to Commerce to either clarify these two issues or to construct a tier three benchmark for JSC's natural gas purchases consistent with this opinion.

## CONCLUSION

The court sustains Commerce's determinations regarding the use of record evidence from calendar year 2021, the calculation of JSC's profit ratio, and the use of facts otherwise available with an adverse inference to find that JSC's natural gas purchases were from government authorities.  For the foregoing reasons, the court remands to Commerce for the reconsideration of the phosphate rock benchmark and of its tier two benchmark for natural gas consistent with this opinion.  The remand shall be issued within 60 days hereof.  Comments may be filed 30 days thereafter and any response 15 days thereafter.

 

                                                           /s/Jane A. Restani
                                                       Jane A. Restani, Judge

Dated: May 6, 2025
      New York, New York