C-821-825
Remand
POR:  11/30/2020 – 12/31/2021
Slip Op. 25-55
**Public Document**
E&C/OVIII:  HW/SS

***Archer Daniels Midland Company v. United States***
**Court No. 23-00239, Slip. Op. 25-55 (CIT May 6, 2025)**
**Phosphate Fertilizers from the Russian Federation**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (CIT or the Court) in *Archer Daniels Midland Company v. United States*.[1]  The final

results of redetermination concern the final results in the countervailing duty (CVD)

administrative review on phosphate fertilizers from the Russian Federation (Russia) covering the

period November 30, 2020, through December 31, 2021.[2]  In its *Remand Order*, the CIT

remanded certain aspects of Commerce's *Final Results* for further explanation or

reconsideration.  Specifically, the CIT directed Commerce to:  (1) either present record evidence

showing that the phosphate rock market is significantly driven by the distinction between

sedimentary and igneous rock or reconstruct the tier three benchmark for the Provision of Mining

Rights for Less Than Adequate Remuneration (LTAR) program;[3] and (2) either clarify two

issues relating to the selection of a tier two benchmark for the Provision of Natural Gas for

LTAR program or construct a tier three benchmark.[4]

---

[1] *See Archer Daniels Midland Company v. United States*, CIT No. 23-00239, Slip Op. 25-55 (CIT May 6, 2025) (*Remand Order*).
[2] *See Phosphate Fertilizers from the Russian Federation:  Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 FR 76182 (November 6, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 16.
[4] *Id.* at 26-27.

On June 18, 2025, Commerce released its Draft Results of Redetermination on the two issues identified above.[5] On July 3, 2025, The Mosaic Company (the petitioner), Joint Stock Company Apatit (JSC Apatit), and Archer Daniels Midland Company (ADM) submitted timely filed comments on the Draft Results of Redetermination.[6]

As set forth in detail below, consistent with the CIT's *Remand Order*, we have: (1) cited evidence of differences between the costs to produce phosphate rock from sedimentary deposits versus igneous deposits, explained how phosphate rock market prices are significantly driven by the distinction between sedimentary and igneous rock, and explained why it is necessary to account for this distinction in our benchmark analysis pursuant to 19 CFR 351.511(a)(2)(iii); and (2) used a tier three benchmark analysis to calculate the benefit for the Provision of Natural Gas for LTAR program, pursuant to 19 CFR 351.511(a)(2)(iii). We have addressed parties' comments regarding these issues and accordingly revised the subsidy rate calculated for mandatory respondent JSC Apatit in the *Final Results* and the Draft Results of Redetermination with respect to the provision of natural gas for LTAR program. Based on this analysis, we calculated a revised 22.13 percent *ad valorem* subsidy rate to JSC Apatit for the provision of natural gas for LTAR program, and calculated a total *ad valorem* subsidy rate of 49.64 percent for JSC Apatit for the POR.

## II.    BACKGROUND

In the *Final Results*, Commerce determined the benefit for the Provision of Mining Rights for LTAR program in accordance with 19 CFR 351.511(a)(2), which sets forth the basis

---

[5] *See* Draft Results of Redetermination Pursuant to Court Remand, *Archer Daniels Midland Company v. United States* Court No. 23-00239, Slip. Op. 25-55 (CIT May 6, 2025), dated June 18, 2025 (Draft Results of Redetermination).

[6] *See* Petitioner's Letter, "Petitioner's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated July 3, 2025 (Petitioner's Draft Remand Comments); JSC Apatit's Letter, "Joint Stock Company Apatit's Comments on Commerce's Draft Results of Redetermination," dated July 3, 2025 (JSC Apatit's Draft Remand Comments); and Archer Daniels Midland Company's (ADM) Letter, "Comments of Archer Daniels Midland Company on Draft Results of Redetermination Pursuant to Court Remand," dated July 3, 2025 (ADM's Draft Remand Comments).

for identifying market-determined benchmarks to determine whether a government provides a good or service for LTAR.[7]  These potential benchmarks are listed in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).[8]  Consistent with the determination in the investigation of the proceeding,[9] Commerce relied on a tier three market principles analysis to determine the appropriate benchmark price for phosphate rock under this program.[10]  Specifically, Commerce relied on period of review (POR) export prices from Global Trade Atlas (GTA) for Finland, Brazil, and South Africa under Harmonized System (HS) codes 2510.10 and 2510.20.[11]

Additionally, in the *Final Results*, Commerce determined the benefit for the Provision of Natural Gas for LTAR program in accordance with 19 CFR 351.511(a)(2), and pursuant to tier two, relied on a world market price to calculate the benefit that JSC Apatit received under this program during the POR.[12]  Specifically, Commerce relied on prices for exports of natural gas under HS code 2711.21.0000 from the Republic of Kazakhstan (Kazakhstan) during the POR, based on export data from the Bureau of National Statistics (BNS) of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan.[13]

---

[7] *See Final Results* IDM at Comments 2g and 2j.
[8] *See* 19 CFR 351.511(a)(2).
[9] *See Phosphate Fertilizers from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76524 (November 30, 2020) (*Phosphate Fertilizers from Russia Investigation Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 4, unchanged in *Phosphate Fertilizers from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 FR 9479 (February 16, 2021) (*Phosphate Fertilizers from Russia Investigation Final Determination*), and accompanying IDM at Comment 2c.
[10] *See Final Results* IDM at Comments 2g and 2j: *see also* 19 CFR 351.511(a)(2)(iii).
[11] *See Final Results* IDM at Comment 2f.
[12] *Id.* at Comment 3a; *see also* 19 CFR 351.511(a)(2)(ii).
[13] *See Final Results* IDM at Comment 3a.

In the *Remand Order*, the CIT sustained certain aspects of Commerce's *Final Results*. However, the CIT remanded two issues for further consideration or explanation. First, for the Provision of Mining Rights for LTAR, the CIT held that Commerce failed to cite record evidence in the construction of the tier three benchmark to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock.[14] The CIT remanded for Commerce to either present record evidence showing that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or reconstruct the tier three benchmark.[15] Second, for the Provision of Natural Gas for LTAR, the CIT held that Commerce's selection of Kazakh export prices for its tier two LTAR benchmark calculation was not supported by substantial evidence.[16] Specifically, the CIT remanded for Commerce to: (1) explain the comparability between raw natural gas in the benchmark prices and refined natural gas purchased by JSC Apatit; and (2) if these two types of natural gas are comparable, then explain why sales to a government entity that distorts the market was within the intended meaning of "purchaser" in the regulation and how that fits into the logic of the three-tier benchmark regulation.[17] The Court remanded for Commerce to either clarify these two issues or construct a tier three benchmark for JSC Apatit's natural gas purchases.[18]

## III.    ANALYSIS

### A.    Selection of Tier 3 Benchmark for the Provision of Phosphate Rock for LTAR Program

With respect to the selection of a tier three benchmark pursuant to 19 CFR 351.511(a)(2)(iii), the Court stated, "{w}ithout record evidence that the costs to produce the two kinds of rock differ significantly and that the distinction between the two was a significant driver

---

[14] *See Remand Order* at 15-16.
[15] *Id.* at 16.
[16] *Id.* at 26.
[17] *Id.* at 26-27.
[18] *Id.* at 27.

of prices in the phosphate rock market, a benchmark reflecting such minimal volume data is unreasonable."[19]  The CIT remanded for Commerce to either present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or reconstruct the tier three benchmark.[20]  Pursuant to the CIT's *Remand Order*, in the section below, we cite record evidence indicating that the costs to produce phosphate rock from igneous phosphate ore reserves and sedimentary reserves differ significantly.  Further, we: (1) explain how phosphate rock market prices are significantly driven by the distinction between sedimentary and igneous rock, and (2) explain why it is necessary to account for this distinction in this "market principles" analysis pursuant to 19 CFR 351.511(a)(2)(iii).

