UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____ )
ARCHER DANIELS MIDLAND COMPANY,            )
                                            )
            Plaintiff,                      )
                                            )
        and                                 )
                                            )
JOINT STOCK COMPANY APATIT,                 )
                                            )
        Plaintiff-Intervenor, and           )
        Consolidated Plaintiff,             )
                                            )
    and                                     )
                                            )
THE MOSAIC COMPANY,                         )
                                            )
        Consolidated Plaintiff              )
                                            )
        v.                                  )        Consol. Court No. 23-00239
                                            )
UNITED STATES,                              )        **PUBLIC DOCUMENT**
                                            )
        Defendant,                          )
                                            )
                                            )
THE MOSAIC COMPANY,                         )
                                            )
        Defendant-Intervenor, and           )
        Consolidated Defendant-Intervenor   )
                                            )
    and                                     )
                                            )
JOINT STOCK COMPANY APATIT,                 )
                                            )
        Consolidated Defendant-Intervenor.  )
_____ )

**PLAINTIFF INTERVENOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S COMMENTS ON COMMERCE'S RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to JSC Apatit*

September 25, 2025

## TABLE OF CONTENTS

**Page(s)**

SUMMARY OF THE ARGUMENT.......................................................................................... 3

I.     COMMERCE'S ARBITRARY SHIFT TO A TIER THREE NATURAL GAS
       BENCHMARK WHEN A TIER TWO BENCHMARK IS AVAILABLE IS
       UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW .. 5

       A.  Commerce's Comparability Determination Is Both Contrary To Record Evidence
       And Unlawful................................................................................................................ 6

       B.  The Kazakh Gas Benchmark Meets The Regulation's "Purchaser" Standard....... 14

II.    ALTERNATIVELY, IF THIS COURT AGREES WITH COMMERCE'S SHIFT TO
       AN UNLAWFUL TIER THREE BENCHMARK, IT SHOULD INSTRUCT
       COMMERCE TO CORRECT ITS CALCULATIONS............................................... 18

III.   COMMERCE ERRED IN CONTINUING TO LIMIT THE PHOSPHATE ROCK
       BENCHMARK TO COUNTRIES WITH IGNEOUS PHOSPHATE ORE DEPOSITS
       WHILE REJECTING THE MORE FULLSOME DATA ON THE RECORD ......... 20

       A.  Commerce Selectively Considered the Record Evidence, Failing to Address
       Contrary Evidence........................................................................................................ 22

       B.  The Law Requires Comparable—Not Identical—Benchmarks............................. 27

IV.    CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ....... 10

*Archer Daniels Midland Company v. United States,* 779 F. Supp. 3d 1349 (Ct. Int'l Trade 2025),

    Slip Op. 25-55, May 6, 2025 ("*Remand Order*") ............................................................ passim

*Beijing Tianhai Indus. Co. v. United States,* 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) 12, 13, 27

*Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318 (Fed. Cir. 2020) ............... 26

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ......................................... 8, 27

*Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) .................... passim

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018) ..................................... 15

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ................... 19

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (Mar. 9, 2015) .................................................... 11

*RZBC Grp. Shareholding Co. v. United States*, 2016 WL 3880773 (Ct. Int'l Trade 2016) ........ 10

*Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) ................................. 7, 15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 ....................................................................... 26

STATUTES

19 U.S.C. § 1677(5) .............................................................................................................. 6, 15

19 U.S.C. § 1677(5)(E)(iv) ......................................................................................................... 6

# OTHER AUTHORITIES

*Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) and accompanying Issues and Decision Memorandum ............................................................................................................................... 3

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*") ................................................................................................................ 16

Final Results of Redetermination Pursuant to Court Remand for *Archer Daniels Midland Company v. United States*, Slip. Op. 25-55 (Ct. Int'l Trade May 6, 2025), *Phosphate Fertilizers from the Russian Federation* ("*Final Remand*") ............................................. passim

Memorandum from Christian Marsh to Paul Piquado, *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Issues and Decision Memorandum for the Final Determination*, Case No. C-821-823 (Investigation) (July 20, 2016) ...................................................................................................... 19

Memorandum from James Maeder to Lisa W. Wang, *Decision Memorandum for the Final Affirmative Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, C-821-834 (Sep. 23, 2022) ("*OCTG from Russia*") .. 9, 11

Memorandum from James Maeder to Lisa W. Wang, *Decision Memorandum for the Preliminary Determination and Preliminary Negative Critical Circumstances Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, Case No. C-821-834 (2020 Review) (Mar. 7, 2022) ........................................ 9, 11

Memorandum from James Maeder to Lisa W. Wang, *Issues and Decision Memorandum for the Final Affirmative Determination of the CVD Investigation of Granular Polytetrafluoroethylene Resin from the Russian Federation*, C-821-830 (Jan. 18, 2022) ("*PTFE from Russia*, Final Det. IDM") ................................................................... 3, 9, 11, 17

Memorandum from James Maeder to Lisa W. Wang, *Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation*; 2020–2021, (Oct. 31, 2023) ("AR1 Final IDM") (P.R. 242) ..... passim

Memorandum from Scot Fullerton to Lisa W. Wang, *Decision Memorandum for the Final Affirmative Determination in the Countervailing Duty Investigation of Urea Ammonium Nitrate Solutions from the Russian Federation,* Case No. C-821-832 (Investigation) (June 17, 2022) ("*UAN from Russia*, Final Det. IDM") ................................................................. passim

Memorandum from Shane Subler to The File, *Final Results Calculations for Joint Stock Company Apatit* (Oct. 31, 2023) ("Final Calculations") (P.R. 243–244; C.R. 226–227)........... 1

Merriam-Webster, *Comparable*, ........................................................................................... 8

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order") ........................................................................................................................... 2

*Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246) ......................................................................... 1, 5, 13, 17

REGULATIONS

19 C.F.R. § 351.511 .............................................................................................................. 6, 16

19 C.F.R. § 351.511(a)(2)(i) ................................................................................................. 6, 15

19 C.F.R. § 351.511(a)(2)(ii) ........................................................................................ 6, 13, 14, 15, 16

**PLAINTIFF INTERVENOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S COMMENTS ON COMMERCE'S FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Plaintiff Intervenor and Consolidated Plaintiff, Joint Stock Company Apatit ("JSC Apatit"), respectfully submits the following comments in opposition to the U.S. Department of Commerce ("Commerce" or the "Department") August 4, 2025, Final Results of Redetermination Pursuant to Court Remand for *Archer Daniels Midland Company v. United States*, Slip. Op. 25-55 (Ct. Int'l Trade May 6, 2025), *Phosphate Fertilizers from the Russian Federation* ("*Final Remand*"). For the reasons set forth below, Commerce's *Final Remand* is contrary to law and unsupported by substantial evidence. JSC Apatit therefore requests that this Court remand this matter again to Commerce with instructions that Commerce correct the errors in its redetermination.

