# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

|  |  |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) |
| Plaintiff, and | ) |
| JOINT STOCK COMPANY APATIT, | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, and | ) |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor. | ) |

**PUBLIC DOCUMENT**

**Consol. Ct. No. 23-00239**

## COMMENTS OF PLAINTIFF, ARCHER DANIELS MIDLAND COMPANY, ON THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Ave., SE
Suite 500
Washington, D.C. 20003

Counsel to Archer Daniels Midland Company

Date: September 25, 2025

# TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ............................................................ 1

II.    CASE BACKGROUND ................................................................... 5

III.    ARGUMENT ................................................................................. 8

    A.  Commerce's Six Record Citations Do Not Constitute Substantial Evidence of Cost of Production Differences or Price Differences Depending on the Type of Ore ................................................................................. 8

          1.  **The Davis Report Does Not Contain Substantial Evidence of a Mining Cost Difference Depending on the Type of Ore** ................... 8

          2.  **Prof. Ptacek's Book Does Not Contain Substantial Evidence of a Beneficiation Cost Difference Depending on the Type of Ore** ...... 13

          3.  **Conclusions Concerning Commerce's Reliance Upon Cherry-Picked Excerpts from the Davis Report and the Ptacek Book** ...... 21

    B.  Commerce's Claim that It Had No Obligation to Quantify the Effect of Cost Differences Has No Merit ................................................................ 24

    C.  Commerce's Hypothesis Concerning the Effect that the Alleged Cost of Production Difference Has on World Market Prices Is Not Supported by Substantial Evidence ................................................................ 25

    D.  Commerce Erroneously Claims that It Did Not Have to Demonstrate a Total Cost of Production Difference Between the Two Types of Ore......... 27

    E.  Commerce Erroneously Claims that It Had No Obligation to Identify the Actual Cost Associated with Any Mining or Beneficiation Step or Identify the Effect of Any Cost Difference on Prices in the Phosphate Rock Market ................................................................................. 29

F. Commerce Erroneously Attempts to Transfer the Burden of Proof to ADM to Demonstrate that Significant Cost of Production Differences Do Not Exist ............................................................................. 30

G. Commerce's Reliance on the Fact that Apatit Produces Phosphate Rock from Igneous Ore Does Not Satisfy the Substantial Evidence Test.......... 31

H. ADM Did Not Fail to Address the "Central Issue" that the Court Identified ...................................................................... 32

IV.    **CONCLUSION** ............................................................... 34

## TABLE OF AUTHORITIES

**Page No.**

**Court Decisions**

*Archer Daniels Midland Company v. United States*, 779 F. Supp. 3d 1349 (2025)
.................................................................................................. 1, 23-25, 28, 34

**Statutes**

19 U.S.C. § 1677(5)(E)(iv) .............................................................................  25

**Regulations**

19 C.F.R. § 351.511(a)(2)(iii) ...................................................................... 6, 9

The Plaintiff, Archer Daniels Midland Company (ADM"), hereby submits its Comments on the Commerce Department's Final Results of Redetermination Pursuant to Court Remand ("Remand Results"). ECF No. 90-1. Commerce issued the Remand Results pursuant to this Court's Opinion and Order in *Archer Daniels Midland Company v. United States*, 779 F. Supp. 3d 1349 (2025). The Court should now find that Commerce has unlawfully failed to revise its benchmark for determining the benefit provided by the Russian Federation's provision of phosphate rock mining rights for less than adequate remuneration ("LTAR"). ADM joins in the remand comments of Joint Stock Company Apatit ("Apatit"), which also opposes Commerce's equally unlawful revision of the benchmark for determining the benefit that the Russian government provided for the provision of natural gas for LTAR.

## I.  SUMMARY OF ARGUMENT

The Court stated that it would not sustain Commerce's phosphate rock benchmark calculation unless its Remand Results identified substantial "record evidence that the costs to produce the two kinds of rock <u>differ significantly</u> and that the distinction between the two was a <u>significant driver</u> of prices in the phosphate rock market." Id. at 1360-61. (Emphasis added.) Commerce failed to meet this burden. Therefore, the Tier Three benchmark that Commerce has continued to use reflects "such minimal volume data {as to be} unreasonable." Id. at 1360.

Instead of complying with the Court's instructions, Commerce cherry-picked the record by selecting just two beneficiation processes so that it could once again

conclude that unspecified cost differences associated with those processes were significant and were a significant driver of prices in the phosphate rock market.[1] However, the beneficiation processes for phosphate rock are significantly more complex and extensive than just the two processes that Commerce fastened upon.[2]

ADM identifies these processes below and explains how their existence makes it impossible to conclude that a significant cost of production difference always exists between production of phosphate rock from igneous ore vs. sedimentary ore. For example: (1) there is not one type of igneous ore and one type of sedimentary ore; (2) there is not one mining process for igneous ore and a different process for sedimentary ore; and (3) there is not one beneficiation process for igneous ore and a different process for sedimentary ore.

These significant differences necessarily mean that the physical characteristics of the ore being mined, the mining processes being used, and the beneficiation processes being employed will yield different production costs depending on all these factors and several others that ADM describes below. However, the final Remand Results do not even address the relevance of ADM's identification of the wide variety of mining and beneficiation processes, much less

---

[1] Commerce also alleges a difference in the cost of the mining process for the two types of ore, but the author of the report upon which Commerce relies characterized this cost difference as "trivial."

[2] Merriam-Webster.com defines the term "beneficiation" as "the treatment of raw material (such as iron ore) to improve physical or chemical properties especially in preparation for smelting." The term is used in describing phosphate rock production processes, including in Chapter 8 of Prof. Petr Ptacek's book, upon which Commerce has heavily relied in its Remand Results.

explain how the enormous number of potential methods of mining and beneficiating phosphate rock could lead to just one conclusion.

In other words, Commerce, despite undisputed record evidence to the contrary, contends that the cost of production from igneous ore is always different from the cost of producing from sedimentary ore. Commerce stands by this opinion even though phosphate rock processors have at their disposal far more than one production process for igneous ore and a different process for sedimentary ore. Moreover, the record contains evidence that three of the beneficiation steps for igneous ore and one type of sedimentary ore are identical.

Therefore, substantial evidence does not support the conclusion that the production cost of igneous ore will <u>always</u> be either higher (or lower) than the production cost for sedimentary ore. Commerce even acknowledges that the record does not permit it to conclude whether the cost of producing phosphate rock from an igneous ore formation is higher or lower than from a sedimentary ore formation:

> Certain costs for producing phosphate rock from igneous reserves may be higher than from sedimentary reserves and *vice versa*. This does not change the fact that the production costs for each type of ore are different.

