**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| **ARCHER DANIELS MIDLAND COMPANY,**<br><br>      **Plaintiff,**<br><br> **and**<br><br>**JOINT STOCK COMPANY APATIT,**<br><br>      **Plaintiff-Intervenor, and**<br>      **Consolidated Plaintiff,**<br><br> **and**<br><br>**THE MOSAIC COMPANY,**<br><br>      **Consolidated Plaintiff,**<br><br>   **v.**<br><br>**UNITED STATES,**<br>      **Defendant,**<br><br> **and**<br><br>**THE MOSAIC COMPANY,**<br><br>      **Defendant-Intervenor,**<br>      **and Consolidated**<br>      **Defendant-Intervenor,**<br><br> **and**<br><br>**JOINT STOCK COMPANY APATIT,**<br><br>      **Consolidated Defendant-**<br>      **Intervenors.** | **Consol. Court No. 23-00239**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>**Business Proprietary**<br>**Information Removed from**<br>**Pages 15, 20, 31** |

<u>**THE MOSAIC COMPANY'S COMMENTS IN SUPPORT OF COMMERCE'S**</u>
<u>**REMAND REDETERMINATION**</u>

**NON-CONFIDENTIAL VERSION**

David J. Ross
Stephanie E. Hartmann
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Dated: December 15, 2025                          *Counsel for The Mosaic Company*

Consol. Court No. 23-00239                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   COMMERCE'S DECISION TO CONTINUE TO LIMIT THE TIER THREE
      BENCHMARK TO PHOSPHATE ROCK OF IGNEOUS ORIGIN IS
      REASONABLE, SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IN
      ACCORDANCE WITH LAW ........................................................................ 1

      A.    Commerce Identified Substantial Record Evidence and Articulated a
            Reasoned Explanation for Its Decision. .................................................. 2

      B.    ADM and JSC Apatit Fail to Demonstrate Commerce's Decision Was
            Unlawful. ................................................................................................. 8

III.  COMMERCE'S DECISION TO REJECT THE KAZAKH EXPORT PRICES
      AND CONSTRUCT A TIER THREE BENCHMARK FOR NATURAL GAS IS
      REASONABLE, SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IN
      ACCORDANCE WITH LAW ...................................................................... 19

      A.    Commerce Identified Substantial Record Evidence and Articulated a
            Reasoned Explanation for Its Decision. ................................................ 19

      B.    JSC Apatit Fails to Show that Commerce's Rejection of the Kazakh
            Export Prices as a Tier Two Benchmark Is Unlawful ......................... 21

      C.    JSC Apatit Fails to Show, in the Alternative, that Kazakh Export Prices
            Satisfy the "Available to Purchasers" Requirement ............................. 25

      D.    JSC Apatit fails to show Commerce acted unlawfully in rejecting its
            proposed changes to the natural gas benchmark calculation. .............. 29

IV.   CONCLUSION ............................................................................................ 32

i

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Statutes, Rules, and Regulations**

19 C.F.R. § 351.511(a)(2)(i) ............................................................20, 23, 27

19 C.F.R. § 351.511(a)(2)(ii) ......................................................20, 23, 27, 29

19 C.F.R. § 351.511(a)(2)(iii)....................................................................2

19 U.S.C. § 1677b(e) ................................................................................24

Tariff Act of 1930, as amended  ...............................................................20

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345 (CIT 2002).........................13

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .........................................8, 21

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380 (CIT 2021) ......................................2

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197 (1938) .........................................................3

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................13

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ..........3, 7, 11, 13

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), *aff'd sub nom. Pastificio Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012) ................................................................................................10

*Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005)..............................18

*In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)), *appeal dismissed sub nom. In re United States*, 2024 WL 4814738 (Fed. Cir. Nov. 18, 2024)............................3

*In re United States,* 2024 WL 4814738 (Fed. Cir. Nov. 18, 2024) ................................................3

*Kisor v. Wilkie*, 588 U.S. 558 (2019).........................................................................................29

*Mosaic Co. v. United States*, 589 F. Supp. 3d 1298 (CIT 2022) ..............................................2, 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).......................................................................................................8

*Nucor Corp. v. United States*, 633 F. Supp. 3d 1302 (CIT 2023).............................................2, 3

Consol. Court No. 23-00239                          NON-CONFIDENTIAL VERSION

*Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230 (CIT 2011) ................................................................................................................10, 22

*Siderca S.A.I.C. v. United States*, 391 F. Supp. 2d 1353 (CIT 2005) ...........................................10

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................13


**Administrative Materials**

*Certain Alkyl Phosphate Esters From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 80,870 (Dep't Commerce Oct. 4, 2024)..............................17

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug. 9, 2022)...........................................31

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 50,103 (Dep't Commerce Aug. 1, 2023)...........................................18

*Certain Softwood Lumber Products From Canada: Final Results of the Countervailing Duty Administrative Review, 2019*, 86 Fed. Reg. 68,467 (Dep't Commerce Dec. 2, 2021).....................................................................................31

*Chlorinated Isocyanurates From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 71,312 (Dep't Commerce Nov. 9, 2020) .......................................................................................18

*Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ..........................................................................26

*Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) ................................26

Consol. Court No. 23-00239                    NON-CONFIDENTIAL VERSION

## I.    <u>INTRODUCTION</u>

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits these comments in support of the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand in response to the comments filed by Plaintiff Archer Daniels Midland Company ("ADM") and Plaintiff Intervenor and Consolidated Plaintiff Joint Stock Company Apatit ("JSC Apatit").  *See* Comments of Plaintiff, Archer Daniels Midland Company, on the Final Results of Redetermination Pursuant to Ct. Remand, ECF 97; Plaintiff Intervenor and Consolidated Plaintiff Joint Stock Company Apatit's Comments on Commerce's Results of Redetermination Pursuant to Ct. Remand, ECF 96; Final Results of Redetermination Pursuant to Ct. Remand (Aug. 4, 2025), P.R.R. 11, ECF 90-1 ("Remand Determination"); *The Mosaic Company v. United States*, Consol. Ct. 23-00239, Slip Op. 25-55 (CIT May 6, 2025) ("*Remand Order*").

ADM and JSC Apatit ask this Court to find that Commerce's Remand Determination is contrary to law and unsupported by substantial evidence because Commerce continued to limit its selection of phosphate rock benchmark prices to sources of igneous deposits.  JSC Apatit also challenges Commerce's decision to construct a tier three benchmark for natural gas.  For the reasons discussed below, the Court should reject ADM's and JSC Apatit's arguments and affirm Commerce's Remand Determination as reasonable, supported by substantial evidence, and otherwise in accordance with law.

## II.    <u>COMMERCE'S DECISION TO CONTINUE TO LIMIT THE TIER THREE BENCHMARK TO PHOSPHATE ROCK OF IGNEOUS ORIGIN IS</u>

NON-CONFIDENTIAL VERSION

<u>REASONABLE, SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IN ACCORDANCE WITH LAW</u>

A.    **Commerce Identified Substantial Record Evidence and Articulated a Reasoned Explanation for Its Decision.**

The Court's remand opinion instructed Commerce to further explain its selection of the tier three benchmark for phosphate mining rights. *Remand Order* at 15-16. The Court found that Commerce "reasonably found that the record indicated that sedimentary and igneous rock have different production processes," but failed to point to evidence showing that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock. *Id.* at 16.

Following the Court's instruction, Commerce provided a detailed explanation in the Remand Determination for why its decision to select benchmark prices from igneous sources of phosphate rock is reasonable, supported by substantial evidence, and consistent with the statute and its regulations. As Commerce explained, the ultimate purpose of constructing a tier three benchmark is to measure the benefit that the respondents received from their subsidized phosphate mining rights. Remand Determination at 10. The tier three benchmark regulation does not prescribe any particular benchmark calculation methodology – as the Court and Commerce agree – and Commerce therefore has discretion to make a reasonable methodological choice. *See Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (CIT 2023) ("Nucor does not dispute Commerce's discretion to develop a suitable methodology for carrying out a Tier 3 analysis."); *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1314 (CIT 2022); *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1389-92 (CIT 2021).

