C-821-825
Remand
POR:  11/30/2020 – 12/31/2021
Slip Op. 26-10
**Public Document**
E&C/OVIII:  HW

*Archer Daniels Midland Company v. United States*
**Court No. 23-00239, Slip. Op. 26-10 (CIT February 6, 2026)**
**Phosphate Fertilizers from the Russian Federation**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (CIT or the Court) in *Archer Daniels Midland Company v. United States*.[1]  The final

results of redetermination concern the final results in the countervailing duty (CVD)

administrative review on phosphate fertilizers from the Russian Federation (Russia) covering the

period November 30, 2020, through December 31, 2021, as amended by Commerce's *First

Remand Results*.[2]  In the *First Remand Results*, Commerce provided further explanation for its

phosphate rock benchmark for the Provision of Mining Rights for Less than Adequate

Remuneration (LTAR) program,[3] and reconsidered and revised its benchmark for natural gas

purchases for the Provision of Natural Gas for LTAR program.[4]  In its *Second Remand Order*,

the CIT sustained in part, and remanded in part, Commerce's *First Remand Results* for

---

[1] *See Archer Daniels Midland Company v. United States*, CIT No. 23-00239, Slip Op. 26-10 (CIT February 6, 2026) (*Second Remand Order*).
[2] *See Phosphate Fertilizers from the Russian Federation:  Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 FR 76182 (November 6, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Final Results of Redetermination Pursuant to Court Remand, Archer Daniels Midland Company v. United States*, CIT No. 23-00239, Slip Op. 25-55 (CIT May 6, 2025), dated August 4, 2025 (*First Remand Results*), available at https://access.trade.gov/FinalRemandRedetermination.
[3] *See First Remand Results* at 4-11.
[4] *Id.* at 11-17.

reconsideration.  Specifically, the CIT sustained Commerce with respect to its construction of a tier-three benchmark for Joint Stock Company Apatit's (JSC Apatit) natural gas purchases in the natural gas for LTAR program, but directed Commerce to construct a tier-three benchmark to include world phosphate rock price data that was previously excluded solely based on the distinction between igneous and sedimentary phosphate ore for the Provision of Mining Rights for LTAR program.[5]

On April 9, 2026, Commerce released its Draft Results on the issue identified above.[6]  On April 14, 2026, the Mosaic Company (the petitioner), JSC Apatit, and Archer Daniels Midland Company (ADM) submitted timely filed comments on the Draft Results.[7]

As set forth in detail below, consistent with the CIT's *Second Remand Order*, we have constructed a tier-three benchmark to include world phosphate rock price data that was previously excluded solely based on the distinction between igneous and sedimentary ore.  Based on this analysis, we have revised the subsidy rate calculated for mandatory respondent JSC Apatit in the *First Remand Results*.[8]  We have addressed parties' comments regarding these issues and accordingly revised the subsidy rate calculated for mandatory respondent JSC Apatit in the *Final Results* with respect to the provision of mining rights for LTAR program.  Based on this analysis, we calculated that JSC Apatit did not receive a measurable benefit for the provision of mining rights for LTAR program, which results in a total *ad valorem* subsidy rate of 22.86 percent for JSC Apatit for the POR.

---

[5] *See Second Remand Order* at 12.

[6] *See* Draft Results of Redetermination Pursuant to Court Remand, *Archer Daniels Midland Company v. United States* Court No. 23-00239, Slip. Op. 26-10 (CIT February 6, 2026), dated April 9, 2026 (Draft Results).

[7] *See* Petitioner's Letter, "Petitioner's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated April 14, 2026 (Petitioner's Draft Remand Comments); JSC Apatit's Letter, "Joint Stock Company Apatit's Comments on Commerce's Draft Results of Redetermination Pursuant to Court Remand," dated April 14, 2026 (JSC Apatit's Draft Remand Comments); and ADM's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated April 14, 2026 (ADM's Draft Remand Comments).

[8] *See First Remand Results* at 33.

## II.    BACKGROUND

In the *Final Results*, Commerce determined the benefit for the Provision of Mining Rights for LTAR program in accordance with 19 CFR 351.511(a)(2), which sets forth the basis for identifying market-determined benchmarks to determine whether a government provides a good or service for LTAR.[9]  These potential benchmarks are listed in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).[10]  Consistent with the determination in the investigation segment of the proceeding,[11] Commerce relied on a tier three market principles analysis to determine the benefit under this program.[12]  Specifically, using the value of the phosphate rock produced as a proxy for the value of the underlying mining rights as a tier three market principles analysis, Commerce compared the value of the phosphate rock produced by JSC Apatit, using a calculated cost of production, plus profit, to a selected world benchmark price.  As an appropriate world benchmark price, Commerce relied on period of review (POR) export prices from Global Trade Atlas (GTA) for Finland, Brazil, and South Africa under Harmonized System (HS) codes 2510.10 and 2510.20.[13]

---

[9] *See Final Results* IDM at Comments 2g and 2j.
[10] *See* 19 CFR 351.511(a)(2).
[11] *See Phosphate Fertilizers from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76524 (November 30, 2020), and accompanying Preliminary Decision Memorandum (PDM) at 4, unchanged in *Phosphate Fertilizers from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 FR 9479 (February 16, 2021) (*Final Determination*), and accompanying IDM at Comment 2c.
[12] *See Final Results* IDM at Comments 2g and 2j; *see also* 19 CFR 351.511(a)(2)(iii).
[13] *See Final Results* IDM at Comment 2f.

