**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| **ARCHER DANIELS MIDLAND COMPANY,** | |
| **Plaintiff,** | |
| **JOINT STOCK COMPANY APATIT,** | |
| **Plaintiff-Intervenor, and Consolidated Plaintiff,** | |
| **THE MOSAIC COMPANY,** | |
| **Consolidated Plaintiff,** | |
| **v.** | **Consol. Court No. 23-00239** |
| **UNITED STATES,** | <u>**NON-CONFIDENTIAL VERSION**</u> |
| **Defendant,** | |
| **THE MOSAIC COMPANY,** | **Confidential Information Removed from Pages i, 1, 7-8, 10, 12-13, 15-28** |
| **Defendant-Intervenor, and Consolidated Defendant-Intervenor,** | |
| **JOINT STOCK COMPANY APATIT,** | |
| **Consolidated Defendant-Intervenors.** | |

<u>**THE MOSAIC COMPANY'S COMMENTS IN OPPOSITION TO COMMERCE'S**</u>
<u>**SECOND REMAND REDETERMINATION**</u>

<div align="right">

David J. Ross
Stephanie E. Hartmann
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

</div>

Dated: June 5, 2026                              *Counsel for The Mosaic Company*

**Consol. Court No. 23-00239**                    **NON-CONFIDENTIAL VERSION**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   COMMERCE'S DECISION TO include PRICES FOR SEDIMENTARY-
      ORIGIN PHOSPHATE ROCK IN THE TIER THREE BENCHMARK IS
      UNREASONABLE, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND
      OTHERWISE NOT IN ACCORDANCE WITH LAW ...................................... 1

      A.    Commerce Misinterpreted the Court's Instructions As Dictating the
            Outcome of Its Benchmarking Methodology ......................................... 1

      B.    Commerce's Decision is Unsupported by the Record Evidence ........................... 5

      C.    Commerce's Flawed Decision to Include Iranian and Togolese
            Sedimentary-Origin Rock Prices Is Unreasonable Because It Results in a
            Benchmark **[                              ]** JSC Apatit's **[                              ]** ............. 26

III.  CONCLUSION ................................................................................................ 29

**Consol. Court No. 23-00239**                    **NON-CONFIDENTIAL VERSION**

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**Cases**

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................10

*In re NuVasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016) ..........................................................21, 23

*Mosaic Co. v. United States*, 589 F. Supp. 3d 1298 (CIT 2022) ......................................................6

*Nucor Corp. v. United States*, 633 F. Supp. 3d 1302 (CIT 2023)....................................................6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................................17

**Administrative Materials**

*Certain Softwood Lumber Products From Canada: Final Results and Rescission,*
*in Part, of the Countervailing Duty Administrative Review; 2023*, 90 Fed.
Reg. 38,755 (Dep't Commerce Aug. 12, 2025), and accompanying Issues
and Decision Memorandum...........................................................................................28, 29

**Consol. Court No. 23-00239**                    NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic")

respectfully submits these comments in opposition to the U.S. Department of Commerce's Final

Results of Redetermination Pursuant to Court Remand.  Final Results of Redetermination

Pursuant to Ct. Remand (May 6, 2026), P.2.R.R. 1, ECF No. 112 ("Second Remand

Determination"); *The Mosaic Company v. United States*, Consol. Ct. No. 23-00239, Slip Op. 26-

10 (CIT Feb. 6, 2026), ECF No. 108 ("*Second Remand Order*").  Commerce's Second Remand

Determination is contrary to law and unsupported by substantial evidence because Commerce

failed to account for record evidence that fairly detracts from the reasonableness of its conclusion

that sedimentary-origin phosphate rock is comparable to igneous-origin phosphate rock and that

the sedimentary vs. igneous distinction does not drive world market prices for beneficiated

phosphate rock.  Commerce's inclusion of sedimentary-origin prices from Iran and Togo is also

arbitrary and unreasonable because those prices are **[          ]** JSC Apatit's **[**

**]** phosphate rock, resulting in the absurd conclusion that the mining rights the

Government of Russia ("GOR") provides to JSC Apatit **[          ]** are of no value.  The Court

should hold Commerce's Second Remand Determination unreasonable, unsupported by

substantial evidence, and otherwise not in accordance with law and remand for reconsideration.

## II.    COMMERCE'S DECISION TO INCLUDE PRICES FOR SEDIMENTARY-ORIGIN PHOSPHATE ROCK IN THE TIER THREE BENCHMARK IS UNREASONABLE, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

### A.    Commerce Misinterpreted the Court's Instructions As Dictating the Outcome of Its Benchmarking Methodology

As a threshold matter, Mosaic respectfully submits that Commerce's initial analysis of

the comparability of igneous-origin and sedimentary-origin phosphate rock based on, *inter alia*,

**NON-CONFIDENTIAL VERSION**

differences in production costs was lawful and supported by substantial evidence on the record.
As Commerce has explained, "the aim of {the} benefit calculation pursuant to 19 CFR
351.511(a)(2)(iii) for the mining rights program in this proceeding is to isolate JSC Apatit's costs
for phosphate ore mining and beneficiation activities."  Draft Results of Redetermination
Pursuant to Court Remand at 7 (June 18, 2025), P.1.R.R. 1 ("*First Draft Remand Results*").
Commerce has reasonably found that, because the Department's benefit analysis focuses on JSC
Apatit's costs to mine and process phosphate ore into phosphate rock, differences in production
costs are highly relevant to the comparability of benchmark prices.  *See id.*  The record contains
substantial evidence of the significant differences in the production processes used to beneficiate
ore from sedimentary and igneous deposits, and in turn the associated costs to produce
sedimentary versus igneous phosphate rock.

In the *Second Remand Order*, the Court found that costs and profitability are not relevant
"if the price is driven by another factor."  *Second Remand Order* at 10.  The Court stated further
that "Commerce has not cited evidence that the difference between ore from igneous or
sedimentary sources significantly impacts the world market price of beneficiated phosphate
rock."  *Id*.  The Court also stated that "{i}f the product at issue were phosphate ore, then the
costs of beneficiating igneous and sedimentary rock could impact the price for the ore.  But the
benchmark product is not ore – it is phosphate rock."  *Id.* at 11-12.  The Court concluded, "on
this record, Commerce's only remaining option . . . is to include world phosphate rock price data
that was previously excluded solely on the distinction between igneous and sedimentary ore."
*Id.* at 12.

