IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Plaintiff-Intervenor, and ) | |
| Consolidated Plaintiff, and ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Consolidated Plaintiff, ) | |
| v. ) | Consol. Ct. No. 23-00239 |
| ) | |
| UNITED STATES, ) | NON-CONFIDENTIAL |
| ) | VERSION |
| Defendant, ) | |
| ) | Confidential information |
| THE MOSAIC COMPANY, ) | contained on pp. 17-22, |
| ) | 24-26, 28 and pp. 1-3 |
| Defendant-Intervenor and ) | in Exhibit A |
| Consolidated Defendant- ) | has been redacted. |
| Intervenor, and ) | |
| ) | |
| JOINT STOCK COMPANY APATIT, ) | |
| ) | |
| Consolidated Defendant- ) | |
| Intervenor ) | |
| ) | |

## COMMENTS OF THE ARCHER DANIELS MIDLAND COMPANY IN SUPPORT OF COMMERCE'S SECOND REMAND REDETERMINATION

1

Non-Confidential Version

TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     SUMMARY OF COMMERCE'S SECOND REMAND RESULTS ..................... 3

III.    THIS COURT DID NOT AUTHORIZE COMMERCE TO ALLOW
        MOSAIC A THIRD CHANCE TO SUBMIT NEW FACTUAL
        INFORMATION ........................................................................................ 6

IV.     MOSAIC'S NEW FACTUAL INFORMATION FAILED TO
        ESTABLISH THAT PHOSPHATE ROCK PRODUCED FROM
        IGNEOUS ORE ALWAYS COMMANDED A PRICE PREMIUM
        OVER ROCK PRODUCED FROM SEDIMENTARY ORE .............................. 7

V.      MOSAIC'S ANALYSIS OF NFI SUBMITTED BY JSC APATIT AND
        ADM FAILED TO DEMONSTRATE A CONSISTENT PRICE
        DIFFERENCE BETWEEN SEDIMENTARY AND IGNEOUS
        ORIGIN PHOSPHATE ROCK ..................................................................... 16

        A. Mosaic Failed to Adjust Export Prices to Control for Differences in
           the P2O5/BPL Levels of Russian and Togolese Phosphate Rock .............. 17

        B. Mosaic Improperly Cherry-Picked Export Price Data from Two
           Different Reporting Sources ................................................................. 19

VI.     MOSAIC FAILED TO ANALYZE THE EXPORT PRICES FROM
        MOROCCO AND JORDAN THAT JSC APATIT AND ADM
        SUBMITTED OR COMPARE THEM TO RUSSIAN EXPORT PRICES
        AFTER ADJUSTING THEM FOR DIFFERENCES IN BPL CONTENT ...... 20

VII.    MOSAIC'S REMAINING ASSERTIONS CONCERNING AN
        ALLEGED CONSISTENT PRICE DIFFERENCE ARE NOT
        SUPPORTED BY SUBSTANTIAL EVIDENCE .............................................. 22

        A. Mosaic Continues to Erroneously Rely on the 2013 Integer Report .......... 22

        B. Mosaic Has Failed to Discredit the Export Price Information in JSC
           Apatit's Appendix 7 ............................................................................ 24

        C. Mosaic Has Failed to Discredit Commerce's Use of the Togolese
           Export Prices in Its Revised Tier 3 Benchmark Calculation .................... 24

**Non-Confidential Version**

Page

VIII. MOSAIC HAS FAILED TO PROVIDE INFORMATION
CONCERNING THE PRICES THAT IT CHARGED FOR
PHOSPHATE ROCK AND THE COSTS THAT IT INCURRED
TO BENEFICIATE IGNEOUS-ORIGIN AND
SEDIMENTARY-ORIGIN ORE ........................................................................ 28

IX. CONCLUSION ............................................................................................... 30

**Non-Confidential Version**

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                        <u>Page</u>

*Archer Daniels Midland Company v. United States,*
  779 F. Supp. 3d 1349 (Ct. Int'l Trade 2025) ............................................................ 1

*Archer Daniels Midland Company v. United States,*
  816 F. Supp. 3d 1371 (Ct. Int'l Trade 2026) ................................................. 1, 2, 6, 7

*BMT Commodity Corp. v. United States,*
  674 F. Supp. 868 (Ct. Int'l Trade 1987) .................................................................. 8

*Essar Steel Ltd. v. United States,*
  721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) .......................................................... 25

*Essar Steel Ltd. v. United States,*
  678 F.3d 1268 (Fed. Cir. 2012) ............................................................................ 25

*In Re Network Associates, Inc. II Securities Litigation,*
  2003 WL 24051280 (N.D. Cal. 2003) .................................................................... 29

<u>Administrative Determination</u>

*Certain Softwood Lumber Products from Canada: Final Results and Rescission, in
Part, of the Countervailing Duty Administrative Review; 2023,*
90 Fed. Reg. 38,755 (Aug. 12, 2025) ........................................................................ 26

<u>Regulations</u>

19 C.F.R. § 351.511(a)(2)(iii) .................................................................................... 26

<u>Other</u>

Federal Rule of Evidence 201 .................................................................................. 29

**Non-Confidential Version**

## I.    INTRODUCTION

This Court held in *Archer Daniels Midland Company v. United States*, 779 F. Supp. 3d 1349, 1360 (Ct. Int'l Trade 2025) (the *"First Remand Order"* or *"ADM I"*) that the Commerce Department erred when it "constructed a chain of inferences without cited support to reach its conclusion that the benchmark should include only igneous rock." For that reason, it directed Commerce upon remand "to either present record evidence to show that the phosphate rock market is significantly driven by the distinction between sedimentary and igneous rock or to reconstruct the tier three benchmark." *Id.*

Thereafter, in its August 4, 2025 *Final Results of Redetermination Pursuant to Court Remand* ("*First Remand Results*"), Commerce once again erroneously determined that:

> the record shows evidence of significant differences between the two types of reserves for cost items such as capital costs, costs for developing reserves, and energy costs. Although no record evidence allows us to quantify the effect of these cost differences on world market prices, these differences will logically impact the supply of phosphate rock available on the world market from any phosphate rock-producing country, depending on the type of ore available in the country.

