UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, )<br><br>Plaintiff, )<br><br>and )<br><br>JOINT STOCK COMPANY APATIT, )<br><br>Plaintiff-Intervenor, and )<br>Consolidated Plaintiff, )<br><br>and )<br><br>THE MOSAIC COMPANY, )<br><br>Consolidated Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>THE MOSAIC COMPANY, )<br><br>Defendant-Intervenor, and )<br>Consolidated Defendant-Intervenor, )<br><br>and )<br><br>JOINT STOCK COMPANY APATIT, )<br><br>Consolidated Defendant-Intervenor. ) | Consol. Court No. 23-00239<br><br>**PUBLIC VERSION** |

**PLAINTIFF-INTERVENOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S COMMENTS IN SUPPORT OF COMMERCE'S SECOND RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda


HOGAN LOVELLS
CADWALADER US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to JSC Apatit*

July 10, 2026

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................... ii

SUMMARY OF THE ARGUMENT ....................................................................................... 4

I.      THE COURT WAS EXPLICIT AND EXACT IN ITS SECOND REMAND   ORDER
        AND COMMERCE'S SECOND REMAND RESULTS COMPLY WITH THE
        COURT'S INSTRUCTIONS ......................................................................................... 5

II.     COMMERCE'S RECALCULATION OF THE MINING RIGHTS BENCHMARK TO
        INCLUDE WORLD PHOSPHATE ROCK PRICE DATA REGARDLESS     OF
        GEOLOGICAL ORIGIN IS SUPPORTED BY SUBSTANTIAL EVIDENCE     AND
        OTHERWISE LAWFUL ............................................................................................... 7

        A.    The Record is Clear That BPL Levels Drive World Market Prices of
              Phosphate Rock—Not Geological Origin ........................................................... 8

        B.    Mosaic Continues to Advance Cost-Based Arguments That the Court Has
              Already Rejected ................................................................................................. 13

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Archer Daniels Midland Co. v. United States*,
779 F. Supp. 3d 1349 (Ct. Int'l Trade May 6, 2025) ............................................................... 2, 5

*Archer Daniels Midland Co. v. United States*,
816 F. Supp. 3d 1371 (Ct. Int'l Trade Feb. 6, 2026) ......................................................... passim

REGULATIONS

19 C.F.R. § 351.511(a)(2)(iii) .................................................................................................. 4, 18

ADMINISTRATIVE MATERIALS

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:*
*Countervailing Duty Orders*,
86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021)................................................................ 2

**PLAINTIFF INTERVENOR AND CONSOLIDATED PLAINTIFF JOINT STOCK COMPANY APATIT'S COMMENTS IN SUPPORT OF COMMERCE'S SECOND RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Plaintiff Intervenor and Consolidated Plaintiff, Joint Stock Company Apatit ("JSC Apatit"), respectfully submits the following comments in support of the U.S. Department of Commerce ("Commerce" or the "Department") May 6, 2026 Final Results of Redetermination Pursuant to Court Remand for *Archer Daniels Midland Co. v. United States*, Consol. Court No. 23-00239, Slip. Op. 26-10 (Ct. Int'l Trade Feb. 6, 2026), ("*Second Remand Results*") (ECF No. 112-1) (P.R.2 1). 1/ For the reasons set forth below, Commerce's *Second Remand Results* are supported by substantial evidence and are otherwise lawful. JSC Apatit therefore requests that this Court sustain Commerce's *Second Remand Results*.

The *Second Remand* concerns Commerce's final results of its countervailing duty ("CVD") administrative review of phosphate fertilizers from Russia for the period of review ("POR") November 30, 2020, through December 31, 2021. *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ("*Final Results*") (P.R. 246), and accompanying *Issues and Decision Memorandum* (Oct. 31, 2023) ("AR1 Final IDM") (P.R. 242); *see also* Memorandum from Shane Subler to The File, *Final Results Calculations for Joint Stock Company Apatit* (Oct. 31, 2023) ("Final Calculations") (P.R. 243–244; C.R. 226–227). JSC Apatit was the sole mandatory respondent in this review and was assigned a final countervailing duty margin of 28.50 percent in Commerce's final determination. *Phosphate Fertilizers from the Kingdom of*

---

1/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively. References to public and confidential documents in the second remand administrative record for this appeal are identified as "P.R.2" and "C.R.2," respectively.

*Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("CVD Order").

