Slip Op. 26-92

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY,<br><br>    Plaintiff,<br><br>JOINT STOCK COMPANY APATIT,<br><br>    Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>THE MOSAIC COMPANY,<br><br>    Defendant-Intervenor. | Before: Jane A. Restani, Judge<br><br>Consol. Court No. 23-00239<br><br>**Public Version** |

## OPINION AND ORDER

Dated: August 12, 2026

[Sustaining Commerce's final results of its second redetermination pursuant to court remand in the countervailing duty order review of phosphate fertilizers from the Russian Federation.]

<u>Warren E. Connelly</u>, Trade Pacific PLLC, of Washington, DC, for plaintiff, Archer Daniels Midland Company. Also on the brief were <u>Jonathan M. Freed</u>, <u>Kenneth Neal Hammer</u>, and <u>Robert George Gosselink</u>.

<u>Harold Deen Kaplan</u>, Hogan Lovells Cadwalader US LLP, of Washington, DC, for plaintiff-intervenor, Joint Stock Company Apatit. Also on the brief were <u>Jared Rankin Wessel</u>, <u>Jonathan Thomas Stoel</u>, and <u>Maria Alejandra Arboleda Gonzalez</u>.

<u>Sosun Bae</u>, Lead Attorney, Commercial Litigation Branch – Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant, the United States. Also on the brief was <u>Meen Geu Oh</u>. Of counsel on the brief were <u>Emily Elaine Burton</u>, <u>Justin Robert Merhar</u>, <u>Kenneth Garrett Kays</u> and <u>Samuil Oshri Agranovich</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Consol. Court No. 23-00239                                                        Page 2

Alexandra S. Maurer, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, for defendant-intervenor, The Mosaic Company. Also on the brief were David J. Ross, Lindsey A. Ricchi, and Stephanie Ellen Hartmann.

Restani, Judge: This action is a challenge to the final redetermination made by the United States Department of Commerce ("Commerce") pursuant to the court's remand order, see Archer Daniels Midland Co. v. United States, 816 F. Supp. 3d 1371 (CIT 2026) ("Archer Daniels Midland II"). See Final Results of Redetermination Pursuant to Court Remand Order, ECF No. 112-1 (May 6, 2026) ("Second Remand Results"). In Archer Daniels Midland II, the court remanded in part to Commerce to reconstruct its benchmark for the world price of phosphate rock, noting that "on this record, Commerce's only remaining option in constructing the tier-three benchmark is to include world phosphate rock price data that was previously excluded solely on the distinction between igneous and sedimentary ore." Archer Daniels Midland II at 1379. For the following reasons, the court sustains Commerce's Second Remand Results.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in the court's previous opinions ordering remand to Commerce, see Archer Daniels Midland Co. v. United States, 779 F. Supp. 3d 1349 (CIT 2025) ("Archer Daniels Midland I"); Archer Daniels Midland II, and recounts only those facts relevant to the issues currently before the court. On April 7, 2021, Commerce issued a countervailing duty order on phosphate fertilizer imported from Morocco and Russia. See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021). On June 9, 2022, Commerce initiated its review of the order for period of review ("POR") from November 30, 2020, to December 31, 2021. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 35,165 (Dep't Commerce June 9, 2022). Commerce selected Joint Stock Company Apatit ("JSC Apatit"),

Consol. Court No. 23-00239                                                         Page 3

a producer of phosphate fertilizer in Russia, as a mandatory respondent in the review.  Decision Memorandum for the Preliminary Results and Partial Rescission of the Countervailing Duty of Administrative Review; 2020–2021: Phosphate Fertilizers from the Russian Federation at 1, P.R. 188 (Apr. 27, 2023) ("PDM").

Relevant here, in its review, Commerce used a tier-three benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(iii) to assess the Government of Russia's ("GOR") provision of phosphate ore[1] mining rights to JSC Apatit for less than adequate remuneration ("LTAR") and compared JSC Apatit's phosphate rock cost buildup to world market igneous phosphate rock export prices.  Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Russian Federation; 2020-2021 at 16, 29–32, P.R. 242 (Oct. 31, 2023) ("IDM").  On November 6, 2023, Commerce published the final results of its review; it determined the subsidy rate for the mining rights program to be 26.78 percent ad valorem and calculated a total countervailable subsidy rate of 28.50 percent ad valorem.  See Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 76,182, 76,183 (Dep't Commerce Nov. 6, 2023) ("Final Results"); USDOC Final Calculation Memo – JSC Apatit, Attach. 2, C.R. 226–27, P.R. 243–44 (Nov. 3, 2023).