In deriving a benchmark from available data to determine a "market-determined price," Commerce considers the source, nature, and completeness of available data on a case-by-case basis.[21]  However, section 351.511(a)(2)(iii) of Commerce's regulations does not prescribe a specific benchmark calculation methodology for Commerce to follow.  In practice, this methodology has taken multiple forms, though Commerce has endeavored to apply benchmark analyses under 19 CFR 351.511(a)(2)(iii) accurately and, to the extent possible, use benchmarks that are comparable to the government-provided good.[22]  This is consistent with our objective to calculate subsidy rates "as accurately as possible."[23]

In the *Final Results*, we cited evidence that the production processes for phosphate rock from sedimentary reserves and igneous reserves differ.[24]  Record evidence also demonstrates that

---

[19] *Id.* at 15-16.

[20] *Id.* at 16.

[21] *See, e.g., Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014), and accompanying IDM at Comment 17.

[22] *See, e.g., Phosphate Fertilizers from Russia Investigation Final Determination* IDM at Comment 2e (describing the benchmark as "a world market price of comparable phosphate rock"); *see also Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 81 FR 49935 (July 29, 2016), and accompanying IDM at Comment 15.

[23] *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (CIT 2015).

[24] *See Final Results* IDM at 30-31.

these differences in production processes result in significant cost differences.  This evidence is as follows:

- A report on the record by Dr. Graham A. Davis, Professor Emeritus of Mineral Economics at the Colorado School of Mines, states, "These Russian phosphate mining licenses are igneous deposits in the Arctic Circle....Their bonuses cannot be compared with…bonuses in Jordan, *which are for a completely different type of mineralization (sedimentary).*"[25]  The report continues by stating that sedimentary deposits in Jordan "{do} not have the same value as the Russian ore."[26]

- The same report by Dr. Davis also states, "If comparison leases have this 10% difference in development cost, *as they well could if we compare another country's sedimentary deposits to Russia's igneous deposits*, they could suggest a lease bonus that is 100% higher or lower than appropriate at the subject lease."[27]

- Excerpts from *Apatites and their Synthetic Analogues*, a 2016 book by Professor Petr Ptáček,[28] state the following with regard to the use of calcination in the beneficiation of sedimentary phosphate ore:

   o "{M}any sedimentary phosphate deposits contain mixtures of undesired constituents.  These ores require a series of beneficiating operations during their processing depending on the type of gangue minerals present in each ore.  This may include, after the size reduction, the combination of attrition scrubbing, desliming, flotation, gravity separation and/or *calcination*."[29]

   o A chart on page 389 of *Apatites and their Synthetic Analogues* identifies calcination as "{n}ot applicable" to the beneficiation of igneous ores.[30]  The chart also identifies "{p}lants high capital cost" as a disadvantage relating to calcination of "sedimentary with calcareous gangue" ore.[31]

   o "The calcination of phosphate ores to remove carbonates *is expensive because of high costs of energy*.  Calcination is practiced commercially at several phosphate rock mining operations around the world, mainly to improve final product quality by removing minor amounts of carbonates and organic matter.  Calcination is also used to remove carbonates *where the cost of natural gas is very low*."[32]

---

[25] *See* JSC Apatit's Letter, "JSC Apatit's Benchmark Data Submission," dated March 15, 2023, at Appendix 7, pp. 16-17 (emphasis added).
[26] *Id.* at Appendix 7, p. 37.
[27] *Id.* (emphasis added)
[28] Professor Ptáček is an Assistant Professor at the Institute of Materials Chemistry and a Senior Researcher at the Materials Research Centre of Brno University of Technology in the Czech Republic.  *See* Petitioner's Letter, "Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration," dated March 15, 2023 (Petitioner's Benchmark Submission), at 5 and Exhibit 22.
[29] *Id.* at Exhibit 20, p. 384 (emphasis added).
[30] *Id.* at Exhibit 20, p. 389.
[31] *Id.*
[32] *Id.* at Exhibit 20, p. 398 (emphasis added).

- The chart at page 389 of *Apatites and their Synthetic Analogues* states that organic acid leaching is "not applicable" to igneous ores.[33]  However, the chart identifies cost-related "advantages" and "disadvantages" with respect to organic acid leaching of "sedimentary with calcareous gangue" ore.  Specifically, the chart identifies "{a}cid plants have low capital cost" as an advantage and "{o}rganic acid price is high" as a disadvantage for organic acid leaching of this sedimentary ore.[34]  Further, with respect to the use of organic acid leaching agents, page 398 of the book states that "{t}hese organic acids may be expensive and will certainly add to the production cost."[35]

This evidence demonstrates that costs to produce phosphate rock from sedimentary ore deposits differ significantly from igneous ore deposits.  These are not trivial cost differences between production from the two types of ore, such as evidence of an additional production step for one type of ore that results in a negligible increase in costs.  Rather, the record shows evidence of differences for major cost items such as capital costs, costs for developing reserves, and energy costs.

The *Remand Order* instructed Commerce to present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock.[36]  The *Remand Order* did not, however, instruct Commerce to quantify the effect of cost differences between the two types of reserves on world market prices for phosphate rock.  Moreover, no party has cited information on the record that would allow us to undertake any such analysis.  As cited above, though, the record shows evidence of significant differences between the two types of reserves for cost items such as capital costs, costs for developing reserves, and energy costs.  Although no record evidence allows us to quantify the effect of these cost differences on world market prices, these differences will logically impact the supply of

---

[33] *Id.* at Exhibit 20, p. 389.
[34] *Id.*
[35] *Id.* at Exhibit 20, p. 398.
[36] *See Remand Order* at 16.

phosphate rock available on the world market from any phosphate rock-producing country, depending on the type of ore available in the country.

Record evidence demonstrates the wide range of factors that impact supply and demand, and hence world market prices, for phosphate rock in addition to differences between the production costs for phosphate rock from sedimentary versus igneous reserves.[37]  If production costs for phosphate rock from one type of reserves are lower compared to production costs for phosphate rock from the other type, the production and sale of phosphate rock from reserves with lower production costs will be profitable at lower world market prices relative to the other type, and *vice versa*.  For example, if the costs to produce phosphate rock from igneous and sedimentary ore reserves are $60 and $40 per unit, respectively, then only the production and sale of phosphate rock from sedimentary reserves will be profitable at a world market price of $50 per unit.  Economically rational producers in countries with igneous reserves will not sell phosphate rock on the world market if the available world market price is $50 per unit.  This effectively reduces the value of producing phosphate rock from igneous reserves relative to sedimentary reserves in this hypothetical example, as only producers in countries with sedimentary reserves will supply the world market at this price.  Therefore, even if world market prices are a product of supply and demand for phosphate rock from both types of reserves and the final marketable product (*i.e.*, phosphate rock) produced from igneous and sedimentary

---

[37] *See* Petitioner's Benchmark Submission at Exhibit 19, pp. 365-366.  ("Phosphate rock prices will increase when the demand approaches the limits of supply.  When the phosphate rock prices increase, some resources will become reserves, marginal mining projects will become viable and the production will be stimulated.  In the future, fuel and fuel-related transportation costs may become even more important components in the world phosphate rock production scenario.  The political disruption is always an unknown factor, and it can profoundly influence the supply and demand for fertilizer raw materials on a worldwide basis." (citation omitted))

reserves is the same, differences in production costs impact the value of the underlying good conveyed *via* the mining rights.[38]