The *Final Remand* concerns Commerce's final results of its countervailing duty ("CVD") administrative review of phosphate fertilizers from Russia for the period of review ("POR") November 30, 2020, through December 31, 2021. *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246) 1/ and accompanying Memorandum from James Maeder to Lisa W. Wang, *Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation*; 2020–2021, (Oct. 31, 2023) ("AR1 Final IDM") (P.R. 242) and Memorandum from Shane Subler to The File, *Final Results Calculations for Joint Stock Company Apatit* (Oct. 31, 2023) ("Final Calculations") (P.R. 243–244; C.R. 226–227). JSC Apatit was the sole

---

1/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

mandatory respondent in this review and was assigned a final countervailing duty margin of 28.50% in Commerce's final determination. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order").

On appeal, this Court directed Commerce to address issues pertaining to its selection of natural gas and mining rights benchmarks in the underlying administrative review. This Court first directed Commerce to explain the comparability of the Kazakh natural gas benchmark third-party sales and the sales into Russia and, if the sales are comparable, to address why sales to a government entity that distorts the market was within the intended meaning of "purchaser" in the regulation and how that fits into the logic of the three-level benchmark scheme. *Archer Daniels Midland Company v. United States,* 779 F. Supp. 3d 1349, 1367 (Ct. Int'l Trade 2025), Slip Op. 25-55, May 6, 2025 ("*Remand Order*") at 27. In addition, this Court instructed Commerce to either (1) incorporate all data on the record that is comparable to Russian phosphate rock, including sedimentary rock sources, or (2) demonstrate using record evidence that sedimentary and phosphate rock have *significantly* different production costs, and that these production cost differences, if they can be shown, *significantly* drive market pricing. *Remand Order* at 16, 779 F. Supp. 3d at 1360. In the *Final Remand*, Commerce found Kazakh natural gas not comparable and instead relied upon a tier-three benchmark and continued to argue that sedimentary and phosphate rock have significantly different product costs that significantly drive market pricing. *Final Remand* at 2. Accordingly, Commerce assigned JSC Apatit a duty rate of 49.64%. *Final Remand*.

## SUMMARY OF THE ARGUMENT

Two principal errors in the *Final Remand* warrant reversal.  **First**, Commerce erred in departing from its longstanding use of a tier two Kazakh natural gas benchmark and instead adopting a tier three benchmark.  In so doing Commerce failed to abide by this Court's direction to explain the comparability of the benchmark third-party sales and the sales into Russia and to address why sales to a government entity that distorts the market was within the intended meaning of "purchaser" in the regulation.  *Remand Order* at 27, 779 F. Supp. 3d at 1367.  Commerce failed to demonstrate that its shift from a tier two to a tier three benchmark was supported by substantial evidence and in accordance with the statute, Commerce's regulation, and Commerce's practice in other cases.  Specifically, Commerce concluded that Kazakh natural gas exports to Russia were not comparable because they were raw instead of refined gas.  However, record evidence demonstrates that Kazakh natural gas—whether raw or refined—is sufficiently comparable to Russian gas for use as a benchmark. 2/  The only distinction between Kazakh natural gas and Russian natural gas is the stage of processing, which is a normal part of the global gas value chain and does not render the products so dissimilar as to preclude comparability as a benchmark under U.S. law.

---

2/    The petitioner's remarks that there may be differences between the purportedly "raw high-sulfur and unrefined" gas transported to Orenburg and the natural gas under consideration in this program rendering them not comparable are similar to the arguments already addressed in *Granular Polytetrafluoroethylene Resin from the Russian Federation*.  *See* Memorandum from James Maeder to Lisa W. Wang, *Issues and Decision Memorandum for the Final Affirmative Determination of the CVD Investigation of Granular Polytetrafluoroethylene Resin from the Russian Federation*, C-821-830 (Jan. 18, 2022) at 19-20 ("*PTFE from Russia*, Final Det. IDM") While the provided information purportedly demonstrates differences affecting comparability and a comparison between the "raw" gas delivered to Orenburg and the natural gas under consideration, Commerce would not be using exports to Russia as the benchmark for the provision of natural gas.  Rather, as discussed above, Commerce would use exports to other markets.  The petitioner's argument also does not speak to the primary issue of availability.

Moreover, Commerce has previously found that Kazakh gas is available to Russian purchasers, regardless of Gazprom's role in the Russian market. This finding is consistent with Commerce's position in other cases—that the comparable product needs to be available, but not actually purchased in the country, for consideration as a tier two benchmark. *See, e.g.*, *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) and accompanying Issues and Decision Memorandum at Cmt. 47 ("19 CFR 351.511(a)(2)(ii) requires only that the world market price be available to 'purchasers in the country in question,' and does not require a specific demonstration that the mandatory respondents in particular would have made these world market purchases."). Commerce's new approach lacks a reasoned explanation and disregards both the statutory framework and the record evidence. Accordingly, Commerce erred by limiting its benchmark to identical data under tier three when comparable tier two data authorized by the statute was both available and required to be used under Commerce's regulation.

**Second**, in calculating its benchmark for phosphate rock, Commerce failed to address this Court's direction to either (1) incorporate all data on the record that is comparable to Russian phosphate rock, including sedimentary rock sources, or (2) demonstrate using record evidence that sedimentary and phosphate rock have *significantly* different production costs, and that these production cost differences, if they can be shown, *significantly* drive market pricing. *Remand Order* at 16, 779 F. Supp. 3d at 1360. The *Final Remand* ignores this Court's instruction. Commerce failed to revise the phosphate rock benchmark to comprise all data on the record that is comparable to Russian phosphate rock, including sedimentary rock sources. Commerce also failed to provide evidence that sedimentary and phosphate rock have significantly different

4

production costs that drive market pricing. Instead, the record evidence Commerce claims to show production cost differences is cherry-picked and fails to address contradictory evidence (even within the same source). Accordingly, Commerce's remand determination is deeply flawed—on the contrary, the record evidence demonstrates there are no significant differences between the types of rock. In this regard JSC Apatit endorses and supports the arguments on this issue made by the Archer Daniels Midland Company ("ADM") in its *Comments of Plaintiff, Archer Daniels Midland Company, on the Final Results of Redetermination Pursuant to Court Remand*, Consol. Ct. No. 23-239 (Sep. 25, 2025) ("ADM Comments on Final Remand").

These fundamental legal and factual errors by Commerce require a second remand. Commerce should be instructed to address these issues and to calculate a revised CVD margin for JSC Apatit that—(A) applies a tier two benchmark for the natural gas calculation, or (at the very least) corrects Commerce's calculation of a tier three benchmark by requiring the use of a weighted-average, and (B) incorporates into Commerce's calculation of a mining rights benchmark the additional record data from Eurostat, or the GTA data from Togo and Iran that is comparable to Russian phosphate rock (i.e., the sedimentary rock data).