Remand Results at 25. This statement is not surprising since benchmark-related evidence that The Mosaic Company submitted demonstrates that dozens of factors affect production costs, none of which Commerce contested. ADM described these factors in its Comments on the draft Remand Results. See ECF No. 91-2, P.R. 10.[3]

---

[3] ADM's Comments on the Remand Results rely exclusively on publicly available documents contained in either the record of the first administrative review that are

For example, there are at least six types of ore formations, not just two, that can be mined to produce phosphate rock, and there are multiple ways to mine that ore. In addition, there are far more steps in the beneficiation process than just the two steps (calcination and organic acid leaching) that Commerce has relied upon as evidence of cost of production differences.

Within those two steps, multiple processing options exist. For example, in the calcination step, processors may use any of the following types of units: (1) vertical shaft kilns; (2) fluidized-bed reactors; (3) rotary kilns; (4) traveling grate-kilns; or (5) flash calciners.[4] Commerce ignored this evidence, which ADM identified in its July 3, 2025 Comments on the draft Remand Results at 8-9. ECF No. 91-2. P.R. 10.

ADM describes these complexities herein. Their undeniable existence makes it impossible to reasonably conclude that substantial evidence demonstrates that the cost of producing phosphate rock from igneous ore is always higher (or lower) than the cost of producing rock from sedimentary ore.

In addition, Commerce did not address the Court's requirement that it identify substantial evidence that the phosphate rock market is driven by the difference between sedimentary and igneous rock. Instead, Commerce hypothesized that such a difference exists. This hypothesis does not constitute substantial

---

listed in ECF No. 23-2 or documents contained in the record of the remand proceeding that are listed in ECF No. 91-2. ADM cites the documents that it relies upon in either record as "P.R. __."

[4] See Chapter 8 of Prof. Ptacek's book (at 399-402), which is Exhibit 20 to Mosaic's March 15, 2023 Benchmark Submission, ECF No. 23-2, P.R. 133.

evidence because Commerce did not provide the factual basis that supported its hypothesis.

Finally, Commerce's effort to refute ADM's comments on its draft Remand Results is unpersuasive and necessarily ignores the vast amount of evidence that contradicts its position that ADM relies upon.

Therefore, the Court should direct Commerce to recalculate the phosphate rock Tier Three benchmark by including the volumes and values of exports from Togo and Iran. Those two countries exported phosphate rock with the same quality (determined using BPL content) as the phosphate rock exported from Brazil, Finland, and South Africa. Commerce has never disputed ADM's demonstration that Togo and Iran produced and exported phosphate rock with comparable BPL content to that produced in Russia, Brazil, Finland, and South Africa.

## II. CASE BACKGROUND

The Court held that substantial evidence did not support Commerce's calculation of the Tier Three benchmark, which it used to calculate the amount of the benefit provided by Russia's provision of phosphate rock mining rights. Commerce issued its Draft Results of Redetermination Pursuant to Court Remand on June 18, 2025. ADM, Apatit and Mosaic filed their respective comments on the draft Remand Results on July 3, 2025. After considering these comments, Commerce filed its final Remand Results with the Court on August 4, 2025. ECF No. 90-1.

In its Remand Results, Commerce continued to assert that it had correctly determined the phosphate rock Tier Three benchmark and rejected each argument that ADM and Apatit submitted concerning why the draft Remand Results failed to comply with the Court's directives. ADM provides below the reasons why the Court should find that the Remand Results are not supported by substantial evidence and, therefore, why the Court should remand the case for recalculation of the Tier Three benchmark for phosphate rock.

Commerce's "Analysis" of the phosphate rock mining rights benchmark issue relies upon six record citations to support its assertions that: (1) "the costs to produce phosphate rock from igneous phosphate ore reserves and sedimentary reserves differ significantly"; (2) "phosphate rock market prices are significantly driven by the distinction between sedimentary and igneous rock"; and (3) "it is necessary to account for this distinction in this 'market principles' analysis pursuant 19 C.F.R. § 351.511(a)(2)(iii)." Remand Results at 5.

First, Commerce relies upon two excerpts from a report by Dr. Graham A. Davis, entitled "Study of Russian Phosphate Mining Rights"("Davis Report")[5] and four excerpts from Chapter 8 of a book by Prof. Petr Ptacek, entitled "Apatits and Their Synthetic Analogues" ("Ptacek Book").[6] These excerpts purportedly establish the existence of "differences for major cost items such as capital costs, costs for

_____

[5] Apatit submitted the Davis Report as Appendix 7 to its March 15, 2023 Benchmark Submission. ECF No. 23-2. P.R. 155.

[6] Mosaic submitted Chapter 8 of the Ptacek Book as Exhibit 20 to its March 15, 2023 Benchmark Submission. ECF No. 23-2. P.R. 133.

developing reserves, and energy costs." Remand Results at 7. Moreover, these "are not trivial cost differences." Id. In contrast, Dr. Davis identified the alleged mining cost difference that Commerce has relied upon as "trivial," which we discuss in detail below. Commerce had no reply to Dr. Davis's characterization, which ADM also described as both "trivial" and "minuscule" in its Comments on the draft Remand Results (at 11-12). ECF No. 91-2. P.R.10.

Second, Commerce claims that this Court "did not, however, instruct Commerce to quantify the effect of cost differences between the two types of reserves on world market prices for phosphate rock." Remand Results at 7. Nevertheless, these differences, even if not documented in the record, will "logically impact the supply of phosphate rock available on the world market from any phosphate rock-producing country, depending on the type of ore available in the country." Id. at 7-8.

Finally, based on these allegedly definitive cost of production differences, Commerce assumes hypothetical market prices of phosphate rock produced from igneous and sedimentary ore to conclude, hypothetically, that if production cost differences exist, then it necessarily follows that "the production and sale of phosphate rock from reserves with lower production costs will be profitable at lower world market prices relative to the other type and *vice versa*." Id. at 8. Therefore, "we find it reasonable to conclude that these differences are significant drivers of world market prices for phosphate rock." Id. at 9.

## III.  ARGUMENT

### A.  Commerce's Six Record Citations Do Not Constitute Substantial Evidence of Cost of Production Differences or Price Differences Depending on the Type of Ore

There are three fatal flaws in Commerce's reliance upon excerpts from the Davis Report and the Ptacek Book, which are that Commerce incorrectly assumes that: (1) there is just one type of igneous ore and just one type of sedimentary ore; (2) there is a substantial cost of production difference between the two types of ore; and (3) the assumed cost of production difference is passed through in the assumed world market prices of the phosphate rock produced from the two different types of ore. The record does not support any of these assumptions.