Further, while Commerce's tier three regulation, 19 C.F.R. § 351.511(a)(2)(iii), does not technically require it to do so, Commerce explained that it endeavors, to the extent possible, to "use benchmarks that are comparable to the government-provided good," so as to calculate

subsidy rates "as accurately as possible." Remand Determination at 5. Commerce also explained

that, because it is using phosphate rock prices in the tier three analysis as a proxy for the value of

the underlying mining rights, and comparing the prices to JSC Apatit's per-unit cost buildup to

produce beneficiated phosphate rock, it is "appropriate to put significant weight on the question

of whether the production processes and precise costs used in JSC Apatit's cost of production

buildup are comparable to a benchmark market price for beneficiated phosphate rock produced

from the same type of ore reserves." Remand Determination at 10-11.

The substantial evidence standard is a deferential one, requiring the agency to "pu{t}

forward a reasoned explanation by 'mak{ing} the necessary findings and hav{ing} an adequate

evidentiary basis for its findings. *CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1337 (CIT

2023) (quoting *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)), *appeal dismissed sub*

*nom. In re United States*, 2024 WL 4814738 (Fed. Cir. Nov. 18, 2024). "Substantial" evidence

means "more than a mere scintilla," and amounts to what a "reasonable mind might accept as

adequate to support a conclusion," *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d

1369, 1374 (Fed. Cir. 2015) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229

(1938)).

Here, Commerce cited substantial record evidence in support of its findings that the

production processes for phosphate rock from sedimentary reserves and igneous reserves differ –

which the Court has already affirmed as reasonable – and that these differences in production

processes translate to significant cost differences. Remand Determination at 5-6. First,

Commerce cited a report by Dr. Graham A. Davis, Professor Emeritus of Mineral Economics at

the Colorado School of Mines, which JSC Apatit placed on the record. This expert report states

"Russian phosphate mining licenses are igneous deposits in the Arctic Circle . . . Their bonuses

cannot be compared with bonuses in Jordan, *which are for a completely different type of*

*mineralization (sedimentary)*," and that "sedimentary deposits in Jordan '{do} not have the same

value as the Russian ore.'"  Remand Determination at 6 (citing JSC Apatit Letter, "Phosphate

Fertilizers from Russia: JSC Apatit's Benchmark Data Submission," dated Mar. 15, 2023 ("JSC

Apatit Benchmark Submission"), Appendix 7 at 16-17, 37, P.R. 155, C.R. 191).  Commerce also

cited the same report as stating "If comparison leases have this 10% difference in development

cost, *as they well could if we compare another country's sedimentary deposits to Russia's*

*igneous deposits*, they could suggest a lease bonus that is 100% higher or lower than appropriate

at the subject lease."  *Id.* (citing JSC Apatit Benchmark Submission, Appendix 7 at 37, P.R. 155,

C.R. 191).  Thus, Commerce identified record evidence explicitly stating that sedimentary ore in

Jordan is a different type of mineralization and does not have the same value as Russian igneous

ore, and that, in Dr. Davis' expert opinion, sedimentary deposits could have a 10% difference in

development costs as compared to Russian igneous deposits.

This expert report was not the only piece of evidence that Commerce cited.  Commerce

also cited evidence from *Apatites and their Synthetic Analogues*, a 2016 book by Prof. Petr

Ptáček.  Remand Determination at 5-6 (citing Mosaic Letter, "Petitioner's Submission of Factual

Information to Measure the Adequacy of Remuneration," dated March 15, 2023 ("Mosaic

Benchmark Submission"), Exhibit 20, P.R. 133.  As Commerce noted, Prof. Ptáček is an

Assistant Professor at the Institute of Materials Chemistry and a Senior Researcher at the

Materials Research Centre of Brno University of Technology in the Czech Republic.  Remand

Determination at 6 n.28 (citing Mosaic Benchmark Submission at 5, Exhibit 22, P.R. 133).

Prof. Ptáček's book explains that igneous deposits consist of "apatite" – which is what

JSC Apatit produces, hence its name – while sedimentary deposits consist of "varieties of

carbonate-fluorapatite that are collectively called as {*sic*} francolite" and that also contain "non-

phosphatic accessory minerals" such as "quartz, clay and carbonates (calcite and dolomite)."

Mosaic Benchmark Submission, Exhibit 19 at 337, P.R. 133. Commerce cited Prof. Ptáček's book as explaining that "{m}any sedimentary phosphate deposits contain mixtures of undesired constitutes. These ores require a series of beneficiating operations during their processing depending on the type of gangue minerals present in each ore" that "may include, after the size reduction, the combination of attrition scrubbing, desliming, flotation, gravity separation and/or calcination." Remand Determination at 6 (citing Mosaic Benchmark Submission, Exhibit 20 at 384, P.R. 133).

Commerce identified additional evidence from Prof. Ptáček's book that explains there are special beneficiation processes used to remove the impurities found in sedimentary ore (not igneous ore, which is what JSC Apatit uses to produce phosphate fertilizer) – specifically, calcination and organic acid leaching – and describes the associated costs. Remand Determination at 6-7 (citing Mosaic Benchmark Submission, Exhibit 20 at 389, 398). Prof. Ptáček explains that calcination – a beneficiation process that involves heating to high temperatures – may be used as "{a}n alternative technique for the beneficiation of {sedimentary} ores." Mosaic Benchmark Submission, Exhibit 20 at 384, P.R. 133. He provides the following diagram illustrating the calcination process:

Consol. Court No. 23-00239                                    NON-CONFIDENTIAL VERSION



**Fig. 12.** Illustration of the defluorination process of phosphate rocks [1].

Mosaic Benchmark Submission, Exhibit 20 at 400, P.R. 133.  Commerce cited evidence from

Prof. Ptáček's book stating that calcination is "not applicable" to the beneficiation of igneous

ores (*i.e.*, the type of ore that JSC Apatit uses to produce phosphate fertilizer), and that

calcination results in different production costs because of the "high capital cost" of calcination

plants and because "The calcination of phosphate ores to remove carbonates is expensive

because of high costs of energy."  Remand Determination at 6 (citing Mosaic Benchmark

Submission, Exhibit 20 at 389, 398, P.R. 133).

    The second beneficiation process unique to sedimentary ores that Commerce identified is

organic acid leaching.  Remand Determination at 7.  Prof. Ptáček's book provides a diagram of

organic acid leaching as follows:

NON-CONFIDENTIAL VERSION



Fig. 11. Proposed flow sheet for leaching of phosphate rock/ores using formic acid [16].

Mosaic Benchmark Submission, Exhibit 20 at 399, P.R. 133.  Commerce cited evidence from

Prof. Ptáček's book describing how the use of organic acid leaching to beneficiate sedimentary

ore results in different costs of production, because "{a}cid plants have low capital cost" but

"{o}rganic acid price is high" and "organic acids may be expensive and will certainly add to the

production cost."  Remand Determination at 7 (citing Mosaic Benchmark Submission, Exhibit 20

at 389, 398, P.R. 133).  The evidence that Commerce identified is "more than a mere scintilla,"

and satisfies the standard of what a "reasonable mind might accept as adequate to support"

Commerce's conclusion that the differences in beneficiation processes for sedimentary and

igneous ore result in significant differences in cost.  *Downhole Pipe*, 776 F.3d at 1374.