In the *First Remand Order*, the CIT directed Commerce upon remand to: (1) either present record evidence showing that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or reconstruct the tier three benchmark for the Provision of Mining Rights for LTAR program; and (2) either clarify the two issues relating to the selection of a tier two benchmark for the Provision of Natural Gas for LTAR program or construct a tier three benchmark.[14] Commerce maintained its tier-three phosphate rock benchmark and cited record evidence demonstrating that the costs to produce phosphate rock from igneous and sedimentary ore reserves differ significantly.[15] Additionally, Commerce reconsidered its benchmark for JSC Apatit's natural gas purchases and found that the natural gas purchased by third parties was not comparable to the gas purchased by JSC Apatit, warranting the reliance on a tier-three natural gas benchmark.[16]

In the *Second Remand Order*, the CIT sustained certain aspects of Commerce's *First Remand Results*. However, the CIT remanded Commerce's benchmark selection for phosphate rock, stating that the selection was not supported by substantial evidence. Specifically, the CIT held that Commerce's analysis of the cost differences to produce phosphate rock from sedimentary versus igneous phosphate ore reserves, and the impact of these cost differences on the market, does not address the issue that prices, not costs *per se*, are the distinguishing factors for analyzing relevant conditions of purchase or sale.[17] The CIT explained that Commerce did not point to any record evidence that phosphate rock with similar bone phosphate of lime (BPL) levels produced from igneous and sedimentary ore reserves have different export prices. The CIT held that record evidence indicated that the BPL content of phosphate rock, not whether the

---

[14] *See Archer Daniels Midland Co. v. United States*, 779 F.Supp.3d 1349 (CIT 2025) (*First Remand Order*).
[15] *See First Remand Results* at 4-11.
[16] *Id.* at 11-17.
[17] *See Second Remand Order* at 10.

rock is produced from sedimentary or igneous ore, drives the prices in the phosphate rock market from whence the benchmark comes.[18]  Further, the CIT held that "on this record, Commerce's only remaining option in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore."[19]

Accordingly, based on the Court's decision, on March 20, 2026, Commerce provided parties an opportunity to submit new factual information (NFI) regarding the impact of the igneous and sedimentary phosphate rock distinction on global prices during the above-referenced administrative review so as to develop a more complete record on this distinction.[20]  On March 27, 2026, both Mosaic Company (Mosaic, or the petitioner) and JSC Apatit submitted NFI regarding whether phosphate rock with similar BPL levels produced from igneous and sedimentary ore reserves have different export prices, or that the difference between ore from igneous or sedimentary sources significantly impacts the world market price of beneficiated phosphate rock.[21]  On March 30, JSC Apatit filed rebuttal NFI and comments on Mosaic's NFI Letter.[22]

## III.    ANALYSIS

Consistent with the CIT's instructions in the *Second Remand Order*, Commerce has constructed a tier-three benchmark which includes world phosphate rock prices for countries that produce phosphate rock from igneous and sedimentary ore reserves, in accordance with 19 CFR

---

[18] *Id.* at 10-11
[19] *Id.* at 12.
[20] *See* Commerce's Letter, "Request for New Factual Information," dated March 20, 2026.
[21] *See* Petitioner's Letter, "Petitioner's Submission of New Factual Information," dated March 27, 2026 (Petitioner's NFI Letter); *see also* JSC Apatit's Letter, "Joint Stock Company Apatit's New Factual Information and Comments in Response to Commerce's Request," dated March 27, 2026 (JSC Apatit's NFI Letter).
[22] *See* JSC Apatit's Letter, "Joint Stock Company Apatit's Rebuttal New Factual Information and Comments in Response to Commerce's Request," dated March 30, 2026 (JSC Apatit's Rebuttal NFI Letter).

351.511(a)(2)(iii).  The CIT held that "on this record, Commerce's only remaining option in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore."[23]

In the *Final Results*, due to the lack of a viable benchmark for phosphate mining rights under a tier one or tier two analysis, we determined that it was appropriate to conduct a tier three analysis under 19 CFR 351.511(a)(2)(iii) by examining whether the provision of mining rights by the Government of Russia (GOR) is consistent with market principles.  In *Cold-Rolled Steel from Russia* and the investigation of this proceeding, we found it appropriate to conduct a benefit analysis based not on mining rights *per se*, but rather, on analyzing whether the value of the acquired underlying good via the mining rights was market-based.[24]  Because there is no government price charged to the respondent for either the phosphate mining rights or the underlying good, phosphate rock, tier one and tier two analyses are not available to make government price to market price comparisons and Commerce must rely on the costs incurred by JSC Apatit in a tier three analysis.  To do so, Commerce compares the constructed price of the underlying good that is conveyed via the mining rights, *i.e.*, phosphate rock, to a world market price for phosphate rock under a tier three analysis pursuant to 19 CFR 351.511(a)(2)(iii).[25]

Interested parties submitted NFI regarding whether phosphate rock with similar BPL levels produced from igneous and sedimentary ore reserves have different export prices, or whether the difference between ore from igneous or sedimentary sources significantly impacts the world market price of beneficiated phosphate rock.  In JSC Apatit's NFI submission, JSC

---

[23] *See Second Remand Order* at 12.
[24] *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 81 FR 49935 (July 29, 2016) (*Cold-Rolled Steel from Russia*), and accompanying IDM at 30; *see also Final Determination* IDM at Comment 2c.
[25] *Id.*