On remand, Commerce exercised its discretion to re-open the record and provided parties
an opportunity to submit new factual information on this core question of how differences

between igneous and sedimentary-origin rock drive price differences.  Second Remand Determination at 5.  Mosaic, JSC Apatit, and Archer Daniels Midland Co. ("ADM") submitted new factual information.  Mosaic letter, "Phosphate Fertilizers From the Russian Federation: Petitioner's Submission of New Factual Information," dated Mar. 27, 2026, P.2.R.R. 18-19, C.2.R.R. 11-13 ("Mosaic NFI Submission"); ADM letter, "Response and Objection of the Archer Daniels Midland Company to the Department's March 20, 2026 Request for New Factual Information," dated Mar. 27, 2026, P.2.R.R. 17, C.2.R.R. 10 ("ADM NFI Submission"); JSC Apatit letter, "Phosphate Fertilizers from the Russian Federation: Joint Stock Company Apatit's New Factual Information and Comments in Response to Commerce's Request," dated Mar. 27, 2026, P.2.R.R. 13-16, C.2.R.R. 4-9 ("JSC Apatit NFI Submission").

Commerce nonetheless stated that it was following this Court's instruction to include sedimentary-origin prices in the benchmark because the Court "held that 'on this record, Commerce's only remaining option in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore.'"  Second Remand Determination at 5-6.  However, as Mosaic explained in its comments on the draft remand, the Court instructed Commerce to reconsider whether there is evidence that the difference between ore from igneous versus sedimentary sources significantly impacts the world market price of beneficiated phosphate rock.  *Second Remand Order* at 10. The Court did not dictate that Commerce must include the sedimentary-origin prices in the benchmark regardless of what the record evidence shows.

Commerce also stated that the new information Mosaic submitted "does not sufficiently 'demonstrate that the phosphate rock market price is significantly driven by the difference in beneficiation processes of sedimentary and igneous phosphate rock,'" which Commerce

characterized as what "the Court described would make Commerce's limitation of the benchmark to igneous rock reasonable." Second Remand Determination at 8. But here again Commerce mischaracterizes the Court's opinion. The passage Commerce quoted is from page 4 of the *Second Remand Order*, where the Court summarized its holding in the *First Remand Order*. *Second Remand Order* at 4. In the *Second Remand Order*, the Court instructed Commerce to reconsider whether there is any evidence that differences between ore from igneous and sedimentary sources significantly impact world market prices for beneficiated phosphate rock. *See Second Remand Order* at 10.

The Court stated explicitly that it does not consider evidence of differences in the beneficiation processes or costs thereof to be relevant, stating "{i}f the product at issue were phosphate ore, then the costs of beneficiating igneous and sedimentary rock could impact the price for the ore. But the benchmark product is not ore – it is phosphate rock." *Id.* at 11-12. Thus, Commerce's conclusion that the record "do{es} not demonstrate that differences in the beneficiation processes of sedimentary and igneous phosphate ore significantly drive world market prices for phosphate rock," *see* Second Remand Determination at 8-9, elides the Court's instructions and fails to grapple with the core question of whether there is any *other* evidence that the distinction between sedimentary and igneous origin rock drives market prices for beneficiated phosphate rock.

As explained below, there is substantial evidence on the record, as supplemented on remand, that directly addresses the Court's concerns. Commerce failed to meaningfully address this new evidence showing how purchasers of beneficiated phosphate rock factor the significant differences in quality and their *own* processing costs (*i.e.*, the costs they incur in producing the downstream products they produce from phosphate rock) in valuing sedimentary vs. igneous-

origin phosphate rock. These errors render the Second Remand Determination unsupported by substantial evidence and not in compliance with the Court's *Second Remand Order*.

### B.    Commerce's Decision is Unsupported by the Record Evidence

After erroneously finding that it had no option other than to include the sedimentary-origin prices for Togo and Iran in the benchmark, Commerce summarized the new factual information that JSC Apatit and Mosaic submitted regarding whether the difference between ore from igneous or sedimentary sources significantly impacts world market prices for beneficiated phosphate rock. Second Remand Determination at 6-8. Commerce found that the evidence JSC Apatit submitted is "consistent with the Court's ruling that BPL content 'drives prices in the phosphate rock market from whence the benchmark comes.'" *Id.* at 7. Commerce then found the evidence Mosaic submitted "does not sufficiently 'demonstrate that the phosphate rock market price is significantly driven by the difference in beneficiation processes of sedimentary and igneous phosphate rock….'" *Id.* at 8. Commerce also stated "{w}e find no evidence, for example, of separate markets for buyers and sellers of igneous-origin and sedimentary-origin phosphate rock (*e.g.*, published prices for separate igneous-origin and sedimentary-origin markets)." *Id.* at 9. As explained below, Commerce's analysis of the record evidence is superficial and fails to articulate a rational connection between the facts and the conclusions drawn. Commerce also unlawfully disregarded evidence that fairly detracts from the substantiality of the evidence it relied upon. The Court should remand for reconsideration.

### 1.    Commerce unlawfully disregarded evidence that the sedimentary vs. igneous distinction significantly impacts market prices for phosphate rock.

As Commerce has explained, the ultimate purpose of constructing a tier three benchmark is to measure the benefit that JSC Apatit, the only company respondent in this review, received

from its subsidized phosphate mining rights.  Final Results of Redetermination Pursuant to Court Remand (Aug. 4, 2025), P.1.R.R. 11, ECF No. 90 ("First Remand Determination") at 10.  The tier three benchmark regulation does not prescribe any particular benchmark calculation methodology – as the Court and Commerce agree – and Commerce therefore has discretion to make a reasonable methodological choice.  *See Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (CIT 2023); *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1314 (CIT 2022).  Commerce endeavors, to the extent possible, to "use benchmarks that are comparable to the government-provided good," so as to calculate subsidy rates "as accurately as possible."  First Remand Determination at 5 (citations omitted).  Commerce has also explained that, because it is using phosphate rock prices in the tier three analysis as a proxy for the value of the underlying mining rights, and comparing the prices to JSC Apatit's per-unit cost buildup to produce beneficiated phosphate rock, it is "appropriate to put significant weight on the question of whether the production processes and precise costs used in JSC Apatit's cost of production buildup are comparable to a benchmark market price for beneficiated phosphate rock produced from the same type of ore reserves."  First Remand Determination at 10-11.

The fact that JSC Apatit (or "Apatit" as ADM refers to it) produces phosphate rock from igneous deposits is central to Commerce's analysis and benchmark selection.  Igneous-origin ore is called "apatite," or "apatite concentrate."  *See* Mosaic Letter, "Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration," dated Mar. 15, 2023, P.R. 132-141 ("Mosaic Benchmark Submission"), Exhibit 19 at 337.  The record shows that phosphate sourced from sedimentary deposits has a completely different mineral composition, *i.e.*, is not

"apatite."[1] *See id.*, Exhibit 19. JSC Apatit's questionnaire responses, annual reports, and other documents prepared in the ordinary course of business, consistently refer to its production of "apatite" or "apatite concentrate." *See* Mosaic Letter, "New Subsidy Allegations," dated Oct. 14, 2022, P.R. 87-92, C.R. 159-164 ("Mosaic New Subsidy Allegation"), Exhibit 28 (PhosAgro 2020 Annual Report) at 88 ("The Kirovsk branch of Apatit reached stable annual production of more than 10.5 mln t of apatite concentrate."); JSC Apatit letter, "JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission," dated Mar. 27, 2023, P.R. 170-172, C.R. 202-205 ("JSC Apatit Rebuttal Benchmark Submission"), Appendix 17 at 34 ([


]). JSC Apatit's own case brief provided proposed benchmark data for "{e}xports of countries with {i}gneous deposits, with similar <u>apatite</u> ore or rock BPL %." JSC Apatit letter, "Resubmission of Case Brief," dated Aug. 4, 2023, P.R. 228, C.R. 225 ("JSC Apatit Case Brief"), Appendix 2 (emphasis added). Thus, the product that JSC Apatit actually produces from its government-provided mining rights is "apatite."