*Id.* at 7-8. ECF No. 90-1.

However, in *Archer Daniels Midland Company v. United States*, 816 F. Supp. 3d 1371 (Ct. Int'l Trade 2026) (the *"Second Remand Order"* or *"ADM II"*), this Court rejected Commerce's decision in the *First Remand Results* not to include the export prices of phosphate rock produced from sedimentary ore formations in its calculation of the Tier 3 benchmark. Commerce had once again used this incorrect

1

benchmark to determine the countervailable benefit that the Russian producer, JSC Apatit, received that was attributable to the Russian government's alleged provision of phosphate rock mining rights for less than adequate remuneration.

In support of its opinion, this Court concluded that:

(1) "Commerce has not cited evidence that the difference between ore from igneous or sedimentary sources significantly impacts the world market price of beneficiated phosphate rock," which it termed the "core issue." 816 F. Supp. 3d at 1378.

(2) "Commerce has not pointed to evidence on the record that these purported cost differences significantly drive the export prices of phosphate rock on the world market." *Id.*

(3) Instead, "Commerce extrapolated that a higher cost of production necessarily means that a good will sell at a higher price on the market." *Id.*

(4) "Record evidence indicates that the BPL content of phosphate rock, not whether the rock is produced from sedimentary or igneous ore, drives the prices in the phosphate rock market from whence the benchmark comes." *Id.*

For these reasons and more, the Court concluded that "*Commerce's only remaining option* in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore." *Id.* at 1379. (Emphasis added.) It then remanded the matter "for reconsideration of the phosphate rock benchmark consistent with this opinion." *Id.* at 1381. Thus, the Court made it clear that the

2

existence of a consistent cost of production difference between rock produced from igneous vs. sedimentary ore, even if The Mosaic Company had been able to establish that difference (which it failed to do), would remain irrelevant to Commerce's calculation of the Tier 3 benchmark upon remand.

## II.    SUMMARY OF COMMERCE'S SECOND REMAND RESULTS

Commerce has now complied with the Court's instruction that it calculate the Tier 3 benchmark for the first period of review ("POR") by *including* "world phosphate rock price data that was previously excluded solely based on the distinction between igneous and sedimentary ore." *Second Remand Results* at 2. ECF No. 112-1.[1] The recalculated benchmark incorporated POR export price data for phosphate rock exported from the sedimentary ore producing countries of Togo and Iran with BPL levels comparable to the levels contained in phosphate rock exported from the igneous ore producing countries of Brazil, Finland, and South Africa. This resulted in a determination that "JSC Apatit did not receive a measurable benefit for the provision of mining rights for LTAR program." *Id.*

Commerce reached this conclusion only after giving Mosaic a third chance to submit evidence that supported its repeated assertion that alleged cost of production differences were consistently reflected in world market price differences depending on whether the phosphate rock was produced from igneous or

---

[1] The first period of review encompassed the period from November 30, 2020 through December 31, 2021.

sedimentary ore.[2] Specifically, Commerce, without prior Court authorization, allowed Mosaic to provide new factual information ("NFI"):

> regarding whether phosphate rock with similar bone phosphate of lime (BPL) levels produced from igneous and sedimentary ore reserves have different export prices, or that the difference between ore from igneous or sedimentary ore significantly impacts the world market price of beneficiated phosphate rock.

*See* March 20, 2026 Memorandum from Henry Wolfe, International Trade Compliance Analyst to All Interested Parties, captioned "Request for New Factual Information." *See* second public remand record no. 23 ("2d Pub. RR no. 23"). ECF No. 114-2.

ADM and JSC Apatit protested Commerce's decision to request new factual information but nevertheless submitted NFI in response to Commerce's request.[3]

After reviewing the NFI that the parties submitted, Commerce found that:

(1) "The petitioner's NFI does not demonstrate that phosphate rock market prices are significantly driven by differences in the beneficiation processes of igneous and sedimentary ores." *Second Remand Results* at 8.

(2) Instead, Mosaic's NFI exhibits merely "provide evidence of differences in costs to produce phosphate rock from the two types of reserves." *Id.* at 8-9.

---

[2] Commerce gave Mosaic its first chance during the first administrative review proceeding itself. Commerce gave Mosaic its second chance during the first remand proceeding.

[3] *See, e.g.,* ADM's March 27, 2026 "Response and Objection" to Commerce's request for new factual information. Second confidential remand record no. 10 ("2d Conf. RR no. 10"). ECF No. 114-3.

(3) Mosaic failed to submit any evidence "of separate markets for buyers and sellers of igneous-origin and sedimentary-origin rock (e.g., published prices for separate igneous-origin and sedimentary-origin markets)." *Id.* at 9.

(4) The record, including the NFI submitted by the parties, demonstrated that the "BPL content of rock, not whether the rock is produced from sedimentary or igneous ore, drives the overall prices in the phosphate rock market from whence the benchmark comes." *Id.* at 14.