This Court subsequently directed Commerce to address certain issues pertaining to its selection of natural gas and mining rights benchmarks in the underlying administrative review. Regarding the natural gas benchmark, this Court first directed Commerce to explain the comparability of the Kazakh natural gas sales made to third parties and natural gas sales made into Russia employed by Commerce as the benchmark. It further directed that, if Commerce found the sales comparable, it was required to address why relying on sales to a government entity that distorts the market was within the intended meaning of "purchaser" in the regulation, as well as how that fits into the logic of the three-level benchmark scheme. *Archer Daniels Midland Co. v. United States,* 779 F. Supp. 3d 1349, 1367 (Ct. Int'l Trade May 6, 2025) ("*First Remand Order*"). With respect to the mining rights benchmark, this Court instructed Commerce to either (1) incorporate all data on the record that is comparable to Russian phosphate rock, including sedimentary rock sources, or (2) demonstrate using record evidence that sedimentary and phosphate rock have *significantly* different production costs, and that these production cost differences, if they can be shown, *significantly* drive market pricing. *Id.* at 1360.

In the *First Remand Results*, Commerce found Kazakh and Russian natural gas not comparable and instead relied on a tier-three benchmark, and maintained, irrespective of this Court's prior finding, that sedimentary and igneous phosphate rock have significantly different production costs that significantly drive market pricing. *Final Results of Redetermination Pursuant to Court Remand, Archer Daniels Midland Co. v. United States*, Court No. 23-00239, Slip. Op. 25-55 (Ct. Int'l Trade Aug. 4, 2025) ("*First Remand Results*") (ECF No. 90) at 2. Accordingly, Commerce assigned JSC Apatit a duty rate of 49.64 percent. *Id.* at 32.

This Court sustained Commerce's *First Remand Results* in part and remanded in part. *Archer Daniels Midland Co. v. United States,* 816 F. Supp. 3d 1371, 1373 (Ct. Int'l Trade Feb. 6, 2026) ("*Second Remand Order*").  The Court sustained Commerce's use of a tier-three natural gas benchmark.  The Court also concluded that Commerce unreasonably limited the mining rights benchmark solely to the price of phosphate rock known to be from igneous ore deposits and directed Commerce to include world phosphate rock price data that was previously excluded solely based on the unsupported distinction between igneous and sedimentary ore.  *Id.* at 1379.  In the *Second Remand Results*, consistent with this Court's *Second Remand Order*, Commerce constructed a tier-three benchmark for mining rights that included world phosphate rock price data that it had previously excluded solely based on the purported distinction between igneous and sedimentary ore.  *See Second Remand Results* at 22.  Accordingly, notwithstanding the objections of petitioner The Mosaic Company ("Mosaic" or "Petitioner"), Commerce assigned JSC Apatit a duty rate of 22.86 percent.  *Id.* at 22.

In these comments, JSC Apatit supports and incorporates by reference all of Archer Daniels Midland Company's ("ADM's") arguments in its comments brief in support of Commerce's Second Remand Results.  *See* Comments of the Archer Daniels Midland Company in Support of Commerce's Second Remand Redetermination (July 10, 2026) ("ADM Second Remand Comments").  We write separately to emphasize key points pertaining to JSC Apatit's data.

## SUMMARY OF THE ARGUMENT

Commerce's *Second Remand Results* recalculated the tier-three benchmark for the provision of mining rights for less than adequate remuneration ("LTAR") program in compliance with this Court's remand instructions. This Court issued a remand order that was explicit: "on this record, **Commerce's only remaining option in constructing the tier three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore.**" *Second Remand Order*, 816 F. Supp. 3d at 1379 (emphasis added). Commerce complied with the Court's clear instructions in the *Second Remand Results*.

Moreover, Commerce's inclusion of world phosphate rock price data that had previously been excluded solely based on the distinction between igneous and sedimentary ore is supported by substantial evidence and consistent with Commerce's regulations. Commerce reasonably and lawfully weighed the evidence on the record and concluded that "BPL content 'drives prices in the phosphate rock market from whence the benchmark comes.' " *Second Remand Results* at 7. Thus, Commerce correctly recalculated the tier-three benchmark consistent with this Court's *Second Remand Order* to include world phosphate rock price data previously excluded solely on the basis of geological origin (*i.e.*, phosphate rock from Togo and Iran), as well as with Commerce's regulations, 19 C.F.R. § 351.511(a)(2)(iii). Using this corrected benchmark that includes phosphate rock prices from Togo and Iran, Commerce found that the benchmark price does not exceed JSC Apatit's per-unit cost of sales plus profit, and therefore appropriately determined that JSC Apatit did not receive a measurable benefit under the provision of mining rights for LTAR program during the POR. This Court should accordingly sustain Commerce's *Second Remand Results* in full.