On May 6, 2025, the court remanded in part the Final Results as unsupported by substantial evidence.  Archer Daniels Midland I at 1360, 1367.  The court held in relevant part that Commerce unreasonably excluded sedimentary-origin phosphate rock from its benchmark because it failed to demonstrate that the difference in beneficiation processes of sedimentary- and igneous-origin

---

[1] Phosphate fertilizer is created from beneficiated phosphate rock, which is created from phosphate ore.  Letter from Hogan Lovells, JSC Apatit Benchmark, App.  7 at 15, C.R. 179, 182–91, P.R. 143, 146–55 (Mar. 15, 2023) (the "Davis Report").

Page 4

phosphate rock has a significant impact on the market price of phosphate rock.  Id. at 1360.  The

court directed Commerce either to cite record evidence to support its benchmark or to reconstruct

its benchmark.  Id.  On remand, Commerce maintained its phosphate rock benchmark.  Final

Results of Redetermination Pursuant to Court Remand Order, ECF No. 90-1 (Aug. 4, 2025) ("First

Remand Results").

On February 6, 2026, the court remanded in part Commerce's First Remand Results as

unsupported by substantial evidence.  Archer Daniels Midland II at 1379, 1381.  The court held

that Commerce unreasonably excluded sedimentary-origin phosphate rock from its benchmark

based on its conclusion that the different costs to beneficiate igneous and sedimentary ore into

phosphate rock will logically impact world market prices for phosphate rock.  Id. at 1377–79.  The

court reasoned that "[i]f the BPL [bone phosphate of lime[2]] content of beneficiated rock drives the

world market prices, then only difference in BPL content matters in selecting a benchmark," and

that "Commerce has not cited evidence that the difference between ore from igneous or

sedimentary sources significantly impacts the world market price of beneficiated phosphate rock."

Id. at 1378.  The court clarified that absent new record evidence, "Commerce's only remaining

option . . . is to include world phosphate rock price data that was previously excluded solely on

the distinction between igneous and sedimentary ore" in its benchmark.  Id. at 1379.

On remand, Commerce requested parties to provide new factual information ("NFI")

addressing whether the difference between igneous ore and sedimentary ore significantly impacts

the world market price of phosphate rock.  Letter from USDOC to Interested Parties Pertaining to

---

[2] The fertilizer industry uses the terms "BPL content" and "$P_2O_5$ content" (phosphorus pentoxide)
to refer to the grade of phosphorus rock and its suitability for processing into phosphate fertilizer.
Letter from WilmerHale, Mosaic Benchmark, Ex. 21 at 436–37, P.R. 132–33, 136, 138 (Mar. 15,
2023).

Interested Parties Request for New Factual Information, P.2.R.R. 23 (Mar. 20, 2026).  Petitioner

and consolidated defendant-intervenor The Mosaic Company ("Mosaic"), respondent and plaintiff

Archer Daniels Midland Company ("ADM"), and mandatory respondent and plaintiff-intervenor

JSC Apatit submitted NFI responsive to Commerce's request.  Letter from Wilmer Cutler

Pickering Hale and Dorr LLP to Sec of Commerce Pertaining to Petitioner New Factual

Information Submission, C.2.R.R. 11–13. P.2.R.R. 18–19 (Mar. 27, 2026) ("Mosaic NFI

Submission"); Response from Trade Pacific PLLC to Sec of Commerce Pertaining to ADM

Benchmark Data for Phosphate Rock, C.2.R.R. 10, P.2.R.R. 17 (Mar. 27, 2026); Letter from

Hogan Lovells US LLP to Sec of Commerce Pertaining to JSC Apatit, C.2.R.R. 4–9, P.2.R.R. 13–

16 (Mar. 27, 2026) ("JSC Apatit NFI Submission"); Letter from Hogan Lovells US LLP to Sec of

Commerce Pertaining to JSC Apatit Rebuttal Factual Information, P.2.R.R. 9 (Apr. 9, 2026).