Given the evidence of significant cost differences to produce phosphate rock from the two types of ore (*e.g.*, capital costs, costs for developing reserves, and energy costs), we find it reasonable to conclude that these differences are significant drivers of world market prices for phosphate rock, particularly in the context of this tier three analysis pursuant to 19 CFR 351.511(a)(2)(iii). Prices of phosphate rock available on the world market from countries with sedimentary reserves will not reflect the same costs as those from countries with igneous reserves. In the hypothetical example in the paragraph above, economically rational producers in countries with igneous reserves will not sell phosphate ore on the world market if the available world market price is $50 per unit. Thus, JSC Apatit's phosphate rock cost buildup based on production from igneous reserves and this world market price based on production from sedimentary reserves would not be comparable. This example demonstrates that the inclusion of world market prices for phosphate rock from both types of reserves risks substantive inaccuracies in the tier three benchmark analysis, given our objective to compare JSC Apatit's actual per-unit cost buildup for beneficiated phosphate rock to a world market price for comparable phosphate rock.[39]

Accordingly, based on the evidence of significant cost differences cited above, we continue to find the igneous versus sedimentary distinction to be material to our benefit analysis

---

[38] For programs involving a government's provision of mining rights, Commerce's practice is to consider the calculation of a benefit under this program to be not on the value of the mining rights *per se*, but on the value of the underlying good conveyed via the mining rights. *See Final Results* IDM at 22 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 81 FR 49935 (July 29, 2016), and accompanying IDM at 30; *Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of Countervailing Duty Administrative Review*, 73 FR 40295 (July 14, 2008), and accompanying IDM at 19, 65-66; and *Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 FR 62594 (October 20, 2014), and accompanying IDM at 25-27).

[39] *See Final Results* IDM at 30.

and choice of benchmark pursuant to 19 CFR 351.511(a)(2)(iii).[40]  This distinction is particularly

important in this case because of Russia's status as the sole producer of phosphate rock from

igneous reserves among the world's five largest global producers during the POR.  The U.S.

Geological Survey's January 2022 Mineral Commodity Summary for phosphate rock identifies

China, Morocco, the United States, Jordan, and Russia as the five largest global producers of

phosphate rock during the POR.[41]  JSC Apatit's product catalogue on the record identifies Russia

as the only producer of phosphate rock from igneous reserves among these five countries.[42]

Thus, using benchmark phosphate rock export prices from countries that use a different type of

ore in production risks distorting the tier three analysis.  These export prices for countries with

sedimentary reserves reflect significant differences in underlying costs, and hence significantly

different prices at which producers in these countries sell phosphate rock on the world market.

Moreover, we note that what Commerce is attempting to quantify in this analysis is not

the market value of a good based on a broadly available, tier two world market price as

contemplated by 19 CFR 351.511(a)(2)(ii).  Rather, we are conducting a tier three analysis under

19 CFR 351.511(a)(2)(iii), which is an assessment of whether a government price is consistent

with market principles.  The statute instructs that, in determining whether the provision of a good

or service is determined "in relation to prevailing market conditions for the good or service being

provided," Commerce examines the "price, quality, availability, marketability, transportation,

and other conditions of purchase or sale."[43]  Here, we are valuing the phosphate ore mining

rights provided to JSC Apatit.  Although we are using the value of the beneficiated phosphate

rock as a proxy, accurately evaluating the value of the underlying mining rights is the primary

concern of this analysis.  As such, we find it appropriate to put significant weight on the question

---

[40] *Id.*
[41] *See* Petitioner's Benchmark Submission at Exhibit 18.
[42] *See* JSC Apatit's Letter, "JSC Apatit Section III of Initial Questionnaire Response," dated September 23, 2022, at Exhibit 4.
[43] *See* Section 771(5)(E)(iv) of the Tariff Act of 1930, as amended (the Act).

of whether the production processes and precise costs used in JSC Apatit's cost of production buildup are comparable to a benchmark market price for beneficiated phosphate rock produced from the same type of ore reserves.

As explained in the *Final Results*, the aim of our benefit calculation pursuant to 19 CFR 351.511(a)(2)(iii) for the mining rights program in this proceeding is to isolate JSC Apatit's costs for phosphate ore mining and beneficiation activities.[44] To determine the level of benefit that JSC Apatit received, we compared the actual per-unit cost buildup for JSC Apatit's beneficiated phosphate rock to a world market price for comparable phosphate rock.[45] Because we are comparing JSC Apatit's phosphate rock cost buildup to world market phosphate rock export prices in this tier three analysis, differences in production costs for the underlying good are necessary characteristics to consider in our selection of an appropriate benchmark. Selecting phosphate rock exports from countries with comparable bone phosphate of lime (BPL) grades to Russia and with igneous deposits is necessary to determine the adequacy of remuneration in relation to "prevailing market conditions" for the good in question.[46] Because we are comparing JSC Apatit's phosphate rock cost buildup to world market phosphate rock export prices in this tier three analysis, we find that the production method and corresponding production costs for the underlying good are "conditions of purchase or sale," and thus necessary characteristics to consider in our selection of a comparable benchmark.[47] On this basis, consistent with the *Final Results* and Draft Results of Redetermination, we have continued to limit the benchmark to countries with igneous phosphate ore deposits as opposed to sedimentary deposits.[48]

### B. Reconsideration of the Natural Gas Benchmark

---

[44] *See Final Results* IDM at 30.
[45] *Id.*
[46] *Id.* at Comment 2g; *see also* section 771(5)(E)(iv) of the Act.
[47] *See* section 771(5)(E)(iv) of the Act.
[48] *See Final Results* IDM at 31; *see also* Draft Results of Redetermination at 8-9.

Pursuant to the CIT's *Remand Order*, Commerce has further considered the issues of comparability between the natural gas benchmark export prices from Kazakhstan and JSC Apatit's purchases of natural gas from Government of Russia (GOR) authorities.  Consistent with the CIT's instructions in the *Remand Order*, we have constructed a tier three benchmark for JSC Apatit's natural gas purchases based upon the tier three methodology used in the initial investigation segment of this proceeding.[49]

In the *Final Results*, Commerce used Kazakh export prices as tier two benchmarks to measure the adequacy of remuneration for the GOR's provision of natural gas.  Pursuant to 19 CFR 351.511(a)(2)(ii), if there is no usable market-determined price with which to make the comparison under tier one, Commerce will compare the government price to a world market price where it is reasonable to conclude that such price is available to purchasers in the country in question.  In the *Final Results*, we found that that natural gas exported from Kazakhstan was available to purchasers in Russia during the POR, fulfilling the regulatory requirement for a tier two benchmark.[50]  Specifically, export statistics from Kazakhstan's BNS showed that Kazakhstan exported natural gas to Russia during the POR.[51]  Additionally, customs data on the record from the Russian Federal Customs Service showed that Russia imported natural gas from Kazakhstan during the POR under HS code 2711.21.0000.[52]  Based on this information, coupled with the record information cited above from Kazakhstan's BNS and the Russian Federal Customs Service, we found that natural gas exported from Kazakhstan was available to

---

[49] *See Phosphate Fertilizers from Russia Investigation Final Determination* IDM at Comments 3g and 3h; *see also The Mosaic Company v. United States*, 589 F. Supp. 3d 1298, 1310-15 (CIT 2022) (*Investigation First Remand Order*).
[50] *See Final Results* IDM at 49.
[51] *Id.* at 46.
[52] *See* Petitioner's Letter, "Petitioner's Rebuttal Benchmark Submission," dated March 27, 2023 (Petitioner's Rebuttal Benchmark Submission), at Exhibit 11.

purchasers in Russia during the POR, thereby fulfilling the requirement for a tier two benchmark.[53]

In the *Remand Order*, the CIT ordered Commerce to consider the comparability of the natural gas benchmark export prices from Kazakhstan and JSC Apatit's purchases of natural gas from GOR authorities.[54]  Specifically, the Court ordered that consideration be given to the issue that Gazprom only purchases raw gas, which it then refines and primarily exports back to Kazakhstan, while JSC Apatit's gas purchases were of refined natural gas, and if such forms of raw natural gas were comparable as benchmarks.[55]

Upon further consideration of information on the record of this proceeding, we find that the raw natural gas exported by Kazakhstan is not comparable to the refined natural gas available in the Russian market that JSC Apatit purchased from GOR authorities during the POR.  Section 771(5)(E)(iv) of the Act states that a determination of the adequacy of remuneration for the provision of a good or service "shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review."  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.  In addition, we take into consideration "factors affecting comparability," such as product similarity, to identify appropriate world market price benchmarks pursuant to 19 CFR 351.511(a)(2)(ii).