## I.    COMMERCE'S ARBITRARY SHIFT TO A TIER THREE NATURAL GAS BENCHMARK WHEN A TIER TWO BENCHMARK IS AVAILABLE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

Regarding the alleged provision of Russian natural gas for LTAR, Commerce abandoned its own established and lawful practice of employing a tier two benchmark, comprising Kazakh natural gas, and instead adopted a tier three benchmark. Commerce's new approach in the *Final Remand*, which uncritically adopts Petitioner's data, is inconsistent with Commerce's own regulations, prior determinations, and the governing statute. Rather, Commerce should have

continued to use a lawful tier two benchmark, comprising Kazakh gas prices, just as Commerce did in the *Final Results*. *See* AR1 Final IDM at Cmt. 2a (P.R. 242).

### A. Commerce's Comparability Determination is Both Contrary to Record Evidence and Unlawful

The law requires Commerce to select benchmarks that are comparable to the good in the country in question. Under the governing statute, 19 U.S.C. § 1677(5)(E) a subsidy's benefit must be determined in relation to the "prevailing market conditions" for the good being provided in the country which is subject to the investigation or review (here, Russia). The statute expressly defines prevailing market conditions to include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). A tier one benchmark compares the government price to "a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). If no such market-determined price exists—as in this case—Commerce proceeds to its tier two benchmark, which compares the government price (in Russia) to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Commerce's regulation further clarifies that "{w}here there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, *making due allowance for factors affecting comparability*." *Id.* (emphasis added). Thus, Commerce must select a benchmark that is comparable to the good in the country in question.

Commerce concluded in the *Final Remand* that "the raw natural gas exported by Kazakhstan is not comparable to the refined natural gas available in the Russian market *that JSC Apatit purchased from GOR* authorities during the POR." *Final Remand* at 13 (emphasis added). That conclusion is both factually and legally wrong. Factually, Kazakh raw natural gas is

comparable to more refined gas in Russia. Legally, the regulation requires comparability, not that the goods are identical. Moreover, Commerce's benchmark regulation, 19 C.F.R. § 351.511, does not import the additional and distinct requirement—that Commerce attempts to import—that Commerce seek a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question" *and available to the respondent under review*. *See Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1347 (Fed. Cir. 2005) ("When there is no ambiguity in the meaning of a regulation, it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision."). There is nothing in the regulation that would require JSC Apatit to have actually purchased raw natural gas during the POR for it to be used as a tier two benchmark.

This Court's remand order directed Commerce to address two specific issues – (1) whether the benchmark third-party sales of natural gas and the sales into Russia are comparable, and (2) if the sales are comparable, explain why sales to a government entity that distorts the market fall within the intended meaning of "purchaser" under the regulation and how that fits into the logic of the three-level benchmark scheme. *Remand Order* at 27, 779 F. Supp. 3d at 1367. Commerce's new determination that natural gas exported from Kazakhstan is not comparable to gas available in the Russian market is unlawful, unsupported by record evidence, and contrary to Commerce's established practice of finding that Kazakh gas third-party sales and export sales to Russia are comparable and therefore meet the tier two benchmark requirements. Moreover, Kazakh gas third-party sales to Russia meet the "purchaser" requirement under the regulation and fit into the logic of Commerce's three-level regulatory hierarchy for benchmarks.

To resolve the question of comparability, this Court must first define what constitutes a comparable product. The Merriam-Webster Dictionary defines "comparable" as "capable of or

suitable for comparison; similar, like." 3/  As the CIT held in *Essar Steel Ltd.,* Commerce may find that two types of a product are sufficiently comparable to be used as a benchmark. Specifically, the CIT found two different types of iron to be sufficiently comparable, even though they were different grades with different iron content and the sole respondent only used one of the grades. *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1294 (Ct. Int'l Trade Aug. 19, 2010).  The CIT further explained that the respondent incorrectly "confound{ed} what may be incompatible with what is so dissimilar that it cannot serve as a fair price comparison.  The regulation requires product comparability, but does not mandate that the products be identical." *Id.* The Court of Appeals for the Federal Circuit ("CAFC") upheld the CIT's decision, explaining that the law does not require that the benchmark be identical to the good at issue, only that it be comparable. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–4 (Fed. Cir. 2012) ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue.").  Thus, the standard for comparability goes beyond differences that may make a product "incompatible" and instead requires a difference that makes it "***so dissimilar***" as to not be a fair comparison.  Just like the different iron content and grade in *Essar Steel*, raw natural gas is not materially different than refined natural gas—it simply has a higher sulfur content.  Thus, the raw and more purified gas at issue here meets this comparability threshold, and should be considered as a comparable benchmark.

The record further demonstrates that Kazakh natural gas exported to Russia is comparable to the natural gas purchased by JSC Apatit.  Specifically:

---

3/      Merriam-Webster, *Comparable*,
https://www.merriam-webster.com/dictionary/comparable (last visited September 25, 2025).

(1) Data from the Bureau of National Statistics of Kazakhstan, JSC NC "KazMunayGas," and KPO's 2021 Sustainability Report confirm that Kazakh natural gas was exported to the Orenburg Gas Processing Plant in Russia via the Karachaganak-Orenburg pipeline; 4/

(2) Pipeline maps demonstrate that Kazakhstan's pipelines transport both raw and processed gas to domestic and international markets; and

(3) Kazakh government customs data shows that gas exported from Kazakhstan under HTS code (2711.21.0000) is treated indistinguishably from Russian gas under the same code.

Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Benchmark Data Submission*, Case No. C-821-825 (2020–21 Administrative Review) (Mar. 15, 2023) ("JSC Apatit's Benchmark Submission") at App. 1, 4, 5 (P.R. 143, 146–154, 154; C.R. 179, 182–190); Letter from Hogan Lovells US LLP to the U.S.