#### 1.  The Davis Report Does Not Contain Substantial Evidence of a Mining Cost Difference Depending on the Type of Ore

The Davis Report does not address how Commerce should have calculated the Tier Three benchmark for phosphate rock. Rather, Dr. Davis's goal was to demonstrate that the Russian government did not subsidize its provision of mining rights to Apatit:

> Comparing the leasing of phosphate mining rights in Russia with that in other countries, including the United States, shows that the mechanism by which the GOR conveys mining rights to EuroChem and PhosAgro, which includes a competitive auction for the bonus and a subsequent *ad valorem* royalty on phosphate ore extraction is not out of line with international standards. . . .There is no *prima* facie evidence that the price of these leases is subsidized.

Davis Report at para.119 (footnotes omitted). ECF No. 23-2. P.R. 155, Appendix 7.

Moreover, Dr. Davis asserted that the Tier Three benchmark methodology that

Mosaic had proposed was irrelevant because it was "twice removed" from what Dr. Davis regarded as the correct subsidy valuation methodology. Id. at para. 120.[7]

Relying on the Davis Report, Apatit stated that: "Since the GOR is not providing JSC Apatit with phosphate rock, there is no legal basis for Commerce to countervail JSC Apatit's mining licenses." See Apatit's August 4, 2023 resubmitted Case Brief at 21. ECF No. 23-2. P.R. 228. Nevertheless, despite the irrelevance of the Davis Report to Commerce's Tier Three benchmark calculation methodology, the agency scoured that report for evidence of a consistent difference in the mining cost between igneous ore and sedimentary ore.[8]

Commerce first attempts to rely upon Dr. Davis's statement that the lease bonuses paid pursuant to mining licenses for Russian's igneous ore deposits in the Arctic Circle "cannot be compared with . . . bonuses in Jordan," which are paid pursuant to licenses to mine sedimentary ore. Remand Results at 6. Commerce seizes on this sentence as substantial evidence of a difference in the cost of mining

---

[7] Dr. Davis never addresses differences or similarities concerning the cost of beneficiating either type of ore. Rather, the Davis Report solely addresses "Whether the prices at which phosphate mining rights were obtained by EuroChem and PhosAgro are set in accordance with market principles through an analysis of such factors as price-setting methods, costs (including rates of return sufficient to ensure future operations), possible price discrimination, and comparable market-based benchmark prices of phosphate mining rights." Id. at 1.

[8] In its Issues and Decision Memorandum (at 16), Commerce dismissed the Davis Report as "not pertinent to Commerce's analysis of a benefit pursuant to section 771(5)(E)(iv) of the Act and 19 C.F.R. 351.511(a)(2)." ECF No. 23-2, P.R. 242. Ironically, Commerce now relies on this "non-pertinent" document.

sedimentary vs. igneous ore.[9] However, earlier in his Report (at para.16), Dr. Davis states that mining rights worldwide are "conveyed using a combination of financial instruments," and the "three most common instruments are bonuses, rents, and royalties." Thus, lease bonuses are one of three types of payments for a mining lease. However, Dr. Davis regards lease bonus payments as "a trivial component of the price of a lease." Id. at para. 11.

Bonuses "are an up-front cash payment for access to the lease area."  Dr. Davis demonstrates that the "bonus" payment amount is trivial compared to the rent and royalty payments in his Table 8 (at para. 19), which lists U.S. government revenue for sedimentary ore leases granted to four U.S. mining companies, including The Mosaic Company. The U.S. government's revenue for the phosphate mining leases held by these four companies from 2013-2019 totaled $69,282,200. The total lease bonus payment that the four companies received was $10,200, or just .015% of the total revenue that the U.S. government received.

Thus, Commerce's reliance upon a "trivial" lease bonus amount for a sedimentary ore lease, unaccompanied by any information concerning the lease bonus amount for an igneous ore lease anywhere in the world cannot not constitute substantial evidence of a difference in the cost of mining phosphate rock from

---

[9] Commerce conveniently ignores the sentence which follows, which is that: "there are differences even amongst the Russian mining rights at issue that make them non comparable against each other." Id. at para. 37. In other words, different igneous ore deposits within Russia have different values to mining companies precisely because of differences in what it will cost to mine, beneficiate, and market the resulting phosphate rock.

sedimentary ore vs. igneous ore. Moreover, the Davis report contains no analysis showing that the two, far more significant revenue sources for conveying mineral licenses, i.e., rents and royalties, differ between igneous ore leases and sedimentary ore leases. Thus, Commerce's reliance upon the minimal lease bonus amount fails the Court's "significant difference" test.[10]

Commerce next relies upon an excerpt from the Davis Report (at para. 90) in which he assumes, but does not establish, that a 10% difference in the development cost of a mining lease could "suggest a lease bonus that is 100% higher or lower than appropriate at the subject lease." Remand Results at 6. This quotation must be read in its full context:

> Because each mineral right is unique in its location and geological attributes, exact comparison properties do not exist. Where would one find, for example, a comparison property outside of Russia that has apatite, iron ore, and baddeleyite, as one of the EuroChem leases do, in the same quantities, at the same mining cost, with the same chemical properties, sold at the same dates, obtain these leases' bonus and royalty rates as established in some kind of acceptable market environment like a competitive auction with multiple parties bidding, and compare that with the bonus and royalty rate paid by EuroChem and PhosAgro? As Table V in Paddock, Siegel, and Smith showed (Table 18 above), for a lease on a single undeveloped U.S. oil reserve just a 10 percentage point difference in the cost of developing the reserve . . . can cause the maximum bonus for the mineral lease to more than double. If comparison leases have this 10% difference in development cost, as they well could if we compare another country's sedimentary deposits to Russia's igneous deposits, they could suggest a

---

[10] Commerce also relies on the fact that the Davis Report states that the sedimentary ore deposits in Jordan "{do} not have the same value as the Russian ore." Remand Results at 6. However, Dr. Davis never provides any "value" for Russian ore or for any other type of ore, and there are six types of ore, not two. See Exhibit 20 to Mosaic's Benchmark Submission at 383-385. ECF No. 23-2. P.R. 133. Thus, Commerce's reliance on this unsupported statement does not constitute substantial evidence.

lease bonus that is 100% higher or lower than appropriate at the subject lease. There is no way to know how to adjust for this lack of comparability when two actual leases on an identical underlying asset are compared.

The subject of Dr. Davis's analysis is whether it is even possible to establish a benchmark for the provision of mining rights. For this reason, Dr. Davis attempted to compare the bonus and royalty rate for two different leases, one in Russia and a hypothetical ore deposit somewhere else, that contained the exact same ore composition of apatite, iron ore, and baddeleyite. Dr. Davis concluded that this was impossible because no two ore deposits have the exact same mineral composition.