Commerce also followed the Court's direction to explain how the phosphate rock market

is significantly driven by the distinction between sedimentary and igneous rock.  Remand

Determination at 7 (citing *Remand Order* at 16).  As Commerce explained in the Remand

Determination, the goal of constructing a tier-three cost build-up is to isolate the respondent's

costs for phosphate mining and beneficiation that would be reflected in the price of beneficiated

phosphate rock. *Id.* at 11. The record does not contain evidence that would allow Commerce to quantify the differences in mining and beneficiation processes used for sedimentary and igneous ore. *See id.* at 7.[1] However, Commerce articulated a thorough explanation of how production costs impact market forces of supply and demand, making a rational connection between the evidence it identified of significant cost differences between sedimentary and igneous ore – including capital costs, development costs, and energy costs – and its conclusion that JSC Apatit's cost buildup to produce phosphate rock from igneous ore is not comparable to world market prices based on production from sedimentary ore. *See id.* at 7-10. Commerce's straightforward explanation is reasonable, supported by the record evidence, and clearly articulates a "rational connection between the facts found and the choice made," and should therefore be affirmed by the Court. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

**B.      ADM and JSC Apatit Fail to Demonstrate Commerce's Decision Was Unlawful.**

1.      ADM and JSC Apatit Fail to Demonstrate Commerce's Decision Was Unsupported by Substantial Evidence.

ADM argues that Commerce's decision is unsupported by substantial evidence because Commerce made three unsupported assumptions: (1) that "there is just one type of igneous ore and one type of sedimentary ore"; (2) that "there is a substantial cost of production difference between the two types of ore"; and (3) that "the assumed cost of production difference is passed

---

[1] While JSC Apatit submitted voluminous information regarding its costs to mine and beneficiate its igneous ore, it did not provide a description or chart of the beneficiation process. *See* JSC Apatit Letter, "JSC Apatit Section III of Initial Questionnaire Response," dated Sept. 23, 2022 ("JSC Apatit IQR"), P.R. 60, C.R. 31. The record does contain information from another producer of igneous phosphate rock in South Africa, Foskor, that is consistent with the description in Prof. Ptáček's book and does not include processes unique to sedimentary ore (*i.e.*, calcination or organic acid leaching). *See* Mosaic Benchmark Submission, Exhibit 16(b) at 13-14, P.R. 132.

through in the assumed world market prices of the phosphate rock produced from the two different types of ore." ADM Remand Comments, ECF 97, at 8. JSC Apatit argues that Commerce's decision is unsupported by substantial evidence because Prof. Ptáček describes six different types of phosphate rock, not two, and Commerce "selectively cho{se} passages out-of-context to support its determination" while ignoring other evidence. JSC Apatit Remand Comments, ECF 96, at 22. None of these arguments has merit.

At the outset, ADM falsely attributes to Commerce the assumption that "there is just one type of igneous ore and one type of sedimentary ore." ADM Remand Comments at 4, 8. Commerce made no such finding. Regardless, the record includes an entire chapter of Prof. Ptáček's book that describes the "two main kinds of phosphate rock deposits in the world" as sedimentary ore and igneous ore. Mosaic Benchmark Submission, Exhibit 19, P.R. 133. ADM and JSC Apatit base their claim that there are six different ore types on a list in the subsequent chapter. ADM Remand Comments at 4; JSC Apatit Remand Comments at 22. This list identifies five (not six) categories of phosphate "based on major associated gangue materials," with igneous ore described as having "more than one type of gangue material". Mosaic Benchmark Submission, Exhibit 20 at 383-84, P.R. 133. It also states that "many sedimentary phosphate deposits contain mixtures of undesired constituents," *i.e.*, have "more than one type of gangue material." The other four categories of gangue material are described as present specifically in sedimentary ore, including calcareous ores of sedimentary origin and phosphate ores associated with organic matter. *Id.*[2] Thus, all this list indicates is that there are certain sources of sedimentary ore that have only one type of gangue material, while other sources of sedimentary ore and igneous ore have more than one type of gangue material. This evidence

---

[2] The latter is described as undergoing calcination that "burns organic material and residual organic carbon without significantly affecting the superior qualities of sedimentary phosphates such as the solubility and reactivity." Mosaic Benchmark Submission, Exhibit 20 at 384, P.R. 133.

does not fairly detract from the reasonableness of Commerce's decision to analyze differences in production costs as between the two types of ore: sedimentary ore and igneous ore.

ADM's criticisms of Commerce's two other allegedly unsupported assumptions are similarly misplaced. ADM largely copied its discussion of the record evidence from its comments on Commerce's draft remand results, where it argued that Commerce was required to identify the evidence establishing differences both in the mining and beneficiation costs of igneous ore and sedimentary ore and to quantify the differences. *Compare* ADM Remand Comments at 8-23, *with* ADM Comments on Draft Remand at 5-15, P.R.R. 10. ADM fails to acknowledge that the Remand Determination includes six pages of reasoned explanation addressing and rejecting ADM's arguments. Remand Determination at 20-26. Reasonable minds may differ, and the Court may disagree with Commerce's conclusions, but that is not a basis for overturning the Remand Determination. *See, e.g.*, *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230 (CIT 2011) (*citing FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ("{A} court is not to substitute its judgment for that of the agency ...." (quotation marks and citation omitted)), *aff'd sub nom. Pastificio Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012); *Siderca S.A.I.C. v. United States*, 391 F. Supp. 2d 1353, 1369 (CIT 2005) ("Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account.")).

ADM also seeks to undermine the evidence that Commerce relied upon. For example, ADM criticizes Commerce's reliance on Dr. Davis' report, claiming it "does not contain substantial evidence that the cost of mining igneous ore always differs from the cost of mining sedimentary ore." ADM Remand Comments at 12. As an initial matter, ADM misstates Commerce's findings. Commerce did not cite Dr. Davis' report as evidence that the cost of mining igneous ore always differs from the cost of mining sedimentary ore. Remand

Determination at 6-7. Rather, Commerce cited three statements in Dr. Davis' report as evidence

that the significant differences in production processes between sedimentary and igneous ores –

which the Court has already affirmed as a reasonable finding – result in significant cost

differences. *Id.* at 5-6. ADM points to no contradictory evidence.

With regard to Dr. Davis' statement that sedimentary ore "{does} not have the same

value as Russian ore," ADM claims Dr. Davis "never provide{s} any 'value' for Russian ore or

for any other type of ore, and there are six types of ore, not two." ADM Remand Comments at

11, n.10; *see also* JSC Apatit Remand Comments at 25 ("The Davis Report does not discuss

valuing the underlying phosphate rock, other than commenting on how ore deposits in Jordan do

not have the same value as Russian ore."). With respect to Dr. Davis' estimate that sedimentary

deposits could well have a 10% difference in development costs as compared to igneous

deposits, ADM says this statement is "out of context," "contains no cost-related information,"

and is only about the lease bonus payment. ADM Remand Comments at 12. However, ADM

and JSC Apatit fail to identify contradictory evidence that Commerce unlawfully ignored.

Rather, they are merely inviting the Court to reweigh the record evidence, which is not the role

of a reviewing court. *See Downhole Pipe*, 776 F.3d at 1376-77 ("While Appellants invite this

court to reweigh this evidence, this court may not do so.").

ADM also devotes considerable attention to Dr. Davis' discussion of lease bonus

payments. ADM Remand Comments at 9-10. However, ADM ignores that Commerce was

emphasizing Dr. Davis' statement about the differences in mineralization between Russian and

Jordanian ore deposits – i.e., igneous vs. sedimentary – not his reference to lease bonuses:

> A report on the record by Dr. Graham A. Davis, Professor Emeritus of Mineral
> Economics at the Colorado School of Mines, states, "These Russian phosphate mining
> licenses are igneous deposits in the Arctic Circle....Their bonuses cannot be compared
> with…bonuses in Jordan, *which are for a completely different type of mineralization*

> *(sedimentary).*"  The report continues by stating that sedimentary deposits in Jordan
> "{do} not have the same value as the Russian ore."