Apatit submitted:  market share information on phosphate rock imports,[26] information on phosphate rock importing companies,[27] phosphate rock import volumes into the European Union,[28] a contract between JSC Apatit and one of its customers,[29] phosphate rock quantity information from the International Fertilizer Association,[30] the original petition,[31] and data on global monthly phosphate rock pricing with shipping costs.[32]  JSC Apatit argues that this evidence demonstrates that, once BPL content is controlled for, the type of rock does not significantly impact world market prices.[33]  Additionally, JSC Apatit submitted rebuttal NFI to the Petitioner's NFI Letter,[34] in which it provided excerpts from the petitioner's Securities and Exchange Commission filings on phosphate rock[35] and bulk phosphate rock shipping information, both of which further demonstrate phosphate rock prices track grade-adjusted benchmarks rather than the type of rock,[36] as argued by JSC Apatit.  We find the evidence submitted by JSC Apatit to be consistent with the Court's ruling that BPL content "drives prices in the phosphate rock market from whence the benchmark comes."[37]  For example, in Appendix 4, JSC Apatit provided a contract between itself and one of its customers that demonstrates its own phosphate rock prices are negotiated using a reference Morocco phosphate rock price, with adjustments for phosphorus pentoxide ($P_2O_5$) content only, and without adjustments for igneous versus sedimentary origin.[38]

---

[26] *See* JSC Apatit's NFI Letter at Appendix 1.
[27] *Id.* at Appendix 2.
[28] *Id.* at Appendix 3.
[29] *Id.* at Appendix 4.
[30] *Id.* at Appendix 5.
[31] *Id.* at Appendix 6.
[32] *Id.* at Appendix 7.
[33] *Id.* at 3-4.
[34] *See* JSC Apatit's Rebuttal NFI Letter.
[35] *Id.* at Appendix 9.
[36] *Id.* at Appendix 10.
[37] *See Second Remand Order* at 11.
[38] *See* JSC Apatit's NFI Letter at Appendix 4.

In the Petitioner's NFI Letter, the petitioner submitted: research notes,[39] feasibility studies,[40] a declaration from the petitioner,[41] an investor presentation,[42] and a market explainer,[43] among other exhibits, all of which demonstrate igneous rock has an impact on phosphate rock pricing, according to the petitioner.[44] However, we find that this information does not sufficiently "demonstrate that the phosphate rock market price is significantly driven by the difference in beneficiation processes of sedimentary and igneous phosphate rock," as the Court described would make Commerce's limitation of the benchmark to igneous rock reasonable.[45] Although information in the Petitioner's NFI Letter further demonstrates that there are differences in costs to produce phosphate rock from igneous reserves compared to sedimentary reserves, the petitioner's NFI does not demonstrate that phosphate rock market prices are significantly driven by differences in the beneficiation processes of igneous and sedimentary ores.[46] For example, in Exhibit 2, the petitioner provided a "pricing outlook that compares the phosphate rock marginal cost of production for sedimentary rock producers vs. igneous rock producers, with igneous producers facing higher costs but also higher gross margins."[47] Further, Exhibit 5 is a declaration from the petitioner that describes differences in production costs and prices between igneous and sedimentary phosphate rock.[48] Although these exhibits provide

---

[39] *See* Petitioner's NFI Letter at Exhibit 1.

[40] *Id.* at Exhibit 2.

[41] *Id.* at Exhibit 5.

[42] *Id.* at Exhibit 6.

[43] *Id.* at Exhibit 7.

[44] *Id.* at 1-6.

[45] *See Second Remand Order* at 4.

[46] Citing pages 5-6 of the *First Remand Results*, the Court stated, "Commerce cited record evidence to support its argument that the production processes for phosphate rock from igneous and sedimentary ore reserves differ and, accordingly, the cost to produce each kind of rock differs." *See Second Remand Order* at 9-10. However, the Court ruled that "costs and profitability are not relevant for a tier-three, price-based benchmark if the price is driven by another factor. Thus, these are not relevant conditions of purchase or sale. Prices, not costs *per se*, are what is at issue." *Id.* at 10.

[47] *See* Petitioner's NFI Letter at 5 and Exhibit 2.

[48] *Id.* at 6 and Exhibit 5.

evidence of differences in costs to produce phosphate rock from the two types of reserves, they do not demonstrate that differences in the beneficiation processes of sedimentary and igneous phosphate ore significantly drive world market prices for phosphate rock.  We find no evidence, for example, of separate markets for buyers and sellers of igneous-origin and sedimentary-origin phosphate rock (*e.g.*, published prices for separate igneous-origin and sedimentary-origin markets).  Rather, the evidence provided by JSC Apatit, as described above, further demonstrates that BPL content is a driver of world market prices.

Accordingly, we are recalculating the benchmark without regard to igneous or sedimentary rock type.  Therefore, to determine the benefit pursuant to 19 CFR 351.511(a)(2)(iii), we are comparing the actual per-unit cost buildup of JSC Apatit's beneficiated phosphate rock to a world market price for phosphate rock with BPL content levels that are similar to the BPL content levels produced by JSC Apatit.  The petitioner provided IHS Markit's GTA and UN Comtrade export volume and value data under the HS categories 2510.10 and 2510.20 from countries known to export phosphate rock of a grade, measured by the percentage of BPL, which most closely corresponds to the BPL-based grade of Russian phosphate rock.[49] Consistent with the investigation, *Final Remand*,[50] and *Second Remand Order*, we are relying on the following POR export data for HS codes 2510.10 and 2510.20:  (1) IHS Markit's GTA export prices for Finland, Brazil, South Africa, and Iran; and (2) UN Comtrade export prices for

---

[49] *See Final Results* IDM at Comments 2g and 2j; *see also Final Determination* IDM at Comment 2e; and Petitioner's Letter, "Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration," dated March 15, 2023 (Petitioner's Benchmark Submission), at Exhibits 4 and 6.