Commerce's decision in the Second Remand Determination suffers from a fundamental flaw, which is the finding that igneous and sedimentary phosphate rock are "interchangeable" "as long as the BPL/P2O5 level and price for the purity of the phosphate rock are usable." Second Remand Determination at 18. Commerce made this finding for the first time in the Second

---

[1] An expert report prepared by the respondents similarly describes igneous-origin and sedimentary-origin phosphate rock as having a "completely different type of mineralization":

> A report on the record by Dr. Graham A. Davis, Professor Emeritus of Mineral Economics at the Colorado School of Mines, states, "These Russian phosphate mining licenses are igneous deposits in the Arctic Circle....Their bonuses cannot be compared with...bonuses in Jordan, *which are for a completely different type of mineralization (sedimentary)*." The report continues by stating that sedimentary deposits in Jordan "{do} not have the same value as the Russian ore."

First Remand Determination at 6 (emphasis original) (citations omitted).

**Consol. Court No. 23-00239**                                  **NON-CONFIDENTIAL VERSION**

Remand Determination, and this finding is directly contradicted by the record evidence.[2]  JSC

Apatit's own expert report states that "sedimentary deposits in Jordan . . . are problematic . . .

because the ore deposit, once developed, does not have the same value as the Russian ore.

Jordan's phosphate concentrates are so different from the concentrate produced from the licenses

owned by EuroChem and PhosAgro *that they cannot be used in their fertilizer production given

the plants' current metallurgical configurations.*"  JSC Apatit letter, "JSC Apatit's Benchmark

Data Submission," dated Mar. 15, 2023, P.R. 142-155, C.R. 178-191 ("JSC Apatit Benchmark

Submission"), Appendix 7 at 37 (emphasis added).  In other words, contrary to Commerce's

finding, igneous and sedimentary-origin beneficiated phosphate rock are not interchangeable to

fertilizer producers, including most critically for *the only company respondent in this

proceeding*.

The record contains extensive evidence explaining the differences between igneous

deposits that consist of "apatite" – which again is what JSC Apatit produces, hence its name –

and sedimentary deposits that consist of "varieties of carbonate-fluorapatite that are collectively

called as {*sic*} francolite" and also contain "non-phosphatic accessory minerals" such as "quartz,

clay and carbonates (calcite and dolomite)," and how those differences affect the value of the

beneficiated rock and rock prices.  Mosaic Benchmark Submission, Exhibit 19 at 337.  There is

---

[2] Commerce did not cite any record evidence in support of this finding on page 18 of its decision.  On the following page, Commerce stated "record evidence shows that fertilizer-grade phosphate rock is regularly traded and transported as a bulk commodity, which supports the interchangeability of phosphate rock."  Second Remand Determination at 19 (citing JSC Apatit's Rebuttal NFI letter at Appendix 10).  Commerce again does not analyze what this evidence is.  Regardless, the fact that two products are both transported via bulk freight (*i.e.*, via ocean vessel or rail car) does not make them interchangeable.  Indeed, JSC Apatit's own contract with [       ] contains detailed [

].  JSC Apatit NFI Submission, Appendix 4, [          ].  This evidence fairly detracts from the reasonableness of Commerce's conclusion that phosphate rock of igneous and sedimentary origin is interchangeable simply because fertilizer-grade rock is transported in bulk.

an entire chapter of Prof. Ptáček's book on the record that describes the "two main kinds of phosphate rock deposits in the world" as sedimentary ore and igneous ore.  Mosaic Benchmark Submission, Exhibit 19.  Prof. Ptáček's book also describes the "major associated gangue materials," which are impurities or undesired elements found in phosphate deposits.  Mosaic Benchmark Submission, Exhibit 20 at 383-384.  Commerce itself has cited Prof. Ptáček's[3] book as explaining that "{m}any sedimentary phosphate deposits contain mixtures of undesired constituents."  First Remand Determination at 6 (citing Mosaic Benchmark Submission, Exhibit 20 at 384).  The record clearly shows that igneous-origin deposits have lower levels of these unwanted elements – some of which *cannot be removed* during the beneficiation process – which explains why beneficiated phosphate rock of igneous origin is higher-value and higher-priced. *See* Mosaic NFI Submission, Exhibit 5.

Mosaic's NFI submission provided additional evidence explaining that igneous-origin rock is higher quality than sedimentary-origin rock because of the low levels of unwanted impurities, and that it therefore commands a price premium even when controlling for phosphate content (measured by bone phosphate of lime ("BPL") or phosphorous pentoxide (P2O5) levels). Exhibit 1 of Mosaic's NFI submission explains that both ore *and* beneficiated rock produced from sedimentary ore have higher levels of unwanted minor elements.  Mosaic NFI Submission, Exhibit 1.  In Exhibit 2 of Mosaic's NFI submission, the expert report from Integer compares OCP's sedimentary rock from Morocco with Foskor's igneous rock from South Africa and PhosAgro's igneous rock from Kola, Russia.  Mosaic NFI Submission, Exhibit 2, Appendix 2 at 27-28.  It states "{t}he PhosAgro price (Kola) is by far the highest achieved price amongst the

---

[3] As Commerce has noted, Prof. Ptáček is an Assistant Professor at the Institute of Materials Chemistry and a Senior Researcher at the Materials Research Centre of Brno University of Technology in the Czech Republic.  First Remand Determination at 6 n.28 (citing Mosaic Benchmark Submission at 5 and Exhibit 22).

BUSINESS PROPRIETARY
INFORMATION REMOVED

grades of rock" and that "Kola rock is able to command this premium" because it "is igneous, and it therefore contains little or no organic materials" and that "{a}s Kola rock is igneous, this means heavy metal content is low, especially cadmium, mercury and arsenic content." *Id.* at 27.