(5) There was "insufficient evidence on the record to substantiate that the differences in cost of production in the refinement of igneous and sedimentary rock results in fertilizer producers' payment of price premiums for igneous rock that makes its market and pricing distinct from that of sedimentary rock such that sedimentary rock prices are not comparable to igneous rock for Commerce's benchmarking purposes." *Id.* at 16.

(6) "No party, however, has cited evidence of separate published prices for phosphate rock based on the igneous versus sedimentary ore distinction." *Id.* at 17.

Based on these findings and more, Commerce included in its Tier 3 benchmark calculation the export prices of phosphate rock from Togo and Iran with BPL levels comparable to the BPL levels of phosphate rock exported from Brazil, Finland, and South Africa that rock producers in those three countries produced

5

from igneous ore formations. *Id.* at 9, 21. Mosaic now opposes the *Second Remand Results* in its Comments in Opposition to Commerce's Second Remand Redetermination ("Mosaic Opp.").[4] ECF No. 115. (Confidential version.)

## III.  THIS COURT DID NOT AUTHORIZE COMMERCE TO ALLOW MOSAIC A THIRD CHANCE TO SUBMIT NEW FACTUAL INFORMATION

Mosaic asserts that Commerce "exercised its discretion" to reopen the record and direct the parties to submit New Factual Information in response to this Court's *Second Remand Order*. Mosaic Opp. at 2-3. However, Commerce's request for NFI violated the Court's holding that, "*on this record*, Commerce's *only remaining option* in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore." 816 F. Supp. 3d at 1379. (Emphasis added.)

Nevertheless, Mosaic has interpreted the Court's use of the phrase *"on this record"* to allow Commerce to compile an *additional* record. Mosaic Opp. at 3. However, the Court never indicated that it intended to allow Commerce to provide Mosaic with a third opportunity to refute the conclusions that the Court reached in its *First and Second Remand Orders*.[5]

---

[4] ADM herein cites information and argumentation contained in the confidential version of Mosaic's Opposition to Commerce's Second Remand Results. ECF No. 115. All confidential information has been bracketed.

[5] Even if the Court intended to allow Commerce to reopen the record, the NFI that the parties submitted fully supported the conclusions that Commerce ultimately reached in its *Second Remand Results*.

**Non-Confidential Version**

Mosaic twice asserts that this Court's *Second Remand Order* "instructed Commerce to reconsider whether there is evidence that the difference between ore from igneous versus sedimentary sources significantly impacts the world market price of beneficiated phosphate rock." Mosaic Opp. at 3, 4. However, Mosaic's assertions deliberately ignore the Court's holding that "Commerce has not cited evidence that the difference between ore from igneous or sedimentary sources significantly impacts the world market price of beneficiated phosphate rock." 816 F. Supp. 3d at 1378.   Thus, the Court did not provide Mosaic with a third chance to demonstrate that world market prices reflected differences in the source of the ore from which phosphate rock was produced. Rather, the Court rejected Commerce's effort to "extrapolate" the existence of price differences from alleged, but unproven, cost of production differences that Mosaic had submitted. *Id.* at 1377-78.[6]

IV.     **MOSAIC'S NEW FACTUAL INFORMATION FAILED TO ESTABLISH THAT PHOSPHATE ROCK PRODUCED FROM IGNEOUS ORE ALWAYS COMMANDED A PRICE PREMIUM OVER ROCK PRODUCED FROM SEDIMENTARY ORE**

Mosaic first insists that Commerce's "initial analysis" of the comparability of igneous-origin and sedimentary-origin phosphate rock based on differences in production costs was lawful and supported by substantial record evidence. Mosaic

---

[6] Mosaic also asserts that the *Second Remand Results* "fail{ } to grapple with the core question of whether there is any *other* evidence that the distinction between sedimentary and igneous origin rock drives market prices for beneficiated phosphate rock." Mosaic Opp. at 4. (Emphasis in original.) However, the Court never suggested that Commerce could permit Mosaic to search for "other" evidence when Mosaic had failed on two prior occasions to provide that evidence.

Opp. at 1-2. However, the Court has twice rejected this assertion, so it is water under the bridge.

Moreover, Mosaic's continued reliance upon alleged production cost differences constitutes an impermissible request for rehearing, which this Court should reject because Mosaic has failed to satisfy any of the criteria under which rehearing is appropriate. *See, e.g., BMT Commodity Corp. v. United States*, 674 F. Supp. 868, at 869-870 (Ct. Int'l Trade 1987) (After reciting rehearing criteria, court holds that plaintiffs "are not now entitled to a rehearing premised solely on the moving party's dissatisfaction with the trial court's decision.")

Nevertheless, Mosaic claims that a "fundamental flaw" in the *Second Remand Results* is Commerce's finding that "igneous and sedimentary rock are 'interchangeable' as long as the BPL/P2O5 level and price for the purity of the phosphate rock are usable." Mosaic Opp. at 7. However, this claim intentionally ignores the rest of the lengthy discussion in the *Second Remand Results* (at 14-20), which rejected every assertion that Mosaic offered as to why phosphate rock produced from igneous versus sedimentary ore should not be considered interchangeable.

In addition, despite this Court's finding in *ADM II* that the "core issue" was not cost of production differences, but rather, the prices of competing sources of phosphate rock, Mosaic failed to demonstrate that "there is always a premium for

8

**Non-Confidential Version**

the purchase of igneous rock."[7] *Second Remand Results* at 19. To avoid this holding, Mosaic has submitted to the Court a new theory as to why cost of production differences matter.

Specifically, rather than continuing to claim only that differences in the beneficiation costs of igneous ore vs. sedimentary ore generate price premiums for rock produced from igneous ore, Mosaic now asserts that significant and consistent cost of production differences *arise in a fertilizer producer's operations, not in a phosphate rock producer's operations*, depending on whether the fertilizer producer is using rock mined from igneous-origin ore versus from sedimentary-origin ore. Mosaic Opp. at 11.