4

**I.    THE COURT WAS EXPLICIT AND EXACT IN ITS SECOND REMAND ORDER AND COMMERCE'S SECOND REMAND RESULTS COMPLY WITH THE COURT'S INSTRUCTIONS**

Mosaic contends that Commerce misinterpreted the Court's instructions as "dictating" the outcome of its benchmarking methodology. *See* The Mosaic Company's Comments in Opposition to Commerce's Second Remand Redetermination (June 5, 2026) ("Mosaic Second Remand Comments") (ECF No. 115) at 1-5. To the contrary—Commerce's 22-page *Second Remand Results* were not merely a cursory application of the Court's instructions, as Mosaic alleges. *See id.* They comply with this Court's clear remand instructions: "on this record, Commerce's only remaining option in constructing the tier three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore." *Second Remand Order*, 816 F. Supp. 3d at 1379. In complying with this Court's instruction, Commerce thoroughly considered the record evidence (including newly solicited factual information) and provided reasoned explanations for its decision to rely on both igneous and sedimentary rock in its benchmark price construction. *See generally*, *Second Remand Results*.

The Court never suggested that it intended to provide Petitioner with a *third* bite at the apple to refute the determinations reached in the Court's *First and Second Remand Orders*. Nevertheless, Commerce re-opened the record and solicited New Factual Information ("NFI") from parties regarding the impact of the igneous and sedimentary phosphate rock distinction on global prices during the POR. Memorandum from Henry Wolfe to All Interested Parties, *Remand Redetermination for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021; Slip Op. 26-10: Request for New Factual Information*, (Mar. 20, 2026) (P.R.2 23). That Commerce re-opened the record (without the Court's direction) is further evidence that Commerce did not merely apply this Court's instruction because "it had no option" but really Commerce was determined to make its own

reasoned decision.  As discussed below, even with this NFI, Commerce reasonably concluded that BPL levels rather than geological origin significantly drive world market prices of phosphate rock.

This Court held that, absent record evidence demonstrating that (1) the costs to produce sedimentary and igneous rock differ significantly, and (2) that the distinction was a significant driver of prices in the phosphate rock market, it was unreasonable for Commerce to construct a benchmark based only on igneous rock.  *See Second Remand Order*, 816 F. Supp. 3d at 1377. Notably, the quantity value of Commerce's previously selected benchmark data (and the data for which Mosaic advocates) represents a mere 0.02 percent of the total global production of phosphate rock produced during the POR, and less than 0.12 percent of the total global exports of phosphate rock.  *See* Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia:* JSC Apatit's Benchmark Data Submission, Case No. C-821-825 (First Administrative Review) (Mar. 15, 2023) ("JSCA Benchmark Submission") at App. 9 (P.R. 155; C.R. 191); Letter from Wilmer Cutler Pickering Hale and Dorr to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation*: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration, Case No. C-821-825 (First Administrative Review) (Mar. 15, 2023) at Exh. 5 (P.R. 132).  Mosaic thus advocates for a return to this less representative benchmark, contrary to Commerce's stated practice.  *See* Mosaic Second Remand Comments (ECF 115); AR1 Final IDM at 38 (observing that Commerce's "general practice is to use as robust benchmarks as possible, including in Tier 3 analyses").  This Court should accordingly dismiss Mosaic's attempts to convince Commerce to reject the more representative and robust pricing and export data on the record.

Moreover, as this Court is aware, the record already contains comprehensive world market price, volume, and quality data for the POR sufficient to comply fully with the Court's remand

6

instructions. That data—submitted during AR1 and summarized in the parties' prior briefing—demonstrates that phosphate rock prices are determined by grade (BPL/P2O5 content), not geological origin, and supports a recalculated Tier Three benchmark that includes previously excluded world price data (namely, Togo and Iran). *See* JSCA Benchmark Submission at App. 7-9; JSCA Benchmark Submission at App. 9; Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from Russia:* JSC Apatit's Rebuttal Comments to Petitioner's Benchmark Data Submission, Case No. C-821-825 (First Administrative Review) (Mar. 27, 2023) ("JSCA Benchmark Rebuttal") at App. 10-12 (P.R. 169-171; C.R. 202-203). Commerce therefore already had the data necessary to recalculate the benchmark consistent with this Court's instruction, without the need to solicit NFI. Nevertheless, as discussed below, the *entire* record (including the NFI) supports what this Court has already determined: that it would be unreasonable for Commerce to construct a benchmark based only on igneous rock, as Mosaic requests.