On May 6, 2026, Commerce filed the Second Remand Results.  See Second Remand

Results.  Commerce concluded that the record evidence (inclusive of the parties' NFI submissions)

demonstrates that the world market price of phosphate rock is driven by BPL content.  Id. at 6–9.

Commerce accordingly reconstructed the tier-three benchmark to include world sedimentary-

origin phosphate rock price data from Iran and Togo that previously were excluded solely based

on the distinction between igneous and sedimentary ore.  Id. at 2, 11.  Specifically, Commerce

compared the calculated per-unit cost buildup for JSC Apatit to the benchmark per-unit price of

phosphate rock.  Id. at 10.  Commerce calculated that JSC Apatit did not receive a measurable

benefit for the provision of mining rights for LTAR, which resulted in a total subsidy rate of 22.86

percent ad valorem for JSC Apatit for the POR.  Id. at 2, 10–11.

On June 5, 2026, Mosaic filed comments challenging the Second Remand Results as

unreasonable.  The Mosaic Company's Comments in Opp'n to Commerce's Second Remand

Consol. Court No. 23-00239                                                           Page 6

Redetermination, ECF No. 115 (June 5, 2026) ("Mosaic Cmts."). On July 10, 2026, ADM, the

government, and JSC Apatit filed comments in support of the Second Remand Results. Comments

of the Archer Daniels Midland Company in Supp. of Commerce's Second Remand

Redetermination, ECF No. 121 (July 10, 2026) ("ADM Cmts."); Def.'s Comments in Supp. of

Remand Redetermination, ECF No. 123 (July 10, 2027) ("Gov't Cmts."); Pl.-Intervenor and

Consolidated Pl. Joint Stock Company Apatit's Confidential Comments in Supp. of Commerce's

Second Results of Redetermination Pursuant to Court Remand, ECF No. 125 (July 10, 2026) ("JSC

Apatit Cmts.").

## DISCUSSION

Mosaic argues that Commerce unreasonably analyzed the record evidence and unlawfully

disregarded evidence that detracts from Commerce's conclusion that BPL content drives prices in

the phosphate rock market. Mosaic Cmts. at 5. In Mosaic's view, the evidence shows that igneous-

and sedimentary-origin phosphate rock are not interchangeable products because igneous-origin

deposits have lower levels of unwanted elements, "some of which cannot be removed during the

beneficiation process." Id. at 6–9 (citing Mosaic NFI Submission, Ex. 5). Mosaic contends that

buyers pay a premium for igneous-origin phosphate rock because, relative to sedimentary-origin

phosphate rock, processing igneous-origin phosphate rock into downstream products such as

phosphate fertilizer is less costly. See id. at 9–17. Mosaic adds that the record evidence does not

support Commerce's conclusion that there are no price differences between igneous- and

sedimentary-origin phosphate rock.[3] See id. at 17–25.

---

[3] Mosaic also argues that Commerce's benchmark is unreasonable because the prices for Togolese
and Iranian sedimentary-origin beneficiated phosphate rock are [[
                                                        ]], meaning Commerce's benchmark
comparison fails to account for differences in the production processes of igneous versus
sedimentary phosphate rock. Mosaic Cmts. at 26. The government and JSC Apatit respond that

Consol. Court No. 23-00239                                                     Page 7

ADM, JSC Apatit, and the government respond that Commerce adequately demonstrated that, even if there might be a premium on igneous-origin phosphate rock for some purposes due to lower refinement costs, the record evidence reflects that purchasers still consider sedimentary-origin phosphate rock with similar BPL content as an alternative because BPL content ultimately drives the market price. See ADM Cmts. at 8; JSC Apatit Cmts. at 7; Gov't Cmts. at 11. Specifically, JSC Apatit notes that the pricing data on the record demonstrate that prices converge across sources and suppliers when taking into account the BPL grade of the rock. JSC Apatit Cmts. at 9. ADM, JSC Apatit, and the government contend that Mosaic makes a new argument that there are downstream processing cost differences for purchasers of igneous versus sedimentary phosphate rock, but that these purported cost differences, for which Mosaic proffers no evidence, stem from specialized segments of the fertilizer industry.[4] ADM Cmts. at 9–10, 13; JSC Apatit Cmts. at 14–16; Gov't Cmts. at 13. JSC Apatit adds that "the absence of market segmentation or switching costs tied to ore type demonstrate that buyers treat the products as interchangeable" and that the Global Trade Tracker ("GTT") data, although it does not include