The record indicates that the Kazakh exported gas is "raw high-sulfur and unrefined" natural gas that is a byproduct of oil production.[56]  This "sour" or "raw" gas, along with the bulk of Kazakhstan's natural gas output, requires additional processing at a high cost and is not fit for

---

[53] *See Phosphate Fertilizers from the Russian Federation:  Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020–2021,* 88 FR 28505 (May 4, 2023) (*Preliminary Results*), and accompanying PDM at 13-16, unchanged in *Final Results* IDM at 9 and Comment 3a.
[54] *See Remand Order* at 27.
[55] *Id*.
[56] *See* Petitioner's Letter, "Petitioner's Case Brief," dated June 13, 2023, (Petitioner's Case Brief) at 6-7 (citing Petitioner's Rebuttal Benchmark Submission at Exhibit 8).

consumption.[57]  If it does not undergo additional processing, the "sour" or "raw" gas is reinjected into wells to support oil production or disposed of if in this unrefined state.[58]  There is further evidence that this extracted raw gas must go through processing to transform it into commercially usable gas, and that this additional gas processing capacity is complex in nature.[59]

Based on the evidence cited above, we find that this raw natural gas in the Kazakh export data (which is not commercially usable absent additional processing) is not comparable to the higher quality refined natural gas purchased by JSC Apatit, which goes through a costly stage of refinement to become a product for sale commercially.  Therefore, we find that raw Kazakh natural gas is not an appropriate tier two benchmark.  Based on the record evidence of this proceeding, and given our finding that the raw natural gas in the Kazakh export data is not comparable to refined natural gas purchased by JSC Apatit, we conclude that there are no viable tier two benchmarks to compare with JSC Apatit's purchases of natural gas.  As a result, and in accordance with the Court's instructions, we have constructed a tier three benchmark for the Provision of Natural Gas LTAR program, and, thus, we do not reach the remaining issues cited by the Court regarding availability.[60]

The regulations, at 19 CFR 351.511(a)(2)(iii), provide that in situations where "there is no world market price available to purchasers in the country in question, {Commerce} will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  However, the regulations do not prescribe a specific

---

[57] *See* Petitioner's Rebuttal Benchmark Submission at Exhibit 8 ("Given relatively high gas processing costs and low {Kazakh} gas sales prices, most producers prefer to reinject gas to enhance oil production, rather than sell gas to the national gas company…  This leads to a paradox of sorts:  (a) large quantities of associated gas need to be disposed of, yet (b) commercial supply is relatively tight.").

[58] *Id.*

[59] *Id.* ("…Kazakhstan will likely need more gas processing facilities for sour gas treatment.  Any sizable increase in commercial gas supply would necessitate a buildout in additional complex gas processing capacity near the sources of production.")

[60] *See Remand Order* at 26-27.  The *Remand Order* states, "First, the question of the comparability of the benchmark third-party sales and the sales into Russia remains.  Second, if the sales are comparable, Commerce must address why sales to a government entity that distorts the market was within the intended meaning of 'purchaser' in the regulation and how that fits into the logic of the three-level benchmark scheme."  *Id.* at 27.

methodology that Commerce is to follow in such situations.[61]  In the underlying investigation, Commerce utilized a tier three methodology to calculate the benefit for the Provision of Natural Gas for LTAR,[62] which was later sustained by the CIT.[63]  Consistent with the *Remand Order*, we are utilizing this specific methodology to construct a tier three benchmark for JSC Apatit's natural gas purchases.

Under tier three in the benchmark hierarchy, set forth under 19 CFR 351.511(a)(2)(iii), Commerce will normally determine whether the government price is consistent with market principles.[64]  In the *Phosphate Fertilizers from Russia Investigation Final Determination*, Commerce concluded that Gazprom's prices are not set in a manner that is consistent with market principles.[65]  Evidence on the record of this proceeding demonstrates that the systemic fundamentals of Gazprom's price setting have not changed.[66]

Based on the record evidence, we find that the most appropriate proxy for a market-based natural gas benchmark to apply under tier three is a regional European Organization for Economic Cooperation and Development (OECD) natural gas price from the International

---

[61] *See Certain Uncoated Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016), and accompanying IDM at 15-16 ("Provision of Standing Timber for Less Than Adequate Remuneration") (where Commerce found that the government price was not set in accordance with market principles, and thus sought a proxy for a market-based stumpage benchmark).

[62] *See Phosphate Fertilizers from Russia Investigation Preliminary Determination* at 8-18; unchanged in *Phosphate Fertilizers from Russia Investigation Final Determination* IDM at 9 and Comments 3d – 3j.

[63] *See Investigation First Remand Order* at 21-26.

[64] *See Countervailing Duties:  Final Rule*, 63 FR 65348, 65378 (November 25, 1998) ("Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.  In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely."); *see also, e.g., Final Affirmative Countervailing Duty Determinations:  Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992); *Final Affirmative Countervailing Duty Determination:  Venezuelan Wire Rod*, 62 FR 55014, 55021-22 (October 22, 1997); and *Melamine from Trinidad and Tobago:  Final Affirmative Countervailing Duty Determination*, 80 FR 68849 (November 6, 2015), and accompanying IDM at 10.

[65] *See Phosphate Fertilizers from Russia Investigation Preliminary Determination* PDM at 16-18, unchanged in *Phosphate Fertilizers from Russia Investigation Final Determination*.

[66] *See Preliminary Results* PDM at 15-17, unchanged in *Final Results*.

Energy Agency (IEA), the benchmark we used in the investigation.[67]  For this analysis, the

petitioner placed European OECD export prices sourced from the IEA on the record.[68]

Because the dataset on the record contains a per-unit value in U.S. dollars, we derived

average quarterly prices using the selected OECD European export market prices and then used

an average quarterly exchange rate to convert the prices to rubles.  Further, when measuring the

adequacy of remuneration, Commerce will adjust the benchmark price to reflect the price that a

firm actually paid or would pay if it imported the product, including delivery charges and import

duties, *i.e.*, a "delivered" price to the company's facility.  Therefore, in order to ensure that the

quarterly benchmark prices reflect what JSC Apatit would have paid if it had imported natural

gas directly, the regulation stipulates that the average prices are to be adjusted by adding the

delivery charges for the transmission and distribution of natural gas in Russia, any import duties

and taxes, and any surcharges.  However, the record shows that the benchmark IEA data are

already inclusive of European export value-added taxes (VAT) and other taxes.[69]  Thus, to avoid

the possibility of double counting given that the data are already inclusive of VAT and other

taxes, we have not included Russian VAT and import duties in the benchmark, as sustained by

the Court in the *Investigation Second Remand Order*.[70]

The benchmark prices on the record are prices for natural gas calculated on a delivered

basis.[71]  Therefore, we did not add any additional costs for transmission/distribution charges

within the borders of the purchasing countries.