---

4/      Commerce has relied upon similar information in previous cases to determine that Kazakh-gas is available to purchasers in Russia.  *See* Memorandum from James Maeder to Lisa W. Wang, *Decision Memorandum for the Preliminary Determination and Preliminary Negative Critical Circumstances Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, Case No. C-821-834 (Investigation) (Mar. 7, 2022) at 20–21, unchanged in the *Decision Memorandum for the Final Affirmative Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, Case No. C-821-834 (Investigation) (Sep. 23, 2022) ("Data on the record from the Bureau of National Statistics of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan, the JSC NC "KAZMUNAYGAS"' management report, and KPO's 2019 Sustainability Report further indicate that it is reasonable for Commerce to conclude that natural gas was exported from Kazakhstan to Russia during the POI. More specifically, Kazakh natural gas producer KPO stated that it sold natural gas to the Orenburg Gas Plant in Russia using the Karachaganak Orenburg pipeline, which is not a part of the UGSS.  While other pipelines from Kazakhstan to Russia connect to third countries (such as the Caspian Pipeline Consortium pipeline and Atyrau – Samara pipeline), and could, therefore, be directly transported to third countries, the Karachaganak Orenburg pipeline connects to and terminates in Russia. **This information, coupled with customs statistics and the GOR's prior statements that imports from customs code 2711210000 are released into free circulation, leads us to preliminarily determine that natural gas exported from Kazakhstan is available to purchasers in Russia**; fulfilling the main criteria for a tier-two benchmark.") (emphasis added).  *See also* Memorandum from Scot Fullerton to Lisa W. Wang, *Decision Memorandum for the Final Affirmative Determination in the Countervailing Duty Investigation of Urea Ammonium Nitrate Solutions from the Russian Federation,* Case No. C-821-832 (Investigation) (June 17, 2022) ("*UAN from Russia*, Final Det. IDM") at Cmt. 2; *PTFE from Russia*, Final Det. IDM at 19–20.

Department of Commerce, *Phosphate Fertilizers from Russia: JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission*, Case No. C-821-825 (2020–21 Administrative Review) (Mar. 27, 2023) ("JSC Apatit's Benchmark Rebuttal") at App. 18 – *Russian and Kazakhstan Gas Pipelines into Europe Structure* at 4  (P.R. 169-172; C.R. 202-205).

The Kazakh government customs data that shows that gas exported from Kazakhstan under HTS code (2711.21.0000) is treated indistinguishably from Russian gas under the same code is particularly relevant because the HTS system—designed to differentiate products based on their characteristics—treats *both* raw and refined natural gas as the same product subject to the same tariff treatment.  Accordingly, there is no reasonable basis for Commerce to treat them differently.

Further, the CIT has upheld Commerce's use of data based on the HTSUS subheading corresponding to the inputs consumed by a respondent. *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1278 (Ct. Int'l Trade 2014) ("On remand, Commerce properly considered factors affecting comparability.  Commerce measured comparability by the Harmonized Tariff Schedule Heading for sulfuric acid.  It accepted, as comparable, world market prices (export data) for sulfuric acid under HTS Heading 2807."); *RZBC Grp. Shareholding Co. v. United States*, 2016 WL 3880773, *10 (Ct. Int'l Trade 2016) ("In this case, the prices Commerce used pertained to inputs that were comparable to RZBC's.  Commerce derived its benchmarks in large part from GTA HTS data for the tariff headings covering bituminous (or steam) coal, sulfuric acid, and limestone flux—i.e., the tariff headings that correspond to RZBC's inputs.").  Therefore, because the gas exported from Kazakhstan and the gas in Russia share the same HTS code, pursuant to Commerce's own prior findings and relevant case law, Kazakh and Russian natural gas are sufficiently comparable that Kazakh natural has can be employed as a tier two benchmark.

Commerce itself has repeatedly and correctly found in this case, as well as other recent CVD cases involving Russia, that Kazakh-origin natural gas is sufficiently comparable to Russian natural gas to serve as a tier two benchmark. *See, e.g.*, *PTFE from Russia*, Final Det. IDM at 19–20; Memorandum from James Maeder to Lisa W. Wang, *Decision Memorandum for the Preliminary Determination and Preliminary Negative Critical Circumstances Determination in the Countervailing Duty Investigation of Oil Country Tubular Goods from the Russian Federation*, C-821-834 (Mar. 7, 2022) at 20 ("*OCTG from Russia*") (unchanged in Final IDM).   When Commerce changes a longstanding practice, it must explain why it does so. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (Mar. 9, 2015) ("{T}he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy").   Here, Commerce offered no reasoned explanation for departing from its longstanding practice.   To the contrary, Commerce summarily addressed the issue of comparability, ignored the issue of sales to a government entity, discarded abruptly the tier two benchmark on which it had a longstanding practice of reliance, and pivoted to a tier three benchmark. *Final Remand* at 13–14, 28, and 31.

Commerce's sole justification for abandoning the use of Kazakh gas as a tier two benchmark is that the raw natural gas in the Kazakh export data requires further processing to become refined gas. *Final Remand* at 13.   But that justification is unsupported by record evidence. Commerce asserts that further processing raw natural gas is costly and that the raw gas is not fit for consumption, relying exclusively on a *National Energy Report* by the Kazakhstan Association of Oil & Gas and Energy Sector Organizations. *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to the U.S. Department of Commerce, *Phosphate Fertilizers From the Russian Federation: Petitioner's Benchmark Rebuttal Submission*, Case No. C-821-825 (2020–21

Administrative Review) (Mar. 27, 2023) ("Petitioner's Benchmark Rebuttal") at Exh. 8 (P.R. 163–164). That exhibit, however, does not provide quantitative analysis or evidence that the cost of processing raw Kazakh gas alters its market value relative to refined gas such that it would no longer be comparable. To the contrary, the same *National Energy Report* acknowledges that Kazakhstan has extensive processing infrastructure for natural gas and that its "commercial output" (*i.e.*, processed gas) is regularly produced and exported. *See* Petitioner's Benchmark Rebuttal at Exh. 8 at 18–20. Accordingly, the fact that raw gas requires further processing before end use is a common feature in global gas markets and is routinely reflected in market pricing—it is not a basis for categorical exclusion from consideration as a benchmark price.

Moreover, the CIT's prior decisions do not support the distinction that Commerce is making between raw and refined natural gas. Specifically, the CIT has held that differences in grade or processing do not preclude use as a benchmark unless the products are "*so dissimilar*" as to make comparison unfair. *See Essar Steel Ltd. v. United States,* 721 F. Supp. 2d 1285, 1294 (Ct. Int'l Trade Aug. 19, 2010) (emphasis added); *see also Beijing Tianhai Indus. Co. v. United States,* 52 F. Supp. 3d 1351, 1369–71 (Ct. Int'l Trade Feb. 6, 2015) (finding that Commerce acted reasonably in considering steel tubes of all diameter levels, and not limiting the benchmark to steel tubes in specific diameter ranges). Here, the only evidence that Commerce cites to support its argument (as discussed above) fails to demonstrate that raw and refined gas are ***so dissimilar***. Instead, that record evidence demonstrates that raw and refined gas are part of a continuous value chain, just like the different grades of steel discussed in *Essar Steel*, or the different diameters of tubes discussed in *Beijing Tianhai*. The only distinction between raw and refined gas is the stage of processing, which is merely a commercial aspect of the natural gas supply chain—so much so that the HTS system does not differentiate between the gas produced at the end of the two stages.