In addition, Dr. Davis hypothesized, based on information from other sources that he cited from Table 18 pertaining to irrelevant oil and gas leases, that a 10% difference in development cost "could" suggest a higher or lower bonus payment. However, this out of context sentence contains no cost-related information, and even if it did, it would only address the single "trivial" element of the total cost of mining, which is the lease bonus payment.

In short, the Davis Report does not contain substantial evidence that the cost of mining igneous ore always differs from the cost of mining sedimentary ore. When an expert characterizes as "trivial" the only mining cost element that Commerce has relied upon, additional record evidence is needed before the alleged mining cost difference that Commerce relies upon can constitute substantial evidence.[11]

---

[11] In any event, there is not one single mining cost for igneous ore and a different cost for mining sedimentary ore. Prof. Ptacek observes that "a wide variety of techniques and many types of equipment are used to mine and process phosphate rock." Mosaic Benchmark Submission Exhibit 20 at 386. ECF No. 23-2. P.R. 133.

### 2. Prof. Ptacek's Book Does Not Contain Substantial Evidence of a Beneficiation Cost Difference Depending on the Type of Ore

The basis for Commerce's finding that a significant cost difference exists between the beneficiation steps entailed in producing phosphate rock from igneous vs. sedimentary ores consists of the following excerpts from Chapter 8 of Prof. Ptacek's book: (1) the calcination step in processing, which is used to remove carbonates, is not used for igneous ore; (2) calcination is expensive due to the "high cost of energy," except "where the cost of natural gas is low"; and (3) organic acid leaching is a processing step that does not apply to igneous ore. Remand Results at 6-7. In addition, organic acid leaching of sedimentary ore with calcareous gangue has a low capital cost, but the price of acid may be high. Id. at 6-7. Commerce further asserts that the calcination process and the acid leaching process do not involve "trivial cost differences," which, if true, would not distinguish the processes used to beneficiate the two types of ore. Id. at 7.

Thus, to conclude that a cost of production difference always exists between the beneficiation process for sedimentary ore vs. igneous ore, Commerce has relied

---

Moreover, there are three types of surface mining – open cast, open pit, and strip mining, as well as underground mining. Id. Open cast mining "has plenty of variations to match the mining-depth, the slope of the original topography and the types of equipment available." Id. at 387. These variations include area mining, contour mining, box-cut mining, and block-cut mining. Id. Given that mining costs vary with the characteristics of the ore formation being mined and the mining techniques being used, Commerce's conclusion that the mining cost always differs between igneous ore formations and sedimentary ore formations is not supported by substantial evidence.

13

upon just two beneficiation steps.[12] Commerce does not identify any cost difference with respect to any other beneficiation step regardless of the ore type being processed. However, Commerce's sole reliance upon the calcination step and the organic acid leaching step as the basis for its cost of production difference assertion does not constitute substantial evidence for the following reasons.

First, the "Abstract" that introduces Chapter 8 in Prof. Ptacek's book states that "A wide variety of techniques and equipment is used to mine and process phosphate rocks in order to beneficiate low-grade ores and remove impurities." Mosaic Benchmark Submission, Exhibit 20 at 383. P.R. 133. In other words, there is not just one technique for the mining and beneficiation of sedimentary ore and another, totally different technique for the mining and beneficiation of igneous ore. However, Commerce asserts that this is the case even though no evidence supports it.

Second, there is not one single type of igneous ore and another single type of sedimentary ore which arguably could support the conclusion that the beneficiation cost differs between igneous and sedimentary ore. Rather, "Phosphate ores show a wide diversity in the composition of their gangue materials."[13] Id. at 383. Then,

---

[12] Substantial evidence does not support a finding that a significant difference exists in any mining process or beneficiation process between sedimentary vs. igneous ore. However, even if a difference does exist in either the calcination step or the organic acid leaching step, there is no evidence of a significant cost of production difference between sedimentary ore vs. igneous ore when it is subject to either step.

[13] Merriam-Webster.com defines the term "gangue" as the "worthless rock or vein matter in which valuable metals or minerals occur."

Prof. Ptacek states that this wide diversity of ores "generally fall into one of the following {six} categories based on major associated gangue materials," which he then lists and describes. Id. at 383-84. These ore types are: siliceous ores; clayey ores; calcareous ores of sedimentary origin; phosphate ores associated with organic matter; phosphate ores containing more than one type of gangue materials; and igneous and metamorphic ores. Prof. Ptacek describes the mineral composition of each type and some of the differing beneficiation techniques that can be used to remove their differing impurities.

Third, only the fifth of the six ore types is expressly identified as being of sedimentary origin. Id. Thus, Prof. Ptacek does not conclude that there is just one type of igneous ore or just one type of sedimentary ore.[14]

Fourth, Prof. Ptacek distinguishes the six ore types according to differences in "physical factors," e.g., hardness; porosity; cementing of coating phases; particle size (coating or cryptocrystalline); the degree of crystallinity of apatite; and the effect of physical treatments (natural or calcined state). Id. They are further distinguished by differences in "chemical factors," e.g., the content of phosphorus, fluorine, carbonate, and free carbonates in apatite; the Fe and Al content; the Mg content; the content of inert gangue mineral; the content of Na and K: and the

---

[14] According to Prof. Ptacek, there were currently about 1635 operating phosphate rock mines. Id. at 386. He did not identify any evidence that they all contained the exact same type of igneous ore or sedimentary ore or the same types of gangue materials, much less always cost more or less to produce than the other type of ore.

content of organic matter, chlorides, heavy metals, potentially toxic elements, and radionuclides. Id. at 384-385.

Fifth, Prof. Ptacek states that "many sedimentary phosphate deposits contain mixtures of undesired constituents. These ores require a series of beneficiating operations during their processing . . . ." Id. at 384. However, the author does not compare the "undesired constituents" in igneous ores to those in sedimentary ores. There is no evidence that igneous ore always contains different gangue materials than sedimentary ore.

Sixth, Prof. Ptacek states that "Phosphate ores can be beneficiated by many methods, and usually a combination of more methods is used." Id. at 385. He then provides in Figure 2 what he labels a "generic" illustration (not an actual, company-specific illustration) of the mining and beneficiation process for both igneous ore and sedimentary ore. However, Prof. Ptacek then qualifies his illustration by stating that "A wide variety of techniques and many types of equipment are used to mine and process phosphate rock." Id. at 386.