Remand Determination at 6 (emphasis original, citations omitted).  Thus, ADM's arguments

about Commerce's alleged reliance on "trivial" lease bonus amounts, *see* ADM Remand

Comments at 10-11, are unfounded; Commerce did not base its finding on the value of lease

bonus payments.  Further, the other paragraphs of Dr. Davis' report that ADM points to – which

provide information about lease bonuses and other payments for mining leases in the United

States – do not contradict the statements that Commerce relied upon regarding the comparability

and relative value of Jordanian and Russian phosphate rock.  *See id.* at 9-10 (citing JSC Apatit

Benchmark Submission, Appendix 7 at 3-10, P.R. 155, C.R. 191).[3]

  ADM similarly challenges Commerce's reliance on evidence from Prof. Ptáček's book,

arguing that "Commerce's sole reliance upon the calcination step and the organic leaching step

as the basis for its cost of production difference assertion does not constitute substantial

evidence."  *Id.* at 14.  ADM makes fourteen points about other information in Prof. Ptáček's

book, *see id.* at 14-20, but it fails to identify any evidence that contradicts the statements that

Commerce relied upon.  Indeed, Commerce addressed ADM's arguments in the Remand

Determination, correctly concluding that ADM "do{es} not explain how the cited information

detracts from the affirmative evidence of cost differences between the production of phosphate

---

[3] ADM and JSC Apatit both argue that Commerce's reliance on any evidence from Dr. Davis' report is unreasonable because Commerce previously declined to use Dr. Davis' report to measure the adequacy of remuneration paid for the respondents' phosphate mining licenses.  *See* JSC Apatit Remand Comments at 26.  However, the fact that Commerce accorded little weight to Dr. Davis' conclusions on how to measure the value of mining licenses, which JSC Apatit commissioned for purposes of the underlying proceeding, is not the same as a finding that Dr. Davis' factual statements contained in the report are unreliable.  Thus, JSC Apatit is wrong to suggest that Commerce "changed its mind" about Dr. Davis' report.  *See id.*  Moreover, Dr. Davis' statements about the differences between Russian and Jordanian ore are essentially admissions against interest, and thus inherently more reliable than his conclusions on how to measure the value of mining licenses.

Consol. Court No. 23-00239                    NON-CONFIDENTIAL VERSION

rock from sedimentary versus igneous ore."[4]  Remand Determination at 24.  By presenting the

same arguments and evidence to the Court, ADM improperly seeks to have the Court reweigh

the record evidence.  But that is not the Court's role.  *See Downhole Pipe*, 776 F.3d at 1376–77.

Further, ADM's arguments rest on several flawed factual premises, which Commerce

properly rejected in the Remand Determination:

*First*, that there are six types of phosphate ore, not two, *see* ADM Remand Comments at

14-15.  This is false, as discussed *supra* at 9-10.

*Second*, that Commerce made a finding of one single mining and beneficiation technique

for sedimentary ore, and another, totally different mining and beneficiation technique for igneous

ore, *see* ADM Remand Comments at 14.  This is false, as Commerce explained.  Remand

Determination at 23 ("we made no such statement that there is 'one single method of mining and

beneficiation for igneous ore and a different single method of mining and beneficiation for

sedimentary ore' in the Draft Results of Determination.").

*Third*, that Commerce made a finding that there is no overlap between the mining and

beneficiation processes used for sedimentary and igneous ore.  *See* ADM Remand Comments at

14-20.  JSC Apatit similarly criticizes Commerce of ignoring similarities between the production

process for "siliceous" phosphate rock and igneous phosphate rock.[5]  JSC Apatit Remand

---

[4] ADM argues "{t}his assertion is erroneous given that ADM explained in extraordinary detail in its comments on the draft Remand Results (at 4-15) how the insignificant evidence of an unquantified production process difference in just two beneficiation steps failed to constitute substantial evidence of a 'significant' cost difference."  ADM Remand Comments at 32.  ADM's argument once again misses the point.  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47 (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence.  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (citation omitted).  Commerce rightly pointed out that none of the evidence ADM identified detracts from the evidence the agency relied upon.  The fact that ADM explained its proffered evidence in "extraordinary detail" is of no consequence.
[5] Although JSC Apatit refers to the former as "'siliceous' phosphate rock," JSC Apatit Remand Comments at 22, Prof. Ptáček's book clearly identifies it as "sedimentary with siliceous gangue."  Mosaic Benchmark Submission, Exhibit 20 at 389, P.R. 133.  Thus, the type of ore in question is in fact sedimentary in origin.

Comments at 22.  This criticism is unfounded, as Commerce explicitly acknowledged Prof. Ptáček's book indicates overlap between the production steps for igneous ore and sedimentary ore with siliceous gangue.  Remand Determination at 24.  But Commerce went on to conclude that "the record shows affirmative evidence of differences between the production steps and costs for igneous ore and another type of sedimentary ore: sedimentary ore with calcareous gangue."  *Id.*

Commerce also correctly observed that no party cited evidence demonstrating that any particular type of sedimentary ore has identical production steps and production costs compared to igneous ore, or that any particular country has reserves of any specific type of sedimentary ore that has identical production steps and costs compared to igneous ore, such that it would be reasonable to include prices from that country in the benchmark.  *Id*.  Once again, ADM and JSC Apatit point to no contradictory evidence.  *See* ADM Remand Comments at 14-20; JSC Apatit Remand Comments at 22-23.  Instead, JSC Apatit merely cites the exact same table from Prof. Ptáček's book that it directed Commerce's attention to, which merely states that flotation is "{t}he best approach" for beneficiation of igneous ore and sedimentary ore with siliceous gangue.  *See* Mosaic Benchmark Submission, Exhibit 20 at 389, P.R. 133.  Commerce expressly took this evidence into account in its decision, *see* Remand Determination at 24; JSC Apatit fails to identify any new aspect that Commerce failed to consider that could reasonably undermine its conclusions.  The Court should thus reject JSC Apatit's argument as an improper request to reweigh the evidence.

Finally, ADM faults Commerce's evaluation of "prevailing market conditions" for "fall{ing} back on the fact that Apatit produces phosphate rock from igneous ore."  ADM Remand Comments at 31.  However, the fact that JSC Apatit (or "Apatit" as ADM refers to it)

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00239                                      NON-CONFIDENTIAL VERSION

produces phosphate rock from igneous ore – and not from sedimentary ore – is central to

Commerce's benchmark selection.

      As noted above, igneous ore is called "apatite," or "apatite concentrate."  *See* Mosaic

Benchmark Submission, Exhibit 19 at 337, P.R. 133.  Phosphate sourced from sedimentary

deposits is not "apatite" – it has a completely different mineral composition.  *See id.*, Exhibit 19.

JSC Apatit's questionnaire responses, including its annual report and other documents prepared

in the ordinary course of business, consistently refer to the production of "apatite."  *See* Mosaic

Letter, "Phosphate Fertilizers from the Russian Federation: New Subsidy Allegations," dated

Oct. 14, 2022 ("Mosaic New Subsidy Allegation"), Exhibit 28 (PhosAgro 2020 Annual Report),

P.R. Nos. 90-92, C.R. Nos. 162-164 at 88 ("The Kirovsk branch of Apatit reached stable annual

production of more than 10.5 mln t of apatite concentrate."); JSC's Apatit's Letter, "JSC Apatit's

Rebuttal Comments to Petitioner's Benchmark Data Submission," dated March 27, 2023 (JSC

Apatit's Benchmark Rebuttal), Exhibit 17 at 34, P.R. 172, C.R. 205 ([

                                                           ]).  JSC

Apatit's own case brief provided proposed benchmark data for "exports of countries with

igneous deposits, with similar <u>apatite ore</u> or rock BPL %."  JSC Apatit Letter, "Countervailing

Duty Administrative Review on Phosphate Fertilizers from Russia: Resubmission of JSC Apatit

Case Brief," dated August 4, 2023 ("JSC Apatit Case Brief"), Appendix 2, P.R. 228, C.R. 225

(emphasis added).  Thus, the phosphate rock that JSC Apatit produces with its government-

provided mining rights, and thus the good that JSC Apatit is receiving for less than adequate

remuneration, is "apatite."

      ADM asserts that Commerce can only take this fact into account if it is able "to identify

substantial evidence that phosphate rock produced from sedimentary ore . . . does not compete

with rock produced from igneous ore and that it does not have a comparable cost of production,"

Consol. Court No. 23-00239                          NON-CONFIDENTIAL VERSION

ADM remand comments at 31, and it supports this assertion by pointing to purchasers of

phosphate rock in India, Japan, New Zealand, and Brazil.  *Id.* at 32.  But this is a red herring.