[50] *See Final Determination* IDM at Comment 2c; *see also Final Results of Redetermination Pursuant to Court Remand*, *The Mosaic Company, Phosagro PJSC, JSC Apatit, Industrial Group Phosphorite LLC v. United States*, Consol. Court No. 21-00117 (CIT September 2, 2022) (*Final Remand 2022*), dated December 16, 2022 at 21-22, available at https://access.trade.gov/FinalRemandRedetermination.

Togo.[51]  To calculate this world market price for phosphate rock for the comparison under 19

CFR 351.511(a)(2)(iii), we did not exclude countries based on the distinction between igneous

and sedimentary ore reserves.[52]

To calculate the benefit, we compared the calculated per-unit cost buildup to the

benchmark per-unit price of phosphate rock, determined by using the world market benchmark

price for phosphate rock in 2021 by averaging certain 2021 export values for HS headings

2510.10 and 2510.20 from the IHS Markit's GTA data and UN Comtrade data.  We describe the

full methodology for calculating the per-unit cost buildup and benefit for JSC Apatit below.

Initially, starting with JSC Apatit's reported 2021 cost of sales for phosphate rock, we

added the total 2021 extraction taxes and environmental payments that JSC Apatit paid to the

GOR.[53]  The resulting figure is JSC Apatit's total cost of sales for phosphate rock.  Next, we

divided the total cost of sales (*i.e.*, the sum of the reported phosphate rock cost of sales,

extraction taxes, and environmental payments) by JSC Apatit's total reported quantity of

phosphate rock sold.  To calculate a 2021 profit ratio, we divided JSC Apatit's 2021 profit before

taxes for phosphate-based products by the 2021 total cost of sales for phosphate rock.[54]  We

multiplied the resulting profit ratio by the 2021 per-unit total cost of sales value.  The resulting

value is JSC Apatit's per-unit total cost of sales for phosphate rock plus profit.  Next, we

calculated a world market benchmark price for phosphate rock in 2021 by averaging 2021 export

---

[51] *See Final Determination* IDM at Comments 2e and 2g; *see also* Petitioner's Benchmark Submission at Exhibits 4 and 6; and Archer Daniels Midland Company's Letter, "Redacted ADM Case Brief," dated August 4, 2023, at 16-18 and Exhibits 1 and 2 (citing Petitioner's Benchmark Submission at Exhibits 4 and 6).

[52] *See Final Results* IDM at Comment 2g; *see also Second Remand Order* at 12.

[53] For a complete description of the per-unit cost buildup, *see Phosphate Fertilizers from the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020–2021*, 88 FR 28505, 28506 (May 4, 2023) (*Preliminary Results*), and accompanying PDM at 20; *see also* Memorandum, "Preliminary Results Calculations for JSC Apatit," dated April 27, 2023, at 7-8; *Final Results* IDM at 22-23 (describing a change to the profit ratio calculation from the *Preliminary Results*); and Memorandum, "Final Results Calculations for Joint Stock Company Apatit," dated October 31, 2023, at 2.

[54] *See Final Results* IDM at 22-23.

values for HS headings 2510.10 and 2510.20 from IHS Markit's GTA and UN Comtrade for Brazil, Finland, Iran, South Africa, and Togo.  We compared the difference between the per-unit phosphate rock benchmark price and the per-unit total cost of sales plus profit.

Other than the inclusion of sedimentary-origin phosphate rock from Iran and Togo in the benchmark prices, we made no other changes to the benefit calculation methodology for the program as described above and in the *Final Results* and *Final Remand*.[55]  On this basis, we find that JSC Apatit did not receive a measurable benefit under the Provision of Mining Rights for LTAR program during the POR.[56]

## IV.    INTERESTED PARTY COMMENTS

**Comment 1:  Construction of Tier 3 Benchmark for the Provision of Mining Rights for LTAR Program**

*ADM's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by ADM.  For further details, *see* ADM's Draft Remand Comments at 2-3.

> {Commerce}should affirm its draft remand results in its final remand results concerning the calculation of the tier-three benchmark used to measure the benefit, if any, provided by the Russian government's provision of phosphate mining rights for LTAR program.  The {petitioner} has failed to demonstrate that world market prices for phosphate rock are driven by the difference in the costs or in the beneficiation processes used to produce phosphate rock from sedimentary ore versus from igneous ore.  For that reason, {Commerce} correctly calculated the tier-three benchmark in the manner that ADM originally submitted in its Case Brief. Use of this benchmark demonstrates that JSC Apatit did not receive a countervailable subsidy.

---

[55] *Id.* at Comments 2g and 2j; *see also Final Remand 2022* at 21-22.
[56] *See* Memorandum, "Second Draft Remand Redetermination Calculations for Joint Stock Company Apatit," dated April 9, 2026 (Second Draft Remand Calculation Memorandum).

*JSC Apatit's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by JSC Apatit (internal citations omitted).  For further details, *see* JSC Apatit's Draft Remand Comments at 2-4.