Exhibit 3 of Mosaic's NFI submission is a fertilizer industry report from **[            ]** which states that **[**

**].** Mosaic NFI

Submission, Exhibit 3 at 5 (emphasis added). Exhibit 4 of Mosaic's NFI submission is a **[**

**].** Mosaic NFI

Submission, Exhibit 4. It also states that **[**

**]** *Id.* at 15. Commerce unlawfully failed to address any of this evidence, which "fairly detracts" from the substantiality of the evidence it relied upon. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

In addition to resting on an unsupported finding of interchangeability, Commerce's decision erroneously conflates interchangeability and substitutability, as two products that may technically be interchangeable may nonetheless exhibit limited substitutability due to price differences. The core question the Court instructed Commerce to address is whether the sedimentary vs. igneous distinction is a significant driver of export prices, which is a function of their substitutability. Mosaic submitted multiple pieces of evidence that explain in detail how purchasers of beneficiated phosphate rock consider the quality and cost to process sedimentary vs. igneous-origin phosphate rock into downstream products and the impact on phosphate rock

prices. *See* Mosaic letter, "Petitioner's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated Apr. 14, 2026, P.2.R.R. 4, C.2.R.R. 1 ("Mosaic Comments on Draft Remand") at 5-12. Commerce's claim that "the Court has already addressed these cost-based and production theories" is wrong, because Commerce's Second Remand Determination confuses the upstream costs of producing the rock (*i.e.*, beneficiation costs, which the court was addressing) with the downstream processing costs that purchasers of phosphate rock incur (which the court did not address). *See* Second Remand Determination at 14. While the Court stated that evidence of *beneficiation* costs is not probative of whether the igneous vs. sedimentary distinction impacts phosphate *rock* prices,[4] the Court's reasoning allows that evidence of differences in *downstream processing costs* of igneous vs. sedimentary phosphate rock *are* relevant to phosphate rock prices.

The CRU report attached to Exhibit 2 of Mosaic's NFI submission explains how purchasers of beneficiated phosphate rock value rock of different quality and geological origin based on the economics of the process to convert the beneficiated phosphate rock to phosphoric acid. Mosaic NFI Submission, Exhibit 2, Appendix 1 at 85-87. It states that purchasers of beneficiated phosphate rock negotiate "penalties" for impurities that increase their processing costs "to compensate for" the cost of removing unwanted minor elements such as iron, alumina, and magnesium. *Id.* at 85. The CRU report also explains that "there are two reasons why a chemical plant will be willing to pay a premium over and beyond the P2O5 value of a higher grade ore," which are: (1) "they may save on directly identifiable variable processing costs such as acid"; and (2) "they may secure a higher rate of throughput, thereby spreading quasi-fixed

---

[4] *Cf. Second Remand Order* at 11-12 ("If the product at issue were phosphate ore, then the costs of beneficiating igneous and sedimentary rock could impact the price for the ore. But the benchmark product is not ore – it is phosphate rock.").

BUSINESS PROPRIETARY
INFORMATION REMOVED

Case 1:23-cv-00239-JAR   Document 116   Filed 06/05/26   Page 15 of 33

Consol. Court No. 23-00239                    NON-CONFIDENTIAL VERSION

processing costs such as labor and maintenance over a greater volume of acid." *Id.* at 87.

According to the CRU report, "the most important cost impact . . . relates to sulphuric acid

whose consumption is also determined by the rock quality, specifically the ratio of CaO {calcium

oxide} to P2O5 {phosphate}." *Id.* at 84.

The CRU report provides a sample calculation of how a purchaser of beneficiated

phosphate rock would assess their cost to upgrade beneficiated phosphate rock to phosphoric

acid, comparing the rock purchaser's cost differences if the purchaser buys sedimentary-origin

rock vs. igneous-origin rock. *Id.* at 84-85. Specifically, CRU provides a comparison of OCP's

sedimentary phosphate rock from Morocco to igneous-origin rock from a project in Lac a Paul,

Canada as follows:

> To make standard grade {merchant grade acid} at 53% and 100% recovery, we need 1.36
> tonnes of Lac a Paul Rock compared with 1.66 tonnes of Moroccan rock. That rock
> contains 0.71 tonnes of calcium which consume 1.24 tonnes of sulphuric acid. The
> figures for Moroccan rock are 0.85 tonnes of calcium and 1.48 tonnes of sulphuric acid.
> Therefore, the consumer saves 0.25 tonnes of sulphuric acid for each tonne of phosphoric
> acid produced. Expressed in terms of Lac a Paul's {igneous} rock, this is an acid savings
> of 0.18t/t.

*Id.* at 84-85. Mosaic confirmed that the additional processing and byproduct management costs

of utilizing sedimentary-origin rock as opposed to igneous-origin rock (of the same BPL content)

results in approximately **[        ]** higher cost per unit of phosphoric acid produced. *See* Mosaic

NFI Submission, Exhibit 5.

The CRU report concludes that "Lac a Paul {igneous} concentrates will sell at a

substantial premium over the benchmark Morocco export rock due to it {*sic*} higher P2O5

content and its lower acid consumption requirements." Mosaic NFI Submission, Exhibit 2,

Appendix 1 at 86-87. CRU estimated that Lac a Paul igneous rock would command a price

premium of almost 50% higher than Moroccan sedimentary rock. *Id.* at 95. In other words,

BUSINESS PROPRIETARY INFORMATION REMOVED

**Consol. Court No. 23-00239**                                    NON-CONFIDENTIAL VERSION

CRU – which is a reputable industry publication and source of global prices for phosphate rock and fertilizer – concluded that purchasers of beneficiated phosphate rock would be willing to pay a price premium of 50% for igneous-origin rock as compared to sedimentary-origin rock, due to the superior quality and lower cost of processing igneous rock.  Mosaic itself estimated that beneficiated phosphate rock of igneous origin typically commands a **[          ]** price premium as compared to beneficiated phosphate rock of sedimentary origin and the same BPL content. Mosaic NFI Submission, Exhibit 5.

Commerce acknowledged that "certain of {Mosaic's} evidence indicates that there are specialized segments of the phosphate rock market willing to pay a premium price for fewer impurities in igneous rock," but nonetheless found that "the record, including market and pricing data, does not reach the conclusion that the fertilizer market and world prices paid by producers of phosphate fertilizers are affected by this premium."  Second Remand Determination at 18-19. The only data Commerce cites in support of this assertion are import volumes into the European Union in 2021, *see id.* at 19 n.78, which, as discussed below, have no associated prices and thus do not support Commerce's finding that the price premium for igneous-origin rock does not affect fertilizer producers.

Commerce also stated that "in order for Commerce to conclude that the greater processing cost from phosphate rock to phosphoric concentrate results in a price premium fertilizer producers pay for igneous rock, the record evidence must conclude that either fertilizer producers are not indifferent to the type of rock purchased, or that the high-purity igneous rock market affects the remainder of the igneous rock market such that there is always a premium for the purchase of igneous rock.  We cannot fully make either of these conclusions from the record as it stands."  Second Remand Determination at 19.  As support, Commerce cited a statement in

the CRU report attached to Exhibit 2 of Mosaic's NFI submission which notes that "88 percent of the demand for phosphate rock is for fertilizer applications where higher purity *is not valued*." *id.* at 19.[5]  In context, it is clear this statement is referring to the third bullet listed above the quoted sentence, which states "they {meaning downstream chemical plants} may be able to make a higher quality acid that in turn can be sold for a premium price in specialized markets." Mosaic NFI Submission, Exhibit 2, Appendix 1 at 87.