However, the Court never authorized Mosaic to switch its "cost difference" argument at this late date to allow it to submit NFI concerning alleged "evidence of differences in *downstream processing costs* of igneous vs. sedimentary phosphate rock." *Id.* (Emphasis in original.) In addition, Mosaic's latest "downstream processing cost" argument fails for several reasons.

First, Mosaic has failed to rebut Commerce's finding that substantial evidence showed that "phosphate rock is still interchangeable" when it has comparable P2O5/BPL content and price regardless of the type of ore from which it is beneficiated. *See Second Remand Results* at 18. Nevertheless, Mosaic claims that "igneous-origin rock is higher quality than sedimentary-origin rock, *not because* its

---

[7] In Sections V and VI below, ADM refutes the price comparisons that Mosaic conjured up using NFI submitted by JSC Apatit. *See* Mosaic Opp. at 19-20.

P2O5/BPL level is always higher than the P2O5/BPL level of sedimentary-origin rock, but rather, because of its "low levels of unwanted impurities." Mosaic Opp. at 9.

To support this claim, Mosaic has dredged up information purporting to show only that some "specialized segments" of the *fertilizer industry* may prefer to produce fertilizer from phosphate rock sourced from igneous ore. The allegedly "low levels of unwanted impurities" that this rock contains "commands a price premium even when controlling for phosphate content," i.e. after adjusting prices to account for differences in P2O5/BPL levels. Mosaic Opp. at 9.

Mosaic further contends that these specialized segments consist of fertilizer producers that produce the types of fertilizer called "purified phosphoric acid" and "NP/NPK," which are nitrophosphate based fertilizers. Mosaic Opp. at 14-15. Mosaic discusses these specialized segments in detail while ignoring the origin of phosphate rock consumed by the far larger "non-specialized" segments of the fertilizer industry. Mosaic Opp. at 9-17. For that reason, Mosaic is compelled to minimize the significance of the statement in its own Exhibit 2 to its NFI submission that "88 percent of the demand for phosphate rock is for fertilizer applications where higher purity is not valued." Mosaic Opp. at 14.

Thus, Mosaic's discussion constitutes the tail wagging the dog because it has never demonstrated these "specialized segments" account for a significant volume or value of phosphate rock sales to fertilizer producers. In fact, Mosaic is unable to describe or quantify the size of the specialized segment of the fertilizer production

10

industry that prefers to purchase phosphate rock containing fewer impurities and which allegedly commands a price premium. Accordingly, Commerce had a reasonable basis to determine that substantial evidence did not support Mosaic's claim that *fertilizer producers* always distinguish phosphate rock or the prices they are willing to pay based on the nature, amount, or type of impurities that they contain.

Second, to bolster its effort to distinguish the downstream cost of processing phosphate rock from igneous vs. sedimentary ore in fertilizer plants, Mosaic relies on Exhibits 1-5 to its NFI submission. *Id.* at 9-17. However, none of these exhibits support Mosaic's fertilizer production cost-related claim because:

- Exhibit 1 *does not discuss prices or relative price levels.* 2d Pub. RR nos. 18 and 19.

- Exhibit 2 contains an October 2013 "Feasibility Study" for a Canadian "Project" to produce "high purity apatite concentrate" from igneous ore deposits. However, the study *contains no evidence that the envisioned mining project produced or sold phosphate rock during the 2021 period of review. Id.* Thus, the feasibility study does not contain any POR-related price or price premium information. *Id.*

- Exhibit 3, dated August 2021, *does not contain any price or price premium information pertaining to the POR.* 2d Conf. RR nos. 11-13.

- Exhibit 4, dated February 2017, *does not contain any price or price premium information pertaining to the POR. Id.*

11

- Exhibit 5 addresses the cost of production of *phosphoric acid*, not phosphate rock, and it does not contain information concerning actual prices or price premiums charged for phosphate rock produced from either sedimentary or igneous origin rock.[8] *Id.*

Third, Mosaic claims that Commerce "erroneously conflates interchangeability with substitutability." Mosaic Opp. at 10. Then, Mosaic acknowledges that, although phosphate rock from igneous and sedimentary ore "may technically be interchangeable {they} may nonetheless exhibit limited substitutability." *Id.* Mosaic asserts that it "submitted multiple pieces of evidence that explain in detail how purchasers of beneficiated phosphate rock consider the quality and cost to process sedimentary vs. igneous-origin phosphate rock into downstream products." *Id.* Specifically, purchasers consider "downstream processing costs that purchasers of phosphate rock incur (which the court did not address)." *Id.* at 11.

---

[8] *See* ADM's March 30, 2026 Rebuttal Comments in Response to The Mosaic Company's Submission of New Factual Information (at 3-6) for a detailed explanation of the irrelevance of Mosaic's reliance on its NFI exhibits. Both the confidential and public versions of ADM's Rebuttal Comments appear to have been omitted from the administrative record that Commerce filed on May 20, 2026. ECF No. 114. For example, the public version of ADM's Rebuttal Comments was assigned Barcode 4902514-01, which is shown on Commerce's public docket under Case no. C-821-825. *See* access.trade.gov. This barcode is missing from Commerce's list of public documents. ADM has requested that Commerce add these Rebuttal NFI documents to its lists of Public Documents and BPI Documents. In Mosaic's Opposition Comments here, as well as in its comments on the draft second remand results, Mosaic failed to respond to the deficiencies that ADM previously described, thereby implicitly conceding their lack of merit.