## II. COMMERCE'S RECALCULATION OF THE MINING RIGHTS BENCHMARK TO INCLUDE WORLD PHOSPHATE ROCK PRICE DATA REGARDLESS OF GEOLOGICAL ORIGIN IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE LAWFUL

Commerce thoroughly considered the record evidence before it—including the new factual information submitted by both parties—and correctly determined that grade, not geological origin, drives pricing in the phosphate rock market. The record is abundant with evidence that grade drives market prices—including contemporary pricing data and contracts (to which Commerce reasonably gives greater credence than to feasibility studies, consultant reports, internal assertions, and project-level economics like those submitted by Mosaic. *Second Remand Results* at 17, n.71. Moreover, Mosaic's arguments continue to revolve around cost-based arguments that the Court has already rejected, and that nevertheless do not demonstrate that geological origin drives

phosphate rock pricing in the market.  The Court should therefore sustain Commerce's *Second Remand Results* and its tier-three benchmark constructed with record-data for both igneous and sedimentary ore.

### A.   The Record is Clear That BPL Levels Drive World Market Prices of Phosphate Rock—Not Geological Origin

Mosaic alleges that Commerce unlawfully disregarded evidence that the sedimentary vs. igneous distinction significantly impacts market prices for phosphate rock.  *See* Mosaic Second Remand Comments at 5-17.  But Commerce did not disregard Mosaic's evidence, rather—consistent with the Court's ruling—merely disagreed in light of contrary evidence and concluded that grade, not geological origin, drives phosphate rock prices.  *See Second Remand Results* at 7, 11-21 (addressing the arguments on draft remand from all interested parties).  At Commerce's request, JSC Apatit provided new factual information supporting what the existing record already demonstrated: that once one controls for grade (BPL/P2O5 content), the type of rock (sedimentary or igneous) does not significantly impact world market prices.  *See generally*, Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Joint Stock Company Apatit's New Factual Information and Comments in Response to Commerce's Request*, Case No. C-821-825 (Slip Op. 26-10 Remand – REV) (Mar. 27, 2026) ("JSCA NFI") (P.R. 13-16; C.R.2 4-9); Letter from Hogan Lovells US LLP to the U.S. Department of Commerce, *Phosphate Fertilizers from the Russian Federation: Joint Stock Company Apatit's Rebuttal New Factual Information and Comments in Response to Commerce's Request*, Case No. C-821-825 (Slip Op. 26-10 Remand – REV) (Mar. 30, 2026) ("JSCA Rebuttal NFI") (P.R.2 11).

As a threshold matter, if phosphate rock from sedimentary sources were systematically priced lower than comparable igneous rock, rational purchasers would be expected to source exclusively from the lower-priced material.  The fact that purchasers do not do so—and instead

procure both sedimentary and igneous phosphate rock during the same periods—demonstrates that prices are commercially comparable. *See* JSCA NFI at App. 1-3 (providing EU import volumes as well as GTT data and supporting information demonstrating that there is no market segmentation by ore type, discussed in more detail below).

Pricing data already on Commerce's record for this review demonstrate that phosphate rock is priced based on commercially relevant characteristics such as grade, freight, and contract terms. *See e.g.*, JSCA Benchmark Submission at App. 9; JSCA Benchmark Rebuttal at App. 11, 17. When grade is taken into account, prices converge across sources and suppliers. *See* JSCA NFI at App. 5 (demonstrating that igneous and sedimentary rock are interchangeable once grade is accounted for, and that Togo exports phosphate rock with a level of over 73 BPL or 33.4% P2O5, which is comparable to Russian rock and competitive in the market), App. 7 (demonstrating that phosphate rock prices remain consistent across suppliers regardless of ore type); JSCA Rebuttal NFI at 2. Commerce correctly determined that the evidence submitted by JSC Apatit was "consistent with the Court's ruling that BPL content 'drives prices in the phosphate rock market from whence the benchmark comes.' " *Second Remand Results* at 7. We provide additional specifics underscoring Commerce's analysis below.

First, the record shows that countries source phosphate rock from both igneous and sedimentary sources during the same periods. The absence of market segmentation or switching costs tied to ore type demonstrates that buyers treat the products as interchangeable, undercutting any claim that ore origin drives price differences. In this regard, JSC Apatit provided new factual information specifying (1) market share information for sedimentary and igneous phosphate rock imports into Norway, Romania, and Lithuania, and (2) information on importing companies in Norway, Romania, and Lithuania. JSCA NFI at App. 1-2. These materials link trade data to real-

world purchasing behavior by major fertilizer producers and show that individual buyers routinely procure both igneous and sedimentary origin phosphate rock without differentiation in sourcing strategy, reinforcing that ore type is not a commercially meaningful pricing factor. *Id*. Correspondingly, JSC Apatit also provided evidence that EU fertilizer customers purchase both igneous and sedimentary phosphate rock, and do not segregate suppliers or pricing based on igneous versus sedimentary origin. *Id.* at App 3.