---

the [[        ]]      of Togolese and Iranian phosphate rock do not render Commerce's benchmark unreasonable because Commerce is not always required to find a benefit stemming from a financial contribution provided by a foreign government. Gov't Cmts. at 19–20; JSC Apatit Cmts. at 18–19; see ADM Cmts. at 26–27. As the court has already explained, "because Commerce used the price of phosphate rock to compare to JSC Apatit's mining rights cost plus profit (i.e., price) substitute, the relative costs to beneficiate igneous and sedimentary ore are not relevant to the current dispute." Archer Daniels Midland II at 1378 n.9. Accordingly, Mosaic's argument on this point fails.

[4] Mosaic cites a document titled [[



]].          Mosaic Cmts. at 10, 18, 25; Mosaic NFI Submission, Ex. 3 at 5. As the court discusses in more detail, the evidence presented by Mosaic does not suggest that these dynamics significantly drive prices in the phosphate rock market.

prices, shows complete substitution of igneous and sedimentary phosphate rock imports on a year-by-year basis.  JSC Apatit Cmts. at 9–10.

Commerce finds a countervailable subsidy by showing that an authority provided a financial contribution to a recipient and thereby conferred a benefit unto the recipient.  19 U.S.C. § 1677(5)(B).  When the financial contribution in question is a good or service, a benefit is normally considered conferred if the good or service is provided for LTAR.  Id. § 1677(5)(E)(iv).  Commerce determines whether remuneration is adequate by comparing the price paid by the recipient to a market-determined benchmark price.  19 C.F.R. § 351.511(a)(2).  In doing so, Commerce must consider prevailing market conditions—including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale"—for the good or service in question in the country under review.  19 U.S.C. § 1677(5)(E)(iv).  Commerce determines the amount of the subsidy by comparing remuneration actually paid to a market-determined benchmark price for the goods.  Commerce employs a "three-tiered hierarchy to determine the appropriate remuneration benchmark."  Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316, 1332 (CIT 2018); see also 19 C.F.R. § 351.511(a)(2)(i)–(iii).

For a "tier-one benchmark," Commerce compares "the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  19 C.F.R. § 351.511(a)(2)(i).  "If there is no useable market-determined price," Commerce constructs a tier-two benchmark "by comparing the government price to a world market price where it is reasonable to conclude that [a world market] price would be available to purchasers in the country in question."  Id. § 351.511(a)(2)(ii).  "If there is no world market price available to purchasers in the country in question," Commerce "assess[es] whether the government price is consistent with market principles."  Id. § 351.511(a)(2)(iii).  If it is not, Commerce

Consol. Court No. 23-00239                                                                Page 9

constructs an external benchmark to which it compares the government price. <u>Canadian Solar Inc.</u>

<u>v. United States</u>, 537 F. Supp. 3d 1380, 1389 n.6 (CIT 2021).

The GOR owns all subsoil resources in the Russian Federation, meaning companies such

as JSC Apatit must obtain a license from the GOR to extract them. <u>IDM</u> at 14.  Commerce

determined that, in selling mining rights to JSC Apatit, the GOR provided JSC Apatit with "a

financial contribution in the form of a provision of a good within the meaning of [19 U.S.C.

§ 1677(5)(D)(iii)]." <u>PDM</u> at 19.  Because there are neither private-market prices for mining rights

in Russia nor world market prices that would be available to purchasers in Russia, Commerce

constructed a tier-three benchmark. <u>PDM</u> at 19–20; <u>IDM</u> at 30.  Commerce conducted the benefit

analysis based not on the value of the mining rights <u>per se</u>, but by analyzing whether the value of

the acquired good ultimately obtained via the mining rights was market-based.  Second Remand

Results at 6.  "To do so, Commerce compare[d] the constructed price of the underlying good that

is [ultimately] conveyed via the mining rights, <u>i.e.</u>, phosphate rock, to a world market price for

phosphate rock under a tier three analysis . . . ." <u>Id.</u>

In the Second Remand Results, Commerce constructed a tier-three benchmark to include

world phosphate rock price data that previously was excluded solely based on the distinction

between igneous and sedimentary ore. <u>Id.</u> at 2.  Commerce considered the NFI on the record and

concluded that the evidence submitted by JSC Apatit was consistent with the court's conclusion

on the previous record that BPL content drives prices in the phosphate rock market. <u>Id.</u> at 7.