To calculate the program benefit, we compared the corresponding monthly benchmark

unit prices to the unit prices that JSC Apatit paid Gazprom and independent producers and

---

[67] *See Phosphate Fertilizers from Russia Investigation Final Determination* IDM at Comment 3a.
[68] *See* Petitioner's Benchmark Submission.
[69] *Id.* at Exhibits 31-34.
[70] *See The Mosaic Company v. United States*, 647 F. Supp. 3d 1358, 1365 (CIT 2023) (*Investigation Second Remand Order*) (affirming Commerce's tier three benchmark recalculation for the Provision of Natural Gas for LTAR program with Russian VAT and import duties removed).
[71] *See* Petitioner's Benchmark Submission at Exhibits 31-34.

suppliers, including delivery charges, surcharges, and taxes during the POR. In instances where the benchmark unit price was greater than the price paid to the supplier of natural gas, we multiplied the difference by the quantity of natural gas purchased from the supplier to arrive at the benefit. We next summed the benefit for JSC Apatit and divided that amount by the appropriate sales denominator for the POR. On this basis, we find that JSC Apatit received a countervailable subsidy rate of 22.13 percent *ad valorem* under this program.[72]

## IV.    INTERESTED PARTY COMMENTS

**Comment 1:    Selection of Tier 3 Benchmark for the Provision of Phosphate Rock for LTAR Program**

*ADM's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by ADM. For further details, *see* ADM's Draft Remand Comments at 3-17.

> The Court first found that {Commerce} failed to "point to any record evidence to suggest that the phosphate rock market is driven by the difference between igneous and sedimentary rock." Slip Op. at 15. It then found that {Commerce} "failed to show even that there are different costs associated with the production of each type of rock." *Id.* Although {Commerce} found that the record supported the conclusion that sedimentary and igneous rock may have different production processes, the Court found that it failed to support its "extrapolated" conclusion that "the cost to produce each type of rock differs." *Id.* Therefore, "Without record evidence that the costs to produce the two types of rock differ significantly, and that the distinction between the two was a significant driver of prices in the phosphate rock market," the benchmark calculation, especially in light of the "minimal volume data" used to calculate the benchmark, was "unreasonable." *Id.* at 15-16. Considering this failure of proof, the Court directed {Commerce} upon remand "to either present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark." *Id.* at 16.

> {Commerce} failed to provide record evidence for either of the Court's remand directives. First, the Draft Results fail to demonstrate that the costs of production of phosphate rock produced from sedimentary vs. igneous ore formations "differ significantly." The Court's test is that the costs "differ significantly" not that they simply "differ." The Draft Results fail even to address this test. Instead, {Commerce} merely cites a few instances in which the cost of a particular mining or beneficiation process might differ between sedimentary and igneous ore. That

---

[72] *See* Memorandum, "Draft Remand Redetermination Calculations for Joint Stock Company Apatit," dated June 18, 2025.

is not the same as demonstrating a consistent and overall difference that is "significant" between the cost of mining and beneficiating the two different types of ore.

Second, {Commerce} has not even attempted to identify record evidence that "the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock."

Accordingly, {Commerce's} Draft Results fail to identify any record evidence that supports its effort to defend its benchmark calculation in the manner that the Court required. Therefore, in its Final Remand Results, {Commerce} must "reconstruct the tier three benchmark" in order to calculate it in the manner that ADM has consistently advocated throughout the first administrative review proceeding and before Judge Restani, *i.e.*, by including the volumes and prices of phosphate rock exported from Togo and Iran during the period of review.

*JSC Apatit's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by JSC Apatit. For further details, *see* JSC Apatit's Draft Remand Comments at 13-16.

In calculating a phosphate rock benchmark, Commerce failed to address the Court's direction either (1) to incorporate all data on the record that is comparable to Russian phosphate rock, including sedimentary rock sources, or (2) to demonstrate using record evidence that sedimentary and phosphate rock have significantly different production costs, and that these production cost differences, if they can be shown, significantly drive market pricing. The Draft Results of Redetermination wholly ignore the Court's instruction—instead, Commerce decided not to revise the phosphate rock benchmark to include more representative data on the record. Moreover, the record evidence to which Commerce purportedly cites regarding alleged production cost differences is cherry-picked and fails to address contradictory evidence (even within the same source). Commerce's determination is deeply flawed—on the contrary, the record evidence demonstrates there are no significant differences between the types of rock. Accordingly, Commerce must incorporate into its benchmark calculation the additional record data that are comparable to Russian phosphate rock In {sic} this regard, in addition to the points made herein, JSC Apatit fully endorses and supports the submission made by {ADM} on this issue.

*Petitioner's Comments*

The following is a verbatim summary of arguments submitted by the petitioner. For further details, *see* the Petitioner's Draft Remand Comments at 3-9.

In the Draft Remand Results, {Commerce} provided further explanation of its decision to limit the phosphate rock benchmark prices to igneous sources. The Draft Remand Results adequately address the Court's concerns on this issue and

provide sufficient reasoning and explanation to support {Commerce's} decision to maintain its approach.

**Commerce's Position:**

We disagree with ADM's and JSC Apatit's assertion that the Draft Results of Redetermination failed to comply with the CIT's instructions in the *Remand Order*. We address interested parties' arguments on the Provision of Mining Rights for LTAR program in the sections below.

### *Global Trade Tracker (GTT) Export Prices from South Africa*

Regarding export prices for South Africa from GTT, JSC Apatit argues:

Commerce has relied on incomplete South African export data in its Draft Results of Redetermination, omitting substantial exports under {Harmonized Tariff Schedule (HTS)} 2835.26.90, as demonstrated by JSC Apatit's submission of Global Trade Tracker data…Commerce's complete failure to explain why it did not correct the South Africa export data to eliminate distorted export prices as requested by the Court is unlawful, and it must revise its Draft Results of Redetermination accordingly.[73]

We disagree with JSC Apatit's argument that the omission of the cited South Africa export data was "unlawful." In the *Final Results*, we stated:

{T}he information provided by JSC Apatit is insufficient to determine that HS subheading 2835.2690 covers phosphate rock of a type similar to what JSC Apatit produces in Russia, or that the code even covers "phosphate rock." Accordingly, we do not find that the information provided by JSC Apatit supports the inclusion of phosphate products under HS subheading 2835.2690 in the benchmark.[74]

In the *Remand Order*, the CIT stated:

JSC {Apatit} also argues that the data from South Africa that Commerce included in the benchmark was distorted because it was incomplete without data from a third HTS code of South African Exports from the {GTT} dataset, which accounted for a large percentage of South African phosphate rock exports…JSC has failed to show that the products described by these three subheadings are comparable. Given that subheadings 2510.10 and 2510.20 limit their scope to "natural calcium phosphates" and subheading 2835.2690 does not mention the word "natural," Commerce reasonably concluded that 2835.2690 likely covers different products.[75]

---

[73] *See* JSC Apatit's Draft Remand Comments at 13-14 (citation omitted).
[74] *See* *Final Results* IDM at 39.
[75] *See* *Remand Order* at 14 (citing *Final Results* IDM at 39).

The Court remanded the *Final Results* for Commerce to "present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark."[76]  The Court did not instruct Commerce to reconsider the exclusion of the South African export prices from GTT in the benchmarks, as JSC Apatit argues.  Rather, as cited above, Commerce determined in the *Final Results* that record evidence was insufficient to include the South African export prices for HS code 2835.2690 in the phosphate rock benchmarks, and the Court was not persuaded by JSC Apatit's argument that the data from South Africa that Commerce included in the benchmark was distorted.  Accordingly, we have made no changes to the tier three phosphate rock benchmarks based on JSC Apatit's argument.

### *The Court's Instructions in the Remand Order*

The Court remanded the *Final Results* for Commerce to present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark.[77]  Further, the Court stated:

> While Commerce reasonably found that the record indicated that sedimentary and igneous rock have different production processes, it extrapolated that the cost to produce each kind of rock differs and that therefore, the price of sedimentary and igneous rock is not comparable, even if  BPL content does not differ.  Without record evidence that the costs to produce the two kinds of rock differ significantly and that the distinction between the two was a significant driver of prices in the phosphate rock market, a benchmark reflecting such minimal volume data is unreasonable.[78]

ADM raises various arguments concerning the Court's instructions and whether Commerce followed these instructions in the Draft Results of Redetermination.  For example, ADM argues that the Court "specifically directed {Commerce} to identify the evidence establishing that the mining and beneficiation cost of igneous ore was significantly different from the mining and

---

[76] *Id.* at 16.
[77] *Id*.
[78] *Id.* at 15-16.

beneficiation cost of sedimentary ore," and that "{o}nly in this way could a total cost of production difference be established between the two general types of ore."[79]  However, ADM cites nothing to support its assertion that the *Remand Order* instructed Commerce to establish "a total cost of production difference…between the two general types of ore."  Rather, the Court's instruction was for Commerce to "present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock."[80]  Therefore, ADM's argument is outside the scope of the instructions of the *Remand Order*.