Importantly, any purported differences between raw and further processed gas are irrelevant to the construction of a benchmark price because Commerce **did not use the export prices of the raw gas exported from Kazakhstan to Russia in its benchmark construction** for the allegedly subsidized Russian natural gas in its *Final Results*.  AR1 Final IDM at 48 (P.R. 242). Instead, Commerce lawfully selected prices for Kazakh-origin natural gas exported to markets **other than China and Russia** as the tier two benchmark in the *Final Results*.  *Id.*  Commerce asserts that it shifted from its lawful use of a Kazakh gas benchmark because "the record of Commerce's proceedings are distinct, and determinations in a proceeding depend on the facts specific to the record of that proceeding." *Final Remand* at 29.  This claim is unavailing—the record evidence here is exactly the same as in Commerce's prior cases: comparable Kazakh raw gas was imported into Russia, and Kazakh exports of natural gas were used as a tier two benchmark.

Finally, in the *Final Remand*, Commerce contends that the imported Kazakh natural gas requires refinement to be comparable to the natural gas **used by JSC Apatit**.  This is not the applicable legal standard.  To rely on a tier two benchmark, Commerce need only apply a benchmark that "**would be available to purchasers** in the country in question"—Commerce is not required to show that the respondents would have purchased the same good being employed as the benchmark. 19 C.F.R. § 351.511(a)(2)(ii); *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade Feb. 6, 2015) ("When constructing a tier two benchmark, the reference to 'a firm' does not mean the respondent.  Rather, it refers to a hypothetical firm located in the PRC purchasing steel tube during the POI. This is why the Department is directed, when calculating tier two benchmarks, to determine 'price{s that} would be available to purchasers in the country in question.'").  Indeed, as discussed above, in *Essar Steel*, the respondent consumed

in its production process a different grade of iron ore than the grades Commerce employed in its tier two benchmark comparison, and the CIT upheld Commerce's determination because "the differences, if they existed at all, were not so profound as to render the two products incomparable." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1294 (Ct. Int'l Trade Aug. 19, 2010).

In sum, Commerce's obligation to identify a benchmark good that best reflects the conditions of the market under review does not, without explicit regulatory mandate, extend to proving that such a benchmark good would have been directly obtainable ***by the respondent***. The regulation imposes no requirement that Commerce ensure respondent (i.e., firm)-specific access to the benchmark good as a prerequisite to selecting an appropriate benchmark. Instead, Commerce has consistently interpreted 19 C.F.R. § 351.511(a)(2)(ii) to require only that the relevant world market price be one that purchasers in the country could reasonably access. Thus, the regulation does not demand evidence that a particular respondent under investigation actually had the ability or inclination to purchase at that world market price. This Court should not read a requirement into Commerce's regulation that does not exist.

B.    **The Kazakh Gas Benchmark Meets the Regulation's "Purchaser" Standard**

In the *Final Remand*, Commerce did not address this Court's instruction to explain whether sales to a government entity (i.e., Gazprom) that ostensibly distorts the market satisfy the meaning of "purchaser" in the 19 C.F.R. § 351.511(a)(2)(ii). *Remand Order* at 27, 779 F. Supp. 3d at 1367 (also instructing Commerce to address how such sales fits in the tiered benchmark scheme). Commerce instead dismissed this issue as moot given its shift to a tier three benchmark for natural gas. *Final Remand* at 14. Notwithstanding the arguments contained in Section II.A., Commerce's comparability determination is contrary to record evidence and otherwise unlawful. Thus, this

14

Court should also remand for Commerce to address this Court's second question regarding sales to a government entity and the meaning of purchaser.

On remand, Commerce must acknowledge that the references in the statute and Commerce's regulations to "purchaser" in the context of tier two benchmarks are not limited to private entities. *See* 19 U.S.C. § 1677(5); 19 C.F.R. § 351.511(a)(2)(ii). Indeed, the statute and regulation require that a world market price be "available to purchasers in the country"—not that the purchaser be a private, non-governmental entity—for it to be employed as a benchmark. *Id.* As the Federal Circuit has explained: "When construing an agency regulation as a matter of law, we use basically the same rules we would use in construing a statute," beginning with the plain meaning of the text and, where appropriate, examining related provisions. *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. Jan. 23, 2018) (quoting *Roberto v. Department of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)). When regulatory language is unambiguous, "it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision." *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1347 (Fed. Cir. Apr. 26, 2005) (quoting *Gibson v. U.S.,* 194 U.S. 182, 185 (1904).

In this regard Commerce's regulation, 19 C.F.R. § 351.511(a)(2)(i) is not ambiguous: it states unconditionally that Commerce is to use "a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(i). This Court must therefore apply the regulation as written, without incorporating additional and distinct requirements, such as that the benchmark price must also be one available to private purchasers. *See Tesoro Hawaii Corp.,* 405 F.3d at 1347.

In the Russian natural gas market, Gazprom owns the gas pipelines that distribute natural gas, and it is also a purchaser and distributor of natural gas (for its own gas and also from private gas producers). These facts do not disqualify Commerce from using a tier two benchmark. In fact, Commerce's *CVD Preamble* itself contemplates that, under ordinary circumstances, there may be some level of government involvement in the domestic market. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*") (suggesting that the electricity consumers in its example could be government or public consumers). Critically, Commerce's discussion of "distortion" appears only in the context of *tier one* benchmarks, where the agency is assessing in-country prices potentially affected by government intervention. Once the analysis moves to a tier two or tier three benchmark, such as Kazakh gas here, the whole point is to rely on prices external to the (Russian) domestic market. Distortions in Russia's internal market, including the role of Gazprom, therefore cannot disqualify or undermine the use of an available world market price under 19 C.F.R. § 351.511(a)(2)(ii). Simply put, distortion in the in-country market is irrelevant when Commerce has already moved beyond tier one—as Commerce itself acknowledged in its Final Determination. *See* AR1 Final IDM at 47 (P.R. 242) ("the disqualification of natural gas import prices (including Kazakh-origin import prices) into Russia as a tier 1 benchmark is distinct from the issue of whether exports of Kazakh-origin natural gas is 'available' to purchasers in Russia under 19 CFR 351.511(a)(2)(ii). Thus, the petitioner's claims that the distortion of Russia's natural gas market disqualifies all export prices for Kazakh-origin natural gas for use as a Tier 2 benchmark is incorrect.")