For example, "surface mining can take many forms – from manual methods employing picks and shovels to highly mechanized operations." Id. In contrast, "open cast" mining "has developed into a versatile method with plenty of variations to match the mining depth, the slope of the original topography, and the types of equipment available." Id. at 387. Prof. Ptacek then describes the three types of open cast mining, as well as the six steps entailed in the "open-cast mining cycle" and the seven advantages and disadvantages of open cast mining. Id.

16

Seventh, Prof. Ptacek describes the "separation and classification" steps in the beneficiation process. "Many different methods of separation" are used. Id. at 388. Moreover, the "concentrating devices that are used "depend on the fluid, the force field, and the specific properties of particles, such as the density, size, shape, chemistry, surface chemistry, magnetism, conductivity, color, and porosity" of the ore. These concentrating devices "are applicable to particles according to their size ranges, and for any given size range, several processes or devices might be used." For example, "the availability of water is of primary importance and may determine the process or processes used." Id. Here again, the wide variety of techniques used in the separation and classification steps make it impossible to conclude that the cost of separating and classifying any form of igneous ore is always different from the cost of separating and classifying any type of sedimentary ore.

Eighth, on page 389, Prof. Ptacek identifies three steps in the beneficiation process, which are flotation, calcination, and organic acid leaching. He then lists the "beneficiation method" for three types of ore: (1) igneous ore; (2) sedimentary ore with siliceous gangue; and (3) sedimentary ore with calcareous gangue.[15] <u>These three steps are identical for igneous ore and for sedimentary ore with siliceous gangue</u>.

---

[15] Merriam-Webster.com defines the term "calcareous" as material containing calcium carbonate or calcium. It defines the term "siliceous" as material that contains silica or silicate.

For the third type of ore, i.e., sedimentary ore with calcareous gangue, the calcination stage is listed as having a "high capital cost," while the organic acid leaching stage is listed as having a "low capital cost." Accordingly, it is reasonable to assume that the high and low capital costs offset each other, and, in any event, Prof. Ptacek provides no information as to what those costs are or how they differ from igneous ore costs.

Ninth, Prof. Ptacek's Figure 4 on page 389 identifies eleven beneficiation steps, not just the two steps that Commerce relies upon. However, Prof. Ptacek does not identify in Figure 4 the beneficiation steps that are required, or the advantages or disadvantages of those steps, when the "main gangue materials" consist of impurities other than "carbonates, silica, and pyrite," which are the only gangue materials that Figure 4 addresses. Instead, he states that "Effective beneficiation can be achieved by various processes depending on the liberation size of phosphate and gangue materials and other ore specification." Id. at 390. Moreover, "Different processes like screening, scrubbing, heavy media separation, washing, roasting, calcinations, leaching and flotation may be used." Id.

Tenth, Prof. Ptacek states that the "calcination of phosphate ores to remove carbonates is expensive because of high costs of energy." However, Prof. Ptacek identifies carbonates as being present in both "igneous and metamorphic phosphate ores."[16] Id. at 384. Accordingly, no substantial evidentiary basis exists to distinguish

---

[16] Britannica.com defines metamorphic rock as "any of a class of rocks that result from the alteration of preexisting rocks in response to changing environmental conditions, such as variations in temperature, pressure, and mechanical stress, and

sedimentary ore from igneous ore due to use of the calcination process in beneficiating the former but not the latter. Moreover, Prof. Ptacek's statement that "Calcination is practiced commercially at several phosphate rock mining operations around the world" strongly suggests that it is practiced for both types of ore. Id. at 398.

Eleventh, Prof. Ptacek describes the "separation" process. Id. at 390- 397. There are two types of separation – electrostatic separation and magnetic separation. The former "is used to concentrate the phosphate ores of different types." Id. at 391. The latter is used to remove magnetic substances. Id. at 395. Magnetic separation "is mostly used in the beneficiation of igneous phosphate rocks. However, it was also used for the beneficiation of some sedimentary phosphate ores." Id. at 396. Accordingly, Prof. Ptacek provides no basis to conclude that a cost difference exists in either the electrostatic or magnetic separation process depending on whether the ore formation is igneous or sedimentary.

Twelfth, Prof. Ptacek discusses the "calcination" process which is used to produce "more than 10% of the world's marketable phosphates." Id. at 399. Moreover, "There are various types of units that can be used for the calcination of phosphate ores."  He then lists five different types of units that "can be used for the calcination of phosphate ores." Id. at 400-402. However, Prof. Ptacek does not state that the calcination process is only used to beneficiate sedimentary ore or that

---

the addition or subtraction of chemical components. The preexisting rocks may be igneous, sedimentary, or other metamorphic rocks."

calcium carbonates are only found in sedimentary ore. Rather, he states that "Phosphate is a complicated mineral that varies from deposit to deposit with each ore requiring its own special processing consideration." Id. at 402.

Thirteenth, Prof. Ptacek describes the "flotation" process as "a selective separation process." Floth flotation "is widely used in mineral processing technologies to separate finely ground valuable minerals from a mixture with gangue materials initially present in a pulp." Id. at 403. "{M}ore than half of the world's marketable phosphates are concentrated by the flotation process." Id. at 404. Prof. Ptacek does not state that flotation is used only for igneous ore or sedimentary ore. Instead, a "whole range of variables can affect the performance of flotation systems, such as their operating variables, particle size, reagents, ore composition and also the presence of ionic species in water." Id. at 405. Thus, he concludes that: "If silica is the main gangue material, flotation is the conventional mineral processing technique used. Igneous-type ores are also amenable to flotation, which is the best approach for the processing of this type of phosphate ore." Id. at 390.

Finally, Prof. Ptacek observes that the organic acid leaching processing step has low capital costs but a high organic acid price. Neither of these observations pertains to sedimentary ore with siliceous gangue. Moreover, Commerce's focus on one processing stage – organic acid leaching – and one raw material input – organic acid – proves nothing with respect to the difference in the cost of this step for igneous vs. sedimentary ores.

20

### 3. Conclusions Concerning Commerce's Reliance Upon Cherry-Picked Excerpts from the Davis Report and the Ptacek Book

- The production of phosphate rock entails two general steps: (1) mining of an ore formation; and (2) "beneficiation" of the mined ore to remove gangue materials and enhance phosphate rock quality by increasing its BPL content. Both igneous ore and sedimentary ore deposits can be surface mined or underground mined. Neither the Davis Report nor the Ptacek Book contains any information concerning which mining process is used to mine sedimentary ore or igneous ore, or whether both processes can be and are used to mine both types of ore. Moreover, neither Dr. Davis nor Prof. Ptacek addresses the cost of mining phosphate ore regardless of whether it is a sedimentary or igneous formation.