The subject merchandise is phosphate fertilizer, not phosphate rock.  JSC Apatit is using the

phosphate rock that it receives for LTAR as an input into the production of phosphate fertilizer,

not selling it into the world market.  Thus, the fact that JSC Apatit is receiving phosphate rock

produced from igneous ore, and not from sedimentary ore, is central to Commerce's benchmark

selection.

      The record supports Commerce's reliance on that fact when it took into account

"prevailing market conditions" and assessed the comparability of potential benchmark prices on

the record.  *See* Remand Determination at 10-11.[6]

      2.  <u>ADM and JSC Apatit Fail to Demonstrate Commerce's Decision Was
Otherwise Not in Accordance with Law.</u>

      ADM and JSC Apatit fail to identify any other legal basis for overturning Commerce's

Remand Determination.  For example, ADM argues "Commerce's {c}laim that {i}t {h}ad {n}o

{o}bligation to {q}uantify the {e}ffect of {c}ost {d}ifferences {h}as {n}o {m}erit."  ADM

Remand Comments at 24.  Both ADM and JSC Apatit accuse Commerce of failing to follow the

Court's instructions on remand.  ADM Remand Comments at 24; JSC Apatit Remand Comments

---

[6] ADM also claims Commerce failed to "me{et} its evidentiary burden" because of its "continuing inability to rebut the uncontradicted evidence that ADM relied upon in its Memorandum of Points and Authorities in support of its Rule 56.2 motion."  ADM Remand Comments at 31-32 (citing Mem. of Points and Authorities in Supp. of the Rule 56.2 Mot. for J. on the Agency R. nof the Pl. Archer Daniels Midland Company, ECF 41-1).  However, ADM did not actually present this argument in its comments on Commerce's draft remand redetermination.  *See* ADM Comments on Draft Remand.  Thus, Commerce was not obligated to address them in the Remand Redetermination. Moreover, as Mosaic explained in its Response Brief (ECF 55) and Post-Argument Submission (ECF 77), ADM's argument about importers in Brazil, India, Japan, and New Zealand misapprehends the methodology that Commerce uses to calculate the benefit that JSC Apatit receives from the Mining Rights for LTAR program.  The relevant issue for Commerce's methodology is not whether *purchasers* of phosphate rock distinguish between rock produced from sedimentary and igneous ore.  Rather, the relevant issue is the costs that JSC Apatit incurs when it mines and processes the phosphate ore to *produce* the phosphate rock in the first place, as discussed above.  Thus, Commerce's decision to limit its selection of benchmark prices to sources of the same type of rock that JSC Apatit uses for this purpose – namely, igneous phosphate rock from South Africa, Brazil, and Finland – continues to be reasonable and supported by substantial evidence.  The mere fact that some countries import both types of phosphate rock does not "fairly detract" from the reasonableness of Commerce's conclusion.

at 27-28.  But they concede that the Court did not <u>literally</u> instruct Commerce to quantify the effect of cost differences between igneous and sedimentary ore, ADM Remand Comments at 24 ("Although this statement is literally correct…"), meaning Commerce did not unlawfully fail to follow the Court's instruction.  *See also* JSC Apatit Remand Comments at 27-28 ("While this Court did not ask Commerce to quantify differences . . .").

ADM nonetheless asserts that "{e}ven if the Court did not require Commerce to show a 'significant' difference in the cost to produce the two kinds of rock, nothing prevented Commerce from doing so."  *Id.*  ADM presents similar arguments regarding Commerce's alleged failure to quantify the "total cost of production" or "actual cost associated with any mining or beneficiation step."  ADM Remand Comments at 27-30.  But the relevant question is not whether Commerce did not do something that it <u>could</u> have done, but whether Commerce did not do something it was <u>legally required</u> to do.  ADM and JSC Apatit fail to identify any legal basis or cite any legal authority requiring Commerce to quantify the cost differences between igneous and sedimentary ore.[7]

As noted above, Commerce has substantial discretion in constructing a tier three benchmark.  *See, e.g.*, *Mosaic Co.*, 589 F. Supp. 3d at 1314.  Commerce considers the comparability of benchmark prices in the tier three context as a matter of practice, not because it is obligated to do so under the statute or tier three regulation.  *See* Remand Determination at 5.  However, Commerce does not have a practice of <u>quantifying</u> the factors affecting comparability.  Indeed, it would be a radical departure from prior practice for Commerce to do so.  *See, e.g.*, *Certain Alkyl Phosphate Esters From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final*

---

[7] ADM also concedes that the Court did not literally instruct Commerce to perform this quantification.  *See, e.g.*, ADM Remand Comments at 29 ("Commerce's statement may be regarded as literally accurate…").

Case 1:23-cv-00239-JAR    Document 103    Filed 12/15/25    Page 23 of 38

Consol. Court No. 23-00239                          NON-CONFIDENTIAL VERSION

*Antidumping Duty Determination*, 89 Fed. Reg. 80,870 (Dep't Commerce Oct. 4, 2024), and accompanying Preliminary Decision Memorandum at 36 (finding soda ash from the United States and Türkiye was not comparable with soda ash purchased by the respondents due to being naturally occurring rather than synthetically produced, thus resulting in differing costs and production factors); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 71,312 (Dep't Commerce Nov. 9, 2020), and accompanying Issues and Decision Memorandum, Comment 4; *Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 50,103 (Dep't Commerce Aug. 1, 2023), and accompanying Issues and Decision Memorandum, Comment 12.  ADM and JSC Apatit cite no legal authority requiring Commerce to quantify cost differences as a factor affecting comparability in the tier three benchmark analysis.  They thus fail to show that Commerce acted unlawfully by not quantifying the production costs or cost differences as between sedimentary and igneous ore.

JSC Apatit argues further that the Court "instructed Commerce to demonstrate why the distinction between igneous and sedimentary rock was a significant driver of prices in the market," and that Commerce did not follow the Court's instructions because it did not point to any record evidence of price differences.  JSC Apatit Remand Comments at 28.  ADM also criticizes Commerce for reliance on a hypothetical example of how production cost differences impact price.  ADM Remand Comments at 25-27.  The Federal Circuit has affirmed Commerce's use of hypothetical examples to illustrate the impact of cost differences when actual data are not on the record.  *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363, 1369-70 (Fed. Cir. 2005) (holding "Commerce showed by substantial evidence that Hynix's reported R&D expenses fail to reflect the costs of production.  It is facially apparent that a fraction of costs does not

accurately capture full costs.").  Commerce explained in the Remand Redetermination that no

party had cited information on the record that would allow the agency to undertake a quantitative

analysis of cost differences, or to quantify the effect of these cost differences on world market

prices.  Remand Determination at 7.  However, Commerce provided a reasoned explanation of

why it placed considerable weight on the evidence of differences in production cost and how,

based on fundamental principles of supply and demand, the differences in production costs

between sedimentary and igneous ore would impact the value of the underlying good conveyed

via phosphate mining rights.  *Id.* at 8-9.  Commerce thus followed the Court's instruction to

explain how the phosphate rock market is significantly driven by the distinction between

sedimentary and igneous rock, and the Court should affirm Commerce's Remand

Redetermination as supported by substantial evidence and otherwise in accordance with law.

III.    **COMMERCE'S DECISION TO REJECT THE KAZAKH EXPORT PRICES AND CONSTRUCT A TIER THREE BENCHMARK FOR NATURAL GAS IS REASONABLE, SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IN ACCORDANCE WITH LAW**

    A.    **Commerce Identified Substantial Record Evidence and Articulated a Reasoned Explanation for Its Decision.**

In the remand opinion, the Court found that Commerce's decision to use a tier two

benchmark for natural gas – based on evidence that Kazakh-origin raw gas was sold to a single

Russian government-owned entity, Gazprom, the very entity responsible for distortion of

Russia's gas market – was unreasonable and unsupported by substantial evidence.  *Remand*

*Order* at 26-27.  The Court remanded to Commerce with instructions to consider two issues that

the agency had not fully addressed:  (1) the "comparability of the benchmark third-party sales

and the sales into Russia"; and (2) if Commerce were to find the sales are comparable, to address

"why sales to a government entity that distorts the market {is} within the intended meaning of

BUSINESS PROPRIETARY
INFORMATION DELETED

'purchaser' in the regulation and how this fits into the logic of the three-level benchmark

scheme." *Id.* at 27.