Commerce should affirm and adopt the Second Draft Results of Redetermination in its final remand results.  Commerce's recalculated tier-three benchmark for the provision of mining rights for {LTAR} program implements the Court's remand instruction, is supported by substantial evidence, and is consistent with Commerce's regulations.

As Commerce found, after taking the unusual step of reopening the administrative record on remand and requesting {NFI}, demonstrating whether phosphate rock with comparable BPL/$P_2O_5$ levels produced from igneous and sedimentary reserves sold at significantly different prices during the POR, {petitioner} failed—once again—to demonstrate that the geological origin significantly drives world market prices.

Rather than submitting contemporaneous, market-based pricing evidence responsive to the Court's concerns, {petitioner} again advanced a cost- and value-in-use narrative premised on alleged differences between igneous and sedimentary phosphate rock.  This approach simply repackages the same cost-based theories and generalized assertions, as well as the same faulty "reasoning" already rejected by the Court.

As the Court has already held—and as {JSC Apatits} explained in its NFI and rebuttal submissions—cost differences and production theories cannot substitute for evidence of actual pricing behavior in the market.  When prices are demonstrably driven by another factor, such as grade, production costs are not "relevant conditions of purchase or sale" for purposes of a tier-three, price-based benchmark.

Critically, {petitioner} did not demonstrate that that phosphate rock of comparable BPL/$P_2O_5$ levels was sold at significant and systematically different prices due to its sedimentary or igneous characteristics.  Nor could it.  The flaws in this approach are detailed in JSC Apatit's Rebuttal NFI and JSC Apatit's NFI Submission.  Commerce therefore correctly rejected {petitioner}'s renewed attempt to justify the same geological distinction the Court had already found unsupported.

In contrast, the record evidence submitted by JSC Apatit unequivocally demonstrates that phosphate rock prices track grade-adjusted benchmarks rather than geological origin. As Commerce explained, that evidence includes: contemporaneous trade data showing overlapping sourcing of phosphate rock from igneous and sedimentary producers by the same buyers during the POR; contract evidence demonstrating that phosphate rock prices are negotiated using reference benchmark prices adjusted for $P_2O_5$/BPL content, without any adjustment for

12

igneous versus sedimentary origin; market and industry data confirming that phosphate rock is treated as fungible once specification requirements are met; evidence showing buyer behavior during the POR that is fundamentally inconsistent with Mosaic's claim that geological origin meaningfully affects pricing outcomes; and admissions in {petitioner}'s own public disclosures identifying $P_2O_5$ content—not geological origin — as the relevant industry benchmark

*Petitioner's Draft Remand Comments*

The following is a verbatim summary of arguments submitted by the petitioner (internal citations and business proprietary information (BPI) omitted).  For further details, *see* the Petitioner's Draft Remand Comments at 3-19.

While Commerce's tier three regulation, 19 CFR 351.511(a)(2)(iii), does not technically require it to do so, Commerce endeavors, to the extent possible, to "use benchmarks that are comparable to the government-provided good," so as to calculate subsidy rates "as accurately as possible."  The new information that {petitioner} submitted to the record explains in detail how prices for "marketable phosphate concentrates (*i.e.* phosphate ore after beneficiation) produced from igneous phosphate ore" are of higher quality and are higher priced than those produced from sedimentary ore  The record also shows that, contrary to {Commerce}'s findings in the *Draft Remand Results*, there are separate markets and separate buyers and sellers of phosphate rock of igneous and sedimentary origin.  Purchasers of igneous phosphate rock are willing to pay a premium because it is higher quality and lower cost to process into downstream products.

Moreover, the record as supplemented on remand confirms that export prices for igneous origin phosphate rock are significantly higher than sedimentary-origin rock, even when controlled for phosphate content (measured by {BPL} or phosphorous pentoxide ($P_2O_5$)).  Finally, {Commerce}'s flawed approach in the Draft Remand Results unreasonably results in a comparison with sedimentary rock prices that are {BPI omitted} igneous rock.  This comparison effectively measures differences between the cost to produce sedimentary versus igneous rock, not the adequacy of remuneration JSC Apatit paid for its phosphate mining rights.  The record shows that the igneous phosphate rock {BPI omitted} is higher cost to produce than sedimentary phosphate rock, but it is also higher value because of the higher quality and lower cost to process into fertilizer.  {Commerce}'s cost buildup methodology takes into account the higher cost of producing igneous rock.  But its decision to include sedimentary prices in the benchmark distorts the benefit calculation, because it ignores the fact that there are significant price differences between sedimentary and igneous rock, and that these price differences reflect the significant differences in rock production costs and the higher quality and higher value to the purchaser of igneous rock.  In this case, the result is to eliminate completely the benefit that JSC Apatit receives from its mining rights, which is

13

plainly unreasonable.  For all of these reasons, {Commerce} should revert to its prior approach of only including igneous-origin rock prices in the benchmark.

**Commerce's Position:**

In Commerce's Draft Results, we complied with the Court's remand in the *Second Remand Order* to construct a tier-three benchmark to include world phosphate rock price data that was previously excluded solely based on the distinction between igneous and sedimentary ore.[57]  We continue to find in our analysis of the record evidence, including the additional submissions of NFI by interested parties during this remand proceeding, that BPL content of phosphate rock, not whether the rock is produced from sedimentary or igneous ore, drives the overall prices in the phosphate rock market from whence the benchmark comes.