The "higher purity" or "higher quality acid" referenced here is "purified" phosphoric acid ("PPA"), which is a different downstream product not used in the production of phosphate fertilizers. *See id.* at 83.  The potential use of igneous-origin rock to make PPA is only one of the three reasons CRU identifies for why a purchaser would be willing to pay a premium for igneous-origin rock above and beyond the BPL or $P_2O_5$ content. *See id.*  No reasonable mind would conclude that evidence of other specialized end uses for igneous-origin rock (such as to make PPA) would preclude the agency from drawing conclusions about how the igneous vs. sedimentary distinction impacts fertilizer producers.  Indeed, Commerce's finding that it could not make conclusions as to whether the sedimentary vs. igneous distinction impacts fertilizer producers is fundamentally at odds with the weight of the record evidence, including the evidence Mosaic submitted regarding itself, JSC Apatit, and Yara, another phosphate fertilizer producer.  Mosaic NFI Submission, Exhibit 2, Appendix 2; Exhibit 3; Exhibit 4; Exhibit 5.

---

[5] Fertilizer producers generally use the phosphoric acid they produce to make phosphate fertilizers.  Commerce also ignored that there is a footnote following the passage Commerce cited which states "{w}hat is critically important in agricultural applications is that there are extremely low levels of any toxic residuals in the product."  Mosaic NFI Submission, Exhibit 2, Appendix 1 at 87 n.1.  As explained above, the levels of unwanted, toxic elements that cannot be removed through processing is a key differentiator between sedimentary and igneous-origin rock.  Thus, a reasonable mind would not conclude the CRU report supports the conclusion that fertilizer producers are indifferent to the sedimentary vs. igneous distinction.

The Integer report attached to Exhibit 2 of Mosaic's NFI submission describes the two major end uses of igneous-origin rock as purified phosphoric acid (PPA) and nitrophosphate (NP) (a type of fertilizer), which is "the largest potential market for high-grade igneous phosphate rock" and concentrated in Northwest Europe.  Mosaic NFI Submission, Exhibit 2, Appendix 2 at 25-26.  It also states that "{t}he largest single use for high grade phosphate rock in Europe is production of NP/NPK," *i.e.*, two types of phosphate fertilizers, "via the nitrophosphate process, which is more sensitive to rock quality than processes using sulphuric acid. . . .  Yara is the biggest producer of such fertilizer and its own phosphate rock production in Finland" – which is of igneous origin – "is not sufficient to cover its requirements entirely," so it imports Russian-origin igneous rock.  *Id.* at 20.  The [                    ] in Exhibit 4 to Mosaic's NFI Submission also [

                                                                ].  Mosaic NFI Submission, Exhibit 4.  As discussed below, the contract that JSC Apatit placed on the record is [          ], and it confirms that [

                        ].

JSC Apatit itself markets its igneous-origin rock as containing low levels of heavy metals such as cadmium and markets its igneous-origin rock as superior to sources of sedimentary-origin rock for purposes of fertilizer production:

**Heavy metals, such as cadmium, are particularly dangerous to humans.**

 Due to the application of fertilizers containing high cadmium levels, this toxic element accumulates in soils and transfers from the soil to people through the food chain. Cadmium is particularly dangerous to human health. High levels of heavy metals in the human body can lead to serious immune-system deficiencies and can also cause cancer.

 To maintain healthy soils and uphold the general trend towards a healthy lifestyle, the EU intends to cap cadmium levels in phosphate fertilizers at 60 mg/kg of $P_2O_5$. Some countries have already introduced more drastic caps on cadmium levels.

 Today in Europe, phosphate products with a high cadmium content (from 20-60 mg/kg $P_2O_5$ and above) account for almost 40% of total consumption**.



< 60 mg/kg $P_2O_5$ – in 2022

**Cd content in phosphate rock in different countries**

| Country | Russia | Morocco | USA | Jordan | China | Tunisia | Mexico |
|---|---|---|---|---|---|---|---|
| Rock type | Igneous | Sedimentary | | | | | |
| Cd, mg/kg $P_2O_5$ | <0.3 | 40-122 | 25-114 | 15-19 | <7-9 | 136 | 13,3 |

JSC Apatit Section III of Initial Questionnaire Response, dated Sept. 23, 2022, ("JSC Apatit IQR"), Exhibit 4 at 10 P.R. 61, C.R. 32. PhosAgro's annual report states that the "phosphate rock mined on the Kola Peninsula boasts exceptional purity" "thanks to its magmatic origin" and describes its reserves as "high-quality apatite-nepheline ore from igneous rock deposits." Mosaic New Subsidy Allegation, Exhibit 28 at 22, 28. PhosAgro's annual report also states that Apatit's Kirovsk branch mines, beneficiates, and processes apatite-nepheline ore "which is unique in terms of its environmental friendliness and safety," and is "of igneous origin, and so {does} not have concentrations of toxic heavy metals." *Id.* at 90. Exhibit 5 to Mosaic's NFI Submission states that "beneficiated phosphate of igneous origin typically commands a [

] price premium as compared to beneficiated phosphate rock of sedimentary origin of the same BPL content." Mosaic NFI Submission, Exhibit 5.

This evidence clearly shows that fertilizer producers both buying and selling igneous phosphate rock take into account the sedimentary vs. igneous distinction, and that fertilizer producers that purchase igneous phosphate rock are affected by the price premium igneous-origin rock commands. The substantial evidence standard requires Commerce to take into account whatever in the record fairly detracts from its conclusions. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The Court should therefore remand to Commerce again for reconsideration.

> **2. Commerce's decision is unsupported because Commerce ignored the evidence of actual price differences between sedimentary and igneous-origin rock.**

The Court criticized Commerce's first remand redetermination for not "point{ing} to any significant record evidence that phosphate rock with similar BPL levels produced from igneous and sedimentary ore reserves have different export prices." *Second Remand Order* at 11. In the Second Remand Determination, Commerce found there was insufficient evidence of how the sedimentary vs. igneous distinction impacts export prices, based largely on two pieces of evidence. Commerce relies largely on the fact that industry reports do not use the words "sedimentary" and "igneous" in the titles or captions of published price indices or "publish{}" prices for separate igneous-origin and sedimentary-origin markets." *See* Second Remand Determination at 9, 16-18. As a threshold matter, and as Mosaic pointed out in its comments on Commerce's draft remand, it is immaterial that certain industry sources do not include the words "sedimentary" and "igneous" in the titles of published price indices, alongside the country names and BPL levels. It is well understood in the market that igneous-origin rock is only produced in

a handful of countries, namely Russia, South Africa, Brazil, and Finland.  *See* Mosaic NFI

Submission, Exhibit 1.  As noted above, JSC Apatit markets its igneous-origin rock as superior

to sedimentary-origin rock because of lower levels of unwanted heavy metals such as cadmium.