However, Mosaic *never provides evidence concerning what these costs are or how they are reflected in prices during the POR*. Instead, as noted above, Mosaic relies heavily on a June 2013 CRU "Market Outlook and Competitive Position" report for an envisioned Canadian phosphate rock mine called Lac a Paul.[9] Thus, Mosaic substitutes the CRU consulting firm's speculation in 2013 about possible future developments for evidence concerning actual prices or price premiums charged or paid during the POR. *See* Mosaic Opp. at 11-13.

This speculation has no bearing on actual prices that exporters charged for phosphate rock during the POR. Needless to add, Mosaic never explains why this Court should deem a speculative 2013 report as relevant to the prices or price premiums that exporters obtained during the POR.

Fourth, Mosaic relies heavily on Commerce's statement that "there are specialized segments of the phosphate rock market willing to pay a premium price for fewer impurities in igneous rock." Mosaic Opp. at 13. Mosaic lifted this single sentence from Commerce's lengthy discussion of *why the record did not support the conclusion that igneous ore-sourced rock always commanded a price premium over sedimentary ore-sourced rock. See Second Remand Results* at 18-20. In fact, just the opposite is true.

Specifically, Commerce quoted an excerpt from Appendix 1 to Mosaic's own NFI Exhibit 2 in support of its conclusion. As just noted, that Appendix contains a 2013 report from the CRU consulting firm concerning the "Lac a Paul Phosphate

---

[9] *See* Mosaic's NFI Submission, Exhibit 2, Appendix 1. 2d Public RR nos. 11-13.

**Non-Confidential Version**

Project." The Lac a Paul Phosphate Project was a *proposed* Canadian igneous ore mine. That mine had not begun to operate when CRU prepared its report, and Mosaic has never asserted, much less established, that this envisioned "Project" conducted phosphate rock mining or sales operations during the POR. Necessarily, therefore, CRU's analyses concerning possible output, prices, and price premiums were entirely speculative.

In addition, the CRU report, under the caption "Commercial implications," supports Commerce's (and ADM's) position about interchangeability where it states (at 87) that:

> Acid production is ultimately dictated by the P2O5 content of the rock purchased. Fundamentally, therefore, a buyer of rock will pay a higher price for a higher P2O5 content.

The report then discusses the "key question," which was "will the market accord a higher value to Lac a Paul's rock reflecting other aspects of its quality?" *Id.* CRU then concluded that there were two reasons why a buyer *might* be willing to pay a premium above the P2O5 content: (1) the buyer might reduce its variable processing costs or be able to spread those costs over a higher throughput rate; or (2) the buyer might make a higher quality acid that in turn "can be sold for a premium price *in specialized markets.*" (Emphasis added.)

But, CRU then noted that:

> *88% of the demand for phosphate rock is for fertilizer applications where higher purity is not valued. Not all of the remaining 12% of the market will pay a premium price*

***

14

Likewise, the impact of greater throughput on unit costs is *somewhat speculative* because phosphoric acid plants are typically part of a wider chemical processing and fertilizer facility in which phosphoric acid production may not be the actual or strategic bottleneck. Again, *recognition of any premiums requires, in our opinion, at least a letter of intent from a specific plant.*

\*\*\*

Therefore, and at this stage of the development of the project, CRU is recognizing only the value of the acid consumption savings discussed above.

\*\*\*

*The quantum of various value in use premiums and discounts in the phosphate rock industry is not at all transparent . . .* In CRU's opinion, a great deal depends on the circumstances in which a negotiation is conducted.

*Id.* at 87-88. (Emphasis added.)

The following three conclusions flow from CRU's analysis of the possibility that the potential Lac a Paul Project could produce phosphate rock that would command a premium over and above the premium associated with a difference in the P2O5/BPL content: (1) since CRU issued its report in June 2013, it contains no analysis of the actual prices or relative prices of phosphate rock produced from igneous versus sedimentary ore during any period, much less during the POR; (2) CRU's analysis of relative prices in 2013 is irrelevant to actual prices and relative price levels during the POR; (3) CRU expressly acknowledged that it could not quantify the premium, if any, that could be obtained from producing phosphate rock with a higher quality than that associated with differences in P2O5/BPL content.

15

Non-Confidential Version

For these reasons, Commerce found that the CRU report did not support the conclusion that a consistent price premium existed for phosphate rock sourced from igneous ore versus from sedimentary ore. *Second Remand Results* at 8-9 (expressly referencing Mosaic's Exhibit 2 to its NFI submission).

Nevertheless, Mosaic here continues to insist that, based on the CRU report, "No reasonable mind would conclude that evidence of other specialized end uses for igneous-origin rock (such as to make PPA) would preclude the agency from drawing conclusions about how the igneous vs. sedimentary distinction impacts fertilizer producers." Mosaic Opp. at 14. Putting to one side Mosaic's speculation about what a "reasonable mind" would conclude, it has never provided substantial evidence that phosphate rock sellers consistently charged a price premium for igneous-origin rock with a P2O5/BPL level comparable to that of sedimentary-origin rock during the POR.

Finally, Mosaic insists that "the weight of the record evidence" is that a consistent price premium exists and, in support, it cites Exhibits 2, 3, 4, and 5 of its NFI submission. Mosaic Opp. at 14. However, as explained above, none of those exhibits contain evidence supporting the conclusion that a consistent price premium existed during the POR, especially since the documents in those exhibits were prepared well before the start of the POI.