Commerce reasonably considered this record evidence, concluding that "the data shows imports of both sedimentary and igneous-origin phosphate rock varying substantially over the course of a single year, in some instances being entirely sedimentary-origin phosphate rock imports one year and then entirely igneous-origin phosphate rock imports the next." *Second Remand Results* at 18. Mosaic attempts to criticize Commerce's conclusion by claiming that, because there are no prices included in this data, it cannot support Commerce's determination. Mosaic Second Remand Comments at 22-23. But this is simply not true. As Commerce explained, there are no prices needed when the data—as it does here—shows a complete substitution of igneous and sedimentary phosphate rock imports on a year-by-year basis. *Second Remand Results* at 18 (discussing the GTT import data provided by JSC Apatit in its NFI Letter at Appendix 1). Commerce further explained that "record evidence demonstrates it does not preclude a purchaser of phosphate rock to alternatively source sedimentary-origin phosphate rock, if such a price is competitive with igneous-based phosphate rock or is of a similar BPL grade." *Id.* at 15. These purchasing patterns are inconsistent with Mosaic's claims that ore origin materially affects pricing or sourcing decisions.

Second, JSC Apatit supplied a contract between JSC Apatit and one of its customers demonstrating that the industry standard for phosphate rock sales (particularly sales into Europe)

10

is to calculate prices employing a FOB Morocco export price, adjusted for grade (BPL/P2O5 content).  JSCA NFI at App. 4.  Mosaic claims that this contract includes an adjustment to the price demonstrative of a price premium—but as Commerce explained: "the contract does not provide any descriptive indicator that an{y} actual adjustments to the contract are made due to the igneous rock type."  *Second Remand Results* at 16; Mosaic Second Remand Comments at 23-25.  Instead, Commerce explains that this contract demonstrates that prices are negotiated based off of an adjustment for grade (BPL/P2O5 content), and not for igneous vs. sedimentary origin.  *Id*.  JSC Apatit also provided shipping information establishing that the industry standard is to ship phosphate rock employed for fertilizer production by bulk vessel carriers, which demonstrates that fertilizer is traded as a bulk commodity and reinforces that phosphate rock is treated as fungible once specification requirements are met (such that ore origin does not function as a price-determinative factor in actual commercial trade).  JSCA Rebuttal NFI at App. 10.

Third, JSC Apatit provided evidence from trade publications demonstrating that it is not geological origin, but grade level, that drives pricing in the market.  *See* JSCA NFI at App. 5 (providing IFASTAT materials describing the interchangeability of igneous and sedimentary rock once grade has been accounted for); *id.* at App. 7 (providing data on global monthly phosphate rock pricing from leading independent market intelligence providers that does not identify geological origin in their price assessments, but only grade level (BPL/P2O5 content)).  Mosaic alleges that this data demonstrates that the sedimentary versus igneous rock distinction has a significant impact on export prices for phosphate rock, even when controlled for BPL content.  *See* Mosaic Second Remand Comments at 19-22.  But, Mosaic's claimed analysis of this data fails to demonstrate a consistent price difference between sedimentary and igneous rock, including by failing to adjust export prices to control for differences in BPL levels and by cherry-picking data

11

**NONCONFIDENTIAL VERSION**
**CONFIDENTIAL INFORMATION DELETED FROM BRACKETS**

from different reporting sources.  *See* ADM Second Remand Comments at 16-20.  Moreover, ADM correctly draws this Court's attention to the fact that Mosaic failed to analyze the data submitted by JSC Apatit and ADM [

].  *Id.* at Exh. A (referencing JSCA NFI at App. 7 and ADM NFI).

Finally, the record contains evidence from Mosaic itself that grade—not geological origin—drives pricing.  Notably, Mosaic's original petition requested that Commerce include Jordan (a country with sedimentary rock, but high grade) in the original investigation, due to its comparable grade level.  JSCA NFI at App. 6.  In addition, Mosaic's 2024 and 2021 10-K Forms submitted to the Securities and Exchange Commission ("SEC") describe phosphate rock production, valuation, and industry benchmarks, identifying P2O5 as the benchmark used by the industry to evaluate phosphate rock:

> **P2O5 is the key building block** for the production of high analysis or concentrated phosphate crop nutrients and animal feed products and **is the most comprehensive measure** of phosphate capacity and production and a **commonly used benchmark in our industry**.