Commerce concluded that "there is insufficient information on the record to substantiate that the

differences in cost of production in the refinement of igneous and sedimentary rock results in

fertilizer producers' payment of price premiums for igneous rock that makes its market and pricing

distinct from that of sedimentary rock such that sedimentary rock prices are not comparable to

igneous rock [prices] for Commerce's benchmarking purposes." Id. at 15–16.  Commerce added

that "no party [] has cited evidence of separate published prices for phosphate rock based on the

igneous versus sedimentary ore distinction." Id. at 17.  Commerce recalculated the benchmark to

include export data of phosphate rock from both igneous and sedimentary reserves with BPL

content levels similar to the BPL content levels of the phosphate rock produced by JSC Apatit.[5]

Id. at 9.  Commerce relied on export prices from the Global Trade Atlas ("GTA") database and the

United Nations ("UN") Comtrade database for Finland, Brazil, South Africa, Iran, and Togo for

Harmonized System codes 2510.10 and 2510.20.  Id. at 9–10.  Consequently, Commerce's only

change to the benchmark was to include sedimentary-origin phosphate rock from Iran and Togo

in the benchmark prices.  Id. at 11.

Commerce's tier-three benchmark is adequately supported.  Commerce exercised its

discretion to request NFI[6] and reasonably concluded from the record evidence that phosphate rock

---

[5] The court observes that the price data Commerce used for phosphate rock from igneous ore in its previous determination "reflected only a tiny percentage of global phosphate rock exports because it chose to exclude any data for sedimentary phosphate rock." Archer Daniels Midland I at 1360; see Archer Daniels Midland II at 1377, 1379.

[6] ADM argues that the court did not authorize Commerce to allow Mosaic a third chance to submit new factual information.  ADM Cmts. at 6–7; JSC Cmts. at 5 ("The Court never suggested that it intended to provide [Mosaic] with a third bite at the apple to refute the determinations reached in the Court's First and Second Remand Orders.").  The decision to reopen the administrative record and evaluate new evidence, however, is generally within Commerce's discretion.  See, e.g., NTN Bearing Corp. of Am. v. United States, 25 CIT 118, 124, 132 F. Supp. 2d 1102, 1107 (2001) ("As long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data."); see also Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1382 (Fed. Cir. 2003) ("Whether on remand the Commission reopens the evidentiary record, while clearly within its authority, is of course solely for the Commission itself to determine.").  The court did not prohibit Commerce from reopening the record.  See Archer Daniels Midland II at 1379.  Commerce accordingly did not err in requesting NFI.  Mosaic notes that because parties supplemented the record with NFI, the court's holding in Archer Daniels Midland II did not preclude Commerce from categorically excluding price data pertaining to sedimentary-origin phosphate rock from its benchmark.  Mosaic Cmts. at 3.  Also, as the government notes, Commerce did not reconstruct its benchmark because it was required to do so, but rather because the newly supplemented record suggested that BPL content is the main

market prices are not significantly driven by the difference in beneficiation processes of sedimentary and igneous rock. See Second Remand Results at 21. Mosaic argues that igneous and sedimentary-origin beneficiated phosphate rock are not interchangeable to fertilizer producers, but it has not pointed to any record evidence demonstrating that, when controlling for BPL content, there is a meaningful difference in the export price of igneous and sedimentary-origin phosphate rock.[7]

To support its contention that the phosphate rock market is in fact driven by the difference between igneous and sedimentary-origin phosphate rock, Mosaic points to evidence in its NFI Submission which, in relevant part, includes: a declaration from one of Mosaic's executives stating that beneficiated phosphate rock of igneous origin typically commands a price premium as compared to beneficiated phosphate rock of sedimentary origin of the same BPL content, see Mosaic NFI Submission, Ex. 5; a study in support of the feasibility for a mining company's development of the Lac a Paul phosphate rock deposit in Canada which, among other observations, notes that "even when adjusted for higher $P_2O_5$ content of igneous rock . . . , the igneous price is higher than sedimentary rock due to higher purity," Mosaic Cmts. at 21 (citing Mosaic NFI Submission, Ex. 2, App. 2 at 16); and another study on the market outlook for the development of the Lac a Paul phosphate project which lists "two reasons why a chemical plant will be willing to

driver of world market prices for phosphate rock. Gov't Cmts. at 6–7. Accordingly, Commerce did not misconstrue the court's order.