Further, ADM argues that the Draft Results of Redetermination "fail{s} to identify the actual cost associated with any mining or beneficiation process that {Commerce} has identified…"[81]  ADM also argues that Commerce "is unable even to describe which general type of ore costs more to mine and beneficiate and which general type costs less," which ADM asserts "illustrates the lack of a substantial evidentiary basis for the Draft Results."[82]  However, contrary to ADM's arguments, the *Remand Order* did not instruct Commerce to "identify the actual cost{s} associated with any mining or beneficiation process" or "describe which general type of ore costs more to mine and beneficiate."[83]  The *Remand Order* also did not instruct Commerce to quantify differences between the costs to produce phosphate rock from the two types of reserves. Further, the *Remand Order* did not instruct Commerce to quantify the effect of these cost differences on world market prices for phosphate rock.  Rather, the Court remanded the *Final Results* for Commerce to present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark.[84]

---

[79] *See* ADM's Draft Remand Comments at 5.
[80] *See Remand Order* at 16.
[81] *See* ADM's Draft Remand Comments at 4.
[82] *Id.* at 9.
[83] *Id.* at 4 and 9.
[84] *Id.* at 16.

Commerce can only consider information that is available on the record.[85]  In its draft remand comments, ADM cited no record evidence of "total cost{s} of production," "actual cost{s} associated with any mining or beneficiation process," or quantification of the impact of these cost differences (or lack thereof) on world market prices for phosphate rock.  ADM has argued, in effect, that quantifying these costs and differences in costs was necessary for Commerce to comply with the *Remand Order*.  We disagree, as ADM cited nothing in the *Remand Order* to support this assertion.  Consistent with the *Remand Order*, we have cited evidence of differences between the costs to produce phosphate rock from sedimentary deposits versus igneous deposits and explained how phosphate rock market prices are significantly driven by this distinction.  Additionally, we have explained why it is necessary to account for this distinction in our benchmark analysis pursuant to 19 CFR 351.511(a)(2)(iii).

### *Evidence of Production Cost Differences*

JSC Apatit and ADM argue that Commerce failed to demonstrate that the costs to produce phosphate rock from sedimentary ore reserves and igneous reserves differ significantly. For example, ADM argues that the Draft Results of Redetermination "merely cites a few instances in which the cost of a particular mining or beneficiation process might differ between sedimentary and igneous ore," which ADM argues "is not the same as demonstrating a consistent and overall difference that is 'significant' between the cost of mining and beneficiating the two different types of ore."[86]  Similarly, JSC Apatit argues that Commerce selectively considered record evidence and failed to address contrary evidence regarding the production of phosphate rock from sedimentary versus igneous ore reserves.[87]  We disagree with JSC Apatit's and

---

[85] *See, e.g.*, *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From India:  Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 60928 (September 6, 2023) (*CDMT from India*), and accompanying IDM at Comment 4; and *Certain Pasta From Italy:  Final Results of the 2009 Countervailing Duty Administrative Review*, 77 FR 7129 (February 10, 2012) (*Pasta from Italy*), and accompanying IDM at Comment 2.
[86] *See* ADM's Draft Remand Comments at 2.
[87] *See* JSC Apatit's Draft Remand Comments at 14.

ADM's argument that the record does not show evidence of significant cost differences between the two types of reserves, as explained below.

Citing Professor Petr Ptáček's book *Apatites and their Synthetic Analogues*, ADM argues that "{g}iven Prof. Ptacek's extensive description of the enormous variety of mining and beneficiation processes and techniques, it is impossible to conclude that there is one single method of mining and beneficiation for igneous ore and a different single method of mining and beneficiation for sedimentary ore."[88]  However, we made no such statement that there is "one single method of mining and beneficiation for igneous ore and a different single method of mining and beneficiation for sedimentary ore" in the Draft Results of Redetermination.  The relevant question with respect to the *Remand Order* is whether record evidence demonstrates that:  (1) costs to produce phosphate rock from the two types of ore differ significantly; and (2) the distinction between the two types of ore is a significant driver of phosphate rock prices.[89]  If so, then the igneous versus sedimentary distinction is material to our benefit analysis and choice of benchmark pursuant to 19 CFR 351.511(a)(2)(iii).[90]  Because this analysis under 19 CFR 351.511(a)(2)(iii) focuses on JSC Apatit's costs to mine and process phosphate ore into phosphate rock, evidence of differences in production costs for phosphate rock from sedimentary deposits versus igneous deposits is relevant to our analysis.  Under this tier three analysis, selecting phosphate rock exports from countries with comparable BPL grades to Russia and with igneous deposits is necessary to determine the adequacy of remuneration in relation to "prevailing market conditions" for the good in question.[91]

ADM's and JSC Apatit's arguments regarding evidence of cost differences fail to address the central issue identified by the Court in the *Remand Order*, which is whether costs to produce

---

[88] *See* ADM's Draft Remand Comments at 9 (citations omitted).
[89] *See Remand Order* at 15-16.
[90] *See Final Results* IDM at 30.
[91] *See* section 771(5)(E)(iv) of the Act.

the phosphate rock from the two types of ore differ significantly and whether this distinction was

a significant driver of phosphate rock prices.[92]  For example, ADM states,

> {T}he Draft Results cite a chart on page 389 of Prof. Ptacek's Chapter 8.  This chart
> identifies three steps in the beneficiation process for three types of ore:  (1) igneous
> ore; (2) sedimentary ore with siliceous gangue; and (3) sedimentary ore with
> calcareous gangue.  The three process steps are flotation, calcination, and organic
> acid leaching.  These three steps are identical for igneous ore and for sedimentary
> ore with siliceous gangue, which fully supports ADM's position.  The Draft
> Results, not surprisingly, omit mention of this fact.[93]

JSC Apatit, meanwhile, argues that "Prof. Ptacek's book identifies six different types of rock

(not two, as Commerce has unlawfully concluded)."[94]  However, ADM and JSC Apatit do not

explain how the cited information detracts from the affirmative evidence of cost differences

between the production of phosphate rock from sedimentary versus igneous ore.  With respect to

ADM's argument, regardless of whether the chart referenced above identifies no specific

differences between the production steps for igneous ore and sedimentary ore with siliceous

gangue, the record shows affirmative evidence of differences between the production steps and

costs for igneous ore and another type of sedimentary ore:  sedimentary with calcareous

gangue.[95]  No party has cited information demonstrating that a certain type of sedimentary ore

has identical production steps and production costs compared to igneous ores.  Additionally, no

party has cited evidence that certain countries have reserves of any specific type of sedimentary

ore that has identical production steps and costs compared to igneous ores, such that we could

consider the inclusion of phosphate rock export prices from any such countries in the tier three

benchmark.  Again, we can only consider information that is available on the record.[96]  The

record information available here shows significant differences in production processes and costs

---

[92] *See Remand Order* at 15-16.
[93] *See* ADM's Draft Remand Comments at 14.
[94] *See* JSC Apatit's Draft Remand Comments at 15 (citing Petitioner's Benchmark Submission at Exhibit 20).
[95] *See* section III *supra* (citing Petitioner's Benchmark Submission at Exhibit 20, pp. 384, 389, and 398).
[96] *See, e.g., CDMT from India* IDM at Comment 4; *see also Pasta from Italy* IDM at Comment 2.

between igneous and sedimentary ores, such as calcination and its associated costs (*e.g.*, capital costs and energy costs).[97]

Further, ADM argues that "{g}iven the absence of record support for this rationale, it is far more persuasive to assume that the costs of producing phosphate rock from igneous and sedimentary reserves are the same, or are similar, or else overlap."[98]  First, ADM cited no support for its argument that the costs of producing phosphate rock from igneous and sedimentary reserves are the same or similar.  Instead, ADM disputes the significance of the evidence of cost differences cited above in section III.A., but it cites no evidence to show that these cost differences are minimal or nonexistent.[99]  Moreover, ADM does not explain the relevance of its reference to whether costs "overlap."[100]  Certain costs for producing phosphate rock from igneous reserves may be higher than from sedimentary reserves, and *vice versa*.  This does not, however, change the fact that the production costs for each type of ore are different. The *Remand Order* did not instruct Commerce to quantify the effect of cost differences between the two types of reserves on world market prices for phosphate rock, and no party has cited record information that would allow us to undertake any such analysis.