Moreover, Commerce has long held that Gazprom's ownership interest in the Orenburg processing plant does not affect whether gas is available to Russian consumers. *UAN from Russia*, Final Det. IDM at 22. Adopting a contrary position and excluding all sales to government entities

as possible tier two benchmarks is overly broad considering Commerce's regulatory framework set forth in 19 C.F.R. § 351.511.  Indeed, such an approach would render a tier two benchmark inapplicable in any market where the government is a major or sole purchaser, contrary to the purpose of the regulation and to the careful construction of Commerce's three-tier benchmark scheme.  The regulation is designed to ensure that, when a world market price is available to purchasers in the country—regardless of whether those purchasers are public or private, Commerce should be instructed to use that price as the benchmark.  *See, e.g.*, *PTFE from Russia*, Final Det. IDM at 18; *UAN from Russia,* Final Det. IDM at Cmt. 2.

Record evidence demonstrates that Kazakh gas is released into the pipelines that service natural gas to public and private consumers alike in Russia.  *See* Petitioner's Benchmark Rebuttal at Exh. 8 (explaining that only "*some of the processed gas {is sent} back to the Kazakh* domestic market" from Russia) (P.R. 163–64); s*ee also* Letter from Wilmer Cutler Pickering Hale and Corr LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Petitioner's Case Brief*, Case No. C-821-825 (2020–21 Administrative Review) (June 13, 2023) at 7 ("To the extent any finished Kazakh gas remains in Russia after processing, it consists of a product processed and sold by Gazprom…") (P.R. 207).  The fact that Gazprom holds a monopoly over gas distribution in Russia, a consistent fact has in all of Commerce's proceedings involving natural gas from Russia, does not negate that Kazakh natural gas is available to Russian purchasers. *See, e.g., UAN from Russia*, Final Det. IDM at Cmt. 2.  The fact that Gazprom owns the pipelines does not affect the logic behind the benchmark.

Finally, the benchmarks previously constructed by Commerce demonstrate that relying on the availability of natural gas to a government entity is consistent with the regulation.  That is because Commerce ***did not*** use the prices for sales to Russia or China in the benchmarks it

constructed for either the *Final Results* of this administrative review or other recent cases involving Russia. *See* AR1 Final IDM (P.R. 242) ("{W}e are not using exports to Russia as the benchmark for the provision of natural gas. Rather, as discussed above, we are using exports to other markets and the petitioner's argument does not speak to the primary issue of availability."); *see, e.g., UAN from Russia,* Final Det. IDM at Cmt. 2  Instead, Commerce selected prices for Kazakh-origin natural gas exported to markets ***other than China and Russia*** to serve as the tier two benchmark. *See* AR1 Final IDM at 48. Therefore, any distortion in the Russian market per se does not affect the benchmark used.

For all these reasons, this Court should remand this issue to Commerce with instructions to maintain its prior, lawful, and well-supported use of a tier two Kazakh gas benchmark. This approach is consistent with the statute, regulations, record evidence, and Commerce's own established practice.

## II.    ALTERNATIVELY, IF THIS COURT AGREES WITH COMMERCE'S SHIFT TO AN UNLAWFUL TIER THREE BENCHMARK, IT SHOULD INSTRUCT COMMERCE TO CORRECT ITS CALCULATIONS

As set forth in Section II, Commerce's shift to a tier three benchmark for its natural gas calculations is unlawful. However, if this Court agrees with Commerce's use of a tier three benchmark for its calculations of the natural gas benefit for JSC Apatit, this Court should instruct Commerce to correct certain fundamental errors in its calculations. [5]/

Specifically, Petitioner provided inaccurate and incomplete International Energy Agency ("IEA") natural gas pricing data for Organisation for Economic Co-operation and Development ("OECD") European countries as a tier three benchmark. Letter from Wilmer Cutler Pickering

---

[5]/    In its *Final Remand*, Commerce did correctly include the Czech Republic's natural gas prices as reported in the more complete IEA dataset on the record that it had previously "inadvertently excluded." *See Final Remand* at 30.

Hale and Dorr LLP to the U.S. Department of Commerce, *Phosphate Fertilizers From the Russian Federation: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration*, Case No. C-821-825 (2020–21 Administrative Review) (Mar. 15, 2023) ("Petitioner's Benchmark Submission") at Exh. 31 (P.R. 136). Petitioner's data was limited to calendar year 2021, and relied on a simple, rather than weighted average. *Id*. Commerce must complete and correct these flawed data in order to construct a fair and reasonable tier three benchmark.

To assist Commerce with the legal requirement that the agency select and calculate an accurate benchmark, JSC Apatit submitted complete and accurate IEA natural gas pricing data for OECD European countries for December 2020 and calendar year 2021. JSC Apatit's Benchmark Rebuttal at 3, App. 19 (P.R. 162, 172; C.R. 202–205). Commerce unreasonably failed to consider these data and to incorporate them into its newly selected benchmark.

Moreover, Commerce erroneously used a simple average in the *Final Remand* and failed to incorporate the weighted average of the IEA natural gas pricing data already in the record. Applying a simple average, not a weighted average, is contrary to Commerce's practice, including in previous cases in which it has applied a tier three benchmark comprising European natural gas prices. *See, e.g.*, Memorandum from Christian Marsh to Paul Piquado, *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Issues and Decision Memorandum for the Final Determination*, Case No. C-821-823 (Investigation) (July 20, 2016) ("{W}e derived weighted-average monthly prices using the selected European export market prices"); *cf. Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1381 (Fed. Cir. 2022) (relying on weighted averages for the comparison of sales prices in respondent's home country to the United States in antidumping proceedings).

19

The IEA natural gas pricing data submitted by JSC Apatit provides the weighted-average OECD natural gas end-use price, in accordance with Commerce's practice, by accounting for the volume of gas consumed in each OECD country during the POR.  JSC Apatit's Benchmark Rebuttal at 3, App. 19–20 (P.R. 162, 172; C.R. 202, 205).  Commerce erroneously argued in its *Final Remand* that JSC Apatit did not provide a methodology on which Commerce could conduct a weighted average calculation.  *Final Remand* at 31.  This is mistaken—JSC Apatit provided Commerce with the weighted average IEA data for OECD Europe calculated by IEA itself.  *See* JSC Apatit's Benchmark Rebuttal at App. 19 (P.R. 172; C.R. 205).  Indeed, JSC Apatit even explained that the IEA employs the same weighted average based on the volume consumption of natural gas in each country as it does for gasoline, diesel, and electricity.  *See* JSC Apatit's Benchmark Rebuttal at App. 20; Petitioner's Benchmark Submission at Exh. 33 at 24 (P.R. 136). In other words, the IEA pricing data for natural gas are regional aggregates calculated as weighted averages of consumption.  JSC Apatit thus provided the weighted average data as well as an explanation of the source and methodology for that data.  Accordingly, this Court should instruct Commerce to correct its methodology.

This significant, clear error unlawfully skewed the tier three benchmark employed to measure the alleged benefit received by JSC Apatit. Commerce's tier three benchmark constructed in its *Final Remand* was unlawful and unsupported by record evidence.  This Court should remand to Commerce for correction.