- Dr. Davis identifies as "trivial" the difference in lease bonus payments between Russia's Arctic igneous ore deposits and Jordan's sedimentary ore deposits. Commerce's reliance upon the "trivial" evidence of a difference in lease bonus payments does not constitute "substantial" evidence of a mining cost difference, especially where Dr. Davis limited his comparison to Jordan and omitted a lease bonus comparison to other major producing countries like Morocco, Togo, the United States, and China.

- Dr. Davis finds it impossible even to compare the cost of mining rights for igneous vs. sedimentary ore formations because there is no way to adjust for the differences in a particular ore's physical characteristics contained in any

21

individual formation found in the 1635 phosphate rock mines located around the world.

- Neither Dr. Davis nor Prof. Ptacek states that there is only one type of sedimentary ore that requires just one type of mining process and beneficiation process, and one type of igneous ore that requires a different type of mining process and beneficiation process with a resulting cost difference. Prof. Ptacek's book indicates just the opposite because he identifies six different types of ore, not two.

- With few exceptions, the numerous mining and beneficiation processes that Prof. Ptacek describes apply equally to igneous ore and sedimentary ore.

- Neither Dr. Davis nor Prof. Ptacek describes, even in general terms, the costs that processors incur in removing "undesired constituents" from sedimentary ores vs. igneous ores. Rather, Chapter 8 of Prof. Ptacek's book discusses the nature of various beneficiation processes, not the cost of those processes, much less the relative cost of beneficiating sedimentary vs. igneous ore, even assuming that there are just two generic types of ore.

- Neither Dr. Davis nor Prof. Ptacek discusses whether the total cost of mining and beneficiating phosphate rock from igneous ore is higher or lower than the cost of producing phosphate rock from sedimentary ore.

- Neither Dr. Davis nor Prof. Ptacek discusses the prices, or the relative prices, at which phosphate rock is sold in the world market, regardless of whether that rock has been produced from igneous ore or sedimentary ore.

- Neither Dr. Davis nor Prof. Ptacek discusses whether the phosphate rock market is "significantly driven" by any difference in the mining and beneficiation processes for igneous ore vs. sedimentary ore or the cost of those processes.

In summary, Commerce relies on (unquantified) cost differences in just two beneficiation steps identified by Prof. Ptacek, i.e. calcination and organic acid leaching. However, there is no single calcination process or organic acid leaching process. Rather, Prof. Ptacek identifies five types of calcination units, each of which necessarily entails different costs. Id. at 399-402. He also states that "leaching efficiencies can vary significantly depending on the mineralogy of the ore and the type of acid used." Id. at 409.

Given Prof. Ptacek's extensive description of the wide variety of beneficiation processes and techniques, it is impossible to conclude that potential differences in just two beneficiation steps constitutes substantial evidence that "the costs to produce the two kinds of rock differ significantly." 779 F. Supp. 3d at 1360. The Court used the term "costs to produce." This suggests the relevance of the entire cost to produce, not just tidbits of relative but unquantified costs for just two processing steps, especially where Commerce has failed even to demonstrate that there is only one type of calcination process and one type of organic acid leaching process.[17] Commerce claimed that these cost of production differences "are not

---

[17] On five occasions in the Remand Results, Commerce uses the phrase "capital costs, costs for developing reserves, and energy costs" to exaggerate the alleged difference in costs for just the calcination stage and the organic acid leaching stage.

trivial cost differences," but provided no supporting evidence for its claim. Remand Results at 7.

### B. Commerce's Claim that It Had No Obligation to Quantify the Effect of Cost Differences Has No Merit

Commerce claims that the Court did not instruct it "to quantify the effect of cost differences between the two types of reserves on world market prices for phosphate rock." Remand Results at 7. Although this statement is literally correct, it intentionally overlooks the Court's requirement that it show that: (1) the costs to produce the two kinds of rock differ significantly"; and (2) the distinction between the two was a significant driver of prices in the phosphate rock market." 779 F. Supp. 3d at 1360. Commerce's Remand Results satisfy neither requirement. Even if the Court did not require Commerce to show a "significant" difference in the cost to produce the two kinds of rock, nothing prevented Commerce from doing so.

However, the record, as Commerce acknowledges, does not contain <u>any</u> information concerning the cost entailed in any beneficiation step for either type of rock. Without that evidence, Commerce had a difficult burden to satisfy. For example, it could have provided evidence that there are just two types of ore, not six, <u>and</u> that there was a significant difference in most or all of the production steps, i.e., the mining and beneficiation steps, for each type of ore. Commerce did not do

---

The unproven difference in costs at these two beneficiation steps does not equal substantial evidence of "significant cost differences" despite Commerce's contrary claim. Remand Results at 7. Moreover, if Commerce had been able to establish a significant cost of production difference at any other beneficiation step, then it would have said so in the Remand Results.

this because no record evidence exists to meet its burden, even if it did not have to quantify the cost difference for each mining and beneficiation step.

### C. Commerce's Hypothesis Concerning the Effect that the Alleged Cost of Production Difference Has on World Market Prices Is Not Supported by Substantial Evidence

Because Commerce had no evidence concerning the nature or the amount of the difference in production costs between sedimentary ore and igneous ore, it was compelled to assert that the alleged differences in just two production processes for the calcination step and the organic acid leaching step would "logically impact the supply of phosphate rock available on the world market from any phosphate rock-producing country depending on the type of ore available in the country." Remand Results at 7-8. Commerce offered this explanation to try to satisfy the Court's requirement that it "present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock." 779 F. Supp. 3d at 1360.

By referring to the "phosphate rock market," the Court implicated the requirement in 19 U.S.C. § 1677(5)(E)(iv) that, in determining the adequacy of remuneration, Commerce must consider "prevailing market conditions" including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." However, Commerce did not rely on any of these possible factors, which could theoretically, at least, satisfy the Court's requirement that it demonstrate that the type of ore from which phosphate rock is produced "was a significant driver of prices in the phosphate rock market." 779 F. Supp. 3d at 1360.

For example, Commerce could have demonstrated that world market prices for phosphate rock sourced from sedimentary ore vs. igneous ore were driven by cost of production differences. Or, it could have identified differences in availability, marketability, transportation or other conditions of purchase or sale for phosphate rock sourced from sedimentary vs. igneous ore. Or, it could have cited evidence concerning purchaser behavior or purchaser preferences for phosphate rock produced from one type of ore vs. the other type of ore that were directly influenced by cost of production differences.