On remand, Commerce found that "the raw natural gas exported by Kazakhstan is not

comparable to the refined natural gas available in the Russian market that JSC Apatit purchased

from GOR authorities during the POR." Remand Determination at 13. Commerce took into

account prevailing market conditions, pursuant to section 771(5)(E)(iv) of the Act, as well as

"factors affecting comparability," such as product similarity, as provided under 19 C.F.R. §

351.511(a)(2)(i) and (ii). *See id.* Commerce explained that the record shows the Kazakh gas

exported to Russia is "raw" or "sour" gas that contains enough sulfur that it must undergo further

processing to transform it into commercially usable gas. *Id.* at 14 (citing Mosaic Letter,

"Petitioner's Case Brief," dated June 13, 2023 ("Mosaic Case Brief") at 6-7, P.R. 207; Mosaic

Letter, "Petitioner's Rebuttal Benchmark Submission," dated March 27, 2023 ("Mosaic Rebuttal

Benchmark Submission"), Exhibit 8, P.R. 168); *id.* at 28. The evidence Commerce pointed to

includes the 2021 National Energy Report of the Kazakhstan Association of Oil & Gas and

Energy Sector Organizations ("KAZENERGY"), which states that "{t}he bulk of Kazakhstan's

gas output requires processing" and there is "an important arrangement for the processing of

Karachaganak's raw (sour) gas across the border at Russia's Orenburg gas processing plant."

Mosaic Rebuttal Benchmark Submission, Exhibit 8 at 122, P.R. 163.

Commerce reasonably concluded that raw Kazakh gas that is not fit for consumption is

not comparable to the refined natural gas purchased by JSC Apatit,[8] and therefore that Kazakh

gas prices are not an appropriate tier two benchmark. Remand Determination at 14. Commerce

---

[8] The record shows that the natural gas that JSC Apatit purchases from Russian governmental entities is refined gas suitable for industrial use. *See, e.g.*, JSC Apatit IQR, Exhibit 42-A, P.R. 83, C.R. 85-90 [

].

therefore constructed a tier three benchmark for natural gas using a regional European

Organization for Economic Cooperation and Development ("OECD") natural gas price published

by the International Energy Agency ("IEA"). *See id.* at 14-16. The Court should affirm

Commerce's decision as reasonable, supported by substantial evidence, and otherwise in

accordance with law.

### B. JSC Apatit Fails to Show that Commerce's Rejection of the Kazakh Export Prices as a Tier Two Benchmark Is Unlawful

JSC Apatit argues that Commerce's decision is factually and legally incorrect. *See* JSC

Apatit Remand Comments at 6-14. Factually, JSC Apatit asserts that Kazakh gas exported to

Russia is comparable to the natural gas JSC Apatit purchases from Russian governmental

authorities because the record shows: (1) Kazakh gas was exported to the Orenburg Gas

Processing Plant in Russia; (2) pipeline maps show Kazakhstan's pipelines transport both raw

and processed gas; and (3) Kazakh customs data report exports of raw gas in the same HTS

subheading used for Russian gas. JSC Apatit Remand Comments at 8-9. None of this evidence

"fairly detracts" from the reasonableness of Commerce's finding that raw gas is not comparable

to refined or processed gas. Commerce explained that "raw" or "sour" gas contains enough

sulfur that it requires additional processing at high cost and is not fit for consumption in raw

form, and therefore that it is not comparable to refined gas that is commercially usable. Remand

Determination at 13-14, 28. The mere fact that raw gas is exported from Kazakhstan does not

make it "comparable" to refined gas in the sense of "fit for consumption" or "commercially

usable." Commerce provided a straightforward explanation that is reasonable, supported by the

record evidence, and clearly articulates a "rational connection between the facts found and the

choice made," and should therefore be affirmed by the Court. *Burlington Truck Lines, Inc. v.*

*United States*, 371 U.S. 156, 168 (1962).

JSC Apatit claims that Commerce's finding that raw gas requires costly processing to refine is unsupported by substantial evidence because the evidence that Commerce cited does not "provide quantitative analysis or evidence that the cost of processing raw Kazakh gas alters its market value relative to refined gas." JSC Apatit Remand Comments at 12. As discussed above, there is no legal requirement for Commerce to undertake a quantitative analysis in assessing the comparability of benchmarks. Further, the fact that the evidence Commerce relied upon does not provide quantitative analysis does not render it unsubstantial. *See Jinan Yipin Corp. v. United States*, 774 F. Supp. 2d 1238, 1243-44 (CIT 2011). Commerce considered and properly rejected JSC Apatit's arguments that requiring further processing before end use is "a common feature in global gas markets" and "routinely reflected in market prices." Remand Determination at 29. Commerce explained that the facts JSC Apatit points to merely "underscore the issue of comparability between raw and refined gas" and "demonstrat{e} that it is a normal and common commercial practice to first refine {} raw natural gas, and that such cost is impactful enough that it is reflected in market pricing." *Id*. JSC Apatit fails to identify any other evidence that fairly detracts from the reasonableness of Commerce's conclusion.

JSC Apatit argues that Commerce's decision is contrary to law because Commerce did not apply the applicable legal standard. JSC Apatit Remand Comments at 13. Specifically, JSC Apatit argues that Commerce erred in assessing the comparability of raw natural gas and the refined gas that JSC Apatit purchased from Russian governmental entities because, "to rely on a tier two benchmark, Commerce need only apply a benchmark that "***would be available to purchasers*** in the country in question.'" JSC Apatit Remand Comments at 13 (emphasis original). JSC Apatit contends the regulation does not require Commerce "to show that the respondents would have purchased the same good being employed as the benchmark." *Id.*

JSC Apatit's argument mischaracterizes the applicable legal standard. As an initial matter, the purpose of Commerce's benchmark methodology is to determine whether the good that the government provided to the respondent – here, the refined natural gas that JSC Apatit purchased from Gazprom – was for less than adequate remuneration. *See* 19 C.F.R. § 351.511(a)(2) ("In the case where goods or services are provided, a benefit exists to the extent that *such goods or services* are provided for less than adequate remuneration.") (emphasis added). Thus, if a proposed benchmark price is for a different product – as was the case here – then it not a suitable benchmark for determining the adequacy of remuneration, regardless of whether it was "available to purchasers in the country in question," as JSC Apatit asserts.

JSC Apatit also ignores that Commerce's regulations require Commerce to consider "factors affecting comparability" – including product similarity – when it chooses among the available benchmarks. 19 C.F.R. § 351.511(a)(2)(i)-(ii); Remand Determination at 13. Here, Commerce reasonably took into account that the proposed benchmark price was for a good that was *unusable* in commercial and industrial applications, unlike the refined natural gas that JSC Apatit purchased. Remand Determination at 28. Contrary to JSC Apatit's assertions, Commerce did not require JSC Apatit to prove that it could have directly obtained the raw natural gas itself. JSC Remand Comments at 14.

The only other legal authorities JSC Apatit cites are antidumping cases where Commerce relied on HTS classifications to identify "comparable" surrogate values for use in constructing normal value in NME cases; prior countervailing duty cases where Commerce selected Kazakh export prices as a tier two benchmark for natural gas; and the Federal Circuit's decision in *Essar Steel*, holding that benchmarks must be comparable not identical. *See* JSC Apatit Remand Comments at 8, 10-11. However, none of these are contrary legal authority. Commerce's practice of selecting surrogate values in antidumping duty cases based on HTS subheadings is

not relevant here, because this is not an antidumping proceeding and Commerce is not

constructing normal value under 19 U.S.C. § 1677b(e).  Commerce addressed JSC Apatit's

argument that it was departing from prior practice in other CVD cases and explained that each

segment is distinct, with its own factual record.  Remand Determination at 29.