The petitioner continues to argue that the record shows igneous-origin phosphate rock is higher quality than sedimentary-origin phosphate rock and commands a price premium because of it.[58]  Specifically, rather than focusing on the differences in costs of beneficiation of phosphate ore to phosphate rock between igneous and sedimentary rock and the resultant effects on the market price, the petitioner argues that the NFI on the record confirms that lower levels of impurities in igneous-origin rock create a quality distinction between igneous-origin and sedimentary-origin phosphate rock, and that igneous phosphate rock can command a higher market price because it contains little or no organic materials and thus is cheaper to refine into concentrate than sedimentary phosphate rock.[59]  However, the Court has already addressed these cost-based and production theories, as stated in the *Second Remand Order*:

> {C}osts and profitability are not relevant for a tier-three, price-based benchmark if the price is driven by another factor.  Thus, these are not relevant conditions of purchase or sale.  Prices, not costs *per se*, are what is at issue.  If the BPL content

---

[57] *See Second Remand Order* at 12.
[58] *See* Petitioner's Draft Remand Comments at 7-8.
[59] *Id.* at 7.

14

of beneficiated rock drives the world market prices, then only difference in BPL content matters in selecting a benchmark.[60]

The Court further went on to state that in the *First Remand Results* and the parties' briefings focused "on the relative costs to beneficiate igneous and sedimentary ore, but never get to the core issue,"[61] this core issue being, the primary driver for the price of phosphate rock. The Court then notes the focus of the mining rights for LTAR program is on phosphate rock rather than phosphate ore:

> The record evidence indicates that the BPL content of phosphate rock, not whether the rock is produced from sedimentary or igneous ore, drives the prices in the phosphate rock market from whence the benchmark comes. If the product at issue were phosphate ore, then the costs of beneficiating igneous and sedimentary rock could impact the price for the ore. But the benchmark product is not ore—it is phosphate rock.[62]

The petitioner argues that the NFI placed on the record demonstrates that the cost differences between igneous and sedimentary rock refinement into phosphorous concentrate, due to the requirement for a greater amount of sulfuric acid in processing the sedimentary rock that contains more impurities, results in purchasers of igneous rock paying a price premium for igneous rock.[63] However, we continue to find that record evidence points to BPL content as the primary driver of price, and further find that if there is evidence of a price premium as proposed by the petitioner, that such a premium is based on a cost narrative that has already been rejected by the Court. Additionally, even if there is evidence of a price premium on igneous-origin rock based upon the cost of refinement, record evidence demonstrates it does not preclude a purchaser of phosphate rock to alternatively source sedimentary-origin phosphate rock, if such a price is competitive with igneous-based phosphate rock or is of a similar BPL grade. Moreover, there is

---

[60] *See Second Remand Order* at 10.
[61] *Id.*
[62] *Id.* at 11-12.
[63] *See* JSC Apatit's NFI Letter at 3 and 4.

insufficient information on the record to substantiate that the differences in cost of production in the refinement of igneous and sedimentary rock results in fertilizer producers' payment of price premiums for igneous rock that makes its market and pricing distinct from that of sedimentary rock such that sedimentary rock prices are not comparable to igneous rock for Commerce's benchmarking purposes.

As noted in the analysis section, JSC Apatit provided a contract between itself and one of its customers that demonstrates its own phosphate rock prices are negotiated using a reference Morocco phosphate rock price, with adjustments for $P_2O_5$ content only, and without adjustments for igneous versus sedimentary origin.[64]  The petitioner argues that that there are adjustments to the price in the contract that is consistent with price indices demonstrative of a price premium; however, the contract does not provide any descriptive indicator that an actual adjustments to the contract are made due to the igneous rock type.[65]  The petitioner argues that such an omission should not matter, and instead notes that "price indices routinely published by industry publications do not explicitly reference "igneous" or "sedimentary" is immaterial; it is undisputed that Russian phosphate rock is known to be of igneous origin and Moroccan phosphate rock of sedimentary origin."[66]  Here, we see no reason to deviate from our analysis in the Draft Results.  In addition to the record evidence from the phosphate rock purchase contract cited above, the record shows published prices of phosphate rock based on BPL level (*e.g.*, "{free on board (Fob)} Egypt (66 {BPL})," "{cost and freight (Cfr)} Southeast Asia (57-61

---

[64] *Id.* at Appendix 4.

[65] *See* Petitioner's Draft Remand Comments at 13-14.

[66] *Id.* at 14.  Although the petitioner argues that the lack of explicit references to "igneous" or "sedimentary" is immaterial, the record shows that Morocco exported phosphate rock ranging from "65% BPL and under" to "78% BPL and over" during the POR.  *See* JSC Apatit's Letter, "JSC Apatit's Benchmark Data Submission," dated March 15, 2023, at Appendix 9.  This information demonstrates that the igneous versus sedimentary ore distinction does not correspond directly to specific BPL ranges of beneficiated phosphate rock.