JSC Apatit IQR, Exhibit 4 at 10. JSC Apatit also used countries as a proxy for sedimentary or

igneous sources in the data Commerce relied upon.  JSC Apatit NFI Submission, Appendix 1.

Further, the record also contains industry reports that do explicitly reference igneous rock

prices or the igneous market and distinguish sedimentary prices.  For example, Exhibit 3 to

Mosaic's NFI submission describes **[**

**]**.  Mosaic NFI Submission, Exhibit 3 at 5.  Exhibit 4 to

Mosaic's NFI submission is a fertilizer industry report from **[          ]** that describes the **[**

**]** as distinct from the market for sedimentary rock:[6]  **[**

**]**.  *Id.*  And in any event,

Commerce fails to explain why it is necessary to find there are separate markets for sedimentary-

origin and igneous-origin beneficiated phosphate rock in order to conclude that the igneous vs.

sedimentary distinction has a significant impact on export prices.

---

[6] Mosaic NFI Submission, Exhibit 4 at 9-10.

BUSINESS PROPRIETARY
INFORMATION REMOVED

Commerce unlawfully ignored substantial evidence on the record, including information *submitted by the respondents*, that proves the sedimentary vs. igneous distinction has a significant impact on export prices for phosphate rock, even when controlled for BPL content. ADM and JSC Apatit submitted prices reported by CRU and other industry publications. *See* ADM NFI Submission, Attachment; JSC Apatit NFI Submission, Appendix 7. While ADM submitted its CRU data for **[**

**]**, JSC Apatit submitted raw data **[                              ]** in Appendix 7 to its new factual information submission. These data show that export prices for Russian igneous-origin rock were between **[                              ]** than the Togolese sedimentary-origin rock of purportedly comparable BPL **[**

---

[7] **[**

**]**.

BUSINESS PROPRIETARY INFORMATION REMOVED

**Consol. Court No. 23-00239**                                         **NON-CONFIDENTIAL VERSION**

]

*See* Mosaic Comments on Draft Remand at 15-17.

- 20 -

BUSINESS PROPRIETARY INFORMATION REMOVED

**Consol. Court No. 23-00239**                                    NON-CONFIDENTIAL VERSION

The Integer report attached to Exhibit 2 of Mosaic's NFI also compares the export prices of Moroccan sedimentary rock to the United States to export prices of igneous rock from Russia and South Africa.  Integer concludes that the latter have "much higher value per unit" and that "{e}ven when adjusted for higher P2O5 content of igneous rock (typically 39% compared with 30-32% for most sedimentary rock), the igneous price is higher than sedimentary rock due to higher purity."  Mosaic NFI Submission, Exhibit 2, Appendix 2 at 16.  Commerce also failed to address this evidence, which fairly detracts from the reasonableness of its conclusions.

Instead, Commerce cited the new factual information that JSC Apatit submitted and stated it found this evidence to be "consistent with the Court's ruling that BPL content 'drives prices in the phosphate rock market from whence the benchmark comes.'"  Second Remand Determination at 7.  Commerce provided no explanation of what this evidence is, or how it supports the conclusion that only BPL content and not also the type of rock drives export prices.  *See id.*  In fact, none of the evidence that JSC Apatit submitted includes export prices, except for Appendix 7, which are the raw pricing data discussed above that show that export prices for Russian igneous-origin rock were **[                              ]** than the export prices for Togolese sedimentary-origin rock of purportedly comparable BPL.  Commerce did not analyze these data in the Second Remand Determination, simply stating that the data are "global monthly phosphate rock pricing with shipping costs."  Second Remand Determination at 7.  Commerce thus failed to provide a reasoned explanation that "examine{s} the relevant data and articulate{s} a satisfactory explanation for its action," including making "a rational connection between the facts found and the choice made."  *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Consol. Court No. 23-00239                    NON-CONFIDENTIAL VERSION

If Commerce had analyzed the data in JSC Apatit's Appendix 7, it would have found that

JSC Apatit did not identify any BPL levels in its summary table, which is limited to sources of

sedimentary-origin rock:

| Average of AVG, USD/sUoM Row Labels | CY 2021 Column Labels M01 | M02 | M03 | M04 | M05 | M06 | M07 | M08 | M09 | M10 | M11 | M12 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALGERIA | 58 | 60 | 61 | 65 | 66 | 66 | 73 | 75 | 76 | 76 | 85 | 89 | 71 |
| fob | 58.29166667 | 60.16666667 | 60.5 | 65.46666667 | 66 | 66 | 72.9 | 74.91666667 | 75.83333333 | 75.83333333 | 85.33333333 | 89 | 70.85347222 |
| EGYPT | 52 | 53 | 51 | 58 | 59 | 60 | 65 | 66 | 66 | 69 | 91 | 92 | 66 |
| fob | 52.16666667 | 52.66666667 | 50.9 | 57.96 | 58.775 | 59.9 | 65.24 | 65.85 | 66.2 | 68.8 | 91.25 | 92.4 | 66.08705357 |
| JORDAN | 95 | 95 | 99 | 108 | 111 | 124 | 130 | 134 | 138 | 138 | 149 | 156 | 123 |
| fob | 94.5 | 94.5 | 98.84375 | 107.875 | 110.84375 | 123.6875 | 130.25 | 134.0625 | 137.875 | 137.875 | 149.3125 | 155.5 | 122.9270833 |
| MOROCCO | 92 | 96 | 100 | 110 | 120 | 127 | 137 | 146 | 149 | 155 | 164 | 176 | 131 |
| fob | 92.25 | 96.4375 | 99.75 | 110.225 | 120.3125 | 126.875 | 136.5666667 | 145.71875 | 149.125 | 155 | 164.46875 | 176.25 | 131.0815972 |
| PERU | 70 | 71 | 71 | 77 | 77 | 77 | 85 | 86 | 87 | 87 | 99 | 105 | 83 |
| fob | 70 | 70.625 | 71.25 | 76.75 | 76.75 | 76.75 | 84.75 | 86 | 87.25 | 87.25 | 99.375 | 105 | 82.64583333 |
| SYRIA | 51 | 51 | 51 | 56 | 56 | 56 | 58 | 58 | 58 | 58 | 73 | 73 | 58 |
| fob | 51 | 51 | 51 | 55.5 | 55.5 | 55.5 | 58 | 58 | 58 | 58 | 72.5 | 73 | 58.04166667 |
| TOGO | 87 | 87 | 87 | 91 | 91 | 91 | 104 | 104 | 104 | 104 | 128 | 128 | 100 |
| fob | 87 | 87 | 87 | 91 | 91 | 91 | 104 | 104 | 104 | 104 | 127.5 | 127.5 | 100.4166667 |
| Grand Total | 75.35 | 76.75 | 75.54 | 82.93 | 85.83 | 89.99 | 97.18 | 100.36 | 102.15 | 103.98 | 118.31 | 123.30 | 94.61 |