V. MOSAIC'S ANALYSIS OF NFI SUBMITTED BY JSC APATIT AND ADM FAILED TO DEMONSTRATE A CONSISTENT PRICE DIFFERENCE BETWEEN SEDIMENTARY AND IGNEOUS ORIGIN PHOSPHATE ROCK

Mosaic asserts that:

> Commerce unlawfully ignored substantial evidence on the record, including *information submitted by the respondents,* that proves the sedimentary vs. igneous distinction has a significant impact on export prices for phosphate rock, even when controlled for BPI content.

Mosaic Opp. at 19. (Emphasis in original.) In support of that claim, Mosaic provided a Table that consisted of its extraction of a portion of the export price information that JSC Apatit provided in confidential Appendix 7 to its NFI submission and that ADM provided in the Attachment to its own NFI submission. Mosaic Opp. at 19-20. Mosaic asserts that the respondents' NFI purports to show that [

] *Id.* at19. However, Mosaic's Table does not contain "apples to apples" price comparisons for two reasons. Therefore, the Court should disregard it.

### A. Mosaic Failed to Adjust Export Prices to Control for Differences in the P2O5/BPL Levels of Russian and Togolese Phosphate Rock

[

] Mosaic Opp. at 19-20. *See, e.g.,* Mosaic's NFI submission (at 4) quoting the Integer Report's expression of the need to adjust for

---

[10] Mosaic has not challenged ADM's NFI submission statement that comparisons of export prices from different countries need to be controlled for BPL content differences. 2d Conf. RR no. 10. There, ADM stated that "the BPL levels {of phosphate rock sold by exporters in Morocco, Jordan, and Russia} are not identical and, therefore, must be adjusted to reflect the quality difference between the different BPL levels." *Id.* at 2.

17

**Non-Confidential Version**

differences in the higher P2O5 content of igneous rock when comparing prices of igneous rock to prices of sedimentary rock.

[

]

[

]

[

]

[

---

[11] "The phosphate content of the rock is usually expressed as tricalcium phosphate and traditionally referred to as bone phosphate of lime (BPL) (P2O5 × 2.1853 = BPL)." *See* Argus Phosphates Methodology and Specifications Guide, available at: https://www.scribd.com/document/442098115/argus-phosphate-phosphoric-acid-price-metholodogy-pdf.

**Non-Confidential Version**

] For this reason alone, the Court should disregard

[

]

### B. Mosaic Improperly Cherry-Picked Export Price Data from Two Different Reporting Sources

[

]

[

]

[

]

| Month | [ | | ] |
|---|---|---|---|
| | [ | | ] |
| April | [ | | ] |
| May | [ | | ] |
| June | [ | | ] |
| July | [ | | ] |
| August | [ | | ] |

**Non-Confidential Version**

| September | [ | | | ] |
|---|---|---|---|---|
| October | [ | | | ] |
| November | [ | | | ] |
| December | [ | | | ] |

[

]12

## VI.   MOSAIC FAILED TO ANALYZE THE EXPORT PRICES FROM MOROCCO AND JORDAN THAT JSC APATIT AND ADM SUBMITTED OR COMPARE THEM TO RUSSIAN EXPORT PRICES AFTER ADJUSTING THEM FOR DIFFERENCES IN BPL CONTENT

Togo is just one of numerous countries that exported phosphate rock

produced from sedimentary ore during the POR. For example, the one-page

summary worksheet in JSC Apatit's Appendix 7 lists [

]

---

12 Despite Mosaic's claim, JSC Apatit did not submit the export prices [

] *See* JSC Apatit's March 27, 2026 "New Factual Information and Comments in Response to Commerce's Request" at 5-6. 2d Conf. RR nos. 4-9.

**Non-Confidential Version**

[

]

ADM explains how it determined the required BPL adjustment factor in

Exhibit A. [

]

The CRU data set in ADM's Attachment to its NFI submission shows that

[

**Non-Confidential Version**

]

Therefore, the total percentage point BPL quality difference must be multiplied by the [

]

[

]

VII.  MOSAIC'S REMAINING ASSERTIONS CONCERNING AN ALLEGED CONSISTENT PRICE DIFFERENCE ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

   A.  Mosaic Continues to Erroneously Rely on the 2013 Integer Report

---

13 ADM's NFI submission did not list the BPL level of Togolese rock. [

]

22

Non-Confidential Version

Mosaic alleges that the Integer Report "compares the export prices of Moroccan sedimentary rock to the United States to export prices of igneous rock from Russia and South Africa and "concludes that the latter 'have much higher value per unit'" even when "adjusted for the higher P2O5 content of igneous rock." Mosaic Opp. at 21. *See* Exhibit 2, Appendix 2 to Mosaic's NFI submission. However, the Integer Report was prepared in 2013. Moreover, as ADM pointed out in its NFI Rebuttal Comments (at 3):

> none of the information in those reports {in Mosaic's Exhibit 2} has any bearing on the export prices of phosphate rock produced from igneous and sedimentary ore that sellers charged during the POR. Rather, at most, the reports analyze the feasibility of the {Lac A Paul mining} Project based on assumptions about likely prices once the mine became operational, which had not yet occurred by 2021. At most, the CRU report and the Integer report contain unfounded speculation in 2013 as to what market prices might be in subsequent years. Speculation is not evidence. Moreover, here again, Mosaic is forced to rely on assumed cost of production differences, which the Court previously rejected as a basis for the Department's benchmark calculation.

Despite Mosaic's assertion that Commerce failed to address this evidence, Commerce expressly discussed Mosaic's NFI Exhibit 2 in its *Second Remand Results* (at 8-9), and it subsequently stated (at 17) that it was "speculative" to assume that buyers would pay a premium "that is exclusively related to the purity of the phosphate rock."