JSCA Rebuttal NFI at App. 9 (providing Mosaic Form 10-K (2024) at 4 and Mosaic Form 10-K 2021 at 5) (emphasis added).

Moreover, that Mosaic's SEC reports do not discuss geological origin as a pricing determinant or source of market segmentation is particularly probative because annual reports are intended to disclose material pricing and cost drivers.  Mosaic's public disclosures—which must be neither false nor misleading lest Mosaic run afoul of U.S. law and its SEC financial reporting requirements for accuracy—therefore contradict its submitted affidavit [

].  *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to the U.S.

12

Department of Commerce, Phosphate Fertilizers from the Russian Federation: Petitioner's Submission of New Factual Information, Case No. C-821-825 (Slip Op. 26-10 Remand – REV) (Mar. 27, 2026) ("Mosaic NFI") at Exh. 5 (providing a declaration from Mosaic that describes alleged differences in production costs and prices as between igneous and sedimentary phosphate rock).

Evaluating this robust record, Commerce correctly determined that there was "no evidence . . . of separate markets for buyers and sellers of igneous-origin and sedimentary-origin phosphate rock (e.g., published prices for separate igneous-origin and sedimentary-origin markets)." *Second Remand Results* at 9.  To the contrary, as Commerce acknowledged, the record even contains published prices of phosphate rock based on BPL level.  *Id.* at 16-17; JSCA Rebuttal NFI at App. 10 (providing prices such as "{free on board (FOB)} Egypt (66 {BPL})" and "{cost and freight (Cfr)} Southeast Asia (57-61 {BPL})").  These published prices reflect the commercial reality of price being driven by grade, not geological origin.

In short, Commerce's conclusion that prices of phosphate rock are driven by grade (not by geological origin) is amply supported by the evidence and in accordance with law.  Accordingly, the Court should sustain Commerce's *Second Remand Results*.

### B.    Mosaic Continues to Advance Cost-Based Arguments That the Court Has Already Rejected

Mosaic also continues to argue that there is a distinction in world market prices between igneous and sedimentary rock—but Mosaic fails to acknowledge meaningfully this Court's prior decree that grade (BPL/P2O5 content) drives world market price.  *See* Mosaic Second Remand Comments at 5-17.  Rather than submitting contemporaneous, market-based pricing evidence responsive to this Court's concerns, Mosaic again advances a cost- and value-in-use narrative premised on alleged differences between igneous and sedimentary phosphate rock.  *See id.* at

13

11-17.  This approach simply repackages the same erroneous cost-based theories and generalized assertions, as well as the same faulty "reasoning," that this Court has already rejected.

As this Court has already held—and as JSC Apatit explained in its NFI and rebuttal NFI submissions—cost differences and production theories cannot substitute for evidence of actual pricing behavior in the market:

> {C}osts and profitability are not relevant for a tier-three, price-based benchmark if the price is driven by another factor.  Thus, these are not relevant conditions of purchase or sale.  Prices, not costs per se, are what is at issue.  If the BPL content of beneficiated rock drives the world market prices, then only difference in BPL content matters in selecting a benchmark.

*Second Remand Order*, 816 F. Supp. 3d at 1378.  When prices are demonstrably driven by another factor, (such as grade), production costs are not "relevant conditions of purchase or sale" for purposes of a tier-three, price-based benchmark.  *Id.*  Critically, contrary to the Court's instruction, Mosaic was unable to demonstrate that phosphate rock of comparable grade was sold at significant and systematically different prices due to its sedimentary or igneous characteristics—nor could it.

As an initial matter, Mosaic argues that igneous and sedimentary rock are not "interchangeable" because of their levels of unwanted impurities that impose costs for fertilizer production.  Mosaic Second Remand Comments at 7-10.  Notably, Mosaic's cost-based argument has shifted in these remand comments from costs of beneficiation (which it had been arguing previously) to costs of fertilizer production.  *See id.* at 11.  However, at best, Mosaic's purported evidence only demonstrates that certain specialized segments of fertilizer production (those that produce "purified phosphoric acid" and "NP/NPK") care about low levels of unwanted impurities that influence pricing.  *See id*. at 9, 14-15; *Second Remand Results* at 18-19 ("while certain of the petitioner's evidence indicates that there are specialized segments of the phosphate rock market willing to pay a premium price for fewer impurities in igneous rock, the record, including market

14

and pricing data, does not reach the conclusion that the fertilizer market and world prices paid by producers of phosphate fertilizers are affected by this premium"). Moreover, Mosaic's new claim is refuted by evidence that Mosaic itself submitted, which states that "88 percent of the demand for phosphate rock is for fertilizer applications where high purity is not valued." Mosaic NFI at Exh. 2. Mosaic's revised cost arguments accordingly fall flat.