[7] Mosaic points to a portion of JSC Apatit's Benchmark Submission, which it argues demonstrates that the two types of phosphate rock are not interchangeable to fertilizer producers. Mosaic Cmts. at 8–9 (citing Letter from Hogan Lovells US LLP to Sec of Commerce Pertaining to JSC Apatit Benchmark, App. 7 at 37, C.R. 178–91, P.R. 142–55 (Mar. 15, 2023) ("JSC Benchmark")). Yet, this source discusses the quality of the sedimentary and igneous ore deposits. See JSC Benchmark, App. 7 at 37. Any difference in the quality of the ore is relevant only to the costs to produce phosphate rock, which the court has already addressed. See Archer Daniels Midland II at 1378 n.9.

pay a premium over and above the $P_2O_5$ value of a higher grade ore."[8]  Mosaic Cmts. at 11 (citing Mosaic NFI Submission, Ex. 2, App. 1 at 87).  Yet, even setting aside the arguments that the other parties raise about the probative value of this evidence, Mosaic has not shown that the only reasonable conclusion from the record evidence is that the phosphate rock market is significantly driven by the distinction between igneous- and sedimentary-origin phosphate rock in addition to BPL content.  See Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1385 ("An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." (citation omitted)).  Critically, Mosaic has not pointed to export price data demonstrating that anything other than BPL content significantly drives the market price of phosphate rock.[9]  Commerce thoroughly considered the record evidence, see Second Remand

---

[8] Mosaic also cites a [[                                                                                    ]] which, Mosaic argues [[
        ]].      Mosaic Cmts. at 23–24 (citing JSC Apatit NFI Submission, App. 4 at 87).  The government and JSC Apatit respond that nothing on the face of the contract indicates that the noted adjustment is related to the rock being of igneous origin.  Gov't Cmts. at 18; see JSC Apatit Cmts. at 10–11.  As Commerce explained in the Second Remand Results, "the contract does not provide any descriptive indicator that an [sic] actual adjustments to the contract are made due to the igneous rock type," Second Remand Results at 16, and Mosaic's assertion is repetitious of the same unsubstantiated claim it presented to Commerce.

[9] Mosaic presents a table that compares export prices of Russian igneous-origin phosphate rock to Togolese sedimentary-origin phosphate rock.  See Mosaic Cmts. at 19–20. The government responds that the table does not include a direct comparison of BPL percentages because [[

                                                ]],      the table compares data from [[
    ]],      and the datasets involve different reporting intervals (weeks and months).  Gov't Resp. at 16.  ADM responds that this table fails to include comparisons of Russian data to the data of other countries that exported phosphate rock from sedimentary ore during the POR, which includes [[                                                ]].      ADM Cmts. at 20 n.12 (citing JSC Apatit NFI Submission, App. 7).  ADM argues that, [[

                                                ]]      Id. at 21.  A reasonable mind could conclude that this table does not accurately portray the data as it compares phosphate rock of different BPL contents, presents the Russian values in weekly intervals and the Togolese values in

Consol. Court No. 23-00239                                                                 Page 13

Results at 6–9, 14–20, and provided a reasoned explanation for its decision to include Iranian and

Togolese export prices in its benchmark.  The court therefore sustains Commerce's Second

Remand Results.

**CONCLUSION**

For the foregoing reasons, Commerce's Second Remand Results, ECF No. 112-1, is

sustained.  Judgment will be entered accordingly.

      /s/ Jane A. Restani

Jane A. Restani, Judge

Dated: August 12, 2026
      New York, New York

---

monthly intervals, and only compares one exporter sample of each type of phosphate rock.  <u>See</u>
<u>id.</u>  The table is therefore not probative of a market price driver other than BPL content.