Finally, regarding whether the evidence shows "significant" production cost differences, ADM argues that the "false premise" of the Draft Results of Redetermination is "that just a few production process differences constitute substantial evidence of 'significant' production cost differences."[101]  The evidence of cost differences cited above in section III.A, however, is not evidence of trivial cost differences between the production of the two types of ore (*e.g.*, an additional production step that adds less than a cent to overall production costs of hundreds of

---

[97] *See* Petitioner's Benchmark Submission at Exhibit 20, pp. 384, 389, and 398.
[98] *See* ADM's Draft Remand Comments at 16-17.
[99] *Id.* at 5.
[100] *Id.* at 17.
[101] *Id.* at 3-4.

dollars per unit). Rather, the record shows evidence of differences for major cost items such as capital costs, development costs, and energy costs.[102]

### *Comparable vs. Identical Benchmarks*

Finally, citing *Essar* and *Beijing Tianhai*, JSC Apatit argues that the CVD law "does not require that benchmark products be identical, only that they be comparable."[103] The benchmarks at issue in *Essar* and *Beijing Tianhai* were tier two world market price benchmarks pursuant to 19 CFR 351.511(a)(2)(ii).[104] In this instance, however, we are conducting a tier three market principles analysis pursuant to 19 CFR 351.511(a)(2)(iii) to determine the appropriate benchmark price for phosphate rock under the Provision of Mining Rights for LTAR program. In this tier three analysis, we are comparing JSC Apatit's phosphate rock cost buildup to world market phosphate rock export prices.[105]

The aim of our benefit calculation pursuant to 19 CFR 351.511(a)(2)(iii) for the Provision of Mining Rights for LTAR program is to isolate JSC Apatit's costs for phosphate ore mining and beneficiation activities.[106] Therefore, as explained in section III above, the production cost for the underlying good conveyed *via* the mining rights is a relevant factor in our determination of a tier three benchmark. These production costs impact the supply of the input that will be available on the world market from specific countries at specific world market prices. Therefore, although we agree with JSC Apatit that benchmarks pursuant to 19 CFR 351.511(a)(2) in general

---

[102] *See* section III *supra*.
[103] *See* JSC Apatit's Draft Remand Comments at 16 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (*Essar*); and *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1369 (CIT 2015) (*Beijing Tianhai*). The citation that JSC Apatit cited in its draft remand comments, 106 F. Supp. 3d 1358, 1364 (CIT 2015), appears to be an error, as this cites an unrelated CIT proceeding. *See* JSC Apatit's Draft Remand Comments at 16.
[104] *See Essar*, 678 F.3d at 1273-1274; *see also Beijing Tianhai*, 106 F. Supp. 3d at 1369.
[105] *See Final Results* IDM at Comment 2g.
[106] *Id.*

only need to be comparable, not identical, this tier three analysis requires us to consider multiple factors in the benchmark.

**Comment 2:   Reconsideration of the Natural Gas Benchmark**

*JSC Apatit's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by JSC Apatit.  For further details, *see* JSC Apatit's Draft Remand Comments at 4-13.

> Commerce's decision to abandon its longstanding and lawful use of a Tier Two Kazakh natural gas benchmark in favor of a Tier Three benchmark is unsupported by substantial evidence and contrary to statute and Commerce's regulation.  The record evidence demonstrates that Kazakh natural gas—whether raw or refined— is sufficiently comparable to Russian gas for use as a benchmark.  This fact is confirmed by prior Commerce findings, industry practice, and the treatment of both under the same customs code.  The only distinction between Kazakh natural gas and Russian natural gas is the stage of processing, which is a normal part of the global gas value chain and does not render the products so dissimilar as to preclude comparability as a benchmark under U.S. law.  Moreover, Commerce's "Tier Two" benchmark regulation does not require sales to private purchasers.  Furthermore, Commerce has previously recognized that Kazakh gas is available to Russian purchasers, regardless of Gazprom's role in the Russian market.  Commerce's new approach lacks a reasoned explanation and disregards both the statutory framework and the record evidence, which compel continued use of the Tier Two Kazakh benchmark.

*Petitioner's Comments*

The following is a verbatim summary of arguments submitted by the petitioner.  For further details, *see* the Petitioner's Draft Remand Comments at 9-13.

> {Commerce} also properly reconsidered its selection of Kazakh export prices as the benchmark for natural gas and found the Kazakh gas exported to Russia is not comparable to the Russian gas purchased by JSC Apatit.  This finding is supported by the record evidence and satisfies the Court's directions on remand.

**Commerce's Position:**

In Commerce's Draft Results of Redetermination, we complied with the Court's remand in the *Remand Order* to reconsider the natural gas benchmark selection due to comparability issues.[107]

---

[107] *See Remand Order* at 26-27.

As JSC Apatit notes, the Court directed Commerce to look at two specific issues in the natural gas benchmark, (1) the comparability of the benchmark third-party sales and the sales into Russia, and (2) if the sales are comparable, to explain why sales to a government entity that distorts the market fall within the intended meaning of "purchaser" under the regulation and how that fits into the logic of the three-level benchmark scheme.[108]  We found in our analysis of the comparability that the Kazakh natural gas is not comparable, as Kazakh natural gas imported into Russia is in a raw form that requires additional and costly refinement to be comparable to the refined natural gas purchased by JSC Apatit during the POR.

JSC Apatit argues that while the two types of gas, raw and refined, are not identical, they are comparable products with regard to the regulatory definition.  JSC Apatit cites a previous court decision, *Essar*, wherein the Court of Appeals for the Federal Circuit (Federal Circuit) stated that it was reasonable for Commerce to find that two types of iron ore were sufficiently comparable to be used as a benchmark, even though they were different grades with different iron content and the sole respondent only used one of the grades.[109]  We note that in that case, however, the issue of comparability is not equivalent, as the product in question, natural gas, can be in a form that does not allow it to be consumed by an end user.  In *Essar Steel Ltd.*, Commerce "found that the differences, if they existed at all, were not so profound as to render the two products incomparable," and that the respondent failed to provide any evidence that the iron ore input was of a different grade than the respondent used.[110]  As discussed previously, natural gas in its raw or sour form contains enough sulfur that renders it unusable in commercial and industrial applications, and thus requires refinement as a necessary step for it to be available to the product-consuming market.[111]  JSC Apatit acknowledges that "{t}he fact that raw gas

---

[108] *See* JSC's Apatit's Draft Remand Comments at 4-5.
[109] *Id.* at 6.
[110] *See Essar Steel Ltd. v. United States*, 34 C.I.T. 1057, 1066 (CIT 2010) (*Essar Steel Ltd.*), *aff'd*, 678 F.3d 1268.
[111] *See* Petitioner's Rebuttal Benchmark Submission at Exhibit 8.

requires further processing before end use is a common feature in global gas markets and is routinely reflected in market pricing…"[112] and further stated that "{t}he only distinction {between raw and refined gas} is the stage of processing, which is a normal and commercially recognized aspect of the natural gas supply chain."[113] These statements in fact underscore the issue of comparability between raw and refined gas, further demonstrating that it is a normal and common commercial practice to first refine this raw natural gas, and that such a cost is impactful enough that it is reflected in market pricing.