## III. COMMERCE ERRED IN CONTINUING TO LIMIT THE PHOSPHATE ROCK BENCHMARK TO COUNTRIES WITH IGNEOUS PHOSPHATE ORE DEPOSITS WHILE REJECTING THE MORE FULLSOME DATA ON THE RECORD

This Court instructed Commerce in its *Final Remand* to calculate the phosphate rock benchmark using the more robust data on the record.  *Remand Order* at 15–16, 779 F. Supp. 3d at

1360. Instead, Commerce unlawfully continues to reject the more fulsome record data and rely on data accounting for less than 0.02% of the total global production and less than 0.12% of the total global exports of phosphate rock in 2021. *Final Remand* at 11; *see* JSC Apatit's Benchmark Submission at App. 9 (P.R. 155; C.R. 191).

Commerce's only explanation for this repeat failure is to claim that the agency must limit its benchmark for mining rights for LTAR to phosphate rock data from countries with igneous rock because of alleged "cost of production" differences that it fails to substantiate. *Final Remand* at 21. This is not an adequate justification. Rather, this Court explained in its *Remand Order* that Commerce unlawfully limited the phosphate rock benchmark to "a benchmark reflecting . . . minimal volume data" in several ways, including: (1) relying solely on export data from the Global Trade Atlas ("GTA") database for igneous countries; (2) declining to use data from the Eurostat database because they could not identify whether the source was sedimentary or igneous rock; and (3) excluding export prices from Togo and Iran because they produce sedimentary rather than igneous rock. *Remand Order* at 10–11, 779 F. Supp. 3d at 1357–58. This Court was explicit in its instructions to Commerce that, "{w}ithout record evidence that the costs to produce the two kinds of rock *differ significantly* and that the distinction between the two was a *significant driver of prices in the phosphate rock* market, a benchmark reflecting such minimal volume data is unreasonable." *Remand Order* at 15–16, 779 F. Supp. 3d at 1360 (emphasis added).

In its *Final Remand*, Commerce fails to identify any record evidence that the two kinds of rock differ significantly, or that the distinction between the two was a significant driver of prices in the phosphate rock market. As noted above, JSC Apatit supports and incorporates by reference all of ADM's arguments in opposition to final remand pertaining to the phosphate rock benchmark. ADM Comments on Final Remand.

### A.    Commerce Selectively Considered the Record Evidence, Failing to Address Contrary Evidence

Commerce's analysis in its *Final Remand* for why sedimentary and igneous phosphate rock production costs differ significantly relies **solely on two pieces of evidence**—a 2016 book by Petr Ptacek and a report by Graham Davis.  However, Commerce's reliance on these sources is both unlawfully selective and misleading.

Commerce's reliance on the Ptacek book is flawed because it fails to consider the evidence as a whole, instead selectively choosing passages out-of-context to support its determination. Commerce attempts to grasp at a few pieces of evidence that it claims suggests that some phosphate rock types **may** have differences in production costs, while ignoring the overwhelming evidence that there is no significant or notable distinction in the costs of production between igneous and sedimentary phosphate rock.  Instead, if anything, the evidence that Commerce cites merely suggests that there are production cost differences between **other** types of phosphate rock—not between sedimentary and igneous rock.  For example, the Ptacek book identifies <u>**six**</u> different types of rock (not two, as Commerce has unlawfully based its benchmark selections around).  *See* Petitioner's Benchmark Submission at Exh. 20 (P.R. 133).  Furthermore, each of Commerce's citations from the Ptacek book purporting to show differences between igneous and sedimentary rock refer only to "calcareous" sedimentary rock—a very specific type of sedimentary rock— while ignoring that on the very same pages of the book, Prof. Ptacek identifies other types of sedimentary phosphate rock—including "siliceous" phosphate rock—which he explains shares **similarities** with igneous rock (such as having the same beneficiation processes).  *Id*.  The evidence that Commerce relies on in its *Final Remand* therefore does not demonstrate any significant or clear divide between production costs for sedimentary vs. igneous rock at all.  If any differences even do exist—and they do not—Commerce has only demonstrated such differences exist between

*other* specific types of rock, failing to draw a clear line identifying any differences between sedimentary and igneous rock as a whole.

Notably, Commerce explains in its *Final Remand* that "no party has cited evidence that certain countries have reserves of any specific type of sedimentary ore that has identical production steps and costs compared to igneous ores, such that we could consider the inclusion of phosphate rock export prices from any such countries in the tier three benchmark." *Final Remand* at 24. Contrary to this claim, that is exactly the evidence to which JSC Apatit has pointed—that igneous and siliceous sedimentary rock share the same preferred beneficiation processes (and, following Commerce's logic, therefore the same production costs). As the excerpt from the Ptacek book (included below) makes clear, igneous and sedimentary rock with siliceous gangue are the same across all beneficiation methods, while only sedimentary rock with calcareous gangue differs from either igneous or siliceous gangue rock.

| Ore type | Beneficiation method | | |
|---|---|---|---|
| | Flotation | Calcination | Organic acid leaching |
| Igneous | The best approach | Not applicable | Not applicable |
| Sedimentary with siliceous gangue | The best approach | Not applicable | Not applicable<br>Barcode:4353927-02 C-821-825 REV - Admin Rev: |
| Sedimentary with calcareous gangue | **Advantages**<br>— | **Advantages**<br>Low water consumption.<br>Complete elimination of the carbonate gangue. | **Advantages**<br>Very selective.<br>Acid plants have low capital cost.<br>Method has few environmental hazards.<br>Leaching does not affect phosphate minerals.<br>Organic acid can be recycled.<br>Water consumption equal to convectional beneficiation.<br>Final product has good quality and purity.<br>Organic acid salts are soluble in water and easily filtered from solid product. |
| | **Disadvantages**<br>Method has not given satisfactory results.<br>Not applicable in many cases. | **Disadvantages**<br>Calcination.<br>Plants high capital cost.<br>Needs high thermal energy.<br>Calcined product has no desirable quality.<br>Calcination decreases the product solubility.<br>Process is time consuming. | **Disadvantages**<br>Economic aspects are not well established.<br>Organic acid price is high. |

Nonetheless, Commerce asserts (inaccurately) that "record information available here shows significant differences in production processes and costs between igneous and sedimentary ores, such as calcination and its associated costs (*e.g.*, capital costs and energy costs)." *Final Remand* at 24–25. Commerce's explanation for considering only igneous rock relies on showing that there is a more costly "calcination" process used on ***one specific subset*** of sedimentary rock— however, record evidence shows that siliceous sedimentary rock ***does not use*** this production method, and in fact shares a production method with igneous rock. Thus, while Commerce has focused its justification for its benchmark selection on the production differences between igneous and "sedimentary with calcareous gangue" rock, its justification completely ignores the record

24

evidence that there *is* at least one subset of sedimentary rock that shares the same production processes (and, following Commerce's logic, costs and price) with igneous rock. Commerce's abject failure to address the contrary record evidence within its own cited source is contrary to law.