Instead, Commerce relied upon its unsupported claim that the record contained "evidence of significant cost differences" to construct a results-driven, purely hypothetical example of a situation where: "if the costs to produce phosphate rock from igneous and sedimentary ore reserves are $60 and $40 per unit, respectively, then only the production and sale of phosphate rock from sedimentary reserves will be profitable at a world market price of $50 per unit." Thus,

> In the hypothetical example in the paragraph above, economically rational producers in countries with igneous reserves will not sell phosphate rock on the world market if the available world market price is $50 per unit. Thus, JSC Apatit's phosphate rock cost buildup based on production from igneous reserves and this world market price based on production from sedimentary reserves would not be comparable. This example demonstrates that the inclusion of world market prices for phosphate rock from both types of reserves risks substantive inaccuracies in the tier three benchmark analysis given our objective to compare JSC Apatit's actual per-unit cost buildup for beneficiated phosphate rock to a world market price for comparable phosphate rock.

Remand Results at 9. However, the two premises of Commerce's hypothetical rationale, i.e., that a "significant" cost of production difference exists, and that this

difference makes "it reasonable to conclude that these {significant cost} differences are significant drivers of world market prices for phosphate rock," have no record support.[18] Remand Results at 9. Commerce identifies no evidence that the assumed $20 per unit cost difference, even if it does exist, influences buyer behavior.

Moreover, Commerce's hypothesis appears to assume a <u>total</u> cost of production difference of $20 per unit. However, no record evidence supports this assumption, and it contradicts Commerce's assertion that only two beneficiation steps have cost differences. As such, this Court should reject Commerce's hypothetical construct of the phosphate rock market and its consequent assertion that this construct demonstrates that cost of production differences are a significant driver of prices in the world market.[19]

### D. Commerce Erroneously Claims that It Did Not Have to Demonstrate a Total Cost of Production Difference Between the Two Types of Ore

Commerce asserts that ADM has erred in contending that the Court directed it to establish a "total cost of production difference" between the two types of ore. Remand Results at 21. Although the Court did not use the term "total cost of production difference," it did hold that Commerce needed to establish that "the costs

---

[18] Commerce repeatedly mischaracterizes the record by claiming that there is a "significant" cost of production difference between sedimentary ore and igneous ore and that the difference is a "significant driver" of prices in the phosphate rock market. See, e.g., Remand Results at 2, 5, 6, 7, 9, 10, 16, 22, and 24. However, saying so does not make it so.

[19] Commerce implicitly admits that its alleged cost of production differences do not significantly drive prices in the world market where it states that there are a "wide range of factors that impact supply and demand and hence world market prices" besides the alleged differences in production costs between sedimentary and igneous ore. Remand Results at 8.

to produce the two types of rock differ significantly." 779 F. Supp 3d at 1360. The obvious way that Commerce could have satisfied the Court's directive was to identify substantial evidence of a total cost of production difference. However, it is undisputed that no record evidence, much less substantial evidence, exists of a total cost of production difference.

Failing that, Commerce needed to demonstrate that the cost to produce "differs significantly" as to a sufficient number of production steps as to make it reasonable for the Court to conclude that Commerce had satisfied this test. Commerce fails again here because it does not identify substantial evidence that the calcination step and the organic acid leaching step collectively comprise such a large part of the total cost of production as to satisfy the "significantly different" test.

Moreover, Commerce does not identify any record evidence concerning the cost of either the calcination step or the organic acid leaching step, which is another reason why Commerce has not satisfied the "significantly different" test. Needless to add, neither Dr. Davis nor Prof. Ptacek ever asserted that the cost to produce phosphate rock from sedimentary ore vs. from igneous ore differed, much less differed "significantly" due to differences in the calcination or organic acid leaching steps.

At most, Commerce has shown, for just two beneficiation steps, that the processes used in those two steps may have, sometimes, differed between

sedimentary and igneous ore.[20] Then, Commerce assumes that a process difference equals a cost of production difference, just as it did in its final results in the first administrative review. The Court rejected this tactic as an unsupported "extrapolation."

### E. Commerce Erroneously Claims that It Had No Obligation to Identify the Actual Cost Associated with Any Mining or Beneficiation Step or Identify the Effect of Any Cost Difference on Prices in the Phosphate Rock Market

Commerce asserts that the Court did not direct it to: (1) identify the "actual cost associated with any mining or beneficiation process;" (2) "describe which general type of ore costs more to mine and beneficiate and which general type costs less;" (3) "quantify differences between the costs to produce phosphate rock from the two types of reserves;" or (4) "quantify the effect of these cost differences on world market prices for phosphate rock." Remand Results at 21. Commerce's statement might be regarded as literally accurate. However, if Commerce had been able to make any of the four evidentiary showings that ADM said were necessary, it certainly would have done so by citing record evidence. Seen in this light, Commerce's rejection of ADM's arguments as to the agency's burden are the product

---

[20] Commerce's selection of the calcination step and the organic acid leaching step proves too much because of the wide variety of techniques that Prof. Ptacek identified for both of those steps. In other words, Prof. Ptacek establishes that there are numerous types of calcination processes and organic acid leaching processes. Thus, Commerce wrongly concludes that there is just one calcination process and one organic leaching process with one associated cost regardless of the numerous production techniques available in each of the two steps.

of Commerce's inability to cite substantial evidence that would satisfy any of these four evidentiary points.

Thus, considering the absence of any cost of production evidence, the Court must decide whether substantial evidence consists of Commerce's reliance upon just two production <u>process</u> differences, where undisputed record evidence shows significant variations within those processes, as well as where those processes may be identical for both igneous ore and sedimentary ore.

Needless to add, Commerce lacks any evidence concerning the effect of just two alleged production process differences on world market prices. It strains credulity for Commerce to contend that a hypothesized $20 per unit cost of production difference for just two beneficiation processes, without regard to other beneficiation step costs that might offset that assumed $20 difference, was a "significant driver of prices in the phosphate rock market."

## F. Commerce Erroneously Attempts to Transfer the Burden of Proof to ADM to Demonstrate that Significant Cost of Production Differences Do Not Exist

Commerce next asserts that it was up to ADM to cite record evidence concerning: (1) total cost of production; (2) costs associated with individual mining and beneficiation process steps; and (3) the impact of cost differences on world market prices for phosphate rock. Remand Results at 22. The Court did not hold that this was ADM's burden; rather, Commerce had to support with substantial evidence its conclusion that production costs differed "significantly." The agency had several options in how it would choose to make this showing, including those that

ADM identified. It chose none of them and instead focused once more on minimal

production process differences unaccompanied by evidence of production cost

differences. That choice fails the substantial evidence test.