Crucially, JSC Apatit ignores the Court's own statements on this issue – *e.g.*, that "JSC

Apatit's gas purchases . . . were of refined natural gas, and presumably the benchmark would

reflect the subsidized product, not some other product" – and that the Court specifically

instructed Commerce to reconsider its analysis of comparability.  *Remand Opinion* at 27.

Following the Court's instruction, Commerce properly found, based on the factual record of this

proceeding, that the raw Kazakh gas exported to Russia is not comparable to the refined gas that

JSC Apatit purchases.  Remand Determination at 29.  This is not an unreasoned departure from

prior practice.  Commerce also explained that the Federal Circuit's decision in *Essar Steel* is

inapposite because in that case, Commerce found that the differences between the two types of

iron ore, "if they existed at all, were not so profound as to render the two products

incomparable," and that the respondent "failed to provide any evidence that the iron ore input

was of a different grade than the respondent used."  *Id.* at 28.  Here, by contrast, Commerce

found that natural gas in its raw form contains enough sulfur as to render it "unusable in

commercial and industrial applications {and that it} requires refinement as a necessary step for it

to be available to the product-consuming market."  *Id*.  Thus, JSC Apatit fails to show

Commerce's decision is contrary to law.

For all these reasons, the Court should affirm Commerce's finding that raw Kazakh gas is

not comparable to the refined gas that JSC Apatit purchases from Russian governmental entities,

and therefore that Kazakh export prices are not suitable as a tier two benchmark for natural gas.

C.    **JSC Apatit Fails to Show, in the Alternative, that Kazakh Export Prices Satisfy the "Available to Purchasers" Requirement**

JSC Apatit argues that the Court should also remand to Commerce "to address the Court's second question regarding sales to a government entity and the meaning of purchaser." JSC Apatit Remand Comments at 15. Commerce did not reach this issue because the Court instructed Commerce to address the question *if* it determined that the Kazakh raw gas was comparable to the processed gas that JSC Apatit purchased from Gazprom. *Remand Opinion* at 27. As discussed above, Commerce determined that the two types of gas were not comparable, so it resorted to a tier three benchmark instead. Remand Determination at 31. Mosaic respectfully submits that no remand is necessary on this issue, as Commerce's finding is supported by substantial evidence and otherwise in accordance with law. However, if the Court reaches this issue, it should reject JSC Apatit's arguments.

JSC Apatit argues that Commerce failed to follow the Court's instruction, and that on remand, "Commerce must acknowledge that the references in the statute and Commerce's regulations to 'purchaser' in the context of tier two benchmarks are not limited to private entities." JSC Apatit Remand Comments at 15. As an initial matter, Mosaic never argued that the term "purchaser" is limited to private entities in the context of tier two benchmarks, *see* Mosaic Remand Comments at 13, and Commerce made no such finding. *See* Remand Determination at 11-14, 8-29. Moreover, the relevant instruction the Court gave to Commerce is as follows: to address "why sales to a government entity that distorts the market {is} within the intended meaning of 'purchaser' in the regulation and how this fits into the logic of the three-level benchmark scheme." *Id.* at 27. JSC Apatit's presentation of the issue thus elides the key phrase: "that distorts the market".

Commerce found that the Russian natural gas market is distorted by the Government of

Russia's predominant role in the market, including through Gazprom's control of the Russian gas

pipeline system.  PDM at 15.  As Mosaic explained in its response brief, the record shows that

Gazprom – a Russian government authority – is the sole importer of Kazakh gas.  There is only

one natural gas pipeline connecting Kazakhstan and Russia that terminates in Russia, the

Karachaganak Orenburg Transportation System pipeline.  *Phosphate Fertilizers From the*

*Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty*

*Administrative Review; 2020–2021*, 88 Fed. Reg. 28,505 (Dep't Commerce May 4, 2023) P.R.

187, and accompanying Preliminary Decision Memorandum, P.R. 188 ("PDM") at 16-17;

*Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty*

*Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) (Final

Results), and accompanying Issues and Decision Memorandum, P.R. 242 ("IDM") at 46.  This is

a trunk pipeline that terminates at Gazprom's Orenburg Gas Processing Plant in Orenburg,

Russia.  PDM at 17; IDM at 46; JSC Apatit Benchmark Submission, Appendix 4 at 4, 14, P.R.

146, C.R. 182.

During the POR, Kazakh natural gas producer Karachaganak Petroleum Operating BV

("KPO") sold a small volume of "raw (high sulfur)" or "sour" gas to Gazprom's Orenburg Gas

Processing Plant pursuant to a tolling arrangement between Gazprom and its Kazakh joint

venture partner, KRG.  Mosaic Benchmark Rebuttal Submission, Exhibit 8 at 118, 122, 132, P.R.

163-164; JSC Apatit Benchmark Submission, Appendix 4 at 4, 14, P.R. 146, C.R. 182.  The

record shows that this was the only natural gas exported from Kazakhstan to Russia during the

POR, as reflected in the BNS export statistics.  *See* PDM at 17; IDM at 46-47.  Such prices are not

"world market prices" for natural gas that would have been "available to" *any* purchasers in

Russia other than Gazprom, the Russian government authority responsible for distortion of the

NON-CONFIDENTIAL VERSION

Russian market and the supplier of natural gas to JSC Apatit for less than adequate remuneration.[9]

JSC Apatit argues that distortion of the Russian market is irrelevant in the tier two context because "Commerce's discussion of 'distortion'" in the *Preamble* "appears only in the context of *tier one* benchmarks." JSC Apatit Remand Comments at 16. The plain language of section 351.511(a)(2)(ii) states that a tier two benchmark is a world "market price" that would be "available to" purchasers in the country in question. *See* 19 C.F.R. § 351.511(a)(2)(ii). This language mirrors the tier one regulation in section 351.511(a)(2)(i), which states that Commerce will normally seek to measure the adequacy of remuneration by reference to a "market-determined" price. *See id.* § 351.511(a)(2)(i). Thus, Commerce's reference to distortion in the tier one context in the *Preamble* is informative of the proper interpretation of section 351.511(a)(2)(ii). Any price that is set by a governmental entity is, by definition, not a market-determined price.[10] Commerce correctly rejected respondents' arguments that Russian domestic prices are usable as a tier one benchmark because of the GOR's interference in the Russian gas market and Gazprom's control of the Russian gas distribution network. *See* PDM at 15-17; IDM at 46-49. It would be contrary to the plain meaning and purpose of the three tier benchmark scheme for Commerce to then find that Kazakh export prices – where both the prices and the gas are available only to Gazprom pursuant to a tolling arrangement – qualify as market-determined prices that would be available to purchasers in Russia, and thus usable as a tier two benchmark.

JSC Apatit also argues that "Commerce has long held that Gazprom's ownership interest in the Orenburg processing plant does not affect whether gas is available to Russian consumers,"

---

[9] JSC Apatit reported that it purchased natural gas from Gazprom in its initial questionnaire response. JSC Apatit IQR at 37-39, P.R. 60, C.R. 31; *id.*, Exhibits 36, 37, P.R. 83, C.R. 77.
[10] The narrow exception in section 351.511(a)(2)(i) for actual sales from competitively run government auctions is not relevant here. *See* 19 C.F.R. § 351.511(a)(2)(i).

citing *UAN from Russia*, and that excluding all sales to government entities as possible tier two benchmarks would be an overly broad reading of the regulation. JSC Apatit Remand Comments at 16-17. As an initial matter, JSC Apatit misrepresents Commerce's finding in *UAN from Russia*. In that case, Commerce found that Kazakh-origin natural gas was available to the Orenburg Gas Processing Plant, but it did not reference Gazprom's ownership of the Plant, *see UAN from Russia* IDM at 22-23, let alone address the question posed by the Court: whether sales to a government purchaser that distorts the market are within the intended meaning of "purchaser" in the regulation. As explained above, such an interpretation would be unreasonable and contrary to the regulation's text, structure, and purpose.