{BPL})").[67]  No party, however, has cited evidence of separate published prices for phosphate rock based on the igneous versus sedimentary ore distinction (*e.g.*, "Cfr Southeast Asia, Sedimentary Ore").  Therefore, we do not find record evidence demonstrating that the geological origin of phosphate ore drives world market prices for beneficiated phosphate rock.  Rather, record evidence demonstrates the commercial reality of the price being driven by BPL/$P_2O_5$ content.[68]

The petitioner also argues that there are "separate markets and separate buyers and sellers of phosphate rock of igneous and sedimentary origin."[69]  Again, we find there is insufficient record evidence to support such a finding.  As explained above, published prices for phosphate rock based on BPL level are on the record, but published prices based on the igneous versus sedimentary rock distinction are not.  The petitioner points to a feasibility study for a phosphate rock project and export prices on the record that it argues shows a price premium even when controlling for the BPL content of the phosphate rock.[70]  However, we note that there is insufficient evidence in those prices, some of which are speculative in nature,[71] of a consistent price premium that is exclusively related to the purity of the phosphate rock, rather than other factors such as the percentage range of BPL in the sedimentary phosphate rock,[72] to determine if the price is actually driven by the geological origin of the rock.  Furthermore, the BPL levels cited, while similar, are not identical ranges.[73]

---

[67] *See* JSC Apatit's Rebuttal NFI Letter at Appendix 10.

[68] *See, e.g.,* Petitioner's NFI Letter at Exhibit 2.

[69] *See* Petitioner's Draft Remand Comments at 8-9.

[70] *Id.* at 12-13 (citing Petitioner's NFI Letter at Exhibits 2 and 5).

[71] *See, e.g.* Petitioner's NFI at Exhibits 2, 3, 6.  While Commerce does recognize that supporting evidence may come from non-contemporaneous sources, we note that feasibility studies, consultant reports, internal assertions, and project-level economics that are price speculative in nature are less indicative of market-representative conditions as we give greater credence to contemporary pricing data and contracts.

[72] Petitioner's Draft Remand Comments at 8-9.

[73] *Id.*

As an additional example, historical phosphate rock import data from Global Trade Tracker (GTT) for Norway, Romania, and Lithuania, [74] three countries with major phosphate fertilizer industries, demonstrates the lack of support for separate markets based on the geological origin of phosphate ore.[75] The data shows imports of both sedimentary and igneous-origin phosphate rock varying substantially over the course of a single year, in some instances being entirely sedimentary-origin phosphate rock imports one year and then entirely igneous-origin phosphate rock imports the next.[76]

The petitioner then argues that separate buyers and sellers of igneous versus sedimentary rock exist with regard to specialty markets, such as purified phosphoric acid and the nitro phosphate markets.[77] Again, this fails to address the issue that such phosphate rock is still interchangeable, as long as the BPL/ $P_2O_5$ level and price for the purity of the phosphate rock are useable. A purchaser *may* prefer purer/higher quality phosphate rock but will still purchase based on the price and BPL content of the beneficiated phosphate rock rather than geological origin of said rock. Moreover, the evidence on the record does not sufficiently demonstrate that the fertilizer market, in particular, is willing to pay a price premium for igneous rock with fewer impurities for refining. While certain of the petitioner's evidence indicates that there are specialized segments of the phosphate rock market willing to pay a premium price for fewer impurities in igneous rock, the record, including market and pricing data, does not reach the conclusion that the fertilizer market and world prices paid by producers of phosphate fertilizers

---

[74] *See* JSC Apatit's NFI Letter at Appendix 1.

[75] *Id.* Appendix 2.

[76] *Id.* (*e.g.* GTT import data showed Romania imported exclusively from sedimentary phosphate rock sources in 2012 and then imported exclusively from igneous phosphate rock sources in 2013. While that being the starkest example in the GTT import data, a pattern exists between all three countries that igneous and sedimentary import shares vary year-per-year.).

[77] *See* Petitioner's Draft Remand Comments at 9.

are affected by this premium.[78]  For example, the Lac a Paul Market Due Diligence report submitted on the record by the petitioner notes:

> Acid production is ultimately dictated by the $P_2O_5$ content of the rock purchased. Fundamentally, therefore, a buyer of rock will pay a higher price for a higher P2o5 content…The key question is this:  will the market accord a higher value to Lac a Paul's rock reflecting other aspeics of its quality? In general, there are two reasons why a chemical plant will be willing to pay a premium over and beyond the P2O5 value of a higher grade ore.  These are:
>
> - They may save directly identifiable variable processing costs such as acid; and/or
> - They may secure a higher rate of thoroughput, thereby spreading quasi-fixed processing costs such as labor and maintenance over a greater volume of acid; and/or
> - They may be able to make a higher quality acid that in turn can be sold for a premium price in specialized markets.
>
> {The author} considers at this stage of the Lac a Paul project, the latter source of value is too speculative to be taken into account.  We note that 88 percent of the demand for phosphate rock is for fertilizer applications where higher purity *is not valued* {emphasis added}.

Fundamentally, in order for Commerce to conclude that the greater processing cost from phosphate rock to phosphoric concentrate results in a price premium fertilizer producers pay for igneous rock, the record evidence must conclude that either fertilizer producers are not indifferent to the type of rock purchased, or that the high-purity igneous rock market affects the remainder of the igneous rock market such that there is always a premium for the purchase of igneous rock.  We cannot fully make either of these conclusions from the record as it stands.

Further record evidence shows that fertilizer-grade phosphate rock is regularly traded and transported as a bulk commodity, which supports the interchangeability of phosphate rock.[79]

---

[78] *See*, *e.g.*, JSC Apatit's NFI Letter at Appendix 3, showing phosphate rock import volumes into the European Union during 2021 coming from a variety of sedimentary and igneous origin sources with no clear preference that would normally be reflected with a price premium; *see also, e.g.*,  Petitioner's NFI Letter at Exhibit 7, where despite a direct comparison of igneous phosphate rock and sedimentary phosphate rock, the only mention of a price premium is with regard to high-grade vs low-grade phosphate rock (*i.e.* $P_2O_5$ content).
[79] *See* JSC Apatit's Rebuttal NFI Letter at Appendix 10.