JSC Apatit NFI Submission, Appendix 7. Thus, these data could not possibly support

Commerce's conclusion that only BPL content drives phosphate rock export prices.[8]

Commerce similarly failed to provide a reasoned explanation of its analysis of the data

that JSC Apatit submitted in Appendix 1 to its new factual information, which Commerce

described as "market share information on phosphate rock imports." Second Remand

Determination at 7. These data are global trade statistics – specifically, GTT import data for

Norway, Romania, and Lithuania and data on phosphate rock import volumes into the European

Union by all trading partners in 2021 – that Commerce cited as showing a purported pattern of

imports of both sedimentary and igneous-origin phosphate rock. Second Remand Determination

at 18, 19 n.78. However, these data lack the corresponding import values, so they could not

possibly support Commerce's conclusions that the sedimentary vs. igneous distinction does not

---

[8] If Commerce had looked at the raw data in JSC Apatit's Appendix 7, it would have found there is [

]. This evidence
fairly detracts from the reasonableness of Commerce's conclusion that Togolese sedimentary-origin phosphate rock
is comparable to Russian igneous-origin phosphate rock and can serve as a benchmark price.

- 22 -

drive export prices and that fertilizer producers are not affected by the price premium for igneous rock.

Commerce claims these data show "no clear preference that would normally be reflected with a price premium." *Id.* at 19 n.78. This is not a reasoned explanation, and it does not satisfy Commerce's obligation to articulate a "rational connection between the facts found and choice made." *In re NuVasive, Inc.*, 842 F.3d at 1382 (quoting *State Farm*, 463 U.S. at 43). Rather, Commerce's conclusion rests on a series of unsupported assumptions, *i.e.*, that it is the same buyers and sellers in these countries (or the entirety of the EU) for both types of rock, or that if there are import flows of both types of rock, then buyers do not have a preference. There is no evidence on the record to support these assumptions. The GTT and EU data are not transaction-level data and they do not identify the buyers and sellers. Further, JSC Apatit only provided the import quantities, not the associated values. *See* JSC Apatit NFI Submission, Appendix 1. Thus, these data are not probative at all to the core question of whether the sedimentary vs. igneous distinction affects export prices for phosphate rock.

Commerce also cited a contract between JSC Apatit and one of its customers, which JSC Apatit characterized as demonstrating that its phosphate rock prices are negotiated using a reference Moroccan phosphate rock price, with adjustments for phosphorous pentoxide ($P_2O_5$) content only, and without adjustments for igneous vs. sedimentary origin. Second Remand Determination at 7 (citing JSC Apatit's NFI Submission, Appendix 4); *id.* at 16. However, JSC Apatit's description of [                    ] in this contract is false.

The [

- 23 -

BUSINESS PROPRIETARY
INFORMATION REMOVED

**]**

JSC Apatit NFI Submission, Appendix 4.  This **[**

**]** shows that, even with an adjustment for differences in P2O5 content, Russian igneous rock

**[                                                    ]** than Moroccan sedimentary rock, consistent

with the CRU and Integer reports' estimation of the **[                        ]** for igneous-origin rock

as compared to Moroccan sedimentary rock.  *See, e.g.*, Mosaic NFI Submission, Exhibit 2,

Appendix 2 at 27-28.

Mosaic called JSC Apatit's mischaracterization of the contract to Commerce's attention

in its comments on the draft remand.  Mosaic Comments on Draft Remand at 13-14.  However,

instead of grappling with the import of the fact that JSC Apatit's *own contract* demonstrates that

purchasers **[                                        ]** as compared to sedimentary rock, Commerce

argued that "the record shows published prices of phosphate rock based on BPL level (*e.g.*,

'{free on board (Fob)} Egypt (66 {BPL}),' '{cost and freight (Cfr)} Southeast Asia (57-61

**Consol. Court No. 23-00239**                                    NON-CONFIDENTIAL VERSION

{BPL})'" and that "{n}o party . . . has cited evidence of separate published prices for phosphate rock based on the igneous versus sedimentary ore distinction (*e.g.*, "Cfr Southeast Asia, Sedimentary Ore")." Second Remand Determination at 16-17. But this proves nothing, because the industry is well aware of the fact that igneous-origin rock is only produced in Russia, South Africa, Brazil, and Finland, so it would be superfluous to state that rock from Southeast Asia (for example) is sedimentary origin. *See* Mosaic NFI Submission, Exhibit 1.

Similarly, the fact that the contract **[                    ]** does not explicitly reference "igneous" or "sedimentary" also proves nothing, because the contract **[**

**]**. JSC Apatit NFI Submission, Appendix 4, Clause 1. It is indisputable that Russian phosphate rock is igneous origin, and Moroccan phosphate rock of sedimentary origin, and no party to this proceeding has argued otherwise. *See, e.g.*, Mosaic NFI Submission, Exhibit 1; *id.*, Exhibit 3 at 5 (**[**

**]**); *id.*, Exhibit 2, Appendix 2 at 27-28 (same). As noted above, JSC Apatit markets its phosphate rock as igneous-origin and contrasts its igneous-origin beneficiated phosphate rock with phosphate rock of sedimentary sources.[9] *See* JSC Apatit IQR, Exhibit 4 at 10.

For all of these reasons, Commerce's conclusion that "we do not find record evidence demonstrating that the geological origin of phosphate ore drives world market prices for beneficiated phosphate rock," Second Remand Determination at 17, is unsupported by the record. The Court should remand to Commerce for reconsideration.

---

[9] Commerce argued in response to this point that the record shows that Morocco exported phosphate rock with a wide range of BPL levels during the POR and that "{t}his information demonstrates that the igneous versus sedimentary ore distinction does not correspond directly to specific BPL ranges of beneficiated phosphate rock." Second Remand Determination at 16 n. 66. But this is precisely Mosaic's point – the market does not distinguish between sedimentary and igneous rock solely on the basis of BPL content, as **[                    ]**.

**Consol. Court No. 23-00239**                                      **NON-CONFIDENTIAL VERSION**

C.      **Commerce's Flawed Decision to Include Iranian and Togolese Sedimentary-Origin Rock Prices Is Unreasonable Because It Results in a Benchmark [                        ] JSC Apatit's [                        ]**

As noted above, Commerce has explained that the ultimate purpose of constructing a tier three benchmark is to measure the benefit that the respondents receive from their subsidized phosphate mining rights.  First Remand Determination at 10.  Commerce has also explained that, because it is using phosphate rock prices in the tier three analysis as a proxy for the value of the underlying mining rights, and comparing the prices to JSC Apatit's per-unit cost buildup to produce beneficiated phosphate rock, it is "appropriate to put significant weight on the question of whether the production processes and precise costs used in JSC Apatit's cost of production buildup are comparable to a benchmark market price for beneficiated phosphate rock produced from the same type of ore reserves." *Id.* at 10-11.  JSC Apatit does not receive beneficiated phosphate rock from the GOR, it receives phosphate mining rights and more specifically rights to mine igneous ore.