Mosaic has no rebuttal to Commerce's conclusions. Nor does Mosaic explain why speculation in a 2013 report about possible *future* prices and price premiums in a minor segment of the entire global phosphate rock market was relevant to the situation in 2021. Finally, Mosaic fails to acknowledge that the Lac a Paul mine

23

**Non-Confidential Version**

Project had not yet begun production and sales operations in 2021. For these

reasons, Mosaic's reliance upon the 2013 Integer Report is irrelevant.

### B. Mosaic Has Failed to Discredit the Export Price Information in JSC Apatit's Appendix 7

Mosaic asserts that Commerce should not have relied upon [

]

### C. Mosaic Has Failed to Discredit Commerce's Use of the Togolese Export Prices in Its Revised Tier 3 Benchmark Calculation

Mosaic alleges that the [

] *Id.*

However, Mosaic intentionally ignores the fact that [

24

]

Mosaic has never denied that its own Araxa mine produced phosphate rock with a *lower* P2O5 level than Togo's phosphate rock mines. In fact, Mosaic's Exhibit 1 to its NFI submission states (at 3 and Table A2) that *Mosaic operated the Araxa mine.* Accordingly, Commerce's inclusion of the Togolese phosphate rock prices in the benchmark calculation *was supported by evidence that Mosaic submitted.*[15]

Mosaic also seeks to discredit Commerce's inclusion of the Togolese and Iranian export prices in its benchmark calculation because they appear to be

[                                                                        ] Mosaic Opp. at 26. The Court should reject this argument for the following reasons.

---

[14] See ADM's August 4, 2023 refiled Case Brief (at 12), which quoted Exhibit 9 to Mosaic's benchmark submission. Mosaic's exhibit contained a summary chart listing deposit type and BPL/P2O5 content for phosphate rock exported from Russia, Brazil, Finland, and South Africa.

[15] Although Mosaic relies upon an invalid analysis of Russian and Togolese rock prices that does not account for differences in grade, the benchmark regulation does not require that the benchmark be identical, only comparable. *See Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1294 (Ct. Int'l Trade 2010) (finding two types of iron ore to be sufficiently comparable for a benchmark, even though they were different grades with different iron content). *See also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273-74 (Fed. Cir. 2012) ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue."). The record is uncontroverted that Togolese rock is high-grade, just like Russian rock. Accordingly, Commerce reasonably included high-grade Togolese rock prices in its benchmark calculation.

25

**Non-Confidential Version**

First, Mosaic has not demonstrated that the [

]

Second, Mosaic's [

] The Court has rejected Mosaic's similar effort on

two occasions.

Third, Mosaic has not identified any administrative or judicial case support

[

---

[16] Mosaic does attempt to rely on Commerce's determination in *Certain Softwood Lumber Products from Canada: Final Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2023*, 90 Fed. Reg. 38,755 (Aug. 12, 2025). Mosaic Opp. at 28-29. *See* accompanying Issues and Decision Memorandum at Comment 16, available on Westlaw at:
https://1.next.westlaw.com/Document/I2e75fef1794311f0a139fa3f42147315/View/Fu
llText.html?listSource=Foldering&originationContext=clientid&transitionType=My
ResearchHistoryItem&contextData=%28oc.Search%29&VR=3.0&RS=cblt1.0.

That case involved a respondent's unsuccessful attempt to convince Commerce to use *negative derived prices*, not actual positive prices, to determine the Tier 3 benchmark. Commerce rejected that attempt on the ground that Tier 3 benchmark calculations required the use of values that "are meant to represent fair market value." In contrast here, Mosaic has not claimed that the Togolese prices are

26

]

Fourth, Mosaic primarily relies on the rationale that Commerce erroneously used to reject the use of Togolese and Iranian prices in the *First Remand Results*. Mosaic Opp. at 26. The Court has rejected this rationale.

Fifth, the fact that use of Togolese and Iranian export prices in the benchmark calculation results in a finding that JSC Apatit did not receive a countervailable subsidy is unremarkable. The law does not prohibit this result.

Sixth, Mosaic asserts that Togolese rock is "significantly lower-priced than igneous origin-phosphate rock" according to "the record as supplemented on remand." Mosaic Opp. at 26. This is not breaking news because it is undisputed that ADM submitted Togolese export prices for the POR during the administrative review proceeding. Mosaic never raised its "lower-priced" challenge to Togolese export prices then, so it is untimely now. Moreover, Commerce's rules for calculating Tier 3 benchmarks do not contain an exclusion for export prices that are market-determined but are nevertheless lower than other market-determined prices.

---

either "negative" or "derived." Nor has it claimed that Togo's prices do not represent fair market value. Accordingly, the only case that Mosaic relies upon is irrelevant.

Seventh, Mosaic assets that the [

]

Eighth, in order to avoid the consequences of the Court's holding in the *Second Remand Order*, Mosaic asserts that the "record now shows that igneous-origin phosphate rock has overall *higher* production costs, but it also shows that *purchasers'* costs to process beneficiated rock into downstream products such as fertilizer are lower for igneous-origin rock." Mosaic Opp. at 27, fn. 10. (Emphasis in original.) However, since the record does not contain the production costs for sedimentary-origin ore, the claim lacks substantial evidence. Equally unsupported is Mosaic's claim that purchasers of phosphate rock produced from igneous ore incur lower costs when they convert that rock into phosphate-based fertilizer.

For all these reasons, Commerce reasonably rejected [

] *Second Remand Results* at 21.