Likewise, none of Mosaic's proffered support (feasibility studies, consultant reports, internal assertions, and project-level economics) establishes how buyers actually behave in the market or how prices are set in arm's-length transactions. *See* Mosaic Second Remand Comments at 10-17. Mosaic does not rebut record evidence showing that buyers contemporaneously source both igneous and sedimentary phosphate rock, often utilizing comparable pricing mechanisms. *See* JSCA NFI at 3, App. 1-2 (providing information for sedimentary and igneous phosphate rock imports into Norway, Romania, and Lithuania, and associated company information, demonstrating that individual buyers routinely procure both igneous- and sedimentary-origin phosphate rock without differentiation in sourcing strategy); App. 3 (supplying 2021 phosphate rock import volumes into the European Union demonstrating that European Union fertilizer customers purchase both igneous and sedimentary rock); App. 7 (demonstrating that globally reported phosphate rock prices remain consistent regardless of ore type, reinforcing that igneous versus sedimentary origin does not drive meaningful price differentiation in the international market). This buyer behavior—plainly established on Commerce's record—is fundamentally inconsistent with Mosaic's claim that geological origin drives pricing outcomes in the market. Mosaic thus fails to demonstrate that any cost differences translate into significant price premiums in real-world transactions during the POR. *See e.g.*, Mosaic NFI at Exh. 1-5 (failing to provide

15

prices or price premiums for igneous vs. sedimentary phosphate rock from the POR). Without that showing, Mosaic's arguments remain theoretical and legally deficient.

Mosaic's carefully selected new factual information and corresponding arguments are equally unable to escape the fact that grade—not geological origin—is the primary driver of purchasing decisions and pricing. For example, Exhibit 1 of Mosaic's submission confirms that there is an overlap between phosphate ore of igneous and sedimentary rock types, that there are varying grades of phosphate rock within igneous and sedimentary classifications, and that *both* igneous and sedimentary rocks can be used to produce high-grade and low-grade phosphate rock. Mosaic NFI at Exh. 1 ("not all sedimentary phosphate ore, however, can be used to attain a high-quality phosphate concentrate . . . {i}gneous ore can generally produce a phosphate concentrate with higher P2O5 after beneficiation . . . although the average P2O5 content of igneous phosphate ore is lower than that of sedimentary phosphate ore"). Exhibit 2 of Mosaic's submission contains a report published in 2013, well prior to the 2021 POR. Its relevance is thus very limited—but it nevertheless confirms that geological origin does not determine pricing. Specifically, the first study attached to the report includes numerous tables describing pricing in relation to P2O5 content, *not* by geological origin. *See id.* at Exh. 2. Mosaic's Exhibit 7 also lists advantages and disadvantages for the following types of phosphate rock: (i) igneous; (ii) sedimentary; (iii) concentrated; (iv) high-grade vs. low grade. Only the last category (high-grade vs. low-grade) mentions pricing: "high-grade rock commands a price premium . . ." *Id.* at Exh. 7. Thus, Mosaic's own submissions prove the fact that price is driven by grade.

Moreover, numerous Mosaic arguments fail to control for grade—thereby rendering them irrelevant. For example, Mosaic cites a record report that sedimentary phosphate rock from Jordan is not comparable to Russian ore—but Mosaic fails to control for the grade of sedimentary ore

16

from Jordan and thereby says nothing about what is driving any difference in comparability between Jordan and Russian phosphate rock. *See* Mosaic Second Remand Comments at 7-8. Mosaic also provides evidence that Moroccan rock is not priced as high as rock from Russia and South Africa, without addressing the fact that the igneous rock has a significantly higher grade (which, unsurprisingly, drives the price). *Id.* at 9-10. Similarly, in an attempt to find *any* evidence of a distinction between phosphate rock prices by geological origin, Mosaic provides a comparison of OCP's sedimentary rock from Morocco to igneous-origin rock from a project in Lac a Paul, Canada (even though Morocco and Canada are not at issue in the present case). *See id.* at 11-13. Mosaic points out that the Canadian rock has a substantial premium over the Moroccan rock—but, again, Mosaic fails to address the difference in *grade* between phosphate rock from each of these countries. *See id.* Indeed, the evidence here is clear that "Lac a Paul concentrates will **sell at a substantial premium over the benchmark Morocco export rock <u>due to it {sic} higher P2O5 content</u>** and its lower acid consumption requirements." Mosaic NFI at Exh. 2, App. A at 86-87 (emphasis added).