We also find JSC Apatit's arguments regarding the changes in the approach from tier two to tier three for the Russian natural gas benchmarks to be unavailing. The record of Commerce's proceedings are distinct, and determinations in a proceeding depend on facts specific to the record of that proceeding.[114] Commerce regularly requests and evaluates benchmarks for every administrative review. In instances where there is different factual information on the record than in previous administrative segments, Commerce may select a different benchmark or employ a new methodology depending on the facts of the case for that segment. Here, we found upon redetermination that there was sufficient evidence on the case record that demonstrates that Kazakh natural gas is not comparable to Russian natural gas, and that such a conclusion is based on the facts of the specific record rather than compared to other cases with Russian natural gas benchmarks. Additionally, the methodology used for the tier three benchmark is not a new tier three methodology created exclusively for this review, but rather the same methodology used in the initial investigation segment of this case. As such, to comply with the Court's remand, we have found that the record substantiates in this instance that the tier two Kazakh natural gas price benchmark is not sufficiently comparable, and have provided a reasonable tier three alternative

---

[112] JSC's Apatit's Draft Remand Comments at 8.
[113] *Id.* at 9.
[114] *See* 19 CFR 351.104; *see also, e.g., Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM at Comment 61 ("Moreover, all decisions in an investigation must be based upon the information on the record of that investigation.").

as instructed by the Court in the *Remand Order*, that is consistent with Commerce's practice for a tier three analysis for this program.

JSC Apatit additionally argues that Commerce used an incomplete dataset of the IEA natural gas prices from the petitioner's submission,[115] which excluded the Czech Republic, and that there is a more complete dataset of the IEA natural gas prices the includes the Czech Republic on the record.[116] We agree that the benchmark inadvertently excluded the Czech Republic's natural gas prices and taxes as reported in the more complete IEA dataset on the record, and as such have included the relevant Czech data for 2021 fiscal quarters in the final calculation of the natural gas benchmark. We note that we made no additional changes to any other part of the dataset used in the calculation. As such, we have revised the final total *ad valorem* subsidy rate for the Provision of Natural Gas for LTAR for JSC Apatit from 22.36 percent *ad valorem*, as calculated in the Draft Results of Redetermination, to 22.13 percent *ad valorem* for these final results of redetermination.

JSC Apatit also argues that Commerce erroneously used a simple average of the IEA natural gas pricing data in constructing the tier three benchmark for natural gas, allegedly contrary to Commerce's practice of weight averaging by accounting for the volume of gas consumed in each OECD country during the POR.[117] Where there is more than one commercially available market price to construct a benchmark price, it is Commerce's practice to average the prices, as Commerce had done previously for natural gas in *Rebar from Türkiye*.[118] Likewise, in the initial investigation segment of this proceeding, we used a simple average of the IEA's regional European OECD natural gas prices for the natural gas benchmark.[119] We find

---

[115] *See* JSC's Apatit's Draft Remand Comments at 12.
[116] *See* JSC's Apatit's Letter, "JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission," dated March 27, 2023 (JSC Apatit's Benchmark Rebuttal), at Appendix 19.
[117] *See* JSC's Apatit's Draft Remand Comments at 12.
[118] *See, e.g. Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 79 FR 54963 (September 15, 2014) (*Rebar from Türkiye*), and accompanying IDM at "Provision of Natural Gas for LTAR."
[119] *See Phosphate Fertilizers from Russia Investigation Preliminary Determination* at 18.

that JSC Apatit has not cited any additional information that would support using a weighted-average, or even provided a method for conducting a weighted average calculation, over utilizing a simple average of the natural gas prices in the IEA data. JSC Apatit notes that the IEA pricing data on natural gas are regional aggregates that are calculated as weighted averages of consumption,[120] but at the same time does not explain how exactly such a methodology would be scalable or applicable for the overall OECD European natural gas benchmark. Therefore, JSC Apatit has failed to present an argument (*i.e.*, a specific adjustment or allocation methodology) that we can consider. In line with our prior tier three natural gas methodology in the initial investigation,[121] which was later sustained by the CIT,[122] we are continuing to utilize the simple-average methodology without alteration to construct a tier three benchmark for JSC Apatit's natural gas purchases.

Finally, the issue of whether sales to a government entity that distorts the market fall within the intended meaning of "purchaser" under Commerce's regulations is moot due to the fact that we are applying a tier three analysis for the natural gas for LTAR program. In the *Remand Order*, the Court stated that

> …if the sales are comparable, Commerce must address why sales to a government entity that distorts the market was within the intended meaning of 'purchaser' in the regulation and how that fits into the logic of the three-level benchmark scheme. The Court remands to Commerce to either clarify these two issues or to construct a tier three benchmark for JSC's natural gas purchases consistent with this opinion.[123]

Given the conditionality of the Court's request to clarify both points consecutively *or* to construct a tier three benchmark, and the previous determination that the sales are not comparable as per the first point, we make no determination with regards to the government "purchaser."

---

[120] *See* JSC's Apatit's Draft Remand Comments at 12; *see also* JSC Apatit's Benchmark Rebuttal at Appendix 20.
[121] *See Phosphate Fertilizers from Russia Investigation Preliminary Determination* at 8-18; unchanged in *Phosphate Fertilizers from Russia Investigation Final Determination* IDM at 9 and Comments 3d – 3j.
[122] *See Investigation First Remand Order* at 21-26.
[123] *See Remand Order* at 27.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, we have:  (1) cited evidence of differences between the costs to produce phosphate rock from sedimentary deposits versus igneous deposits, explained how phosphate rock market prices are significantly driven by the distinction between sedimentary and igneous rock, and explained why it is necessary to account for this distinction in our benchmark analysis pursuant to 19 CFR 351.511(a)(2)(iii); and (2) used a tier three benchmark analysis to calculate the benefit for the Provision of Natural Gas for LTAR program. Based on the foregoing explanations, we revised the subsidy rate calculations for the mandatory respondent JSC Apatit.  If the CIT affirms these final results of redetermination, we intend to issue a notice of the Court's decision[124] and of amended final results, which will include the revised CVD rate for the POR covering November 30, 2020, through December 31, 2021, as listed in the chart below.

| Company | Subsidy Rate in *Final Results*[125] (percent *ad valorem*) | Subsidy Rate in Final Remand Redetermination[126] (percent *ad valorem*) |
|---|---|---|
| JSC Apatit | 28.50 | 49.64 |

8/4/2025

X ~~Chris J. Abbott~~

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 Performing the non-exclusive functions and duties
 of the Assistance Secretary for Enforcement and Compliance

---

[124] In its decision in *Timken*, as clarified by *Diamond Sawblades*, the U.S. Court of Appeals for the Federal Circuit held that, pursuant to section 516A(e) of the Act, Commerce must publish a notice of a court decision not "in harmony" with a Commerce determination and must suspend liquidation of entries pending a "conclusive" court decision. *See Timken Co.* v. *United States, 893* F.2d 337, 341 (Fed. Cir. 1990); *see also Diamond Sawblades Mfrs. Coalition* v. *United States,* 626 F.3d 1374 (Fed. Cir. 2010).
[125] *See Final Results,* 88 FR at 76183.
[126] *See* Memorandum, "Final Remand Redetermination Calculations for Joint Stock Company Apatit," dated concurrently with these final results of redetermination.