Further, Commerce admits that "certain costs for producing phosphate rock from igneous reserves may be higher than from sedimentary reserves, and *vice versa*. This does not, however, change the fact that the production costs for each type of ore are different." *Final Remand* at 25. Even assuming *arguendo* that production costs for each type of ore are different, if they are not consistently different in any meaningful manner, as Commerce appears to admit, this is further evidence that excluding all sedimentary rock prices from the benchmark is arbitrary and unlawful because there is no evident lack of comparability between the two types.

Finally, Commerce cherry-picks from the Davis report to support its position regarding the alleged distinction between sedimentary and igneous rocks. The Davis Report does not discuss valuing the underlying phosphate rock, other than commenting on how ore deposits in Jordan do not have the same value as Russian ore. *See id*. Indeed, the report never provides any value for Russian ore or any other type of ore, and therefore Commerce's reliance on this statement to show a distinction between sedimentary and igneous rock cannot constitute substantial evidence. Commerce's extrapolation of this one tangential statement to argue that there is a distinction between all sedimentary and igneous rock is unexplained and unlawful.

Moreover, Commerce previously rejected the central proposition of the same report—that Commerce should value the actual subject of this review, phosphate fertilizer, not the input used to produce it (phosphate rock). AR1 Final IDM at 14, 16 (P.R. 242); s*ee* JSC Apatit's Benchmark Submission at App. 7 (P.R. 155; C.R. 191) . The Davis Report addresses whether prices at which

phosphate mining rights were obtained were set in accordance with market principles for purposes of calculating a tier two benchmark.  JSC Apatit's Benchmark Submission at App. 7 (P.R. 155; C.R. 191). However, Commerce has determined that it must calculate a tier three benchmark price assessing the value of the underlying good, phosphate rock.  Accordingly, Commerce's reliance on the Davis Report as justification for excluding sedimentary phosphate rock from its tier three benchmark is misleading and erroneous.

Indeed, Commerce itself dismissed the Davis Report as "conclusions that were tailored by an interested party to generate a desired (biased) result."  *See* AR1 Final IDM at n.81 (P.R. 242). Without any explanation for why Commerce has, in its *Final Remand*, changed its mind that the conclusions in the Davis Report were generating a "biased" result that was focused on valuing mining rights and leases for a tier two benchmark calculation (not the underlying phosphate rock for a tier three benchmark calculation), Commerce should not rely upon peripheral segments of that same report to support its conclusion that igneous and sedimentary rock differ significantly.

Commerce's selective citation of only those passages from the Ptacek book and the Davis Report that purportedly support its position is unlawful, particularly as Commerce fails to consider contrary evidence in the very same sources. *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1327 (Fed. Cir. 2020) ("Commerce must consider all evidence on the record, both that which supports and that which detracts from its conclusion.").  The *Final Remand* is accordingly unlawful.

### B.    The Law Requires Comparable—Not Identical—Benchmarks

Moreover, as we established above, the CVD law does not require that benchmark products be identical, only that they be *comparable*, and differences in grade or processing do not preclude use as a benchmark unless the products are so dissimilar as to make comparison unfair.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–4 (Fed. Cir. Apr. 27, 2012) ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue."); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1294 (Ct. Int'l Trade 2010) (Commerce "confound{ed} what may be incompatible with what is so dissimilar that it cannot serve as a fair price comparison.  The regulation requires product comparability, but does not mandate that the products be identical."); *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1364 (Ct. Int'l Trade 2015) (finding that Commerce acted reasonably in considering steel tubes of all diameter levels, and not limiting the benchmark to steel tubes in specific diameter ranges).  Indeed, this Court echoed this very point by directing Commerce to explain why the costs to produce igneous and sedimentary rock *differ **significantly*** and why the distinction between the two was a ***significant*** *driver of prices in the phosphate rock* market.  *See Remand Order* at 15–16, 779 F. Supp. 3d at 1360.

Instead of following this Court's instructions, Commerce tried to point to alleged differences in production processes as evidence of differences in production costs—without presenting any actual evidence that production costs differ significantly.  Commerce attempts to justify this approach by saying that the Remand Order "did not, however, instruct Commerce to quantify the effect of cost differences between the two types of reserves on world market prices for phosphate rock." *Final Remand* at 7.  While this Court did not ask Commerce to quantify cost

differences, it ***did*** ask it to demonstrate why the costs differ significantly, which Commerce has failed to do by simply pointing to alleged differences in production processes. This is particularly so given that the few insignificant differences in production processes that Commerce selectively identifies between sedimentary and igneous rock (such as that calcareous sedimentary rock can use a calcination method of processing that igneous ore does not) are not sufficient to render any comparison unfair for benchmark purposes.

Moreover, this Court also instructed Commerce to demonstrate why the distinction between igneous and sedimentary rock was a significant driver of prices in the market. Here, Commerce failed to point to ***any*** record evidence of price differences between igneous and sedimentary phosphate rock, instead merely concluding that where costs differ, prices must also differ. This perfunctory conclusion devoid of any record evidence (because there is none) is unlawful.

Commerce was required to calculate the phosphate rock benchmark using the more robust data on the record in its *Final Remand*—the agency failed to do so. Instead, Commerce continues unlawfully to reject the more fulsome record data, relying on specious and unreliable data accounting for less than 0.02% of the total global production and less than 0.12% of the total global exports of phosphate rock in 2021. *See* JSC Apatit Benchmark Submission at App. 9 (P.R. 155; C.R. 191). Given the lack of evidence supporting its determination and the wealth of more robust and reliable data on the record, Commerce's reliance on only the sparse igneous country data continues to be contrary to law. This Court should remand to Commerce to reconsider its *Final Remand*.

## IV.    CONCLUSION

The multiple errors in Commerce's analysis require a second remand.  Commerce should be instructed to address these issues and to determine a revised CVD margin for JSC Apatit that — (1) applies a tier two benchmark for the natural gas calculation, or at the very least, if this Court agrees with Commerce's shift to a tier three benchmark, corrects Commerce's calculations to use a weighted-average, and (2) incorporates into its mining rights benchmark calculation the additional record data that are comparable to Russian phosphate rock (i.e., the sedimentary rock data).

<div style="margin-left:50%">

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.6634
Fax:  +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to JSC Apatit*

</div>

Dated: September 25, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 8,742 words according to the word-count function of the word-processing software used to prepare the brief. This is less than the 10,000 words permitted for comments on Remand determinations set forth in SCP 2(B)(1)(b) and CIT Rule 56.2(h).

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

September 25, 2025