## G. Commerce's Reliance on the Fact that Apatit Produces Phosphate Rock from Igneous Ore Does Not Satisfy the Substantial Evidence Test

Given its failure of proof with respect to cost of production differences and

differences in phosphate rock world market prices depending on the type of ore,

Commerce has been compelled to fall back on the fact that Apatit produces

phosphate rock from igneous ore:

> Under this tier three analysis, selecting phosphate rock exports with comparable BPL grades to Russia and with igneous deposits is necessary to determine the adequacy of remuneration in relation to "prevailing market conditions" for the good in question."

Remand Results at 23. (Emphasis added.) However, that conclusion depends on

Commerce's ability to identify substantial evidence that phosphate rock produced

from sedimentary ore (with an undisputed comparable BPL level) does not compete

with rock produced from igneous ore and that it does not have a comparable cost of

production. For all the above-described reasons, Commerce has not met its

evidentiary burden.

A prime example of this failure is Commerce's continuing inability to rebut

the uncontradicted evidence that ADM relied upon in its Memorandum of Points

and Authorities in support of its Rule 56.2 motion, which stated (at 9-10) that:

> In addition, ADM once again contended {in its Rebuttal Brief} that exports from Togo and Iran should be included in Commerce's Tier 3 benchmark calculation because phosphate rock processors in

31

> three countries, namely India, Japan, and New Zealand, imported phosphate rock, with 78% and above BPL content from countries that produced phosphate rock from both sedimentary ore and igneous ore formations. In addition, Brazil imported phosphate rock from countries that produced it from sedimentary ore formations even though Brazil produced phosphate rock from igneous ore formations. Id. at 7–11. This evidence further demonstrated that the type of ore formation from which the phosphate rock was produced made no difference to phosphate fertilizer producers in these countries.

ECF. No. 41-1. See also ADM's Reply Brief at 9-10. ECF No. 58.

In short, if igneous ore was a distinguishing quality characteristic, then fertilizer producers in four countries would not have imported phosphate rock produced from both types of ore formations.

### H. ADM Did Not Fail to Address the "Central Issue" that the Court Identified

Commerce claims that ADM's:

> arguments regarding evidence of cost differences fail to address the central issue identified by the Court in the *Remand Order*, which is whether costs to produce the phosphate rock from the two types of ore differ significantly and whether this distinction was a significant driver of phosphate rock prices.

Remand Results at 23-24. In support of this claim, Commerce asserts that ADM (and Apatit): "Do not explain how the cited information detracts from the affirmative evidence of cost differences between the production of phosphate rock from sedimentary versus igneous ore." Id. at 24. This assertion is erroneous given that ADM explained in extraordinary detail in its comments on the draft Remand Results (at 4-15) how the insignificant evidence of an unquantified production process difference in just two beneficiation steps failed to constitute substantial evidence of a "significant" cost difference.

Moreover, Commerce never addresses the distinct likelihood that, within both the calcination step and the organic acid leaching step, numerous techniques are used. For this reason, it is literally impossible for Commerce to broadly assert that the cost of these two stages is always different for sedimentary vs. igneous ore. Nor does Commerce ever address the legal consequence of the situation where the cost of all other beneficiation steps offsets the (unspecified) cost difference in the calcination and organic acid leaching steps.

In other words, if the total cost of mining and beneficiation is comparable, then there is no basis for failing to include the export prices of sedimentary rock from Togo and Iran from the Tier Three benchmark calculation. Commerce fails to identify any evidence that suggests that the total cost of mining and beneficiation is not comparable for the two types of ore.

In one instance, Prof. Ptacek states that three production steps are identical for igneous ore and sedimentary ore with siliceous gangue. He regards, for both types of ore, the flotation process as the "best approach," while calcination and organic acid leaching are "not applicable" to either type of ore. See Mosaic's Benchmark Submission Exhibit 20 at 389. P.R. 133. This example alone refutes Commerce's contention that the different production costs for these two stages satisfy the "significant difference" test.[21] If there is no difference, as Prof. Ptacek describes, then Commerce's analysis fails.

---

[21] Commerce asserts that "No party has cited information demonstrating that a certain type of sedimentary ore has identical production steps and production costs compared to igneous ores, such that we could consider the inclusion of phosphate

Nevertheless, Commerce asserts that there is a difference in the beneficiation process between igneous ore and sedimentary ore with calcareous gangue, as opposed to siliceous gangue. Remand Results at 24. However, here again, since the record contains no evidence concerning the relative significance of cost differences for processing either type of ore, it is impossible to conclude that the different cost of this particular beneficiation step is "significant."

Finally, Commerce baldly asserts that the two beneficiation steps do not involve "trivial cost differences." Remand Results at 25. No record evidence supports this assertion, although Dr. Davis used the word "trivial" to describe the leasing bonus difference upon which Commerce relies.

In summary, upon remand, Commerce confronted an administrative record that simply did not support what the Court rightfully called an unsupported "extrapolation." 779 F. Supp. 3d at 1360. The Remand Results fail to correct Commerce's original errors.

## IV. CONCLUSION

Commerce's position boils down to its unsupported assertion that any mining <u>process</u> difference or beneficiation process between sedimentary and igneous ore,

---

rock export prices from any such countries in the tier three benchmark." Remand Results at 24. The example we discuss in the text is precisely that type of information, which we provided to Commerce in ADM's Comments on the draft Remand Results (at 14). ECF No. 91-2. P.R. 10. Commerce has no answer to this evidence of identical processing steps for two types of ore (out of a total of six types). Commerce does assert that ADM "cites no evidence to show that these cost differences are minimal or nonexistent." Remand Results at 25. ADM's reliance upon Figure 4 in Prof. Ptacek's book refutes this assertion as to igneous ore vs. sedimentary ore with siliceous gangue.

regardless of its relative or absolute importance, automatically qualifies as a "significant" <u>cost</u> difference. However, the evidence Commerce relies upon concerning the calcination step and the organic acid leaching step does not indicate how significant this difference is, if any.

Therefore, the Court should direct Commerce upon remand to recalculate the Tier Three benchmark by including the export prices of phosphate rock from Togo and Iran. There is nothing else in the record upon which Commerce could rely to justify its current benchmark calculation for phosphate rock.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
wconnelly@tradepacificlaw.com

Counsel for Archer Daniels Midland Company

Date: September 25, 2025

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the attached Comments of the Archer Daniels Midland Company opposing the Commerce Department's Remand Results contain 8,054 words according to the word count function of the word processing system used to prepare these Comments and, therefore, complies with the maximum word count limitation set forth in CIT Rule 56.2(h)(2) and Chambers Procedures 2(B)(1)(b).

/s/ Warren E. Connelly
Warren E. Connelly