JSC Apatit argues further that "{r}ecord evidence demonstrates that Kazakh gas is released into the pipelines that service natural gas to public and private consumers alike in Russia." JSC Apatit Remand Comments at 17. This is incorrect. The record actually indicates that, after processing the gas, Gazprom re-exports the finished gas back to Kazakhstan. Mosaic Benchmark Rebuttal Submission, Exhibit 8 at 132, P.R. 164; JSC Apatit Benchmark Submission, Appendix 4 at 14, P.R. 146, C.R. 182. Mosaic noted in its case brief – purely as a hypothetical – that, to the extent any refined Kazakh-origin gas remains in Russia after Gazprom processes it, that would be a new and different product that would be sold by Gazprom – *i.e.*, by the GOR – to consumers in the distorted Russian market at the GOR-regulated price. Mosaic Case Brief at 7, P.R. 207. The hypothetical possibility of such sales does not demonstrate that export prices for the product Kazakhstan actually exports, *i.e.*, raw "sour" gas, are "world market prices" that would be "available to purchasers" in Russia.

JSC Apatit argues in the alternative that any distortion in the Russian market is irrelevant, because Commerce ultimately did not use the Kazakh export prices for sales to Russia in constructing the tier two benchmark, but rather used sales to third countries (excluding China).

NON-CONFIDENTIAL VERSION

JSC Apatit Remand Comments at 17-18.  However, as Mosaic argued in its reply, export prices

to third countries are certainly not world market prices that would be "available to purchasers" *in*

*Russia*, within the meaning of the regulation.  *See* 19 C.F.R. § 351.511(a)(2)(ii).  That Commerce

has taken this approach in other proceedings involving Russia does not make it a reasonable

interpretation of the regulation.  Moreover, Commerce's own interpretation of its regulation in

past cases only merits deference under *Auer* and *Kisor* if the Court finds, after exhausting all the

traditional tools of construction, that the regulation is genuinely ambiguous and that Commerce's

interpretation is reasonable.  *Kisor v. Wilkie*, 588 U.S. 558, 559 (2019).  In this case, it is not: the

plain text of the regulation is clear that a tier two benchmark must be based on prices that would

be available to purchasers *in the country in question*, here Russia.[11]

       The Court should therefore reject JSC Apatit's arguments and affirm Commerce's

decision to reject the Kazakh export prices as a tier two benchmark as reasonable, supported by

substantial evidence, and otherwise in accordance with law.

     **D.**      **JSC Apatit fails to show Commerce acted unlawfully in rejecting its**
             **proposed changes to the natural gas benchmark calculation.**

       JSC Apatit argues that Commerce made two fundamental errors in its calculation of a tier

three benchmark using the OECD Europe gas prices published by IEA that Mosaic submitted.

JSC Apatit Remand Comments at 18-19.  JSC Apatit alleges these data are "inaccurate" and

"incomplete" because the data only cover calendar year 2021 and included a simple, as opposed

---

[11] *Auer* deference is also only appropriate where the regulatory interpretation reflects the agency's "authoritative" or "official" position, rather than an *ad hoc* statement, and also reflects the "fair and considered judgment" of the agency, rather than a "convenient litigating position" or "*post hoc* rationalization."  *Kisor.* 588 U.S. at 576-79. Commerce has been inconsistent in its application of the tier two regulation, *see* Rule 56.2 Motion for J. on the Agency R. of the Mosaic Company, ECF 68 ("Mosaic 56.2 Br.") at 16, which is further reason why Commerce's interpretation is not entitled to deference.

to weighted, average.[12]  *Id.* at 19.  JSC Apatit argues that Commerce must "complete and

correct" the data "in order to construct a fair and reasonable tier three benchmark."  *Id.*

This Court has already rejected JSC Apatit's argument that Commerce acted unlawfully

in calculating subsidy rates based on data for calendar year 2021, when the period of review

("POR") included parts of two months of 2020.  *Remand Opinion* at 7.  The Court found that

Commerce's general practice is to rely on one year's worth of data when the POR extends into a

second year by less than two months and held that JSC Apatit failed to present any reason why

Commerce should have deviated from its practice in this case.  *Id.*  JSC Apatit still fails to

identify any reason why Commerce's decision to follow its normal practice by calculating the

benchmark for natural gas based on calendar year 2021 data is unreasonable.  The Court should

therefore once again reject JSC Apatit's argument.

JSC Apatit also argues that Commerce's calculation was unlawful because Commerce

used a simple average, instead of the "weighted-average OECD natural gas end-use price" that

JSC Apatit argued for.  JSC Apatit Remand Comments at 20.  Commerce explained in the

Remand Determination that, notwithstanding JSC Apatit's claim that the IEA data are regional

aggregates calculated as weighted averages of consumption, JSC Apatit had failed to explain

how such a calculation (*i.e.*, based on consumption) would be scalable or applicable for the

OECD Europe natural gas benchmark prices.  Remand Determination at 31.  JSC Apatit argues

that this is "clear error" because it "provided Commerce with the weighted average IEA data for

OECD Europe calculated by IEA itself."  JSC Apatit Remand Comments at 20.

However, JSC Apatit failed to present this argument – *i.e.*, that the weighted average for

OECD Europe shown in Appendix 19 to its Rebuttal Benchmark submission was calculated by

---

[12] JSC Apatit submitted nearly identical data, with the addition of prices from Q4 2020 and an average price for OECD Europe.  JSC Rebuttal Benchmark Submission, Appendix 19, P.R. 172, C.R. 205.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00239                              NON-CONFIDENTIAL VERSION

IEA itself – in its comments on the draft remand results.  *See* JSC Apatit Comments on Draft

Remand at 12.  It is also not apparent from the document itself.  *See* JSC Apatit Rebuttal

Benchmark Submission, Appendix 19, P.R. 172, C.R. 205.  Further, the explanation of IEA's

averaging methodology consists of an email from [

] from March 2023 that is partially redacted and appears to have been solicited for

purposes of the underlying proceeding.  JSC Apatit Rebuttal Benchmark Submission, Appendix

20, P.R. 172, C.R. 205.  In similar circumstances, Commerce has declined to rely on evidence

created for purposes of a proceeding to clarify the methodology used by sources of potential

benchmark prices.  *See Certain Softwood Lumber Products From Canada: Final Results of the*

*Countervailing Duty Administrative Review, 2019*, 86 Fed. Reg. 68,467 (Dep't Commerce Dec.

2, 2021), and accompanying Issues and Decision Memorandum, Comment 21; *Certain Softwood*

*Lumber Products From Canada: Final Results and Final Rescission, in Part, of the*

*Countervailing Duty Administrative Review, 2020*, 87 Fed. Reg. 48,455 (Dep't Commerce Aug.

9, 2022), and accompanying Issues and Decision Memorandum, Comment 20; *Certain Softwood*

*Lumber Products From Canada: Final Results and Final Rescission, in Part, of the*

*Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 50,103 (Dep't Commerce Aug.

1, 2023), and accompanying Issues and Decision Memorandum, Comment 17.  Thus, Commerce

reasonably declined to use JSC Apatit's weighted average for OECD Europe as the natural gas

benchmark.[13]  Remand Determination at 31.

_____

[13] JSC Apatit's submission of the OECD Europe gas prices sourced from IEA includes an "OECD Europe" average price and average tax.  JSC Apatit Rebuttal Benchmark Submission, Appendix 19, P.R. 172, C.R. 205.  While JSC Apatit claims in its comments to this Court that the "OECD Europe" price is a weighted average calculated based on consumption by IEA itself, JSC Apatit Remand Comments at 20, the "OECD Europe" total tax appears to be a simple average.  JSC Apatit fails to address this in its comments.

The Court should therefore affirm Commerce's calculation of the tier three benchmark for natural gas as reasonable, supported by substantial evidence, and otherwise in accordance with law.

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, Mosaic respectfully requests that the Court uphold Commerce's Remand Redetermination.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

</div>

Dated: December 15, 2025

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this submission complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 9,984 words.

<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>December 15, 2025</u>
(Date)