19

The petitioner argues that the price premium is due in part to impurities found in sedimentary rock that are not present in igneous rock, regardless of BPL content, and thus, to produce the same amount of fertilizer, purchasers require additional quantities of sedimentary phosphate rock for refining compared to igneous phosphate rock.[80]  A seller of igneous-origin phosphate rock must still set a price relative to the price of less pure but equally usable sedimentary-origin phosphate rock.

Furthermore, we find the petitioner's comments about the erasure of benefits for the mining rights for LTAR program with the new benchmark to be misplaced.  The petitioner notes that the ultimate purpose of constructing a tier three benchmark is to measure the benefit that the respondent received from subsidized phosphate mining rights.[81]  The petitioner argues that by including this revised phosphate rock benchmark, Commerce "fully erased the benefits JSC Apatit received under the mining rights for LTAR program."[82]  We find that this argument has no impact on the tier three benefit analysis for the program.  Due to the lack of a viable benchmark for phosphate mining rights under a tier one or tier two analysis, we conducted a tier three analysis under 19 CFR 351.511(a)(2)(iii) by examining whether the GOR's provision of mining rights is consistent with market principles.[83]  We found it appropriate to conduct a benefit analysis based not on mining rights *per se*, but rather, on analyzing whether the value of the acquired underlying good *via* the mining rights was market-based.[84]  Accordingly, pursuant to 19 CFR 351.511(a)(2)(iii), we compared world market prices for the underlying good that is conveyed via the mining rights, *i.e.*, phosphate rock, to JSC Apatit's cost buildup for

---

[80] *See* Petitioner's NFI Letter at 3-4 and Exhibit 2.
[81] *See* Petitioner's Draft Remand Comments at 17-18.
[82] *Id.* at 19.
[83] *See Final Results* IDM at Comments 2g and 2j.
[84] *Id.*; *see also Final Determination* IDM at Comment 2c.

beneficiated phosphate rock.[85]  Under this tier three analysis, we have not "fully erased" the benefits JSC Apatit received under the program.  Rather, the absence of a benefit is a result of comparing world market prices for the underlying good that is conveyed via the mining rights to JSC Apatit's cost buildup for beneficiated phosphate rock, based on data available on the record.

Lastly, to address ADM's comments regarding the inclusion of Togo but not Iran to recalculate the tier-three benchmark for phosphate rock,[86] we state in the analysis section above, as we did previously in the Draft Results, that we included both Togo and Iran in the benchmark.[87]

For the reasons explained above, we are modifying the benchmark for the phosphate mining rights for LTAR program to include sedimentary rock from Togo and Iran.  We do not find evidence on this record demonstrating that phosphate rock market prices are significantly driven by the difference in beneficiation processes of sedimentary and igneous phosphate rock, which is the standard described by the Court that would make limiting the benchmark to igneous rock reasonable.[88]  We emphasize, however, that we are basing this determination solely on information available on the record.  Although evidence on this record demonstrates that BPL content drives world market prices for phosphate rock, this does not preclude the possibility of additional evidence demonstrating that other factors may also drive world market prices.  This would include, *e.g.*, evidence demonstrating that differences in the underlying costs to produce beneficiated phosphate rock from the two types of ore (*i.e.*, igneous and sedimentary) are significant drivers of world market prices for phosphate rock.

---

[85] *See Final Results* IDM at Comments 2g and 2j.
[86] *See* ADM's Draft Remand Comments at 2.
[87] *See* Draft Results at 9 and 10.
[88] *See Second Remand Order* at 4.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the CIT's *Second Remand Order*, we have constructed a tier-three benchmark to include world phosphate rock price data that was previously excluded solely based on the distinction between igneous and sedimentary ore.  Based on this analysis, we revised the subsidy rate calculations for the mandatory respondent JSC Apatit in the *First Remand Results*. If the CIT affirms these final results of redetermination, we intend to issue a notice of the Court's decision[89] and of amended final results, which will include the revised CVD rate for the POR covering November 30, 2020, through December 31, 2021, as listed in the chart below.

| Company | Subsidy Rate in *First Remand Results*[90] (percent *ad valorem*) | Subsidy Rate in Second Draft Remand Redetermination[91] (percent *ad valorem*) |
|---|---|---|
| JSC Apatit | 49.64 | 22.86 |

5/6/2026

X _Chris J. Abbott_ (signature)

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  Performing the non-exclusive functions and duties
  of the Assistance Secretary for Enforcement and Compliance

---

[89] In its decision in *Timken*, as clarified by *Diamond Sawblades*, the U.S. Court of Appeals for the Federal Circuit held that, pursuant to section 516A(e) of the Act, Commerce must publish a notice of a court decision not "in harmony" with a Commerce determination and must suspend liquidation of entries pending a "conclusive" court decision.  *See Timken Co.* v. *United States,* 893 F.2d 337, 341 (Fed. Cir. 1990); *see also Diamond Sawblades Mfrs. Coalition* v. *United States,* 626 F.3d 1374 (Fed. Cir. 2010).
[90] *See First Remand Results* at 14.
[91] *See* Second Draft Remand Calculation Memorandum.