Any benchmark comparison that fails to account for differences in the production processes and market prices of igneous versus sedimentary phosphate rock does not accurately measure the benefit of the subsidy JSC Apatit receives from its igneous mining rights.  Here, the record as supplemented on remand shows that sedimentary-origin phosphate rock has a lower cost of production and is significantly lower-priced than igneous-origin phosphate rock.  *See* Mosaic NFI Submission, Exhibit 2, Appendix 2 at 47-48.  Indeed, the prices for Togolese and Iranian sedimentary-origin beneficiated phosphate rock that Commerce included in the benchmark are [

].  *Compare* Second Draft Remand Redetermination Calculations for JSC Apatit (Apr. 9, 2026), P.2.R.R. 7-8, C.2.R.R. 2-3 ("*Final Remand Results*, Calculations Memo.")  at

- 26 -

BUSINESS PROPRIETARY
INFORMATION REMOVED

Att. 1 ([

]), *with id.*, Att. 2 ([

]).  This result is arbitrary and unreasonable because it fails to account for the substantial record evidence of significant differences in the production processes and costs to mine and beneficiate sedimentary vs. igneous-origin rock.  By including these prices for non-comparable phosphate rock in the benchmark, Commerce is not measuring the adequacy of remuneration paid for mining rights but rather differences in production costs for sedimentary vs. igneous phosphate rock.

The Court has recognized that Commerce's cost buildup methodology should account for the cost differences to mine and beneficiate sedimentary vs. igneous ore.  *See Second Remand Order* at 11 n.9.[10]  The prices on the record for Iranian and Togolese sedimentary-origin beneficiated phosphate rock are so low that even if one were to assume, *arguendo*, that the Iranian and Togolese producers paid nothing for their phosphate mining rights, their cost of

---

[10] At footnote 9 of the *Second Remand Order*, the Court stated:

> There may be an implication which can be drawn from the Remand Results that because Commerce is looking at JSC Apatit's cost buildup, the difference in cost to beneficiate igneous and sedimentary ore into beneficiated phosphate rock is significant because lower beneficiation costs would make JSC Apatit's underlying mining rights more valuable than mining rights for sedimentary ore. . . .  Here, Commerce chose to use JSC Apatit's beneficiated phosphate rock per-unit cost buildup <u>plus profit</u> and compared it to a world market price for comparable phosphate rock. . . .  Accordingly, because Commerce used the price of phosphate rock to compare JSC Apatit's mining rights cost plus profit (i.e., price) substitute, the relative costs to beneficiate igneous and sedimentary ore are not relevant to the current dispute, even if one could determine them.  Assuming <u>arguendo</u>, that ore used by respondent {*sic*} costs less to beneficiate, it would be accounted for in the cost buildup already selected, resulting in a higher potential subsidy than using greater production costs would generate.  Further whatever the value is of the ore input, it is accounted for in the cost buildup.  If it is valuable because of lower beneficiation costs, it results in an overall smaller cost buildup thereby increasing the subsidy determination after comparison of cost plus profit to a world price.

*Second Remand Order* at 11 n.9 (citations omitted) (emphasis original).  Mosaic respectfully submits that the Court's reasoning misconstrues the relevance of differences in costs – both mining and beneficiation costs – to produce phosphate rock.  The record now clearly shows that igneous-origin phosphate rock has overall *higher* production costs, but it also shows that *purchasers'* costs to process beneficiated rock into downstream products such as fertilizer are lower for igneous-origin rock.  The latter fact is a significant difference in quality and price between igneous and sedimentary phosphate rock, and it is not accounted for in the cost buildup.

**Consol. Court No. 23-00239**                                    **NON-CONFIDENTIAL VERSION**

production would still be **[**                                                                **]**.

JSC Apatit also **[**                                                    **]**. *See* Final Results Calculations

for JSC Apatit (Nov. 3, 2023), P.R. 243-244, C.R. 226-227 (*"Final Calculations Memo."*), Att.

2, tab BPI Exhibit SUPP-11 **[**

**]**. Even if one were to subtract from the Iranian and Togolese prices the amounts of

JSC Apatit's mining and beneficiation costs other than the fees paid to the GOR associated with

mining phosphate ore, the result would still be **[**                                    **]**. *See Final Calculations*

*Memo.*, Att. 2, tab BPI Exhibit SUPP-11 **[**

**]**; *id.*, tab BPI Mining Costs **[**

**]**.

Commerce rejected Mosaic's arguments for why this is an illogical result with the facile

conclusion that "the absence of a benefit is a result of comparing world market prices for the

underlying good that is conveyed via the mining rights to JSC Apatit's cost buildup for

beneficiated phosphate rock." Second Remand Determination 21. But Commerce failed to

grapple with the fact that the sedimentary-origin prices it included in the benchmark are **[**

**]** the good conveyed via its mining rights. This is akin to

the scenario where Commerce itself has concluded that using benchmarks in a derived demand

methodology that generate negative results is inherently illogical because it suggests the

underlying right has no value. *See Certain Softwood Lumber Products From Canada: Final*

*Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2023*, 90

BUSINESS PROPRIETARY
INFORMATION REMOVED

**Consol. Court No. 23-00239**                    NON-CONFIDENTIAL VERSION

Fed. Reg. 38,755 (Dep't Commerce Aug. 12, 2025), and accompanying Issues and Decision

Memo., Comment 16.[11]  By including the Iranian and Togolese sedimentary-origin export prices

in the phosphate rock benchmark, the Department fully erased the benefits JSC Apatit received

under the mining rights for LTAR program, despite undisputed record evidence showing that

JSC Apatit sold **[                    ]** of phosphate ore during the POR, which it obtained

effectively for free.[12]  Commerce's decision to include the Iranian and Togolese sedimentary-

origin phosphate rock prices in the benchmark is unreasonable, unsupported by substantial

evidence, and contrary to law.

**III.    CONCLUSION**

For the reasons discussed above, Mosaic respectfully requests that the Court remand for

further consideration.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Wilmer Cutler Pickering Hale and Dorr
LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

</div>

Dated: June 5, 2026                    *Counsel for The Mosaic Company*

---

[11] It also suggests that if sedimentary- and igneous-origin rock were interchangeable, such that JSC Apatit could use sedimentary-origin rock to produce fertilizers (which it cannot), JSC Apatit would be acting in an economically irrational manner by producing the rock in the first place, instead of purchasing rock from Togo or Iran.  The same conclusion follows for **[                                                    ]**. *See* JSC Apatit NFI Submission, Appendix 4.

[12] Commerce acknowledged in the Second Remand Determination that the GOR charges JSC Apatit nothing for the phosphate mining rights or the phosphate rock.  *See* Second Remand Determination at 6.  This cannot be squared with its conclusion that the program conferred no benefit.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this submission complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 8,826 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney)

The Mosaic Company
(Representative Of)

June 5, 2026
(Date)