## VIII. MOSAIC HAS FAILED TO PROVIDE INFORMATION CONCERNING THE PRICES THAT IT CHARGED FOR PHOSPHATE ROCK AND THE COSTS THAT IT INCURRED TO BENEFICIATE IGNEOUS-ORIGIN AND SEDIMENTARY-ORIGIN ORE

As a publicly traded company, The Mosaic Company is required to annually file Form 10-K with the U.S. Securities and Exchange Commission. Mosaic's SEC

28

Form 10-K for its fiscal year ended December 31, 2021 provides the following information.[17]

- Mosaic was either the sole or joint venture owner and/or operator of: (a) three phosphate rock mines in Florida, which produced from *sedimentary* ore formations; (b) five mines in Brazil, which produced rock from *igneous* ore formations; (c) the Miski Mayo mine in Peru, which produced rock from *sedimentary* ore formations; and (d) a mine in the Kingdom of Saudi Arabia, which produced rock from *sedimentary* ore formations.

- Mosaic's CEO certified in this Form 10-K that: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

After considering the representations of accuracy and completeness that Mosaic provided to the SEC, the following two conclusions are indisputable.

---

[17] Mosaic's SEC Form 10-K is available at: https://stocklight.com/stocks/us/nyse-mos/the-mosaic/annual-reports/nyse-mos-2022-10K-22663018.pdf. Both Federal Rule of Evidence 201 (Judicial Notice of Adjudicative Facts), and case law establish that this Court may take judicial notice of the contents of a Form 10-K. *See, e.g., In Re Network Associates, Inc. II Securities Litigation*, 2003 WL 24051280 (N.D. Cal. 2003) ("Judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'") *Id.* at fn. 3.

First, Mosaic possesses significant information concerning its cost in 2021 to produce phosphate rock from both igneous ore and sedimentary ore formations because it wholly or partially owned phosphate rock mines in four countries that produced millions of tons of phosphate rock in that year. Mosaic did not submit any of this cost information to Commerce in support of its repeated contention that significant cost of production differences existed in the beneficiation processes used for the two different types of ore.

Second, Mosaic sold phosphate rock produced in its mines. Mosaic also consumed an unknown percentage of its phosphate rock production in its own internal production of phosphate fertilizers. Mosaic also purchased phosphate rock from third parties according to its Form 10-K. However, Mosaic failed to disclose to Commerce any of the prices that it paid or the internal transfer prices that it used.

By not disclosing to Commerce the mining costs that it incurred or the prices that it paid for the phosphate rock that it acquired, regardless of the ore formation from which it was sourced, Mosaic was able to contend that the record showed that there were two separate markets for phosphate rock depending on the type of ore formation from which it was mined. The Court should not permit Mosaic to conceal material information bearing directly on the accuracy and completeness of the contentions that it has made.

## IX.    CONCLUSION

For these reasons, the Court should affirm Commerce's *Second Remand Results.*

**Non-Confidential Version**

Respectfully submitted,

/s/ Warren E. Connelly
Warren E Connelly
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760
wconnelly@tradepacificlaw.com

Counsel for Archer Daniels Midland Co.

Date: July 10, 2026

**Non-Confidential Version**

# EXHIBIT A

**Non-Confidential Version**

**Non-Confidential Version**

In the Attachment to its New Factual Information submission, ADM

submitted [

]

[

]

ADM's objective was to determine how much the price per metric ton

increased for each percentage point difference in BPL level. Here, there was [

]

[

1

**Non-Confidential Version**

]

| Period | Price Difference | Weighting Factor* | Wghtd Amount** |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| | | [ | ]**** |

\* The Weighting Factor is the number of weeks for which the Price Difference was in effect.

** The Weighted ("Wghtd") Amount equals the price difference multiplied by the weighting factor.

***Total number of weeks for which price comparisons can be made between Moroccan and Russian rock, as well as between Jordanian and Russian rock.

**** The total of all four Weighted Amounts.

[                                                                            ]

[

          ]

   The next step is to use the adjustment factor to control for the difference in

[

2

] The

result of this adjustment is as follows:

| Period | [ | | | ] |
|---|---|---|---|---|
| | [ | | | ] |
| 4/8/21-5/20/21 | [ | | | ] |
| 5/27/21- 8/12/21 | [ | | | ] |
| 8/19/21-11/18/21 | [ | | | ] |
| 11/25/21- 12/30/21 | [ | | | ] |

The same type of adjustment of the Jordanian average 69% BPL prices to the Russian 83% BPL prices is made by multiplying the 14-percentage point difference in BPL level by $7.27/MT, which equals an adjustment factor of $102/MT for each reported Jordanian price.

The adjustment of the Moroccan 70% BPL prices to the Russian 83% BPL prices is made by multiplying the 13-percentage point difference in BPL level by $7.27/MT, which equals an adjustment factor of $94/MT for each reported Moroccan price.

After each price of Jordanian rock and Moroccan rock listed in ADM's Attachment to its NFI submission is adjusted to control for the differences in their BPL levels compared to the 83% BPL level of Russian rock, *the sedimentary-origin phosphate rock is always priced higher than the igneous-origin phosphate rock in direct contravention of Mosaic's claim that the opposite is true with respect to its comparison of the prices of Russian and Togolese rock.* Thus, Mosaic has failed to establish that a consistent difference exists between always higher priced igneous-origin rock and always lower-price sedimentary-origin rock.

3

**Non-Confidential Version**

## CERTIFICATE OF COMPLANCE

The undersigned certifies that the attached Comments of the Archer Daniels Midland Company, including Exhibit A, contain 8,508 words according to the word count function of the word processing system used to prepare these Comments and, therefore, complies with the maximum word count limitation set forth in CIT Rule 56.2(h)(2) and Chambers Procedures 1(B)(1)(b).

/s/ Warren E. Connelly
Warren E. Connelly