Mosaic's entire claim pertaining to the purportedly higher purity of igneous rock compared to sedimentary rock (and its resulting impact on pricing) fails to control for rock grade. Instead, Mosaic appears to erroneously conflate correlation with causation. Because igneous rock often (but not always) has a higher grade than sedimentary rock, Mosaic incorrectly attempts to credit geological origin as being the driver of phosphate rock pricing. But (as Commerce acknowledged), the record demonstrates that Morocco (with only sedimentary rock) exported phosphate rock ranging from "65% BPL and under" to "78% BPL and over" during the POR. *Second Remand Results* at 16, n.66; JSCA Benchmark Submission at App. 9. Commerce's conclusion that igneous

17

and sedimentary rock do not correspond directly to specific BPL ranges of beneficiated phosphate rock supports its finding that BPL level, not rock type, drives phosphate rock pricing.

Moreover, Mosaic argues that because PhosAgro markets its rock as having lower levels of impurities, impurities must be a significant driver of prices. *See* Mosaic Second Remand Comments at 15-18. That there are other factors that distinguish phosphate rock between different countries (including impurity levels) does not detract from Commerce's conclusion that such factors are not a significant driver of prices, once grade has been controlled for.

Indeed, even with every opportunity to add new evidence to the record, Mosaic has pointed to *no evidence* that prices for phosphate rock from Togo and Iran (the countries that Commerce has added to the benchmark comparison per this Court's instruction) are driven by anything other than grade (*i.e.*, no evidence that their rock is less pure than Russian rock, has higher levels of contaminants, etc.). Accordingly, there is simply no reason that Commerce should not include Togo and Iran in its benchmark comparison.

Finally, Mosaic advances arguments that Commerce's calculated benchmark erases any benefits JSC Apatit received for the mining rights for LTAR program. *See id* at 26-29. In so doing, Mosaic makes an argument based purely on outcome—rather than lawfully following Commerce's stated methodology in conducting a tier-three analysis under 19 C.F.R. § 351.511(a)(2)(iii) and conducting a benefit analysis, not on mining rights per se, but rather on the underlying good of phosphate rock. *See Second Remand Results* at 20. As Commerce explained, "the absence of a benefit is a result of comparing world market prices for the underlying good that is conveyed via the mining rights to JSC Apatit's cost buildup for beneficiated phosphate rock, based on data available on the record." *Id.* at 21. Moreover, as set forth in detail in ADM's Second Remand Comments, Mosaic has failed to discredit Commerce's

18

use of the Togolese export prices in its benchmark calculation. ADM Second Remand Comments at 25-27 (citing Mosaic Second Remand Comments at 26). This Court should not find that Mosaic's disappointment with the outcome that Commerce achieves when dutifully following the law is a compelling reason for Commerce to stray from its methodology.

In its *First Remand Results*, Commerce failed to point to *any* record evidence of price differences between igneous and sedimentary phosphate rock—because there was none. *See First Remand Results*. As explained above, even with the additional opportunity to submit NFI, Mosaic has not been able to provide Commerce with any record evidence of price differences between igneous and sedimentary phosphate rock, continuing to advance instead a cost- and value-in-use narrative that this Court has already debunked. *See, e.g.*, Mosaic Second Remand Comments at 8-9. Mosaic's repeated reliance on only cost-based reasoning underscores the weakness of its claim. Commerce has aptly rejected these arguments, in alignment with this Court's reasoning. *See Second Remand Results* at 15-16. This Court should accordingly sustain Commerce's *Second Remand Results*.

## CONCLUSION

Commerce's *Second Remand Results* correctly applied the Court's remand instructions, informed by a fully developed record (including evidence submitted after Commerce afforded Petitioner an additional opportunity to substantiate their claims). That record unequivocally demonstrates that phosphate rock prices are driven by grade, not geological origin, and confirms that JSC Apatit did not receive a countervailable benefit under the provision of mining rights for LTAR program. This Court should therefore sustain the *Second Remand Results* in full.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
H. Deen Kaplan
Maria A. Arboleda

HOGAN LOVELLS
CADWALADER US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6634
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hlc.com

*Counsel to JSC Apatit*

</div>

Dated: July 10, 2026

20

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells Cadwalader US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 5,720 words according to the word-count function of the word-processing software used to prepare the brief.  This is less than the 10,000 words permitted for comments on Remand determinations set forth in SCP 2(B)(1)(b) and CIT Rule 56.2(h).

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

HOGAN LOVELLS
CADWALADER US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hlc.com

July 10, 2026